**EXHIBIT 3**

EEOC v. Publix Super Mkts., Inc., No. 3:17-cv-1308, 2020 BL 317759 (M.D. Tenn. Aug. 20, 2020), Court Opinion

**Pagination**
*   BL

**Majority Opinion** >

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, v. PUBLIX SUPER MARKETS, INC., Defendant.

NO. 3:17-cv-1308

August 20, 2020, Filed

## BNA Headnotes

### FAIR EMPLOYMENT PRACTICES

**SUMMARY**

**[1] Religious Accommodation**
The EEOC, which is bringing a lawsuit on behalf of an unsuccessful Rastafarian job seeker, is entitled to a trial on a claim that Publix Super Markets Inc. unlawfully told the applicant that he would need to cut off his dreadlocks to work in a Nashville store, a federal district court in Tennessee ruled, citing taped phone conversations. A jury must also decide whether the applicant's refusal to cut his hair manifests a sincere religious belief protected under Title VII, the court said, and whether he informed Publix of the conflict between his religion and its work rule forbidding male employees to wear hair reaching their shirt collar.

For Equal Employment Opportunity Commission, Plaintiff: Faye A. Williams, Roslyn N. Griffin, Equal Employment Opportunity Commission (Memphis Office), Memphis, TN; Rachel V. See, Equal Employment Opportunity Commission, Washington, DC.

For Publix Super Markets, Inc., Defendant: Edmund J. McKenna, Ogletree, Deakins, Nash, Smoak & Stewart,



P.C. (FL), Tampa, FL; Taylor B. Mayes, Butler Snow LLP (Nashville), Nashville, TN; Wendy V. Miller, Ogletree, Deakins, Nash, Smoak & Stewart, P.C. (Nashville), Nashville, TN.

ELI RICHARDSON, UNITED STATES DISTRICT JUDGE.

ELI RICHARDSON

**<u>MEMORANDUM OPINION</u>**

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. No. 85, "Plaintiff's Motion") and Defendant's Motion for Summary Judgment (Doc. No. 88, "Defendant's Motion"). Each party has filed both a response in opposition to the other party's motion and a reply in support of its own motion, in accordance with the Local Rules of Court and the Federal Rules of Civil Procedure.

**<u>BACKGROUND</u>** [1]

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), is the agency of the United States charged with the administration, interpretation, and enforcement of Title VII of the Civil Rights Act of 1964 (" Title VII"). Plaintiff brought this action, pursuant to **42 U.S.C. § 2000e-5(f)(1)** and **(3)** , as a result of a charge of employment discrimination brought by Guy Usher against Defendant, Publix Super Markets, Inc. ("Publix"). Usher asserted in his EEOC charge, and Plaintiff alleges herein, that Defendant refused to provide Usher a religious accommodation and constructively discharged him from his employment.

Usher, an African American male resident of Nashville, Tennessee, contends that he practices Rastafarianism, including the Rastafarian practices of prayer, non-consumption of alcohol and pork, and maintaining his hair in dreadlocks. On January 9, 2017, Usher applied and was interviewed for a part-time position at Defendant's store on Harding Pike in Nashville. At the conclusion of the interview, Defendant's Assistant Store Manager, Ms. McKee, told Usher he would have to cut his hair to work at Publix.[2] Plaintiff claims that Usher informed McKee that he could not cut his hair, because it was against his religion, and that he asked whether he could wear his hair inside a hat. Plaintiff alleges that McKee responded that she would have to check and get back to him.

Plaintiff alleges that on January 10, 2017, Defendant (through McKee) offered Usher employment as either a cashier or a produce clerk. Plaintiff asserts that McKee also informed Usher that Publix could not accommodate his religious beliefs by allowing an exception to its Appearance Standards (hereinafter, "grooming policy"), which prohibit male employees from wearing their hair longer than the collars of their shirts. Plaintiff claims that Usher initially refused Publix's offer of employment but later called back and accepted the part-time [*2] produce clerk position. Plaintiff alleges that Usher referenced his religion and equal-employment-opportunity laws and asked again whether Publix would still require him to cut his hair. Plaintiff avers that Defendant, through McKee, reiterated that Publix would require him to cut his hair. Plaintiff contends that several days later, Usher called Defendant's store and spoke with its Customer Service Manager, Ms.

Johnson. Plaintiff asserts that Usher told her that he felt uncomfortable cutting his hair, for religious reasons. Plaintiff alleges (in the Complaint)₃ that Johnson asked whether Usher wanted Publix to withdraw its offer of employment, and that Usher said yes.

Plaintiff alleges that Defendant's withdrawal of its offer of employment amounted to constructive discharge and that its practice of refusing to provide accommodation for his religious beliefs deprived Usher of equal employment opportunities, was intentional, and was malicious or undertaken with reckless indifference to the federally protected rights of Usher.

In Plaintiff's Motion, Plaintiff seeks partial summary judgment, *i.e.*, summary judgment on the issue of liability on all of its claims. In Defendant's Motion, Defendant seeks summary judgment on all of Plaintiff's claims. Plaintiff asserts that the Court should strike Defendant's Motion as untimely under the Revised Case Management Order (Doc. No. 71), which states that all dispositive motions must be filed by June 15, 2019, two days before Defendant's (dispositive) Motion was filed.

**Rule 6 of the Federal Rules of Civil Procedure** provides that, unless the Court orders otherwise, if the Clerk's office is inaccessible, then the time for filing is extended to the first accessible day that is not a Saturday, Sunday, or legal holiday. **Fed. R. Civ. P. 6(a)(3)(A)**. Here, June 15, 2019, fell on a Saturday, and Defendant filed its Motion on the following Monday.

