

**WALLEON BOBO, Plaintiff-Appellant, v. UNITED PARCEL SERVICE, INC., Defendant-Appellee.**

No. 09-6348

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

12a0006p.06; *665 F.3d 741*; *2012 U.S. App. LEXIS 394*; *2012 FED App. 0006P (6th Cir.)*; *192 L.R.R.M. 2524*; *114 Fair Empl. Prac. Cas. (BNA) 254*; *161 Lab. Cas. (CCH) P10,435*; *95 Empl. Prac. Dec. (CCH) P44,397*

June 8, 2011, Argued
January 9, 2012, Decided
January 9, 2012, Filed

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by *Bobo v. UPS, 2012 U.S. Dist. LEXIS 166429 (W.D. Tenn., Nov. 21, 2012)*

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Western District of Tennessee at Memphis. No. 08-02238--Jon Phipps McCalla, Chief District Judge.
*Bobo v. UPS, Inc., 2009 U.S. Dist. LEXIS 80415 (W.D. Tenn., Sept. 2, 2009)*

**COUNSEL:** ARGUED: Luther Oneal Sutter II, HARRILL & SUTTER, P.L.L.C., Benton, Arkansas, for Appellant.

Waverly D. Crenshaw, Jr., WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee.

ON BRIEF: Luther Oneal Sutter II, HARRILL & SUTTER, P.L.L.C., Benton, Arkansas, Andrew C. Clarke, Memphis, Tennessee, for Appellant.

Waverly D. Crenshaw, Jr., Stanley E. Graham, William T. Fiala, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee.

Justin S. Gilbert, GILBERT RUSSELL McWHERTER PLC, Jackson, Tennessee, for Amicus Curiae.

**JUDGES:** Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

**OPINION BY:** JANE B. STRANCH

**OPINION**

[*744] [***1] JANE B. STRANCH, Circuit Judge. Walleon Bobo appeals the district court's grant of summary judgment in favor of United Parcel Service, Inc. (UPS) on Bobo's discrimination and retaliation claims brought under the Uniformed Services Employment [***2] and Reemployment Rights Act (USERRA) and his race discrimination and retaliation claims brought under *42 U.S.C. § 1981*, Title VII, and the Tennessee Human Rights Act (THRA). We **AFFIRM** the grant of [**2] summary judgment on the retaliation claims brought under *§ 1981*, Title VII, and THRA, but we **REVERSE** and **REMAND** for trial on the remaining claims.

**I. FACTS**

Bobo is an African American who began his career at UPS in 1987 and worked his way up through the hourly ranks. He was also a longstanding member of the Army Reserve and a combat veteran. In late June 2004, after completing rehabilitation for an injury sustained in Iraq, Bobo returned to his employment as a supervisor at the UPS Oakhaven facility in Memphis, Tennessee.

When Bobo subsequently presented a copy of his military orders for annual training, Bobo's manager, Dennis Langford, told Bobo that he needed to choose between UPS and the Army. A co-worker also warned Bobo that UPS did not want its supervisors to serve in the military reserves and that he should expect harass-

ment about his military service. Bobo complained about Langford's remark in an email he sent to Bob Wagner, a Caucasian who served as Transportation Services Division Manager for the Mid-South District. The record does not appear to include a copy of this email or any written response Wagner may have made to it. UPS apparently allowed Bobo to take the requested [**3] leave.

In late 2004 UPS certified Bobo for the position of on-road feeder supervisor to train and supervise UPS drivers. Bobo reported to Norman Morton, who is African American. Morton in turn reported to Bob Wagner.

In March 2005, Bobo received military orders for annual training in June. He provided a copy of the orders to Morton, who asked Bobo if his military service was voluntary or involuntary. Morton later provided a written statement to Wagner in which he admitted that he "did not want Walleon volunteering for additional military duty when he was needed at UPS." (Bobo Aff. Ex. 1 at 1-2.) Wagner signed and dated [***3] Morton's statement to indicate that he had read it. Bobo claims he had several conversations with Morton and Wagner about his requests to take time off for military duty. Bobo requested a letter [*745] explaining UPS policy on allowing supervisors to take leave for military duty, but he did not receive such a letter.

After Bobo returned from military training, Morton assigned Bobo eleven drivers to train between July and November 2005, while during the same period he assigned each of Bobo's peers four drivers to train. One of the drivers assigned to Bobo was Sharon Thompson, [**4] an African American female. Bobo avers that Morton instructed him to disqualify Thompson, no matter how well she performed. Troubled by this demand, Bobo did not disqualify Thompson. As a result, Bobo believed that he was harassed for not following a plan to discriminate against Thompson.

Bobo asserts that, in January 2006, Morton assigned him to supervise eighty-three drivers, while the Caucasian feeder supervisors who had not taken leave for military duty were assigned to supervise forty-one drivers each, and the only other African American feeder supervisor was assigned to supervise forty-six drivers. During a meeting with Morton and Wagner, Bobo asked why he was assigned to supervise so many drivers. Morton told him, "[D]on't worry about it. Get your friends to help you." (Bobo Depo. at 87, 89.) UPS disputes Bobo's assertion that he carried a supervisory load twice as heavy as his peers and suggests that charts showing Bobo was assigned to supervise two large groups of drivers were incorrect due to a simple typographical error.

