EXHIBIT 4

# IN THE CIRCUIT COURT OF WILLIAMSON COUNTY, TENNESSEE

In re: Enforcement of Foreign Court Subpoena
Williamson County Miscellaneous Docket No. 21CV-267

## Foreign Court Caption:

| | |
|---|---|
| State of Washington, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 20-2-03141-1-SEA |
| v. ) | King County, Washington |
| ) | Superior Court |
| Reed Hein & Associates et al, ) | |
| ) | |
| Defendants. ) | |

## DAVID L. RAMSEY, III'S DECLARATION

I, David L. Ramsey, III declare as follows:

1. I am over 18 years of age, I have personal knowledge of the matters stated herein, I am competent to testify on the matters stated herein, and the facts stated herein are true and correct.

2. I am the Chief Executive Officer and Chairman of the Executive Committee of The Lampo Group, LLC, d/b/a Ramsey Solutions ("Lampo"). I submit this Declaration in support of my response to the State of Washington's motion to compel my deposition, to demonstrate that I have no unique or non-repetitive knowledge relevant to the State's lawsuit against Reed Hein & Associates, d/b/a Time Share Exit Team ("Reed Hein").

3. I founded Lampo in 1992 to provide personal finance education to people seeking a better understanding of wise money management.

4. As CEO and Chairman, I am responsible for oversight and management of the Lampo enterprise, which generates hundreds of millions of dollars in annual revenue and employs over 1,000 people.

5. I rely on our executive team to carry out the company's day-to-day business activities. I also lead weekly meetings with my team and participate in executive and board meetings several days per week.

6. I host a nationally syndicated radio program, which is recorded each weekday. I spend about 5 hours per weekday preparing for and appearing on the show.

7. I also travel extensively for speaking engagements and other events.

8. By way of example, the following events and obligations in the next 30 days alone are in addition to my normal day-to-day obligations in running Lampo:

   a. I will be speaking in Orlando, Florida at a Leadership Conference for John Maxwell;

   b. I will be attending a Leadership outing for our leadership team;

   c. I will be leading a three-day planning offsite for our Operating Board;

   d. I will be spending a week in Martha's Vineyard with our Top 50 Radio Station Clients teaching leadership;

   e. I will be doing a three-hour radio show daily when in the office;

   f. I will be leading Monday morning staff meetings for 1,000 team members;

   g. I will be speaking at five services at a church in Anaheim, California;

   h. I will be speaking at an event on Time Management;

   i. I will be spending a day of filming for new videos for Financial Peace University and five days of planning for that shoot;

   j. I will be hosting a VIP Platinum reception at my home for our Master Coach Training event;

   k. I will be speaking for a Game Plan Livestream;

l. I will be speaking at Convocation for Liberty University in person in Lynchburg, Virginia; and

m. I will be leading an evening for finalizing onboarding of 70 new team members.

9. As a result, preparing for and giving a deposition in the Washington Attorney General's lawsuit against Reed Hein would impose a significant burden on me, disrupting my schedule and Lampo's business.

10. I also have no unique or non-repetitive knowledge regarding the State's allegations against Reed Hein in the lawsuit. As described below, other Lampo employees have more substantive and particularized knowledge regarding Lampo's relationship with Reed Hein.

11. In July of 2015, Lampo and Reed Hein entered into an endorsement agreement, pursuant to which Lampo agreed to run advertisements for and endorse the services of Reed Hein in exchange for payment from Reed Hein.

12. The contracts that form the basis of the endorsement relationship are between Reed Hein and Lampo, not me personally.

13. While I promote the endorsements on our radio program and online, I do so in my capacity as CEO of Lampo.

14. When Lampo entered into the endorsement agreement, I had no prior relationship with Reed Hein or its principals.

15. Brian Mayfield is an Executive Vice President of Lampo and is primarily responsible for the Reed Hein relationship. Mr. Mayfield has been a Lampo team member for approximately 12 years and is one of our top leaders.

16. Mr. Mayfield and his team undertook due diligence of Reed Hein prior to the endorsement agreement and negotiated the terms of the agreement. I did not do any independent due diligence or participate in those negotiations.

17. I relied on Mr. Mayfield and his team to undertake the due diligence into Reed Hein prior to the endorsement agreement. I adopted Mr. Mayfield's and his team's recommendations.

18. Mr. Mayfield and his team are also responsible for the financial terms of the agreements between Lampo and Reed Hein.

19. I agreed to enter the endorsement agreement on behalf of Lampo based on the recommendation of Mr. Mayfield and his team. That recommendation did not change during the pendency of the relationship, and I relied on that in continuing the relationship.

20. When Reed Hein advised my team in or about March 3, 2021, that Reed Hein could no longer honor the financial terms of our endorsement arrangement, my team recommended that Lampo end the endorsement relationship and remove Reed Hein from Lampo's website, which Lampo did.

21. I had no discussions personally with anyone associated with Reed Hein concerning their ability to honor the financial terms of our endorsement arrangement.

22. I have had no contact with Reed Hein or its principals, other than brief, personal interactions with Mr. Reed before and after recording joint endorsement pieces, and social interactions at Lampo's annual Christmas party for significant clients and similar social events.

23. I have had no direct insight into Reed Hein's operations, representations to its customers, or any other aspects of its business. Again, others on my team are responsible for the details of the endorsement relationship, and I act based on their recommendations and advice.

24. I recall a couple of occasions when I observed a spike in questions or complaints regarding Reed Hein from our listeners. In those instances, I instructed Mr. Mayfield to address the issues with Reed Hein to ensure that our listeners were receiving prompt attention from Reed Hein.

25. I had no communications with Reed Hein about these issues, only internal communications with Mr. Mayfield and other members of my team.

26. After these spikes in feedback from our listeners regarding Reed Hein, the issues were promptly addressed, and the volume of questions and complaints subsided.

27. We also received a lot of positive feedback from our listeners regarding Reed Hein during these same timeframes.

28. Mr. Mayfield and his team are also responsible for the content of the endorsement pieces that I promote on the radio program or online.

29. I have ultimate control over the content, of course, but I typically accept what Mr. Mayfield and his team propose, without changes. Further, any changes I would make would be largely stylistic or to correct errors in grammar or syntax.

30. The endorsement material is written by Tammy Gray, another member of Mr. Mayfield's team. Ms. Gray has worked with me for a long time. As a result, she knows how I speak and my preferred language, so I rarely have to edit her copy.

31. I have only limited, general knowledge of the litigation in which Reed Hein is involved, which knowledge came from Lampo's legal counsel.

Pursuant to Tenn. R. Civ. P. 72, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 27, 2021.

_____
David L. Ramsey, III