⊞ Dunavant v. Frito Lay, No. 1:11-0028, 2013 BL 57174, 2013 Us Dist Lexis 30690, 2013 WL 816673 (M.D. Tenn. Mar. 05, 2013), Court Opinion

**Pagination**
\*      BL

**Opinion** >

United States District Court, M.D. Tennessee

DONNA JARETHA DUNAVANT, Plaintiff, v. FRITO LAY, Defendant.

No. 1:11-0028

March 5, 2013.

**MEMORANDUM**

Kevin H. Sharp, District Judge

Plaintiff Donna Dunavant sued her former employer, Defendant Frito Lay, claiming that she was terminated in violation of the Americans with Disabilities Act, **42 U.S.C. § 12101** *et seq.*, the Tennessee Disability Act, Tenn. Code Ann. § **8-50-103**, and the Family and Medical Leave Act, **29 U.S.C. § 2601** *et seq.* Pending before the Court is Defendant's fully briefed Motion for Summary Judgment (Docket No. 27), as well as Motions to Strike (Docket Nos. 50, 51 & 52), and Plaintiff's Motion for Appointment of Grievance Committee and to Stay Proceedings Pending Investigation (Docket No. 60). For the following reasons, Defendant's Motion for Summary Judgment will be granted as will Plaintiff's Motion to Strike her Motion to Strike. All other motions will be denied.**[fn1]**

**I. FACTUAL BACKGROUND**

The relevant facts, drawn primarily from Defendant's Statement of Facts and Plaintiff's response thereto,**[fn2]** are as follows:

Frito-Lay manufactures and distributes snack foods throughout the United States, and operates a food processing and manufacturing plant in Pulaski, Tennessee. On April 29, 1999, Plaintiff began her at-will employment at Frito Lay as a Packer at the Pulaski plant. Later, she worked as a Cartoner Operator, and held that position until she was terminated from employment on June 29, 2010.

➕ Dunavant v. Frito Lay, No. 1:11-0028, 2013 BL 57174, 2013 Us Dist Lexis 30690, 2013 WL 816673 (M.D. Tenn. Mar. 05, 2013), Court Opinion

A Cartoner Operator oversees the operation of the carton-packing system, loads cartons, performs quality assurance checks according to schedule, and performs changeover of the system. At the time of her discharge, Plaintiff's immediate supervisor was Natalie Clark.

At the Pulaski plant, employees are subjected to a Progressive Coaching Policy that is contained in the Frito-Lay Pulaski Team Handbook. As its name suggests, the policy is a progressive discipline system that includes counseling, oral warnings, written warnings, and Decision Making Leaves.

A Decision Making Leave, or DML, is generally issued as an alternative to discharge after an employee has received a written warning. Those given a DML are sent home so that they can decide whether they want to commit to changing their behavior and continue working at Frito-Lay.

Plaintiff concedes that she received all relevant Frito-Lay policies. She also concedes that she was well aware of the Progressive Coaching Policy.

During the twelve-month period before her termination, Plaintiff had many performance issues. On June 22, 2009, Plaintiff was issued an oral warning for poor performance because, during a three hour period, she utilized the wrong caddies for 324 cases of crackers, which resulted in losses of $1,223.50 in labor costs and material. Plaintiff was warned to make sure she was properly performing the quality checks every thirty minutes, instructed not to fill out paperwork without doing quality checks first, and informed that she was expected to run the correct product in the correct caddie with the correct code dates. While Plaintiff **[*2]** agrees she received this oral warning (she actually signed it, Docket No. 28-1 at 26), she claims that did not make any misrepresentations on her paperwork. She also "agrees that she was reminded of her responsibility but denies that it was her responsibility." (Docket No. 39 at 3).

