⊞ Cox v. Little Clinic of Tenn., LLC, No. 3:18-cv-00679, 2020 BL 439867, 2020 Us Dist Lexis 211622, 2020 WL 6685517 (M.D. Tenn. Nov. 12, 2020), Court Opinion

**Pagination**
\* BL

[Majority Opinion](#) >

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

---

JUNE MICHELLE COX, Plaintiff, v. THE LITTLE CLINIC OF TENNESSEE, LLC, Defendant.

---

NO. 3:18-cv-00679

November 12, 2020, Filed

For June Michelle Cox, Plaintiff: Matthew R. Zenner, Zenner Law, PLLC, Brentwood, TN.

For The Little Clinic of Tennessee, LLC, Defendant: Stephen H. Price, Burr & Forman, LLP (Nashville Office), Nashville, TN.

ELI RICHARDSON, UNITED STATES DISTRICT JUDGE.

ELI RICHARDSON

### MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 16, "Motion"). Plaintiff filed a response in opposition (Doc. No. 26), and Defendant filed a reply (Doc. No. 31). Plaintiff also filed a response to Defendant's Statement of Facts (Doc. No. 27), and Defendant filed a response to Plaintiff's Statement of Additional Facts (Doc. No. 32).

### BACKGROUND [1]

Plaintiff is a former employee of The Little Clinic in Franklin, Tennessee, which is owned and operated by Defendant The Little Clinic of Tennessee, LLC. (Doc. No. 6 at ¶ 5; Doc. No. 27 at ¶ 1). Plaintiff worked as a

nurse practitioner for Defendant from December 1, 2015, through April 27, 2018, and alleges that Defendant terminated her employment because she was pregnant. (Doc. No. 1-1). She has sued Defendant pursuant to the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-401 , et seq. ( *Id.*)

Plaintiff alleges that on April 18, 2018, while she was performing a Department of Transportation ("DOT") medical physical[2] for a patient ("the DOT patient"), she discovered that he did not have proper documentation for her to complete the physical. (Doc. No. *1-1* at ¶ 8; Doc. No. 27 at ¶ 8). When the DOT patient became agitated, Plaintiff advised him that he could bring in the missing documentation the next day and she would waive the follow-up fee for the second meeting. (Doc. No. *1-1* at ¶ 8). Plaintiff later discussed this DOT patient with Defendant's Regional Clinic Director, Gina Haffner, and advised Haffner that Plaintiff had told the DOT patient she needed additional documentation in order to certify him under DOT guidelines. (Doc. No. 27 at ¶ 8). Plaintiff also told Haffner she had told the DOT patient she could waive the $ 35 follow-up fee. ( *Id.* at ¶ 9). Haffner claims that she did not agree that Plaintiff should have waived the fee. ( *Id.* at ¶ 9).

Plaintiff also told the DOT patient that his wife could bring in his additional medical documentation and pick up his DOT certification card. ( *Id.* at ¶ 10). The DOT patient, however, had not signed a medical release form authorizing release of his medical information to his wife. Plaintiff did not discuss with Haffner whether Plaintiff could provide the DOT patient's medical information to his wife without such a signed release. ( *Id.*).

In her progress notes in the DOT patient's chart, Plaintiff wrote: "RCD [Regional Clinical Director] agreeable with plan and documentation needed to verify patient is safe to operate CMV [commercial motor vehicle] per DOT exam guidelines." (Doc. No. 27 at ¶ 1; Doc No. 23-1).

Haffner believed that Plaintiff's notes in the DOT patient's chart did not accurately reflect Plaintiff's discussions with Haffner, and so Haffner added an addendum to the chart, stating that she **[*2]** had been consulted by Plaintiff and agreed only with Plaintiff's medical plan of care for the DOT patient, and not with Plaintiff's financial arrangements to waive the follow-up fee or to release the DOT patient's information to his wife. (Doc. No. 27 at ¶ 12; Doc. No. 23-1).

Haffner thereafter called her direct supervisor, Meggen Brown, Defendant's Health and Wellness National Director "for guidance," and Brown agreed to investigate the alleged inaccuracies made by Plaintiff in the DOT patient's chart. (Doc. No. 27 at ¶ 13; Doc. No. 20-5 at 13 (Dep. at 52)). Brown consulted with, among others,[3] Defendant's medical director and certain human resources managers and decided to interview Plaintiff on April 27, 2018. (Doc. No. 27 at ¶ 15).

On April 27, 2018, Plaintiff met with Brown and Whitney Cochran, Plaintiff's Clinic Manager. The parties dispute what occurred during that meeting. Plaintiff claims that Brown forced Plaintiff to resign, effectively terminating her, and that the reason given for Plaintiff's termination (*i.e.*, the false charting) was pretext for pregnancy discrimination because she did not chart anything inaccurately. Defendant argues that Plaintiff voluntarily resigned and that no decision was based upon Plaintiff's pregnancy.

In its Motion, Defendant argues that Plaintiff cannot establish a *prima facie* case of pregnancy discrimination under the THRA, contending that Plaintiff was not replaced by a person outside her protected class or treated differently from other similarly situated, non-pregnant employees. (Doc. No. 17 at 1). Defendant also claims

that no pertinent decision-maker had actual knowledge of Plaintiff's pregnancy before the alleged adverse employment action. ( *Id.* at 1-2). Defendant argues that Plaintiff voluntarily resigned and cannot show that she was constructively discharged.₄ ( *Id.* at 1). Finally, Defendant maintains that, in any event, Plaintiff cannot show that Defendant's legitimate business reasons for its actions were pretext for pregnancy discrimination. ( *Id.* at 2).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(c)** . "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242** , **247-48** , **106 S. Ct. 2505** , **91 L. Ed. 2d 202** (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See* ***id.*** **at 248** . On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" ***Id.***

A fact is "material" within the meaning of **Rule 56(c)** "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, **477 U.S. at 248** . A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*[*3] , **902 F.3d 630** , **634-35** (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sol., Inc.*, **901 F.3d 619** , **627-28** (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. ***Id.*** **at 628** .

