# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**Confidential**

# ARMANDO LOPEZ

# June 29, 2021

---



**Terri Beckham, RPR, RMR,CRR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1    IN THE UNITED STATES DISTRICT COURT FOR THE
              MIDDLE DISTRICT OF TENNESSEE
2                 NASHVILLE DIVISION

3

4    _____

5    CAITLIN O'CONNOR,

6              Plaintiff,

7    vs.                    Case No. 3:20-cv-00628

8    THE LAMPO GROUP, LLC
     a/k/a RAMSEY SOLUTIONS,
9
              Defendant.
10   _____

11

12

13            ***CONFIDENTIAL***
              (UNTIL FURTHER DETERMINATION)
14
              Video Deposition of:
15
              ARMANDO LOPEZ
16
              Taken on behalf of the Plaintiff
17            June 29, 2021

18            Commencing at 9:34 a.m.

19

20

21   _____

22        Elite-Brentwood Reporting Services
            www.elitereportingservices.com
23        Terri Beckham, RMR, CRR, LCR
                 P.O. Box 292382
24          Nashville, Tennessee 37229
                 (615)595-0073
25

Case 3:20-cv-00628  Document 52-8  Filed 08/31/22  Page 2 of 73  PageID #: 4378
Elite-Brentwood Reporting Services          (615)595-0073
www.EliteReportingServices.com

```
1               A P P E A R A N C E S

2

3    For the Plaintiff:

4               HEATHER MOORE COLLINS
                ASHLEY WALTER
5               Attorneys at Law
                Collins & Hunter
6               7000 Executive Center Drive
                Building 2, Suite 320
7               Brentwood, Tennessee 37027
                615.724.1996
8               heather@collinshunter.com
                ashley@collinshunter.com
9

10   For the Defendant:

11               LESLIE SANDERS
                 Attorney at Law
12               Webb Sanders, PLLC
                 611 Commerce Street, Suite 3102
13               Nashville, Tennessee 37203
                 615.915.3300
14               lsanders@webbsanderslaw.com

15

16

17

18   Also present:

19               Daniel Cortez
                 Ramsey Solutions General Counsel
20
                 Mary Ciezadlo, Videographer
21

22

23

24

25
```

Case 3:20-cv-00628 Document 161-1 Filed 08/11/22 Page 3 of 208 PageID #: 43792
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1

              S T I P U L A T I O N S

2

3

4

5           The Video Deposition of ARMANDO LOPEZ was

6  taken by counsel for the Plaintiff, at Webb

7  Sanders, PLLC, 611 Commerce Street, Suite 3102, on

8  June 29, 2021, for all purposes under the Federal

9  Rules of Civil Procedure.

10          All formalities as to caption, notice,

11  statement of appearance, et cetera, are waived.

12  All objections, except as to the form of the

13  question, are reserved to the hearing, and that

14  said deposition may be read and used in evidence in

15  said cause of action in any trial thereon or any

16  proceeding herein.

17          It is agreed that Terri Beckham, RMR,

18  CRR, Notary Public and Licensed Court Reporter for

19  the State of Tennessee, may swear the witness, and

20  that the reading and signing of the completed

21  deposition by the witness are reserved.

22

23

24

25

Case 3:20-cv-00628 Document 45-1 Filed 03/31/22 Page 6 of 208 PageID #: 43825
Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com

```
1                           * * *

2                THE VIDEOGRAPHER:  We are now on the

3       record.  Today is Tuesday, the 29th of June, 2021.

4       And the time indicated on the video screen is

5       9:34 a.m.

6                This is the video deposition of Armando

7       Lopez taken in the matter of O'Connor versus The

8       Lampo Group, LLC, also known as Ramsey Solutions,

9       Case Number 3:20-cv-00628, filed in the United

10      States District Court for the Middle District of

11      Tennessee, Nashville Division.

12                This deposition is being held today at

13      Webb Sanders PLLC, located at 611 Commerce Street,

14      Nashville, Tennessee.  My name is Mary Ciezadlo, the

15      videographer.  The court reporter is Terri Beckham,

16      both in association with Elite-Brentwood Reporting

17      Services.

18                Will counsel please introduce yourselves

19      and state whom you represent.

20                MS. COLLINS:  Heather Collins and Ashley

21      Walter for the plaintiff.

22                MS. SANDERS:  Leslie Sanders for

23      defendant.

24                MR. CORTEZ:  Daniel Cortez for

25      defendant.
```

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

THE VIDEOGRAPHER:  Will the court

reporter please swear in the witness.

* * *

ARMANDO LOPEZ,

was called as a witness, and after having been duly

sworn, testified as follows:


EXAMINATION

QUESTIONS BY MS. COLLINS:

Q.     Good morning.  Could you state your full name

for the record, please?

A.     Sure.  Armando M. Lopez.

Q.     And what is your address?

A.     ████████████████████████████████████████

Q.     The zip code?

A.     ██████████

Q.     What is your phone number?

A.     ████████████████████

Q.     Is that a mobile phone?

A.     It is.

Q.     Is that a company paid-for cell phone?

A.     It is.

Q.     Okay.  Where are you currently employed?

A.     At Ramsey Solutions or The Lampo Group.

Q.     How long have you been there?

1    A.      Since November of 2014.

2    Q.      What is your job title?

3    A.      Currently, senior executive director of Human

4    Resources.

5    Q.      How long have you been in that position?

6    A.      I've been in Human Resources since I started.

7    I was recently promoted to senior director.

8    Q.      What position did you start in?

9    A.      Executive director.

10   Q.      Okay.  How long were you in that position?

11   A.      All but the last six months.

12   Q.      Okay.  So from November 2014 until about the

13   beginning of this year or the end of last year?

14   A.      The beginning of this year.

15   Q.      Okay.  What are your job duties -- well, let

16   me -- let me go back a little bit.  What were your

17   job duties as the executive HR director, the

18   position before this one?

19   A.      So everything related to human resource,

20   finding people, so the recruiting process,

21   on-boarding people, development strategies to

22   develop them, and retention strategies to keep them.

23          The culture piece, we had a person that

24   oversaw the culture.

25   Q.      What do you mean by that?

1  A.     We had an executive director over the culture

2  piece, the cultural events, team member activities

3  or team member functions.

4  Q.     By "cultural events," what are

5  specifically -- give me examples of that.

6  A.     Battle of the Bands.

7  Q.     Okay.

8  A.     Christmas party.

9  Q.     Tell me about the on-boarding process.  What

10 did that entail?

11 A.     What did it entail then or what does it

12 entail now?

13 Q.     What did it entail then?  And the reason why

14 I'm sort of going back in time a little bit,

15 because, you know, Ms. O'Connor was terminated in

16 2020, and so, really, that's what I'm more

17 interested in.

18 A.     Okay.  Would you like for me to start in

19 2020?

20 Q.     Well, I want to know what the on-boarding --

21 did it change from --

22 A.     Yeah.

23 Q.     -- before that time period?

24 A.     How about I give you historical from --

25 Q.     Sure.

1    A.     -- the time I got there?

2         So when I got there, it was half a day

3    on-boarding.  It was really paperwork, what most

4    companies traditionally would do for someone that

5    starts.

6         About a year after I started, we moved to a

7    full day on-boarding where we covered other things,

8    the policies, procedures, things the company felt

9    were good, kind of confirming a person's decision

10   for employment.

11        Since then we've expanded further, so we

12   have a two-day on-boarding that includes things

13   that are more fun, so think cultural race, which is

14   more of a team activity, team-sponsored, team-based

15   activity.

16   Q.    Okay.  So it was -- in 2020 -- was it about

17   in 2015 when it changed, the on-boarding process

18   changed to be a full day?

19   A.     Yes.

20   Q.    Okay.  What documents are you all -- back in

21   that time period did you require employees to sign

22   when they were on-boarded?

23   A.     I don't have them from memory, but there's

24   really, I'm going to guess, seven/eight pages that

25   covered the bulk of the documents, with the

Case 3:20-cv-00028-Document-Report-Filed-05/31/22-Page 16 of 1595-PageID #: 4337
Elite Reporting Services
www.EliteReportingServices.com

1    exception of the federally required documents such

2    as W-2s.

3    Q.    What do you mean by that?  Explain that.

4    A.    So there are eight pages that cover the

5    Ramsey policies and procedures, which have been

6    turned over to you in discovery.  And then there

7    are -- people fill out their government forms for

8    E-Verify, et cetera.  So an I-9, for example, W-2

9    for tax deductions.

10   Q.    Prior to that -- and I'm going to refer to

11   that as an orientation period -- but prior to that,

12   when Ramsey is determining whether or not they're

13   going to hire someone, how is that process?

14   A.    Can you explain the question?

15   Q.    I want you to explain the process that Ramsey

16   goes through when deciding whether or not to hire

17   someone, when they're vetting people.

18   A.    So not from the time a person applies, so I

19   can walk you through --

20   Q.    After the pool has been narrowed down.

21   A.    Okay.  So there's a series of interviews that

22   take place.

23   Q.    Okay.  Tell me about that series of

24   interviews.

25   A.    There is the hiring leader interview.  There

1    is a recruiter interview.  And then there is what we

2    call a half-day interview, which is just a series of

3    other leaders that get an opportunity to weigh in.

4    Q.    Do all these people meet with the candidate?

5    A.    Yes.

6    Q.    Okay.  Prior to those interviews, how is the

7    pool narrowed down?

8    A.    So the recruiters will take all the

9    applicants and they'll look for skill sets.  They'll

10   look for keywords.  They'll look for background and

11   experience that fit what that position is, at least

12   on paper.

13         They will then narrow that pool for who they

14   will contact.  They'll do the initial screen to

15   make sure that what's on paper is actually what the

16   person did and that that fits what we're looking

17   for.

18         The recruiter will then pass that person on

19   to the hiring leader, and that person might be

20   persons, to answer your question of narrowing the

21   pool, that's how it starts narrowing.

22   Q.    Is the recruiter in-house or external?

23   A.    In-house.

24   Q.    Okay.  Who was the recruiter back in 2014?

25   A.    We had more than one recruiter in 2014.

Elite Brentwood Reporting Services  615 595-0073
www.EliteReportingServices.com

1    Q.      Who are they?

2    A.      Going off memory, that would have been Heath

3    Sellers, Chris Woodard, Doug Oakley, and I believe

4    that's it for 2014.  A few more started after I

5    started, but for 2014, that would have been the

6    recruiters.

7    Q.      Are those three people still there?

8    A.      Chris Woodard and Heath Sellers are.  Doug

9    Oakley is not.

10   Q.      In 2015 who came on?

11   A.      Kimberly Rudolph, Allison Bible, Jeff

12   Schadoff, I believe that's it.  And I'm going off

13   memory, so I could have left someone off.

14   Q.      Are any of those people no longer with

15   Ramsey?

16   A.      All three of those are no longer with Ramsey.

17   Q.      Were any of them involuntarily terminated?

18           MS. SANDERS:  I'm going to, obviously,

19   let him answer that question, but I should have done

20   this at the very beginning.  Because we're going to

21   get into personnel information we're going to go

22   ahead and designate his whole deposition as

23   confidential, and then we can deal with that after

24   the fact if there are certain parts that aren't,

25   just so he can freely testify, so...

Case 3:20-cv-00023 Document 36 Filed 05/21/21 Page 14 of 208 PageID #: 439
Elite Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

1           MS. COLLINS:  Okay.

2           THE WITNESS:  One of those.

3  BY MS. COLLINS:

4  Q.     Who?

5  A.     Jeff Schadoff.

6  Q.     Why was he involuntarily terminated?

7  A.     Performance.

8  Q.     Okay.  What about 2016?  Who did the

9  recruiting in 2016?

10 A.     So we've added quite a few recruiters.  I'm

11 trying to, in my head, put them in the right year

12 for you.  I think in 2016 we hired Josh Sikes, and I

13 believe he was the only person that come on in 2016.

14 Q.     Okay.

15 A.     We hired -- if we're going down every year,

16 in 2017 we hired Beth McCart, Ayesha Davis.  We

17 transferred in an internal person into recruiting

18 that was already employed by the company Chelsea

19 Willis.

20 Q.     What about 2018?

21 A.     In 2018 we transferred internally several

22 people, and we're up to 15 recruiters today.  So if

23 we started from 2020, it might be easier for me go

24 backwards and go, "How long has that person been

25 around?"

Case 3:20-cv-00023-Brentwood Reporting Services cege 15 of 208 PageID #: 4394
Elite Reporting Services * www.EliteReportingServices.com
www.EliteReportingServices.com

1  Q.     Okay.  Who oversees the recruiters?

2  A.     We have a director of recruiting, Jeremy

3  Hezlep.

4  Q.     How long has Jeremy been in that position?

5  A.     He's been in that position for two-and-a-half

6  years, and he's been with the company for about 10.

7  Q.     Okay.  When you say that the hiring leader,

8  the recruiter and a series of other leaders, meets

9  with a candidate, are they required to keep any sort

10  of document or take any notes?

11  A.     They enter notes into the system.  We use an

12  applicant tracking system.

13  Q.     How long has that been in place?

14  A.     The current system was put in in 2014.

15  Q.     What's the name of that system --

16  A.     Jobvite, J-o-b-v-i-t-e, Jobvite.

17  Q.     Vite.  For a minute there, I thought you said

18  "fight," and I thought, well, that's not very...

19  A.     That wouldn't be very good for recruiting.

20  Q.     Okay.  Who has access to the Jobvite system?

21  A.     It's a role-based access.  Every hiring

22  leader has access to it, but there are different

23  degrees of access of who can see what.

24  Q.     Okay.  Do you know if the Jobvite system

25  information was produced in this case with respect

Case 3:20-cv-00028 Document Reported Filed 05/21/22 Page 16 of 208 PageID #: 4395
Elite Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

```
 1    to Caitlin O'Connor?

 2    A.     It was.

 3    Q.     Is there a part of the recruitment process or

 4    hiring process that involves a dinner or an

 5    interview with a dinner and spouses?

 6    A.     There's a spousal dinner that is kind of the

 7    final breaking bread, getting to know each other,

 8    not used for rule-out.

 9    Q.     What do you mean "not used for rule-out"?

10    A.     You said, "part of interview process."  It's

11    part of the process, but it's not used to screen a

12    candidate or to say "no" to a candidate.

13    Q.     Who typically attends one of those spousal

14    dinners?

15    A.     The hiring leader and their spouse, if

16    they're married, the candidate and their spouse, if

17    they're married.

18    Q.     To your knowledge, has it ever been -- that

19    spousal dinner, has it ever been used to rule out a

20    candidate?

21    A.     To my knowledge, no.  We've had candidates

22    that have changed their mind where -- but not -- to

23    my knowledge, no.

24    Q.     As part of your job as executive HR director,

25    do you set policy?
```

Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    A.      I'm a part of a group that would set policy.

2    I wouldn't set policy alone.

3    Q.      What group is that?

4    A.      It could come from one of two groups, so it

5    could be an operations committee group that sets a

6    policy related to processes.  It could be Human

7    Resource Committee that sets a policy.

8    Q.      As executive HR director, is it part of -- or

9    was it part of your job duties to enforce policy?

10   A.      Again, not singularly, but as a part of a

11   group, yes.

12   Q.      Okay.  Which group?

13   A.      Human Resource Committee.

14   Q.      But as the human resource executive, you have

15   knowledge of the Ramsey policies and how they're to

16   be enforced, right?

17   A.      I do.

18   Q.      Tell me what the Human Resource Committee's

19   function is.

20   A.      We deal with personnel issues, good and bad

21   exceptions to time off, someone runs out of time off

22   but is needing more, if they're having some crisis

23   going on in their lives, disciplinary actions when a

24   leader is ready to put someone on a performance

25   improvement plan, pretty much all terminations go

Elite-Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

1    through there.  There are a few that -- that might

2    not, but I would say for the most part they would

3    all go through the Human Resource Committee.

4          Earlier we talked about setting policy if

5    something needs to change.

6    Q.     What sort of involvement does Dave Ramsey

7    typically have in the termination of employees?

8    A.     It's an HRC decision.  He's informed in the

9    notes from HRC.

10   Q.     Does he typically weigh in on those

11   decisions?

12   A.     Weigh in?  Not necessarily.  He'll -- he

13   might respond to someone or to the HRC note saying

14   "So sad," or something to that effect, especially if

15   someone had been there for a while.

16   Q.     When you say "HRC note," is that another --

17   is that something else that's put in a system or

18   what are you referring to?

19   A.     They're not put in the system.  It's

20   typically an email.

21   Q.     Does the HRC meet on a regular basis?

22   A.     Yes.

23   Q.     How often?

24   A.     Weekly.  There could be times where we meet

25   more often or times when too many are on vacation or

something else is going on where we don't meet.

Q.     Okay.

A.     But typically weekly.

Q.     Okay.  And how many people are on the HRC?

A.     It's varied in the time that I've been there, but there are currently five members.

Q.     Who are those five members?

A.     So currently it is Jeremy Breland, ██████ ███████, Mark Floyd, Jack Galloway, and myself.

Q.     Is Dave Ramsey not on the HRC?

A.     No, he's never been, to my knowledge.

Q.     Is he included on the HRC emails?

A.     No.

Q.     Okay.

A.     By "emails," do you mean distribution list?

Q.     Yes.

A.     He is not.

Q.     Okay.  How often does it change?

A.     Typically every year there might be one person that drops off and one person that comes on, or we may have someone sit in for a short period of time as part of their leadership development.

Q.     Who was on the HRC in 2020?

A.     So we've turned this over to you, but I'm going to -- again, because I know this case, I'm

going off the top of my head and I don't think I'll leave anyone off. But the names I mentioned, ██ ███████, Jack Galloway, myself, Suzanne Simms, Mark Floyd, and I don't recall if at this point -- Sarah Sloyan was the newest member.

Q.     Who do you take direction from or who do you report to?

A.     Currently I report to Jack Galloway. He's the chief people officer.

Q.     He's the chief what officer?

A.     Chief people officer. And that is new. I reported to Mark Floyd, the chief financial officer, in 2020.

Q.     In 2020, how many people reported to you?

A.     Directly, five -- six. My assistant.

Q.     Okay. Who are those five people?

A.     In 2020 that would have been Teresa Newsome as my assistant, Jeremy Hezlep as the director of recruiting, Oksana Ballard as the compensation manager, Karla Lundell as the benefit administrator, Sarah Cranston as the benefit coordinator, and Mark Mozingo as compliance specialist.

Q.     Are any of those people no longer on your team?

A.     Oksana Ballard.

1    Q.      Okay.

2    A.      And Teresa Newsome retired.

3    Q.      What happened to those two?  Well, Teresa

4    retired, you told me that.

5    A.      And Oksana moved on.  She found a job

6    doing -- more than just compensation.

7    Q.      Okay.  Is she still with Ramsey?

8    A.      She is not.

9    Q.      Now, tell me in your words what Ramsey

10   Solutions does.

11   A.      We provide hope.

12   Q.      What do they do?

13   A.      We provide education around finances, around

14   leadership, around education for schools, career

15   advice, small-business advice.

16   Q.      Does it also have a media part of its

17   business?

18   A.      It does.  It has a radio component and

19   podcast and other forms of broadcast.

20   Q.      Does it receive advertising dollars for the

21   radio and the podcast portion of its business?

22   A.      It does.

23   Q.      What is the largest part of its business?

24   A.      I wouldn't know.  I don't get the financials.

25   Q.      Okay.  But Ramsey Solutions is not a school,

Elite Reporting Services   ·   Elite.Reporting.Services
www.EliteReportingServices.com
5:10:02:28   Brentwood Reporting   Page 22   615 595-0073

1    is it?

2    A.    It is not.

3    Q.    And it does not -- it's not a 501c3

4    organization, is it?

5    A.    It is not.

6    Q.    And it's not considered a charitable

7    organization, to your knowledge, is it?

8    A.    To my knowledge it is not.

9    Q.    And that was the same in 2020, wasn't it?

10   A.    That is correct.

11   Q.    Okay.  So Ramsey Solutions is a private

12   corporation, for-profit corporation?

13   A.    Correct.

14   Q.    Prior to your position in HR with Ramsey,

15   which you started in 2014, right --

16   A.    (Nods)

17   Q.    -- what did you do?

18   A.    I worked at Human Resources for O'Charley's,

19   which is owned by American Blue Ribbon Holdings.

20   Q.    How long were you in HR with O'Charley's?

21   A.    For eight years, a little over eight years.

22   Q.    Okay.  And prior to that?

23   A.    I was with Cracker Barrel for 15 years.

24   Q.    Were you also in HR with Cracker Barrel?

25   A.    I was.  I was five years in restaurant

1   operations and then 10 years in HR.

2   Q.    So about how long have you been in HR?  It

3   sounds like a while, but I'm not going to do the

4   math.

5   A.    Let's see.  15 plus 8 plus 7, whatever that

6   works out to be.

7                 MS. SANDERS:  30.

8                 THE WITNESS:  30 years.

9   BY MS. COLLINS:

10  Q.    I was just going to say, I told you I wasn't

11  going to do math.

12        Okay, about 30 years in HR; is that right?

13  A.    Yes.

14  Q.    Okay.  Did you have any sort of formal

15  training or education in HR?

16  A.    I have.

17  Q.    Just briefly describe that.

18  A.    So I have gone through the SHRM courses,

19  which is Society for Human Resource Managers.  I

20  received certification from them.  I've also been a

21  part of taking courses with Cornell University as

22  well as different certifications for recruiting.

23  ICM comes to mind.  ARIS certification.

24  Q.    What was your undergraduate -- or did you --

25  do you have an undergraduate degree?

Case 3:20-cv-00028-Brentwood Reporting Service Page 24 of 208 Page #: 4423
Elite Document Reporting - Filed 05/31/22
www.EliteReportingServices.com

1    A.    I do, in business management with a human

2    resource emphasis.

3    Q.    Any work beyond undergraduate, formal

4    education?

5    A.    Beyond that, no.

6    Q.    Okay.  So I would assume that as a person

7    who's been in HR for approximately 30 years, you

8    have background in Title VII, right?

9    A.    That's correct.

10   Q.    And do you train employees at Ramsey on

11   obligations under Title VII or does someone else do

12   that?

