# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**Confidential**

# MARK FLOYD

# June 30, 2021

---



Terri Beckham, RPR, RMR, CRR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1

          IN THE UNITED STATES DISTRICT COURT FOR THE
2               MIDDLE DISTRICT OF TENNESSEE
                     NASHVILLE DIVISION
3

4  _____

CAITLIN O'CONNOR,
5
                    Plaintiff,
6
   vs.                              Case No. 3:20-cv-00628
7
   THE LAMPO GROUP, LLC
8  a/k/a RAMSEY SOLUTIONS,

9                   Defendant.
   _____
10

11

12

13
                   ***CONFIDENTIAL***
14                 (UNTIL FURTHER DETERMINATION)

15                 Video Deposition of:

16                 MARK FLOYD

17                 Taken on behalf of the Plaintiff
                   June 30, 2021
18
                   Commencing at 9:51 a.m.
19

20

21

22 _____

           Elite-Brentwood Reporting Services
23           www.elitereportingservices.com
           Terri Beckham, RMR, CRR, LCR
24                P.O. Box 292382
             Nashville, Tennessee 37229
25                (615)595-0073

Case 3:20-cv-00628 Document 89-2 Filed 05/01/22 Page 2 of 99 PageID #: 4586
Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com

```
 1              A  P  P  E  A  R  A  N  C  E  S

 2

 3    For the Plaintiff:

 4              HEATHER MOORE COLLINS
                ASHLEY WALTER
 5              Attorneys at Law
                Collins & Hunter
 6              7000 Executive Center Drive
                Building 2, Suite 320
 7              Brentwood, Tennessee 37027
                615.724.1996
 8              heather@collinshunter.com
                ashley@collinshunter.com
 9

10    For the Defendant:

11              LESLIE SANDERS
                Attorney at Law
12              Webb Sanders, PLLC
                611 Commerce Street, Suite 3102
13              Nashville, Tennessee 37203
                615.915.3300
14              lsanders@webbsanderslaw.com

15

16

17
      Also present:
18
                Mary Ciezadlo, Videographer
19

20

21

22

23

24

25
```

Case 3:20-cv-00663   Document 99-2   Filed 08/01/22   Page 6 of 99   PageID #: 4587
Elite Brentwood Reporting Services   (615) 595-0073
www.EliteReportingServices.com
2

```
1
2                      I  N  D  E  X
3                                                Page
4   Examination
    By Ms. Collins                                  6
5
6   Attorneys' Eyes Only                         75-79
7
8                E  X  H  I  B  I  T  S
9                                                Page
10  Exhibit No. 14                                 59
        Severance Offer and Exit Form documents
11      DEFENDANT 0519-0524, 0528, 0858-0873,
        1324-1348
12
13            PREVIOUSLY MARKED EXHIBITS
14                                             Page
15  Exhibit No. 1                                  30
        Previously marked: Employment Policies &
16      Procedures
        DEFENDANT 0004-0011
17
    Exhibit No. 2                                  32
18      Previously marked: Ramsey Solutions
        Mission Statement and Core Values
19      DEFENDANT 0003
20  Exhibit No. 5                                  42
        Previously marked: Email string dated
21      6/18/20 RE: Sensitive Information
        DEFENDANT 0083-0085 and 0104-0106
22
23
24
25
```

1                    S  T  I  P  U  L  A  T  I  O  N  S

2

3

4

5          The Video Deposition of MARK FLOYD was

6    taken by counsel for the Plaintiff, at Webb

7    Sanders, PLLC, 611 Commerce Street, Suite 3102, on

8    June 30, 2021, for all purposes under the Federal

9    Rules of Civil Procedure.

10          All formalities as to caption, notice,

11   statement of appearance, et cetera, are waived.

12   All objections, except as to the form of the

13   question, are reserved to the hearing, and that

14   said deposition may be read and used in evidence in

15   said cause of action in any trial thereon or any

16   proceeding herein.

17           It is agreed that Terri Beckham, RMR,

18   CRR, Notary Public and Licensed Court Reporter for

19   the State of Tennessee, may swear the witness, and

20   that the reading and signing of the completed

21   deposition by the witness are reserved.

22

23

24

25

```
 1                          *  *  *
 2              THE VIDEOGRAPHER:  We are now on the
 3    record.  Today is Wednesday, the 30th of June, 2021.
 4    And the time indicated on the video screen is
 5    9:51 a.m.  This is the video deposition of Mark
 6    Floyd taken in the matter of O'Connor versus The
 7    Lampo Group, LLC, also known as Ramsey Solutions,
 8    Case Number 3:20-cv-00628, filed in the United
 9    States District Court for the Middle District of
10    Tennessee, Nashville Division.
11              This deposition is being held today at
12    Webb Sanders PLLC, located at 611 Commerce Street
13    Nashville, Tennessee.
14              My name is Mary Ciezadlo, the
15    videographer.  The court reporter is Terri Beckham,
16    both in association with Elite-Brentwood Reporting
17    Services.
18              Will counsel please introduce yourselves
19    and state whom you represent.
20              MS. COLLINS:  Heather Collins and Ashley
21    Walter for the plaintiff.
22              MS. SANDERS:  Leslie Sanders for
23    defendant.
24
25    ///
```

Case 3:20-cv-00628   Document 98-1   Filed 04/06/22   Page 6 of 99 PageID #: 4590
Elite-Brentwood Reporting Services   (615) 595-0073
www.EliteReportingServices.com
5

MARK FLOYD,

was called as a witness, and after having been duly
sworn, testified as follows:


EXAMINATION

QUESTIONS BY MS. COLLINS:

Q.     Good morning.  Could you state your full name
for the record, please?

A.     Sure.  Mark Andrew Floyd.

Q.     What is your address?

A.     ███████████████, as in songwriters,
Brentwood, Tennessee 37027.

Q.     What is your phone number?

A.     ████████████.

Q.     Is that your cell phone?

A.     Yes.

Q.     Is it a company-provided cell phone?

A.     Yes.

Q.     Where are you currently employed?

A.     Ramsey Solutions, The Lampo Group.

Q.     How long have you been employed there?

A.     Oh, 12-plus years.

Q.     What is your job title?

A.     Chief financial officer.

Q.     How long have you held that position?

1    A.     I came in as chief financial officer 12-plus

2    years ago.

3    Q.     What did you do before you were CFO at Ramsey

4    Solutions?

5    A.     I was the CFO at the Nashville Predators.

6    Q.     How long were you there?

7    A.     Technically a year-and-a-half.

8    Q.     What are your job duties as CFO of Ramsey

9    Solutions?

10   A.     I lead the accounting and finance area.  I

11   lead procurement and purchasing, and I used to lead

12   HR.  I'm looking at Armando over there.

13          And then I serve on the operating board and

14   lead a couple of operating committees of the board.

15   That's -- we structure ourselves that way.

16   Q.     Okay.  What did you do in HR?

17   A.     I led -- I just had the HR leader report to

18   me.  But that is now six months ago.

19   Q.     Okay.  So six months ago that was no longer

20   one of your job duties?

21   A.     Right.

22   Q.     So the entire time that you worked there,

23   you -- the HR manager reported to you until six

24   months ago; is that right?

25   A.     Not the entire time.  Over time the duties

Case 3:2023-cv-00609 Document 36-1 Filed 06/03/25 Page 115 of 995 PageID #: 45927
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  have changed.  But a couple, two or three years in

2  there -- no, probably four, five years had HR

3  reporting to me until six months ago.

4  Q.    Okay.  Do you have a background in human

5  resources?

6  A.    I do not.

7  Q.    Have you had any specific training in human

8  resources or discrimination laws?

9  A.    I -- I have not.

10        MS. SANDERS:  Heather, before you go on,

11  I don't want to interrupt your flow, but just as a

12  reminder, this deposition, we're placing the whole

13  thing confidential under the protective order until

14  it's over, until we've had a chance to review it,

15  okay?

16  BY MS. COLLINS:

17  Q.    So, Mr. Floyd, you've had no specific

18  training in HR antidiscrimination laws, correct?

19  A.    We have had a couple of trainings, but I

20  haven't gone formal because I didn't lead the HR

21  department.  I led the person who led the HR

22  department.

23  Q.    Well, what was the extent of your job duties

24  in leading the person who led the HR department?

25  A.    Helping with staffing needs, retention, I'll

1    call it more the basic operations, not the

2    day-to-day HR -- HR responsibilities.

3    Q.    Did you have any role in enforcing or setting

4    policy?

5    A.    Can you be more specific about "policy"?

6    Q.    Discrimination policy.

7    A.    In my -- not as in my role as leading the HR

8    department, no.

9    Q.    Do you have knowledge of Ramsey's policies,

10   like employment policies and procedures --

11   A.    Yes.

12   Q.    -- and how they're to be enforced?

13   A.    Yes.

14   Q.    Okay.  Who decides how Ramsey's policies and

15   procedures are to be enforced?

16   A.    Well, ultimately the operating board would

17   make that decision, but we do put the power into the

18   leaders to, you know, play out those policies to --

19   every decision does not have to come to the

20   operating board.  We make overall policy and then

21   it's carried out by leaders.

22   Q.    Okay.  Who do you, as CFO, take direction

23   from or report to?

24   A.    The CEO.

25   Q.    And who's that?

Case 3:20-cv-00628 Document 55-1 Filed 08/11/22 Page 10 of 99 PageID #: 45949
Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

1    A.      Dave Ramsey.

2    Q.      When the HR leader reported to you, did you

3    provide any sort of regular reports to Dave Ramsey

4    about the HR functions or what was going on in the

5    HR department?

6    A.      On periodic occasion.

7    Q.      What do you mean by that?

8    A.      There was no set schedule for those updates,

9    just when -- as needed.

10   Q.      Have you ever been on the HRC committee?

11   A.      Yes.

12   Q.      Okay.  When?

13   A.      For the last three years.

14   Q.      Okay.  Are you still on it?

15   A.      I am.

16   Q.      What is your role on the HRC committee?

17   A.      Committee member.

18   Q.      What do you do as a committee member?

19   A.      I sit in committee meetings and, as the

20   agenda rolls through, help make decisions, approve

21   expenditures if there are those types of things

22   coming through, or approve performance improvement

23   plans.  It's just whatever comes through the HR

24   committee.

25   Q.      Okay.  Are you involved in any hiring or

Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

1    firing decisions?

2    A.     Yes.

3    Q.     Okay.  Tell me the extent of that

4    involvement.

5    A.     Which one?

6    Q.     Either.  Both.

7    A.     Hiring would be more specific to areas that I

8    directly -- or roles that I either lead or are one

9    step removed from me.  I'm not involved in hiring

10   decisions for the -- all of our new team members.

11   Q.     And tell me about your involvement in firing

12   decisions.

13   A.     If they are directly related to me, I would

14   be directly involved.  If -- if they come to the

15   HRC, then I would be involved from an HRC member.

16   Q.     Okay.  When you say you were -- you may be

17   directly involved as an HRC member, explain that to

18   me.  How would you be involved?  Is there a vote to

19   decide if somebody's going to be terminated or what?