Plaintiff argues, however, that **Rule 6** does not apply in this situation, citing **subdivision (a) of Rule 6** itself, which provides that "The following rules apply in computing any time period specified in these rules, in any local rule or court order, or in any statue that does not specify a method of computing time." **Fed. R. Civ. P. 6(a)**. Citing the Advisory Committee Notes for the **2009 Amendment to Rule 6(a)**, Plaintiff contends that the time-computation provisions of **subdivision (a)** apply only when a time period must be computed, not when a fixed time to act is set. *See also Violette v. P.A. Days, Inc.*, **427 F.3d 1015**, **1018** (6th Cir. 2005) (language of **Rule 6(a)** does not address situations where litigants are required to file papers on a particular, stated, calendar date), *cited in Evans v. Aloisio*, Case No. 1:19-cv-331, [**2020 BL 190559**], 2020 U.S. Dist. LEXIS 89499, [**2020 BL 190559**], 2020 WL 2571671, **at \*2, n.2** (S.D. Ohio May 21, 2020).

Defendant's reliance upon **Rule 6** 's provisions concerning extending a filing date that falls on a weekend, although inconsistent with the advisory committee notes and some authority interpreting **Rule 6(a)**, is understandable under the circumstances. Defendant's interpretation is by no means clearly foreclosed by the text of **Rule 6(a)**, nor by any (non-existent) custom in this Court to consistently treat a deadline set on a specific date that falls **[\*3]** on a Saturday as necessarily expiring on that Saturday and not the beginning of the following workweek. Moreover, there is no indication that Defendant either is acting in bad faith either in advancing this interpretation of **Rule 6(a)** or in filing on the Monday after the Saturday. And importantly, given the extensive briefing by both parties on these cross-motions for summary judgment, the Court fails to see that (or how) Plaintiff has been prejudiced by the two-day delay in Defendant's filing. In its discretion, absent any indication of bad faith or prejudice, the Court declines to strike Defendant's Motion.

## SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)* . "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 , 247-48 , 106 S. Ct. 2505 , 91 L. Ed. 2d 202 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248 . On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of *Rule 56(c)* "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248 . A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630 , 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sol., Inc.*, 901 F.3d 619 , 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628 .

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. *Fed. R. Civ. P. 56(c)(1)(A)* . On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(2)* . Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585 , 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 674 F. App'x 531 , 536-37 (6th Cir. 2017) (citing *Fed. R. Civ. P. 56(c)* advisory committee's note to 2010 amendment).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party.[4] *Pittman*, 901 F.3d at 628 . Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*[*4], 895 F.3d 844 , 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587 , 595 (6th Cir. 2003).

## *RELIGIOUS DISCRIMINATION*

Title VII makes it unlawful to discriminate against an employee on the basis of religion. *Jiglov v. Hotel Peabody, G.P.*, 719 F. Supp. 2d 918 , 927 (W.D. Tenn. 2010) (citing 42 U.S.C. § 2000e-2(a) ). The law broadly defines "religion" to mean "all aspects of religious observance and practice, as well as belief." *Id.* (citing 42 U.S.C. § 2000e-2(j) ). The analysis of any religious accommodation case begins with the question of whether the employee has established a *prima facie* case of religious discrimination.[5] *Stanley v. ExpressJet*

*Airlines, Inc.*, 356 F. Supp. 3d 667 , 679 (E.D. Mich. 2018).

## A. Failure to Accommodate

To establish a *prima facie* case of failure to accommodate, Plaintiff must show that the allegedly aggrieved person: (1) holds a sincere religious belief that conflicts with an employment requirement; (2) informed the employer about the conflict; and (3) was discharged or disciplined for failing to comply with the conflicting employment requirement. *Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589 , 597 (6th Cir. 2019); *Scott v. Carter Roag Coal Co.*, Civil Action No. 2:19-CV-50, [2020 BL 72100], 2020 U.S. Dist. LEXIS 33473 , [2020 BL 72100], 2020 WL 963049 , at *3 (N.D. W.Va. Feb. 27, 2020).

If and when an employee establishes a *prima facie* case, the employer has the burden to show that it could not reasonably accommodate the employee without undue hardship. *Mohamed v. 1st Class Staffing, LLC*, 286 F. Supp. 3d 884 , 901 (S.D. Ohio 2017) (citing *Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508 , 516 (6th Cir. 2002)). To require an employer to bear more than a *de minimus* cost in order to accommodate an employee's religious belief(s) would constitute an undue hardship. *Id.* (citing *Cooper v. Oak Rubber Co.*, 15 F.3d 1375 , 1378 (6th Cir. 1994)).

## B. Constructive Discharge/ Failure to Hire

Although Plaintiff frames the claim here as constructive discharge, it could also be characterized appropriately as "failure to hire," since Usher never worked a day for Defendant. Title VII prohibits employers from refusing to hire an individual based on religion. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 , 135 S. Ct. 2028 , 2031 , 192 L. Ed. 2d 35 (2015). To establish a *prima facie* case of failure to hire, Plaintiff must show that the allegedly aggrieved person (Usher): (1) holds a sincere religious belief that conflicts with an employment requirement; (2) informed the employer about the conflict; and (3) was not hired because of the conflicting requirement. *Winchester v. Wal-Mart Stores, Inc.*, No. 16-5890, [2017 BL 541269], 2017 U.S. App. LEXIS 28184 , [2017 BL 541269], 2017 WL 11489879 , at *3 (6th Cir. Mar. 2, 2017) (citing *Tepper*, 505 F.3d at 514 )). Manifestly, the first two requirements for a failure-to-hire claim are the same as those applicable for a failure-to-accommodate claim; it is the third element (dealing with the consequence to Plaintiff of the conflict reflected in the first two elements) that reflects the only difference in the two kinds of claims.

In contrast, to demonstrate **[*5]** a claim for constructive discharge, a plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit. *Myrick v. Publix Super Markets, Inc.*, No. 3:16-CV-690, [2017 BL 183226], 2017 U.S. Dist. LEXIS 83219 , [2017 BL 183226], 2017 WL 2362491 , at *8 (M.D. Tenn. May 31, 2017) (citing *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475 , 481 (6th Cir. 2012)).