As an on-road feeder supervisor, Bobo was required to conduct a "safety ride" with each driver under his supervision at least once a year and following accidents. [**5] A safety ride ordinarily required a full workday to complete. Bobo was trained to observe the driver's safety performance, personally demonstrate safe driving techniques, coach the driver on best practices, complete a comprehensive Record of Safety Ride form to document the topics covered during the safety ride, and have the driver sign the completed form to confirm that the safety ride was done and that the driver understood the instructions given. In Wagner's view, a feeder supervisor could not properly complete safety ride training or safety ride forms by observing a driver while he operated [***4] equipment only on UPS property. Bobo contends that feeder supervisors routinely conducted safety rides on UPS property.

Between February and September 2006, the Oakhaven feeder department failed to complete driver safety rides in a timely manner due to a lack of trained supervisors. During this period, UPS management permitted half-day safety rides as long as supervisors completed all of the necessary training, but permission to conduct half-day safety rides did not give supervisors license to falsify safety ride forms, fail to conduct complete safety rides, or request that drivers sign incomplete [**6] forms. Bobo contends that UPS was concerned about passing audits during this period. As a result, high-level managers instructed supervisors to document that they provided at least one hour of supervisor demonstration time during each safety ride, even if the statement was not true. Further, managers instructed supervisors to vary the amount of demonstration time over one hour that was documented on safety ride forms.

In March 2006, Bobo provided to UPS a copy of his military orders for annual training and requested twenty-two days of leave in June and July. UPS allowed Bobo to take the leave. Under company policy, Bobo's compensation should have been suspended temporarily because Bobo received military salary and benefits during military duty; however, UPS inadvertently continued to pay Bobo's salary while he was receiving military pay. When UPS [*746] discovered the overpayment in August 2006, it prepared a schedule of payroll deductions to recoup $6,000 from Bobo's salary between September and December 2006. Bobo claimed that UPS deducted too much money from his salary to retaliate against him for taking leave to attend military training. Bobo asked Wagner if he treated Arthur Shumway the [**7] same way he treated Bobo. Shumway was a Caucasian feeder supervisor who was not a member of the military reserve. According to Bobo, Shumway often worked less than four hours a day and conducted private business on company time, yet he drew a full UPS salary. Wagner was upset by Bobo's question.

In early January 2007, Bobo notified Fred Flenorl, an African American driver, that his annual safety ride was overdue. Because Flenorl's work attendance was [***5] generally poor, Bobo had difficulty communicating with Flenorl. Bobo asserts that he gave Flenorl the opportunity to participate in a full safety ride, but Flenorl would only agree to a shortened safety ride. In March 2007, Bobo observed Flenorl's driving on UPS property and orally examined him for fifteen minutes about the safety ride topics. Bobo asked Flenorl to sign a partially completed safety ride form, and Bobo documented that a full safety ride had occurred, including one hour and twenty minutes of supervisor demonstration time. In April 2007, Flenorl complained to UPS Security that Bobo directed him to sign a blank safety ride form. Bobo contends Flenorl's complaint was prompted by a disciplinary warning letter he gave to Flenorl [**8] two days earlier.

As a result of Flenorl's complaint, UPS launched a department-wide investigation into the falsification of safety rides. UPS Security Investigator Ronald Barrett and Security Supervisor Orlando Croft, both of whom are African American, conducted the investigation. On May 10, 2007, Barrett interviewed Bobo, who admitted that he observed Flenorl's driving only on UPS property and that he asked Flenorl to sign an incomplete safety ride form. During his interview, Flenorl denied that Bobo observed his driving at all. He alleged that Bobo asked him to sign a blank safety ride form in February 2007 and instructed him not to date the form. Based on Flenorl's statement and Bobo's admissions, Barrett recommended that management remove Bobo from service pending further investigation.

During this litigation, Flenorl provided an affidavit favorable to Bobo. He swore that, shortly before he filed the complaint against Bobo, Caucasian feeder supervisors, including David Pendleton, asked him on multiple occasions whether Bobo had given him a safety ride. Flenorl believed that UPS was "after someone" and likely him because Wagner had fired him several times previously, only to reinstate [**9] him. To deflect attention from himself, Flenorl filed the complaint against Bobo. Flenorl averred that it was widespread practice for feeder supervisors to ask drivers to sign blank safety ride forms. Pendleton and Chris Wheeling, also a Caucasian feeder supervisor, had asked Flenorl to sign blank safety ride forms.

[***6] Barrett and Croft interviewed every employee in the Oakhaven feeder department. They uncovered evidence that Bobo falsified other drivers' safety ride forms. When questioned again, Bobo admitted that he instructed drivers Tim Swindle and Dennis Rowe to sign incomplete forms and that he falsified their forms to make it appear that he rode with them from Memphis to Albuquerque when he actually rode with them only a few miles. When interviewed by the investigators, Pendleton denied that he falsified safety ride forms. [*747] He provided UPS with a written statement denying any misconduct.

UPS terminated Bobo's employment on May 22, 2007, for violation of the company integrity policy. Bobo's discharge occurred two weeks before his scheduled annual military training. Six high-level managers from the Mid-South District jointly decided to discharge Bobo: Wagner; Bob Cowan, Operations [**10] Manager; Mike Speraw, Security Manager; Jon Robertson, Human Resources Manager; Jim Smith, District Manager; and Carolyn Walsh, Vice President of the West Region. Although Bobo was given the option to resign, he refused to do so.