On August 12, 2009, Plaintiff proceeded to the next step in the Progressive Coaching Policy when Frito-Lay issued her a written warning for failing to perform metal detector checks at the times they were scheduled,**[fn3]** and failing to sign package certifications on certain wrappers. Plaintiff was informed in the written warning that she was expected to perform the job requirements of her position. Again, Plaintiff signed the warning (Docket No. 28-1 at 27), and, while she admits to having received the warning, she claims in response to the Motion for Summary Judgment that signing package certifications was not a part of her job.

On September 2, 2009, Frito-Lay issued a final written warning, along with a DML because Plaintiff again failed to complete a package certification. Plaintiff was reminded that this was her responsibility and that certifications are important because they allow Frito-Lay to address quality control issues early and thereby, perhaps, eliminate the need for a product to be placed on hold, or reduce the time that the product is placed on hold. While Plaintiff concedes receiving this warning and being reminded that completing packaging certifications was a part of her job, she disputes that this was actually a part of her job.

Plaintiff received a second final warning and DML on February 9, 2010, for poor job performance. This was because Frito-Lay discovered the film that had been placed on the wrapper for a cracker line was wrong.**[fn4]** This error required that an entire product line be placed on hold, and required the manual checking of 170 cases of product, resulting in $881.00 in product and labor cost. Again, Plaintiff agrees that she received the warning, but denies that she failed to perform the required quality check, or making any such admission in her deposition. Rather, she asserts that, while she did not personally perform the check, the check had been performed by someone else, and she documented that the check had been made.

In the February 9, 2010 warning, Plaintiff was informed that any further performance problems could result in either a suspension or termination. Plaintiff was also informed that she had a right to appeal the DML through Frito-Lay's employee dispute process, which she did. After an investigation (and apparently a discussion with Plaintiff, Docket No. 28-1 at 33), Mark Vantrease, Frito-Lay's Vice President of Operations for the Central Gulf Region, upheld the DML on February 16, 2010.

On April 5, 2010, Plaintiff took approved FMLA leave. Her medical provider cleared her to return to work on June 7, 2010, full time and without any restrictions. While Plaintiff acknowledges that is what the release said, she claims her doctor, Glenn Yank, did so as an accommodation to her because Frito Lay has a requirement that employees [*3] return to work "without restriction." She also claims Dr. Yank told her that she was still "extremely ill," and that if she did not continue to take her prescribed medicines she would have a relapse which would require immediate medical intervention.

Defendant claims that Plaintiff failed to properly code cracker boxes and failed to notice that the shift code date was improperly coded during the second shift on June 27, 2010.**[fn5]** She was suspended for this incident on June 28, 2010, pending an investigation.

As a result of its investigation, Frito-Lay determined that Plaintiff had once again failed to perform her job responsibilities by not properly monitoring and changing the code dates, which led to the incorrect printing of production information on roughly 144 cases of packaged product. Because Plaintiff had already been issued a final warning for poor job performance on two previous occasions in the past twelve months, Frito-Lay terminated her employment on June 29, 2010. Two other employees were also disciplined for this incident but, because they were not as far along in the progressive disciplinary process, they were not terminated.

With regard to the reasons given for her termination, "Plaintiff disagrees with Defendant's determination," and claims that the reasons were "trumped up." (Docket No. 39 at 7 & 8). Plaintiff insists that the real reason she was terminated was because of her disability.

As indicated, Plaintiff disputes many of the assertions raised by Defendant, particularly as they relate to whether Plaintiff performed her job duties or whether the unperformed tasks were really Plaintiff's responsibility. Whether Plaintiff has competent evidence to support these denials, or to otherwise defend against the summary judgment motion, is the subject of Defendant's motion to strike which the Court considers

next.

## II. DEFENDANT'S MOTION TO STRIKE[fn6]

Arguing that "Plaintiff's Response is littered with fatal evidentiary deficiencies, including but not limited to incompetent and hearsay testimony, unauthenticated and hearsay documents, and other statements which squarely contradict Plaintiff's previous sworn deposition testimony and/or interrogatory responses[,] Frito-Lay objects to the introduction of this evidence and requests that the Court sustain its objections, and strike and/or not consider the same in deciding Defendant's Motion for Summary Judgment." (Docket No. 50-1 at 1). This Court has reviewed Plaintiff's evidentiary submissions and agrees that they are lacking in many respects.