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. **Fed. R. Civ. P. 56(c)(1)(A)** . On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." **Fed. R. Civ. P. 56(c)(2)** . Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, **303 F. Supp. 3d 585** , **624** (M.D. Tenn. 2018); *Mangum v. Repp*, **674 F. App'x 531** , **536-37** (6th Cir. 2017) (citing **Fed. R. Civ. P. 56(c)** advisory committee's note to 2010 amendment).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, **901 F.3d at 628** . Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, **895 F.3d 844** , **852** (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. ***Id.*** The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. ***Id.*** The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*,

344 F.3d 587 , 595 (6th Cir. 2003).

## PREGNANCY DISCRIMINATION

In analyzing claims of unlawful discrimination on the basis of sex or pregnancy brought pursuant to Title VII and the THRA,₅ courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 , 93 S. Ct. 1817 , 36 L. Ed. 2d 668 (1973). *Vigil v. ServiceSource Del., Inc.*, No. 3:14-cv-2166, [2016 BL 437312], 2016 U.S. Dist. LEXIS 180711 , [2016 BL 437312], 2016 WL 8669214 , at *6 (M.D. Tenn. Dec. 30, 2016). In order to show a *prima facie* case of pregnancy discrimination under Title VII, a plaintiff must show that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision. *Asmo v. Keane, Inc.*, 471 F.3d 588 , 592 (6th Cir. 2006); *Pierce v. City of Humboldt*, No. W2012-00217-COA-R3-CV, [ 2013 BL 82429], 2013 Tenn. App. LEXIS 200 , [2013 BL 82429], 2013 WL 1190823 , at *10 (Tenn. Ct. App. Mar. 25, 2013).

As explained more fully below, there are several ways to show the "nexus" required by the fourth element. A plaintiff may, for example, show that she was replaced by a person outside her protected class or treated differently than similarly situated non-protected employees. *Vigil*, [2016 BL 437312], 2016 U.S. Dist. LEXIS 180711 , [2016 BL 437312], 2016 WL 8669214 , at *6 ; *Southwick v. Russell Stover Candies, Inc.*, No. 2:05cv0050, [2007 BL 231289], 2007 U.S. Dist. LEXIS 18042 , [2007 BL 231289], 2007 WL 776496 , at *14 (M.D. Tenn. Mar. 9, 2007); *Spann v. Abraham*, 36 S.W.3d 452 , 467-68 (Tenn. Ct. App. 1999). To establish the fourth element in this **[*4]** manner, a pregnancy discrimination plaintiff must make meaningful comparisons between herself and non-pregnant employees who are similarly situated in all material respects. *Id.* at 468 . The comparable employees should have held similar positions, dealt with the same level of supervision, and been subject to the same general employer-imposed work rules and requirements. *Id* . ₆

If the plaintiff makes the required *prima facie* showing, then "the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue." *Vigil*, [2016 BL 437312], 2016 U.S. Dist. LEXIS 180711 , [2016 BL 437312], 2016 WL 8669214 , at *6 . If the defendant is able to meet that burden, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Id.* To make this showing, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against her. *Id.* (citing *Braithwaite v. Timken Co.*, 258 F.3d 488 , 493-94 (6th Cir. 2001)); *see also* Tenn. Code Ann. § 4-21-311 .

To obtain summary judgment on Title VII or THRA claims (including those based on alleged pregnancy discrimination), a defendant either (i) must show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case and it is entitled to judgment as a matter of law on that element; or, if it fails to do that, (ii) articulate a legitimate, nondiscriminatory reason for its alleged actions and then show that there is no genuine issue of material fact as to pretext and it is entitled to judgment as a matter of law on that issue. The plaintiff, on the other hand, to avoid summary judgment, (i) must present sufficient evidence to demonstrate a genuine issue of material fact as to any elements of her *prima facie* case as to which the defendant has met its initial burden to show the lack of a genuine issue of material fact; and also (ii)

show that the defendant (a) cannot articulate a legitimate, nondiscriminatory reason for its alleged actions, or (b) demonstrate that there is a genuine issue of material fact as to pretext.

## ANALYSIS

Defendant does not dispute that Plaintiff was a member of a protected class based on her gender and her pregnancy at the time of her resignation and does not dispute, for purposes of this Motion, that Plaintiff was "qualified" for her job to the extent that she was a nurse practitioner. (Doc. No. 17 at 7, n.2). Defendant disputes the third and fourth elements of Plaintiff's *prima facie* claim.

### A. Adverse Employment Action

The parties dispute whether Plaintiff suffered an "adverse employment action." An adverse employment action is a "materially adverse change in the terms or conditions" of employment. *Thomas v. Great Lakes Water Auth.*, No. 18-13033, [2020 BL 359378], 2020 U.S. Dist. LEXIS 171891, [2020 BL 359378], 2020 WL 5629997, at *5 (E.D. Mich. Sept. 21, 2020). Plaintiff claims she was terminated, and Defendant argues Plaintiff voluntarily resigned. The Court finds that there are genuine issues of material fact as to this issue.

There is no dispute that termination constitutes an adverse employment action. On the other [*5] hand, a voluntary resignation is not an adverse employment action. *Leamon v. Cent. Mich. Dist. Health Dep't*, No. 08-14731-BC, *2010 U.S. Dist. LEXIS 160490*, *2010 WL 11703430*, at *5 (E.D. Mich. Feb. 12, 2010) (citing *Hammon v. DHL Airways, Inc.*, [165 F.3d 441], [447] (6th Cir. 1999)); *Watkins v. Shriners Hosps. for Children, Inc.*, No. 5:18-CV-548-REW-MAS, [2020 BL 172690], 2020 U.S. Dist. LEXIS 81077, [2020 BL 172690], 2020 WL 2309468, at [*6] (E.D. Ky. May 8, 2020); *Blair v. Rutherford Cnty. Bd. of Educ.*, No. [3-12-0735], [2016 BL 35967], 2016 U.S. Dist. LEXIS 15551, [2016 BL 35967], 2016 WL 494191, at [*3] (M.D. Tenn. Feb. 9, 2016).

But a particular resignation could be involuntary rather than voluntary. "A resignation will be involuntary and coerced when the totality of the circumstances indicate the employee did not have the opportunity to make a free choice." *Yearous v. Niobrara Cty. Mem'l Hosp. By & Through Bd. of Trustees*, [128 F.3d 1351], [1356] (10th Cir. 1997). And if Plaintiff resigned *involuntarily*, her involuntary resignation conceivably could amount to an adverse employment action under each of two different theories. The first is constructive discharge.[7] But Plaintiff insists that she is not claiming she was constructively discharged. (Doc. No. 26 at 1 and 16, n.2). so the Court disregards this potential theory.

That leaves the other theory: that an involuntary resignation is a de facto termination and therefore an adverse employment action. *Turnbull v. Memeo*, No. 03:06-CV-00656-LRH-VPC, [2008 BL 299194], 2008 U.S. Dist. LEXIS 50873, [2008 BL 299194], 2008 WL 2699687, at [*7] (D. Nev. July 1, 2008) ("Where (1) the employer imposed a forced choice of resignation or termination, (2) at-will employment limits an employee's ability to challenge her termination, and (3) there was no reasonable alternative to resigning, the employee's subsequent resignation is involuntary. An involuntary resignation is a de facto termination, and a de facto termination may satisfy the prima facie requirement of adverse action.") (citation omitted). That is, "a resignation may be involuntary (and therefore qualify as a constructive termination) if a reasonable person in the employee's position would have felt coerced into resigning and deprived of free choice in the matter, whether or not intolerable working conditions were at issue." *Heilman v. Memeo*, [359 F. App'x 773], [775] (9th

Cir. 2009).[8]

The issue here is whether Plaintiff voluntarily resigned or involuntarily resigned (and thus was de facto terminated and thereby subjected to an adverse employment action). On this issue, Plaintiff testified that Brown told her, in their meeting, "that I fraudulently documented and she was going to terminate my employment, but she would give me the opportunity to resign instead. That she'd made her determination." (Doc. No. 20-4 at 35 (Dep. at 139-40)). Plaintiff stated that Brown "said if I don't resign, this is not going to end well for me, that she can report me to the state board for falsifying a record, and I could lose my license over this." ( *Id.*).