13   A.    Somebody else does that, but I'm a part of

14   it.  However, we don't have a formalized training on

15   Title VII.

16   Q.    Okay.  Do you-all do any sort of -- and by

17   "you-all" I mean Ramsey -- does Ramsey do any sort

18   of formal training on antidiscrimination laws or

19   Title VII?

20   A.    So we've been trained people on interviewing

21   and doing the right thing, which a component of is

22   Title VII.

23   Q.    But is there any specific training on

24   antidiscrimination?

25   A.    There is no specific training on

Elite-Brentwood Reporting Service 615 595-0073
www.EliteReportingServices.com

1    antidiscrimination today beyond some leadership

2    training that includes that.

3    Q.    Okay.  What is the leadership training that

4    includes that?

5    A.    So we've done -- we do Entre University on

6    Wednesday mornings.  And some of those have been on

7    recruiting, for example.  And a component of that is

8    discrimination.

9    Q.    What is your understanding of that component?

10   A.    So I know that we covered the -- all

11   Title VII and the fact that we don't discriminate

12   against any of those things.

13   Q.    Do you-all have any sort of person with

14   Ramsey that does diversity, equity and inclusion or

15   a diversity officer?

16   A.    We do not.

17   Q.    To your knowledge, does Ramsey track its

18   diversity in its workforce?

19   A.    We do.

20   Q.    Tell me about that.

21   A.    We track it to complete an EEO-1 report at

22   the end of the year.

23   Q.    How long have you done the EEO-1 report?

24   A.    I have never personally done the EEO-1

25   report, but it is a component of my job, so I make

1    sure that it gets done.

2    Q.     Okay.  Who do you coordinate with or work

3    with to make sure it gets done?

4    A.     Mark Mozingo, who is our compliance

5    specialist.

6    Q.     Who did it before Mark?

7    A.     Oksana Ballard.

8    Q.     Okay.  Do you-all keep copies of those EEO-1

9    reports?

10   A.     Yes.

11   Q.     In the EEO-1 reports -- and I just can't

12   remember off the top of my head.  I don't think you

13   do, but do you-all track the religious preference of

14   your employees?  I don't think you-all have to

15   report that.

16   A.     That's not in there.

17   Q.     Yeah.

18   A.     To my knowledge.

19   Q.     Do you-all keep track of that anywhere?  Does

20   Ramsey keep track of that anywhere, to your

21   knowledge?

22   A.     We do not.

23   Q.     Does -- to your knowledge, does Ramsey hire

24   anyone who's not a Christian?

25   A.     We don't ask that question, so I don't know

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    the answer to it.

2    Q.    To your knowledge, are there any employees at

3    Ramsey who are not Christians?

4    A.    We have a thousand team members.  I have no

5    clue what their religious preferences are.

6    Q.    How often does Ramsey do devotionals?

7    A.    Wednesdays.

8    Q.    Every Wednesday?

9    A.    If there's something going on, we might not

10   do it, but, yes, for the most part, every Wednesday.

11   Q.    Are all employees required to attend?

12   A.    They're not required to attend.

13   Q.    Do they have to be excused from attending?

14   A.    To my knowledge, no.

15   Q.    Has it always been like that?

16   A.    Since I got there, yes.  It's the way that I

17   was told.

18   Q.    Who told you?

19   A.    Rick Perry.  But probably more than one

20   person, but that's who I'm going with.  He was the

21   executive director over the culture side.  I'm sure

22   other people have told me.  He's just the first one

23   that came to mind when you asked the question.

24   Q.    To your knowledge, have you ever had any

25   issue with Ramsey employees refusing to attend the

Case 3:20-cv-01035 Document 32-1 Filed 05/12/21 Page 28 of 208 PageID #: 4427
Elite Reporting Services
www.EliteReportingServices.com

1   Wednesday morning devotional?

2   A.     To my knowledge, no.

3   Q.     What would you do if an employee -- if it

4   came to your attention an employee was refusing to

5   go?

6   A.     It hasn't happened.  Are you asking just

7   hypothetically?

8   Q.     If it hasn't happened, then does that mean

9   all of the employees are Christians?

10  A.     Not every devotional is Christian --

11             MS. SANDERS:  Objection.

12             You can answer.

13             THE WITNESS:  Not every devotional is a

14  Christian speaker.  So I don't see the correlation

15  between the two.

16  BY MS. COLLINS:

17  Q.     Are most of the speakers Christian?

18  A.     Most of them, yes.

19  Q.     Since you've been there, have you ever had a

20  speaker that was Muslim?

21  A.     We have not to my knowledge, but I didn't ask

22  them what their religious preference was before they

23  stood up on stage.

24  Q.     Since you've been there, have you ever had a

25  speaker that was agnostic or atheist?

Elite Brentwood Reporting Service 615 595-0073
www.EliteReportingServices.com

1    A.      Never asked them what their religious

2    preference was.

3    Q.      So to your knowledge, you haven't had a

4    speaker that's agnostic or atheist?

5    A.      It would be my knowledge, or lack thereof.

6    Q.      Since you've been with Ramsey, have you ever

7    had a Muslim employee request a religious

8    accommodation?

9    A.      No.

10   Q.      Have -- since you've been with Ramsey, have

11   you had an employee request any kind of religious

12   accommodation, to your knowledge?

13   A.      Can you give me an example?

14   Q.      Well, noon-day prayers for Muslims is a

15   typical one.  Jehovah's Witnesses go to annual

16   conventions.  A lot of Seventh Day Adventists

17   request off a certain day of the week.  Something

18   like that.

19   A.      Not that I personally dealt with, no.

20           Can we come back to that question?

21   Q.      Sure.

22   A.      I've had one accommodation that was tied to

23   religion, someone that did not want to attend the

24   Christmas party because of their religious belief.

25   Q.      Tell me about that.

Case 3:20-cv-00028-Brentwood at Reporting 05/31/22 eBage 30 of 1595-00713 # 4409
Elite Brentwood Reporting Services Page 30 5 1595-00713 # 4409
www.EliteReportingServices.com

1    A.    He didn't want to attend the Christmas party

2    because of his religious belief, and we accommodated

3    it.

4    Q.    Is the Christmas party mandatory?

5    A.    It is not.

6    Q.    What was his religious belief?

7    A.    I don't remember his actual belief or his

8    religion, other than he did not believe that

9    Christmas parties were the way to celebrate or honor

10   his faith.  He didn't believe in gift-giving, he

11   didn't believe in participating in a celebration.

12   Q.    Was he Christian?

13   A.    I don't know.

14   Q.    Who was it?

15   A.    I'll have to go back and pull the name.  I

16   can -- I can find it.  I can picture his face.  I

17   can't think of his name.

18   Q.    Is he still with Ramsey?

19   A.    I don't know.

20   Q.    When was this?

21   A.    This would have been 2019.

22   Q.    Do you recall what department he worked in?

23   A.    What's in my head is technology.

24   Q.    Okay.  You think it's technology, you're just

25   not sure?

Elite Document Reporting Services  615 595-0073
www.EliteReportingServices.com

1    A.    Yeah.  I'm probably 80 percent sure it was in
2    the technology department, but I'm not 100 percent
3    sure.
4    Q.    Who's over the technology department?  Is
5    that Finney?
6    A.    Over all of it, yes, Michael Finney.
7    Q.    Were most of the Ramsey Solutions policies
8    already written when you came?
9    A.    Yes.
10   Q.    Have you directed any changes to the policies
11   since you've been there?
12   A.    No.
13   Q.    When an employee is hired, do you give them a
14   copy of the policies and procedures?
15   A.    They sign them electronically as part of the
16   paperwork process, and then they have access to them
17   through the system.  We don't hand them a hard copy,
18   per se.
19   Q.    Why not?  Are you-all a green company?
20   A.    I don't know that I'd say we're a green
21   company, but we try to do everything electronically.
22   Q.    Okay.  If an employee wanted to print out a
23   copy of the policies and procedures and take them
24   home, they're old school, can they do that?
25   A.    Absolutely.

Case 3:20-cv-00628  Document 82-11  Filed 05/12/22  Page 32 of 52  PageID #: 4431
Elite Brentwood Reporting Service  (615) 595-0073
www.EliteReportingServices.com

1    Q.      I know a lot of people like paper.  Obviously

2    attorneys do.

3    A.      Uh-huh.  It wasn't an intentional trying to

4    be green, it was more of a "it's the 21st century

5    and things are digital."

6    Q.      Right, right.  Sort of like doctors' offices

7    too --

8    A.      Right.

9    Q.      -- getting rid of paper to make it more

10   efficient.

11          How long has it been that, that you-all did

12   the digital policy thing?

13   A.      It was sometime in early 2015.  It was paper

14   when I got there.  And while I didn't direct a

15   change to the policies, I directed a change to the

16   way we delivered the policies, capturing electronic

17   signatures and having a digital copy versus a paper

18   copy.

19   Q.      Are there any policies or documents that

20   would be -- well, let me ask that in a better way.

21          Do you just provide a copy of the policies

22   and procedures after they've been hired?

23   A.      It's before they would start, so the answer

24   would be yes, but they haven't started yet.  So they

25   sign all that before they show up on day one.  They

1   sign it electronically.

2   Q.     Okay.  So is it sent to, like, their personal

3   email address or is it sent to their -- seems like

4   if they haven't started yet, they wouldn't have a

5   Ramsey email address yet.

6   A.     That's right, so it's through Jobvite.  So

7   it's through that applicant tracking software, so

8   it's whatever email has been used to communicate

9   with them.  So it sent through that.  They log into

10  a system that allows them to complete their

11  paperwork electronically.

12         So what's being sent is not the actual

13  document, but a link that allows them to have

14  access to the document.

15  Q.     Okay.  And that system, the Jobvite --

16  A.     Yes.

17  Q.     Okay.  I almost said "bite" again.

18  A.     It's confusing.

19  Q.     It is.

20         The Jobvite system, is that just a system

21  that Ramsey has purchased that's available, I

22  guess, on the open market or is that just a Ramsey

23  system?

24  A.     It's an open-market software.

25  Q.     Okay.

1  A.    One of probably a million ATSs, applicant and

2  tracking systems.

3  Q.    Okay, got it.

4        And as an HR professional, you know that

5  sometimes policies can be written by a company that

6  actually violate the law, right?

7            MS. SANDERS:  Objection.

8            THE WITNESS:  Can you clarify the

9  question?

10 BY MS. COLLINS:

11 Q.    Sure.  For example, if a company had a policy

12 where they refused to hire people with disabilities,

13 that would violate the law, right?

14           MS. SANDERS:  Objection.

15           THE WITNESS:  I've never worked for such

16 a company, but if a company had that, then, yes,

17 that would violate the law.

18 BY MS. COLLINS:

19 Q.    Okay.  So in that type of situation, it

20 doesn't really matter if a policy's written or not,

21 it can still be a violation of the law, if it's

22 written in an illegal way, right?

23           MS. SANDERS:  Objection.  If he

24 understand that he can answer it.

25           THE WITNESS:  I didn't understand.  I

1    was going to ask you to clarify.

2    BY MS. COLLINS:

3    Q.     Sure.  If a company has a policy that's

4    written in a illegal way, like, "We don't hire

5    disabled people," or "We don't hire blacks," or "We

6    don't hire atheists," or something like that, even

7    though it's a written policy, it would still violate

8    the law, right?

9              MS. SANDERS:  Object that it asks for

10   his legal conclusion, but...

11             MS. COLLINS:  I'm asking for his

12   conclusion based on 30 years as a HR professional.

13   BY MS. COLLINS:

14   Q.     You can answer the question.

15   A.     So your question is if a -- if a policy is

16   written in clear violation of the law, does it still

17   violate the law?  Is that the question?

18   Q.     If it's written in a way that is a violation

19   of the law, even though it's a written policy, it

20   would still be a violation of the law?

21   A.     I think your answer is in your question.  If

22   a policy is written that violates the law, it

23   violates the law.

24   Q.     Okay.  So it doesn't matter if it's contained

25   in an employee handbook or not, it would still be a

Case 3:20-cv-00028 Document 34 Filed 05/21/21 Page 66 of 208 PageID #: 4435
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  violation of the law?

2  A.    To be clear, I've never worked for a company

3  that did that.  And also to be clear, your answer is

4  in your question.  If a policy is written that

5  violates the law, wherever it's contained, a

6  handbook, a policy and procedure manual, whatever

7  other form, it still violates the law.

8  Q.    Okay.  In the past 10 years has Ramsey had

9  any EOC charges filed against it?

10  A.    Yes.

11  Q.    Okay.  About how many?

12  A.    I can only speak for the six-and-a-half years

13  that I've been there.

14  Q.    Okay.  About how many in the six-and-a-half

15  years that you've been there?

16  A.    I would say about four, maybe five.

17  Q.    Has Ramsey been sued for employment law

18  violations in the six-and-a-half years that you've

19  been there?

20  A.    Other than this case?

21  Q.    Uh-huh, yes.

22  A.    Yes.

23  Q.    How many times?

24  A.    To my knowledge, counting this one would be

25  two.

Elite Brentwood Reporting Service  615-595-0073
www.EliteReportingServices.com

1  Q.     Have you given testimony under oath as a
2  Ramsey HR representative before?
3  A.     I have not.
4  Q.     Have you given testimony under oath ever?
5  A.     Yes.
6  Q.     In your other capacities as HR?
7  A.     Correct.
8  Q.     Have you given testimony under any other
9  capacity?
10 A.     No.
11 Q.     Does Ramsey hire people who have had children
12 out of wedlock?
13 A.     Yes.
14 Q.     Is that consistent with their values to do
15 so?
16 A.     Yes.
17 Q.     Tell me about that.
18 A.     Ramsey's values pertain to Ramsey employees,
19 Ramsey team members at the time, not prior.
20 Q.     What sort of background investigation does
21 Ramsey run when it's hiring?
22 A.     We use a third party to do background checks,
23 criminal, sex offender list.  We use the federal
24 database for offenses.
25 Q.     In the hiring process, are employees -- or

1    applicants, potential employees asked where they go

2    to church?

3    A.     No.

4    Q.     Do you know if part of the spousal interview

5    that's discussed?

6    A.     Not any spouse that I've been a part of.

7    Q.     What sort of training does the hiring team

8    undergo?

9    A.     Can you define "hiring team"?

10   Q.     Sure.  Well, the people we talked about

11   earlier.

12   A.     I can walk you through it if you want --

13   Q.     Yes.

14   A.     -- starting with recruiters --

15   Q.     Okay.

16   A.     -- right?

17          So the recruiters go through training to

18   know what they're looking for, how to find the best

19   qualified candidate.  Hiring leaders, we don't have

20   a formal process, but hiring leaders will undergo

21   typically one or two trainings where we discuss

22   finding the best qualified candidate and interview

23   questions and how to treat candidates right.

24   Q.     A moment ago you mentioned they look for

25   keywords in determining whether or not to move them

Case 3:20-cv-00023  Document 36  Filed 05/21/21  Page 39 of 208  PageID #: 443
Elite Document Reporting Service
www.EliteReportingServices.com

1    on to the next level.  What does that entail?  Or do
2    you-all have a set list of keywords you look for?
3    Tell me about that.
4    A.     It varies by position.  But if we're looking
5    for, say, a Java developer, we might know that PC --
6    I'm not a tech recruiter, but I think it's called
7    PCP.  It's another language that is very similar to
8    Java.  And so if they mention that, that's still a
9    go-ahead, that's still, "Hey, that's a language in
10   development coding that we can use."
11   Q.     Is there, like, a list that's kept for
12   different positions for the keywords to look for?
13   A.     Yeah, it's mostly -- it's mostly in the
14   technology side, but it's also in other areas.  For
15   example, if we're looking for a general counsel we'd
16   want to see if they're licensed to practice in this
17   state, if they litigate, or might be one of those
18   words.
19   Q.     But is there any sort of list that breaks it
20   down by position --
21   A.     No --
22   Q.     -- of keywords you would look for?
23   A.     -- there is -- no.
24   Q.     Okay.  Does Ramsey have any sort of internal
25   messaging or text system, or do they just use email?

Case 3:20-cv-00628  Document  Reporting Service  Page 40 of 208 PageID #: 4439
Elite Brentwood Reporting 05/12/22  (615) 595-0073
www.EliteReportingServices.com

1    A.      Teams, Microsoft Teams.

2    Q.      How long has that been in place?

3    A.      I want to say it's relatively recent, so in

4    the last couple of years.

5    Q.      Okay.  Are the -- the messages that are

6    exchanged on Teams, are those archived, to your

7    knowledge?

8    A.      I don't work in technology, but -- I don't

9    know the answer to that.

10   Q.      Okay.  Other than Teams, anything else?

11   A.      Teams, email.

12   Q.      Okay.  And you mentioned the recruitment

13   system that you use.  Is there any sort of HRIS

14   system that Ramsey uses?

15   A.      There is not.

16   Q.      Okay.  I'm going to provide you a document

17   that's going to be marked as Exhibit-- whoa, wait a

18   second -- it's Exhibit No. 1.

19   A.      Is this it?

20   Q.      Yeah.  She's going to mark it real quick.

21           (WHEREUPON, the above-mentioned

22   document was marked as Exhibit Number 1.)

23   BY MS. COLLINS:

24   Q.      All right.  A moment ago you were referring

25   to Ramsey's policies and procedures.  Is this what

Case 3:20-cv-00023 Document Report Filed 05/01/22 Page 41 of 208 PageID #: 44170
Elite Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1    you were referring to?

2    A.      Yes, ma'am.

3    Q.      Okay.  And on the last page it says that it

4    was last updated 4/7/2017.  Was that just the update

5    to incorporate electronic signatures or was there

6    something else that was updated in the policy?

7    A.      I believe in 2017 we added "Recreation,

8    Sports Leagues, Voluntary Team Building" on that

9    same page 7.

10          (Reviewing)

11          To the best of my knowledge, everything else

12   was already in there.

13   Q.      Okay.

14   A.      You know, that "Information Security" on

15   page 3, I think, might have also been added in 2017.

16   Q.      Okay.  Did anything in particular prompt the

17   addition of those two?

18   A.      Yes.  Hiring an information security director

19   who said, "I think we ought to include the

20   information" -- this -- what's in there, on page 3.

21   Q.      Okay.  Who is that?

22   A.      He's no longer with us.

23          (Pause)

24          Last name, Russell, and he went by Russ, but

25   that was not his first name, and I cannot think of

1    his first name.

2    Q.    Okay.  And the -- the other section, the

3    "Recreation, Sports Leagues and Voluntary Team

4    Building," why was that added?

5    A.    We used to have a separate document, and

6    since we were already updating for that one thing, I

7    met with our general counsel at the time, Matt

8    Blackburn, and said, "Are you okay if we just put it

9    in here and it gets signed all at once?"

10   Q.    Is this the only, I guess, handbook, for lack

11   of a better term, that Ramsey uses?

12   A.    That's correct.

13   Q.    Okay.  And this is the one that's provided to

14   employees before they actually start?

15   A.    Correct.

16   Q.    Okay.

17   A.    It gets sent to them electronically to review

18   and sign.

19   Q.    So to start employment with Ramsey, they

20   would have had to sign off on this along with other

21   documents --

22   A.    Yeah.

23   Q.    -- and send it back.

24   A.    Yeah.  This, W-2, the top portion of an I-9,

25   et cetera.

1    Q.    Okay.  Do you know if, when it's sent to

2    them, they can download it?

3    A.    Yes, they can.

4    Q.    Okay.  And the Equal Employment Opportunity

5    statement that's included on page 1, that's a pretty

6    standard provision that's included in most employee

7    handbooks, right?

8    A.    Correct.

9    Q.    Okay.  And based on your experiences as an HR

10   professional, why is that typically included in a

11   handbook?

12   A.    It's a disclosure and information.

13   Q.    Of what?

14   A.    Of protected classes of discrimination.

15   Q.    Does it -- is it fair to say that it

16   recognizes Ramsey's duty under the law to eliminate

17   discrimination in the workplace?

18   A.    It is fair to say that.

19   Q.    It does not specifically include pregnancy.

20   Is pregnancy covered under Ramsey Solutions' EEO

21   policy?

22   A.    It's covered under the law.  I don't know if

23   it falls under EEO policy, but it is covered under

24   the law.

25   Q.    Okay.  And so by having this EEO statement

Elite Brentwood Reporting 05/21/21 Page 44 of 208 ID #: 4430
www.EliteReportingServices.com

1  here, it's supposed to keep Ramsey in compliance

2  with the law, right?

3         MS. SANDERS:  Objection.  I don't think

4  that's what he --

5         THE WITNESS:  Yeah.

6         MS. SANDERS:  -- I don't think that's

7  how he answered.

8         THE WITNESS:  That's not how I would

9  answer it.  However, it's not all-inclusive.  Like,

10 that is not the entire -- all the protected classes.

11 That's just a portion of it.

12 BY MS. COLLINS:

13 Q.    Has it been updated since this policy to

14 include LGBT people?

15 A.    I don't think we've updated it since 2017.

16 I'd have to go back and look.

17 Q.    Does Ramsey recognize the protection of LGBT

18 employees under the law?  Or potential employees

19 under the law?

20        MS. SANDERS:  Objection.  What's that --

21 how is that relevant to this case?

22        MS. COLLINS:  I'm just asking the

23 question.

24        MS. SANDERS:  If Ramsey recognizes --

25 can you restate the question?

1          MS. COLLINS:  Can you repeat the

2     question that I asked?

3               (The requested record was read back by

4     the court reporter.)

5          MS. SANDERS:  In his capacity as an

6     individual -- how do you want him to answer that?

7     As an individual or on behalf of Ramsey?  Because

8     he's not here on behalf of Ramsey.

9          MS. COLLINS:  He's Ramsey's HR director,

10    and so I think that he -- I've laid the foundation

11    that he can answer this question.

12         MS. SANDERS:  He can testify with

13    respect to policies.

14         MS. COLLINS:  He can testify with

15    respect to his knowledge of Ramsey's policies which,

16    I assume, he has quite a bit of knowledge about.

17         MS. SANDERS:  Okay.  He can answer that

18    question.  I object on the basis of relevancy, but

19    he can answer that question.

20         THE WITNESS:  The answer is yes.

21    BY MS. COLLINS:

22    Q.    Do you know if Ramsey has any gay employees?

23    A.    A thousand employees, I don't know if we do.

24    Q.    Have any employees come out as gay at Ramsey?

25    A.    Ever?  Or in my time there?  Or to my

1    knowledge?