20   A.     Restate -- state your question again.  I'm

21   trying to follow.

22   Q.     Well, I'm trying to understand your

23   involvement.  You said you were involved as an HRC

24   member in terminations.  What is the extent of your

25   involvement?  Is it just voting as a member of the

Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

1    HRC or what?

2    A.      We are a committee, so we have discussion,

3    and then we eventually have a decision.  And

4    generally we reach -- if a vote's needed, but most

5    the time we're pretty much in one accord on most

6    things.

7    Q.      Okay.  Do you consider yourself a Christian?

8    A.      Yes.

9    Q.      Do you go to a specific denomination church?

10   A.      It's actually a non-denominational church.

11   Q.      Which one?

12   A.      Fellowship Bible Brentwood.

13   Q.      Have you ever been divorced?

14   A.      No.

15   Q.      Did you say no?

16   A.      No.

17           MS. SANDERS:  Objection.

18           THE WITNESS:  Okay.

19           MS. SANDERS:  You already answered.

20   That's fine.

21   BY MS. COLLINS:

22   Q.      Have you ever had an extramarital affair?

23           MS. SANDERS:  Objection.  I'm not going

24   to let him answer that.

25           MS. COLLINS:  Why not?

1          MS. SANDERS:  Because you're asking

2    personal things that could be incriminating to him

3    in this case.  I don't know if they are, but they

4    could be.

5          MS. COLLINS:  Incriminating?

6          MS. SANDERS:  Yes.  That's not on topic.

7          MS. COLLINS:  That's not a basis for an

8    objection.

9          MS. SANDERS:  It is.  You know the rules

10   of this company.  I don't know what his answer is

11   going to be to that.  It could lead to something

12   that could result in his termination of employment.

13   BY MS. COLLINS:

14   Q.    Are you refusing to answer the question?

15         MS. SANDERS:  I'm telling him.  I'm not

16   going to put him in the position to refuse.

17         MS. COLLINS:  So does the company turn a

18   blind eye to certain people and just not ask about

19   other people?  Is that what you're saying?

20         MS. SANDERS:  They don't ask anybody.

21         MS. COLLINS:  Okay, then I can ask the

22   question in a deposition.

23         MS. SANDERS:  No, because the answer --

24   you have the director of HR, you have the general

25   counsel for the company.  I don't know what his

1    response is going to be.

2           MS. COLLINS:  Okay.  You're not

3    asserting a valid objection under the Federal Rules

4    of Evidence.

5           MS. SANDERS:  I am.  It's incrimination.

6    That is a valid objection.

7           MS. COLLINS:  Incrimination in what

8    sense?  It's not going to lead to -- you're not

9    asserting a Fifth Amendment right.

10          MS. SANDERS:  Yes, I am.  It could lead

11   to his termination from his employment.

12          MS. COLLINS:  This isn't a criminal

13   case.  You can only assert a Fifth Amendment right

14   in a criminal case.  This isn't a criminal case.

15          MS. SANDERS:  It's an incriminating

16   question.  You can ask it, and I will ask them to

17   leave the room, and it will be under seal.  That's

18   how we have to proceed with that.  Because what

19   you're asking him, Heather, could lead to the

20   termination of his employment.

21          MS. COLLINS:  The company seems to have

22   no problem getting in other people's business in an

23   extreme way, so, you know, I think it's really

24   hypocritical to sit here and say that an officer of

25   the company can't talk about something.

1       MS. SANDERS:  I understand your personal
2  view on it --
3       MS. COLLINS:  It's not my personal view,
4  it's a legal view.  The case is about the issue of
5  premarital or extramarital sex where a company feels
6  like they can get in someone's business and
7  terminate someone because of that.
8       MS. SANDERS:  And you can ask any
9  question --
10      MS. COLLINS:  And you can't selectively
11  say, "Oh, we're not going to -- we're going to turn
12  a blind eye to these people and not to these
13  people."
14      MS. SANDERS:  You can ask any questions
15  you want about people who have been terminated.
16  We've said that.  And about people that the company
17  knows about.  I don't know what Mr. Floyd's answer
18  to this question is.  But I don't think he should be
19  in a position to provide information today that
20  could lead to the termination of his employment.
21      If it's something Ramsey doesn't know,
22  how is it relevant?
23      MS. COLLINS:  Relevancy is not the issue
24  right now.  I can ask him whatever questions I want
25  to ask him within the scope of this case.

Case 3:20-cv-01662-Brentwood Reporting Filed 08/11/22 es Page (615) 595-9073 # 46005
Elite Brentwood Reporting Services Page 16 of 99 PageID #: 46005
www.EliteReportingServices.com

```
 1              MS. SANDERS:  How does any affair he --
 2    BY MS. COLLINS:
 3    Q.     Do you want to answer the question or not?
 4              MS. SANDERS:  I'm instructing him not to
 5    answer at all.
 6              MS. COLLINS:  So you're continuing to
 7    obstruct the deposition.
 8              MS. SANDERS:  No, I'm not.
 9              MS. COLLINS:  Yes, you are.
10              MS. SANDERS:  No, I'm not.  I'm simply
11    stating --
12              MS. COLLINS:  Yes, you are, with no
13    legal basis whatsoever.
14              MS. SANDERS:  That is a basis.  There
15    are bases to objections.  It is not relevant because
16    Ramsey -- you don't know if Ramsey knows that he's
17    having an affair or not having an affair.  You don't
18    know that.  If it's not knowledge to Ramsey, his
19    answer is not relevant and it has a high likelihood
20    of -- whatever his answer may be, it has a
21    likelihood of prejudicing him in a way that is not
22    necessary.  It's not even relevant to your case.
23    What's relevant is what Ramsey knows.
24              So you digging into his personal life is
25    not relevant in this case.  And I gave you
```

Case 3:20-cv-00628-Brown wood Reporting Services(615)595-0073 # 46016
Elite Brentwood Reporting Document 81-12 Filed 08/11/22 Page 17 of 99 PageID #: 46016
www.EliteReportingServices.com

1  parameters on which I'll allow it, but I can't allow

2  anyone at Ramsey --

3        MS. COLLINS:  Okay.  You don't set the

4  parameters for this case.  The Federal Rules of

5  Civil Procedure do.

6        MS. SANDERS:  Yes.  And there's a way

7  for you to --

8        MS. COLLINS:  And so do the Federal

9  Rules of Evidence.

10        MS. SANDERS:  And I'm following the

11  Federal Rules of Civil Procedure and the Federal

12  Rules of Evidence.  I'm providing you a valid

13  objection in discovery, which is relevancy that

14  leads to embarrassment, and I would file for a

15  motion for a protective order on this question.

16        MS. COLLINS:  Embarrassment is not a

17  basis.  Show me the rules.

18        MS. SANDERS:  Yes, it is.

19        MS. COLLINS:  Show me the rule.

20        Show me the rule.  Show me the rule.

21        MS. SANDERS:  Can we stop the deposition

22  and I'll go get the rule book right now?

23        MS. COLLINS:  Sure, show me.

24        MS. SANDERS:  And we'll go back on

25  record when I'm back.

Case 3:20-cv-00627-Dreamwood Reporting Services Page 18 of 99 PageID #: 4607
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1          THE VIDEOGRAPHER:  Going off the record

2     at 10:07 a.m.

3          (Recess observed from 10:07 a.m. to

4     10:09 a.m.)

5          THE VIDEOGRAPHER:  We are back on the

6     record at 10:09 a.m.

7          MS. SANDERS:  Thank you.  Ms. Collins, I

8     direct your attention to Federal Rule of Civil

9     Procedural Rule 26c1.  And I'll read it.  "A party

10    or any persons from whom discovery is sought may

11    move for a protective order in the court where the

12    action is pending or, as an alternative, on matters

13    relating to deposition in the court or district

14    where the deposition may be taken.  The motion must

15    include certification that the movement has, in good

16    faith, conferred or attempted to confer with other

17    affected parties in an effort to resolve the dispute

18    without court action.  The Court may, for good

19    cause, issue an order to protect a party or person

20    from annoyance, embarrassment, oppression or undue

21    burden or expense."

22          And then I can read the rest if you

23    prefer, but that's the section I'm referring to.

24          So I would move for a protective order

25    unless we're able to come up with a conclusion

Case 3:20-cv-00628 Document 60-2 Filed 08/11/22 Page 19 of 99 PageID #: 4608
Elite-Brentwood Reporting Services     (615) 595-0073
www.EliteReportingServices.com

1    today, that any of these witnesses, when you ask
2    them things that are embarrassing and that are not
3    knowledge of Ramsey, that could lead to the
4    termination of their employment, I will move for a
5    protective order for that.
6            MS. COLLINS:  Well, first off, he hasn't
7    said that Ramsey knows.
8            MS. SANDERS:  No.
9            MS. COLLINS:  Because you've instructed
10   him not to answer altogether.
11           MS. SANDERS:  Well, I instructed him not
12   to answer your question.
13           MS. COLLINS:  Secondly, if he's making
14   HRC decisions, then it is relevant.  And I think
15   that I've established that foundation.  I've set the
16   foundation.
17           Thirdly, we already apparently have a
18   protective order in his case.  You've asked for
19   basically everything under the sun to be sealed up
20   to keep it out of the public record.  So I believe I
21   can ask this question.
22           Now, if you want to preserve your
23   objection and ask the two people that you think
24   might fire him if he answers in a way that you're
25   concerned about to leave the room, then that's fine.

Case 3:20-cv-00863-Document Reporting Services Page 20 of 93 (615) 595-0073 #: 46049
Elite Brentwood Reporting Services Filed 08/11/22 Page 20 of 3 #: 4609
www.EliteReportingServices.com

1  But I feel like I'm entitled to ask the question

2  since the entire issue in the case is what -- when

3  Ramsey asks people about whether or not they've

4  engaged in premarital or extramarital sex and if

5  they terminate them.

6              MS. SANDERS:  Ms. Collins, are you

7  agreeing this portion of the deposition will be

8  under seal until the court is able to rule on this?

9              MS. COLLINS:  That's fine with me.

10             MS. SANDERS:  Okay.  That's all I'm

11 asking.

12             MS. COLLINS:  That's fine with me.

13             MS. SANDERS:  If you two will leave the

14 room, he can answer the question, and then I'll tell

15 you when it's time to come back in.  Thank you.

16             (Mr. Cortez and Mr. Lopez left the

17 room.)

18             MS. COLLINS:  Terri, can you reread the

19 question?  I know you're going to have to scroll

20 back.

21             (The requested record was read back by

22 the court reporter.)

23             THE WITNESS:  The answer is no.

24 BY MS. COLLINS:

25 Q.    Okay.

Case 3:20-cv-01023-Brentwood Reporting Services Filed 08/11/22es Page 21 of 99 PageID #: 46030
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1      MS. COLLINS:  All right.