## ANALYSIS

### 1. Authenticity of recordings of alleged January 10, 2017 conversation with employees of Defendants.

Plaintiff contends that it has presented direct evidence of religious discrimination[6] through Usher's Declaration (Doc. No. 86-7) and audio recordings Usher made of three different telephonic conversations with Defendant's

employees, Kayla McKee and Cassandra Johnson. (Doc. No. 86 at 7). In his Declaration, Usher authenticates, to an extent more than adequate to satisfy the Federal Rules of Evidence, each of three recordings of conversations he claims occurred sequentially on January 10, 2017. Through his averments, he specifically and unequivocally identifies each of the first two as reflecting (without alteration) the entirety of a conversation he had with McKee; he likewise identifies the third as reflecting (without alteration) the entirety of a conversation he had with Johnson. The declaration is more than adequate to render the recordings admissible under **Rule 901** , which requires only that the proponent of evidence "produce evidence sufficient to support a finding that the item is what the proponent claims it is." **Fed. R. Evid. 901(a)** . Usher's sworn testimony asserts clearly that each recording accurately captures the entire conversation Usher purports it to capture. This is sufficient to support a finding that each recording completely and accurately reflects a conversation of the precise nature Usher claims.

In the conversation reflected in the first recording (Exhibit A to Usher's Declaration), Usher first asks for "Kayla, " and McKee soon thereafter comes on the line. Usher asks her whether the job offer is still available, and she responds that it is. Usher then asks whether he would have to cut his hair. McKee responds by beginning to describe Defendant's requirements regarding hair length but, clearly not wanting to recite the substance of the grooming policy off the top of her head, then tells Usher that she will read him the "exact wording"; she asks him to "hold on one second," plainly because she needs a moment to find the grooming policy. Usher indicates that he is okay with waiting and is clearly placed on hold, while music plays. Then an automated voice is heard saying, "you have 30 second." Roughly a half minute later, the automated voice is heard saying, you ran out of credit, and the call has been disconnected. You can buy more credit at the "'buy' screen."

In the conversation reflected in the second recording (Exhibit B to Usher's Declaration), Usher first asks for "Kayla," and McKee soon thereafter comes on the line and asks, "Guy, are you still there?" Usher responds, "Yes, I don't know what happened; I got disconnected." It is not lost **[*6]** on the Court that in claiming ignorance as to what had happened to cause the disconnection, Usher here was being less than candid at best and deliberately dishonest at worst; he knew full well what had happened and yet volunteered the false statement that he did not know what had happened in order to conceal the reason for the disconnection. This matters because a factfinder could take this as specific evidence suggesting that Usher will say what he has to say—even if knowingly untruthful—to pin a religious discrimination claim on Defendant.

McKee then starts to read to him what clearly is Defendant's grooming policy and tells Usher that his hair "is supposed to be shorter than your collar." Usher responds, "That's fine, I just had to make sure, with my religion and all that [unintelligible] this isn't gonna [unintelligible]." Evidently perceiving from Usher that he wishes to proceed with his employment application, McKee indicates that she wishes to switch phones so that she can "go over everything. Usher is plainly put on hold while music$_7$ plays. McKee then returns to the line and explains the two available positions, the higher paying of which she described as the "produce clerk" position, and asks whether he wants "to think about that." Usher responds, "I mean, produce sounds fine." They then discuss how Usher will come in the following morning for a drug screen. Usher then asks, "and when should I have my hair cut by?" McKee responds by explaining that an employee's first day of work is always a Saturday, that his first day likely would be that Saturday, and that by Saturday he would "need to be ready to go." Usher responds, "okay" and then indicates that he has "one more question": "like, even with like the religion and equal opportunity, uh, the EEOC, I still have to cut it like that short?" McKee responds, "Yep."

Usher replies, "Okay, that's fine, it'll, it'll be done." They conclude the call by discussing how he will come in the following morning and meet with "Casey" and perhaps her (McKee) as well, and update his job application to reflect it to encompass the produce clerk position.

In the conversation reflected in the third recording (Exhibit C), Usher first asks for "Kayla." After being placed on hold and then told that Kayla is not available, Usher asks for "Casey," which the Court presumes to be the nickname he knew for (Cassandra) Johnson. When Johnson comes on the line soon thereafter, Usher identifies himself, to which Johnson responds with a friendly "hey" indicative of her being acquainted with him. Usher then says, "Hi, yes, I was calling to let you guys know because of my religion I just can't cut my hair. Sorry." Johnson responds, "Okay, so, are you gonna withdraw the job offer?"[8] Usher responds, "Um, yes." Johnson responds, "Okay, all right. Well, we will separate you, then." Usher replies, "All right. Thank you." Johnson thanks him and says goodbye, and then the call is concluded.

As explained above, the recordings clearly have been authenticated sufficiently for their introduction into evidence (and thus their consideration on these cross-motions). Defendant challenges the authenticity **[*7]** of the recordings. In so doing, Defendant appears to be challenging the *admissibility* of the recordings. It is possible, though, that Defendant instead or additionally is asserting that authenticity questions affect the *weight* of the recordings—*i.e.*, that the recordings, even assuming they are authenticated sufficiently to be admissible, should nevertheless be discounted (in full or in part) and not relied upon due to substantial lingering questions as to their authenticity.

The Court feels constrained to pause to deconstruct in some detail Defendant's attack on the authenticity of (and thus the admissibility of and/or weight to be ascribed to) the recordings. In so doing, the Court will first address what appears to be Defendants' primary contention here, even though the Court has already rejected it, as indicated above: that the recordings are inadmissible due to lack of authenticity/authentication. Regrettably, Defendant is unclear as to part of its purported basis for its primary challenge to the authenticity of the recordings—namely, its claim that McKee and Johnson deny that the recordings are true and accurate reflections of what was said during the conversations at issue.[9] And the Court ascribes little weight to Defendant's observation, even accepting it as true as far as it goes, that Plaintiff's "own expert cannot testify that the tape recordings are true and accurate copies of what was actually said between the individuals." For this observation, Defendants cite only to a page of the expert's deposition wherein the expert states merely that he has no opinion as to whether the applicable recordings had been manipulated. (Doc. No. 96-5 at 3). This does not indicate much, and certainly not that Plaintiff's expert had spotted a legitimate issue as to whether the recordings are true and accurate or whether they had been manipulated.