During an exit interview with Wagner and Robertson, Bobo again admitted that he falsified safety ride forms, but he insisted that, if UPS was going to fire him for falsifying forms, then every feeder supervisor should be fired. Bobo emphasized that UPS management knew there was a widespread custom of conducting safety rides as Bobo had conducted them, and every supervisor, on at least one occasion, had not actually performed the length of demonstration time recorded on a safety ride form. Bobo reported that he saw Pendleton ask a driver to sign a blank safety ride form, and the driver complied. Bobo also disclosed that, on more than one occasion, at Pendleton's request, Bobo asked drivers assigned to Pendleton to sign blank safety ride forms. Bobo then gave the forms to Pendleton, who later completed them and turned them in.

Bobo further claimed that, in early April 2007, Oakhaven feeder department manager Jeff Hauss instructed him to complete a safety ride [**11] with Randy Cain. Bobo asked Hauss if he should travel to Mississippi to perform a full safety ride with Cain. Hauss instructed Bobo to conduct a safety ride with Cain on UPS property in Memphis. [***7] Bobo admitted that he falsified the form by showing that a full safety ride took place and by indicating that he provided one hour and five minutes of demonstration time.

The investigators' final report, dated May 31, 2007, listed numerous instances of improperly completed safety rides and possible falsification of safety ride forms at the Oakhaven facility. The report stated that Morton, Hauss, and Wagner at times approved of irregular conduct concerning safety rides. Wagner denied, however, that UPS Security informed him about feeder supervisors falsifying records.

In October 2007, five months after Bobo's discharge, UPS Security received a report that feeder supervisor Ronnie Wallace, a Caucasian, falsified safety ride forms.

When interviewed, Wallace, like Bobo, admitted that he falsified forms. UPS gave Wallace the option to resign or be fired, and Wallace chose to resign. UPS contends that Wallace is the only feeder supervisor similarly situated to Bobo because both Wallace and Bobo admitted [**12] misconduct and both lost their jobs.

Bobo claims that he was fired because of his commitment to military service, which required him to be absent from work, his race and his opposition to unlawful discrimination. He believes UPS could have imposed discipline short of discharge, such as denying him pay raises and stock options, placing him on probationary status, or removing him from service without pay for a period of time.

Bobo further contends that Pendleton and Brad Jordan, both Caucasians who were not in the military reserve, received better treatment than he did because they falsely denied misconduct during the safety ride investigation. Bobo also claims that he is similarly situated to Myles Spears, a Caucasian who was the former UPS Center Manager at Fort Smith, Arkansas. [*748] After falsifying an audit document, Spears was demoted to feeder supervisor. Bobo pointed out that he and Spears both worked at UPS for many years, neither had been disciplined previously, and both served under the same high-level chain of command in the Mid-South District. Yet, Spears received preferential treatment because his direct supervisor saved his job. UPS denies that Wagner supervised Spears or that [**13] Wagner knew Spears falsified documents. UPS also contends that Bobo cannot compare himself to Spears because there was no [***8] management-level position below feeder supervisor to which Bobo could have been demoted, and UPS does not demote supervisors to hourly bargaining unit positions.

In support of his legal claims, Bobo relies heavily on the testimony of Bob Cowan, the second-highest manager in the Mid-South District. During deposition, Bobo's attorney confronted Cowan with Morton's remark that he did not want Bobo volunteering for additional military duty when he was needed at UPS. Cowan characterized Morton's comment as "absolutely inappropriate" and a violation of UPS policy. Cowan also acknowledged that Kent Hardy, a Caucasian supervisor, falsified time cards in violation of federal law, but he was not discharged. Cowan further expressed concern about a technique Barrett used when he interviewed Pendleton about falsifying safety ride forms. Barrett told Pendleton that he could prove Pendleton falsified safety ride forms. Cowan testified that, if Barrett in fact had such proof about Pendleton's conduct, Cowan wanted to know about it. If Barrett did not have such proof, then Barrett, [**14] too, committed a violation of the UPS integrity policy by lying to Pendleton. Cowan admitted that some of the information he learned for the first time during his deposition raised questions he would want answered.

Cowan further testified that in agreeing to discharge Bobo, he relied on the information uncovered during the safety ride investigation and on information Wagner gave him about Bobo and, had he been provided with additional information, he might have suggested a course of action other than termination of Bobo's employment.

Due to the loss of his UPS employment, Bobo was forced to retire as a Lieutenant Colonel in the Army Reserve so that he could accept a position as a Junior ROTC instructor for Memphis City Schools. Bobo can no longer serve on active military duty.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a) & (c)*. [***9] The burden to show that there are no genuine issues of material fact falls upon UPS as the party seeking summary judgment. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. [**15] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. We consider the evidence presented in the light most favorable to Bobo and we draw all justifiable inferences in his favor. *Id*. The ultimate question before us is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided [*749] that UPS should prevail as a matter of law. *See id. at 251-52*.