For example, Plaintiff submits numerous documents, but they have not been properly authenticated. The Sixth Circuit "has repeatedly emphasized that 'unauthenticated documents do not meet the requirements of Rule 56(e).'" Automotive Support Group, LLC v. Hightower, [2012 BL 286528], 2012 WL 5351588 at *6 (6th Cir. Oct. 31, 2012) (quoting, Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009)). However, even if this deficiency is overlooked because the 2010 amendments to Rule 56 speak in terms of whether evidence "can[] be presented in a form that would [*4] be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and some of the documents appear to be Frito-Lay's or those of Plaintiff's treating physician and hence could be authenticated at trial by a corporate representative or someone from the doctor's staff, there are other problems with Plaintiff's submissions.

Plaintiff relies heavily upon her own affidavit, but that affidavit contains hearsay. For example, she references purported conversations with Dr. Yank to the effect that he only agreed to make her return to work authorization "without restriction" because of Frito Lay's requirements, and he warned Plaintiff about what could occur if she did not take her medications or was subjected to stress. But "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge," Fed.R.Civ.P 56(e); hearsay evidence generally does not fit this bill and "must be disregarded." Alpert v. United States, 481 F.3d 404, 409 (6th Cir. 2007). Again, even if one considers that the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment," Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986), "a party opposing summary judgment who proffers evidence in a form not admissible at trial nonetheless 'must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will* be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.'" Alexander, 576 F.3d at 558 (citations omitted) (emphasis in original).

Hearsay aside, some parts of Plaintiff's affidavit contain statements that contradict her deposition testimony and/or her interrogatory responses. For example, Plaintiff purports to set forth her conversation with Matt Zink on her return from leave on June 7, 2010, but her recollection of that conversation as set forth in her affidavit is markedly different than the recollection she provided in her deposition. Likewise, Plaintiff makes blanket assertions in her response to the summary judgment motion to the effect that she was not responsible for ensuring that the correct caddies were run, but stated in her deposition that she was responsible for insuring

that the correct caddies were run with the correct code dates. Similarly, Plaintiff writes in her affidavit that upon her return to work on June 7, 2010, Becky Allen, her "bosses' supervisor" told her that "it wasn't fair that I took so much time off and that I was taking advantage of the FML [sic]," yet when asked in interrogatories to provided every basis for her FMLA claim, Plaintiff neglects to mention that purported, yet important, conversation.

"[A] plaintiff may not create a factual issue by filing an affidavit that contradicts her earlier deposition testimony." Trout v. FirstEnergy Generation Corp., 339 Fed. Appx. 560, 566, (6th Cir 2009). Additionally, "[t]he sham affidavit rule precludes [a party] from creating a genuine dispute of material fact by contradicting its prior interrogatory answers." Pinnacle Fitness and Recreation Mgmt, LLC v. Moyes Family Trust 844 F.Supp.2d 1078, 1094 (S.D. Cal. 2012); see, Siskiyou Buckle Co., Inc. v. GameWear, [*5] Inc., [2011 BL 308281], 2011 WL 5999869 at *4 (D. Ore. Nov. 30, 2011) ("a party cannot create a triable issue of fact by introducing a sham affidavit that contradicts his prior deposition testimony or interrogatory responses").