Brown, on the other hand, testified that Plaintiff volunteered to resign "all on her own" and they did not discuss losing her license or losing privileges until *after* Plaintiff wrote and signed the paper that stated: "Please accept my resignation immediately," the document Defendant calls a "resignation notice." (Doc. No. 20-2 at 15-16 (Dep. at 59 and 61); Doc. No. 21-5)). Brown denied saying that "it would not end well" for Plaintiff if she was terminated and denied saying that resignation was the [*6] best thing for Plaintiff. ( *Id.* at 16 (Dep. at 61-62)). In addition, Brown testified that she did not tell Plaintiff that she was going to be terminated if she did not resign. ( *Id.* (Dep. at 62)). Brown testified that going into the meeting with Plaintiff, she considered three options available: final written warning, termination, and resignation. ( *Id.* at 11 (Dep. at 43)).

Cochran, who was in the meeting, testified that Brown discussed the fact that this was "something that could be reported," but Brown did not threaten to report Plaintiff to the Board of Nursing. (Doc. No. 20-3 at 17-18 (Dep. at 68-70)). Cochran testified that Brown explained that Plaintiff "could stay and work through this" but let her know that "it wasn't looking good as far as, like, the outcome or that she could resign and be considered re-hirable." ( *Id.* at 18 (Dep. at 70)). Cochran stated that she did *not* "take that as Meggan Brown letting [Plaintiff] know that she was going to be fired." ( *Id.* (Dep. at 71)). Cochran said that Plaintiff then asked if she would be able to give a two-week notice, and Brown said she would accept her resignation, effective immediately, and Plaintiff wrote out her resignation. ( *Id.* (Dep. at 72)). Cochran testified that she considered Plaintiff to have voluntarily resigned from her employment but stated that Plaintiff understood that if she did not resign, it was a possibility that she would be fired. ( *Id.* at 19 (Dep. at 76)).

The separation notice issued by Defendant for Plaintiff (Doc. No. 29-7) lists the "circumstances of this separation" as: "Resigned to avoid discharge for cause." ( *Id.*) Brown testified that she did not know who filled out that form and she was not consulted about it. (Doc. No. 20-2 at 16 (Dep. at 62-63)).

The Court finds that Plaintiff has sufficiently demonstrated genuine issues of material fact as to whether she was terminated. That is, Plaintiff has sufficiently established that she suffered an adverse employment action for purposes of her *prima facie* case.

**B. Nexus Between Pregnancy and Adverse Employment Action**

As for the fourth element, to establish a nexus between her pregnancy and her alleged termination, Plaintiff must provide evidence of a causal link (nexus) between them. *Ward v. Sevier Cty. Gov't*, **440 F. Supp. 3d 899** , **907** (E.D. Tenn. 2020) (citing *Asmo*, **471 F. 3d at 593** ).

Defendant relies on the statement in *Spann* that "[t]he final element of a discrimination claim under the *McDonnell Douglas* approach *requires* proof that the employer treated similarly situated non-pregnant employees better." *Spann*, 36 S.W.3d at 468 (emphasis added).₉ Defendant asserts that this statement means that Plaintiff *must* show that Defendant treated similarly situated non-pregnant employees better to establish the fourth element of her claim.₁₀ The Court understands why Defendant would say this, considering the usual meaning of the word "'require." But considered in context, this statement was not actually meant to convey that, to satisfy the fourth element, the plaintiff has no option(s) other than to show that the defendant treated similarly situated non-pregnant employees better than the plaintiff. Earlier in *Spann*, the court stated: "The fourth element *may* be proven by showing [*7] that [Defendant] treated similarly situated, non-pregnant employees better than [Plaintiff]." *Id.* at 467-68 (emphasis added). And, as mentioned above, courts have held that evidence that a defendant treated similarly situated non-pregnant employees better than a plaintiff is simply one way to show nexus.

For example, in *Bonner-Gibson v. Genesis Eng'g Grp.*, No. 3:18-cv-00298, [2019 BL 303347], 2019 U.S. Dist. LEXIS 137446, [2019 BL 303347], 2019 WL 3818872 (M.D. Tenn. Aug. 14, 2019), the court held that the nexus requirement could be met with other evidence: "The parties devote a substantial amount of briefing to whether Bonner-Gibson has established that similarly-situated non-pregnant employees were treated differently than she was. It is unclear to the court why such a showing would be strictly necessary in a case, such as this one, where the nexus requirement can be met with other evidence." [2019 BL 303347], 2019 U.S. Dist. LEXIS 137446, [WL] at *10 (citing *Huffman v. Speedway LLC*, 21 F. Supp. 3d 872, 877 (E.D. Mich. 2014)).₁₁

The Court finds that the fourth element of Plaintiff's claim *may* be established not only by showing that Defendant treated similarly situated, non-pregnant employees better than Plaintiff, but alternatively by showing a nexus between her pregnancy and the adverse employment action in other ways.₁₂ The Court turns to whether Plaintiff, in any such other way, has raised a genuine issue as to the existence of such a nexus.

### 1. Knowledge of the Pregnancy

In order to establish the fourth prong of her *prima facie* case, Plaintiff must demonstrate that Defendant had actual knowledge of her pregnancy at the time the alleged adverse employment action was taken. *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 444 (6th Cir. 2002). Otherwise, Defendant could not logically be held accountable for acting on that basis. Plaintiff must identify a decision-maker of Defendant who knew of her pregnancy and played a role in the decision to terminate her employment. *See Hicks v. Powell Staffing Solutions, Inc.*, No. 3:12CV439-HEH, [2012 BL 269825], 2012 U.S. Dist. LEXIS 152775, [2012 BL 269825], 2012 WL 5040715, at *4 (E.D. Va. Oct. 17, 2012); *see also Prebilich-Holland*, 297 F.3d 438 (following circuits holding that "a pregnancy discrimination claim cannot succeed in the absence of the employer's knowledge of the pregnancy" and citing Sixth Circuit decisions requiring evidence of the employer's knowledge of a plaintiff's disability to establish a prima facie case of disability discrimination); *Pierce v. GM LLC*, No. 14-14491, [2016 BL 299803], 2016 U.S. Dist. LEXIS 124631, [2016 BL 299803], 2016 WL 4800869, at *8 (E.D. Mich. Sept. 14, 2016) (plaintiff cannot prove the decision-makers' knowledge based simply on the claim that it was "common knowledge" within the company).