2    Q.      Sure, in the past three years?

3    A.      Yeah, I know of one.

4    Q.      Are they still working there?

5    A.      She resigned.

6    Q.      Was she forced to resign?

7    A.      No.

8            MS. SANDERS:  Objection.  That has no

9    relevance to this case.  He's already answered it.

10   BY MS. COLLINS:

11   Q.      And even though the Ramsey Solutions' EEO

12   policy doesn't mention pregnancy, it covers that,

13   right?

14   A.      Pregnancy is a protected class.

15   Q.      Is it covered under Ramsey's policies?

16   A.      It is.

17   Q.      And this policy is not a contract, right?  It

18   doesn't create a contract of employment?

19   A.      It is not an employment contract, correct.

20   Q.      Does Ramsey have any independent contractors

21   that work for it?

22   A.      We do.

23   Q.      Are they required to abide by this policy?

24   A.      They are not.

25   Q.      To your knowledge, has anyone been

Elite Brentwood Reporting Services
www.EliteReportingServices.com

1    disciplined or had action taken against them for

2    keeping a copy of this policy at home?

3    A.      Not to my knowledge.

4    Q.      Does Ramsey have any kind of ADA or

5    accommodation policy aside from this EEO statement

6    that's in the front of the handbook?

7    A.      Can you repeat the question?

8    Q.      Sure.

9            MS. COLLINS:  Can you repeat that

10   question, Terri?

11           (The requested record was read back by

12   the court reporter.)

13           THE WITNESS:  We don't have a policy.

14   We just comply with ADA.

15   BY MS. COLLINS:

16   Q.      How so?  How do you know that?

17   A.      We make reasonable accommodation for any team

18   member requesting it.

19   Q.      Who handles that process?

20   A.      HR handles, for the most part, all of them.

21   There are some exceptions.  For example, we've made

22   enough accommodation now for larger screens due to

23   eyesight that leaders can just order that through IT

24   without having to go through HR.

25   Q.      Okay.  But there's no separate form to

1    request an accommodation or anything like that?

2    A.     There is no form, it usually comes to HR.

3    The team member comes to HR, sent by a leader.  We

4    meet with that person and discuss what the

5    accommodation is and why it's needed.

6    Q.     As part of that process, does HR meet with

7    the employee?

8    A.     Correct.

9    Q.     Does Ramsey require employees to return

10   copies of handbooks when they leave?

11   A.     No.

12   Q.     Now, if you could turn to page 4 of the

13   handbook.  On the "Company Conduct" section, it

14   says, "The image of Ramsey Solutions is held out to

15   be Christian."

16          What does that mean?

17   A.     It means that the image of Ramsey Solutions

18   is held out to be Christian.

19   Q.     Well, I know what it says, but I'm asking you

20   what does it mean, the practical application of

21   that?

22   A.     There is no practical application to it.  The

23   image of Ramsey Solutions is held out to be

24   Christian, so we're -- we're not a

25   Christian-designated company, it's just our image.

Case 3:20-cv-00628 Document Reporting Services Page 49 of 208 PageID #: 4475
Elite Reporting Services
www.EliteReportingServices.com

1    Q.      So you're not a Christian-designated company?

2    What do you mean by that?

3    A.      Your questions earlier were, are we a 501c3

4    company.  And the answer is, no, we're not a

5    not-for-profit company.  We're a for-profit company

6    who's founded on Christian principles, and that's

7    what that is saying.

8    Q.      Okay.  What are the Christian principles that

9    you're founded on?

10   A.      There are probably more than one, but I would

11   guess that for people that have heard the show,

12   they've heard Dave talk about ultimately there's

13   only one way to financial peace, and that is to walk

14   daily with the Prince of Peace, Jesus Christ.  That

15   is the image and principles that we're founded on.

16   Q.      And that's to walk what with Jesus Christ?

17   A.      Ultimately there's only one way to true

18   financial peace, and that's to walk daily with the

19   Prince of Peace.

20   Q.      And the Prince of Peace is Jesus?

21   A.      Correct.  And he says that on his radio show

22   as his close.

23   Q.      So can Muslims never find financial peace

24   if -- it seems like they would be foreclosed from

25   finding financial peace.

Elite Brentwood Reporting Services
www.EliteReportingServices.com

1          MS. SANDERS:  Objection.

2   BY MS. COLLINS:

3   Q.    Is that right?

4          MS. SANDERS:  Objection.  He can answer

5   it personally, his personal opinion.

6          THE WITNESS:  Anyone can find it.  It's

7   the image of Ramsey Solutions.

8   BY MS. COLLINS:

9   Q.    What do you mean "the image of Ramsey

10  Solutions"?  Anyone can find it?

11  A.    Anyone can find it.  A Muslim can find

12  financial peace.  It is the founding of this

13  company, the -- in marketing or advertisement, the

14  plumber that says, "No one will clean your pipes

15  except us" does not mean that's the only way to get

16  your pipes clean, through that company.

17         This is not the only way, obviously, but it

18  is the way that we profess it.

19  Q.    Okay.  Are employees required to complete

20  Financial Peace University?

21  A.    Yes.

22  Q.    All employees?

23  A.    Yes.

24  Q.    So to -- to complete Financial Peace

25  University, are they supposed to walk daily with the

Elite Document Reporting Service  615 595-0073
www.EliteReportingServices.com

1  Prince of Peace, Jesus?

2  A.     No, they don't have to do that to complete

3  the Financial Peace University.

4  Q.     To your knowledge, are there any in the past

5  three years who have not completed Financial Peace

6  University?

7  A.     We don't keep up with it, so I'm not sure.  I

8  do know of some that have not completed it.

9  Q.     Are they still with the company?

10  A.     Yes.

11  Q.     Why have they not completed it?

12  A.     They already believed in the principles, knew

13  the material, but not -- had never taken Financial

14  Peace University, but they had maybe read the book

15  or they had listened to the show enough to

16  understand the baby steps.  They knew what we sold,

17  knew the material, could speak to it, but maybe

18  didn't take Financial Peace University.

19  Q.     Are employees at Ramsey Solutions encouraged

20  to walk daily with the Prince of Peace, Jesus?

21  A.     By who?

22  Q.     By the company.

23  A.     No.

24  Q.     But they are encouraged to come to weekly

25  devotionals, right?

Elite Reporting Services * www.EliteReportingServices.com

1          MS. SANDERS:  Objection, asked and

2   answered.

3          THE WITNESS:  Not all of those

4   devotionals are Christian speakers.

5   BY MS. COLLINS:

6   Q.     My question was employees are encouraged to

7   go to the weekly devotionals, right?

8   A.     They're not required to go.

9   Q.     But they're encouraged to, right?

10  A.     I don't know if they are or aren't.

11  Q.     What do you mean, you don't know?

12  A.     I don't know.  I don't know every team member

13  and every leader, if they're encouraging or not

14  encouraging them to go.

15  Q.     Are meetings typically scheduled during the

16  weekly devotionals?

17  A.     Meetings are not typically scheduled during

18  that time.

19  Q.     And what do you understand the term

20  "devotional" to mean?

21  A.     On -- based on my knowledge of what it is

22  today or the definition of the term?

23  Q.     I'm asking you what it is -- what your

24  understanding of "devotional" is in the context of

25  the Ramsey Solutions Wednesday morning meetings.

Case 3:20-cv-00083 Document 86-1 Filed 05/07/21 Page 66 of 209 PageID #: 4453
Elite Brentwood Reporting Service 615-595-0073
www.EliteReportingServices.com

```
1    A.     It's a time of encouragement.  It's a time of
2    learning.  It's a time of motivation.
3    Q.     Is there music?
4    A.     There has been.
5    Q.     Is it Christian?
6    A.     It has been.
7    Q.     Has there been non-Christian music?
8    A.     Yes.
9    Q.     What?
10   A.     We've had some of our bands from Battle of
11   the Bands that were practicing practice and it was a
12   non-Christian song.
13   Q.     What was it?
14   A.     I don't recall it.
15   Q.     What was the band?
16   A.     It would have been a band that Scott Chaney
17   was on and it would have been a country song, but I
18   don't recall the name of the song.
19   Q.     Are most of the speakers for the Wednesday
20   morning devotionals Christian?
21          MS. SANDERS:  Objection.  He's answered
22   that.
23   BY MS. COLLINS:
24   Q.     Can you answer it?
25   A.     Some are; some aren't.
```

Elite Reporting Services ● 615-595-0073
www.EliteReportingServices.com

1    Q.    Are most of them Christian?

2    A.    Most of them are.

3    Q.    Is a prayer a part of the Wednesday morning

4    devotional?

5    A.    Yes, at the close.

6    Q.    Other than the Wednesday morning devotional,

7    are there any kind of Bible groups at Ramsey that

8    you know of?

9    A.    Company-sponsored or individual team members?

10   Q.    And at -- in the -- that you're aware of that

11   take place during the course of the workday.

12   A.    I'm aware of some Bible studies that go on,

13   just like I'm aware of some off-roading clubs that

14   are a part of Ramsey Solutions or book study clubs.

15   So, yes, I am aware of some.

16   Q.    You said these other clubs are a part of

17   Ramsey Solutions.  Does that mean a Bible study is a

18   part of Ramsey Solutions?

19   A.    They're not sponsored by the company, it's

20   just team members that get together that have common

21   interests.

22   Q.    How many Bible studies are there with team

23   members who get together at Ramsey Solutions?

24   A.    I wouldn't even know where to start.  It

25   could be one.  It could be more.  I have no clue.

Case 3:20-cv-00641 Document Report Filed 05/31/22 Page 55 of 208 PageID #: 4434
Elite Brentwood Reporting Service 615 595-0073
www.EliteReportingServices.com

1    Q.    Are Bible studies encouraged among Ramsey
2    employees?
3    A.    Not to my knowledge.
4    Q.    Are they discouraged?
5    A.    Not to my knowledge.
6    Q.    The company conduct code on page 4 of
7    Exhibit No. 1 states, "Should a team member engage
8    in behavior not consistent with traditional
9    Judeo-Christian values or teaching, it would damage
10   the image and the value of our goodwill and our
11   brand."
12         What does it mean by traditional Christian
13   values or teaching?
14   A.    So I did not write this.  I can answer it as
15   to what I believe it means.  I cannot answer it as
16   to the person that wrote it, what they wanted it to
17   mean.
18   Q.    What is your understanding of that statement?
19   A.    It would be that the company wants our team
20   members to engage in behavior that is Christian.
21   And things that would not be would be like
22   drunkenness, cursing someone out in a restaurant or
23   in a public place.  Those would be non-traditional
24   Judeo-Christian values that could damage the brand.
25   Q.    Anything else?

1    A.    I would put sex out of -- premarital sex or

2    extramarital sex in there.

3    Q.    Why?

4    A.    Because that would be my definition of

5    traditional Judeo-Christian values or teachings.

6    Q.    And "Judeo-Christian values," that's a

7    religious term, right?

8    A.    I don't know where it started.  I would guess

9    it's a religious term, but I don't know where that

10   term...

11   Q.    Well, Judeo Christian is not secular, is it?

12         MS. SANDERS:  Objection.

13         THE WITNESS:  I don't know who named it

14   Judeo Christian.

15   BY MS. COLLINS:

16   Q.    Well, your understanding of Judeo Christian

17   would be that it's got a religious underpinning or

18   foundation, right?

19   A.    It would be -- my understanding would be yes.

20   My understanding in this is that the image would be

21   that.

22   Q.    Okay.  You mentioned a second ago that

23   premarital sex is a traditional Judeo-Christian

24   value or teaching, right?

25   A.    The lack thereof, yes.

Elite Brentwood Reporting Services Page 57
www.EliteReportingServices.com

```
1    Q.     Where do you get that from?

2    A.     I would get it from the Bible.

3    Q.     Where in the Bible?

4    A.     So I would get it from my Bible teachings

5    that say premarital sex or extramarital sex.  I

6    don't have a Bible with me to point to the exact

7    verse.

8    Q.     Okay.  You said that you would get it from

9    your Bible teachings.  Is that, what, from church?

10   A.     Church and Mom.

11   Q.     And what?

12   A.     Church and my mom, the way I was brought up.

13   Q.     And when you say the way you were brought up,

14   is that in a religious household?

15   A.     I was brought up as Catholic.

16   Q.     Would you still describe yourself as

17   Catholic?

18              MS. SANDERS:  Objection.

19              THE WITNESS:  I would describe --

20              MS. SANDERS:  He can answer that if he

21   wants.

22              THE WITNESS:  I would describe myself as

23   non-denominational, Christian.

24   BY MS. COLLINS:

25   Q.     And when you refer to "the Bible," you mean
```

Elite-Brentwood Reporting Service  615-595-0073
www.EliteReportingServices.com

1    the Christian Bible?

2    A.      Yes.  I didn't know there was more than one.

3    Q.      What version?

4    A.      NIV.

5    Q.      Okay.  So understanding of traditional

6    Christian values as set forth in this company

7    conduct policy is based on the Christian Bible?

8    A.      Can you rephrase that?  My understanding --

9            You can reread it if you want.

10              (The requested record was read back by

11   the court reporter.)

12              THE WITNESS:  I don't understand the

13   question.

14   BY MS. COLLINS:

15   Q.      We just went through and talked about

16   Judeo -- Judeo-Christian values, right?

17   A.      (Nods)

18   Q.      And -- and that you got that from the Bible

19   or Bible teachings.

20   A.      (Nods)

21   Q.      So is it your understanding that

22   Judeo-Christian values are derived from the Bible?

23   A.      Yes.

24   Q.      Okay.  And sitting here today, you don't know

25   of a verse in the Bible that prohibits premarital

```
1    sex, do you?
2            MS. SANDERS:  Objection.  You're asking
3    this witness for his personal testimony on the
4    Bible, not matters related to this case.
5            MS. COLLINS:  Okay.  Could you just keep
6    your objections to form objections?
7            MS. SANDERS:  Objection.
8            MS. COLLINS:  I did the same thing when
9    you deposed my clients.
10           MS. SANDERS:  Well, objection to the
11   form.
12           MS. COLLINS:  Okay, thanks.
13           THE WITNESS:  No.
14   BY MS. COLLINS:
15   Q.    Okay.  Is it a policy or practice of Ramsey
16   Solutions to prohibit its employees from engaging in
17   premarital sex?
18   A.    Yes.
19   Q.    How does it carry that policy out?
20   A.    By terminating those when we are made aware
21   of it, those that have violated that policy or
22   practice.
23   Q.    Is that policy or that prohibition against
24   premarital sex written down anywhere?
25   A.    Not to my knowledge.
```

1    Q.    How are employees made aware of it?

2    A.    During interviews, during on-boarding, during

3    staff meetings.

4    Q.    Give me an example of how they're made aware

5    of it in on-boarding interviews or staff meetings.

6    A.    During the interviews, one of the interviews

7    is with Human Resources, and that is to cover sex

8    out of marriage or premarital sex, in addition to

9    other things.

10   Q.    What are the additional things?

11   A.    That would be things like our no-gossip

12   policy and how that operates, how that works.  That

13   would be things like dress code, flex schedules.  In

14   the old building, it was to cover parking or the

15   lack thereof.

16   Q.    Any other examples?

17   A.    That's probably the bulk of them.

18   Q.    Okay.  And you said that this was when there

19   was the interview with the H -- with HR in the

20   beginning?

21   A.    (Nods)

22   Q.    Is that the recruitment team or is that a

23   different team?

24   A.    That's a different team.

25   Q.    Okay.

Elite-Brentwood Reporting Services                61
www.EliteReportingServices.com

1    A.      They're part of HR, but not everyone that

2    does it today is a part of HR.

3    Q.      Okay.  Who does it?

4    A.      Two different answers.  Can I give you one

5    for 2020 and one for today?

6    Q.      Sure.

7    A.      Okay.  So in 2020 there would have been two

8    people that did it, and that was Rick Perry or

9    myself.  So the two executive directors of HR.

10   Based on hiring and scaling, we've added people to

11   that group that we call culture ambassadors.  And so

12   these are leaders from different areas of the

13   company.

14   Q.      The culture ambassadors or leaders, do they

15   get extra pay for that, for doing that?

16   A.      They don't.

17   Q.      Okay.  Do they get any kind of incentive?

18   A.      They don't.

19   Q.      Do you-all keep a list of who those people

20   are, or how are they selected?  That's really two

21   different questions.  Let me do the list first.

22   A.      Okay.  We do have a list of those

23   individuals.

24   Q.      Okay.  And how are they selected to be one of

25   those cultural ambassadors?

Elite Document Reporting Service 615 595-0073
www.EliteReportingServices.com

1    A.     People are nominated by their leader, and

2    then those people go into HRC -- those names go into

3    HRC, not the actual individuals.  And then HRC

4    approves.

5    Q.     Okay.  And I think a couple of times we've

6    gone back and forth in the deposition referring to

7    HRC and the human -- that's the Human Resources

8    Committee, right?

9    A.     That's correct.

10   Q.     Okay.  And so you're part of HRC, right?

11   A.     Right.

12   Q.     So you know who the people are?

13   A.     That's correct.

14   Q.     Okay.  To your knowledge, are all of the

15   culture ambassadors Christian?

16   A.     I don't know.  We don't ask them.

17   Q.     If you had to guess, would you say they are?

18   A.     I would guess yes, but I have no way of

19   knowing that.

20         MS. COLLINS:  Okay.  What time is it?

21   Do you-all need to take a break?  I didn't realize

22   that we'd been going for an hour-and-a-half.

23         THE WITNESS:  I'm okay if you want to

24   keep going.

25         MS. COLLINS:  Let's go off the record

1    and take a quick break.

2                   MS. SANDERS:  Sure.

3                   THE VIDEOGRAPHER:  Going off the record

4    at 11:07 a.m.

5                   (Recess observed from 11:07 a.m. to

6    11:16 a.m.)

7                   THE VIDEOGRAPHER:  We are back on the

8    record at 11:16 a.m.

9    BY MS. COLLINS:

10   Q.     Okay.  All right, Mr. Lopez.  Before the

11   break we were talking a little bit about the company

12   conduct code.  Is gambling considered a

13   Judeo-Christian value that would be prohibited by

14   Ramsey Solutions?

15   A.     I don't believe so.

16   Q.     Why is that?  Why do you believe that?

17   A.     It hasn't come up.

18   Q.     Oh, okay.  And what about watching

19   pornography?  Would that be a violation of

20   traditional Judeo-Christian values and teaching?

21   A.     I know that we address pornography addiction

22   and watching pornography.  I don't know that we make

23   the distinction to call it specifically out because

24   of Christian values, but I know that it's not

25   allowed.

1    Q.    What about -- you mentioned premarital sex --

2    well, tell me, what is your -- what do you mean by

3    that, "premarital sex"?

4    A.    Are you asking me to define what premarital

5    sex is?  Is that the question?

6    Q.    Yes.

7    A.    Or in relation to --

8    Q.    Yes.

9    A.    Yes, to the definition?

10   Q.    Yes.  You said that premarital sex was --

11   would be prohibited by Ramsey's company conduct code

12   because it would be a violation of Judeo-Christian

13   values.  Specifically what do you mean by

14   "premarital sex"?

15   A.    I would mean having intercourse with someone

16   you're not married to.

17   Q.    Does it just cover intercourse?

18   A.    Yes.

19   Q.    Okay.  Does that also cover extramarital

20   affairs?

21   A.    Yes.

22   Q.    So if you-all found out that an employee

23   engaged in an extramarital affair, would they be

24   terminated?

25   A.    If we find out an employee engaged in

Case 3:20-cv-00028 Document 32-1 Filed 05/07/21 Page 66 of 209 PageID #: 4464
Elite Brentwood Reporting Service 615 595-0073
www.EliteReportingServices.com

1  intercourse, then yes, they would be terminated.

2  Q.      How would you-all find something like that

3  out?

4  A.      Someone would tell us and we'd address the

5  team members in question.  And if they admitted to

6  it, then they would be terminated.

7  Q.      Is the company conduct code strictly adhered

8  to or is it selectively and flexibly applied?

9  A.      Can you define "company conduct code,"

10 please?

11 Q.      Sure, what we've been talking about here in

12 the handbook, page 4.  It says "Company Conduct."

13 A.      And your question is, is it loosely applied

14 or does it apply to everyone?

15 Q.      Is there some flexibility in it?

16 A.      There are gradients, yes, depending on the

17 infraction.

18 Q.      What do you mean by that?

19 A.      What I mean is that it's not a zero -- zero

20 opportunity policy, it is a gradient policy.  Not

21 every violation of it would be met with the same

22 company action.

23 Q.      Is any instance of premarital sex met with

24 the same action of termination?

25 A.      Yes.

Elite-Brentwood Reporting Services
www.EliteReportingServices.com

1   Q.    Whose job is it to make sure the employees of

2   Ramsey comply with this company conduct code?

3   A.    It's everyone's job to make sure that they're

4   aware of it and comply to it.

5   Q.    Is there any sort of written policy or

6   standard for what the company conduct code means?

7   A.    Beyond what you have?  No.

8   Q.    Okay.  And other than being told at -- upon

9   hiring or as you described by their managers, do

10  employees have any other way to know the gradients

11  of the policy as you just referred to?

12  A.    So can you clarify that?  Are you speaking

13  about the entirety policy or one specific aspect of

14  it?

15  Q.    I'm talking about the company conduct code --

16  A.    Okay.

17  Q.    -- the Judeo-Christian values.

18  A.    That's covered in sections, so it wouldn't be

19  covered as that.  We wouldn't stand in on-boarding

20  and read that and talk about the gradients of that.

21  We talk about the conduct, conduct that's acceptable

22  and conduct that is not, not the policy.

23  Q.    Okay.  But this specific conduct that's

24  prohibited by this policy, that's not written down

25  anywhere, that's just covered verbally with these

Elite Brentwood Reporting Service 615 595-0073
www.EliteReportingServices.com

different managers and people that go over these things with employees?

A.    Correct.  They're covered in on-boarding, the conduct.  They're covered in staff meeting.  They're covered in interviews.

Q.    Is it covered in the weekly devotionals at times?

A.    There have been times where it has been covered there as well.

Q.    Can you give me an example of that?

A.    I can think of one example to give you where we had lost a team member due to a violation, their conduct related to sex out of wedlock.  And during a devotional we learned about it and talked about it.