2              MS. SANDERS:  Is that the only one?

3              MS. COLLINS:  Everybody ready?

4              MS. SANDERS:  For the record, Mr. Lopez

5  and Mr. Cortez are back in the room.

6              MS. COLLINS:  And we're not under seal

7  anymore.

8              MS. SANDERS:  That's right.

9  BY MS. COLLINS:

10  Q.     Mr. Floyd, as CFO, can you confirm that

11  Ramsey Solutions is not a 501c3 or charitable

12  organization?

13  A.     I can confirm that, yes.

14  Q.     And as the CFO, can you confirm that Ramsey

15  Solutions is not getting tax breaks for being a

16  school or educational institution?

17  A.     Correct, I can confirm.

18  Q.     Do you know if Ramsey Solutions received any

19  PPP loans?

20  A.     I know that we didn't.

21  Q.     Okay.  Did they apply for any?

22  A.     No.

23  Q.     Okay.  Have they received any state grants

24  for funds?

25  A.     Yes.

Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1    Q.    For what?

2    A.    The construction -- the buildings that we're

3    putting up in Berry Farms we applied for and

4    received grants from TVA and from the Tennessee

5    Economic Development Department for -- all related

6    to job creation.

7    Q.    Okay.  And TVA, are those federal funds?

8    A.    I don't know.

9    Q.    Okay.  Have you ever been involved in any

10   spousal interviews in the hiring process?

11   A.    Yes.

12   Q.    Okay.  A lot of them?

13   A.    Can I say too many?  No.

14   Q.    Sure, you can say whatever you want to.

15   A.    Not -- I don't know what you mean by "a lot."

16   Q.    Okay.  Well, you tell me.  Is it 10 or less

17   or more than 10 or more than 50?  Just a ballpark.

18   A.    More than 10, less than 50.

19   Q.    Okay.  Is it just for people that are being

20   hired in your department, or what is your

21   involvement?

22   A.    I would either be the leader or the next

23   level leader, and that's the spousals I've been

24   involved in.

25   Q.    Okay.  Who typically attends those spousal

Case 3:20-cv-00628 Document 51-2 Filed 08/11/22 Page 23 of 99 PageID #: 4607
Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

1  interviews?

2  A.     Candidate and spouse, immediate leader and

3  spouse, and then likely next level leader and

4  spouse.

5  Q.     Are they typically at someone's home or do

6  you all go out to eat?

7  A.     At a restaurant.

8  Q.     Oh, okay.  Do you have a favorite restaurant

9  you go to, or is it not your choice?

10  A.     We give BrickTop's a lot of business.

11  Q.     I like BrickTop's too.  Do you get the

12  vegetarian burger?  That's one of my favorites of.

13  A.     No.

14  Q.     You haven't tried that?

15  A.     No.

16  Q.     Tastes like a real burger.

17          MS. SANDERS:  You can vouch for that.

18          THE WITNESS:  My wife would like to know

19  that.

20  BY MS. COLLINS:

21  Q.     Yeah, tell her.  It's delicious.

22          In these interviews, do you-all go by any

23  sort of -- you-all have, like, goals or objectives,

24  or is it just to get to know people?

25  A.     Clarify "these interviews."

Case 3:20-cv-00628 Document Report Filed 08/11/22e Page 24 of 99 PageID #: 4608
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  Q.     Those spousal interviews where you all go out

2  to eat.

3  A.     Now that you've clarified that, ask your

4  question again, please.

5  Q.     Is it -- do you-all have any objectives or

6  goals in the spousal interviews, things you want to

7  find out about?

8  A.     Generally speaking, I'd say we want to get to

9  know the spouse and we want them to get to know us.

10 Q.     Okay.  Have you ever asked, in these

11 interviews, what religion or denomination someone

12 is?

13 A.     I -- no.  I'll clarify.  If the subject of

14 church comes up and they talk about church, I would

15 ask, just like you asked me, "Oh, so where do you go

16 to church?"

17 Q.     So you've asked that before in interviews,

18 "Where do you go to church?"

19 A.     But only after it's come up.

20 Q.     Have you ever hired anyone since you've been

21 at Ramsey Solutions that is not Christian, to your

22 knowledge?

23 A.     To my knowledge, I don't know.  Don't -- not

24 asking.

25 Q.     Okay.  Well, have you hired anyone who's

Case 3:20-cv-01035  Document 56-11  Filed 08/11/22  Page 25 of 99  PageID #: 4604
Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1    Muslim?

2    A.      I don't know.  Not to my knowledge.

3    Q.      Okay.  What about someone who's Jewish?

4    A.      I don't know.  Not to my knowledge.

5    Q.      Okay.  Do you go to the Wednesday morning

6    devotionals?

7    A.      Yes.

8    Q.      What are those typically about?

9    A.      Pardon?

10   Q.      What are those typically about?

11   A.      Depends who the speaker is.  It can be

12   very -- is it a business speaker like Patrick

13   Lencioni.  It could be on leadership.  They could

14   also be very much based on the Bible, a section in

15   the Bible.

16   Q.      About how long do they last, the devotionals?

17   A.      30 to 40 minutes generally.

18   Q.      Do most of the employees go to those?

19   A.      It appears, yes.

20   Q.      Do you-all sing during the devotionals?

21   A.      No.

22   Q.      Do you listen to any sort of praise music?

23   A.      No.

24   Q.      And you-all have bands come in on occasion to

25   the devotionals?

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    A.    Not to devotionals.  I'd say once in a --

2    "rarely" is a better answer.

3    Q.    Have you had any specific training to be on a

4    hiring team or to be part of the spousal interviews?

5    A.    Yes.

6    Q.    Tell me about the training.

7    A.    Well, which one do you want?  You asked two

8    different questions there.

9    Q.    Okay.  Well, let's break it down.

10   A.    Okay.

11   Q.    Let's start with the spousal interview.

12   A.    Yes, we -- training is probably a strong

13   word, but we -- actually, it's the right word,

14   because we have new leaders that need to know how to

15   do spousal interviews.  You don't want to make the

16   spouse uncomfortable; you want to make them super

17   comfortable.  So it's -- so I've been -- I've been a

18   part of training and I've probably done some of the

19   training myself, taking a new leader through the

20   process.

21   Q.    Okay.  What is the process?

22   A.    I think I just told you, just you're making

23   sure you don't ask the wrong questions and you --

24   and you make sure that the candidate's comfortable

25   and the spouse is comfortable.  You're just trying

1    to get to know them.

2    Q.    Do you fill out any sort of report after the

3    interview?

4    A.    Not that I'm aware of.

5    Q.    Okay.  And the hiring team, what sort of

6    training do you have for the hiring team?  Tell me

7    about that.

8    A.    Be specific.  When you say "hiring team,"

9    what do -- what do you mean?

10   Q.    Well, I asked you a moment ago if you're

11   trained to be on the hiring team or if you receive

12   any training to do the spousal interviews.  And you

13   said yes.  And then you wanted me to break it

14   down --

15   A.    Okay.

16   Q.    -- so I'm breaking it down.

17   A.    Probably using the phrase "hiring team" makes

18   it sound like there's a team running around doing

19   the hiring.  Each leader is responsible -- or you

20   know, is ultimately responsible for hiring, not a

21   team of people.  So that's -- that was my confusion

22   there.

23   Q.    Okay.

24   A.    So are people trained to be hiring people?

25   Yes.

Case 3:20-cv-00628-Elite Document Reporting Services Page 28 of 99 PageID #: 46127
Elite Reporting Services (815) 595-9073
www.EliteReportingServices.com

1    Q.      Okay.  Tell me about the training.
2    A.      We learn what questions to ask and what
3    questions not to ask, because there are places you
4    can't go and...
5    Q.      What are the places you can't go?
6    A.      The same stuff that you asked earlier about,
7    what the federal hiring practices thing -- I won't
8    say that right, but...
9    Q.      Such as?
10   A.      You can't ask about religion, race.  I don't
11   remember all the others.
12   Q.      Okay.  Anything else that you can recall?
13   A.      No.
14   Q.      Okay.  You also mentioned what questions to
15   ask.  What questions do you try to remember to ask?
16   A.      I don't know that it's specifically talking
17   about questions to ask.  It's more questions that
18   are going to open up dialogue and have conversation.
19   And, again, the basic premise is to get to know them
20   and ask them if they've got questions about us.
21   That's a question to ask is, "What do you want to
22   know about us?"
23           As a spouse, you ought to know.
24   Q.      How many people do you directly supervise?
25   A.      (Pause)

1          Four.

2     Q.    Who are they?

3     A.    Daniel Cortez, general counsel; Jeff

4     Williams, executive director of finance; Joleen

5     Wadlington, director of procurement.

6     Q.    One more.

7     A.    Yeah.  Oh, my admin assistant --

8     Q.    Okay.

9     A.    -- Shelby Davis.

10    Q.    And based on your earlier testimony --

11    A.    Oop, I've got somebody I left out.  In case

12    they read the deposition, I don't want them to feel

13    bad.  Thom Carlin, director of shipping.

14    Q.    All right.  And before that it was also the

15    HR director, right?

16    A.    Right.

17    Q.    Well, I guess before six months ago; is that

18    right?  Is that what you said is about when it

19    changed?

20    A.    Somewhere around six months ago, yeah.

21    Q.    Okay.  Have you seen a copy of Ramsey

22    Solutions' handbook or employee policies and

23    procedures?

24    A.    Yes.

25              MS. COLLINS:  Okay.  I'm going to --

1  well, I'm going to provide you a copy of that.  It's

2  been previously marked as Exhibit No. 1 in this

3  case.

4           (WHEREUPON, the above-mentioned

5  document was presented, previously marked as

6  Exhibit Number 1.)

7  BY MS. COLLINS:

8  Q.     Here you go.

9  A.     (Reviewing)

10  Q.     Is this the handbook that you've seen before?

11  A.     Yes.

12  Q.     Okay.  Now, with respect to the top section,

13  the "Equal Employment Opportunity" section, have you

14  read that before?

15  A.     I've read all this before, yes.

16  Q.     Okay.  Do you have any understanding as to

17  whether or not pregnancy is also a prohibited form

18  of discrimination?

19  A.     I am not aware that it's a protected class or

20  whatever you just -- a form of discrimination.

21  Q.     Okay.  And what about religion?  What is your

22  understanding as to religion being a protected

23  class?

24  A.     You can't discriminate based on religion.

25  Q.     Is it your understanding that that's based on

1  federal and state law?

2  A.     That is my understanding.

3  Q.     Okay.  And is it important for Ramsey

4  Solutions to be in compliance with federal and state

5  law?

6  A.     I would say it's important.

7  Q.     And it's important to not discriminate

8  against people, isn't it?

9  A.     According -- if it's in accordance with the

10  law, then, yes, we should not discriminate.

11  Q.     Now, if you could turn to page 4 for me,

12  please.  In the "Company Conduct" section on page 4

13  it says, "The image of Ramsey Solutions is held out

14  to be Christian."