Finally, Defendant states that in his deposition, Usher "admi[tted] that he 'does not recall' if, while recording the call from his phone to an iPad, whether [sic] he pressed the mute button on the phone"; according to Defendants, pressing the mute button would have allowed Usher to record without the other party to the call hearing what Usher was saying. (Doc. No. 96 at 7). The quoted statement of Defendant makes no reference to any particular conversation recorded by Usher, and in context Defendant appears to represent that Usher's comment was directed to all of the recordings. This apparent representation is false. To support the quoted statement, Defendant cites only page 139 of Usher's deposition transcript (Doc. No. 89-1 at 21), which on this issue addresses only the so-called "second call," and not the first or the third call.

So Defendant's point here relates to only one of three calls. And the point is not a valid one, to the extent it suggests that the recording of that (second) call is not admissible. The possibility—speculation, really—[10] that the mute button prevented the other conversant to *hear* everything Usher said would not affect the admissibility of the recording. And this is not just **[*8]** because it is mere speculation. Even if the mute button had been held down, that would not impair a finding that the recording accurately captured everything that was *said*. And that is the authenticity question, for purposes of admissibility, as to recordings: whether they accurately reflect what was *said*. The fact, or perhaps even speculation, that a conversant may not have heard some of what someone else said (as reflected on the recording) may be grounds for cross-examination on the significance of the recording in numerous respects; and when an inability to hear everything allegedly results from another conversant's purposeful act, the cross-examination could get interesting indeed. But this, like everything else Defendant has raised here, does not affect the admissibility of the recordings.[11]

Finally, the recordings, individually and collectively, do not support the speculation that—contrary to Usher's averment—they omit some of conversation(s) recorded. From the undersigned's personal and repeated listening, he can say that there is no indication whatsoever that there is a gap in the conversation (whether due to operation of the mute button or otherwise) where a portion of the conversation went unrecorded. Instead, the entire sequencing of the three calls—what is discussed, when, how, for how long, and with what hiatuses in between them—is entirely logical and consistent with every one of the recordings being a complete reflection of the conversation it purports to reflect.

In short, the Court rejects Defendant's almost entirely conclusory assertion that there is a real issue as to the authenticity of the recordings. The Court realizes that there is always the theoretical possibility that a recording of a conversation is abridged, altered, or otherwise inaccurate or inauthentic in some respect. But Defendants have shown no particular reason that this theoretical possibility was realized in this case. To the extent that there is any issue as to authenticity, it would go (though not very persuasively) to the weight to be given the recordings.

**2. Dispute as to whether Usher informed Defendant of a conflict with its policy based on a religious belief.**

McKee and Johnson each deny that Usher ever asked for an exemption from Publix's grooming policy for religious reasons.[12] Johnson testified that if Usher had said anything about religion, then "we would have accommodated it, but since he didn't say anything to me about religion, we — he has to cut his hair." (Doc. No. 86-9 at 3 (deposition at 34-35)). Obviously, the recordings reflect what they reflect, and Usher says what he says, and a jury could reject McKee and Johnson's denials based on the content of the recordings. However, a jury also could credit their denials by: (a) discrediting Usher's averment (Doc. No. 86-7 at 1) that in person on January 9, 2017, Ms. McKee told Usher that he would have to cut his dreadlocks before his first day of work even after he (allegedly) told Ms. McKee that he "wore dreadlocks because of [his] religion, Rastafari;" and (b) concluding that whatever Usher may have **[*9]** *said* either then or on the subsequent recorded phone conversations, they did not *understand* Usher to have conveyed an actual religious belief that conflicted with Defendant's grooming policy.

As noted above, Plaintiff contends that the recordings are direct evidence of religious discrimination. Direct

evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor. *Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011). Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. *Nasrallah v. Robert Half Int'l, Inc.*, No. 1:19-CV-00795, [2020 BL 138318], 2020 U.S. Dist. LEXIS 65150, [2020 BL 138318], 2020 WL 1862657, at *5 (N.D. Ohio Apr. 14, 2020) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). Importantly, the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition. *Id.*; see also *Lovell v. Champion Car Wash, LLC*, 969 F. Supp. 2d 945, 951 (M.D. Tenn. 2013) (direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group).

Here, the alleged "direct evidence" is, at most, evidence that Usher informed Publix of his need for religious accommodation. It is not direct evidence of *discrimination*.[13] Thus, this evidence fails to shift, automatically and by itself, the burden to Defendant as direct evidence would. This evidence is, however, *circumstantial* evidence that could go towards meeting Plaintiff's burden to make a *prima facie* showing on each of the three elements of Plaintiff's failure-to-accommodate and failure-to-hire claims.[14] That is to say that, presented with such evidence, a reasonable jury could, but not necessarily would, find the existence of each and every one of the three elements. As discussed below, with respect to each of the elements, a jury reasonable could find in Plaintiff's favor but would not be required to. This, in turn, means that neither side has met its burden on its motion for summary judgment.

The Court first finds that there is a genuine issue of material fact as to the second element of these claims, *i.e.*, whether Usher informed Defendant's employees of a conflict between his (alleged) sincere religious beliefs and Defendant's grooming policy.[15] The Court cannot resolve this factual issue on these cross-motion for summary judgment. This by itself scuttles the possibility of summary judgment for Plaintiff as to liability on these claims because the Court cannot say as a matter of law, based on facts not in genuine dispute, that Plaintiff has established all elements of these claims.