## III. ANALYSIS

In resolving this appeal, we first consider Bobo's argument that the actions of UPS and the district court during litigation of the case unfairly precluded him from presenting additional facts in support of his claims. We agree with Bobo that the district court improperly restricted the scope of discovery when it allowed UPS to determine unilaterally that the only Caucasian, non-military supervisor who was similarly situated to Bobo was Ronnie Wallace. We also conclude that the district court unduly delayed its ruling on Bobo's discovery motions until after [**16] the court had already granted summary judgment for UPS. The discovery errors alone convince us that the summary judgment in favor of UPS cannot stand, but we also conclude that the record demonstrates genuine issues of material fact for

trial. As explained in more detail below, we reverse the grant of summary judgment in favor of UPS on most of Bobo's claims and remand the case to the district court with instructions.

**A. Discovery background**

The district court imposed a discovery deadline of March 1, 2009. Two days before the deadline, Bobo filed a motion to compel and a motion to extend the discovery deadline, which UPS opposed. The gravamen of the discovery dispute was two-fold. First, Bobo asked the district court to compel UPS to provide a wider scope of discovery [***10] in response to his written discovery requests, which sought information about several Caucasian, non-military supervisors to whom Bobo compared himself. Second, Bobo proposed an extension of the discovery deadline to allow him to depose more than fifty additional witnesses.

In response to Bobo's written discovery requests, UPS identified Ronnie Wallace as the only Caucasian, non-military feeder supervisor whom UPS considered [**17] to be similarly situated to Bobo. Although UPS provided discovery about Wallace, it declined to provide discovery about other potential comparators because it asserted such discovery was "not relevant" under *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). UPS also pointed out that courts routinely limit discovery to those persons in an employee's division or chain of command; therefore, UPS claimed that it was required to provide discovery only concerning comparable supervisors under Bob Wagner's oversight.

The magistrate judge denied Bobo's discovery motions on May 27, 2009, expressly finding that UPS had "appropriately complied with Plaintiff's discovery request[s] by providing information [about] the sole employee [who] qualifie[d] as a comparator under *Mitchell*." R. 44, Order at 3. The magistrate judge also found no good cause to extend the discovery deadline to permit Bobo to take more depositions. *Id*. at 4.

Two days after entry of the discovery order, on May 29, UPS moved for summary judgment in accordance with the dispositive motion deadline set forth in the scheduling order. On June 4, Bobo filed objections to the discovery order, and on June 5 he filed a "*Rule 56(f)* [**18] Motion,"[1] explaining how the discovery order adversely impacted his ability to respond to the summary judgment motion. UPS opposed both motions. Inexplicably, the district [*750] court did not timely rule on Bobo's objections or his *Rule 56(f)* motion.

> 1 The 2010 amendment to *Rule 56* moved former *subsection (f)* to *subsection (d)*. To maintain consistency with the district court record, all references hereafter will be to *Rule 56(f)*.

[***11] On June 26, Bobo filed a response to the summary judgment motion, providing in support his own affidavit, Flenorl's affidavit, excerpts from Cowan's deposition, excerpts from the depositions of Cowan and Eddie Roach[2] taken in *Weston v. UPS, No. 6:08cv6061, 2009 U.S. Dist. LEXIS 12227 (W.D. Ark.)*, three "Statements Under Oath,"[3] and excerpts from an uncompleted deposition of Naaman Kelley, a feeder department dispatch supervisor in Little Rock, Arkansas, that was taken on June 23, 2009, in *Haynes v. UPS*, No. 2:09cv01250 (W.D. Tenn.).[4] UPS filed its reply brief on July 22.

> 2 Roach was the current HR manager for the Mid-South District. He testified that Myles Spears admitted to him that he falsified an audit document, but Spears was not fired because he was "a good partner" and he served many years [**19] with the company without receiving any prior discipline. R. 56-8 at 7-10.
> 3 Bobo's counsel took the "Statements Under Oath" of Rodel Diggins, Keitha Barnes, and Jesse Hughes in question-and-answer format before a court reporter without UPS counsel present. We need not resolve the parties' dispute about whether these statements constitute affidavits or *ex parte* depositions because we do not rely on these statements to support the conclusions we draw in this opinion.
> 4 Kelley testified that he attended division-level meetings with Wagner and other managers following national feeder audits. During the meetings, the participants discussed Oakhaven's practice of giving drivers partial safety rides. When Bobo's counsel asked Kelley what Wagner said during those meetings about Oakhaven's practice, UPS objected and instructed Kelley not to answer on the ground that discovery in this case was closed. During the deposition, counsel for the parties contacted Magistrate Judge Pham in the Western District of Tennessee, who suspended Bobo's questioning of Kelley pending receipt of briefs on whether the discovery should be allowed.

The next day, on July 23, the district court heard telephonic oral argument [**20] on the summary judgment motion. On the following day, July 24, Bobo filed the transcript of the suspended Kelley deposition and asked the district court for permission to complete the deposition. Bobo represented Kelley would testify that, during a post-audit meeting with other high-level Mid-South District managers, Wagner blamed Bobo's frequent military service as the reason why Oakhaven

was always behind on completing safety rides. UPS filed a response to Bobo's request to complete the deposition. The district court did not rule on Bobo's request.

At the pretrial conference on August 17, the district court indicated an intent to grant summary judgment for UPS, but noted, "I've been putting this off hoping that I would be able to reach a different conclusion." R. 110 at 4. The court invited further argument because it was bothered by two aspects of the case. First, the court was concerned about the direct evidence that UPS supervisors discouraged Bobo from [***12] military service. Second, the court was concerned that Bobo admitted his misconduct and lost his job, while other feeder supervisors likely did not tell the truth and retained their jobs. *Id.* at 5, 15. After hearing further argument, [**21] on September 2 the court issued its decision granting summary judgment for UPS without ruling on Bobo's objections to the discovery order, the *Rule 56(f)* motion, or the request to complete Kelley's deposition.