While Defendant has titled its motion as a Motion to Strike, it alternatively requests that this Court ignore evidence which cannot properly be considered under Rule 56. The latter approach is the course this Court will take in this case. See, LuJan v. Southwest Airlines Co., [2008 BL 243446], 2008 WL 4791490 at *6 (M.D. Tenn. Oct. 28, 2008) (noting that motions to strike are disfavored, but considering plaintiff's affidavit only to the extent that it was based on personal knowledge, set forth facts which would otherwise be admissible in evidence and did not directly contradict prior deposition testimony); Berry v. Frank's Auto Body Carstar, Inc., 817 F.Supp.2d 1037, 1041-42 (S.D. Ohio 2011) (footnote omitted) ("But motions to strike are disfavored; a Court should ignore inadmissible evidence instead of striking it from the record").

## III. PLAINTIFF'S MOTION FOR APPOINTMENT OF GRIEVANCE COMMITTEE AND TO STAY

The present state of the evidentiary record is among the reasons Plaintiff requests the appointment of a grievance committee to investigate the conduct of her prior counsel. Plaintiff alleges that prior counsel failed to draft a complaint which encompassed all of her causes of action, and failed to "conduct pre-trial discovery including but no [sic] limited to deposition discovery prior to the discovery deadline[.]" (Docket No. 60 at 2). Said omissions, Plaintiff insists, violate the Tennessee Rules of Professional conduct.

Plaintiff's complaints are best addressed by the Tennessee Board of Professional Responsibility. Further, while the local rules provide that "this Court may from time to time appoint grievance committees to investigate any complaint made to it alleging improper professional conduct," *L.R. 83.01(e)(4)*, this case does not warrant that action, particularly since Plaintiff has already filed a complaint with the Board. Moreover, this Court's local rules do not contemplate that a case be stayed while an investigation proceeds, and certainly not a case that is ripe for adjudication and one in which the request to appoint a grievance committee comes months after the motion for summary judgment has been fully briefed.

## IV. MOTION FOR SUMMARY JUDGMENT

Bloomberg Law® Case 3:19-cv-00828 Document 67-9 Filed 11/09/21 Page 5 of 13 PageID #: 1171 © 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service // PAGE 5

## A. Standard of Review

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## B. Disability Discrimination under the ADA and TDA

"To make out a *prima [*6] facie* case of employment discrimination through indirect evidence [under the ADA] a plaintiff must show that '1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.'" Whitfield v. Tennessee, 639 F.3d 253, 258—259 (6th Cir. 2011) (quoting, Macy v. Hopkins Cnty. Sch. Bd. of Educ., 484 F.3d 357, 365 (6th Cir. 2007)). The same general elements apply whether the claim is under the ADA or the TDA, although the TDA does not require a reasonable accommodation. Cadenas-Meade v. Pfizer, Inc., 2013 WL 49570 at *2 & fn.3 (6th Cir. Jan. 4, 2013).

"[O]nce a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." Whitfield, 639 F.3d at 259 (citing, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 703 (6th Cir. 2008)). Plaintiff's disability discrimination case falters at all three stages of the McDonnell-Douglas paradigm.

With regard to the *prima facie* case, Plaintiff's ADA and TDA claims fail because she has failed to forward evidence that she was suffering from a disability at the time of her termination and that her employer was aware of that disability. Plaintiff asserts that while her doctor returned her to work without restrictions, he did so only because Frito-Lay had a "without restrictions" policy. This assertion is not supported by competent evidence.

Plaintiff's recitation of what her doctor allegedly told her is hearsay. That aside, she relies upon a declaration from Medina Adkins to support the "no restriction" requirement, but Ms. Adkins only states that she "was told by the representatives of Human Resources that in order for me to return to work after leave I had to have a doctor's note stating that I had 'no restrictions' and releasing me at 100% to be at full duty." (Docket No. 48-2 at 1). Even if Ms. Adkins' statement could be deemed to fall within Fed.R.Evid. 801(d)(2)'s hearsay exception for

an admission by a party opponent (a questionable proposition since the representative is not specifically identified), Ms. Adkins does not indicate when the alleged statements about a "no restriction" policy were made, or even if they were made at a time close to when Plaintiff took FMLA leave.