⊞ Cox v. Little Clinic of Tenn., LLC, No. 3:18-cv-00679, 2020 BL 439867, 2020 Us Dist Lexis 211622, 2020 WL 6685517 (M.D. Tenn. Nov. 12, 2020), Court Opinion

There are two issues here with regard to whether Defendant knew of Plaintiff's pregnancy. The first is whether Brown—the person who investigated the allegedly false documentation, "did all the talking," and accepted Plaintiff's resignation in the final meeting—knew of Plaintiff's pregnancy. The second is whether Cochran, who undisputedly knew about Plaintiff's pregnancy, was "significantly involved" with the alleged termination decision, such that the Court should impute her knowledge of the pregnancy to Defendant. The Court will address these two issues in turn.

Defendant argues that Brown was not aware of Plaintiff's pregnancy until *after*[*8] Plaintiff's resignation. (Doc. No. 17 at 5 and 14). Brown testified that *after* Plaintiff signed her resignation notice, she told Brown that she was 20 weeks pregnant. (Doc. No. 20-2 at 16-17 (Dep. at 64-65)).[13] Cochran also testified that Plaintiff told Brown she was pregnant *after* she signed the resignation notice. "And [Brown] said that she did not know she was pregnant and congratulated her somberly, under the circumstances . . .." (Doc. No. 20-3 at 19 (Dep. at 74)). Cochran also testified that she did not tell Brown that Plaintiff was pregnant. ( *Id.* at 15 (Dep. at 57)).[14]

Plaintiff, on the other hand, contends that when she (Plaintiff) stated in their meeting that she was 20 weeks pregnant and would lose her insurance, Brown said, "*I know that*. But if you resign . . . you can keep your insurance through the end of May." (Doc. No. 27 at ¶ 17) (emphasis added). Plaintiff interprets this alleged statement as indicating that Brown knew about her pregnancy. Plaintiff testified, "When I told her, I said, I'm 20 weeks along now. I'm losing my insurance. She responded with, 'I know.' And that totally led me to believe that she did absolutely know that I was pregnant." (Doc. No. 20-4 at 41 (Dep. at 163)). Plaintiff also testified she was absolutely sure that she said something to Brown about her pregnancy *before* she signed the resignation notice. ( *Id.*; *see also* Doc. No. 27 at ¶¶ 17 and 19).

Defendant argues that Plaintiff's claim about Brown's knowledge is "mere speculation"[15] which is insufficient for purposes of showing knowledge, citing to *Sanders v. Williams Equip. & Supply Co.*, No. 09-2281-STA, [2012 BL 125566], 2012 U.S. Dist. LEXIS 70122 , [2012 BL 125566], 2012 WL 1856241 , at *5 (W.D. Tenn. May 21, 2012) ("Where the decision-maker denies having knowledge of the alleged protected activity, a plaintiff's mere speculation that the decision-maker must have known is not enough.") The testimony of Plaintiff, Cochran, and Brown, however, raises a possibility beyond mere speculation that Brown had knowledge that Plaintiff was pregnant at the time of the alleged adverse employment decision, and is sufficient to create a genuine issues of material fact as to Brown's knowledge.

Alternatively and additionally, Plaintiff asserts that a genuine issue as to the required employer knowledge of pregnancy can be established via Cochran. Cochran undisputedly knew that Plaintiff was pregnant.[16] Defendant asserts, however, that Cochran was not the relevant decision-maker in this case; it argues that the investigation concerning Plaintiff's alleged misrepresentation of information in the medical record was handled "at the corporate level" by Brown. Defendant claims that although Cochran was present as a witness, it was Brown who met and talked with Plaintiff about the alleged inaccuracies in the medical record and Brown who accepted Plaintiff's resignation. (Doc. No. 17 at 4-5). In sum, Defendant argues that Cochran was not the decision-maker with respect to the DOT patient chart issue. ( *Id.* at 14).

Plaintiff, on the other hand, argues that, as Plaintiff's Clinic Manager, Cochran had authority to fire her[17] and contributed significantly to the decision to do so. (Doc. No. 26 at 17). Cochran testified that Brown telephoned

her on April 25, 2018, to discuss [*9] the DOT patient chart issue and to get Cochran's input regarding Plaintiff's performance as a whole. (Doc. No. 20-3 at 14 (Dep. at 55)). She stated that Brown did *not* ask her what she (Cochran) thought should happen. ( *Id.*). "So my involvement was solely to act as a witness to the conversation and to provide any requested feedback as clinic manager on her performance in general if that came into play." ( *Id.* (Dep. at 56)).[18] Brown testified that she spoke with Cochran again on April 26, 2018, about the timing of the meeting on April 27th. Both Brown and Cochran testified that the two of them met alone on April 27th before inviting Plaintiff into the conference room for their meeting. (Doc. No. 20-3 at 15-16 and Doc. No. 20-2 at 12).

As Defendant notes, the Sixth Circuit has declined to impute one employee's awareness of a plaintiff's health condition to another employee who makes the termination decision absent a showing that the terminating employee had actual knowledge of the condition. *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364 , 368-69 (6th Cir. 2013), *cited in Alves v. AHS Mgmt. Co.*, No. 3:15-cv-00484, [2017 BL 20179], 2017 U.S. Dist. LEXIS 9712 , [2017 BL 20179], 2017 WL 347555 , at *3 (M.D. Tenn. Jan. 24, 2017).[19] Nevertheless, the impermissible bias of an individual may "taint" an ultimate employment decision if that biased individual's recommendations or actions proximately lead to the ultimate decision. *Marquit v. Mylan Specialty, L.P.*, No. 1:18-cv-00647 (ALC), [2020 BL 96078], 2020 U.S. Dist. LEXIS 44735 , [2020 BL 96078], 2020 WL 1228635 , at *3 (S.D.N.Y. Mar. 13, 2020). In other words, a finding of discrimination can be predicated upon the decision-maker's reliance on recommendations that were motivated by impermissible considerations of a plaintiff's pregnancy. *Id.* (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107 , 125-26 (2d Cir. 2004)). Here, however, there is no evidence that Cochran was biased because of Plaintiff's pregnancy. Although Plaintiff asserts that Cochran seemed uncomfortable or "put off" when Plaintiff announced that she was pregnant, Plaintiff has not presented any evidence other than this speculation to indicate that Cochran had a discriminatory animus toward her.