Q.    Did you-all mention the employee's name?

A.    Yes, I believe we did.

Q.    Who was the employee?

A.    His name is ███████.

Q.    What do you recall talking about?

A.    I didn't do the talking.  What I remember from the conversation was Dave talking about ███████ engaging in sex out of marriage and that having had additional consequences coming to the light years later.  And ███████ being talked to and not having been a single occurrence and his

termination -- or separation from the company.  I

don't think he said "termination."

Q.     Okay.  Any other instances that you can

recall besides ██████ where a team member left the

company for engaging in premarital sex?

A.     Yes.  We've handed you a list of those

individuals.

Q.     Did -- I -- I got the list, but did you-all

talk about each of those in devotion?

A.     No.

Q.     Was ██████ the only one that was talked

about at devotional?

A.     By name, yes.  There were other people, but

their names were not mentioned, just our standard.

Q.     If an employee lost their job for engaging in

premarital sex, would it typically be talked about

at the morning devotional?

A.     No, not typically.

Q.     You mentioned that other people, their names

were not mentioned, and it was talked about at

morning devotional, right?

A.     So we do a staff meeting on Mondays and the

devotional you're speaking of on Wednesdays, and it

could have been one or the other.

Q.     Okay.  Who is in the staff meeting?

1    A.    Most, if not all, team members except for
2    those on vacation or traveling for business or
3    doing -- engaged in other things.
4    Q.    So either in a staff meeting, which all the
5    employees attend, or the devotional, which most or
6    all the employees attend, it would have been
7    discussed if a team member were let go because they
8    engaged in premarital sex?
9    A.    Yeah, the topic might have been discussed.
10   Not the name, again, where we would reiterate the
11   practice and the fact that you can't work there and
12   have sex out of wedlock or premarital sex.
13   Q.    Has this prohibition on premarital sex been a
14   part of any of the other companies you worked for,
15   the O'Charley's brand or the Cracker Barrel?
16   A.    It has not.
17   Q.    Okay.  Are you aware of any private companies
18   who have prohibition on premarital sex?
19   A.    I am not aware of any other private companies
20   that have a prohibition on premarital sex.
21   Q.    Why is it Ramsey Solutions' business whether
22   an employee engages in premarital sex?
23             MS. SANDERS:  Objection to form.
24             THE WITNESS:  I don't have an answer to
25   your question.  It was that when I got there.

Elite-Brentwood Reporting Service  (615) 595-0073
www.EliteReportingServices.com

1   BY MS. COLLINS:

2   Q.     Do you have an understanding as to where this

3   prohibition came from?  I mean, I know that it was

4   there when you got there, but do you have any kind

5   of understanding as to, like, where it came from

6   or...

7   A.     I don't have an understanding.

8   Q.     Okay.  Have you ever questioned that or the

9   legality of that policy?

10  A.     I have not questioned the legality of that

11  policy.

12  Q.     On the next page of Exhibit No. 1, page 5,

13  there's an FMLA policy.  And it mentions -- well, it

14  refers to the Department of Labor website for the

15  Family Medical Leave Act, right?

16  A.     That's correct.

17  Q.     And it also mentions a Ramsey Solutions

18  maternity leave policy.  Is that a separate policy?

19  A.     It's actually part of the same policy, but

20  maternity leave in terms of payment is a slight

21  difference to FMLA.

22  Q.     Okay.  Is that a written policy?

23  A.     Yes, we do have that written somewhere.

24  Q.     Okay.  Where is that?  Do you know?  The

25  Ramsey Solutions maternity leave policy?

Case 3:20-cv-00628 Document 36-1 Filed 05/21/21 Page 71 of 208 PageID #: 4447
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
1    A.      It is in our intranet.

2    Q.      Okay.  So employees of Ramsey Solutions can

3    access that policy?

4    A.      Correct.

5    Q.      Okay.  Is it a form they fill out or is it

6    just a written policy about the hours and stuff?

7    A.      It's a written policy about the hours and how

8    pay works while they're on maternity leave.  And

9    then it says "Contact," and it has the name of the

10   person to contact.  This one says Oksana and Jenny.

11   Currently it's Karla Lundell or Sarah Cranston.

12   Q.      Do you know if either Oksana or Jenny were

13   contacted about Caitlin O'Connor's request for

14   maternity leave?

15   A.      I know they were not contacted.

16   Q.      Why not?

17   A.      Because I've asked them the question.

18   Q.      So is it fair to say that Ramsey Solutions'

19   maternity leave policy was not, to your knowledge,

20   provided to Caitlin O'Connor?

21           MS. SANDERS:  Objection to the form of

22   that question.  Please restate it.

23           Don't answer it --

24           MS. COLLINS:  Can you read back --

25           MS. SANDERS:  -- unless she --
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1            MS. COLLINS:  No, read back the

2    question, please.

3            (The requested record was read back by

4    the court reporter.)

5            MS. SANDERS:  Object to that form.  He

6    didn't testify to that.

7            MS. COLLINS:  I'm asking what his

8    knowledge is.

9            MS. SANDERS:  You led him, and you

10   stated testimony that he didn't say.  Rephrase the

11   question, please, so he understands it.

12           MS. COLLINS:  He didn't say he didn't

13   understand the question.  You're the only one that

14   doesn't seem to understand the question.

15           MS. SANDERS:  Oh, I understand it.

16   You're saying the question like something he

17   testified to why, which he didn't.  You're

18   leading --

19           MS. COLLINS:  I would really appreciate

20   if you would quit obstructing the deposition.

21           MS. SANDERS:  I didn't.  I said

22   objection to the form and you didn't rephrase it.

23           MS. COLLINS:  You're obstructing the

24   deposition at this point with your objections.  So

25   unless the deponent has an issue with my question, I

1   would appreciate it if he answered.

2            MS. SANDERS:  I'm instructing him not to

3   answer because I object to the form.

4            MS. COLLINS:  Okay.  That's not a basis

5   for instructing someone not to answer.

6            MS. SANDERS:  Yes, it is.  I'm objecting

7   to the form of your question.

8            MS. COLLINS:  There's nothing wrong with

9   the form of my question.

10           MS. SANDERS:  I disagree.  I'm objecting

11   to it because it's a leading question.

12           MS. COLLINS:  He's an adverse witness.

13   I can ask leading questions.

14           MS. SANDERS:  But you're stating it as

15   testimony, which he didn't say.

16           MS. COLLINS:  I didn't state it as

17   testimony.

18           MS. SANDERS:  That's fine.  Restate the

19   question and then he can answer.

20   BY MS. COLLINS:

21   Q.    Can you answer the question?  Do you know if

22   Caitlin O'Connor was provided the maternity leave

23   policy?

24   A.    Everyone is provided it through the intranet.

25   Anyone can go look for it.

1    Q.      Do you know if she was specifically provided
2    the maternity leave policy?
3    A.      She did not ask me for it, and she did not
4    ask the two people that you mentioned earlier,
5    Oksana or Karla.
6    Q.      Okay.  To your knowledge, did you or Oksana
7    or --
8    A.      Karla.
9    Q.      -- Karla provide it to Caitlin?
10   A.      She has access to it.  She did not request --
11   she wouldn't have to.  A team member doesn't have to
12   request that because they can go pull it and then
13   they can come talk to us when they're ready.
14   Q.      Okay.  To your knowledge, did they provide it
15   to her?  Did you or anyone provide it to Caitlin
16   O'Connor?
17   A.      Can you tell me what they would provide?
18   Q.      The maternity leave policy.
19   A.      Which is where?
20   Q.      It's on the intranet.  Again -- okay.
21   A.      So are you asking me --
22   Q.      Let me just -- and I didn't -- I didn't waste
23   time at the beginning of the deposition laying out
24   the ground rules for a deposition because I assumed
25   your attorney had told them to you.  I don't

Elite Brentwood Reporting Service  (615) 595-0073
www.EliteReportingServices.com

1 typically answer questions during the course of a

2 deposition.  I ask the questions and you answer them

3 to the best of your ability.

4         So I understand that we've gotten in this

5 terrible game in this deposition of asking this

6 roundabout and objections and all that sort of

7 stuff, but I would just appreciate it if you would

8 answer the questions to the best of your ability.

9         So you've already testified that you asked

10 Oksana or Jenny if they provided the policy to

11 Caitlin and they said no, right?

12 A.      Correct.

13 Q.      Okay.

14 A.      But there is no policy for them to hand her,

15 other than what's already in the intranet that

16 Caitlin has access to in digital form.

17 Q.      Can you print out the policy?

18 A.      Yes.

19 Q.      Okay.  Did they direct her to that policy, to

20 your knowledge?

21 A.      To my knowledge, neither of them spoke to

22 her.

23 Q.      Okay.  Did you direct Caitlin O'Connor to the

24 policy?

25 A.      I did not speak to her either.

Case 3:20-cv-00028 Document 30 Filed 05/21/21 Page 76 of 208 PageID #: 4837
Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

1    Q.     Okay.  Thank you.

2          All right.

3              MS. COLLINS:  I'm going to mark the next

4    document as Exhibit No. 2 to the deposition.

5              (WHEREUPON, the above-mentioned

6    document was marked as Exhibit Number 2.)

7    BY MS. COLLINS:

8    Q.     Okay.  Have you seen this document that's

9    been marked Exhibit 2 before?

10   A.     Yes, I have.

11   Q.     Tell me what it is.

12   A.     It is the Ramsey Solutions Mission Statement

13   and Core Values.

14   Q.     Is this public knowledge, what Ramsey

15   Solutions' core values are?

16   A.     Yes.

17   Q.     Okay.  What are these core values for?

18   A.     Guidelines for operating the company,

19   guidelines for conduct and behavior.

20   Q.     Okay.  Guidelines for who?

21   A.     For team members of the organization.

22   Q.     All team members?

23   A.     Correct.

24   Q.     Okay.  And going down -- it's actually three

25   up from the bottom, there's a "Righteous Living"

Case 3:20-cv-00028-RLJ-DCP  Document 57-13  Filed 05/31/22  Page 77 of 203  PageID #: 4437
Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

1    value.  It looks like it's beside a little clock --

2    is that a clock --

3    A.      A compass.

4    Q.      -- or a compass?  Okay.  By the compass, "We

5    believe that character matters.  All the time."

6           Where does that come from?

7    A.      Where does character come from or where

8    does...

9    Q.      Where does this righteous living core value

10   come from?  What is your understanding of where it

11   comes from?

12   A.      So it was there when I got there, but

13   righteous living speaks to a person's character, how

14   they behave.  There's not a core value for honesty

15   or integrity, and they fall under that as well.

16   It's the character of an individual.

17   Q.      Okay.  And up at the top there is a core

18   value for Colossians 3:23.

19          What is that from, Colossians 3:23?

20   A.      That's a Biblical verse, the book of

21   Colossians in the Bible, Chapter 3, Verse 23.

22   Q.      Is that Old Testament or New Testament?

23   A.      Colossians would be in the New Testament.

24   Q.      Are all employees expected to abide by those

25   core values?

www.EliteReportingServices.com

1   A.      Yes.

2   Q.      Up at the top for the mission statement it

3   says, "Ramsey Solutions provides biblically based

4   common-sense education and empowerment."

5           With respect to the term "biblically based,"

6   is that referring to the Christian Bible like the

7   NIV version that you typically use?

8   A.      That is correct.

9   Q.      Okay.  Are employees required to sign a

10  contract about the core values or to sign off on it?

11  A.      They are not.

12  Q.      Okay.  And with respect to the "Righteous

13  Living" core value it says, "We believe that

14  character matters.  All the time."

15          What is your understanding as to what is

16  meant by that?

17  A.      It's what we talked about earlier, behavior

18  outside of work, this follows someone into work,

19  again, drunkenness, someone cursing someone out and

20  somehow stating that they work at Ramsey Solutions,

21  sex, premarital and extramarital.

22  Q.      Well, I guess character is sort of a

23  subjective term, right?

24  A.      Correct, could be used in a negative tone as

25  well.

Elite Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

1    Q.    And even different denominations interpret

2    the Bible differently; is that fair to say?

3    A.    It is.

4    Q.    Okay.  So with respect to character and it

5    being a loosely defined term, how are employees

6    supposed to know really what that means?  Is it just

7    from those meetings that you-all have with them?

8    A.    Yes, from meetings, interviews.  Righteous

9    living is one that we cover in the interview with

10   every team member.

11   Q.    Okay.  What is covered with the righteous

12   living in the interview?

13   A.    I specifically cover righteous living in

14   every interview I do, to talk about both premarital

15   sex as well as extramarital sex.  I give the example

16   that I am married, and if I choose to have an affair

17   on my spouse, I cannot work here.  I continue that

18   to say it also applies to individuals who are not

19   married who would have premarital sex; they cannot

20   work here.

21   Q.    Okay.  And if an employee told you -- or a

22   candidate told you that they were of a different, I

23   guess, denomination who did not share that belief,

24   that it was not essential to their religious beliefs

25   or practice, could they continue employment or would

Case 3:20-cv-00028 Document Reported By Filed 05/01/21 Page 80 of 208 PageID #: 4450
Elite Brentwood Reporting Services-Page 615 595-0073
www.EliteReportingServices.com

1  they be hired?

2  A.     I would let them know that to continue and --

3  you did use the word "if," so I want to clarify that

4  it has not happened.  But if that were to happen,

5  then I would let them know to work there you must be

6  able to comply with that.  You must be able to say,

7  "I will not have sex out of marriage or premarital

8  sex, if I'm single."

9  Q.     So even if their religious belief is that

10 that's not required, they -- they could not work at

11 Ramsey if they were living with their girlfriend or

12 boyfriend?

13 A.     So this is hypothetical, and

14 hypothetically -- I know you're not allowed to

15 answer questions so I'm not expecting you to answer,

16 but I'm going to ask it of you as I would a

17 candidate.  I would ask them if their religion

18 required them or asked them to have sex out of

19 wedlock.  And if so, are they asking for a religious

20 accommodation.  And if they said no, then I would

21 say, "In order for you to work here, you would have

22 to comply with that."

23 Q.     What if it's their belief that they can have

24 sex outside of marriage and that that's not

25 prohibited by their religious practice or belief?

Case 3:20-cv-00028-Brentwood Reporting Services ca Page 8115 1595-20713 #: 4437
Elite Reporting Services
www.EliteReportingServices.com
81

```
 1    A.     I would, again -- you've made it clear you're
 2    not here to answer questions.  I would then say,
 3    "Can you tell me if you're asking for a religious
 4    accommodation?"
 5    Q.     Okay.  And what if they said yes?
 6    A.     Then I would go down that road.
 7    Q.     Okay.  Would an exception be made based on
 8    the policies that we've discussed?
 9    A.     These are all hypothetical, correct?  It has
10    never happened.  I don't know the answer to that
11    question.
12    Q.     Okay.  But what you do know is that
13    premarital sex is prohibited at Ramsey Solutions?
14    A.     That is correct.
15    Q.     Okay.  So, for example, if someone came to
16    you and they said, "Well, I'm Lutheran.  It's a
17    little bit more progressive denomination."
18           Or, "I'm Episcopalian" and they say, "Hey,
19    I've been living with my partner for three years,"
20    does that pose a problem?
21    A.     One, it hasn't happened.  Two, if a current
22    team member, correct, if a current team member came
23    up to me and said, "Hey, I've been living with my
24    girlfriend, I would say, "Did you know that that's
25    against a righteous living?"  If I was the one that
```

Case 3:20-cv-00628 Document 36-1 Filed 05/31/22 Page 82 of 208 PageID #: 448
Elite Brentwood Reporting Service · 615 595-0073
www.EliteReportingServices.com

1    did their culture interview, as I was Caitlin, I

2    would say, "Didn't we talk about this in your

3    interview?  You know you can't work here."

4    Q.    And that's based on Ramsey Solutions'

5    interpretation of Judeo-Christian values?

6    A.    That's based on a standard the company has

7    set before I got there.

8    Q.    That's based on Judeo-Christian values,

9    right?

10                MS. SANDERS:  Objection.

11                THE WITNESS:  I don't know what the

12   standard was set on.

13   BY MS. COLLINS:

14   Q.    Okay.  Well, we just went over the company

15   conduct code which said that it was Judeo-Christian

16   values.

17   A.    The entire company, yes.

18   Q.    Okay.  So are these core values also based on

19   those same Judeo-Christian values?

20   A.    I wasn't there when they were set.

21   Q.    Is it your understanding that they're based

22   on Judeo-Christian values?

23   A.    No.  I don't know where team is spoken about

24   in Judeo-Christian values.

25   Q.    Okay.  As far as righteous living in

1  particular, is that based on a Judeo-Christian

2  value?

3  A.     I believe so, but I don't know that.  So my

4  personal opinion would be yes.

5  Q.     Are employees required to provide intimate

6  details about their personal lives to remain

7  employed by Ramsey Solutions?

8  A.     No.

9  Q.     So if a leader, a manager of Ramsey

10 Solutions, asked an employee if they were engaging

11 in premarital sex, they could say no, even if they

12 were?

13 A.     They could.

14            MS. COLLINS:  I'm going to mark the next

15 document as Exhibit 3.

16            (WHEREUPON, the above-mentioned

17 document was marked as Exhibit Number 3.)

18 BY MS. COLLINS:

19 Q.     Have you seen this document before?

20 A.     I have seen it.  Not in this format, but,

21 yes, I have seen it.

22 Q.     Okay.  Well, I guess, where have you seen it?

23 A.     I'm sorry?

24 Q.     Like, where have you seen it?  What do you

25 mean by "not in this format"?

Case 3:20-cv-00628 Document 98-3 Filed 05/31/22 Page 84 of 208 PageID #: 4460
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  A.    It's a smaller journal.  So this is in a

2  journal, and I don't know if all the pages flow the

3  way you have them.  But, yes, I still have seen the

4  material that you're handing me.

5  Q.    Okay.  So is it a journal that is provided to

6  Ramsey employees?

7  A.    Correct.

8  Q.    Okay.  Is it still used at Ramsey Solutions?

9  A.    Yes.  However, we weren't reprinting, so I

10  don't know -- wherever we ran out of that printing,

11  we were going to do something different.  I don't

12  know that we were going to do another journal.

13  Q.    Okay.  And on page -- well, it's got the

14  little Bates numbers down at the bottom and it has

15  28 down at the bottom of the page?

16  A.    Yes, ma'am.

17  Q.    Do you see that?  Okay.  It -- it also -- and

18  it looks -- it looks to list out the core values.

19  Is that fair?

20  A.    Yeah, that is fair.

21  Q.    Okay.  And it lists out, righteous living,

22  and it expands on it a little bit more than what's

23  written out in Exhibit No. 2.  Does that still

24  apply, this, "You are far more important than what

25  you do.  We aren't perfect, but we want to get

Case 3:20-cv-00628 Document Reporting Services 06-15-22 Page 85 of 208 PageID #: 4464
Elite Brentwood Reporting Filed 05/31/22 Page 85 PageID #: 4464
www.EliteReportingServices.com

1    better.  No cheating, stealing or lying.  Goal No. 1

2    is to be men and women of integrity."

3         Is that still an applicable encapsulation of

4    the righteous living policy?

5    A.    I would say that it is a representation of

6    it.  I don't know that it's fully encapsulated, but,

7    yes, I would think that it does a better job of

8    expanding on it.

9    Q.    And that applies to all the employees?

10   A.    Correct.

11             MS. COLLINS:  All right.  Let's go off

12   the record for just one sec.

13             MS. SANDERS:  Sure.

14             THE VIDEOGRAPHER:  Going off the record

15   at 11:54 a.m.

16             (Lunch recess from 11:54 a.m. to

17   1:04 p.m.)

18             THE VIDEOGRAPHER:  We are back on the

19   record at 1:04 p.m.

20   BY MS. COLLINS:

21   Q.    Okay.  Mr. Lopez, before the break you

22   mentioned that the righteous living policy was a

23   gradient, right?

24   A.    Core value, yes.

25   Q.    Core value.

Case 3:20-cv-00028  Document 263  Filed 05/12/21  Page 86 of 208  PageID #: 4465
Elite Brentwood Reporting Services  615 595-0073
www.EliteReportingServices.com

1          Who decides that?  Who decides the
2     different...
3     A.     HR committee.
4     Q.     Okay.  Did the HR committee receive any sort
5     of specific training on how to apply that policy?
6     A.     No, not to my knowledge.
7     Q.     Okay.  So is it just based on the HR
8     committee's subjective analysis as to whether or
9     not -- where it falls on that gradient scale?
10    A.     There's some precedent that's already been
11    set, but yes.
12    Q.     Okay.  And earlier, before the break, you
13    mentioned that it was a violation of the righteous
14    living policy to have intercourse for premarital
15    sex, right?
16    A.     Correct.
17    Q.     What did you mean by "intercourse"?
18    A.     Have sex out of wedlock.
19    Q.     Okay.
20    A.     Engage in actual intercourse, actual
21    penetration.
22    Q.     Okay.  Does it cover oral sex?
23    A.     It does not.
24    Q.     Does it cover -- what if a woman got pregnant
25    through in vitro fertilization?  Did it cover

Elite Brentwood Reporting Service 615-595-0073
www.EliteReportingServices.com

1    that --
2    A.      It does not.
3    Q.      -- if she were not married?
4    A.      It does not cover that either.
5    Q.      Do you know if anybody asked Caitlin O'Connor
6    if she had had IVF?
7    A.      No.  We do have a team member, however, that
8    has come to us to make sure that was okay, and it
9    was.
10   Q.      To your knowledge, did anyone ask Caitlin
11   O'Connor the specifics of how she became pregnant?
12   A.      To my knowledge, no.  She -- she had
13   volunteered it.  So this is not -- I don't know the
14   answer to that.
15   Q.      Okay.  You just recall that she had
16   volunteered it to someone?
17   A.      Correct.
18   Q.      To your knowledge, are there any Jehovah's
19   Witnesses working at Ramsey Solutions?
20   A.      I don't know.  I don't ask.
21   Q.      And you don't know if there are any Jewish
22   people working there?
23   A.      I don't know.  I don't ask.
24   Q.      Have you ever seen a man wearing a yarmulke,
25   the Jewish -- traditional --

Case 3:20-cv-00028 Document 69 Filed 05/21/21 Page 88 of 208 PageID #: 4467
Elite Document Reporting Service 615 595-0073
www.EliteReportingServices.com

```
 1   A.      No.
 2   Q.      -- Jewish head covering at Ramsey Solutions
 3   that's an employee there?
 4   A.      I have not.
 5   Q.      Have you had any females that worked there
 6   wear a hijab?
 7   A.      Not to my knowledge.  I haven't seen it.
 8   Q.      Are the Wednesday devotionals, are those
 9   recorded?
10   A.      They're not, but -- I don't know the answer
11   to that.  I don't believe they are.
12   Q.      Okay.  If an employee misses one, can they go
13   back and get the information from the Wednesday
14   morning devotional?
15   A.      So I think -- I don't know that all of them
16   are recorded.  I believe some of them are.
17   Q.      Okay.  Are employees encouraged to record
18   those devotionals sometimes and share them with
19   their family members?
20   A.      No, not to my knowledge, nobody's encouraged
21   to record them.
22   Q.      Okay.  Can they record them and share them
23   with their family members or friends?
24   A.      They're not discouraged, but they're not
25   encouraged.  I would guess that we would not want --
```

1    we would not want it recording.  It's for the team

2    members, not for the family members.