15         What is your understanding of that?

16  A.     Exactly that.  I mean...

17  Q.     Well, how is that practically carried out or

18  applied?

19  A.     We operate our company based on

20  Judeo-Christian principles.

21  Q.     Okay.  What do you mean by "Judeo-Christian

22  principles"?

23  A.     Well, our mission statement is that we

24  provide biblically based education, and we use the

25  same biblically based traditions to help manage our

Case 3:20-cv-01062-Elite Reporting Services Filed 08/11/22 Page 32 of 99 PageID #: 4615
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    company.

2    Q.    And are all the employees expected to abide

3    by those biblically based traditions?

4    A.    They're expected to adhere to and live by our

5    core values.

6    Q.    And the core values are biblically based?

7    A.    I don't know that all core values are

8    biblically based.  Some are for sure.

9          Others are just good business practice.

10         MS. COLLINS:  Okay.  Well, let me ask

11   you about that.  I'm going to show you a copy of the

12   core values.  This is Exhibit No. 2 in the case.

13         (WHEREUPON, the above-mentioned

14   document was presented, previously marked as

15   Exhibit Number 2.)

16   BY MS. COLLINS:

17   Q.    Which ones would you say are biblically

18   based?

19   A.    The core value entitled "Colossians 3:23" for

20   sure.

21   Q.    That's an easy one.

22   A.    Yeah.

23   Q.    Give me a harder one.

24   A.    Righteous living.

25         And maybe, in my personal opinion, we

Case 3:20-cv-00628-Elite Document Reporting Services Page 33 of 99 PageID #: 46172
Elite Reporting Services      (315) 595-0073
www.EliteReportingServices.com

1    don't -- by the way, this is all my personal

2    opinion because we haven't had that discussion,

3    other than clearly Colossians 3:23 is, because it

4    kind of states it in its title.

5         "Fear not," that's Mark Floyd's personal

6    opinion.

7    Q.    Okay.  Anything else that seems biblically

8    based?

9    A.    Not off the top of my head.

10   Q.    What is "Shoot Sacred Cows"?  What does that

11   mean?

12   A.    Well, if you look at the byline, "We

13   challenge traditions," would probably be the best

14   place to go.  We don't just keep doing something for

15   the sake of doing something.  "That's how we've

16   always done it" is not an acceptable answer.  That's

17   not how you succeed in business.  You need to take a

18   bigger look at things all the time.

19   Q.    Okay.  By challenging traditions, is that

20   just how business is typically run?  Is that what

21   that means?

22   A.    I don't know that I understand your question.

23   Q.    Well, it says, in the "Shoot Sacred Cows, We

24   challenge traditions."  Is that just how business is

25   typically run, you know, we -- what does that mean?

1    A.      In my opinion, it would be don't get stuck in

2    a rut and keep making the same decisions because

3    that's how you've always done it.

4    Q.      Oh, okay.

5            You also mentioned righteous living and

6    "fear not" seem to be biblically based.  Let's

7    start with "fear not."  Why do you think that's

8    biblically based?

9    A.      And I said that was my opinion, so that's --

10   that's never been discussed in the company.  I've

11   never had a conversation around that.  I just know

12   that, with my faith, I -- I don't -- don't fear man.

13   I don't -- I don't fear -- I fear a higher power.

14   Q.      Okay.  When you say you don't fear man, what

15   do you mean by that?

16   A.      It's ultimately not where my -- where -- I'm

17   not worried about what man thinks, I worry about

18   what God thinks.  Again, personal opinion.

19   Q.      But you do believe in following manmade laws,

20   right?

21   A.      Yes.

22   Q.      Okay.  All right.  I've just got to be sure.

23   Just asking the question.

24           Okay.  What is righteous living?  What about

25   that is biblically based?

1    A.    Because it's based on character and integrity
2    and how you conduct yourself.  And the Bible speaks
3    to that a lot.  So that's how I would say -- that's
4    how I would tie that into a biblically based core
5    value.
6    Q.    Do you think the Bible speaks to, I guess,
7    the requirement that people should not engage in
8    premarital sex or a prohibition against premarital
9    sex?
10   A.    Ask that question again, please?
11   Q.    Yeah, it's kind of confusing to even state
12   because it's, like, a double negative.
13   A.    That's --
14   Q.    Do you think the Bible contains something, a
15   verse, a story, do you think it speaks to the, I
16   guess, the thought or the theory that someone should
17   not engage in premarital sex?
18   A.    Yes.
19   Q.    Okay.  Where?  Do you have a story that
20   you're thinking of or do you have a verse that
21   you're thinking of?  Or where in the Bible can you
22   think of that it states that?
23   A.    I'm not a Bible scholar.
24   Q.    Okay.
25   A.    Okay?

1   Q.    Sure.

2   A.    So --

3   Q.    But you go to Fellowship Bible Church, and

4   I'm sure they talk about all that stuff.

5   A.    They do.  Do I retain it is a different

6   thing.

7   Q.    I know.  I hear you.

8   A.    Just -- I don't have a specific verse or

9   story to point you towards other than you take the

10   Bible as a whole in context, and you gather from

11   that that -- of course, the word "righteous" is in

12   the Bible quite a bit, so that would be a tie to the

13   righteous living part of it.

14        And -- so, keep yourself pure, holy, all

15   those things -- I don't have a specific verse for

16   you, sorry.

17   Q.    Okay.  Was there a story about Jesus telling

18   people not to throw stones at other people?  Do you

19   know that story?

20   A.    I know -- I'm familiar with that story.

21   Q.    What is your recollection of that story?

22   A.    Don't be the -- let the first among you who

23   have not sinned cast the first stone.

24   Q.    Okay.  And that was Jesus --

25   A.    Don't ask me what book of the Bible.

Elite Reporting Services
www.EliteReportingServices.com

1    Q.    That was Jesus saying that, right?

2    A.    I believe so, yes.

3    Q.    In that story, was he talking about -- do you

4    remember who he was talking about?

5    A.    I believe it was a woman.

6    Q.    Do you remember if it was a married woman or

7    not a married woman?

8    A.    I don't recall.

9    Q.    Okay.  Well, I'm going to try not to quiz you

10   anymore on the Bible, but I'm not going to make any

11   solid promises.  Always learn a lot in depositions.

12         Do you have any understanding as to whether

13   or not Ramsey Solutions only hires Christians?

14   A.    I don't know.  We hire the best person for

15   the job, most qualified --

16   Q.    Okay.

17   A.    -- who aligns with our core values and is on

18   board with our mission.

19   Q.    Okay.  And that was the core values and

20   mission we just discussed on Exhibit 2, right?

21   A.    We discussed the core values, and the mission

22   statement is on Exhibit 2 as well, yes.

23   Q.    And do you-all provide that to prospective

24   people before you-all finalize the hiring of them?

25   A.    It is my understanding that we cover those

1    things, yes.

2    Q.    Okay.  And going back to Exhibit No. 1, we

3    were talking about the "Company Conduct" section,

4    and it says, "Should a team member engage in

5    behavior not consistent with traditional Judeo

6    values or teaching, it would damage the image and

7    the value of our good will and our brand."

8          What is your understanding as to what that

9    means?

10   A.    Specifically you're speaking of damaging the

11   image and the value?

12   Q.    Uh-huh, yes.

13   A.    So what that means?

14   Q.    Yeah.

15   A.    I believe the market views us as a -- again,

16   just like the first sentence says, a company that is

17   biblically based.  And so if we contradict that in

18   our actions or our team members do, then that would

19   damage our brand and image.

20   Q.    Okay.  What market are you referring to?

21   A.    The market that hands us dollars for our

22   products.

23   Q.    Okay.  Does part of that market include

24   public educational institutions?

25   A.    Yes.

Elite Reporting Services  (615) 595-0073<br>www.EliteReportingServices.com

1    Q.    Okay.  And by "public educational

2    institutions," is that -- you-all sell products to

3    states, right?  Is that right?

4    A.    Not to states.

5    Q.    Is it like the -- like departments of

6    education?

7    A.    Let me help you with the -- we sell it to --

8    Q.    Perfect.

9    A.    -- school systems.

10   Q.    Yes.  Specific school systems.  But do you

11   sell it by state or by county?

12   A.    County, local, not state.

13   Q.    Okay.  Do you also provide that sort of

14   educational program to higher education, like

15   colleges, junior colleges that sort of thing?

16   A.    We have a curriculum that we sell to higher

17   ed as well, yes.

18   Q.    Okay.  And that curriculum that you sell

19   to -- whether it's local school boards or higher

20   education, those educational programs are secular,

21   right?

22   A.    We sell to both secular -- the particular

23   ones you're talking about feels like secular, yes.

24   We also sell to private middle schools and high

25   schools and colleges as well.

Case 3:20-cv-01630 Elite Document Reporting Services (415) 595-9073 Filed 08/11/22 Page 40 of 99 PageID #: 46239
Elite Document Reporting Services (415) 595-9073
www.EliteReportingServices.com

1  Q.    So there's two different educational programs

2  is what you're saying, one that is more secular and

3  one that is not?

4  A.    We don't sell two different educational

5  programs.  There are two different -- I'm separating

6  those two market segments.

7  Q.    Okay.  I guess what I'm trying to understand

8  is the ones that you sell for, like, private schools

9  or home schools, those have Bible verses and things

10 in them and relate back to Bible verses and the

11 mission that it's biblically based.  And the ones

12 that you sell to public entities, they can't have

13 Bible verses in them, can they?

14           MS. SANDERS:  Object, but you can

15 answer.  Object to the form of that.

16           THE WITNESS:  Okay.  The product is

17 exactly the same.

18 BY MS. COLLINS:

19 Q.    Okay.

20 A.    It contains some Bible verses, some quotes

21 from Abraham Lincoln and Teddy Roosevelt.  It's --

22 it contains a little bit of everything.

23 Q.    Okay.  Even the ones that you sell to public

24 institutions?

25 A.    Right.

1    Q.     Have you ever heard that the company conduct

2    code is flexibly applied?

3           It's flexible?

4    A.     I've never heard that.

5    Q.     Okay.  What about the core values?  Is that

6    applied in a flexible way?

7    A.     Can you be more specific with your question?

8    Q.     Sure.  Does it depend on the people who

9    are -- seems like it could be subjectively applied.

10   Like, if you're looking at it, you might see it one

11   way; someone else is looking at it, they might see a

12   possible infraction a different way.  Is that fair?

13   A.     Well, we're all human, and we all have our

14   individual opinions that we bring in to, say, the HR

15   committee, so we're all going to view it through a

16   different lens.  And then every circumstance is

17   different.

18          So, yes, we're flexible, but we do not apply

19   it differently to different levels of people or

20   race, religion, sex within the company.  But we all

21   have different, you know, frames which we look

22   through things, right?