3. **Dispute as to whether Usher holds a sincere religious belief**.

The parties also dispute the existence of the first element, that is, whether Usher holds a sincere religious belief that conflicts with Defendant's **[*10]** employment requirement. Plaintiff asserts that Usher's Rastafarian beliefs, including his need to wear dreadlocks, are based upon "a deep religious conviction." (Doc. No. 85 at 12). Defendant, on the other hand, contends that Usher's desire to wear dreadlocks is a personal preference, not a requirement of his religion. This matters because even if Usher *conveyed to Defendant* that he had a religious belief conflicting with Defendant's policy, that would not matter here unless such religious belief was sincerely held.

To ascertain whether an activity qualifies as the kind of religious belief that merits accommodation, courts look to whether the beliefs professed by a claimant are sincerely held and whether they are, "in his own scheme of things," religious. *Sistrunk v. Camden Cty. Workforce Inv. Bd.*, Civ. No.1:05-cv-1506 (RBK), [2007 BL 214461],

2007 U.S. Dist. LEXIS 28854 , [2007 BL 214461], 2007 WL 1175701 , at *3 (D. N.J. Apr. 18, 2007) (citing *Patrick v. LeFevre*, 745 F.2d 153 , 157 (2d Cir. 1984)). Title VII does not protect employees seeking to obligate an employer to accommodate purely secular preferences. *Duran v. Select Med. Corp.*, No. 08-cv-2328-JPM-tmp, *2010 WL 11493117* , at *5 (W.D. Tenn. Mar. 19, 2010) (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679 , 682 (9th Cir. 1998)). While the truth of a belief is not open to question, there remains the significant question of whether it is "truly held." *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49 , 56 (1st Cir.2002) ("*Union Independiente*") (citing *United States v. Seeger*, 380 U.S. 163 , 185 , 85 S. Ct. 850 , 13 L. Ed. 2d 733 (1965)).

In a different context,[16] the Supreme Court has observed that, in order to qualify as a "religious" belief or practice entitled to constitutional protection, an alleged belief must not be merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living. *Dunn v. Kentucky Dep't of Corr.*, Civil Action No. 5:12-cv-192, [2014 BL 85426], 2014 U.S. Dist. LEXIS 41640 , [2014 BL 85426], 2014 WL 1319777 , at *3 (W.D. Ky. Mar. 28, 2014) (citing *Wisconsin v. Yoder*, 406 U.S. 205 , 215-16 , 92 S. Ct. 1526 , 32 L. Ed. 2d 15 (1972)); *see also Ackerman v. Washington*, 436 F. Supp. 3d 1002 , 1012 (E.D. Mich. 2020) (court may inquire into the sincerity of a prisoner's professed religiosity, and the sincerity inquiry is almost exclusively a credibility assessment).[17]

Summary judgment is seldom appropriate in subjective inquiries and, in religious accommodation cases such as this, should be granted only where on the record before the Court, the only conclusion a reasonable jury could make is that the employee's religious assertion was not bona fide. *Duran*, 2010 WL 11493117 , at *5. The finding on this issue generally will depend on the factfinder's assessment of the employee's credibility. *Union Independiente*, 279 F.3d at 56 . Credibility issues such as the sincerity of an employee's religious belief are "quintessential fact questions." As such, they ordinarily should be reserved for the factfinder at trial, not for the court at summary judgment. *Id.* ; *see also Jiglov*, 719 F. Supp. 2d at 929 , n.30 .

Plaintiff alleges that Usher is a member of the Rastafari religious organization. Defendant disputes this fact, arguing that Usher testified that Rastafari is "far from an organized religion." (Doc. No. 95 at ¶ 1). Defendant also points out that Usher testified that he does not follow all the beliefs and practices of the Rastafari religion and considers the tenets **[*11]** of Rastafari "optional." ( *Id.; see also* Doc. No. 99 at ¶¶ 12-26) (listing numerous tenets of Rastafari beliefs Usher does not follow). Plaintiff contends that Usher wears his hair in dreadlocks as one of his main beliefs based on Leviticus (also known as the Third Book of Moses), because his dreadlocks resemble the Lion of Judah's mane, and because he believes he gets his strength from the Lion of Judah and his hair. (Doc. No. 95 at ¶¶ 3-5). Defendant argues again that Usher considers the tenets of Rastafari optional and points out that Usher testified that a person can be a member of his religion without wearing dreadlocks and conversely that people can have dreadlocks and not be Rastafarian. ( *Id.* at ¶ 3; *see also* Doc. No. 99 at ¶¶ 9-11).

Defendant asserts that Usher admitted he is not following the tenets of Rastafari but simply is trying to "emanate" (by which Defendant presumably means "emulate") his great-grandfather. (Doc. No. 99 at ¶ 5). Plaintiff denies this fact, noting that although Usher learned about the Rastafari religion from his great-grandfather, he has his own Rastafari beliefs, such as not drinking alcohol, not eating pork, not eating red meat or anything unnatural, and wearing his hair in dreadlocks. ( *Id.*) On the other hand, Plaintiff concedes that

Usher does not follow certain Rastafari "practices" (actually beliefs), such as believing that black people are superior to white people and women are subservient to men. ( *Id*).

There are genuine issues of material fact as to the first element of Plaintiff's failure-to-accommodate and failure to hire claims—whether Usher's stance that conflicts with Defendant's grooming policy qualifies as a sincere religious belief.[18] The Court cannot judge the sincerity of Usher's beliefs on this motion for summary judgment. As held in the cases cited above, judging the sincerity of a person's religious beliefs is a "quintessential fact question." As such, it should be reserved for the factfinder at trial, not for the Court at summary judgment. In other words, the Court cannot determine on this record, as a matter of law, whether Usher's alleged belief about dreadlocks is sincerely held. This means, again, that Plaintiff is not entitled to summary judgment on these claims, because it has not shown that it has established, as a matter of law based on facts not in genuine dispute, all elements of these claims.