Bobo moved to alter or amend the judgment under *Federal Rule of Civil Procedure 59(e)*, specifically requesting rulings on his outstanding objections and motions. After receiving UPS's response to the *Rule 59(e)* motion, the district court denied [*751] it, holding that the magistrate judge's order limiting discovery to Ronnie Wallace, the only similarly-situated supervisor as defined by UPS, was not a clearly erroneous decision and fell within Sixth Circuit precedent, citing *Mitchell, 964 F.2d at 583*, and *Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir. 2006)*. The court further ruled that there was no indication UPS knew of any employees besides Ronnie Wallace who were employed in a similar position, worked for the same supervisor, and committed the same improper conduct. The district court declined to modify the discovery order to allow more depositions, but the court indicated it might have reached a different decision on that request. Finally, the court denied the *Rule 56(f)* [**22] motion on the ground that Bobo had sufficient time to conduct discovery and respond to the summary judgment motion, and the *Rule 56(f)* motion could not be used to circumvent the discovery order.

**B. Reversal of the discovery and post-judgment orders**

We are troubled by both the procedural and substantive treatment of this case. We long ago clarified that courts should not assume "the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)*. In *Ercegovich*, we concluded that differences in job activities did not destroy comparator status because [***13] such differences do not "automatically constitute a meaningful distinction that explains the employer's differential treatment of the two employees." *Id. at 353*. The key word in *Ercegovich* is "relevant" and the case instructs that the factors listed in *Mitchell* or other cases are only apposite where they are meaningful to the particular claim of discrimination [**23] presented.

Contrary to the holding below, Bobo was not required to demonstrate an exact correlation between himself and others similarly situated; rather, he had to show only that he and his proposed comparators were similar in all relevant respects, *id. at 353*, and that he and his proposed comparators engaged in acts of comparable seriousness. *Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir. 2006)* (citing *Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002)* (conduct must be similar in kind and severity). While *Mitchell* stated that similarly-situated employees must have dealt with the same supervisor, we later explained that the inquiry "does not automatically apply in every employment discrimination case." *McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005)*. Moreover, we have never read "the 'same supervisor' criterium" as an "inflexible requirement." *Seay v. Tennessee Valley Auth., 339 F.3d 454, 479-80 (6th Cir. 2003)*. Whether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented. *McMillan, 405 F.3d at 414*. Thus, the focus of the litigation is not on a comparison of "the employment status of the plaintiff [**24] and other employees in every single aspect of their employment." *Ercegovich, 154 F.3d at 352*. As the Supreme Court explains, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*.

[*752] We turn to the application of these standards to our facts. Bobo compared himself to several UPS supervisors who were Caucasian and not members of the military reserves. Had Bobo received an opportunity for discovery on these comparators, a jury might have found them similarly situated. David Pendleton and Brad Jordan, feeder supervisors at the Oakhaven facility in Memphis, and Danny Clark and Don Culpepper, [***14] feeder supervisors in Little Rock, Arkansas, were accused of falsifying safety rides but, unlike Bobo, they were not discharged. Bobo also identified Myles Spears, Kent Hardy, and Art Shumway, all of whom apparently violated the UPS integrity policy through various acts of dishonesty, but none of whom were discharged. Bobo also presented evidence that the decisions to terminate his employment, but to retain Pendleton,

[**25] Jordan, Clark, Culpepper, Spears, Hardy, and Shumway, were made by the same high-level managers in the Mid-South District, including Wagner, Cowan, Robertson, Smith, and Walsh.

Despite Bobo's written discovery requests seeking information about his proposed comparators, UPS refused to provide discovery on these individuals and instead provided discovery only on Ronnie Wallace, a single comparator of its own choosing. The district court's discovery order ratified UPS's position. Thus, the discovery order effectively blocked Bobo from obtaining relevant and potentially admissible evidence on a critical element of his case--evidence necessary to convince a jury that there were supervisors besides Wallace who were similarly situated to Bobo in all relevant respects and yet received better treatment than Bobo because they did not take time off for military service or were of a different race.

The district court's "framing of the similarly-situated standard [was] too narrow and necessitate[d] an exact correlation not required by the law of this circuit." *Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008)*. Also, by limiting discovery on other potential comparators, [**26] the district court improperly narrowed *Federal Rule of Civil Procedure 26(b)(1)*, which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim[.]"

In *Clay v. UPS, 501 F.3d 695, 711-12, 716 (6th Cir. 2007)*, we considered UPS's failure to turn over discovery in two instances: (1) certain bid sheets that could have been used to show one plaintiff and the proposed comparators were similarly situated; and (2) attendance records that a second plaintiff could have used to show that he and proposed comparators engaged in acts of comparable seriousness. The district court granted summary judgment against both plaintiffs without requiring UPS to turn over [***15] the records in question. This Court reversed, ruling that the district court should have drawn adverse inferences against UPS for failing to disclose the bid sheets and the attendance records. *Id*. The Court stated that "Clay should not be punished for his inability to point to the relevant comparators in this case[,]" because the "'general rule is that [w]here relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that [**27] such information would be harmful to the party who fails to provide it.'" *Id. at 712* (quoting *McMahan & Co. v. Po Folks, Inc., 206 F.3d 627, 632-33 (6th Cir. 2000))*. Drawing the adverse inferences against UPS on appeal, the Court concluded that each plaintiff established a *prima facie* case of discrimination and, because the plaintiffs pointed to evidence from which a jury could infer that UPS's proffered reasons for the employment decisions were pretextual, the Court reversed the grant of [*753] summary judgment on the disparate treatment claims. *Id. at 713, 717*.