Perhaps to shore up the deficiencies in this evidentiary record, Plaintiff states in her Affidavit that she was told by Matt Zink and Tammy Hargrove in the Human Resources Department that she could not return to work, unless it was without restriction. Even if that were so, this does not end the inquiry.

It is true, as Plaintiff argues, that "100% healed" policies can constitute a *per se* violation of the ADA because they do not provide for an individualized assessment. See, Steffen v. Donahoe, 680 F.3d 738, 748 (7th Cir. 2012); Watts v. United Parcel Serv., 328 Fed. Appx. 520, 529 (6th Cir. 2010); but **[*7]** see, Hohider v. United Parcel Serv., 524 F.3d 169, 195 (3rd Cir. 2009) (declining to decide whether 100% healed policies violate the ADA). But "a 100% rule is impermissible [only] as to a *disabled* person" and "one must first be disabled," Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir. 2001) (italics in original), something which Plaintiff has not shown by competent evidence to have been the case at the time she was terminated from employment.

Plaintiff's *prima facie* case also fails on the fifth element which requires her showing "either the position remained open or a non-disabled person replaced her," Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321 (6th Cir. 2012), or "by showing that similarly situated non-protected employees were treated more favorably." Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 660 (6th Cir. 1999).

In her affidavit, Plaintiff avers that, after her termination, her job was filled by "a non-disabled employee named Donna Currin." (Docket No. 46-1, ¶ 38). She claims that occurred three weeks after she left Frito-Lay, but does not indicate how she has personal knowledge of this "fact," or the "fact" that Ms. Currin is not disabled. In her deposition, Plaintiff claimed that she was treated differently than an employee named "Margaret," and, according to Defendant, the only employee that could have been is Margaret Franklin. Even assuming there is a smidgen of evidence before the Court that Ms. Franklin was not disabled, she has not been shown to have been similarly situated or treated differently than Plaintiff because Ms. Franklin, too, was terminated, her termination occurred three years before Plaintiff's, Ms. Franklin worked in a different job, and she did not enegage in the same conduct or have the same performance issues as Plaintiff. See, Jones v. Potter, 488 F.3d 397, 406 (6th Cir. 2007) (citation omitted) ("To be considered 'similarly situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'").

Assuming for the sake of argument Plaintiff can establish a *prima facie* case of disability discrimination, her claims under the ADA and TDA fail because Frito-Lay has set forth legitimate, non-discriminatory reasons for her discharge and Plaintiff has not shown those reasons to be pretextual.

As this Court's recitation of the facts make clear, Plaintiff had a well-documented history of performance issues

in the year prior to her termination. She received an oral warning, a written warning, and two separate final warnings with DMLs, and this history alone would be sufficient for her termination under Frito-Lay's Progressive Coaching Policy. Nevertheless, Plaintiff was not terminated at this point, but allowed another opportunity to cure her performance problems. Plaintiff then failed to properly code product, and failed to notice that a shift code was incorrect, resulting in her termination.

Poor performance is obviously a legitimate non-discriminatory [*8] reason for an adverse employment action, see, Whitfield v. Tennessee, 639 F.3d 253, 261 (6th Cir. 2011), and, because the summary judgment record wholly supports the conclusion that Plaintiff performed poorly, it is incumbent upon her to show that her poor performance was but a pretext for her termination and that the real reason was because of her disability. Again, the evidence she has mustered falls short.

"'[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.'" Romans v. Mich. Dept. of Humans Serv., 228 F.3d 826, 839 (6th Cir. 2012).

Plaintiff argues that "Defendant's own documentation provides evidence of the pretextual nature of Plaintiff's discharge." (Docket No. 38 at 20). This is because in her warnings she was told that it was her job to "sign the package certification" and to "fill out your package certification," but the job description for her position "does not state that Plaintiff is required, as a part of her job, to either sign package certifications or fill out package certifications." *Id. at 21*. Instead, "[t]hese instructions were given to her verbally by Becky Allen and Debbie Terry in order to create a pretext for her termination." *Id*.