The Court finds that while there are genuine issues of material fact here as to whether Cochran, who knew of Plaintiff's pregnancy, contributed significantly to the alleged adverse employment decision, there is no evidence that Cochran was biased or held a discriminatory animus toward Plaintiff. The question, therefore, is whether *Brown* knew of Plaintiff's pregnancy, and there is a genuine issue of material fact as to that issue.

## 2. Replaced by a Person Outside the Protected Class

Plaintiff does not dispute that she was replaced by a woman, but she argues that her replacement was not pregnant at the time she was hired. Plaintiff was not pregnant at the time she was hired either. Technically, Plaintiff was replaced by a person outside her protected class to the extent her replacement was not pregnant. [20] In light of the circumstances, however, including the fact that Plaintiff has not shown that any pregnant nurse practitioners even *applied* for her job, the Court finds that showing she was replaced by a person outside her protected class does not, alone, establish a nexus between Plaintiff's [*10] pregnancy and the alleged adverse employment action. This factor, nonetheless, is relevant in combination with the other ways to show nexus, as indicated below.

## 3. Similarly Situated Employees Treated Differently

Plaintiff has not shown that similarly situated, non-pregnant employees were treated more favorably than she,

because she has not identified any non-pregnant employee who was investigated for alleged falsification of medical records and was treated differently.[21] As indicated, Plaintiff must make meaningful comparisons between herself and other employees who are similarly situated in all material respects, which would include their work and disciplinary records.[22] Plaintiff has failed to show a nexus between her pregnancy and her alleged termination by showing that similarly situated, non-pregnant employees were treated differently.

**4. Other Ways to Show Nexus**

Another way for a plaintiff to establish nexus is to show that there was a "temporal proximity" between the employer learning of her pregnancy and the adverse employment decision. *Asmo*, 471 F.3d at 593 . "Where an adverse action occurs soon after pregnancy, a court can infer a nexus from the temporal proximity." *Kubik v. Cent. Mich. Univ. Bd. of Trustees*, 717 F. App'x 577 , 582 (6th Cir. 2017). "But where the timeline is less probative, plaintiffs must offer other evidence." *Id.* For example, other evidence can come in the form of comments or comparison to another employee who is similarly situated. *Id.*

Plaintiff argues that she was terminated two weeks after she informed her Clinic Manager that she was pregnant and that this temporal proximity is sufficient to establish a nexus between the pregnancy and her termination for purposes of her *prima facie* case. Defendant argues that temporal proximity cannot be the sole basis for finding pretext. This is not the pretext stage, however; this is the *prima facie* stage.

The Sixth Circuit has recognized that temporal proximity may satisfy the nexus requirement in the pregnancy discrimination context. *Rim v. Lab. Mgmt. Consultants, Inc.*, No. 3:18-cv-00911, [2019 BL 434464], 2019 U.S. Dist. LEXIS 195945 , [2019 BL 434464], 2019 WL 5898633 , at *11 (M.D. Tenn. Nov. 12, 2019) (citing *Asmo*, 471 F.3d at 593 ). In cases in which the temporal proximity is "acutely near in time," temporal proximity alone may constitute circumstantial evidence of a causal connection. *Id.* However, temporal proximity alone "is usually insufficient to demonstrate a nexus unless the adverse action occurred soon after the pregnancy." *Ward*, 440 F. Supp. 3d at 907 . Absent a close temporal proximity, a plaintiff must provide other evidence of a causal connection. *Id.*

The Court finds that Plaintiff has demonstrated that the temporal proximity of Defendant's learning of her pregnancy and the alleged adverse employment action were sufficiently close to, along with the fact that she was replaced by someone outside the protected class, (Doc. No. 27 at ¶¶ 20-24), create a genuine issue of material fact as to the required nexus.

In summary, Plaintiff has sufficiently demonstrated a genuine issue of material fact as to the two disputed elements of her *prima facie* claim. And Defendant has not even undertaken to meet its initial **[*11]** burden under Rule 56 of showing the absence of a genuine issue of material fact as to the other two elements of the prima facie case. So Plaintiff is not subject to summary judgment for failure to show a *prima facie* case sufficient at the summary judgment stage.

**C. Legitimate, Nondiscriminatory Reason**

Thus, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. As indicated, Defendant claims that Plaintiff voluntarily resigned. There being genuine issues of material fact as to

that issue, the Court looks to whether, assuming (contrary to Defendant's claim) that Plaintiff was terminated, Defendant has articulated a legitimate, nondiscriminatory reason for such termination. In other words, assuming that Defendant's actions constituted an adverse employment action (termination) rather than voluntary resignation, was there a legitimate non-discriminatory reason for that adverse employment action?

Defendant maintains that it has articulated facially legitimate reasons for Defendant's belief that Plaintiff had falsified the DOT patient's medical chart. (Doc. No. 17 at 17-18).[23] Plaintiff disputes Defendant's decision to investigate and take adverse action concerning her charting of the DOT patient (Doc. No. 32 at ¶¶ 1-3), but Defendant asserts that Haffner genuinely believed that Plaintiff's notes in the medical chart did not accurately reflect her discussions with Plaintiff. (Doc. No. 27 at ¶12). Therefore, Haffner placed an addendum to the chart to clarify what she actually agreed to. ( *Id.*). She also notified Brown about her concerns, and Brown agreed to investigate any inaccuracies in the chart. ( *Id.* at ¶13).

Keeping in mind that the articulation of a legitimate non-discriminatory reason "is merely a burden of production, not of persuasion, and it does not involve a credibility assessment," *Shorter v. Magneti Marelli of Tenn., LLC*, F. Supp. 3d , [2020 BL 156442], 2020 U.S. Dist. LEXIS 73495 , [2020 BL 156442], 2020 WL 1980981 , at *6 (M.D. *Tenn. Apr. 27* , 2020) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576 , 585 (6th Cir. 2009)), the Court finds that Defendant has articulated a legitimate, nondiscriminatory reason for its alleged actions.

**D. Pretext**

A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274 , 285 (6th Cir. 2012). Whichever method the plaintiff employs, she always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against her. *Id.* ; *Lloyd v. Greater Cleveland Reg'l Transit Auth.*, 1:18-CV-01557, [2020 BL 327155], 2020 U.S. Dist. LEXIS 155826 , [2020 BL 327155], 2020 WL 5077009 , at *9 (N.D. Ohio Aug. 27, 2020) (same). Defendant's asserted reason for its investigatory conduct that led to the alleged adverse employment action is Defendant's (allegedly) reasonable belief that Plaintiff falsified medical documentation, an offense which Defendant considers to be a "Type A" offense that may result in immediate suspension or termination of employment. (Doc. No. 27 at ¶ 14). There are genuine issues of material **[*12]** fact as to whether this asserted reason had a basis in fact.