3    Q.     Okay.  But if there was a good speaker for

4    one of those Wednesday morning devotionals, could an

5    employee record that devotional and would it be a

6    violation of any sort of policy for them to take it

7    back and share it with their family or friends as a

8    source of encouragement?

9    A.     You said "if."  To my knowledge, that's never

10   happened, and to my knowledge we don't have a policy

11   that says you cannot.

12   Q.     Okay.  Has that ever come up, where an

13   employee was disciplined for recording one of those

14   Wednesday morning devotionals?

15   A.     Not to my knowledge.

16   Q.     Okay.  What about staff meetings?  Has anyone

17   been disciplined for recording a staff meeting?

18   A.     Not to my knowledge.  There is a distinction

19   between the two, however.

20   Q.     Now, you knew Caitlin O'Connor, right?

21   A.     Correct.

22   Q.     Okay.  Were you on the hiring team that

23   approved her initial hire?

24   A.     Yes.

25   Q.     Okay.

Elite Reporting Services  www.EliteReportingServices.com

1          MS. COLLINS:  I'm going to provide you a

2   document that we're going to mark as Exhibit No. 4.

3          (WHEREUPON, the above-mentioned

4   document was marked as Exhibit Number 4.)

5   BY MS. COLLINS:

6   Q.    Okay.  Is that your signature on this -- on

7   the top line, above Armando Lopez?

8   A.    Yes, ma'am, it is.

9   Q.    See?  You go to law school for that deductive

10  reasoning.

11         Okay.  And this document is a business

12  record of Ramsey Solutions, right?

13  A.    Correct.

14  Q.    Okay.  Is this a standard sort of offer

15  letter that you-all provide to employees being

16  on-boarded to Ramsey Solutions?

17  A.    Yes.

18  Q.    Okay.  And it's not a contract; it

19  specifically says that, right?

20  A.    Correct.

21  Q.    Other than the terms set forth in this

22  document, are there any other terms that are

23  encompassed in this offer of employment?

24  A.    Not in the offer of employment.

25  Q.    Nowhere in this offer of employment does it

1    say that an employee cannot engage in premarital

2    sex, does it?

3    A.      Not in the offer of employment.

4    Q.      Okay.  So they don't have to certify or

5    anything to receive this offer of employment that

6    they haven't -- that they're not going to engage in

7    premarital sex, right?

8    A.      Can you clarify that?  Do they -- can you

9    clarify that, please?

10   Q.      Sure.  On this offer of -- as part of this

11   offer of employment, they don't have to certify

12   anywhere that they won't engage in premarital sex,

13   do they?

14   A.      Not on the offer, but before you get to the

15   offer is all the interviews where it's already been

16   covered.

17   Q.      Okay.  It's been covered, but they don't have

18   to sign a document or anything saying that they

19   won't, do they?

20   A.      They do not.

21   Q.      And they don't have to affirm that they will

22   disclose if they do engage premarital sex, do they?

23   A.      They do not.

24   Q.      Okay.  Did you work with Caitlin O'Connor

25   when she was employed by Ramsey Solutions?

```
1   A.      I did not work with her directly.  I worked
2   with her in that we were both team members for the
3   company.
4   Q.      Okay.  So did you, I guess, have any dealings
5   with her when she worked for Ramsey?
6   A.      Yeah.  She covered the front desk.  By "the
7   front desk," I mean the reception area.  She was on
8   rotation with a few other administrative assistants
9   that would help cover it.  And at that point, the
10  front desk reported up through Human Resources.  And
11  so I had dealings with her walking up, thanking her
12  for doing that, thanking her for being able to be
13  friendly to people and covering lunches, et cetera.
14  Q.      Okay.  Was she friendly to people?
15  A.      Huh?  Yes, to my knowledge, she was.
16  Q.      Okay.  Now, tell me about Caitlin O'Connor's
17  termination.  Why was she terminated?
18  A.      She was terminated for engaging in sex out of
19  marriage.
20  Q.      And that's from Ramsey's policies?
21  A.      Correct.
22  Q.      Which one?
23  A.      It would be the righteous living core value.
24  Q.      Okay.  And the prohibition on premarital sex
25  is -- I believe you said -- one of those
```

Elite Brentwood Reporting Service 615 595-0073
www.EliteReportingServices.com

1  Judeo-Christian values that the company adheres to,

2  right?

3  A.    I don't know that I said it that way.  I

4  think you said it that way.  I said it's one of the

5  core values, and it was there before I got there, so

6  I don't know why they implemented it.

7  Q.    Okay.  But it's your understanding that it's

8  premised on a Judeo-Christian value, right?

9  A.    My personal belief, yes.

10 Q.    And how did you come to find out that she had

11 premarital sex?

12 A.    She sent an email to me letting me know that

13 the company frowned upon her being single and

14 pregnant and wanting to have a conversation about

15 FMLA.  And I believe you have that, a copy of that

16 email.  I don't remember it verbatim.

17 Q.    Okay.  So she sent you an email notifying you

18 that she was single and pregnant and that she was

19 asking about FMLA, right?

20 A.    Something like that, yes.

21 Q.    Okay.  And as a result of that, the decision

22 was made to terminate her?

23 A.    Yes.  As a result of the ensuing

24 conversations with her.

25 Q.    Did you have an ensuing conversation with

Case 3:20-cv-00028-Brenda Court Reporting Services Document 66-15 05/12/21 Page 94 of 208 PageID #: 4470
Elite Reporting Services
www.EliteReportingServices.com

her?

A.     I did not.

Q.     Who did?

A.     Okay.  Suzanne Simms and ██████████, two members of the HR committee.

Q.     So she notified you she was pregnant and needed FMLA, and additional conversations were had with her as a result of that?

A.     Yes.  She didn't say that she needed FMLA, she wanted to talk about what FMLA was.

Q.     Okay.  Did you ever talk with her about FMLA?

A.     I did not.

Q.     Did you ask anyone to talk with her about FMLA?

A.     I did not.

Q.     Do you know if anyone from Ramsey Solutions did talk to her about FMLA?

A.     Not to my knowledge.

Q.     And a woman typically can't hide a pregnancy, right?

A.     I'm sorry?

Q.     A woman typically cannot hide a pregnancy, right?

A.     I don't understand the question.

Q.     It's a visible condition.

```
 1   A.     Not for every woman.  I've had women that
 2   don't appear to be pregnant, but are.
 3   Q.     But typically it's a visible condition,
 4   right?
 5   A.     Typically, you are correct.
 6   Q.     Did you respond to the email that Caitlin
 7   O'Connor sent you?
 8   A.     I did.
 9   Q.     When did you respond to it?
10   A.     I believe it was the next morning.
11   Q.     Okay.  Did you provide the email to anyone
12   else?
13   A.     Yes, I did.
14   Q.     Who?
15   A.     Human Resource committee.
16   Q.     Anyone else?
17   A.     No.
18   Q.     And Dave Ramsey is on the HRC emails?
19   A.     He is not.
20   Q.     Did you provide him information about Caitlin
21   O'Connor's situation?
22   A.     Define the question.
23   Q.     Did you provide Dave Ramsey information about
24   Caitlin O'Connor's pregnancy?
25   A.     No.  I provided it to HRC, and he's not on
```

Elite-Brentwood Reporting Service
www.EliteReportingServices.com

1  that email.

2  Q.    Do you know if HRC provided it to him?

3  A.    I'm not aware of that.  I don't believe so,

4  but I'm not aware of it.

5         MS. COLLINS:  I'm going to mark the next

6  document as Exhibit No. 5.

7         (WHEREUPON, the above-mentioned

8  document was marked as Exhibit Number 5.)

9  BY MS. COLLINS:

10  Q.    If you could turn to the second page, starts

11  at DEFENDANT 84 through DEFENDANT 85.  And this is

12  an email from Caitlin Eastwood, which is Caitlin

13  O'Connor, right?

14  A.    I know her to be the same, yes.

15  Q.    Okay.  And she sent this email to you on

16  June 18, 2020, at 4:44 p.m.

17         Was this the -- and it says, "I needed to

18  let you know that I'm 12 weeks pregnant.  I

19  understand being unmarried and expecting is frowned

20  upon here, but the reality of the situation is this

21  is what I'm walking through right now.  This is

22  obviously unchartered territory for me, so I'm not

23  sure what my next steps are regarding sharing the

24  news with my leader, getting FMLA and ADA paperwork

25  in case it's needed in the future," et cetera.

It says, "I'm OOO" -- do you recognize -- do you know what "OOO" means?

A.     I am guessing it's "out of office."

Q.     Okay.

-- "Friday, 19th, and Monday, 22nd, but will still be checking email periodically if this needs to be discussed."

Was this the email that you were referring to earlier?

A.     That's correct.

Q.     Okay.  So you didn't immediately respond to her.  Is that your recollection?

A.     Yes.  I also see that I did carbon copy Dave and Michael Finney as her direct leader.

Q.     Okay.  So it looks like two minutes later you sent it to the Human Resources committee, Dave Ramsey and Michael Finney, right?

A.     Correct.

Q.     Okay.  And then ███████████ wrote you back.  Does that mean she's on the HR committee?

A.     That's correct.

Q.     And she states, "We've dealt with this before and I think we should handle it exactly the same way.  Lots of grace, lots of generosity, but our core values and what they stand for are clear."

1        What did you take that to mean?

2   A.      I took that to mean that it would be a

3   separation for the violation of a core value.

4   Q.      Okay.  All right.  And on the next page you

5   wrote back within, I guess if my math is right, two

6   minutes.  Quick on the draw with the email, that at

7   4:50 that, "She sent me the email only."  And, "I

8   agree with handling the same way we have in the

9   past."

10        What did you mean by "I agree with handling

11  this the same way we have in the past"?

12  A.      We've had other people who have engaged in

13  sex out of wedlock, and we have terminated them.

14  Q.      Okay.  Would there have been any way for you

15  to know that she had engaged in sex out of wedlock

16  had she not sent you this email notifying you that

17  she was pregnant?

18  A.      Probably not, with the exception that she's

19  pregnant.  If she was someone that showed, then we

20  might have known that she was pregnant if she didn't

21  come forward and say, "Hey, I had IVR [verbatim],

22  this is what's going on."

23  Q.      Okay.  So if she just started showing up at

24  work and it looked like she was showing, what would

25  have happened?  Would she have been called in to ask

Case 3:20-cv-00023 Document Report Filed 05/21/22 Page 99 of 208 PageID #: 4479
Elite Reporting Services
www.EliteReportingServices.com

about that?

A.     Yes.

Q.     Okay.  And it looks like the next responding person was Sarah Sloyan, she responded at 4:52.  Was she also on the HRC committee at the time?

A.     Yes.  I don't remember if she was a full member or sitting in as part of her leadership development, but she was on the distribution list.

Q.     Okay.  Did everybody have to express their consent for an employee to be terminated?

A.     Yes, it had -- that's the way it's happened. I don't know if everybody has to, but typically everybody does.

Q.     Okay.  And Mark Floyd responded next at 5:17. Is he also on the HRC committee?

A.     Yes, ma'am.

Q.     Okay.  And he wrote, "Totally classless on her part.  And yes, I agree there's precedent (a/k/a principles and values) for how we handle this, what ▮ said."

       What did you take that to mean when he said, "totally classless on her part"?

A.     You'd have to ask him.  I don't know.

Q.     Well, I'm asking what you took it to mean?

A.     Personally?

Q.     Yeah.

A.     Like he frowned on it or he looked down on it.

Q.     Did you think Caitlin O'Connor was being classless when she notified you-all that she was pregnant and asking for information about FMLA?

A.     My personal thoughts?

Q.     Yeah.

A.     No, I don't think she was being classless.

Q.     And when Mark Floyd referred to, "I agree there's precedent, a/k/a principles and values," what did you take that to mean, "principles and values"?

A.     I correlated it to █████'s response which is, We have faced this in the past when someone engages in premarital sex and those are the principles and values that we make decisions from.

Q.     Okay.  Do you think a woman is classless if she gets pregnant outside of wedlock?

A.     Personally?

Q.     Yes.

A.     No.

Q.     Did you have any conversations with Mark Floyd about his comment that he perceived Caitlin O'Connor to be classless?

A.    I did not.

Q.    And if you could turn to page 104, page 3 of Exhibit No. 5.  It looks like one of the next people to respond was Michael Finney.

And he responded, "Agree with what ██ said as well.  Sad."

Do you know what he meant by that, that it was sad?

A.    Again, personal opinion; I don't know what he meant, but personal opinion would just be that it's sad.  It's -- we struggle to find good people, and so to try -- to just lose someone is not a happy event.  It's not a good event.  It's sad.

Q.    But is it sad that she's pregnant?

A.    I didn't take it to mean that.

Q.    Did you think it was sad that she was pregnant?

A.    No, I did not.  In fact, that's not what I put in my response to her.

Q.    Okay.  And Suzanne Simms, looks like she was the next person to respond, at 5:50, and she just says "Same."  Does that mean she just agrees with everybody else?

A.    I took it to mean that.

Q.    So is it fair to say that everyone that had

1  responded that evening that was on the HRC,

2  including Michael Finney, who was Ms. O'Connor's

3  supervisor, all agreed that she was going to lose

4  her job?

5  A.    Well, she -- yes, that she would be talked

6  to, and if she violated it, that she would lose her

7  job.  I think the decision to lose her job might not

8  have been there had she said, "Hey, I -- you guys

9  need to know that I had AVR [verbatim]."

10  Q.    But it sounds like the automatic assumption

11  was that that was not the case; is that fair to say?

12  A.    That is fair to say.

13  Q.    Okay.

14        MS. COLLINS:  Okay.  Let me mark this as

15  Exhibit No. 6.  I only have one copy.

16        MS. SANDERS:  That's all right.  What

17  number is it?

18        MS. COLLINS:  It's 2170.

19        MS. SANDERS:  Okay.

20        (WHEREUPON, the above-mentioned

21  document was marked as Exhibit Number 6.)

22        MS. SANDERS:  Defendant...yeah, okay.

23  BY MS. COLLINS:

24  Q.    All right.  Now, also in response to your

25  email, it looks like Dave Ramsey responded; is that

Case 3:20-cv-00628 Document 96 Filed 08/21/22 Page 103 of 208 PageID #: 4472
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  correct?

2  A.     Yes.

3  Q.     And he's the owner of the company?

4  A.     Correct.

5  Q.     And do you recall receiving this email?

6  A.     I recall reading it, yes.

7  Q.     Okay.  And he responded at 5:10 a.m., so

8  that's the next day; is that correct?

9  A.     That's correct, June 19.

10  Q.     Okay.  And he says, "So sad."

11         He's sad too.  What did you take that to

12  mean he was sad about?

13  A.     The same thing.  Losing someone.  I don't

14  know that -- my mind did not go, and still does not

15  go, to the fact that she's pregnant is a sad event.

16  Q.     Okay.  And it says, "The reason she's sent an

17  email is she is scared and embarrassed."

18         As of 5:10 a.m. on June 19, had Caitlin

19  O'Connor expressed to you that she was scared or

20  embarrassed?

21  A.     She had not.

22  Q.     Okay.  So is that just an assumption,

23  probably, that she was scared and embarrassed?

24  A.     Right, that she would have lost her job.

25  Again, an assumption.

Q.     And then Mr. Ramsey directs ███ or Suzanne,
"Please pick up the phone and call her today.  Love
her.  Tell her we will work this out with her next
week, but she will be loved and cared for."

     I'm going to break that down a little bit.

     What did you understand that to mean that
███ or Suzanne was supposed to pick up the phone
and call her and love her?

A.     Not to judge her, not to berate her, not to
embarrass her, but, rather, to pick up the phone and
call her and learn what happened.

Q.     Okay.

A.     Reassure her.

Q.     Okay.  But she had already been judged,
right?

A.     No.

Q.     Well, we just went through the other emails
and it sounded like everybody had pretty much
arrived at the conclusion that she was going to be
terminated, right?

A.     Right, same as prior, so if she had done the
same thing as prior, it would have been the same
way.  I'm not sure that's judging, though.  I
wouldn't have considered that judging.  She violated
policy, she loses her job.

1   Q.    And where it says, "Tell her we will work

2   this out with her next week, but she will be loved

3   and cared for."

4       What did you take that to mean?

5   A.    I took it to mean we'd be generous in some

6   kind of separation package.

7   Q.    So did that indicate that the decision had

8   been made to separate her employment?

9   A.    I think it indicates it's leading there.

10   Q.    Okay.  Then it says, "Then next week we will

11   follow the steps we did before."

12       What is that referring to, "the steps we did

13   before."

14   A.    That's prior people that have violated that

15   core value.  So we would meet with them, hear out

16   what they have to say, and then separate.

17   Q.    And when it's talking about "the steps we did

18   before," is that referring to other women who had

19   notified you that they were pregnant?

20   A.    I didn't take it that way.  I took it to mean

21   as anyone else who has violated that policy.

22   Q.    But Ramsey had terminated other women who

23   notified you that they were pregnant, and they got

24   pregnant out of wedlock, right?

25   A.    We have, as we have terminated men.

1　Q.　　Have the women typically been offered more

2　money in severance?

3　A.　　Yes.  I'd have to go back and look at it, but

4　off the top of my head, I believe that's true.

5　Q.　　Why is that?  Why are the women typically

6　offered more money in severance?

7　A.　　I don't know the answer to that.  I don't

8　know the why, but I know that we have.

9　Q.　　But is it just the women who are pregnant

10　that are typically offered more money in severance?

11　A.　　As opposed to the men in this case?  The

12　comparison between those two?

13　Q.　　Yes.

14　A.　　Yes, it is typically the women.

15　Q.　　And it says, "Lots of grace, care for the

16　child, money, counseling, pastor support."

17　　　　What did -- what did you take that to mean?

18　A.　　I took it to mean that we'd be generous with

19　separation monies, offer counseling if she needed it

20　or wanted it, and pastor support, same thing, if she

21　needed or wanted.

22　Q.　　It says, "We were thorough because that is

23　the right thing to do."

24　　　　What was your understanding as to what that

25　meant?

Case 3:20-cv-00616 Document 36-1 Filed 08/21/23 Page 107 of 208 PageID #: 4408
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1   A.    I actually don't know.  I don't remember that

2   sentence standing out to me.

3         You're calling it out now, and so I'm

4   reading it now, but I don't remember reading it and

5   thinking in my head, "I wonder what he means by

6   that."

7         If I'm reading it now, again, out of context

8   by itself, it would mean that, "Hey, we're going to

9   be thorough."

10        I don't know that we had been thorough at

11   that point.

12   Q.    Okay.  So to get a full understanding as to

13   what that sentence means, I would probably have to

14   ask Dave Ramsey, right?

15   A.    Yes and no.  I think what -- again, I think

16   he's missing a word.  I think what it means is we'll

17   be thorough because it's the right thing to do.

18   Q.    Okay.  And I asked your understanding as to

19   what this email meant that was sent by Dave Ramsey,

20   but have you talked with him to ask him what he

21   meant by this email?

22   A.    Specifically about the email?  No.

23   Q.    Okay.  And so sitting here today, you can't

24   testify as to what he meant by this email, can you?

25   A.    I can testify that if she became pregnant by

Case 3:20-cv-00616-Elite Reporting Services t 108-1 595 Page ID #: 4837
Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

1  having sex out of marriage that she would have been

2  terminated and that my direction is to make sure

3  that we investigate thoroughly, that we speak to

4  her, that we talk to her, that we treat her with

5  grace, kindness and love.

6  Q.    But you don't know for certain what he meant

7  by his own email, right?

8  A.    I think for every sentence, other than the

9  last one, I think I can infer pretty quickly what he

10  meant.  And for the last one I just think he left

11  off "we will be" versus "we were."

12  Q.    Okay.  And so you're inferring, but you don't

13  know for certain, right?

14  A.    Correct.

15  Q.    All right.

16         MS. COLLINS:  I'm going to mark the next

17  document as Exhibit No. 7.

18         (WHEREUPON, the above-mentioned

19  document was marked as Exhibit Number 7.)

20         THE WITNESS:  Thanks, Terri.

21         THE REPORTER:  You're welcome.

22  BY MS. COLLINS:

23  Q.    Okay.  Have you seen this document?

24  A.    I have.  It's been a while, but, yes, I have

25  seen it.

Q.     Okay.  Now, it looks like -- well, you were
cc'd on all of them, right?

A.     I am on the first.

Q.     I guess we could go back to the last page.

A.     Yes, I am on the last page and also on the
subsequent two.

Q.     All right.  And on July -- or June 23 it
talks about a conversation that Suzanne Simms and
█████ -- does that refer to ██████████████████ --

A.     ██████████ , yes.

Q.     ██████████ .

       -- had with Caitlin O'Connor that morning.

       Do you recall receiving this email?

A.     I do.

Q.     Okay.  And Ms. Simms states that, "Caitlin is
12 weeks pregnant, not married, she is 37 and has a
19-year-old and a 20-year-old.  Her boyfriend and
the father of her child is 52.  They plan to get
married but she is not officially engaged."

       Is that -- well, what is the significance of
that information?

             MS. SANDERS:  Object to the form.

             THE WITNESS:  I think she's just trying
to share something about this team member we have.
I don't think there's significance to it other than

1    these are the facts as we knew them.

2    BY MS. COLLINS:

3    Q.    Okay.

4    A.    Or as we learned them in that conversation.

5    Q.    Okay.  And she -- Ms. Simms states that,

6    "Asked her where her head was based on her comment

7    in her email to Armando regarding this being 'weird'

8    with our culture.  She seemed nervous but made it

9    clear she needs us to make this decision.  She isn't

10   going to self-select out."