23   Q.     Right, right.  But the policies that we've

24   discussed, whether it's the company conduct that's

25   set forth in the policies and procedures or the core

Case 3:20-cv-06754-Document Report Filed 04/11/22es Page 42 of 99 Page ID #: 46241
Elite-Brentwood Reporting Services (415) 595-9073
www.EliteReportingServices.com

1    values, should apply across the board to every

2    single person in the company?

3    A.      They are consistently applied.

4    Q.      Okay.  And the company stance against

5    premarital sex, that's not written down anywhere, is

6    it?

7    A.      Not to my knowledge.

8    Q.      Okay.  Do you know why that is?

9    A.      No.

10   Q.      Did you know Caitlin O'Connor when she worked

11   at Ramsey Solutions?

12   A.      A face maybe, but not Caitlin on an even

13   first-name basis, no.

14           MS. COLLINS:  I'm going to jump to

15   another exhibit, a document that's been previously

16   marked as Exhibit No. 5 in this case.

17           (WHEREUPON, the above-mentioned

18   document was presented, previously marked as

19   Exhibit Number 5.)

20           MS. COLLINS:  I'm sorry.

21   BY MS. COLLINS:

22   Q.      There you go.  If you can turn to page -- it

23   starts on the second page and goes to the third page

24   on the document, page 84, 85 is the Bates number.

25   A.      Okay.

1    Q.    Do you recall receiving a copy of this email?

2    A.    Not from Caitlin, but from Armando to the

3    HRC, yes.

4    Q.    Okay.

5    A.    Because you're -- you're taking it over to 85

6    and that's just Caitlin only, so I would have been

7    forwarded the email from Armando.

8    Q.    Right.  And it looks like the -- on page 84,

9    Mr. Lopez sent it to the HR committee, Dave Ramsey

10   and Michael Finney specifically, but you're -- are

11   you included on the HR committee group emails, or

12   were you as of June 18, 2020?

13   A.    Yes, I would have been included in that,

14   whatever we call that group, address.

15   Q.    Okay.  Now, when you got a copy of this email

16   that Caitlin O'Connor had sent to Mr. Lopez, did you

17   speak with anyone about it?

18   A.    No.

19   Q.    Okay.

20   A.    You said "speak," right?

21   Q.    Uh-huh.

22   A.    Okay, no.

23   Q.    Did you speak with anyone in the following

24   days about it?

25   A.    In the -- pardon, day or days?

1  Q.    In the following days, you know, let's go up
2  to a week, that you can recall?
3  A.    I don't recall -- at some point, yes.  I
4  don't know in the next week.
5  Q.    Okay.  And on the first page, the first
6  email, that looks like it's from you.  It's at
7  5:17 p.m. on June 18, after Caitlin O'Connor had
8  sent the initial email that day at, like, 4:44.
9        You wrote back to the HR committee that it
10  was "Totally classless on her part."
11        What did you mean by that?
12  A.    By "classless" I meant the fact that she
13  resigned via email and didn't go to her leader
14  directly.  It had nothing to do with her
15  classless -- classless and pregnancy had nothing to
16  do with each other.
17  Q.    Where do you get in her email that she
18  resigned?
19  A.    I probably ought to say "notified" is
20  probably a better word than "resigned"; that she let
21  us know this rather large piece of news in an email
22  instead of sitting down with her leader.  That's not
23  what -- how we do it at Ramsey.
24  Q.    What do you base that on, that that's not how
25  you do it?

Case 3:20-cv-00628-Elite Document Reporting 08/11/22 Page 45 of 99 - Page ID #: 46244
Elite Document Reporting (615) 595-0073
www.EliteReportingServices.com

1    A.    We're a highly relational company, so we
2  expect leaders to have one-on-one conversations with
3  the team that they lead and the team itself to go to
4  the leader and have one-on-one conversations.
5    Q.    Who was her leader?
6    A.    I'm not exactly sure.
7    Q.    Okay.  Do you know if her leader was even in
8  the office that day?
9    A.    I don't know that.
10   Q.    So you think it was classless on her part to
11 have sent an email as opposed to talking with her
12 leader; is that what you're saying?
13   A.    Yes.  I'm sure her leader was in the office
14 at some time in that period.  I don't want to just
15 leave it to this day at 4:44 p.m.
16   Q.    And when you wrote, "And, yes, I agree
17 there's precedent, a/k/a principles and values for
18 how we handle this."
19        What did you mean by "principles and
20 values"?
21   A.    Our core values.
22   Q.    Which ones?
23   A.    In this case it would be the righteous
24 living.
25   Q.    Okay.  What about the righteous living?

Case 3:20-cv-01163-Brentwood Reporting Services Filed 08/11/22 Page 46 of 99 PageID #: 46345
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    A.      What about it?

2    Q.      Well --

3    A.      I don't understand your question.

4    Q.      Well, what about righteous living was

5    precedent?

6    A.      Our precedent is that we had seen the

7    situation before and we -- and I knew the end --

8    where we would end up with this.  It's consistent

9    with how we've applied righteous living core value

10   principle in the past.

11   Q.      Okay.  And when you say "this situation,"

12   what do you mean by that?

13   A.      She had premarital sex, and that violates our

14   righteous living core value.

15   Q.      And having premarital sex is -- I think we

16   already covered it's not written down anywhere,

17   right?

18   A.      Not that I'm aware of.

19   Q.      Okay.  And what is your understanding as to

20   how employees are supposed to know that engaging in

21   premarital sex will cost them their job?