### 4. **Dispute as to whether Defendant did not hire Usher in the first place or instead hired him and then discharged him**.

Plaintiff has shown that it could possibly prevail before a jury on the first two elements. This means that Defendant cannot obtain summary judgment unless it prevails on the third element, *i.e.*, shows that no reasonable jury could find that Usher was disciplined or discharged (or not hired) because of the conflicting grooming policy. Plaintiff contends that the "undisputed" evidence shows that Defendant "fired" (i.e., discharged) for not complying with the grooming policy. (Doc. No. 86 at 15). Defendant contends that Usher withdrew his acceptance of Defendant's job offer. (Doc. No. 95 at 9). The Court has trouble seeing much merit **[*12]** to the notion that Defendant was "discharged"—or "disciplined" in a manner other than discharge—given that at most he was "employed" only insofar as he accepted a job offer over the phone and then took no further steps towards actually working for Defendant. But the Court concludes that depending on how the recording of the third telephone conversation and other relevant evidence is interpreted, a jury could find—albeit just barely—that Defendant was "discharged." This keeps alive Plaintiffs' failure-to-accommodate claim. And Plaintiffs' failure-to-hire claim likewise survives, because a jury easily could find (consistent with Defendant's own theory) that Defendant was never "hired" in the first place.[19]

The Court cannot grant summary judgment for either party on Plaintiff's religious discrimination (failure-to-accommodate or failure-to-hire) claims,[20] because of the genuine issues of material fact that must be determined by a jury. As noted above, Plaintiff has not shown the absence of a genuine issue of material fact with respect to all elements of any claim, as is required for it to obtain summary judgment as to liability on a claim. And Defendant likewise has not shown the absence of a genuine issue of material fact as to at least one element of any claim, as is required for it to obtain summary judgment on a claim.

As for Plaintiff's "constructive discharge" claim, such a claim arises when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Funk v. City of Lansing, Mich.*, --- F. App'x --- , [2020 BL 287393], 2020 U.S. App. LEXIS 24270 , *2020 WL 4384226* , at *5 (6th Cir. 2020). For a constructive discharge claim, a plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit. *Id.*[21]

The Court finds that Plaintiff has not carried its burden to demonstrate the elements of such a claim. Usher did not work even one hour for Defendant, and so he had no working conditions. And Plaintiff has not shown that Usher's working conditions—if he even had working conditions at all, were "intolerable." The facts here do not fit into the "constructive discharge" analysis. As one district court put it well:

> [T]he court rejects Plaintiffs' argument that the refusal to hire [one plaintiff] amounted to constructive discharge of [the other plaintiff]. "Although an employee's voluntary resignation from employment ordinarily is not an adverse action, an adverse action can be established where the employee shows that the conditions in the workplace had been so intolerable that a reasonable employee would have felt compelled to quit. Initially, the court finds Plaintiffs' constructive discharge theory to be problematic because [the second plaintiff] never worked for Defendant and therefore did not experience *any* conditions of employment—let alone conditions that a reasonable employee would find intolerable.

*Medina v. Werner Enterprises, Inc.*, Civil Action No. 14-cv-01188-CMA-KMT, **[\*13]** [2015 BL 41485], 2015 U.S. Dist. LEXIS 19219 , *2015 WL 720979* , at \*6 (D. Colo. Feb. 18, 2015).[22] The Court realizes that when Usher indicated to Ms. McKee that he was withdrawing his application for employment, she responded that "we will separate you, then." Despite her use of that term, the fact remains that Usher never actually had any substantive employment with Publix from which he could be separated. And in any event, even if Usher is deemed to have some kind of employment status based on (allegedly) merely accepting an offer of employment, he undisputedly never had *any* working conditions—and thus certainly no intolerable working conditions amounting to constructive discharge. Therefore, Defendant's Motion for Summary Judgment will be granted as to Plaintiff's constructive discharge claim.

## **CONCLUSION**

For the reasons stated herein, both Plaintiff's Motion for Partial Summary Judgment (Doc. No. 85) and Defendant's Motion for Summary Judgment (Doc. No. 88) will be DENIED as to Plaintiff's failure-to-accommodate and failure-to-hire claims. Defendant's Motion for Summary Judgment (Doc. No. 88) will be GRANTED as to Plaintiff's constructive discharge claim.

An appropriate Order will be entered.

/s/ Eli Richardson

ELI RICHARDSON

UNITED STATES DISTRICT JUDGE

---

[fn]

1

Unless otherwise noted, the facts in this section are taken from the Complaint (Doc. No. 1). Because the Court is considering cross-motions for summary judgment, these facts are not presumed to be true; rather,

the Court must also consider, among other things, the parties' responses to the competing Statements of Undisputed Material Facts (Doc. Nos. 95 and 99). This Background section provides context by summarizing the allegations of the Complaint.

[fn] 2

Publix's grooming policy, with respect to males, requires that hair "should be worn conservatively styled, clean and neat" and "must not hang or curl over the collar." (Doc. No. 86-3).

[fn] 3

Usher's Affidavit (Doc. No. 86-7) states that Johnson asked Usher (inaptly) whether *he* (Usher) was going to withdraw the job offer, and he said yes. *Id.* at 3. And, as discussed below, this statement (and not the allegation in Plaintiff's Complaint that "Johnson asked Usher if he wanted Publix to withdraw its offer of employment") is what is reflected in the recording of the conversation. Indeed, Plaintiff acknowledges as much in its Memorandum in Support of its Motion for Partial Summary Judgment (Doc. No. 86 at 6 and 8). And yet in asserting that Defendant constructively discharged Usher, Plaintiff essentially reverts back to its assertion in the Complaint, claiming that "Johnson withdrew the job offer." ( *Id.* at 15). It is clear that this is merely Plaintiff's interpretation of what Johnson meant when she asked the nonsensical question of whether Usher was going to withdraw an offer that he (as opposed to Defendant) obviously was not the one to make in the first place and thus was in no position to withdraw. In any event, as regards Plaintiff's constructive discharge claim, ultimately it is immaterial whether Plaintiff's interpretation of this exchange is the proper one, or whether instead the proper interpretation is either that (i) Usher withdrew his application for employment prior to accepting any job offer, or (ii) Usher had accepted the job offer but withdrew his acceptance in his conversation with Johnson. Any way one looks at it, the claim fails because Usher never actually worked at all for Defendant as discussed below.