Discrimination cases frequently turn on whether the plaintiff can identify one or more comparators who are similarly situated in all relevant respects. The cases we have cited grapple with the difficulty of applying the "similarly situated" comparator standard and the danger of treating that standard as requiring exact correlation, in violation of our precedents. *Clay* and this case also point to the problems inherent in allowing a defendant to control the designation of comparators by simply refusing to provide requested comparator evidence except as to those persons it selects. *See Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 25, 28-29, 326 U.S. App. D.C. 224 (D.C. Cir. 1997)* [**28] (reversing summary judgment and remanding for further discovery where employment discrimination plaintiff requested, but did not receive, comparator data). The refusal of a defendant to disclose requested comparator information denies plaintiff the opportunity to determine whether the evidence actually reveals comparator status and different treatment, critical elements of the claim that the trier of fact must determine. *See Culwell v. City of Fort Worth, 468 F.3d 868, 873-74 (5th Cir. 2007)* (holding *Rule 56(f)* motion should have been granted where plaintiffs sought comparator information, discovery was in defendants' sole possession, and such evidence could create genuine issues of material fact for trial on whether comparators were similarly situated, as well as on pretext).

[***16] An improper denial of discovery occurred here. Bobo's claims related to discrimination and retaliation based on his military service and race, and he requested discovery on a small number of specific individuals outside each of those protected categories whom he alleged violated the UPS integrity policy by falsifying forms *or* other acts of dishonesty and were treated differently. UPS refused to provide discovery [**29] on any of the seven persons Bobo claimed violated the policy yet were retained by the same high-level managers in the Mid-South District. The only comparator on whom discovery was provided was the individual who lost his job for admittedly falsifying forms, five months *after* Bobo was fired.

In light of the above, we conclude that the discovery order was contrary to law and should have been set aside by the district court. *Fed. R. Civ. P. 72(a)*. The district court's unexplained delay in ruling on Bobo's objections to the discovery order unfortunately compounded the error. We also conclude that the district court should have considered favorably Bobo's *Rule 56(f)* motion because it was tied to his objections to the discovery order. *See Resolution Trust Corp. v. North Bridge Assoc., Inc., 22 F.3d 1198, 1208 (1st Cir. 1994)* ("When *Rule 56(f)*

functions properly, it ensures that, in the mine-run of cases, a litigant who fails to answer potentially relevant discovery requests on schedule will be unable to demand summary judgment until after he remedies his failure.")

Accordingly, we reverse the discovery order. R. 44. We also reverse the district court's post-judgment order affirming the discovery [**30] order and denying the *Rule 56(f)* motion. R. 99. We remand the case to the district court to re-evaluate Bobo's discovery requests. *See Stella v. Mineta, 284 F.3d 135, 147, 350 U.S. App. D.C. 300 (D.C. Cir. 2002)* ("Having corrected the standard pursuant to which the District Court must evaluate [the] prima facie case, we remand so that the District Court may determine whether further discovery" is necessary in light of *Rule 56(f)* motion); *Farmer v. Brennan, 81 F.3d 1444, 1450-51 (7th Cir. 1996)* (reversing and remanding where district court granted [*754] defendants' summary judgment motion without providing plaintiff adequate opportunity for discovery requested in timely *Rule 56(f)* motion); *Garrett v. City and Cnty. of San Francisco, 818 F.2d 1515, 1519 (9th Cir. 1987)* [***17] (reversing and remanding because trial court failed to exercise its discretion when it granted summary judgment before ruling on *Rule 56(f)* motion).

On remand we instruct the district court to grant Bobo's motion to compel UPS to provide appropriate discovery in response to Bobo's written discovery requests for information on proposed comparators other than Ronnie Wallace. We also instruct the district court to decide whether any additional depositions [**31] are warranted. While we do not condone Bobo's decision to wait until two days before the discovery deadline to request numerous additional depositions, we will not preclude him from demonstrating to the district court that certain additional depositions are necessary. Finally, it does not appear that the court ever addressed Bobo's request to complete the Kelley deposition. We return the issue for the court's determination in light of the parameters established herein for continuing discovery, including the request to take Kelley's deposition in this litigation. Although we reverse the judgment primarily because of discovery and procedural error, we also conclude that Bobo presented sufficient facts in opposition to summary judgment to warrant a jury trial on his claims.

### C. USERRA claims

USERRA was enacted to prohibit discrimination against individuals because of their military service. *Hance v. Norfolk S. Ry. Co., 571 F.3d 511, 517 (6th Cir. 2009)* (per curiam); *Curby v. Archon, 216 F.3d 549, 556 (6th Cir. 2000)*. USERRA provides, among other things, that "[a] person who is a member of . . . a uniformed service shall not be denied . . . retention in employment, . . . or any benefit of [**32] employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation." *38 U.S.C. § 4311(c)(1)*.