As Plaintiff claims, the job description of a Cartoner Operator does not specifically list either signing or filling out package certifications as a part of the essential elements of the job, but it does state as the first essential function that a Cartoner Operator is responsible for "[o]verseeing operation of carton-packing system." (Docket No. 28-1 at 38). Regardless, and contrary to Plaintiff's position, Plaintiff was not just verbally instructed by Ms. Allen and Ms. Terry to fill out and sign certifications. To the contrary, in the first written warning which Plaintiff received (and signed) some 10 months before her termination, she was specifically informed that she was to conduct metal detector checks and that "it is also part of your job to sign the package certifications on wrappers 2 and 3," and "on numerous occasions you have been advised by QA as well as myself to do this[.]" (*Id*.at 28). Less than a month later, when Plaintiff received her first "DML for not filling out your package certification," she was reminded:

... You have been coached numerous times. This is part of your job requirement. Doing this may prevent product hold. This is the reason the certification has four signatures required.

(*Id. at 31*). Five months later, when Mr. Vantrease reviewed Plaintiff's second DML he wrote:

Bloomberg Law® © 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

⊞ Dunavant v. Frito Lay, No. 1:11-0028, 2013 BL 57174, 2013 Us Dist Lexis 30690, 2013 WL 816673 (M.D. Tenn. Mar. 05, 2013), Court Opinion

> Your dispute surrounds the Site's decision to issue you a Decision Making Leave (DML) resulting from your failure to properly execute Packaging Certifications on Sept 2, 2009.
>
> After further investigation and careful review I found that there were grounds for the DML. You had been reminded on several occasions prior to Sept 2, 2009 to execute the standard duties aligned with you Job Classification. I must therefore uphold the Leadership Teams decision to issue a DML.
>
> The **[*9]** Packaging Certification is a multi point sign-off process and one that holds a "Regulatory" Quality Assurance rating.
>
> It is important for each Team Member to do their individual part and to work as a team to ensure we produce the best quality product.

(*Id. at 33*). Plaintiff signed the second DML, indicating her "desire to return to work at Frito-Lay," and "agree[ing] to abide by all Frito-Lay rules and regulations. (*Id. at 35*).

This evidentiary record belies any suggestion that either Ms. Terry or Ms. Allen came up with the package certification requirements in order to set Plaintiff up to fail. Rather, it clearly shows that (1) Frito-Lay expected her to fill out and sign packaging certifications, and (2) Plaintiff understood this to be Frito-Lay's expectation.

Also on the issue of pretext, Plaintiff contends that it was "unreasonable" and "unfair" to terminate her from employment. "[B]ut the fact that she thinks more highly of her performance than her employer does is beside the point" because "[t]he inquiry into pretext centers on the employer's beliefs." Alvarez v. Royal Atl. Developers, Inc., **610 F.3d 1253**, **1266** (11th Cir. 2010). "The question is not whether it really was" not Plaintiff's fault that the certification were not properly filled out, but, rather, "[t]he question is whether her employer[ was] dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [plaintiff] as cover for discriminating against her[.]" **Id**.; see also, Conner v. State Farm Mut. Auto. Ins. Co., **273 Fed. Appx. 438**, **442** (6th Cir. 2008) (plaintiff's belief as to her qualifications is not relevant; rather, the inquiry is whether the plaintiff established that discriminatory intent motivated the defendant's decision to terminate). Plaintiff has failed to produce evidence from which a reasonable jury could conclude that her alleged disability, as opposed to her work performance issues, was the real reason for her termination.

Accordingly, summary judgment will be granted on Plaintiff's ADA and TDA claims.