The parties dispute what the allegedly inaccurate language in the DOT patient's medical chart actually meant. That language states: "Notified Gina RCD about situation regarding DOT physical and patient leaving upset. RCD agreeable with plan and documentation needed to verify patient is safe to operate CMV per DOT exam guidelines." (Doc. No. 23-1). Haffner later added the following to the medical chart: "It should be noted that [Plaintiff] consulted with me regarding the medical plan of care, but never sought my advice nor received any instruction regarding the above discussed financial arrangement[24] *or release of* patient information.[25] I am only in agreement with the medical plan or care portion with the reference." ( *Id.*).

Basically, there is a question of fact as to whether, in context, Plaintiff's words "RCD agreeable with plan and documentation needed to verify patient is safe to operate CMV per DOT exam guidelines" reasonably meant

(a) that the RCD agreed with *everything* in the preceding medical notes (including Plaintiff's assent to waiver of the follow-up fee and drop-off of the medical documentation and pick-up of the DOT card by the DOT patient's wife) or (b) that the RCD agreed with only the medical plan and the documentation needed to issue the DOT certificate (and not Plaintiff's assent to these other arrangements). Plaintiff asserts that the patient note at issue is a completely accurate account of what transpired. (Doc. No. 32 at ¶ 1).

Defendant, on the other hand, asserts that Haffner believed Plaintiff inaccurately represented in the patient chart that Haffner agreed to waive the follow-up fee and agreed that it was OK for the wife to bring in the patient's medical records and for the DOT card to be given to the wife, things to which Haffner had not agreed. (*See, e.g.*, Doc. No. 20-3 at 9 (Dep. at 36)). That is, Defendant asserts in essence that Plaintiff's patient note is inaccurate in that it (allegedly) represents that Haffner agreed to the full "plan," including the part of the "plan" whereby the follow-up fee would be waived and the DOT patient's wife would pick up the DOT card.

Haffner testified that she "was agreeable that Plaintiff made a good choice on the medical part," but Haffner "had no part in the process of who would follow up or how the documents would be released." (Doc. No. 20-5 at 14 (Dep. at 56)). Haffner testified that she "absolutely" felt that the chart was falsification of documentation. (*Id.* at 16 (Dep. at 62)). She stated that the documentation's inaccuracy falsely reflected improper adherence to company policy and procedure because "making the decision to release a document to somebody that wasn't the patient without proper HIPAA safeguards was contra to those policies and procedures" and "the decision to waive a charge was not our practice." (*Id.* (Dep. at 64)).

Plaintiff certainly has shown there to be a genuine issue as to whether Plaintiff falsified the patient note. On the current record, there is an argument to be made that, fairly construed, the patient note does not convey anything false (or **[*13]** misleading or inaccurate) about what Haffner told Plaintiff she (Haffner) agreed to. On the other hand, there is an argument to be made that, fairly construed, the patient note does convey something false about what Haffner told Plaintiff—that, intentionally or unintentionally, the patient note suggests that Haffner agreed to everything in the "plan" Plaintiff had discussed with the DOT patient, including waiving the follow-up fee and having his wife pick up the DOT card.

A plaintiff cannot establish pretext, however, so long as the employer made a reasonably informed and considered decision before taking the adverse employment action. *McDowell v. Heartland Dental, LLC*, No. 3:15-cv-00838, [2017 BL 69187], 2017 U.S. Dist. LEXIS 31314 , [2017 BL 69187], 2017 WL 876177 , at **3** (M.D. Tenn. Mar. 6. 2017). Where the employer can demonstrate an honest belief in its proffered reason, an inference of pretext is not warranted. *Id.* (citing *Seeger*, 681 F.3d at 285

An employer's proffered reason is considered honestly held where the employer can establish it reasonably relied upon the particularized facts that were before it at the time the decision was made. *McDowell*, [**2017 BL 69187**], 2017 U.S. Dist. LEXIS 31314 , [2017 BL 69187], 2017 WL 876177 , **at *3** . A plaintiff is required to show more than a dispute over the facts upon which the decision was based. *Id.* ; *James v. Quanta Servs.*, No. CV 18-11135, [2020 BL 203211], 2020 U.S. Dist. LEXIS 95581 , [2020 BL 203211], 2020 WL 2849987 , at **11** (E.D. Mich. June 1, 2020). As long as an employer held an "honest belief" in its proffered reason, the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. *Hawkins v. Center for Spinal Surgery*, 34 F. Supp. 3d 822 , 844 (M.D. Tenn. 2014).[26] The employee must put forth evidence that

demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action. *James*, [2020 BL 203211], 2020 U.S. Dist. LEXIS 95581, 2020 WL 2849987 at *11 (citing *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012)). The employer is not required to show that the decisional process it used was optimal or that it left no stone unturned; rather, the key inquiry is whether the employer made a reasonably informed and considered decision. *Whitesell v. Fms Fin. Mgmt. Servs., LLC*, No. 3:18-cv-00496, [2020 BL 199004], 2020 U.S. Dist. LEXIS 93281, [2020 BL 199004], 2020 WL 2770017, at *13 (M.D. Tenn. May 28, 2020).

Plaintiff does not dispute that Defendant considers falsification or misrepresentation of information to be a "Type 'A' Offense," which may result in immediate suspension or termination of employment. (Doc. No. 27 at ¶ 14). Brown testified that, after her conversation with Haffner, as a part of her investigation, she consulted with Defendant's medical director and one of Defendant's human resources ("HR") managers concerning the DOT patient chart issue. (Doc. No. 20-2 at 6 (Dep. at 22-23)). She stated that they decided to review all documentation, "essentially, everything that we had on [Plaintiff]." ( *Id.* at 8-9 (Dep. at 32-33)). She stated that two managers in HR talked with legal counsel and then advised her (Brown) to interview Plaintiff. ( *Id.* at 9-10 (Dep. at 35, 37-38)). Brown testified that she did not discuss with the HR managers what the ultimate decision was going to be and they did not have input in it. ( *Id.* at 10 (Dep. at 39-40)). The Court finds that Defendant had an honest belief that Plaintiff committed the alleged misleading or inaccurate documentation and that Defendant reasonably relied **[*14]** upon the particularized facts that were before it at the time the decisions (Defendant's investigation and alleged termination) were made.[27]

Plaintiff contends, however, that she may demonstrate pretext by showing that Defendant's reasons are "unworthy of credence." She appears to assert essentially that no one could interpret the words of that medical chart as being false, misleading or inaccurate and that it is clear that Defendant was just looking for a way to fire her because she was pregnant. This is "'essentially an attack on the credibility of the employer's proffered reason . . . [and] consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual.'" *Seeger*, 681 F.3d at 285 (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 (6th Cir.2006)).