11         What does that mean, "she isn't going to

12   self-select out"?

13   A.    Hang on.  I'm catching up on where you are.

14   Q.    Sure.

15   A.    Give me one second.

16         (Reviewing)

17         Okay.  I'm there.  Sorry.

18   Q.    Okay.

19   A.    I was taking it out of context.

20         So what it means is that in the past when

21   team members have come forward to say they've

22   engaged in premarital sex or extramarital affairs,

23   they will typically come up and have self-select

24   and go, "Hey, I know this means I'm terminated."

25         Caitlin did not in that meeting.  She did

1    not opt out.

2    Q.    Okay.  Would that seem to indicate that she

3    did not believe she should be terminated for

4    engaging in premarital sex and getting married?

5    A.    It did not.  We have other team members that

6    don't necessarily want to opt out, but then we

7    terminate them.

8    Q.    Did anyone follow up with her to ask why she

9    wasn't going to self-select out?

10   A.    Not in that way, not in that manner.

11   Q.    Do you know if anyone followed up to see if

12   her stating she wasn't going to self-select out, if

13   that was based on a particular belief of hers?

14   A.    Can you clarify the question?  I maybe missed

15   the front part of it.

16              MS. COLLINS:  Sure.

17              Can you repeat the question, Terri?

18              (The requested record was read back by

19   the court reporter.)

20              THE WITNESS:  Great.

21              The answer is no.

22   BY MS. COLLINS:

23   Q.    Okay.  And it states in the last paragraph on

24   that page, 1930, "Can I predict how she'll react

25   now, six months from now or later?  No.  But we'll

1    have a meeting with her, Armando, me and Finney to

2    go over this all with her again, express our desire

3    to make sure she and baby are taken care of and let

4    her go.  We'll do our best."

5         At that time, did you-all have any sort of

6    understanding as to whether or not she would accept

7    a severance package?

8    A.    We did not at that time.  It had not been

9    presented to her.

10   Q.    Okay.  And then above that it looks like Dave

11   Ramsey sent another email, and if you go to the page

12   before, it looks like he sent it at 2:34 p.m. on

13   June 23, agreeing with Ms. Simms.  But he says,

14   "Finney and Armando should not talk.  As a matter of

15   fact, would be good if one of them is not there."

16        Did that happen?  Did one of you-all not go

17   to the final meeting with her?

18   A.    Yes.  Michael Finney did not attend.

19   Q.    Did you talk during the meeting?

20   A.    I did.

21   Q.    What did you say?

22   A.    I went over the exit paperwork, Tennessee

23   separation agreement, et cetera, as well as our

24   separation agreement and severance offer.

25   Q.    Okay.

A.     If I'm not mistaken there's an audio of that
as well.

Q.     Uh-huh.  Okay.

       Do you know if there is an audio of the
meeting with Suzanne and █?

A.     I don't know.

Q.     Okay.  And the audio of the meeting that you
were a part of, do you know who created that?

A.     Ms. O'Connor.

Q.     Did you create one?

A.     I did not.

Q.     Okay.  Did anyone at Ramsey record that
meeting that you know of?

A.     Not to my knowledge.

Q.     Okay.  Was that a violation of Ramsey policy
for her to record that meeting?

A.     We don't have a policy on recording.

Q.     Okay.  So is that "no"?

A.     That would be "no."

Q.     Okay.  And Mr. Ramsey states, "Don't want her
to feel ganged up on.  You handle this with great
compassion, ask her what more we can do to love her
well, but this is obviously contrary to our values."

       And is that the righteous living core value?

A.     Correct.

1  Q.    Okay.  Is that the only one?

2  A.    I don't know if it's the only one.  I know

3  that it's the obvious one.

4  Q.    Okay.

5         MS. COLLINS:  All right.  Let's mark the

6  next document as Exhibit No. 8.

7         THE WITNESS:  Thank you.

8         (WHEREUPON, the above-mentioned

9  document was marked as Exhibit Number 8.)

10 BY MS. COLLINS:

11 Q.    All right.  Was this the email that you were

12 referring to earlier that you sent?

13 A.    Yes.  That is my response.

14 Q.    Okay.  Did you have any other correspondence

15 with Caitlin O'Connor after she notified you that

16 she was pregnant, other than this email?

17 A.    Correspondence via email, no.

18 Q.    Okay.  Correspondence in any other way?

19 A.    Yeah, no.

20 Q.    Okay.  Okay.

21 A.    I don't recall if we were working to set up

22 the time that we were meeting, but I don't think

23 that I was involved in setting the time up.

24 Q.    Okay.  And you state in your email, "First

25 let me say that every child is from God."

1        And that includes children born out of
2  wedlock?
3  A.      That includes every child.
4  Q.      Does it include children born out of wedlock?
5  A.      Yes.
6  Q.      How is it consistent with Judeo-Christian
7  values to terminate a woman who's pregnant if the --
8  even if it's from an encounter that's out of
9  wedlock?
10  A.      Can you rephrase that?  So if I'm
11  understanding your question, how is it consistent
12  was your word, right?
13  Q.      Yes.
14  A.      With Judeo-Christian values.  I don't think
15  this is -- she was terminated for having sex out of
16  wedlock.
17  Q.      But you terminated her pregnant, right?
18  A.      Yes.  She also happened to be pregnant.
19  Q.      Okay.  How is that consistent with
20  Judeo-Christian values to terminate a pregnant
21  woman?
22  A.      I don't know where Judeo-Christian values say
23  not to.
24  Q.      Okay.  Well, earlier I asked you where, like,
25  where it said that you couldn't have sex outside of

1    marriage and you couldn't point to anything, so

2    wouldn't the same logic apply, that --

3    A.      The same logic could apply.  I happen to know

4    that having sex premarital or extramarital is not

5    consistent with biblical principles, just like I

6    happen to know that there's nothing in there perhaps

7    that says you can't fire someone for having sex out

8    of marriage.

9    Q.      Okay.  So is this just Ramsey's

10   interpretation of Judeo-Christian values?

11           MS. SANDERS:  Objection to the form.

12           THE WITNESS:  So define "this," is

13   this --

14   BY MS. COLLINS:

15   Q.      Well, terminating a woman who's pregnant

16   who's not married.

17   A.      So the termination was because she engaged in

18   sex out of marriage.  She happened to be pregnant.

19   They're not connected.  They're two separate things.

20   Q.      Okay.  But you would not have known about her

21   violation of the policy had she not disclosed her

22   pregnancy?

23   A.      That is correct.

24   Q.      Okay.  And when you sent this email on

25   June 19 to Caitlin O'Connor at 7:30 a.m., pursuant

to the other emails we already read from June 18th,
everyone was pretty much on board with the decision
to terminate her, right?

A.      Correct.

Q.      Okay.

A.      Pending the conversation that ▉ and Suzanne
had.

        MS. COLLINS:  Okay.  I'm going to ask
you about another document.  This is going to be
Exhibit No. 9.

        (WHEREUPON, the above-mentioned
document was marked as Exhibit Number 9.)

BY MS. COLLINS:

Q.      Okay.  Have you seen this text message
before?

A.      I have not.

Q.      Oh, okay.

A.      It could have been in the pile of discovery,
but there was a lot there.

Q.      Agreed.

        Okay.  Well, if you haven't seen it, then
I'm not going to ask you anything about it.

        All right.  Okay.  I think that I've already
asked this, but I'm not 100 percent sure, so
forgive me if I'm asking something another time.

1      Is it Ramsey's interpretation of

2  Judeo-Christian values that premarital sex is

3  inconsistent with Judeo-Christian values?

4         MS. SANDERS:  Object to that form.

5         You can answer that.

6         THE WITNESS:  You've asked it before.

7  The answer is I don't know.  The principle of not

8  having sex and that leading to termination, I don't

9  know if that's a direct tie to Judeo-Christian or

10  not.  It was there when I got there.

11  BY MS. COLLINS:

12  Q.    Okay.  Okay.  But it's enforced in that

13  manner, correct?  It's been enforced in that manner

14  since you've been there?

15  A.    It's enforced under righteous living.

16  Q.    Okay.  And righteous living is part of a

17  Judeo-Christian value, right?

18  A.    Looks like it, yes.  There's a lot of...

19  Q.    Okay.  I'm going to provide you one more

20  document -- well, no, I'm going to provide you a lot

21  more documents, but for the moment.

22         MS. COLLINS:  And I just realized I did

23  not...

24         (To the Reporter) Can you make sure that

25  gets redacted a little bit better?

1          THE REPORTER:  Where?

2          MS. COLLINS:  The Social Security

3     number.

4          THE REPORTER:  Sure.

5     BY MS. COLLINS:

6     Q.    I'm going to provide you a document that's

7     marked as exhibit -- I'm going to mark it

8     Exhibit 10.

9          (WHEREUPON, the above-mentioned

10    document was marked as Exhibit Number 10.)

11         MS. SANDERS:  For the record, Heather, I

12    realize that's something we produced with her

13    social.  Do you want to mark this document

14    "Confidential" just because her social's on it and

15    unredacted?

16         MS. COLLINS:  I'm going to redact her

17    Social Security number.  That's what I was just

18    telling the court reporter.

19         MS. SANDERS:  Okay.

20         MS. COLLINS:  I'm going to make sure

21    it's scratched out.

22         MS. SANDERS:  Okay.

23    BY MS. COLLINS:

24    Q.    Mr. Lopez, have you seen this document

25    before?

1    A.      Yes, I have.

2    Q.      Was this one provided to the Department of

3    Labor and Workforce Development?

4    A.      Yes.  We don't necessarily provide it.  It's

5    electronic so it's not the same -- we didn't provide

6    the paper, we just filed it electronically.

7    Q.      Okay.  And the one that you filed

8    electronically, did it have the same information on

9    here?

10   A.      It did not.  She did not accept the severance

11   pay, so there was nothing in there for severance.

12   Q.      Okay.  And was this document given to

13   Ms. O'Connor on the day that she was notified of her

14   termination?

15   A.      Yes, it was given to her, along with the

16   severance document.

17   Q.      Who made the decision as to the severance

18   amount?

19   A.      We have a guideline that we utilize, so it's

20   time in position, reason for separation and salary

21   earned.

22   Q.      Do you recall how much was offered to Caitlin

23   O'Connor?

24   A.      According to this, $47,000.

25   Q.      Okay.  And she turned that down?

Case 3:20-cv-00620-Document 98-1 Filed 08/21/22 Page 121 of 208 PageID #: 4420
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1   A.      Correct.

2   Q.      Okay.  Was that -- was that based on her time

3   in position and salary?

4   A.      If I recall correctly, it was based not only

5   on those three, but the 47 represents one year of

6   compensation for her.

7   Q.      Was that also to take into account that she

8   was pregnant?

9   A.      It was to take into account not having to

10  look for a job, so yes, not having to look for a job

11  until she delivered, and then beyond that.

12  Q.      Was any consideration made as to her

13  insurance status?

14  A.      Yes.

15  Q.      Okay.  Tell me about that.

16  A.      We agreed to cover the insurance for the full

17  year in addition to that 47,000, both for her and

18  for her child.

19  Q.      Did there come a point in time when you were

20  made aware that she had filed a charge of

21  discrimination with the EEOC?

22  A.      Yes.

23  Q.      Okay.  How did you find out about that?

24  A.      Through the EEOC.

25  Q.      Do you receive EEOC charges in your position?

1    A.      Yes.

2    Q.      Okay.  Do you receive those electronically or

3    by mail?

4    A.      Both, but I think recently it's been

5    electronic.

6            MS. COLLINS:  I'm going to mark the next

7    document as Exhibit No. 11.

8            (WHEREUPON, the above-mentioned

9    document was marked as Exhibit Number 11.)

10   BY MS. COLLINS:

11   Q.      Okay.  Have you seen a copy of this charge

12   before?

13   A.      I have.  It's been a while, but yes.

14   Q.      Okay.  If you could just read the charge for

15   me.  I mean, you don't have to read it out loud.

16   And let me know when you've been finished reading

17   it.

18   A.      (Reviewing)

19   Q.      Okay.  So, Mr. Lopez, you had an opportunity

20   to review Exhibit No. 11, Caitlin O'Connor's charge

21   of discrimination.  And with particular in the

22   "Particulars" section, is there anything that, to

23   your knowledge, is not true in that section?

24   A.      I think in that Section II, as it gets into,

25   "In this same email, I requested both Family Medical

Leave Act paperwork," she never did request that
paperwork, nor did she request maternity leave or
mention ADA.  She said it, but she wasn't requesting
it at that moment.  She just wanted to know about
it.

Q.     Okay.  Anything else?

A.     I'm guessing that the dates are correct.  And
when she met with █ and Suzanne on the 23rd, I'm
guessing that the date is correct on the 25th, which
we can go back and double check.  I don't know when
her doctor's appointment was.

       I think where she states her reason for
termination being pregnancy, that is not correct.
And it's not for violating the company code of
conduct.

Q.     Okay.  But she was terminated for notifying
you that she was pregnant and unwed, right?

A.     No, I think her sentence down at the bottom
is actually what states it the best, so, "The father
of my baby and I are in a committed relationship,
but are not married.  Part of this code incorporates
a righteous living policy, which prohibits
premarital sex."

       And so she was married for premarital sex.

Q.     Or she was...

1    A.    Or she was fired, sorry, for premarital sex.

2    Q.    Okay.  What about the next sentence?

3    A.    "This policy has a disparate impact on women

4    because we cannot keep our personal lives private."

5          No, I think, while that may be true, we had

6    fired other women that are not pregnant because we

7    found out they were engaged, as we have male.

8    Q.    Okay.  And the next sentence, "But other

9    women have been forced out for the same reason."

10          Is that true?

11   A.    That is true, the reason of premarital sex.

12   Q.    But premarital sex that results in pregnancy?

13   A.    There were -- yes, unwed -- not just

14   pregnancy, by the way, anybody that engaged in

15   premarital sex, whether it resulted in pregnancy or

16   not.  She specifically tossed out those that

17   resulted in pregnancy.

18          MS. COLLINS:  Okay.  Sorry.  It's that

19   time of afternoon where you just move a little bit

20   slow.

21          MS. SANDERS:  I have some caffeine if

22   you need it.

23          MS. COLLINS:  Oh, I was just more

24   talking about the subject matter.

25          MS. SANDERS:  Oh.

Case 3:20-cv-00054-RGJ Document 96-1 Filed 08/11/22 Page 125 of 208 PageID #: 4524
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1          MS. COLLINS:  Okay.  I'm going to mark

2    the next exhibit as 12.

3          (WHEREUPON, the above-mentioned

4    document was marked as Exhibit Number 12.)

5    BY MS. COLLINS:

6    Q.    Now, on the -- let's see -- page 11 of

7    Exhibit No. 12, is that your signature?

8    A.    Yes.

9    Q.    Okay.  So you verified that the responses to

10   Plaintiff's First Set of Interrogatories were

11   accurate, correct?

12   A.    Correct.

13   Q.    All right.  And in response to No. 3 it

14   states, "Plaintiff did not request to take medical

15   leave or pregnancy leave during her employment and,

16   therefore, Defendant did not have any communications

17   or discussions about it."

18         And we went through the email that Caitlin

19   O'Connor sent you initially requesting information

20   and notifying you that she was pregnant.  Did you

21   not take that as a request to take medical leave or

22   pregnancy leave?

23   A.    I did not.

24   Q.    Okay.

25   A.    It was an inquiry.  It was more of an inquiry

1    as to what it was, but -- I can read it again and

2    make sure.

3    Q.    Sure.

4    A.    (Reviewing)

5          Yeah, I did not read it that way.

6    Q.    Okay.  So where she's asking you, "I'm not

7    sure what my next steps are regarding sharing news

8    with my leader, getting ADA -- getting FMLA and ADA

9    paperwork in case it's needed in the future."

10   A.    That's correct.  I took it as she's unsure of

11   what -- what does she need to do to get that

12   paperwork?  Not, "I'm formally requesting my FMLA

13   paperwork and ADA paperwork."

14         Just like she's talking about she's unsure

15   about how to share the news with her leader.

16   Q.    Okay.  And other than the conversation that

17   you had with her on the 23rd when she was

18   terminated, did you have any direct conversations

19   with her after -- with Caitlin O'Connor after she

20   sent you this email on June 18?

21   A.    I did not.

22   Q.    And with respect to the response to

23   Interrogatory No. 5, it says that, "Request for

24   disability accommodations under the ADA are

25   administered by Human Resources."

Case 3:20-cv-00086-Brentwood Reporting Services Page 127 of 595 PageID #: 4526
Elite Brentwood Reporting Services Filed 08/21/23 (615) 595-0073
www.EliteReportingServices.com

Is there anyone in particular in Human Resources that deals with that?

A.     Yes, typically it's Karla Lundell.  She's our benefit administrator.

Q.     Okay.  Was it the same in June of 2020?

A.     Yes, it would have been the same person.

Q.     Okay.  And did you ask Karla to follow up with Caitlin O'Connor, based on her email?

A.     I did not.  I was waiting for the outcome of the meeting with Suzanne and ███ to determine whether or not she would still be employed.

Q.     And in response to Interrogatory No. 6, which is about the core values and righteous living, it says the defendant equates righteous living to strong character, integrity and honesty, right?

A.     What section are you on?  What page?

Q.     Sure.  Page 3 in response to Interrogatory No. 6.

A.     Yes, ma'am.  Towards the bottom of the page?

Q.     Uh-huh.

A.     Yes.

Q.     Okay.  So someone who gets pregnant as a result of having premarital sex, do they have -- do they not have strong character, integrity or honesty?

1  A.    It would be violating the premarital sex

2  clause.

3  Q.    Well, would they be someone that does not

4  have strong character, integrity or honesty?

5  A.    They would not, but if you read on page 4

6  towards the top, the additional comment, "Defendant

7  considers and treats premarital sex as inconsistent

8  with righteous living."

9  Q.    Okay.  Do you think if you had a Bible you

10  could go back and figure out which part of Bible it

11  says that premarital sex is prohibited?

12  A.    I probably could.

13  Q.    Okay.  Sitting here today, you don't know

14  where that came from, that premarital sex is

15  prohibited at Ramsey solutions?

16  A.    Where the company made the policy?

17  Q.    Yeah.  Who -- who made that decision that

18  premarital sex was inconsistent with the company's

19  values?

20  A.    I don't know the answer.

21  Q.    Have you ever asked?

22  A.    I have not.

23  Q.    So it was already there when you came?

24  A.    Correct.

25  Q.    And nobody's ever told you that, you know,

1  "This person feels that way" or "This Bible verse

2  says this and so this is why we do it this way," or

3  anything like that?

4  A.     They have not, and I have not asked.

5  Q.     Do you have any understanding as to whether

6  it's Dave Ramsey's personal belief that premarital

7  sex is inconsistent with righteous living?

8  A.     I don't have that understanding.

9  Q.     And not all Christians share that belief,

10 right --

11            MS. SANDERS:  Objection.

12 BY MS. COLLINS:

13 Q.     -- that premarital sex is a violation of a

14 Judeo-Christian belief?

15            MS. SANDERS:  I object to the form.

16            THE WITNESS:  I'm not a religious

17 expert.  I don't know what all religions.

18 BY MS. COLLINS:

19 Q.     But your belief about -- do you share the

20 belief that people should not engage in premarital

21 sex?

22 A.     I do share that belief.

23            MS. SANDERS:  Object to the form.

24 BY MS. COLLINS:

25 Q.     And the belief that you have, is that based

Case 3:20-cv-01035 Document 82-2 Filed 08/21/23 Page 130 of 208 PageID #: 4529
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    on the fact that you're a Christian?

2    A.    It's the way my mom brought me up and my

3    Catholic upbringing, a combination.

4    Q.    Okay.  Do you know other Christians that

5    don't share that belief that it's a requirement of

6    their faith?

7    A.    That which part is a requirement?

8    Q.    That engaging in premarital sex is not part

9    of their faith practice, that that's not, like, a

10   deal-breaker in their faith practice as a Christian?

11   A.    I'm going to rephrase it just to make sure I

12   have it right.

13   Q.    Sure.  It's confusing with all the "nots."

14   A.    Yes.  So do I know any Christians who are

15   okay with having premarital sex?

16   Q.    Yes.

17   A.    I know many Christians that don't follow --

18   they profess Christians, but they'll engage in

19   premarital sex, live together, drink to get drunk,

20   do drugs, et cetera.

21   Q.    And none of those people could work at Ramsey

22   solutions, could they?

23   A.    If they engaged in premarital sex, they could

24   not.

25   Q.    And do you see that position as prohibiting

1  premarital sex based on a Judeo-Christian value at

2  all inconsistent with what you know about Title VII?

3  A.      I do not.

4  Q.      Why not?

5  A.      Sex out of wedlock or premarital is not a

6  protected class.

7  Q.      But if it's based on a religious underpinning

8  or foundation, wouldn't it be?

9  A.      Again, I'm not a religious expert, but I

10  don't know of any religion that says you must, in

11  order to have a -- be a member of that church or to

12  have that as a tenet, that you must do that.

13  Q.      But it's not an issue of you must do that,

14  but does it preclude you from being a member of a

15  particular...

16  A.      I think you've left my field of knowledge.

17  Q.      Okay.  But you think it's biblical that

18  someone should not engage in premarital sex?  You

19  think that's a biblical thing?

20  A.      It hasn't changed from the time I answered it

21  before.

22  Q.      So your answer is yes?

23  A.      No, I was raised that way by my mom and my

24  Catholic upbringing.

25  Q.      Okay.

A.    And, yes, I believe it's biblical.

          MS. COLLINS:  Okay.  All right.  Let's
take a quick break.

          MS. SANDERS:  Okay.

          THE VIDEOGRAPHER:  Going off the record
at 2:21 p.m.

          (Recess observed from 2:21 p.m. to
2:33 p.m.)

          THE VIDEOGRAPHER:  We are back on the
record at 2:33 p.m.

BY MS. COLLINS:

Q.    Okay.  All right, Mr. Lopez.  We've had a
nice, refreshing break.

      Now, were you involved in any of the
employment decisions concerning ███████?

A.    No.

          (The following pages, 133 through 170,
are for attorneys' eyes only.)

///

(Start of confidential portion.)