22   A.      We -- they are talked -- it is discussed, if

23   they are a single team member when we're hiring

24   them, they know coming in that we expound upon what

25   righteous living means to us and needs to mean to
```

1    them.

2    Q.    If it's that important and it could cost

3    someone their job, why don't you-all write it down

4    and have them sign it, sign some sort of pledge

5    saying they won't do that or they'll be terminated?

6    A.    I don't know.

7    Q.    Okay.  So going back to the righteous living

8    clause it says that, "We believe character matters.

9    All the time."

10          And you said that's biblically based, right?

11   A.    I believe that to be the case.

12   Q.    And then an employee that engages in

13   premarital sex is, what, bad character?  Is that

14   what that means?

15   A.    I -- we haven't gone to that extent to define

16   it that -- to exactly say that's what that means,

17   bad character.  I haven't heard that phrase.  I just

18   know that we view it as and we've consistently

19   applied it as a violation of that core value.

20   Q.    And you understand that not all people

21   believe in that, right, that believe that having

22   premarital sex is bad or something that should cost

23   them their job?

24   A.    I understand that there are a lot of beliefs

25   out there, so I'm not surprised that they would

Case 3:20-cv-00628  Document 66-2  Filed 08/11/22  Page 48 of 99  PageID #: 4634
Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1   maybe believe counter to what we believe.

2   Q.     Have you ever worked for another company that

3   told its employees they cannot engage in premarital

4   sex because the company was biblically based?

5   A.     I have worked for other companies, but I --

6   and I've never had that said to me.

7   Q.     Have you ever worked for another company that

8   had a righteous living core value that was based on

9   the Bible?

10  A.     No.

11  Q.     I'm not sure the Predators didn't have

12  anything like that, did they?

13  A.     Not that I'm aware of.

14         MS. COLLINS:  Maybe I shouldn't be

15  making assumptions about hockey players.

16         Okay.  Let's go off the record and take

17  a quick break.

18         MS. SANDERS:  Sure.

19         THE VIDEOGRAPHER:  Going off the record

20  at 10:59 a.m.

21         (Recess observed from 10:59 a.m. to

22  11:12 a.m.)

23         THE VIDEOGRAPHER:  We are back on the

24  record at 11:12 a.m.

25  ///

1    BY MS. COLLINS:

2    Q.    Okay, Mr. Floyd.  We were discussing

3    Exhibit No. 5 and your response to Caitlin

4    O'Connor's email that -- requesting information

5    about FMLA and notifying the company she was

6    pregnant.  And you responded at 5:17 to Armando's

7    email where he forwarded that.

8          Would you say at that time, on June 18,

9    2020, at 5:17 p.m., that that was basically you

10   saying "Time for her to go," or you agreed with

11   letting her go?

12   A.    I would say that, unless there was something

13   that I didn't know, that we would be consistently

14   applying our decisions that we've made in other

15   instances to this instance here.

16   Q.    Okay.  And you say, "What Jen said," and Jen

17   Sievertsen says, "We've dealt with this before and I

18   think we should handle it exactly the same way."

19         What was your understanding as to what that

20   meant, handle it exactly the same way?

21   A.    Can you tell me where Jen's --

22   Q.    Oh, sure.  It's on the next page, on 84, at

23   the top of the page, is her response.

24   A.    Oh, there's Jen.  Okay.  Sorry.

25         Okay.  Can you ask your question again?

1    Sorry.  I was -- I was trying to find Jen.  I've

2    got it now, but what was your question?

3              MS. COLLINS:  What was my question,

4    Terri?

5              (The requested record was read back by

6    the court reporter.)

7              THE WITNESS:  I can't read any more into

8    it than handle it exactly the same way, and that

9    it's -- if the facts are what we think they are,

10   when we go further into it, it will lead to a

11   dismissal or termination.

12   BY MS. COLLINS:

13   Q.     Okay.

14   A.     With lots of grace and lots of generosity.

15   Q.     And you said a minute ago that you felt like

16   your comment that it was totally classless on her

17   part to not talk with her leader before she sent

18   this email; is that right?  Did I get that right?

19   A.     That the notification should not come via

20   email, it should have come via a one-on-one

21   conversation.

22   Q.     Okay.  And in Caitlin O'Connor's email,

23   she -- she states, "This is obviously uncharted

24   territory for me, so I'm not sure what my next steps

25   are regarding sharing the news with my leader,

1   getting FMLA and ADA paperwork in case it's needed

2   in the future, et cetera."

3        So could that be her just asking for advice

4   from Mr. Lopez, the HR doctor, about how to go

5   about handling that with her leader?

6   A.     You ask "could be."  Could be anything, yeah,

7   it could be.

8   Q.     Well, should employees be able to go to HR

9   and ask questions like that, like, "How I do handle

10  this?  What's the best way to handle this?"

11  A.     They should be able to go to HR and ask

12  questions, yes.

13  Q.     Okay.

14  A.     I don't believe it was just about FMLA and

15  ADA was the reason for the email in the first place.

16  It was more about the notification.

17  Q.     Notification of what?

18  A.     To say "I'm pregnant."

19       If it would have been an only FMLA and ADA

20  question, then HR would make a ton of sense.  I

21  think there was more in this than that.

22  Q.     Okay.  And so when you said it was totally

23  classless on her part, you felt like it was

24  classless of her to ask HR how to handle the

25  situation for guidance?

1    A.    No.  The "classless," again, had nothing to

2    do with -- had nothing to do with her being

3    pregnant, had nothing to do with guidance on FMLA or

4    ADA or whatever those things were or weren't.  It

5    was more about the first-time notification to our

6    organization that "I'm pregnant" was not sitting

7    down with the leader and say, "Here's what's going

8    on" because she knew that was in violation of our

9    core values.

10   Q.    But isn't she asking how to share the news

11   with her leader?

12   A.    I don't know if that's what she's asking or

13   not.

14   Q.    Okay.  Well, she specifically states that,

15   "I'm not sure what my next steps are regarding

16   sharing the news with my leader."

17         Do you think that's fair to accuse someone

18   of being classless for seeking advice from HR?

19   A.    Again, I think I've asked -- I've answered

20   the question, that "classless" has nothing to do

21   with her reaching out to HR.  My comment was because

22   she did not sit down and talk to her leader first,

23   because she knew she was in violation of our core

24   values.  That's the ultimate thing.

25   Q.    Well, she doesn't say that she knows that

Case 3:20-cv-00662-Brendamour Reporting & Video Services (515) 595-0073 Filed 08/11/22 Page 53 of 99 PageID #: 46352
Elite Brendamour Reporting & Video Services (515) 595-0073
www.EliteReportingServices.com

1    that's a violation of the core values, does she?

2    A.    She does not say.

3    Q.    Okay.

4    A.    She knows.

5    Q.    If you went and sought advice from HR, would

6    you appreciate being called classless?

7    A.    I've been called worse.

8    Q.    Yeah, me too.

9         All right.  Are employees at Ramsey

10   Solutions expected to share medical information

11   with their leaders?

12   A.    Expected to?  I don't know.  They tend to,

13   yes, because I said earlier we're highly relational

14   and our leaders care about our team and our team

15   cares about -- our leaders care about our team and

16   our teams want their leaders involved, if they do

17   want their leaders involved.  If it was highly

18   confidential and they wanted to go straight to HR,

19   they could.

20   Q.    Okay.  So in Caitlin O'Connor's email

21   where -- I mean, she writes that it's confidential

22   or sensitive information, doesn't she?  The top of

23   the email, the subject line says, "Sensitive

24   information"?

25        So if your position is that an employee can

1    go to HR to share medical information, and

2    pregnancy's a medical condition, right?

3    A.      Yes.  I think.

4    Q.      Wouldn't that --

5    A.      I'm not a doctor.

6    Q.      Wouldn't that -- wouldn't that be okay for an

7    employee to go to HR first and get advice about how

8    to share sensitive medical information?

9    A.      It would be okay, yes.

10   Q.      Okay.

11   A.      It wasn't -- she wasn't stopped, right?  She

12   did, so it would be okay.

13   Q.      So I'm still just trying to understand, if --

14   if it's okay for an employee to go to HR first to

15   ask for direction how to share sensitive medical

16   information, why would that garner being called

17   classless?

18   A.      I'll answer it again, because I believe there

19   was -- my belief is that there was more to that,

20   that she was going to HR and not to her leader

21   because she knew she'd violated our core values.

22   Q.      So whether she went to HR or her leader,

23   what's the difference between the two?  Does it

24   matter?  I mean, she's going to someone in upper

25   management.  What is the distinction between the

1   two?

2   A.    My belief, my personal belief is that you

3   should speak to your leader --

4   Q.    Okay.  Is that written --

5   A.    -- when you've violated a core value.

6   Q.    Okay.  Is that written in any policies,

7   procedures or rules of the company that you have to

8   go to your leader first?

9   A.    I don't know of anything written.

10   Q.    Okay.  Is it an unwritten rule that you have

11   to go to your leader first or is it something that

12   you know that is regularly communicated to

13   employees, that you have to go to your leader first

14   before going to HR?

15   A.    It is encouraged to speak with your leader

16   unless you have an issue with your leader themselves

17   and then you're encouraged to go find a different

18   leader or HR.  But if it is not a situation with

19   your leader, that's what we strongly encourage, is

20   you sit down with your leader.

21   Q.    Okay.  But none of that that is written down,

22   that process?

23   A.    Written, no.  Spoken about, yes.

24   Q.    Spoken about when and where?

25   A.    In one-on-one -- we have one-on-one meetings

Case 3:20-cv-00628-Brenwood Reporting - (561) 595-0073 Page 56 of 73 PageID #: 4645
Elite-Brenwood Reporting Services - (561) 595-0073
www.EliteReportingServices.com

1    every week, if you lead somebody and it's very
2    apparent that there's an open dialogue and there's
3    conversation and it's encouraged.  So it's -- I'd
4    call it a common practice.
5    Q.    And you don't see any distinction in the fact
6    an employee might be sharing confidential medical
7    information?
8    A.    I -- I see that distinction if that's what
9    it's solely about, yes, then I'm great with going to
10   HR.
11   Q.    But because this was a pregnancy that
12   involved premarital sex, you draw a different line
13   in the sand, right?
14   A.    Yes.  It was a violation of our core value.
15   Q.    But she was being honest about it, right?
16   A.    Yes.
17   Q.    That's a good thing?
18   A.    Yeah.  We'll take that.
19   Q.    To your knowledge, was this the first notice
20   of her pregnancy she had provided to the company?
21   A.    To my knowledge, yes.
22   Q.    Okay.  And is being pregnant without having a
23   husband or being married considered a violation of
24   righteous living?
25   A.    I wouldn't say the pregnant part is, but the

Case 3:20-cv-00628-Document Report 4 Filed 08/11/22 es Page 57 of 99 PageID #: 46456
Elite Brentwood Reporting Services (515) 595-0073
www.EliteReportingServices.com

1  act that got you there in the first place, which
2  would be premarital sex and sexual intercourse,
3  would be what would get you there.
4  Q.    And did you assume, based on this email on
5  June 18, that she had engaged in premarital sex?
6  A.    I did make that assumption.
7  Q.    Okay.  But she didn't say she engaged in
8  premarital sex, right?  She just said she was
9  unmarried?
10 A.    Correct.
11 Q.    Wasn't Mary, Jesus's mother, unmarried when
12 she conceived with him?
13 A.    Yes, she was.
14 Q.    It's a good thing she didn't work for Ramsey
15 Solutions, huh?
16         MS. SANDERS:  Objection.
17         THE WITNESS:  Immaculate Conception.
18 BY MS. COLLINS:
19 Q.    Well, nobody knew about that right off the
20 bat, did they?
21         MS. SANDERS:  Objection.
22         THE WITNESS:  I wasn't there.
23 BY MS. COLLINS:
24 Q.    Have you been involved in the hiring of any
25 women at Ramsey Solutions?

1   A.     Yes.

2   Q.    Okay.  I guess it goes without saying you

3   haven't hired any unmarried pregnant women, have

4   you?

5   A.     No, not that I know of.

6   Q.    Okay.  If you did interview someone and you

7   found out they were pregnant and unmarried, would

8   you refuse to hire them?

9   A.     I would, again, look at -- and say does that

10  violate our core value -- I mean, we're looking to

11  hire the person who's most qualified who fits our

12  core values and fits our mission.  If I knew that,

13  then I would be able to make the decision that's

14  probably not the best, most qualified person for the

15  position.

16  Q.    Based on the fact that they were unmarried

17  and pregnant?

18  A.    (Pause)

19        Based on the fact that they didn't align

20  with our core value.

21  Q.    And being unmarried and pregnant does not

22  align with the core values, right?

23            MS. SANDERS:  That's fine.

24            THE WITNESS:  If unmarried and pregnant

25  came about by premarital sex, then yes.

Case 3:20-cv-00629-Brentwood Report Filed 08/11/22 Page 59 of 73 PageID #: 46458
Elite Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

BY MS. COLLINS:

Q.    Would you ask that in an interview, if someone had premarital sex?

A.    No.

Q.    Well, how would you figure that out?  How would you know that?

A.    They would have had to tell me.

Q.    Volunteered, or would you ask questions to figure out?

A.    They would have to volunteer.  I can't ask that question.  They would have to volunteer.

        MS. COLLINS:  I'm going to mark this next set of documents.

        (WHEREUPON, the above-mentioned document was marked as Exhibit Number 14.)

        THE WITNESS:  Oh, I get the real sticker.

        (Reviewing)

BY MS. COLLINS:

Q.    Okay.  I've handed you a set of documents that we've marked as Exhibit No. 14.  And these are related to a former employee named ███████████.  Did you know ██████ -- is it ████████?  I'm probably mispronouncing it, if I had to guess.

A.    I don't know how you pronounce it.

Q.     Okay.  We'll call him ████.

A.     And I wouldn't say that I know him.

Q.     Okay.

A.     Yeah.

Q.     Do you recall being involved in his
termination at all?

A.     I'm looking at the date, ████, and I don't
know if I was on the HRC then or not, and so I
honestly don't remember specifically ████
████.

Q.     Okay.  All right.  Well, let me -- I think
I'm just going to pull you to the back couple of
pages.  If you could turn to page -- it will
probably help just refresh your recollection.  Turn
to page 1333.

A.     Okay.

Q.     And then start there and read to page 1331.
No, you gotta go backwards because the way emails
do.  So you start at 1333 and go to 1331.  Read that
to yourself and then when you're done I'm going to
ask you just a couple of questions, and that will
probably refresh your recollection.

A.     (Reviewing)

       MS. SANDERS:  I'm sorry, what number did
you say, Heather?

MS. COLLINS:  1333 to 1331.

                    THE WITNESS:  (Reviewing)

BY MS. COLLINS:

Q.      Okay.  You ready?

A.      Yeah, yeah.

Q.      Okay.  All right.  I'm going to start with
the email from Jack Galloway on ███████████████, at
4:13 p.m.  It starts on page 1332, it goes to 1333.

        And he sent it to the operating board.  Do
you recall if you were on the operating board at
that time?

A.      Yes, I would be.

Q.      Okay.  What is the difference between the
operating board and the HRC?

A.      HRC is -- I'll call it a committee that deals
specifically with HR-related things.  The operating
board helps run the operations of the entire
company.

Q.      Okay.  Do you know why that discussions
regarding this particular employee involved the
operating board instead of the HRC?

A.      I do not know.

Q.      Okay.  One of the things Jack Galloway says
that ██████ is very liberal -- well, he starts saying
that two people have to come to him concerned that

███████ -- I guess that's ████████ -- ███████

████████ and his fiancée are living together, and

that he had met with ██████ that day, along with

Finney and Ebert in his office.  And the short

version was that ███████ was nice, but guarded and

hesitant to say anything other than they're living

at the same address.

And then Mr. Galloway writes that, "██████ is

very liberal in his beliefs and shared with us that

his fiancée's pastor recommended that they live

together prior to marriage.  We had some short

discussion about the difference and varying

interpretations of right and wrong versus agreeing

to work here and respect our core values."

And then it looks like Mr. Finney wrote back

that it was the fiancée's pastor at a ████████

████████████.  Dave Ramsey wrote back, "Well,

that makes it okay, then.  Did you see the

sarcastic font?"

And you wrote back, and this is on

page 1331, that, "Dang, ███████████ preachers

apparently are now going to Lutheran seminary."

What did you mean by that?

A.     That's -- if you saw lots of emails, you'd

see that Mark has a tendency to be a little bit of a

funny -- what I think is funny.  Everybody else may not agree with it sometimes.  Smart aleck, so...

Q.    Okay.  So did you mean that Lutherans are more liberal than Baptist preachers, as a general rule?

A.    Since I'm the one that wrote it, then I can attest to that.  I would say yes, on the spectrum of conservative to liberal, Baptist would definitely be over on the conservative side and Lutheran on the liberal side.

Q.    Okay.  So even if someone shares with you that they have a belief they're living with their fiancée and seeking guidance from their church about it, that doesn't matter, you still think they should be terminated from Ramsey Solutions?

A.    Our core value is our company's belief, so it's not necessarily influenced by somebody else's beliefs sitting in ███████████.  We would consistently apply that, and that's what we did.

Q.    Okay.  Would you say that those core values are on the more conservative side of the spectrum, like you just described with the difference between Baptist and Lutheran?

A.    We would lean conservative.  That's how our interpretation of Judeo values would be.

Q.     Is it your interpretation that Lutherans allow people to engage in premarital sex or live together?

A.     First, it's not -- nobody from the company ever said anything about Lutheran, so this is just Mark.  And I honestly was just having fun.  I hadn't thought -- given two thoughts about what Lutherans believe and what they don't believe.  I don't know what Lutherans believe and don't believe, so...

Q.     But you do consider Lutherans a bit more liberal in their beliefs, right?

A.     Yes.

Q.     And in this instance it looks like █████ was just living with his fiancée, but I didn't read anything that said he confirmed they were engaging in premarital sex.