[fn] 4

This directive has a somewhat counterintuitive application with cross-motions for summary judgment, in that it entails that the Court must view the facts in the light most favorable to Defendant in addressing Plaintiff's Motion but in the light most favorable to Plaintiff in addressing Defendant's Motion.

[fn] 5

Although these cases confusingly identify a "*prima facie* case of religious discrimination," the elements of a *prima facie* case they set forth are elements of a *prima facie* case of *failure to accommodate a person's religion*.

There is a difference, since the elements of a *prima facie* case of religious discrimination, according to the

case relied upon by Plaintiff, are that the allegedly aggrieved person: (1) was a member of a protected class, (2) experienced an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside of the protected class or that he was treated differently than similarly situated employees. *Tepper v. Potter*, 505 F.3d 508 , 515 (6th Cir. 2007). These elements are neither addressed by the parties herein nor necessary for the Court to address in determine whether either party is entitled to summary judgment on Plaintiff's *failure to accommodate claim*. In other words, although failure to accommodate is a form of religious discrimination, the elements required to prove such a claim are specific and not the same as those required to establish a general religious discrimination claim. The Court here is confronted with the former rather than the latter claim and will proceed accordingly.

fn
6

If and when a plaintiff produces direct evidence of discrimination, the burden shifts to the defendant to prove that it would have terminated the employee, "even if it had not been motivated by impermissible discrimination." *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:*14 C 02325* , [2016 BL 160664], 2016 U.S. Dist. LEXIS 66219 , [2016 BL 160664], 2016 WL 2927983 , at *5 (M.D. Tenn. May 19, 2016) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559 , 563 (6th Cir. 2000) and citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 , 349 (6th Cir. 2012)).

fn
7

The undersigned, who listened personally to the tapes multiple times, pauses to note that the music here was a smash hit single (1987's "Breakout") by the (arguably) one hit wonder group, Swing Out Sister.

fn
8

Since Usher obviously was not in a position to have made, and had not made, a job offer, Johnson presumably meant withdraw the "acceptance of the job offer" or "application for employment" rather than "job offer."

fn
9

For the proposition that the individuals Usher secretly recorded "deny that the recordings are true and accurate copies of what was actually said in those conversations[,]" Defendant cites only page 34 of McKee's deposition transcript (Doc. No. 96-3 at 14) and page 23 of Johnson's deposition transcript (Doc. No. 96-4 at 3). But the former page reflects only that McKee was asked, "And that that you heard on the tape was not true; is that testimony?" and then answered, "It's not true." (Doc. No. 96-3 at 14). To say the least, the question (which the Court has reproduced here exactly as it was transcribed) and the answer construed in light of the question, are ambiguous. As for the latter page, it reflects only that Johnson did not recall a particular recorded conversation and that her voice possibly could be a voice on the recording. If

Defendant wants to demonstrate to the Court that there is a legitimate issue as to the authenticity and/or accuracy of recordings made by Usher, it simply needs to do much better than this. It needs to explain the basis for the authenticity challenge, *i.e.*, why it disputes that the recordings are what they purport to be; namely, an accurate recording of a particular conversation. Here, the basis includes (mere) speculation that the mute button could have been held down. But the basis here also includes a claim that the purported participants in the purported conversations dispute the accuracy. That being so, Defendant needs to show where (and preferably why) the participant(s) denied such accuracy; simply citing ambiguous snippets of deposition testimony (which the Court generally is constrained to presume was accurately transcribed) will not cut the mustard.

[fn] 10

Indeed, as Plaintiff accurately notes, Defendant's "audio video expert, Frank Piazza, who was hired to determine if recordings had been altered, could not declare Usher used the mute button at any point during the Recordings." (Doc. No. 101 at 4) (citing Doc. No. 102-2).

[fn] 11

Moreover, a factfinder could find that the weight of this (second) recording is not much affected by mere speculation that Usher could have held down the mute button (and thereby prevented McKee from hearing at least some of what he said as reflected on the recording). On the other hand, a jury could ascribe at least some significance to Usher's admission that he "might have" pressed the mute button, (Doc. No. 96-1), and alter its view of that one conversation accordingly—even though the undersigned, given the flow of the conversation, does not perceive any particular reason to believe that McKee was unable to hear some of what Usher was saying. As to any possible diminution of the weight afforded the other two recordings, a jury's view of the significance and meaning of those recordings could possibly be affected by testimony from McKee and Johnson about their content and surrounding circumstances. In short, Defendant has hardly made a compelling case that little weight should be placed on the recordings, but ultimately the jury should assess their weight.