An adverse employment action is prohibited under USERRA if the person's obligation for military service "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such . . . obligation for service." *Id*. "Protected status is a motivating factor if a truthful employer would list it, if asked, as one of the reasons for its decision." *Escher v. BWXT Y-12, LLC, 627 F.3d 1020, 1026 (6th Cir. 2010)* [***18] . Discriminatory motivation may be inferred from a variety of considerations, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. *Id*. If Bobo carries the initial burden to show by a preponderance that his protected status [**33] was a motivating factor in his discharge from employment, the burden shifts to UPS to prove affirmatively that it would have taken the same employment action in the absence of Bobo's protected status. *See Hance, 571 F.3d at 518* (quoting *Sheehan v. Dep't of Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001))*; *Escher, 627 F.3d at 1026*; *Petty v. Metro. Gov't of Nashville-Davidson Cnty., 538 F.3d 431, 446 (6th Cir. 2008)*.

Taking all of the evidence in a light most favorable to Bobo, we conclude that there are genuine issues of material fact for trial concerning whether Bobo's military service was a motivating factor in his [*755] discharge and whether UPS would have taken the same employment action in the absence of Bobo's protected status. The district court ruled that Morton's comment, "I did not want Walleon volunteering for additional military duty when he was needed at UPS[,]" might have satisfied Bobo's *prima facie* case under USERRA if the statement had been made by someone responsible for the decision to fire Bobo. But, the court reasoned, Bobo did not present admissible evidence to tie Morton to the termination decision, nor did he establish that Morton poisoned the minds of the ultimate decision-makers [**34] against Bobo.

To the contrary, Bobo's evidence tied Morton and Morton's direct supervisor, Wagner, directly to the termination decision. A jury could reasonably find that Morton's comment is direct evidence that Bobo's military service was a motivating factor in employment decisions. Wagner was aware of Morton's discriminatory remark because he read, signed, and dated the memorandum in

which the comment was made. The evidence also shows Bobo complained to Wagner about supervisor Langford's comment [***19] that Bobo needed to choose between UPS and the Army, and that Bobo, Morton, and Wagner engaged in ongoing conversations about Bobo's requests to take leave to attend military training. Bobo felt discouraged from taking such leave, especially when Morton asked him if his military service was voluntary or involuntary. Wagner was present at the meeting when managers of the Mid-South District decided to terminate Bobo's employment.

Bobo also produced evidence that might permit a jury to find UPS liable for a USERRA violation through the "cat's paw" theory. This phrase refers to a situation in which "a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker to [**35] make an adverse [employment] decision, thereby hiding the subordinate's discriminatory intent." *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009). If a direct supervisor performs an act motivated by anti-military animus that is intended to cause an adverse employment action and that act is a proximate cause of the adverse employment action, then the employer may be held liable under USERRA based on the "cat's paw" theory. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194, 179 L. Ed. 2d 144 (2011).

Bob Cowan was Wagner's supervisor and the second-in-command of the Mid-South District. In agreeing to terminate Bobo's employment, Cowan relied in part on information he received from Wagner. But it appears that Cowan did not know at the time of Bobo's termination that Wagner and Morton harbored anti-military animus against Bobo. During his deposition, Cowan learned of Morton's remark that was sent to and read by Wagner. Cowan characterized Morton's remark as "absolutely inappropriate" and a violation of UPS policy. This evidence suggests that Wagner influenced Cowan to agree to Bobo's firing, thereby hiding his own and Morton's discriminatory animus against Bobo. *See Staub*, 131 S. Ct. at 1194. [**36] Further, Cowan candidly acknowledged that, if he had known more facts, he might have recommended other discipline for Bobo, and not termination. His acknowledgment draws into question whether UPS can prove the defense that it would have discharged Bobo anyway for a valid reason.

[***20] The district court did not discuss Wagner's involvement in the termination decision or the potential liability of UPS under the "cat's paw" theory. Instead, the court focused narrowly on Morton and his lack of decision-making authority. The court [*756] also did not mention the other evidence Bobo produced indicating anti-military animus against him, including Langford's comment that he needed to choose between UPS and the Army, and the co-worker's warning to Bobo about the anti-military culture at UPS. Assuming that the district court on remand allows completion of the Kelley deposition, Bobo may also be able to show that Wagner identified Bobo's frequent military service as the reason why Oakhaven failed to complete safety rides on a timely basis. A reasonable jury hearing all of the facts could thus determine that Bobo proved a USERRA discrimination claim.

With regard to the USERRA retaliation claim, the district [**37] court held that the period between Bobo's submission of his military orders to Morton in March 2007 and his termination on May 22, 2007, did not establish temporal proximity. But looking at the facts in the light most favorable to the plaintiff, Bobo's discharge occurred just two weeks before his scheduled 2007 military service and less than two months after he submitted his military orders. We think Bobo demonstrated sufficient temporal proximity to establish a *prima facie* case of retaliation under USERRA. Therefore, we reverse the grant of summary judgment in favor of UPS on Bobo's USERRA claims.

**D. Title VII and § 1981 claims for race discrimination and retaliation**

We review Title VII and § 1981 claims under the same standard. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009). The district court analyzed the race discrimination and retaliation claims as single-motive claims based on circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256-59, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The court held that Bobo satisfied the first three elements of his prima facie case of race discrimination, but as to the fourth [**38] element he failed to identify a similarly-situated Caucasian employee who was treated more favorably than he was.