In concluding that summary judgment is appropriate, the Court acknowledges Plaintiff's argument in her reply brief that, not only did her dismissal violate the ADA, Defendant violated the ADA when it failed to accommodate her disability while she was employed. However, Plaintiff did not allege a failure to accommodate in her EEOC, charge and while a charge may be said to include discrimination which may

reasonably be expected to grow out of the scope of the initial charge, a disparate treatment claim based upon an alleged disability does not encompass a failure to accommodate claim. See, Durham v. City of Clarksville, [2012 BL 316192], 2012 WL 6021435 at *3 (M.D. Tenn. Dec. 4, 2012); Boker v. Sec. Dept. of Treas., *2009 WL 3193199074* at *8 (S.D. Ohio Sept. 29, 2009). Moreover, in her Complaint, Plaintiff specifically alleges that she was discriminated against when she "was terminated because of her disability" (Docket No. 1 at ¶¶ 42 & 47) in violation of the ADA and TDA; there is no claim that Defendant violated the ADA when if failed to accommodate her while she was still employed. See, West v. New Mexico[*10] Taxation and Rev. Dept., 747 F.Supp.2d 1065, 1113 (D. N.M. 2010) (a failure to accommodate claim is not properly before the court where it is not the subject of an EEOC charge, or pled in the complaint).

Regardless, to the extent Plaintiff's claim is that Frito-Lay should have accommodated her when she returned from FMLA leave, a failure to accommodate claim, just like a disability discrimination claim, requires that the party seeking the accommodation be disabled. See, 42 U.S.C. § 12112(5)(A) (emphasis added) (the ADA prohibits "not making reasonable accommodations to the *known physical or mental limitations of an otherwise qualified individual with a disability* who is an applicant or employee"). Plaintiff returned to work "without restriction," and she has not shown with competent evidence that the release meant something other than it said.

**C. FMLA Retaliation Claim**

The FMLA prohibits employers from interfering with, restraining, or denying the exercise of rights under the Act. 29 U.S.C. § 2615(a)(1). "Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in McDonnell Douglas[.]" Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007). "At the outset, 'the plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.'" *Id*. (quoting, Macy v. Hopkins County Sch. Bd. of Educ., 484 F.3d 357, 363 (6th Cir. 2007).

"[A] plaintiff may make out a prima facie case is by showing that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity." *Id*. (citing, Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001). As with claims under the ADA, once a Plaintiff meets her burden, the burden "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action," and, if it does so, "the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Id*.

In her reply brief, Plaintiff spends little time arguing about her FMLA claim. She does note that she returned to work on June 7, 2010 just 22 days prior to her termination, (Docket No. 38 at 22), but does not further argue the point.

➕ Dunavant v. Frito Lay, No. 1:11-0028, 2013 BL 57174, 2013 Us Dist Lexis 30690, 2013 WL 816673 (M.D. Tenn. Mar. 05, 2013), Court Opinion

Temporal proximity between protected activity (here taking FMLA leave) and an adverse employment action may allow an inference of discriminatory intent, but generally it must be "'coupled with other indicia of retaliatory conduct[.]'" Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007) (citation omitted) (collecting cases). Apparently in an effort to show other indicia of retaliatory intent, Plaintiff writes:

... Becky Allen told Plaintiff upon her return to work from the second FML that Plaintiff was out too much. Becky Allen said that Plaintiff's absences was taking advantage of the FML and that it wasn't fair even though FML is not to be determined by "fairness" but by "need" and Becky Allen was making it quite clear that [*11] she and management considered Plaintiff's absence a matter of "fairness" rather than "necessity."

Mike Miller, the "decision maker" in Plaintiff's termination, repeated word for word the same derogatory comments regarding Plaintiff's job performance and absences as Becky Allen said to Plaintiff. Mike Miller, the "decision maker", knew of Plaintiff's disability and used all of the alleged job performance violations as a pretext for terminating Plaintiff's employment because he too didn't think it was fair that Plaintiff took FML and he too thought that Plaintiff was taking advantage of the FML.

(Docket No 38 at 22-23).