Proof that an employer's explanation is unworthy of credence is a persuasive way to prove unlawful discrimination. *Wilson*, 104 S.W.3d at 51. Evidence showing that the "employer's explanation is unworthy of credence" serves two purposes: (1) it permits triers-of-fact to conclude that the reason given by the defendant was not the true reason for the challenged employment actions, and (2) it serves as independent evidence from which the trier of fact can reasonably infer that the employer is "dissembling" to cover up a discriminatory purpose. *Id.* (citing *Wilson*, 104 S.W. 3d at 51 and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). Moreover, if an employer, in its investigation and reaching its decision to terminate an employee, makes "blatant mistakes" that are "too obvious to be unintentional," then the plaintiff may be able to avoid the honest-belief rule. *Smith v. Towne Properties Asset Mgmt. Co., Inc.*, 803 F. App'x 849, 852 (6th Cir. 2020). On the other hand, "an optimal investigation—i.e., interviewing the employee and some or all of his witnesses—is not a prerequisite to application of the honest belief rule." *Seeger*, 681 F.3d at 286. And even more to the point, Plaintiff's whole line of attack here is subject to the "honest belief" principle discussed above, *id at 285*, which, the Court has found, is applicable here.

The Court finds that Plaintiff has not succeeded in demonstrating a genuine issue of material fact with regard to whether Defendant's stated non-discriminatory reason was pretextual. Plaintiff merely disagrees with Defendant's interpretation of the statements Plaintiff made in the DOT patient's chart. But Plaintiff is required to show more than a dispute over the facts upon which the alleged termination decision was based; she must, as indicated above, put forth evidence which demonstrates that Defendant did not honestly believe in its proffered non-discriminatory reason, which she has not done. Moreover, Plaintiff has not presented evidence that would show "blatant mistakes" in Defendant's investigation and alleged termination decision that are "too obvious to be unintentional." Defendant has shown that it reasonably believed the information in the DOT patient's chart was inaccurate, which was an offense that could result in immediate suspension **[\*15]** or termination. Based upon the honest-belief doctrine explained above, that is enough.

Moreover, a reason cannot be pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason. *Seeger*, 681 F.3d at 285 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)) ("nothing in the law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable."); *Goza v. Memphis Light, Gas & Water Div.*, 398 F. Supp. 3d 303, 326 (W. D. Tenn. 2019) (reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason). "It is not enough, in other words, to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's*, 509 U.S. at 519 (emphasis in original). To avoid summary judgment, therefore, Plaintiff must present evidence from which a reasonable jury could find that the alleged falsification of documents was not the real reason that Defendant allegedly terminated her *and* that unlawful pregnancy discrimination in fact was. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). This Plaintiff has not done.

In short, "[t]he determinative question is not whether [Plaintiff] actually committed [falsification of documents], but whether [Defendant] reasonably and honestly believed that [s]he did." *Seeger*, 681 F.3d at 286. Plaintiff has failed to raise a genuine issue, as opposed to mere speculation, on that issue.

For these reasons, Plaintiff cannot establish her THRA pregnancy discrimination claim, and it is therefore subject to summary judgment.

## CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment (Doc. No. 16) will be granted. An appropriate Order will be entered.

/s/ Eli Richardson

ELI RICHARDSON

UNITED STATES DISTRICT JUDGE

fn

1

The facts stated herein without qualification are undisputed. Purported facts that are qualified herein (as for example as being "alleged" by one party or the other) appear to be in dispute.

fn

2

Commercial drivers are required to have a current Medical Examiner's Certificate in order to operate a commercial vehicle. 49 C.F.R. § 391.41 ; *Herring v. Berkshire Hathaway Homestate Ins. Co.*, No. 1:18-CV-4711-WMR, [2020 BL 410025], 2020 U.S. Dist. LEXIS 196961 , [2020 BL 410025], 2020 WL 6135654 , at *4 (N.D. Ga. Sept. 24, 2020).

fn

3

Plaintiff contends that Whitney Cochran, Plaintiff's Clinical Manager, was also consulted about the investigation and the decision to terminate Plaintiff. (Doc. No. 27 at ¶ 15).

fn

4

Plaintiff denies that she is pursuing a constructive discharge claim. (Doc. No. 26 at 1 and 16, n.2).

fn

5

The THRA is a Tennessee statute that tracks Title VII and is generally analyzed in the same way. *Sherman v. CBRE Grp., Inc.*, No. 3:14-cv-1661, [2016 BL 33208], 2016 U.S. Dist. LEXIS 14231 , [2016 BL 33208], 2016 WL 454733 , at *6 (M.D. Tenn. Feb. 5, 2016). It is true that the THRA is broader than Title VII in some respects, *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, [2020 BL 124239], 2020 U.S. Dist. LEXIS 58132 , [2020 BL 124239], 2020 WL 1640440 , at *5 (M.D. Tenn. Apr. 2 , 2020), but not any that are relevant to the analysis in this case.

fn

6

A plaintiff may also, as explained below, show a nexus by demonstrating temporal proximity or citing discriminatory comments by decision-makers.

fn

7

A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.

*Funk v. City of Lansing, Michigan*, 821 F. App'x 574 , 580 (6th Cir. 2020).

Plaintiff does not claim that whatever happened to her in this case involved intolerable working conditions that would support a constructive discharge claim; for example, she does not claim that the circumstances of her meeting with Brown and Cochran created (if only suddenly and for a brief period) intolerable working conditions for her. Instead, as noted above, she specifically disavows a constructive discharge claim.

fn
8

The last phrase of this quote makes clear that the term "constructive termination" does not mean "constructive discharge" in its usual sense as discussed above, *i.e.*, an involuntary resignation prompted by intolerable working conditions. Rather, the term "constructive termination" here appears to mean de facto termination.

fn
9

*Spann* made this statement specifically in connection with a claim of pregnancy discrimination brought under the THRA.

As noted earlier, the THRA is a Tennessee statute that tracks Title VII and is (generally, and with respect to the disputed issues in this case) analyzed in the same way. *Sherman*, [2016 BL 33208], 2016 U.S. Dist. LEXIS 14231 , [2016 BL 33208], 2016 WL 454733 , at *6 (citing *Regnier v. Metro. Gov't of Nashville & Davidson County*, No. M2004-00351-COA-R3-CV, [2006 BL 167154], 2006 Tenn. App. LEXIS 309 , [2006 BL 167154], 2006 WL 1328937 , at *7 (Tenn. Ct. App. May 11, 2006) ("It is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute the policies embodied within the federal anti-discrimination acts.")). Thus, Title VII cases allowing nexus to be shown in various ways are instructive.

fn
10

For whatever reason, Plaintiff does not seem to dispute that if she was indeed required to make this showing, she could not make this showing. In other words, she omits any argument that Defendant treated similarly situated non-pregnant employees better than her.

fn
11

In *Huffman*, the defendant argued that the fourth element of a *prima facie* pregnancy discrimination claim required a plaintiff to demonstrate that similarly situated individuals outside the protected class were treated more favorably than those in the protected class, and the court disagreed.