BY MS. COLLINS:

Q.      Okay.  Did you know about the allegations his
wife had made that he had engaged in extramarital
affairs?

A.      Yes.

Q.      Why wasn't he terminated?

        MS. SANDERS:  Objection.  I'm going to
instruct this witness not to answer.  He's not
familiar with it; he just said he wasn't.  He wasn't
involved.

        MS. COLLINS:  Well, I think he said he
was familiar with some of this stuff, and so he can
testify as to what he knows about it.

        MS. SANDERS:  Well, we also have pending
before the court a discovery dispute on ██████████
so I'm going to instruct him not to answer until
that's resolved.

        MS. COLLINS:  Well, that's about ████████
████████ personnel files.  And I thought the last
documentation I received from you is that you would
produce ████████ personnel file.

        MS. SANDERS:  We would, and we would
produce a 30(b)(6) witness to testify as to ████████
But we're not going to litigate ████████████ in this

case.  And, also, he just testified he wasn't

involved, so he's not the one to ask about █████

██████

            And we don't want -- we don't want media

sound bites being released that aren't accurate.

It's a highly sensitive, embarrassing topic.  And he

just testified he wasn't involved.

BY MS. COLLINS:

Q.    All right, Mr. Lopez.  With respect to ██████

██████ do you know anything about the allegations

that were made by his wife that he engaged in

extramarital affairs?

A.    Not firsthand knowledge.

Q.    Okay.  What hand knowledge do you have?

            MS. SANDERS:  Objection, calls for

attorney-client privilege.

BY MS. COLLINS:

Q.    What knowledge do you have about that?

A.    From being the head of HR.

Q.    Okay.  Were you provided that information

from Mr. █████ or as a member of the HRC?

A.    Both.

Q.    Okay.  Was the HRC apprised of information

about the allegations that Mr. █████ had engaged in

extramarital affairs?

A.      No.  I was not.

Q.      Okay.  Do you find that unusual that you were
not?

A.      No, not really.

Q.      Okay.  Had you been a part of any of the
emails that were sent to or from ██████████ about
█████████ extramarital affairs?

A.      I was not.

        MS. COLLINS:  Okay.  I'm going to mark
the next document as Exhibit No. 13 -- well, maybe
I'm not.  I don't seem to have extra copies.

        Okay.  I will not because I don't have
extra copies.  I'm just going to ask you.

BY MS. COLLINS:

Q.      Do you recall receiving a hotline call from
██████████, ████████'s father?

A.      I do.

Q.      Okay.  What do you recall about that?

A.      He made allegations about ████████ having
an affair and not being a good dad, and there may
have been a few more things there.

Q.      Okay.  Did he specify what type of affair
████████ was having?

        MS. SANDERS:  Objection.  This goes back
to the issue we were discussing earlier.  This --

this is -- at best, the rest of this would proceed attorneys' eyes only.

BY MS. COLLINS:

Q.    Can you answer the question?

        MS. SANDERS:  I'm instructing him not to answer unless we agree to that, on the attorneys' eyes only.  This only serves to embarrass Mr. █████.

        MS. COLLINS:  Well, I think it's pretty much public knowledge that █████████ had an affair.

        MS. SANDERS:  I don't know if it is or isn't, but that's not -- that's not my client's job, to testify under oath on a deposition about ████████ ██████.  We're not going to do that.  I gave you the confines that we'd do that in, and we will, but not Mr. Lopez because he doesn't have knowledge.

        MS. COLLINS:  He just testified that he did.

        MS. SANDERS:  No, he doesn't have firsthand knowledge.  He'll be speculating on a matter that's already embarrassing to Mr. █████ and sensitive.

        MS. COLLINS:  Well, I hate that it's embarrassing to him, but it was embarrassing to my client to get fired for getting pregnant.

MS. SANDERS:  Well, we wouldn't disclose
that.

          MS. COLLINS:  So that's where we are.
And if you're going to -- and if a company is going
to terminate employees on the basis of a righteous
living policy that lets some employees get away with
it and not others, then, you know, at best, it's a
double standard.  At worst, it's hypocritical.

          So we have to be able to get into that
and examine that, irrespective of whether it's ██████
██████ and irrespective as to whether or not it's
embarrassing.

          MS. SANDERS:  You may get into that
under the confines that I gave you, and it's not
Mr. Lopez --

          MS. COLLINS:  Well, I disagree --

          MS. SANDERS:  -- because he doesn't have
knowledge.

          MS. COLLINS:  -- with that.  So I think
we need to go off the record and get the Court on --
see if we can get the Court on the phone because I
don't see that we have to come back and do this over
again with the head of HR, who received a hotline
complaint about this whole thing with ████████████████

          MS. SANDERS:  You can talk about the

hotline complaint if you designate it as attorneys' eyes only.

MS. COLLINS:  I don't have to do that.

MS. SANDERS:  Okay.  Then we'll call the Court.

MS. COLLINS:  Okay.  All right.  Yeah, let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 2:40 p.m.

(The following telephone exchange with Judge Frensley was taken off the video record:)

THE COURT:  Hello, this is Judge Frensley.

MS. COLLINS:  Good afternoon, Judge Frensley.  This is Heather Collins and I'm here with Leslie Sanders.  We're in the middle of a deposition with -- in this case that I mentioned, O'Connor versus The Lampo Group.  And we have the head of HR, Armando Lopez here.  And we have a bit of a disagreement as to some information and line of inquiry that I was going to go into about an employee we contend is similarly situated in the application of its policy, █████████████

And I don't know if you recall, Mr. ██████ was the subject of a motion to compel --

well, discovery motion that --

THE COURT:  Hang on just a second, Ms. Collins.  Do you have a court reporter on with us?  Recording this?

MS. COLLINS:  Yes, I do.  I can tell her not to record or to record.

THE COURT:  No, that's fine.  She can go ahead and do it.  That's fine.  I just wanted to check.  Thank you.  Go ahead.

MS. COLLINS:  Okay.  And so the issue is that, number one, they've said that anything about ████████ is embarrassing and not relevant.  And number two, that the head of HR can't testify as to what happened with Mr. ██████ So it's our contention that he can and that it being embarrassing is beside the point and that, really, it's the application of their righteous living value, which supposedly prohibits premarital sex and how it's applied differently to men and women.

And so it's our position that we should be able to get into anything with respect to Mr. ██████ and the righteous living policy with the HR director.

THE COURT:  Okay.  Ms. Sanders.

MS. SANDERS:  Your Honor, yes.  So we

had made a proposal about the information related to

██████ We've maintained through the entire case

that ██████ is not similarly situated because the

decision related to ██████ was not made by the Human

Resources committee.  Mr. Lopez testified that he

does not have direct knowledge and that it did not

come to the Human Resources committee.

The proposal we made prior to

Mr. Lopez's deposition was an offer to provide a

30(b)(6) witness or witnesses to testify to the

topics that she wanted to know about Mr. ██████ also

to make it attorneys' eyes only.  And we would

produce his personnel file.

So that's the proposal we made ahead of

time, and that is -- we believe that's more than

sufficient for Ms. Collins to determine if he's

similarly situated, which is something the Court has

not determined.

And, Your Honor, we would also move, not

in this hearing, unless Your Honor requests, but we

would move for a motion for a protective order

because we believe this meets the standards of a

protective order, particularly given the fact that

it's a different body that made the decision with

respect to Mr. ██████ and it is being used to

embarrass Mr. ████ and to sensationalize something

that's not related to this case.

        THE COURT:  All right.  So, Ms. Sanders,

do you say that Mr. Lopez doesn't -- like, if he was

asked about anything about Mr. ████ situation,

all he could say is, "I don't know anything about

that, that didn't come here and I didn't have

anything to do with that decision-making process"?

        Is that what you're telling me his

testimony would be?

        MS. SANDERS:  Yes, Your Honor.  He has

already testified he didn't have anything to do with

the decision and that the information he has

received would be, like, thirdhand -- it would be

secondhand.  He wasn't involved in the

decision-making process.

        THE COURT:  Okay.  And, Ms. Collins, you

want to ask him those questions, but you want to ask

him about what did he hear?  That's basically what

you want to ask him?

        MS. COLLINS:  Yes, Your Honor, and the

other part of that is, he does have firsthand

knowledge.  And we have an affidavit from the

father-in-law of ████ who testified that he

called in to Ramsey's hotline and disclosed to

Ramsey's hotline that ██████████ had had an affair, he'd had several affairs on his wife, that he was not faithful to his wife. And then in response to that hotline call, this witness, Mr. Lopez, called him back, and so he does have firsthand knowledge as to what's going on with ██████████.

Now, whether or not he was involved in any specific decision as to what subsequently did or didn't happen to ██████████ is a different matter, but if he was allowed to stay on in any capacity with the knowledge that he had engaged in an extramarital affair, which is, you know, really the heart of the issue in this case, having sex outside of marriage, then, you know, we need to know that and we need to be able to explore that.

We do intend to take a 30(b)(6) deposition. It's become clear that that's going to be necessary.

But, you know, I don't see any reason why the head of HR can't talk about his knowledge, and I don't think that whether it's firsthand or secondhand or thirdhand knowledge necessarily precludes us from asking him.

THE COURT: Okay. Yeah, Ms. Sanders, go ahead. And can you answer one question for me? Is

Mr. Lopez a part of that HR committee?

          MS. SANDERS:  He is.  He's a member of the HR committee, yes.

          THE COURT:  Okay.  Thank you.  Go ahead and say what you wanted to now.  I just wanted to understand that.

          MS. SANDERS:  Sure.  Yes, Your Honor. So as far as the hotline complaint goes -- first of all, our position has been that ███ should be excluded.  And we've not heard that before the Court.  That's been our position in the entire discovery process, so this isn't new.

          Second of all, as far as the hotline goes, I offered for Ms. O'Connor -- I'm sorry -- for Ms. Collins to depose and ask Mr. Lopez questions on that and attorneys' eyes only designation, because we will file for any testimony about ███ to be excluded, not just from the trial, but from the discovery process.

          So because he's here today, I offered her to ask, she could ask about the hotline as attorneys' eyes only.  Because my concern is if her client gets that information, she will discuss that with the media because she's done that already in this case multiple times.

THE COURT:  She's given interviews or talked to the media were it's been broadcast doing it or something like that?

MS. SANDERS:  Not specifically about ███ that I know of.  She may have.  I don't know that.

THE COURT:  But generally about the case --

MS. SANDERS:  Yes.

THE COURT:  Okay.  All right.

MS. COLLINS:  She's had one interview, Your Honor.

THE COURT:  Okay.  All right.

Well, let's do this:  You know, obviously this issue about Mr. ███ and whether or not he's similarly situated is going to be something that's going to need to get decided.  But I think for purposes of discovery, you know, we need to not lose this opportunity if we've got Mr. Lopez here to go ahead and take the deposition, you know, ask whatever questions you want to ask related to Mr. ███ in that situation.

You can ask him about his role in the HR committee and why -- or whether this was brought to him and if not, why not, things like that.  You can

ask him about his personal knowledge about anything related to the ███ situation.  You can ask him his hearsay knowledge about whatever he heard or understood or was told by anybody else.

But I think, given the, you know, the context and Ms. Sanders' position on this, you know, its admissibility is maybe for another day, obviously, and I think that it's appropriate to go ahead and do it in the context of a protective order.

Let's put this under seal, and I think for now I'm okay with let's do it attorneys' eyes only.  I don't know if your client's there or not, Ms. Collins, but if she is, you can have her step out for that portion of the questions that relate to Mr. ███ and his situation, and then obviously we can take that up later, depending on what you decide.

I think that it's kind of like fair ball versus a foul ball.  If we call it -- you know, call it fair or call it foul, we can't fix that, but if we call it fair we can fix it if we need to later.

So let's go ahead and let you take the deposition, let's do it attorneys' eyes only.  And then you-all can either talk about what sort of

1    agreement you can make with respect to what to do

2    with it for discovery purposes.  Or if you can't

3    reach an agreement and, you know, you need to look

4    at something else, Ms. Collins, then you can raise

5    the issue then.

6              And, of course, ultimately, when you get

7    to summary judgment and beyond, the issue of

8    admissibility and sealing is going to be a whole

9    other, you know, issue to get resolved by the

10   district court in the matter.

11             So I think for now, our most prudent

12   approach here is let's go ahead and let you ask what

13   you want, Ms. Collins.  Let's put it under seal and

14   attorneys' eyes only.  That leaves the door open for

15   us to fix whatever we need to later on down the

16   road, if that's what we need to do.

17             MS. COLLINS:  Okay.

18             MS. SANDERS:  Thank you.

19             THE COURT:  Anything else we need to

20   talk about while I've got you on the phone in regard

21   to this deposition?

22             MS. COLLINS:  Not about this deposition.

23   I feel like we sent you an email.  Did we send you

24   an email --

25             THE COURT:  Yeah, I'm trying to find a

1    time to fit you guys in.  I'm going to get you on a

2    call and set a hearing on the other matters you need

3    to deal with.  Certainly we'd like you-all to

4    continue talking about those things and, you know,

5    see if there's any common ground you can find so we

6    can narrow the issues as much as possible.  But

7    we'll get something set up to deal with the other

8    matters.

9            I've got a pretty full plate right now.

10   We're trying to find a time to work you in for that.

11   But we'll get you set.  But you did -- a long answer

12   to your question, which is, yes, you did send me

13   something about us getting together.

14           MS. COLLINS:  Okay.  I appreciate that,

15   Your Honor.  I know it's been a busy summer for

16   everybody.

17           THE COURT:  I understand.  Exactly all

18   right.  Thank you.

19           I guess that's clear, Ms. Sanders?

20           MS. SANDERS:  Yes.

21           THE COURT:  Anything else you want to

22   say?

23           MS. SANDERS:  No, thank you, Your Honor.

24   Appreciate it.

25           THE COURT:  Very good.  Well, thank you

all.  Appreciate talking to you.  Thanks for calling
me.  If you need anything else, let me know.

MS. SANDERS:  Thank you.

MS. COLLINS:  Thanks so much.

(End of telephone call with Judge
Frensley and return to the video record.)

THE VIDEOGRAPHER:  We are back on the
record at 2:55 p.m.

BY MS. COLLINS:

Q.    Okay.  Now, Mr. Lopez, before the break I was
asking you about the hotline call that Mr. █████
made to Ramsey.  And you listened to that call?

A.    I did.

MS. SANDERS:  Just to be clear for the
record, I think it's on the record, but this portion
of the deposition is under seal.

THE REPORTER:  Okay.

BY MS. COLLINS:

Q.    And remind me again what your recollection of
that call was.

A.    So my recollection was that ████████
father-in-law was making accusations against him of
having affair, of not treating his wife right, and
of not treating the family, the boys, right, his
sons.

Q.     Okay.  And what did you do in response to listening to that hotline call?

A.     I picked up the phone and called him back.

Q.     Okay.  Was anyone with you?

A.     No, it was just me.  And to be clear, Ms. Collins, we've received probably eight of these calls.  In my career I've received a lot of these calls where someone is making an accusation against a team member that may or may not be true.

Q.     Okay.  Do you save the calls?  Are they on any sort of system?

A.     I don't know the answer to that.  I don't think our voice mail holds for this long.

Q.     Okay.  You don't know if they're archived or anything like that?

A.     I don't.

Q.     Okay.

A.     I don't think they are, though.

Q.     Okay.  So you called him back.  Did you recall calling him back with ████████████?

A.     No, I was by myself.

Q.     Okay.  And what did you talk with Mr. ██████ about?

A.     I asked him questions about what he had said. I took notes about what he had said.  I asked him if

1    he had any proof of what the allegations that he was

2    making.

3        I then, as I wound the call down, which I

4    think was maybe -- in my mind it may have been 15

5    or 20 minutes long.  He did the bulk of the

6    talking.  As I wound it down, I asked him what he

7    wanted to see, what his desired outcome would be.

8        And then I informed him that my job as the

9    head of HR is to investigate, but it is also to

10   protect our team members.  And I informed him that

11   I was -- "I don't know who's on the other end of

12   this call.  You are telling me who you are, but I

13   don't know if that's who you really are.  And so

14   I'm not discrediting you, but I'm also not

15   crediting you.  So if you can produce any kind of

16   evidence to support the allegations you have made,

17   I'd like to give you my mailing address.  You've

18   got my telephone number.  Let me give you my cell

19   phone number."

20   Q.    Okay.  Did he contact Ramsey solutions again,

21   to your knowledge?

22   A.    He did not contact me again.

23   Q.    But did he contact Ramsey Solutions again?

24   A.    I don't know that for a fact.  I've heard

25   that he did, but I don't know that.

Q.     Who did you hear that from?

A.     So at this point there's been so much around ███████ that I don't know if I can pinpoint the person I heard it from.  But I know that I've heard that he contacted several people in leadership.

Q.     Okay.  Who are some of the people in leadership that you spoke to about ██████████

A.     ████████████, because that's ██████'s direct leader; ████████████, because that was my direct leader; ████████████, because he is the head of the HRC; ████████████ and ████████████ as part of HRC.

       And I believe that's it for direct conversation, not hearsay, not things I heard in the hallway.

Q.     So ██████████, ████████, ████████, ████████████?

A.     And ████████████.

Q.     ████████████.  Anyone else?

A.     I think those are all the people that I had an actual conversation with, where it wasn't just hearsay where someone's saying something, but I'm not really having a conversation with them.

Q.     Did you have any conversations with ████████ ████████ about ████████████

A.     I did not.

Q.     Okay.  What did you discuss with Jack
Galloway?

A.     So a lot.  I don't know that I recall
specifics.  I know that I discussed with ███k
██████████ and ███████████ specifically the phone call
with -- did you call him Mr. Kaufman?  I can't
remember his name, his last name, the father-in-law.

Q.     ████████.

A.     ████████.

Q.     Uh-huh.

A.     I remember having a conversation with
Mr. ████████ and Mr. ████████████ specifically about that
phone call, and Mr. ████████.

Q.     Okay.  Anything else you can recall
discussing with ████████████?

A.     No.  ██████ said they were aware.  Again, this
is all two-and-a-half years ago, so -- one of them,
I don't know if it was ██████ or one of them, said
they were aware of this and they were looking into
it.

Q.     Okay.  Why were you not part of conversations
about ████████████?

A.     It didn't come through HR committee.  And
when I brought it to operating board members, they
were aware of it and were handling it.

Q.      Okay.  Did you take any notes of any
conversations you had with ██████████████?

A.      No.

Q.      All right.  What about ████████████████?  What
did you discuss with him?

A.      The conversation with Mr. ████████.

Q.      Anything else?

A.      As it pertains to this matter, no.

Q.      Okay.  And if Mr. ██████████ recalled ████████
████████ being on the phone with you, would you
dispute that?

A.      I would.  He would be mistaken.

Q.      Did you take any notes from your conversation
with Mr. ████████?

A.      I did.

Q.      What did you do with those notes?

A.      I gave them to ██████████ or ████████████████
or one of them in the form of the scratch pad that I
had written them on.

Q.      Okay.  Did you keep a copy?

A.      I did not.

Q.      Okay.  When you receive a hotline call, how
are you notified of that?

A.      We don't have a hotline.  That call came in
through the front desk and then routed to my

extension.

Q.     Okay.

A.     If I had been at my desk it would have rang and I would have answered it.  I was not at my desk and he left a voice mail.

Q.     Okay.  And you don't know if that voice mail still exists?

A.     I don't believe it does.  I don't think the system holds them that long.

Q.     When you get a voice mail, does it send you an email and you know you have a voice mail?

A.     The new system does.  We had a different system, and no.

Q.     Okay.  So at that time you'd just see a little red light blinking on your phone?

A.     Kind of.  A little more sophisticated than that, but yes.  It's an actual digital screen that says you have two voice mails, or whatever it is.

Q.     Okay.  Anything else that you discussed with ▇▇▇▇▇▇▇▇▇▇ that we didn't already talk about?

A.     Related to ▇▇▇▇ no.  We talked about hunting and fishing and that kind of stuff, but I'm guessing that's not what you want to know.

Q.     What about ▇▇▇▇?

A.     Related to ▇▇▇▇

Q.    Yes.

A.    No.

Q.    "No," what?

A.    No, I did not discuss anything beyond the phone call with Mr. ███████.

Q.    Okay.

A.    If I recall correctly, I spoke to Mr. ██████ first because I directly reported to him.  And so I would have called him.  And then I spoke to Mr. ██████, probably the same day if not within minutes of hanging up with Mr. ██████.

Q.    Okay.  Were your conversations with ███████ and ██████, were they in person or were they on the phone?

A.    With Mr. ██████ it would have been on the phone.  With Mr. ██████ it would have been in person.

Q.    Was anyone else around when you had that in-person conversation?

A.    Not to my knowledge, not that I can recall.

Q.    Okay.  Was anyone else around when you had the telephone conversations with either ██████ or ████?

A.    No.  The conversation with Mr. ██████ was in my car on my drive home.

Q.      Okay.  And Ms. Simms, what did you discuss
with Ms. Simms about ████████████

A.      That Mr. ████████ had reached out and called
me and the allegations he had made.

Q.      Okay.  And you think you gave your notes to
████████████ or ████████?

A.      I actually -- it's ████████ or ████████████.

Q.      Okay.

A.      I don't think it's ████████████.

Q.      Okay.  All right.  Any other conversations
with Ms. Simms about ████████████

A.      No.

Q.      What about Ms. ████████████?  Any conversations
with her about ████████████

A.      I don't think I had any conversations with
her about Mr. ████████.  At this point, I don't
remember having any conversations with her about
that.

Q.      Did you have any conversations with her about
████████████

A.      Yeah, probably most recently when the
decision was made to terminate him.

Q.      Okay.  Did you agree with the decision to
terminate him?

A.      I wasn't asked if I agreed or disagreed.  Are

you asking me now do I agree with it?  At the time I was not asked.

Q.     I was just asking you if you agreed with that.

A.     I wasn't asked then if I agreed with it.

Q.     Okay.  So when Mr. ██████ initially contacted you about ████████ having extramarital affairs, did you have any understanding as to what that meant when he said he had been having extramarital affairs?

A.     Can you clarify that?  Did I understand that it meant what it meant?

Q.     Yeah.  Was it a violation of the policy?  Did you have an understanding as to whether or not it involved intercourse?