       Is living together also prohibited, or is it just assumed that if you're living together you must be engaging in sex, having sex?

A.     I don't read it in here either, so I don't know.

Q.     Okay.  Do you remember this guy, █████, being terminated?

A.     Not until I read my ████████ Baptist smart aleck answer.  Then that rang a bell.

1    Q.    Okay.  Now, I understand that the company --
2    the company's prohibition against premarital sex --
3    well, what do you consider the prohibition against
4    premarital or extramarital sex to be?  What's your
5    understanding of that?
6    A.    Sexual intercourse.
7    Q.    Okay.  What about oral sex?  Is that
8    prohibited?
9    A.    Sexual intercourse is where, to my knowledge,
10   and where I've drawn the line.
11   Q.    Okay.  So you would have not voted in favor
12   of impeaching Bill Clinton?
13          MS. SANDERS:  Objection to form.  I
14   don't think he had a vote on that, but he can answer
15   it.
16          THE WITNESS:  I would have wanted him
17   impeached more from a political view standpoint,
18   so --
19   BY MS. COLLINS:
20   Q.    But you agreed with Bill Clinton, though,
21   that intercourse -- that having sex is only
22   intercourse --
23          MS. SANDERS:  Objection.
24   BY MS. COLLINS:
25   Q.    Not oral sex, right?

Case 3:20-cv-00862-Brendan Reporting Filed 08/31/22 es Page(615)595-0073# 46505
Elite Document Reporting Services Page 66
www.EliteReportingServices.com

1    A.      I don't even know how to answer that.

2            MS. SANDERS:  That's fair.

3    BY MS. COLLINS:

4    Q.      Is drunkenness considered a violation of

5    righteous living?

6    A.      We haven't drawn the line at that like we

7    have the premarital sex.  It would then come down to

8    is it at work.  What's the pattern of conduct that

9    has occurred to get to the point where we're having

10   a discussion about someone's drunkenness?

11   Q.      Okay.  But Ramsey does host events at times

12   that serve alcohol, right?

13   A.      Yes.

14   Q.      With respect to your involvement in hiring

15   single employees, is the assumption made that

16   they're not engaging in premarital sex?

17   A.      Ask the question again.  Sorry.

18   Q.      Sure.  With respect to your involvement in

19   hiring single employees, is the typical assumption

20   made that they're not engaging in premarital sex?

21   A.      Yes, because we're not inquiring if they are

22   or not.

23   Q.      Okay.  Have you ever heard employees referred

24   to as "thoroughbreds" at Ramsey Solutions?

25   A.      Yes.

Case 3:20-cv-00628 Document 74-2 Filed 08/11/22 Page 67 of 99 PageID #: 4656
Elite Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    Q.      Okay.  What is the context of that?

2    A.      The context would be thoroughbreds are --

3    well, you have to take it in the context of

4    thoroughbreds versus donkeys.

5    Q.      Okay.

6    A.      Who would you want in a race?  I'd take a

7    thoroughbred every day over a donkey.  So it's not

8    like some type of thoroughbred is better than a

9    different type of thoroughbred, it's just in the

10   context of a comparison of a racehorse versus a

11   stubborn donkey.

12   Q.      Okay.  So are employees who are terminated

13   from Ramsey Solutions considered donkeys?

14   A.      I don't -- I don't think so.

15   Q.      Okay.

16   A.      Never heard it referred to that way.

17   Q.      Okay.  Have you ever heard former employees

18   referred to as donkeys?

19   A.      No.

20   Q.      Where did you hear that -- or who did you

21   hear that from, this distinction between

22   thoroughbreds and donkeys?

23   A.      I don't recall exactly who.  It's said on

24   stage occasionally when we -- we want to -- we want

25   to make sure we hire thoroughbreds and we don't hire

Case 3:20-cv-01035 Document 82-2 Filed 08/11/22 Page 68 of 73 PageID #: 4652
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    donkeys.  Again, in the context of -- not calling

2    anybody a donkey, but we want the best, the

3    brightest, the fastest, in a context.

4    Q.    And people who engage in premarital sex are

5    not considered thoroughbreds, I suppose?  Is that

6    right?

7    A.    Never had -- never drawn that correlation, so

8    I can't answer that question.

9    Q.    Well, I'm asking you to draw the correlation

10   now.

11          MS. SANDERS:  Personally?  His opinion?

12   Is that what you're asking, Heather?

13   BY MS. COLLINS:

14   Q.    I'm asking you, is someone who engages in

15   premarital sex not a thoroughbred?

16   A.    Okay.  Since we've never had that discussion

17   as a company, Mark Floyd's opinion would be I don't

18   know that -- I don't think I'd consider them a

19   thoroughbred.  Never thought of it before until you

20   posed that question right there.

21   Q.    Have you ever heard former employees referred

22   to as stupid?

23   A.    I don't recall a specific instance.

24   Q.    Do you recall any conversations where

25   employees who disagreed with the policy that

1    premarital sex was prohibited, that they were stupid

2    if they worked for that company and didn't believe

3    the same thing?  Or something to that effect?

4    A.    The "or something to that effect" is really

5    broad and vague.  Can you --

6    Q.    Sure.

7    A.    -- just narrow it down to -- tell me what

8    you're asking.

9    Q.    Have you ever heard someone at Ramsey

10   Solutions make the comment that an employee who

11   engages in premarital sex is stupid if they think

12   they should be allowed to work there and have that

13   belief?

14   A.    I -- I don't recall anybody being called

15   stupid.

16   Q.    Do you think people who have more liberal

17   views on Christianity are wrong?

18   A.    Again, my personal view, I don't know that

19   they're wrong.  It would depend.  I need better -- I

20   need more context than that.  I need to know what

21   specific things we're talking about.  We may be far

22   apart on some things and some things we may be

23   really close.  I have lots of good debates with good

24   friends all the time.

25   Q.    Do you think that people who hold more

1    liberal views about premarital sex should be

2    prohibited from working?

3    A.      Working at Ramsey?

4    Q.      I'm just talking in general right now.

5    A.      Working?  No.

6    Q.      But they should be prohibited from working at

7    Ramsey?

8    A.      Start over with the question, then.  So --

9    are you asking Ramsey?  Are you talking about

10   working in general, so --

11   Q.      I'm talking two different things.

12   A.      Okay.  Then let's start over.

13   Q.      So working in general, do you think people

14   who hold more liberal views on premarital sex should

15   be prohibited from working?

16   A.      No, it's a free country.  They should work.

17   Q.      But you do think they should be prohibited

18   from working at Ramsey?

19   A.      It is a violation of our core values, and

20   that's who we are, so they're not going to be the

21   best fit, they're not going to be in alignment with

22   our core values or on our mission.

23   Q.      Now, can a company just make up a core value,

24   even if it violates federal law?

25   A.      Not -- not to my knowledge.

1    Q.      Okay.  Have you ever thought about that,

2    whether or not Ramsey's core values could violate

3    federal law?

4    A.      Have I thought about it?

5    Q.      Uh-huh.

6    A.      I don't believe any of our core values do

7    violate, so I don't think I've put a lot of thought

8    into it.

9    Q.      Do you think that eliminating discrimination

10   in the workplace is a good thing, that it's

11   important?

12   A.      I don't believe in discrimination, so yes.

13   Q.      Should a company be allowed to impose its

14   religious beliefs on its employees?

15          MS. SANDERS:  Object to the form.

16          He can answer.

17          THE WITNESS:  I don't think you should

18   be able to impose your religious beliefs.  When

19   you're hiring -- you know what organization you're

20   stepping into, you know what -- if a core value is

21   based on a biblical view, then, again, it's the core

22   value, it's not the religious belief, it's our core

23   value.

24   BY MS. COLLINS:

25   Q.      Do you think a company shouldn't impose its

Case 3:20-cv-01062-Brennwood Reporting Services Page 72 of 73 # 46561
Elite Document Filed 08/11/22 (615)595-0073
www.EliteReportingServices.com

1    religious beliefs on its employees, even if it's

2    couched as a core value?

3            MS. SANDERS:  Object to the form.

4            You can answer it.

5            THE WITNESS:  When you object it throws

6    me.

7            MS. SANDERS:  I'm sorry.

8            THE WITNESS:  No, I understand why you

9    did it.

10           Can you ask the question again, then,

11   the exact same way.

12           MS. COLLINS:  Terri, what did I say?

13           (The requested record was read back by

14   the court reporter.)

15           THE WITNESS:  I don't think a company

16   should have -- be able to have a religious belief

17   couched in a core value that violates somebody's

18   religious beliefs.

19           MS. COLLINS:  Okay.  All right.  Let's

20   go off the record.  I just need to review my notes.

21           MS. SANDERS:  Sure.

22           THE VIDEOGRAPHER:  Going off the record

23   at 11:52 a.m.

24           Recess observed from 11:52 a.m. to

25   11:59 a.m.)

Case 3:20-cv-00628-BJD-JRK  Document 82-12  Filed 08/31/22  Page 73 of 99 PageID #: 4657
Elite Document Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1    THE VIDEOGRAPHER: We are back on the

2 record at 11:59 a.m.

3 BY MS. COLLINS:

4 Q.    Mr. Floyd, do you know who ultimately decides

5 what is or is not a core living -- or righteous

6 living violation?

7 A.    Generally speaking, it's the HR committee,

8 because that's where those violations come.

9         (Reporter asked for clarification.)

10    THE REPORTER: What was the last thing

11 you said? "That's where they come"...

12    THE WITNESS: That's where they come,

13 yeah.

14 BY MS. COLLINS:

15 Q.    Do you know who decided about that difference

16 between oral sex and intercourse being a premarital

17 sex issue? Do you know where that came from?

18 A.    I don't know the origins.

19 Q.    How long have you known about that

20 distinction?

21 A.    I'm trying to -- maybe a couple of years.

22 Q.    What was the context where that was first

23 discussed or where you first, like -- seems like a

24 bit of a nuanced issue to grapple with.

25 A.    Yeah. I'm -- I don't remember way back, so

Case 3:20-cv-00123-Document Reported Services Page 74 of 99 Page ID #: 4658
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1   I'm just going to my nearest memory.  That would

2   have been an instance where -- did they have -- I

3   mean, if it's more about the did they have sexual

4   intercourse.  It was less about oral sex, it was did

5   they have sexual intercourse.  And that's where the

6   line then was -- not the line, but that's where that

7   distinction was, like, that's where we definitely

8   draw the line.

9   Q.     Okay.  Do you recall who that was?

10  A.     I don't -- yeah, I -- I think it was in

11  the --

12          THE WITNESS:  Can I answer that?

13  BY MS. COLLINS:

14  Q.     You can -- yes, you answer it.

15          MS. SANDERS:  Yeah.

16          (The following pages, 75 through 79, are

17  for attorneys' eyes only.)

18  ///

19

20

21

22

23

24

25

(Start of confidential portion.)

BY MS. COLLINS:

Q.     You can't ask your attorney.

A.     Okay.  The most -- a time that I remember it
is in the ███████  instance.

Q.     Okay.

          MS. SANDERS:  As we've already
established, anything about ██████  will be
under seal.

BY MS. COLLINS:

Q.     Okay.  So the difference between whether oral
sex was a righteous living violation for having
premarital sex came up ██████████  when
something came up with ██████?  Is that the --

          MS. SANDERS:  Objection -- sorry.

BY MS. COLLINS:

Q.     -- best of your recollection?

          MS. SANDERS:  Object to the form.

          You can answer.

BY MS. COLLINS:

Q.     Is that the best of your recollection?

A.     That's the best of my recollection.

Q.     So is this, like, a whole discussion with the
HRC, or did you-all receive direction from someone
else as to the distinction between the two?

1    A.    That was not at HRC level.  That was at the

2    operating board level.

3    Q.    Okay.  So did the operating board have

4    discussions about the distinction between oral sex

5    and intercourse being a violation of the righteous

6    living premarital sex ban?

7    A.    We had -- the distinction was drawn in that

8    operating -- in an operating board conversation,

9    yes.

10   Q.    Okay.  Was it a discussion with the full

11   operating board at the time?

12   A.    I believe so.

13   Q.    Okay.  Do you know if any minutes were kept

14   from that meeting?

15   A.    I -- we -- we aren't -- we don't do minutes

16   because it's not a board of directors type of

17   organization, how we -- we don't keep minutes,

18   per se.

19   Q.    Okay.  Does anyone typically take notes

20   during operating board meetings?

21   A.    In our operating board meetings, when it is a

22   general business update, we have an executive

23   assistant in there taking notes.  When we go to more

24   sensitive matters, we do not have anybody in there

25   taking notes.

Q.     Who do you recall being in on that meeting?

A.     Wow.  The -- in the -- we're talking
specifically about the ██████ case, right?

Q.     Yes, uh-huh.

A.     I don't know that I can recall every name in
there, but the general nature would be the full
operating board.

Q.     Who is that?  Who do you recall?

A.     Okay.  Here we go.  Myself -- I got to go
around the room.  Sorry.  Jack Galloway, Jen
Sievertsen, Suzanne Sims, Brian Williams, Jeremy
Breland.

       Two years ago...Daniel Tardy, Luke LeFevre,
Jim King, Blake Thompson.  This is when I feel bad
when I can't remember who's on the board.  Dave
Ramsey, Daniel Ramsey, Rachel Cruze, Denise
Whittemore, Winston Cruze.  And I'm sure I've left
one person out that I can't remember.  I'd have to
look over that list.

Q.     Okay.  So the operating board, not the HRC,
dealt with the allegations that ███████████ had
engaged in premarital sex?

A.     Yes, the operating board, not HRC.

Q.     Okay.  Was that -- what you're referring to,
I'd initially started off asking you questions about

who decided this distinction between intercourse versus oral sex, and the full operating board that you just described, was that ██████████ when that discussion was had, or was that more recently when ████████ was terminated?

A.    It was --

Q.    Or both?

A.    No.  It would have been ████████ -- yeah, over ████████ ago.

Q.    Okay.  Were you involved in the more recent termination decision with respect to ████████?

A.    Yes, because I'm on the operating board --

Q.    Okay.

A.    -- still.

Q.    And why was he terminated recently?

A.    Because we recently discovered that he was having premarital sex -- no -- yeah, he's divorced. So -- I'm sorry.  I'm trying to think, was it extramarital or premarital.  But he was having sex outside of marriage.  How about that?  And when that news came to light, he was terminated.

Q.    Okay.  And how did that news come to light?

A.    Oh.  I don't know if I remember exactly how it came to light.  I know he was confronted and he admitted.

1    Q.      Who confronted him?  Do you know?

2    A.      It would have been a subset of that -- of

3    that operating board.

4    Q.      What is it?

5    A.      Well, in that case it probably would have

6    been the personnel -- Jeremy Breland probably.

7            Did I name Jeremy earlier?

8               MS. SANDERS:  Yes.

9               THE WITNESS:  He leads the personnel

10   committee, so that would be the right chain, if you

11   will.

12              (End of confidential portion.)

13   ///

14

15

16

17

18

19

20

21

22

23

24

25

1              (Continuation of regular,

2    non-confidential testimony:)

3    BY MS. COLLINS:

4    Q.    Okay.  If you ever have a righteous living

5    question, like, what all does that core value

6    encompass, who do you go to?

7    A.    I don't -- I don't go to anybody.  We let

8    those questions come in to HRC and make that

9    determination.  We don't have a list.

10   Q.    Okay.  But as a leader of a team, if you had

11   a question about whether or not something impact --

12   or involved the righteous living core value, would

13   you still take that to the whole HRC committee or

14   would you just go to someone and ask, "Hey, what do

15   you think about this?"

16   A.    If precedent has been set, there's no need to

17   ask the question or right -- right?  I mean, we've

18   had precedent set before.  But if there's a

19   question, I would take it to HRC.

20   Q.    Do you know if Ramsey Solutions has any

21   atheists or agnostics working for it?

22   A.    I have no idea.

23   Q.    Do you think that would be consistent with

24   Ramsey Solutions' core values to hire an atheist or

25   agnostic?

Case 3:20-cv-01026 Document 63-21 Filed 08/11/22 Page 9 of 13 PageID #: 4665
Elite-Brentwood Reporting Services    (615)595-0073
www.EliteReportingServices.com    81

1    A.    I have no idea.  We haven't had that brought

2    up before.

3    Q.    Sure.  I'm asking your opinion.

4          Do you think it would be consistent with the

5    core values to hire an atheist or agnostic?

6    A.    In my opinion -- I'm running through my

7    righteous -- I'm running through the core values.

8          Without more context I would say -- I would

9    want to ask questions and understand, are they in

10   alignment with our core values.  Just you saying

11   that, I don't know whether they are or not.

12   Q.    Is there any sort of set of guidelines for

13   the HRC to follow, that you-all follow, or is it

14   just based on established precedent that's

15   unwritten?

16   A.    The latter.

17   Q.    Okay.  And I think I've already asked you

18   this.  Is it your understanding that the core values

19   apply to every single employee at Ramsey Solutions?

20   A.    Core values apply to everybody, yes.

21   Q.    Okay.

22   A.    I don't know that you've asked that exactly

23   like that.

24   Q.    Okay.  Have you ever had a situation that

25   you've been involved in with the HRC where the

1    committee just disagreed about something?

2    A.     It's a committee.  So we would -- we've had

3    lots of -- we'll have spirited discussion.

4    Q.     Well, what would you do if something like

5    that happened, if you needed a tie breaker?

6    A.     If we needed a tie breaker and the -- again,

7    I can't remember exactly -- in the three to -- three

8    years plus that I've been on the HRC committee,

9    never had to have one.  If we absolutely ended up

10   deadlocked or just -- even just in violent

11   disagreement, the nature of our organization is then

12   we would take that to the operating board to say,

13   "Here's something we can't resolve at the committee

14   level, let's resolve it at the operating board

15   level."

16            MS. COLLINS:  Okay.  All right.  I think

17   that's all I have.

18            MS. SANDERS:  Nothing from us.

19            Other than, Terri, when you prepare the

20   transcripts -- we don't have to do this on the

21   record, sorry.

22            THE VIDEOGRAPHER:  The time is

23   12:14 p.m.  We are going off the record.  This will

24   conclude today's deposition.

25            THE REPORTER:  Do you want to read and