[fn] 12

Plaintiff claims that McKee contends that Usher asked her, in person on January 9, 2017, "Well, what if I just said it was for religious beliefs?" (Doc. No. 86 at 4). The page of McKee's deposition transcript Plaintiff cites (p. 38) supports Plaintiff's claim, but it lacks context, and the prior page (which perhaps would provide context) has not been filed. In any event, McKee went on to say that she assumed Usher was joking. (Doc. No. 86-6 at 4 (Dep. at 38) ("It was obvious to me that he was — what I took it as when he said, 'What if I just said it was for religious beliefs?' meaning that it wasn't actually a religious belief for him."). If credited, these contentions arguably cut against Defendant on the issue of whether Defendant heard *something* from Usher about *purported* religious beliefs, but clearly cut in favor of Defendant on the issues of whether Usher

had a *sincerely held* religious belief and whether Defendant was informed of an actual religious belief, as opposed to a religious "belief" represented from the very beginning to be bogus and indeed nonexistent. These (sworn) contentions of McKee must be considered in determining whether there is a genuine issue of fact as to whether Usher asked for a religious accommodation. They are not dispositive, but they further suggest that neither side can show the absence of a genuine issue of material fact on the first two elements of a failure-to-accommodate or failure-to-hire-claim.

fn
13

The Court has identified no controlling authority as to whether the question of whether evidence is "direct evidence" is actually one for the jury rather than the court. But in the Court's view, that does not matter here, because no reasonable jury could find that the purported "direct evidence" here meets the above-referenced legal standards for direct evidence.

fn
14

"A plaintiff may establish a claim of [religious] discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination *Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589 , 594 (6th Cir. 2019).

In a Title VII case, "[a]t the summary judgment stage, the ultimate question is whether [the plaintiff] presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that her race or gender were motivating factors in MGM's decision to terminate her employment. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642 , 649 (6th Cir. 2012) (citation omitted). Given the posture of the arguments in this case, the Court need go no further in discussing the use and applicability of circumstantial evidence under "the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 , 93 S. Ct. 1817 , 36 L. Ed. 2d 668 (1973)." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826 , 835 (6th Cir. 2012).

fn
15

Plaintiff also argues that Usher informed the employee who administered his drug screening, Cole Webb, about his religious objection, but Webb was not a manager and simply referred Usher to McKee. (Doc. No. 86-8 at 2 (Dep. at 12)).

fn
16

Many of the reported cases involving dreadlocks involve prison settings and alleged constitutional violations by the prison authorities. *See, e.g., Koger v. Mohr*, 964 F.3d 532 , *2020 WL 3722966* (6th Cir. 2020). In addition, many of the cases involve alleged violations of the Religious Land Use and Incarcerated Persons

Act ("RLUIPA"). *See, e.g., Johnson v. Collins*, 564 F. Supp. 2d 759 (N.D. Ohio 2008). The Court considers these cases as instructive, even though they were not decided in the context of Title VII.

fn
17

The court, however, may not inquire into the centrality to a faith of certain religious practices, dignifying some while disapproving others. *Pleasant-Bey v. Tennessee*, No. 3:19-cv-00486, [2020 BL 51387], 2020 U.S. Dist. LEXIS 24460 , [2020 BL 51387], 2020 WL 707584 , at *5 (M.D. Tenn. Feb. 12, 2020) (citing *Haight v. Thompson*, 763 F.3d 554 , 566 (6th Cir. 2013)).

fn
18

Plaintiff argues that *United States v. Seeger* requires this Court to give "great weight" to Usher's assertion that he does not cut his hair because it is an essential part of his Rastafari beliefs. (Doc. No. 98 at 5).

But *Seeger* does not require this. *Seeger* involved conscientious objectors to service in the armed forces, and the Court held that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." "This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector." *United States v. Seeger*, 380 U.S. 163 , 185 , 85 S. Ct. 850 , 13 L. Ed. 2d 733 (1965). In addition, the Court notes that *Yaacov v. Mohr*, also cited by Plaintiff, was decided based on the court's initial screening under 28 U.S.C. § 1915 , not with a developed record on summary judgment. *Yaacov v. Mohr*, No. 16-4361, [2018 BL 199020], 2018 U.S. App. LEXIS 15159 , [2018 BL 199020], 2018 WL 6333604 (6th Cir. June 5, 2018). The appellate court simply found that the district court should have accepted the facts of the Complaint as true for purposes of the initial review. [2018 BL 199020 ], 2018 U.S. App. LEXIS 15159 , [WL] at *2.

fn
19

The Court notes that, just as with the first and second element of these claims, the third element is an independent and alternative basis to deny summary judgment to Plaintiff. Plaintiff has not shown the absence of a genuine issue of material fact either as to whether Usher was "discharged" or as to whether he was "not hired."

fn
20

The Court wishes to emphasize that in reaching this conclusion, it is accounting fully for the way factual issues must be analyzed on cross-motions for summary judgment. In particular, the Court realizes that to say that there are "factual issues" that prevent one side from obtaining summary judgment is not necessarily to say that those "factual issues" prevent the cross-movant from obtaining summary judgment.

If one movant is unsuccessful in showing the lack of a genuine issue of material fact (and therefore cannot be entitled to judgment under applicable law), one might say that "factual issues" prevent the movant from obtaining summary judgment. But that does not preclude the possibility that the cross-movant will be successful in showing the lack of a genuine issue of material fact (and also be entitled to judgment under applicable law); if this possibility comes to fruition, one might say that the cross-movant successfully showed a "lack of factual issues." In stating (for conciseness sake) its conclusion that there remain "factual issues" preventing summary judgment for either side, the Court means that it has specifically concluded that *neither side* has been able to show the absence of genuine issue of material fact as required for it to prevail on its own motion for summary judgment.

[fn]
21

Regarding the first prong of the constructive discharge inquiry, factors to consider in determining whether a reasonable person would feel compelled to resign include whether the employer's actions involved (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Eaves v. Eye Centers of Tennessee, LLC*, No. 2:18-cv-00072, [2020 BL 11212], 2020 U.S. Dist. LEXIS 5323 , [2020 BL 11212], 2020 WL 134116 , at [*5] (M.D. Tenn. Jan. 13, 2020). These factors do not fit the situation here.

[fn]
22

It appears that there are not many existing cases making this seemingly obvious point—perhaps because it is a rare for a plaintiff to take the counterintuitive positions that a defendant who never *really* employed the plaintiff (even if the plaintiff is deemed to have accepted a job offer): (i) somehow constructively discharged the plaintiff from employment; and (ii) did so by subjecting the plaintiff to working conditions to which the plaintiff was never subjected, not having ever faced any working conditions with the defendant.