[***21] The court specifically ruled that Bobo and Spears were not similarly situated because they worked in different offices, held different jobs, and answered to different supervisors. We have already explained that we believe the district court applied *Mitchell* too narrowly, and in addition, evidence indicates that employment decisions for Bobo and Spears were made by the same high-level managers in the Mid-South District. The district court held that Bobo and Shumway were not similarly situated because Shumway's unsubstantiated infraction was different from the accusation against Bobo. But UPS's integrity policy covered various types of dishonesty and Bobo was not required to establish exact correlation with similarly situated employees, as we have already discussed. The district court further determined that Bobo did not make out a *prima facie* case of retaliation because, even assuming Bobo engaged

in protected activity when he refused to disqualify Sharon Thompson, Bobo did not produce evidence to indicate that any alleged discrimination against Thompson occurred because [**39] of her race and/or gender.

Bobo argues that the district court erred in disposing of his race discrimination claim for failure to identify a similarly-situated Caucasian comparator, and we agree for reasons already stated. But more importantly, Bobo asserts the court should have analyzed the claim under a mixed-motive analysis, citing *Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)*.

[*757] In *Wright v. Murray Guard, Inc., 455 F.3d at 711-13*, we explained the development of the law after *Price Waterhouse*, noting that Congress in 1991 added to Title VII a new statutory provision codifying the mixed-motive alternative for proving an unlawful employment practice. *Id. at 711* (citing *42 U.S.C. § 2000e-2(m)*). Under that statute, Bobo can proceed on a mixed-motive claim by demonstrating that race was a motivating factor in his termination, even though other factors also motivated his discharge. *See id*. If Bobo can make that showing, UPS is liable, although Bobo's remedies are limited if UPS can establish that it would have taken the same action in the absence of the impermissible motivating factor. *Id. at 711-12* (citing *42 U.S.C. § 2000e-5(g)(2)(B)*). Bobo can pursue a mixed-motive claim based solely [**40] on circumstantial [***22] evidence. *See Desert Palace, Inc. v. Costa, 539 U.S. 90, 100-01, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003)*. At the summary judgment stage, the ultimate question is whether Bobo presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that his race was a motivating factor in UPS's decision to terminate his employment. *See Wright, 455 F.3d at 713*.

Reviewing all of the evidence favorably to Bobo, a reasonable jury could logically infer that Bobo's race was a motivating factor in the discharge decision. None of the Caucasian supervisors who violated or were accused of violating the integrity policy suffered employment termination, except Ronnie Wallace. UPS insists that only Wallace and Bobo are similarly situated because they admitted misconduct. But whether the other identified supervisors who did not admit misconduct are similarly situated to Bobo is a jury question. *See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (on summary judgment, court must not make credibility determinations or weigh evidence); *Hamilton v. General Elec. Co., 556 F.3d 428, (6th Cir. 2009)* (*Reeves* reinforces fact that *Mitchell* cannot apply where non-moving party contests [**41] material facts). Therefore, we reverse the district court's grant of summary judgment to UPS on Bobo's Title VII and § 1981 discrimination claims.

We affirm, however, on the Title VII and § 1981 retaliation claims. Even if Bobo's refusal to disqualify Sharon Thompson constituted protected activity, Bobo did not establish the necessary causal connection between the protected activity and his discharge from employment. *See Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2009)*.

**E. THRA claims**

Finally, we reach the THRA claims. The district court ruled that Bobo's THRA claims failed for the same reasons his Title VII and § 1981 claims failed, noting that Tennessee courts look to federal cases applying federal anti-discrimination statutes as the baseline for interpreting and applying the THRA. *See e.g. Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008)*. During the pendency of this appeal, the question arose whether federal courts, on summary judgment, should continue to analyze [***23] THRA claims similarly to Title VII claims in light of the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co., 320 S.W.3d 777, 779, 785 (Tenn. 2010)* (holding in a common law retaliatory [**42] discharge case "that the *McDonnell Douglas* framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence" after *Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 8-9 (Tenn. 2008)*). Because *Gossett* was decided after the entry of summary judgment in this case, we accepted supplemental briefs from the parties and an *amicus* [*758] *curiae* brief from the Tennessee Employment Lawyers Association (TENNELA) concerning *Gossett's* effect. Shortly after oral argument, an amendment to *Tenn. Code Ann. § 4-21-311(e)* took effect, which appears to abrogate *Gossett* and *Hannan* and require the continued application of the *McDonnell Douglas* framework in THRA cases in accordance with the law prior to *Gossett* and *Hannan*.

We find it unnecessary to engage in a lengthy discussion of these developments. For the same reason we reverse summary judgment on Bobo's Title VII and § 1981 race discrimination claims, we also reverse summary judgment on the race discrimination claim under the THRA. Likewise, for the same reason we affirm summary judgment on Bobo's Title VII and § 1981 retaliation claims, we also affirm summary judgment on the retaliation claim under the [**43] THRA. We leave for the district court to decide in the first instance how the recent changes in Tennessee law affect Bobo's THRA discrimination claim.

Finally, because we reverse in part the grant of summary judgment for UPS, we do not reach Bobo's argument concerning the award of costs. We leave this issue to the district court for resolution on remand.

**IV. CONCLUSION**

For all of the reasons stated, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** the case to the district court for further proceedings consistent with this opinion.