This Court has already observed that reliance on the reference to Ms. Allen allegedly making complaints about Plaintiff taking advantage of the FMLA is problematic because those purported statements were not a part of the Plaintiff's interrogatory responses, or mentioned in Plaintiff's deposition. And the suggestion that Mike Miller "repeated word for word the same derogatory comments" is even more problematic because Plaintiff does not cite the evidentiary record for that statement, and Plaintiff's only mention of Mike Miller in her affidavit is that "he knew at the time of my termination, of my disability" because he and Matt Zink "spoke" and, thereafter, Mr. Miller "assured" Plaintiff "that Becky Allen would not 'pile on' additional tasks verbally." (Docket No. 46-1 ¶ 40). This hardly establishes as a fact that Mr. Miller was aware of Plaintiff's alleged disability, let alone that he made comments about Plaintiff misusing FMLA leave.

Regardless, "'[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one.'" Bryson, 498 F.3d 571 (citation omitted). However, even assuming that Plaintiff can set forth *a prima facie* case, her FMLA claim fails because, as already stated, Defendant had plenty of reasons to terminate her employment, and Plaintiff has not shown those reasons to be pretextual. Indeed, she relies solely on the arguments she made in regard to her ADA and TDA claims but, as indicated, those are insufficient to survive summary judgment. Moreover, Plaintiff's "documented performance issues began well before she used FMLA leave," Cox-Freitch v. Ohio Bur. of Workers' Compensation, 2012 WL 6051972 at *3 (6th Cir. Dec. 6, 2012), and, to put it rather bluntly, "an employee may not insulate [her]self from a pending dismissal by opportunistically invoking the FMLA." Gipson v. Vought Aircraft Indus., Inc., 387 Fed. Appx. 548, 557 (th Cir. 2010).

Defendant is therefore entitled to summary judgment on Plaintiffs FMLA claim.

## V. CONCLUSION

On the basis of the Defendant's Motion for Summary Judgment will be granted and Plaintiffs claims will be dismissed. All other motions, save for Plaintiffs Motion to Strike her Motion to Strike, will be denied.

An appropriate Order will be entered.

**[fn1]** In anticipation of trial, Defendant has also filed a Motion in Limine (Docket No. 55). This motion is rendered moot by the granting of Defendant's Motion for Summary Judgment and will be denied.

**[fn2]** The Court has also thoroughly reviewed the evidentiary record in this case in relation to the statement of facts.

**[fn3]** Metal detector checks at the Pulaski Plant are supposed to be performed every three hours during a shift.

**[fn4]** Apparently, wrapper #2 "was running Bacon Cheddar crackers with Doritos film." (Docket No. 28-1 at 32).

**[fn5]** Proper coding is important because Frito-Lay uses the codes to track the causes of manufacturing problems if there is a consumer complaint, or quality issues arise.

**[fn6]** In addition to Defendant's motion, Plaintiff moved to strike Defendant's reply brief, but upon recognizing that a reply brief was contemplated by the Case Management Order, moved to strike the motion to strike. As such, Plaintiff's initial motion to strike will be denied while her motion to strike her motion to strike will be granted. Also, and for future reference, the undersigned does not require leave of Court to file reply briefs.

Dunavant v. Frito Lay, No. 1:11-0028, 2013 BL 57174, 2013 Us Dist Lexis 30690, 2013 WL 816673 (M.D. Tenn. Mar. 05, 2013), Court Opinion

# General Information

| | |
|---|---|
| **Case Name** | Dunavant v. Frito Lay |
| **Court** | U.S. District Court for the Middle District of Tennessee |
| **Date Filed** | Tue Mar 05 00:00:00 EST 2013 |
| **Judge(s)** | Kevin Hunter Sharp |
| **Parties** | DONNA JARETHA DUNAVANT, Plaintiff, v. FRITO LAY, Defendant. |
| **Topic(s)** | Employment Law; Evidence |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service // PAGE 13