"While a plaintiff can prove the fourth element of the prima facie case 'through comparison to another

employee who is similarly situated,' there are other ways to skin this cat." *Huffman*, 21 F. Supp. 3d at 877 ; *see also Castro v. Tx Direct, LLC*, No. W2012-01494-COA-R3CV, [2013 BL 50892], 2013 Tenn. App. LEXIS 126 , at *5 (Tenn. Ct. App. Feb. 25, 2013) ("A plaintiff *may* establish the nexus between her pregnancy and the adverse employment action by demonstrating that comparable non-pregnant employees received more favorable treatment.") (emphasis added).

fn
12

For example, in *Huffman*, the court noted that one way to show such a nexus was the temporal proximity between an employer learning of an employee's pregnancy and that employee's termination. *Huffman*, 21 F. Supp. 3d at 877 . In *Kubik v. Cent. Mich. Univ. Bd. of Trustees*, 717 F. App'x 577 , 582 (6th Cir. 2017), the court noted that evidence of such a nexus could come in the form of discriminatory comments.

fn
13

"I was in utter shock. And I said, 'Under these circumstances, congratulations.' I did not know what else to say. I was clueless that [Plaintiff] was pregnant, had no idea that she was pregnant." ( *Id.* at 17 (Dep. at 65); *see also* Doc. No. 27 at ¶¶ 17 and 19).

fn
14

Defendant argues that Plaintiff testified that Brown indicated she had already made the decision to terminate Plaintiff's employment before their meeting and, if the Court accepts those facts as alleged as true, then from Plaintiff's own testimony, Brown did not know of Plaintiff's pregnancy when she allegedly decided to terminate Plaintiff's employment. (Doc. No. 32 at ¶ 9). This roundabout argument is not sufficient to show that Defendant is entitled to judgment as a matter of law on this issue.

fn
15

Plaintiff argues: "It is inconceivable that over the course of multiple telephone calls and meetings between Cochran and Brown regarding Plaintiff's possible termination, that Cochran would never mention that just two weeks earlier Plaintiff had told her she was pregnant." (Doc. No. 26 at 17). Were this Plaintiff's only evidence on this issue, it perhaps would be insufficient "speculation." Plaintiff also testified, however, that she specifically told Brown she was pregnant before Brown terminated her.

fn
16

Plaintiff testified that she told Cochran on April 13, 2018, that she was due in September and she was going to have some questions about scheduling because she was "high risk" and would have multiple appointments later in her pregnancy. (Doc. No. 20-4 at 39 (Dep. at 155)).

fn
17

Cochran stated that she supposed she would have authority to fire Plaintiff. (Doc. No. 20-3 at 18 (Dep. at 71)).

fn
18

Cochran testified that she told Brown she was "tired"— "tired of dealing with tardiness; patient complaints; and, frankly, someone who was expected to be my partner who did not act like my partner." (Doc. No. 20-3 at 14-15 (Dep. at 56-57)).

fn
19

Plaintiff cites to a direct evidence age discrimination case, *West v. New Cherokee Corp.*, 58 F. 3d 233 (6th Cir. 1995) for the proposition that the relevant inquiry is whether the person "with the discriminatory animus" contributed significantly to the decision. (Doc. No. 26 at 16). In *West*, the issue was whether a certain non-managerial employee's discriminatory remarks were relevant. Plaintiff has not alleged discriminatory remarks by anyone regarding her pregnancy.

fn
20

Defendant asserts that Defendant was aware, at the time it hired Ms. Hunter (Plaintiff's replacement), that Ms. Hunter then wanted to become pregnant. (Doc. No. 19-1). Defendant also asserts that Ms. Hunter in fact became pregnant shortly after she was hired, advising Defendant of that fact a little more than six months after hire. ( *Id.*)

fn
21

Neither has Plaintiff shown that a similarly situated non-pregnant employee had the same work issues of tardiness, absences and leaving early (resulting in verbal or written warnings) as Plaintiff had and was treated differently.

fn
22

The comparable employee should have held similar positions, dealt with the same level of supervision, and been subject to the same general employer-imposed work rules and requirements. *Spann*, 36 S.W.3d at 468 .

fn
23

Plaintiff appears to believe that Defendant claims that the falsification of information in the patient notes was intentional and thus "fraudulent." But the Court does not see where Defendant has ever taken that position. Defendant's position, rather, appears to be that Plaintiff's inclusion of information that allegedly was—whether or not knowingly or intentionally—false, inaccurate and/or misleading was a serious matter that subjected Plaintiff to termination under standard company policy, and that such inclusion was the reason for Plaintiff's termination.

fn
24

Plaintiff wrote in the chart: "Explained the $ 35 follow up charge - verbally told patient that I would waive this fee for him at this time." (Doc. No. 23-1).

fn
25

Plaintiff also wrote in the chart: "I am agreeable as the provider for the spouse to bring documentation for cardiology and if all information needed I (sic) provided, I will issue a 1 year card and give to his spouse." (Doc. No. 23-1).

fn
26

"The honest-belief rule kicks in even when the reason for firing an employee turns out to be factually mistaken."

*Smith v. Towne Properties Asset Mgmt. Co., Inc.*, 803 F. App'x 849 , 852 (6th Cir. 2020).

fn
27

In the Sixth Circuit, employers are permitted to investigate their employees for wrongdoing, and an internal investigation into suspected wrongdoing by an employee does not constitute an adverse employment action. *Niekamp v. Ohio Bd. of Embalmers & Funeral Dirs.*, No. 2:18-CV-100, [2019 BL 329936], 2019 U.S. Dist. LEXIS 149523 , [2019 BL 329936], 2019 WL 4168987 , at *9 (S.D. Ohio Sept. 3, 2019) (citing *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626 , 631 (6th Cir. 2018)); *Jones v. Progressive Cas. Ins. Co.*, No. 6:18-CV-21-REW-HAI, [2019 BL 360601], 2019 U.S. Dist. LEXIS 163863 , [2019 BL 360601], 2019 WL 4684459 , at *6 (E.D. Ky. Sept. 24, 2019).

# General Information

| | |
|---|---|
| **Case Name** | Cox v. Little Clinic of Tenn., LLC |
| **Court** | U.S. District Court for the Middle District of Tennessee |
| **Date Filed** | Thu Nov 12 00:00:00 EST 2020 |
| **Judge(s)** | Mr. Eli Jeremy Richardson |
| **Parties** | JUNE MICHELLE COX, Plaintiff, v. THE LITTLE CLINIC OF TENNESSEE, LLC, Defendant. |
| **Topic(s)** | Employment Law; Civil Procedure; Civil Rights |
| **Industries** | Nursing |