A.     I did not.

Q.     Okay.  Did you ask him?

A.     I did.  I asked him for proof.  I asked him for -- "Do you have something to collaborate what you're saying?"

Q.     What kind of proof would he have had?

A.     He said there may be pictures, text messages, phone calls, et cetera, and I said, "Sure."

       At this point it's just his word, no different than me saying something about you that

may or may not be true.

Q.     Okay.  Do you recall having any HRC meetings
to discuss ████████ possible violations of
policy?

A.     No, I don't recall having a conversation in
HRC about it.

Q.     For the HRC meetings, do you-all typically
send out an agenda?

A.     Yes.

Q.     Okay.  Are those agendas preserved?

A.     I believe so.  I believe we've submitted some
of them to you maybe.

       MS. COLLINS:  Okay.  I'm going to mark
this document as Exhibit No. 13.

       (WHEREUPON, the above-mentioned
document was marked as Exhibit Number 13.)

       THE WITNESS:  Thanks, Terri.

       THE REPORTER:  You're welcome.

BY MS. COLLINS:

Q.     Okay, Mr. Lopez, I've handed you a document
we've marked as Exhibit No. 13.  And it was sent
from Jack Galloway to the HRC committee.

       Would you have been on this email in May of
2020?

A.     Yes, I would have been.

Q.      Okay.  Do you recall receiving this email
saying, "FYI, I'm changing the agenda to give us
more time to talk about the ███ thing and move it
up on the agenda"?

A.      I actually do not remember that.

Q.      Okay.  Do you recall being in an HRC meeting
on May 19, 2020, where Mr. ███ was discussed?

A.      I don't necessarily remember, but, yes, I
should have been there, on a typical HRC meeting.

Q.      It looks like, based on the original email,
that there were five guests to the HRC -- on the HRC
agenda, Michael Reddish, Michael Finney, Mia
Higgins, John Markie and Alex Sheppard.

        Why would you-all have guests at an HRC
committee meeting?

A.      There are all different reasons, but if we
say Michael Reddish, and we flip to the back, you
can see that Michael Reddish is going to give us an
update on team member events.  He runs the bingo
night and happy hour and whatever.  So he would have
been presenting that, the plan for the rest of the
year, the budget, et cetera.

        Mia Higgins is on there for RSA growth
track, so we were working on that growth track.
She would have been reporting on that.

Michael Finney was there to discuss a team member issue. We typically would not have the name, and so it doesn't have the name, and I don't recall who that was off the top of my head.

John Markie and Alex Sheppard were in there to discuss ██████████ so we did put the name on that one.

And then it looks like ████████████ had time -- she's not listed as a guest because she's a member -- but she would have been discussing a team member, ██████████████

Q.    Do you remember what the deal was with ██████ ██████

A.    If I'm not mistaken, I think ██████████ was someone who wanted to live with his girlfriend. We were supposed to discuss him that day. He resigned while we were still in HRC committee. I think that's who ██████████ was.

Q.    Okay. Who's ████████████████

A.    She's not with us anymore, but she reported to ██████████, so she was in marketing or a marketer of some sort. She was having attendance issues. And so ████ was bringing awareness to it.

Q.    Okay. And with respect to ██████ do you recall any of the discussion about the ████ thing

at that meeting?

A.    I don't remember us talking about ████ in HRC.  I know Jack's stating in this email that he's moving it up.  I don't remember talking about ████ in HRC committee.

Q.    Did you typically take any kind of notes in HRC?

A.    I do not.

Q.    Or minutes or anything -- did anyone take notes during HRC?

A.    Yes.

Q.    Who?

A.    Jack is the chair, and so he typically took some kind of notes and sent them onward to whoever needed them.  I guess it goes to an executive committee or operating board or one of those groups.

Q.    Okay.  Who's on the executive committee?

A.    That's a great question.  Without looking at a roster, I don't know that I can answer it completely, but I can try.

Q.    Okay.

A.    So that would be the Ramsey family, so Rachel, Denise, Daniel, Dave; a few bored members, but not all of the board members.  So I believe it's Suzanne, ████, Mark, I think Finney, Brian Williams,

1  Herb Jenkins, and I think there's eight or nine so I

2  think I'm missing a few.

3  Q.    Okay.  And the operating board?

4  A.    That's the rest of the board members, so

5  everybody else.  So Luke LeFevre, Jim King, Daniel

6  Tardy, plus the group that I gave you already.

7  Q.    Okay.  And when Jack sends out the minutes or

8  the notes from the HRC committee, does he cc

9  everybody on the -- or does he send it to the HRC

10 committee, group email typically?

11 A.    He copies us, then it goes to, again, either

12 the operating board or executive committee -- I

13 can't remember which one he actually addresses it

14 to -- and then copies HRC typically.

15 Q.    Is it, like, a Word document or is it just in

16 an email?

17 A.    I think it's just in the body of the email.

18 I don't think it's an attachment.  I actually have a

19 rule set up in my Outlook, so I don't look at those

20 when they come back through.

21 Q.    They go into a separate little subfolder?

22 A.    Yeah.

23 Q.    Okay.  Do they get deleted after a certain

24 time period?

25 A.    Yeah, but I don't know what that is.  And

Case 3:20-cv-00406-DPJ-ASH Document Report Filed 08/12/23 Page 163 of 208 PageID #: 4682
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

that's just for everybody to save server space.

Q.    Okay.  Do you know if they get archived or is
that more of a techy question?

A.    It's more of a techy question, but I do know
they get archived.  I know you can retrieve them if
you needed to, up to a certain point.

Q.    So any time the HRC committee meets, the
chair usually sends out notes from the meeting what
was discussed --

A.    Uh-huh.

Q.    -- to the HRC committee meetings, and the
operating board or the executive committee, one --

A.    Correct.

Q.    -- one of those two, what's going on?

A.    Yes.

Q.    Okay.  Got it.

      And do you know if there were allegations or
if Ramsey knew whether or not ████████████ had
engaged in an extramarital affair that involved
intercourse while he was employed by Ramsey
Solutions?

A.    No firsthand knowledge, but I -- I believe
that that was not -- they did not have that
knowledge at the time that the incident happened.

Q.    Did it come to light at a certain point in

time, based on what you were told, whether it was firsthand or secondhand?

A.     Yes.

Q.     Okay.

A.     Recently.

Q.     How did that come about?

A.     My understanding is someone came forward and said, "I had an affair with ████████ that involved intercourse."

Q.     Okay.  Do you know how -- well, do you know who the person was?

A.     I do.

Q.     Who was it?

A.     I'd rather not say that.

Q.     Well, it's under seal, so -- and you're under oath.

        MS. SANDERS:  It's under seal, attorneys' eyes only, so Caitlin O'Connor is not going to see this.

        THE WITNESS:  Okay.  ████████████

BY MS. COLLINS:

Q.     Okay.  Was she an employee of Ramsey Solutions?

A.     Yes, she was.

Q.     Did she also get terminated?

A.     She did not get terminated, but she would
have been.  She resigned -- well, I don't know if
she would have been.  She just resigned.  When she
said, "Here's what's going on," she resigned.

Q.     Okay.  Did she provide any information about
any prior affairs that she had been made aware of
that █████████ engaged in?

A.     No, not to my knowledge, but I wasn't there.

Q.     Okay.  And when did she come forward about
this affair?

A.     Very recently, but I don't have the date.

Q.     What department was █████████ in or was
she in?

A.     █████████

Q.     Did she sign a nondisclosure agreement?

A.     She did.

Q.     Okay.  Was she paid a severance?

A.     She was.

Q.     Do you know how much it was?

A.     I don't off the top of my head.

Q.     Was it more or less than a year's salary?

A.     I don't recall.  I don't want to speculate.

Q.     Okay.  Was it a recent affair or was it an
affair that had happened in the past?

A.     So, again, I wasn't there.  Here's what I

heard:  The accusation that Mr. ████ had made,
actually, was one of the people that he claimed was
her.  She was brought in and spoken to about that
and denied it, as did ████.

My understanding is the affair was from that
date, from that time period.

Q.      Okay.

A.      But she just came forward now to say it.

Q.      Did Mr. ████ provide you any other
specific names other than ██████████

A.      No, and he wasn't even certain of her name.
He mentioned different people and kind of what they
did, and people that had traveled together,
et cetera.  I happened to know who was on that book
tour, so that's how -- he said if I heard it, I'd
know it.

So I said, "Well, was it" -- and I just
started making up different names, first names.
And one of the names mixed into my list was
████.  And he said, "Yeah, it's ██████,
████ something or other."

And I said, "Okay."  I didn't give him a
last name or -- I just -- he mentioned that name.

Q.      Okay.  But other than ████, he didn't
recognize any other names?

A.      No.  And, again, I gave him just a laundry
list of names.

Q.      Okay.  At any point in time did you talk to
██████████████?

A.      I've spoken to her before.

        Can you be more specific?

Q.      Sure.  Did you speak with her about concerns
she had that her husband had been cheating on her
and was not faithful to her?

A.      No.

Q.      Did you know that █████ and ██████'s church
leaders have confirmed that ██████ had told them that
he had had sexual affairs with other women?

A.      When you say "Did you know," I'm going to --
at the time that it was discovered, the answer is
no.  Do I know now?  The answer is yes.

Q.      Okay.  So let me understand that a little bit
better.  When I asked you about the church leaders,
were you just not made a part of those meetings with
the church leaders?

A.      That's correct.  I was not involved in that
at all, nor did I even know that it was happening.

Q.      Did you find that odd that you weren't
involved in those meetings?

A.      No.

1    Q.     Would it be fair to say you were excluded
2    from those meetings?
3    A.     I didn't view it that way, but, yes, it would
4    be fair to say.
5    Q.     And you don't know why you were excluded from
6    those meetings?
7    A.     My guess is I'm not a board member and that
8    was just board members in that meeting.
9    Q.     Are board members also charged with enforcing
10   Ramsey policy?
11   A.     I think -- I think everyone kind of enforces
12   policy, right?  Like, our team members are empowered
13   to call out gossip and tell the other person not to
14   engage in it.
15          But from a termination perspective, a board
16   member could, I guess, terminate someone.
17   Typically it goes either through the operating
18   board or through HR committee.
19   Q.     Do you know if board members are trained on
20   Title VII policies and procedures or the ins and
21   outs of Title VII, rather?
22   A.     I don't know that.
23   Q.     Okay.  Did you find that unusual that you
24   were excluded from those meetings?
25              MS. SANDERS:  Objection.

Case 3:20-cv-00628  Document 98-1  Filed 08/11/22  Page 169 of 208  PageID #: 4548
Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

You can answer.

THE WITNESS:  No.

BY MS. COLLINS:

Q.     If there was information brought out in a board meeting that confirmed over a year ago that ███████████ had admitted to having sexual affairs during the course of his marriage, should he have been terminated at that time?

MS. SANDERS:  Object to the form.

You can answer.

THE WITNESS:  Yes.

BY MS. COLLINS:

Q.     Okay.  Did you know that his wife accused him of having at least four extramarital affairs?

A.     I did not know the number, but I knew that she accused him of having affairs.

Q.     Did you have any conversations with Mrs. ██████ about ██████████████ affairs?

A.     No.

Q.     What is -- well, strike that.

If Ramsey Solutions' board members knew ███████████ had had multiple affairs that involved intercourse over a year ago, would that have been a violation of the righteous living policy?

MS. SANDERS:  Object to the form.

1            You can answer.

2            THE WITNESS:  So you used "if."  And,

3    yes, if they had that knowledge, then, yes, it would

4    have been a violation.

5            (End of confidential portion.)

6    ///

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Continuation of regular,

2    non-confidential testimony:)

3    BY MS. COLLINS:

4    Q.    Okay.  Do you recall if Caitlin O'Connor was

5    told that her -- after she informed the company that

6    she was pregnant out of wedlock, do you recall if

7    she was told that her values did not align with the

8    company's values?

9    A.    I believe that's what's in that recording.

10   Q.    Okay.  Would that have been the company's

11   Judeo-Christian values?

12   A.    That would have been the sex, premarital sex,

13   sex out of marriage.

14   Q.    That's based on Judeo-Christian values?

15   A.    That you've attested to that, yes.  It's a

16   loose --

17   Q.    Well, I'm asking you.  Is the righteous

18   living value based on a Judeo-Christian value?

19   A.    I think we've answered this before.  I've

20   answered it before, but, yes, it does have a

21   correlation to biblical principle.

22   Q.    And I understand that there have been several

23   men that have been disciplined for looking at

24   pornography at work, right?

25   A.    Correct.

1   Q.     Do you know about those?

2   A.     Yes.

3   Q.     Okay.  And have they typically gone to some

4   sort of -- been given a second chance to go

5   through -- whether it's Celebrate Recovery or other

6   addiction services to help them with that problem?

7   A.     Some have, yes.

8   Q.     Okay.  Have all of the people the company has

9   caught looking at porn, have they all been men?

10  A.     Yes.

11  Q.     Okay.  And is it fair to say that most of

12  them have been given second chances, as long as they

13  go through the steps to recover from that or address

14  that problem?

15  A.     Yes, I think that's probably a safe...

16  Q.     Okay.  Do you know if women who have admitted

17  to having sex outside of marriage have been given a

18  second chance?

19  A.     While employed at Ramsey?

20  Q.     Yes.

21  A.     I don't believe that's happened.

22  Q.     Okay.  And Caitlin O'Connor never said she

23  had sex outside of marriage; she only said that she

24  was pregnant and disclosed who the father was,

25  right?  She didn't specifically say that she had sex

outside of marriage, did she?

                MS. SANDERS:  Object to the form.

                You can answer.

                THE WITNESS:  I wasn't there when ███
and Suzanne spoke to her.

BY MS. COLLINS:

Q.    Okay.

A.    To me she did not.

Q.    Okay.  If she would have been raped, would
she have been fired?

                MS. SANDERS:  Object to the form.

                THE WITNESS:  That has never happened
before.  I don't -- I don't believe so, but that's
my own personal thought and opinion.  I would go
stronger than "believe," so I would think the answer
would be no.

BY MS. COLLINS:

Q.    Okay.  And is it fair to say that men can
hide premarital sex easier than a woman can if she
gets pregnant?

A.    If she gets pregnant?  Yeah, that would be
safe to say.

Q.    Okay.  And earlier you were discussing about
the gradient nature of the righteous living core
value, but that that core value is enforced, for

1    lack of a better term, by the HRC, right?

2    A.    Uh-huh.

3    Q.    If the HRC changes members, does that

4    gradient sort of enforcement change?

5    A.    It's informed by -- certainly new members

6    might bring a different perspective, and the

7    collective decision might be different.  However,

8    we've never changed -- to my knowledge, we've never

9    changed all the members at one time.  So we might

10   drop one and pick one up, but the core of the group

11   we try to maintain the same core for consistency.

12   Q.    Okay.  Got it.

13         An employee has a right to request FMLA,

14   right?

15   A.    Correct.

16   Q.    And they have a right to notify you if

17   they're pregnant and request information about

18   maternity leave, right?

19   A.    Correct.

20   Q.    Okay.  And Title VII applies to Ramsey

21   Solutions, doesn't it?

22   A.    Correct.

23         MS. SANDERS:  Object to that form.

24   That's fine.

25   ///

Elite Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

BY MS. COLLINS:

Q.    And as Ramsey Solutions' HR director, you're
not saying that it's a religious institution, are
you?

A.    I'm not.

Q.    And Ramsey Solutions doesn't associate with a
specific church or denomination, does it?

A.    No, not to my knowledge.

Q.    Did you rely on the email that Caitlin
O'Connor sent you on June 18 when she first notified
you that she was pregnant in the decision to
terminate her?

A.    We did rely on that, in addition to her
conversation with Ms. Simms and ███████████.

Q.    And prior to Caitlin O'Connor sending that
email she was not being considered for termination,
was she?

A.    Not to my knowledge.

Q.    Okay.  And as HR director, you understand
that treating employees differently in the terms or
conditions of their employment is illegal
discrimination if pregnancy were to play a part in
that, right?

          MS. SANDERS:  Object to the form.

          You can answer.

1          THE WITNESS:  If your question is, is it

2     illegal to treat a pregnant person different than a

3     non-pregnant person, yes, I understand that.

4     BY MS. COLLINS:

5     Q.    Okay.  And pregnancy discrimination is

6     illegal, right?

7          MS. SANDERS:  Object to the form.

8          THE WITNESS:  That's correct.

9     BY MS. COLLINS:

10    Q.    And so is discrimination on the basis of

11    someone's religious beliefs; that's illegal, right?

12         MS. SANDERS:  Object to the form.

13         THE WITNESS:  Can you repeat the

14    question?  Sorry, I didn't catch that.

15    BY MS. COLLINS:

16    Q.    Sure.  Discrimination on the basis of a

17    person's religious beliefs is illegal as well,

18    right?

19         MS. SANDERS:  Object to that form.

20         You can answer.

21         THE WITNESS:  Yes.

22    BY MS. COLLINS:

23    Q.    And retaliating against an employee for

24    requesting FMLA is illegal too, right?

25    A.    Retaliation, yes, would be illegal.

Q.     Does Ramsey Solutions have any kind of zero
tolerance policy with respect to discrimination in
the workplace?

A.     I don't know that we have anything we call
"zero tolerance" written down that says it's a zero
tolerance policy.

Q.     Okay.  All right.

            MS. COLLINS:  Let's go off the record.

            MS. SANDERS:  Sure.

            THE VIDEOGRAPHER:  Going off the record
at 3:39 p.m.

            (Recess observed from 3:39 p.m. to
4:01 p.m.)

            THE VIDEOGRAPHER:  We are back on the
record at 4:01 p.m.

BY MS. COLLINS:

Q.     Mr. Lopez, are you aware of any other
employment decisions that did not go through the HRC
like the ███████████ decision?

A.     Yes.  We became aware of one through this
case, ██████████████ [phonetic].

Q.     Is ████████ a man or a woman?

A.     It's a woman.

Q.     Okay.  And she did not go through the HRC?

A.     Correct.

Q.     Okay.  Why not?

A.     I don't know.

Q.     Okay.  What was the situation with ██████?

A.     ██████ was on the list.  She is someone that became pregnant out of wedlock.

Q.     Okay.  And you don't know why it wasn't handled by HRC?

A.     No.

Q.     Okay.  Who -- who handled it?

A.     Operations committee.

Q.     Okay.  Was she offered a severance?

A.     She was.

Q.     Okay.  But you didn't deal with that at all?

A.     I dealt with the severance part, not the decision part.

Q.     Okay.  Do you know how they came to find out that she was pregnant?

A.     She told her leader.  I was -- I'm not -- it's not factual, but I believe that's exactly how it happened.

Q.     Okay.

A.     She told her leader.

Q.     Who was her leader at that time?

A.     ██████████

Q.     Okay.  Are there any others that you can

think of that were not handled through the HRC
process?

A.      Not in my time there.

Q.      Okay.  And do you have any understanding as
to why ████████'s was not handled in the HRC?

A.      I don't.  I have speculation on my part, but,
no, I don't know.

Q.      Okay.  What is your speculation why it was
not handled by the HRC?

A.      I think she was the first one that had sex
out of marriage and was pregnant as a reason for it.

Q.      What do you mean by that, she was the first
one that had sex out of marriage?

A.      She was the first single person who was being
terminated for having sex out of wedlock and told us
she was pregnant at the same time.

Q.      Okay.  So like Caitlin's case, pregnancy was
part of the equation?

          MS. SANDERS:  Object to the form.

          THE WITNESS:  So, yes, pregnancy was a
part of the equation.

          MS. COLLINS:  All right.  That's all I
have.

          MS. SANDERS:  And just for the record,
we have portions of this deposition under seal, as

1    we discussed earlier, you'll pull that out of the

2    video and you'll put that under seal as attorneys'

3    eyes only, and the entire deposition for now is

4    designated as confidential.  Thank you.  Nothing

5    further from us.

6              THE VIDEOGRAPHER:  Okay.  The time is

7    4:05 p.m.  We are going off the record.  This will

8    conclude today's deposition.

9              (Proceedings adjourned at 4:05 p.m.)

10              FURTHER DEPONENT SAITH NOT.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:20-cv-00236 Document 96-2 Filed 08/21/23 Page 181 of 208 PageID #: 4837
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1              REPORTER'S CERTIFICATE

2              I certify that the witness in the

3    foregoing deposition, ARMANDO LOPEZ, was by me duly

4    sworn to testify in the within entitled cause; that

5    the said deposition was taken at the time and place

6    therein named; that the testimony of said witness

7    was reported by me, a Shorthand Reporter and Notary

8    Public of the State of Tennessee authorized to

9    administer oaths and affirmations, and said

10   testimony, pages 1 through 180, was thereafter

11   transcribed to typewriting.

12             I further certify that I am not of

13   counsel or attorney for either or any of the parties

14   to said deposition, nor in any way interested in the

15   outcome of the cause named in said deposition.

16             IN WITNESS WHEREOF, I have hereunto set

17   my hand on July 14, 2021.

18

19

20        Terri Beckham, RPR, RMR, CRR, LCR No. 355

21        My commission expires:  3/6/2022

22

23

24

25
```

Case 3:20-cv-00686  Document 96-1  Filed 08/11/21  Page 182 of 208  PageID #: 4558
Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

# E R R A T A

I, ARMANDO LOPEZ, having read the foregoing deposition, pages 1 through 180, taken June 29, 2021, do hereby certify said testimony is a true and accurate transcript, with the following corrections, if any:

| PAGE | LINE | SHOULD HAVE BEEN |
|------|------|------------------|
| 33 | 9 | "it's" replaces "its" |
| 34 | 1 | applicant tracking systems (remove "and") |
| 38 | 6 | spousal interview replaces "spouse" |
| 89 | 1 | "recorded" replaces "recordings" |
| 98 | 21 | "IVF" replaces "IVR" |
| 102 | 9 | "IVF" replaces "AVR" |
| 161 | 23 | "Board" replaces "bored" |
| —— | —— | ———————— |
| —— | —— | ———————— |
| —— | —— | ———————— |
| —— | —— | ———————— |
| —— | —— | ———————— |
| —— | —— | ———————— |
| —— | —— | ———————— |

ARMANDO LOPEZ

Sarah Cranston                     June 21, 2023

Notary Public                      My commission expires:

State of Tennessee Notary Public Williamson County

Case 3:20-cv-00628  Document 95-1  Filed 08/03/23  Page 106 of 208 PageID #: 4559

















