```
 1   sign?

 2              MS. SANDERS:  Yes.

 3              THE REPORTER:  And so you want copies?

 4              MS. SANDERS:  Yes.

 5              (Proceedings adjourned at 12:15 p.m.)

 6              FURTHER DEPONENT SAITH NOT.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          REPORTER'S CERTIFICATE

2               I certify that the witness in the

3     foregoing deposition, MARK FLOYD, was by me duly

4     sworn to testify in the within entitled cause; that

5     the said deposition was taken at the time and place

6     therein named; that the testimony of said witness

7     was reported by me, a Shorthand Reporter and Notary

8     Public of the State of Tennessee authorized to

9     administer oaths and affirmations, and said

10    testimony, pages 1 through 83, was thereafter

11    transcribed to typewriting.

12               I further certify that I am not of

13    counsel or attorney for either or any of the parties

14    to said deposition, nor in any way interested in the

15    outcome of the cause named in said deposition.

16               IN WITNESS WHEREOF, I have hereunto set

17    my hand on July 15, 2021.

18

19

20

          Terri Beckham, RPR, RMR, CRR, LCR No. 355
21        My commission expires:  3/6/2022

22

23

24

25

Elite-Brentwood Reporting Services      (615) 595-0073
www.EliteReportingServices.com

## E R R A T A

I, MARK FLOYD, having read the foregoing deposition, pages 1 through 83, taken June 30, 2021, do hereby certify said testimony is a true and accurate transcript, with the following corrections, if any:

| PAGE | LINE | SHOULD HAVE BEEN |
|------|------|------------------|
| 45 | 3 | "team member" replaces "team" (two instances) and delete "itself" |
| 79 | 6 | "personalities" replaces "personnel" |
| 79 | 9 | "personalities" replaces "personnel" |
| 30 | 20 | Insert "it's" before "a form of discrimination" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

MARK FLOYD

Notary Public

02/23/2025

My commission expires:

Case 3:20-cv-00628  Document 192-2  Filed 08/04/22  Page 86 of 99 PageID #: 4678

























