# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**Attorneys Eyes Only**

# JENNIFER LYNN SIEVERTSEN

# July 20, 2021

---



**Jerri L. Porter, RPR, CRR, CLR, LCR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

IN THE UNITED STATES DISTRICT COURT
FOR the MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
_____

CAITLIN O'CONNOR,

            Plaintiff,

vs.                          Case No. 3:20-cv-00628

THE LAMPO GROUP, LLC,
a/k/a RAMSEY SOLUTIONS,

            Defendant.
_____


      ***CONFIDENTIAL ATTORNEYS' EYES ONLY***
        (UNTIL FURTHER DETERMINATION)


        Videoconference Deposition of:

        JENNIFER LYNN SIEVERTSEN

        Taken on behalf of the Plaintiff
        July 20, 2021

        Commencing at 9:33 a.m. CST


_____

Elite-Brentwood Reporting Services
www.elitereportingservices.com
Jerri L. Porter, RPR, CRR, LCR
P.O. Box 292382
Nashville, Tennessee 37229
(615)595-0073

Case 3:20-cv-00628 Document 89-3 Filed 04/01/22 Page 2 of 72 PageID #: 4685
Elite-Brentwood Reporting Services (615)595-0073
www.elitereportingservices.com

```
1

2                    A P P E A R A N C E S

3

4    For the Plaintiff:

5              MS. HEATHER MOORE COLLINS
               MS. ASHLEY WALTER
6              Attorneys at Law
               Collins & Hunter
7              7000 Executive Center Drive
               Building 2, Suite 320
8              Brentwood, Tennessee 37027
               (615)724-1996
9              heather@collinshunter.com
               ashley@collinshunter.com
10

11

     For the Defendant:
12
               MS. LESLIE SANDERS
13             Attorney at Law
               Webb Sanders
14             611 Commerce Street
               Suite 3102
15             Nashville, Tennessee  37203
               (615)4915-3300
16             lsandesr@websanderslaw.com

17

18
     Also present:
19

20   DANIEL CORTEZ, Ramsey Solutions General Counsel
     ARMANDO LOPEZ, Ramsey Solutions Corporate Rep
21   ANDREW WHITTEN, Law Clerk

22

23

24

25
```

Case 3:20-cv-00613  Document 99-2  Filed 06/01/22  Page 6 of 73  PageID #: 4686
Elite Reporting Services    (615) 595-0073
www.elitereportingservices.com
2



1

2         S  T  I  P  U  L  A  T  I  O  N  S

3

4         The video deposition of JENNIFER LYNN

5    SIEVERTSEN was taken by counsel for the Plaintiff,

6    by Notice, with all participants appearing at their

7    respective locations, on July 20, 2021, for all

8    purposes under the Federal Rules of Civil

9    Procedure.

10        All formalities as to caption, notice,

11   statement of appearance, et cetera, are waived.

12   All objections, except as to the form of the

13   question, are reserved to the hearing, and that

14   said deposition may be read and used in evidence in

15   said cause of action in any trial thereon or any

16   proceeding herein.

17         It is agreed that Jerri L. Porter, RPR,

18   CRR, Notary Public and Licensed Court Reporter for

19   the State of Tennessee, may swear the witness, and

20   that the reading and signing of the completed

21   deposition by the witness is not waived.

22

23

24   / /

25   / /

1

2                        *    *    *

3              THE REPORTER:  Good morning.  My name is

4   Jerri Porter.  I am a Tennessee Licensed Reporter,

5   LCR Number 335.  Today's date is July 20, 2021, and

6   the time is approximately 9:33 a.m. Central Standard

7   Time.

8              This is the deposition of Jennifer

9   Sievertsen, in the matter of O'Connor versus Lampo

10  Group, LLC, Case Number 3:20-cv-00628, in the

11  United States District Court for the Middle District

12  of Tennessee, Nashville Division.

13             At this time, I will ask counsel to

14  identify yourselves, state whom you represent, and

15  agree on the record that there is no objection to

16  Jerri Porter administering a binding oath to the

17  witness via Zoom.

18             MS. COLLINS:  Heather Collins and Ashley

19  Walter for the plaintiff, and we also have a law

20  clerk with our firm, Andrew Whitten, with us.  And

21  we have no objection to the administration of the

22  oath via Zoom.

23             MS. SANDERS:  Leslie Sanders, attorney

24  for the defendant, and Daniel Cortez, attorney for

25  the defendant, and we have no objection to the oath

Case 3:20-cv-00628   Document 58-12   Filed 08/01/22   Page 6 of 72   PageID #: 4689   5
Elite Reporting Services * (615) 595-0073
www.elitereportingservices.com

```
 1   being administered via Zoom.

 2                     *    *    *

 3                JENNIFER LYNN SIEVERTSEN,

 4

 5   was called as a witness, and after having been duly

 6   sworn, testified as follows:

 7

 8                     EXAMINATION

 9   QUESTIONS BY MS. COLLINS:

10   Q      Good morning.  Could you state your full name

11   for the record, please.

12   A      Sure.  Jennifer Lynn Sievertsen.

13   Q      And Ms. Sievertsen, what is your address?

14   A      ███████████████████████████████████████████

15   ██████.

16   Q      What is your phone number?

17   A      █████████████████████.

18   Q      Is that a mobile phone or a landline?

19   A      That's a mobile.

20   Q      Is that a company provided cell phone?

21   A      It is.

22   Q      Okay.  Where are you currently employed?

23   A      I'm currently employed at Ramsey Solutions,

24   also known as the Lampo Group.

25   Q      Okay.  What is your job title?
```

```
1    A      Chief marketing officer.
2    Q      Okay.  How long have you held that job title?
3    A      For 11 years.
4    Q      How long have you been employed at Ramsey
5    Solutions?
6    A      It will be 12 years next month.
7    Q      What position did you start off in?
8    A      Executive director of web marketing.
9    Q      Okay.  Do you have any background in human
10   resources or discrimination law?
11   A      No.
12   Q      Okay.  What are your job duties as chief
13   marketing officer?
14   A      I lead the marketing function for the
15   company, all of the marketing, the creative team,
16   and the PR and publicity teams and our Ramsey
17   concierge team.  I also serve on our operating
18   board.
19   Q      Okay.  Are you on the human resources
20   committee?
21   A      I am.
22   Q      How long have you been on the human resources
23   committee?
24   A      Since 2012.
25   Q      Okay.  And how long have you been on the
```

Case 3:20-cv-00063-Brentwood Reporting Services Page 8 of 75 PageID #: 46917
**Elite Reporting Services**
*www.elitereportingservices.com*

1  operating board?

2  A      Since 2012.

3  Q      What is the difference between the two?

4  A      The operating board helps to set the

5  strategic direction for the company and helps to run

6  the day-to-day operations of the company.  And there

7  are several committees that are subsets of the

8  operating board, and one of them is the HR

9  committee, and that specifically focus on HR issues.

10  Q      Okay.  Who is in charge or who leads the HRC?

11  A      The HRC is chaired by Jack Galloway.

12  Q      And when I say HRC, I'm referring to the

13  human resources committee.

14  A      Yes.  That's what I assumed.

15  Q      Okay.  Now, in any of the roles that you

16  perform, either on the operating board or the HRC or

17  your role as chief marketing officer, are you

18  responsible for enforcing policy of Ramsey

19  Solutions?

20  A      Sure.

21  Q      What about setting policy?  Does fall within

22  your responsibilities?

23  A      Sometimes.  It depends on what it is.

24  Q      In all three of those roles, either your role

25  as chief marketing officer or your role on the HRC

1    or the operating board, no matter what, you have

2    knowledge of all of the Ramsey policies, right?

3    A      I have some knowledge of them, yeah, sure.

4    Q      Okay.  Who do you report to?

5    A      To the CEO, Dave Ramsey.

6    Q      Did you say -- to the CEO, who?

7    A      Dave Ramsey, the CEO.

8    Q      Okay.  There's a little bit of delay between

9    when you speak on the video and when your voice

10   comes across.

11   A      Oh, okay.

12   Q      So that's a little bit of the trouble that

13   we're experiencing.

14          Who reports to you in your role as the chief

15   marketing officer?

16   A      Okay.  Hold on.  I might have to make some

17   notes so that I -- I will try not to miss anybody.

18   Andy High reports to me, Kacy Maxwell, Katharine

19   Cook, Courtney Kaehler, Megan McConnell, Melissa

20   Wilhoite, Trey Sheneman.

21          Hold on.  I'm just trying to make sure I

22   haven't -- I think I'm missing somebody.  Jacqueline

23   Garneau.

24              MS. SANDERS:  Jerri, while she's giving

25   these, I'll provide you with spellings after the

Case 3:20-cv-00706 Document 83-12 Filed 03/11/22 Page 10 of 73 PageID #: 4693
Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

1  deposition, okay?

2          THE REPORTER:  Thank you so much.

3          THE WITNESS:  I think that's it.  I'm

4  afraid I might be missing one or two.

5  BY MS. COLLINS:

6  Q      Okay.  In total, about how many report to

7  you?

8  A      About ten.

9  Q      Okay.  Are they all in the marketing or

10 PR department?

11 A      I'm sorry.  Luke LeFevre also reports to me.

12 They're marketing, creative, PR, Ramsey concierge,

13 and -- yeah.

14 Q      Okay.  Have you ever had any training in

15 Title VII?

16 A      Generally, but not formally.  Meaning

17 generally as a leader, but not formally as an HR

18 profession.

19 Q      What is the extent of that general knowledge?

20 A      The extent of the general knowledge is that

21 you can't -- you can't discriminate against certain

22 categories of people as part of their employment or

23 hiring.

24 Q      Okay.  How often do you receive any sort of

25 training as a leader in the -- in discrimination

Case 3:20-cv-00628-Document Reporting Services Page 11 of 73 #: 46910
Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1  policies?

2  A    There's not a set time frame, but every

3  few years.

4  Q    When was the first time you received that

5  general training in your role at Ramsey?

6  A    Oh, I don't remember.  I really don't

7  remember the first time.

8  Q    Was it shortly after you started there or has

9  it been more recent than that?

10  A    There's been more recent training since that,

11  but I think you asked me the first time.

12  Q    Yes, I did.  What I'm trying to get at is,

13  did you receive the training early on or has it been

14  more recent that you received that sort of training?

15  A    Oh.  I don't remember early-on training, but

16  I can't swear that early-on training didn't happen.

17  I just don't remember.

18  Q    Okay.  About how long did the training last?

19  A    I can remember a couple of different

20  trainings over the last, I don't know, two to

21  five years, and probably -- maybe it was an hour.  I

22  don't remember exactly.

23  Q    Did you have to take any test or receive any

24  sort of documentation during the training?

25  A    I don't recall a test, no.

1    Q      What about documentation?

2    A      I don't remember.  There could have been

3    documentation.  I just don't recall.

4    Q      Okay.  Are you involved in the hiring

5    process?

6    A      For certain positions I am.

7    Q      For which positions?

8    A      Positions that report directly to me and some

9    other positions that fall within the area I lead.

10   Q      Have you been involved in any spousal

11   meetings before --

12   A      Yes.

13   Q      -- you recommended hiring?

14          Okay.  Tell me about those spousal meetings.

15   A      We typically will do a spousal interview near

16   the end of the interview process if the person is

17   married.

18   Q      Why do you do that?

19   A      So that the spouse has an opportunity to ask

20   any questions that they might have about the

21   organization or the role or their spouse's, you

22   know, potential appointment with us.

23   Q      Okay.  And if someone is not married or if

24   they have a significant other, are they invited to

25   those couple meetings?

1   A      Usually it's not a couple of meetings.

2   Typically it's only one.  If they're engaged, then,

3   yes, but if they're not engaged, then probably not.

4   I can't think of a time when there's been a

5   significant other unless they've been engaged.

6   Q      Okay.  Have you ever asked someone on a

7   pre-hiring interview if they've engaged in

8   premarital sex?

9   A      No.

10  Q      Okay.  Have you ever told anyone on a -- as

11  part of an interview in a prehiring situation that

12  the company has any sort of prohibition against

13  premarital sex?

14  A      I would talk about our core values as part of

15  the interview process, and might refer to the fact

16  that if I, as a team member here, had an affair,

17  that I wouldn't be able to stay as a team member

18  here.  And that would be part of our core values.

19  Q      Okay.  But have you specifically addressed

20  the issue of premarital sex or any prohibition

21  against sex before marriage with someone that you're

22  looking to hire?

23  A      I would talk about it in the context of our

24  righteous living core value.  I'm sure I have.  We

25  regularly talk about what it means, what righteous

Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

1  living means.

2  Q      Okay.  Now, there's no written policy that

3  prohibits premarital sex, right?

4  A      No, there's not a policy.  There's just our

5  core values.

6  Q      There's no written communication or document

7  that says an employee of Ramsey Solutions cannot

8  engage in premarital sex, is there?

9  A      There's just our core values where we talk

10  about lots of things that would violate core values,

11  including premarital sex.

12  Q      Okay.  But that -- those lots of things that

13  you just referred to, they're not written down

14  anywhere, right?

15  A      Not that I'm aware of, no.

16  Q      Okay.  Well, give me some examples of other

17  things that would violate righteous living, as you

18  understand it, based on your experience working at

19  Ramsey Solutions.

20  A      Pornography would violate righteous living,

21  having an addiction issue would violate righteous

22  living.  I'm sure there are other things.  Those are

23  the kinds of things I think of off the top of my

24  head.

25  Q      Okay.  What type of addiction are you

```
 1    referring to?

 2    A      There can be all kinds of addiction that

 3    violates righteous living.  If you've got an

 4    addiction issue that's causing you to look at porn

 5    at work, that's going to violate righteous living.

 6    Q      Any other addictions that violate righteous

 7    living?

 8    A      Sure.  Alcohol addiction or a drug addiction,

 9    those are going to be things that violate righteous

10    living.

11    Q      Okay.  Have you ever hired anyone who has

12    children out of wedlock?

13    A      I don't know.  I'm sure we have.  Actually, I

14    know we have.  I can think of somebody, yeah.  Two

15    people.

16    Q      Have you specifically recommended the hiring

17    of someone with children out of wedlock?

18    A      One of them that we hired on was on my team.

19    I wasn't the hiring leader.

20    Q      Okay.  Who was it?

21    A      Who was the person or who was the hiring

22    leader?

23    Q      Who was the person that you hired that had

24    children out of wedlock?

25    A      ███████████████████.
```

```
 1   Q        ███████  what?

 2   A        ██████.

 3   Q        Okay.  Who was the other person?  You said

 4   you could recall two people.  Who was the other one?

 5   A        █████████.

 6   Q        What department --

 7                  (Overlapping speech.)

 8   A        Just to be clear, they had children out of

 9   wedlock prior to starting here.

10   Q        Okay.

11   A        Just to clarify.

12                  MS. SANDERS:  I'm sorry, Heather.  At

13   the beginning of this, I should have designated this

14   deposition as confidential, and now, getting into

15   these matters reminds me.

16                  So just to remind the witness and the

17   court reporter, this deposition is designated

18   confidential until we've had an opportunity to

19   review and change those designations.

20                  So just so you know, Jen.

21   BY MS. COLLINS:

22   Q        Ms. Sievertsen, you mentioned that you wanted

23   to make it clear that they had these children out of

24   wedlock prior to starting.  Why is that an important

25   difference?
```

1    A       Because if they had -- if they had sex

2    outside of marriage while working here and we became

3    aware of it, they wouldn't be able to continue

4    working here.

5    Q       And why is that?

6    A       Because it violates our righteous living core

7    value.

8    Q       And has that come up since you've been

9    working there, where y'all found out that someone

10   had had sex outside of marriage?

11   A       Yes.

12   Q       Okay.  How does that typically come up?

13   A       Comes up various ways.  I can't think of a

14   typical way that it comes up.  We aren't looking for

15   it.

16   Q       Okay.

17   A       But if we find out about it, we act upon it.

18   Q       Okay.  Give me some examples, then, of how it

19   has come up.

20   A       Let's see.  It's come up because somebody has

21   chosen to move in with their boyfriend or

22   girlfriend.  It's come up because -- in Caitlin's

23   case, like she came to us and let us know that she

24   was pregnant and that she was engaged in a long-term

25   relationship with the baby's father.

1    Yeah, those are two ways I can think of that

2  has come up.

3  Q    Okay.  All right.  Let's start with the first

4  one where someone has chosen to move in with their

5  boyfriend or girlfriend and y'all found out about

6  it.  Can you recall a specific person where that's

7  come up?

8  A    I feel like it's come up once or twice, but

9  if you're asking me for the specific name of the

10 person, I couldn't tell you off the top of my head.

11 Q    Okay.  Did a third party tell you that they

12 had moved in together or did the person just come

13 and tell you?  Do you recall how that came about?

14 A    No, I don't recall.

15 Q    Okay.  And you mentioned Caitlin.  You're

16 referring to Caitlin O'Connor, right?

17 A    Yes.

18 Q    And she came and told you that she was

19 pregnant and that she was in a long-term

20 relationship with her -- with the baby's father,

21 right?

22 A    Yes.  She first told us she was pregnant.

23 Then in a meeting with us told us that she was in a

24 long-term relationship with the baby's father.

25 Q    Okay.  So her notification to the company

1    that she was pregnant is what really put y'all on

2    notice that she had engaged in premarital sex,

3    right?

4    A      On its face it seemed like it, but she

5    confirmed that in a meeting.

6    Q      Okay. Tell me about the meeting. Where was

7    it and who was present?

8    A      She met with me and Suzanne Simms, and we

9    were in Suzanne's office.

10    Q      Okay. What do you recall about that meeting?

11    A      I don't recall a lot. I don't think it was a

12    very long meeting. I remember just being concerned

13    for Caitlin and wanting to see if she was okay.

14        You know, I remember talking with her and her

15    talking about being pregnant and it had been so long

16    since she had had her other children. I remember

17    her talking about her other children that were, I

18    don't know, 18, 19, 20, at the time. And, you know,

19    just it physically being harder on her and her

20    being -- you know, feeling that.

21        I remember her talking about being in a

22    committed relationship with the baby's father, but

23    obviously, you know, saying that she wasn't married

24    to him and didn't know if they were going to get

25    married at the time.

1          Yeah.  I mean, that's really what I recall.

2     Q     Okay.  Why did you and Suzanne Simms meet

3     with her?

4     A     Just it's a pretty big deal here, and so we

5     were meeting with her to check on her, see if there

6     was anything that she wanted us to be aware of

7     related to this.  And of course it -- if it was as

8     it seemed, to be a violation of our core values, you

9     know, we were just making sure we had all of that

10    information and to see if there was anything Caitlin

11    needed, really.

12    Q     Okay.  When you say that it was a pretty big

13    deal here, what do you mean specifically, that it's

14    a pretty big deal here?  That an employee gets

15    pregnant or that an employee gets pregnant outside

16    of marriage?

17    A     No.  Our employees get pregnant all the time.

18    We have tons of team members that have babies while

19    they work here.

20          But it's a pretty big deal to violate our

21    righteous living core value.  We're very clear in

22    the hiring process about that and we're clear when

23    people work here about that.  So that's what I meant

24    by it's a pretty big deal.

25    Q     Okay.  If it's such a big deal, do y'all make

1    employees sign any sort of purity pledge if they're

2    not married or anything that's in writing that

3    notifies them that it's such a big deal to -- that

4    they can't have sex outside of marriage?

5    A      We do have an employee handbook that talks

6    about our adherence to traditional Judeo-Christian

7    values.

8    Q      Okay.  Anything else?

9    A      Not that I can think of.

10   Q      Okay.  Well, what is -- where's the

11   connection between prohibiting premarital sex in a

12   traditional Judeo-Christian value?  Where does that

13   come from in the traditional Judeo-Christian values?

14   A      From a biblical standpoint, sex outside of

15   marriage in traditional Judeo-Christian values,

16   those two things don't align.  And we're very clear

17   that we're biblically based in our values and in our

18   mission.

19   Q      Okay.  And are you referring to the Christian

20   Bible?

21   A      Yes.

22   Q      Okay.  Where in the Bible does it say that?

23   A      It says it multiple places, but I can't tell

24   you off the top of my head exactly where.

25   Q      Okay.  Is it in connection with a story in

Case 3:20-cv-00628-Redwood Reporting Services Page 22 of 73 (215) 525-9073 # 4703
Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1    the Bible?

2    A      It might be, but again, I can't tell you off

3    the top of my head.  If you're looking for books of

4    the Bible and verses, I can't tell you off the top

5    of my head where that is.

6    Q      When did you first hear that premarital sex

7    was prohibited at Ramsey Solutions because of its

8    interpretation of traditional Judeo-Christian

9    values?

10   A      I first heard about it, I'm sure, during my

11   interview process as part of talking about the core

12   values of the company.

13   Q      Do you remember who first told you about it?

14   A      No.

15   Q      All right.  So you just don't know where in

16   the Bible it comes from that this traditional

17   Judeo-Christian value prohibits premarital sex?

18   A      It's in multiple places, but if you're asking

19   me for books and verses, no, off the top of my head

20   I can't provide that to you.

21   Q      Okay.  Well, aren't there lots of things in

22   the Bible that are prohibited?

23   A      Sure.

24   Q      Okay.  Does Ramsey Solutions prohibit

25   everything that the Bible prohibits?

Elite Document Reporting Services  (615) 595-0073
www.elitereportingservices.com

1    A       No.  I think we've been pretty clear about

2    how we -- how we look at that from our values

3    standpoint.

4    Q       Well, what is that?  You said you were pretty

5    clear about how we look at that from a value

6    standpoint.  What do you mean by that?

7    A       I mean, like if you're talking about our

8    righteous living core value, we've been very clear

9    about what we believe that applies to.

10   Q       Okay.  So, what type of premarital sex is

11   prohibited based on your knowledge as a member of

12   the operating board and the HRC?

13   A       Intercourse specifically.

14   Q       What about oral sex?

15   A       No.

16   Q       Why is oral sex okay but intercourse is not?

17   A       We've just drawn the line at intercourse.

18   Q       Does the Bible draw the line between

19   intercourse and oral sex?

20   A       I don't know that it distinguishes.

21   Q       Okay.  How did that conversation come about,

22   that oral sex was okay and intercourse was not?

23   A       It's come up a couple of times in specific

24   situations.

25   Q       What specific situations?

Case 3:20-cv-00629-Elite Reporting Services 08/11/22e (615) 595-0073 47073
Case 3:20-cv-00629 Document 59-5 Filed 08/11/22 Page 24 of 73 PageID #: 47073
www.elitereportingservices.com

```
1   A      I can think of one where a team member -- two

2   team members were engaged in relationship, but we

3   drew the line that if they had not had intercourse,

4   and they had not, that they -- as long as they did

5   not continue that relationship, they were able to

6   stay.

7   Q      Okay.  Who were the team members?

8              MS. SANDERS:  That's okay, yes.  It will

9   be under seal.

10             THE WITNESS:  ██████████  and  ██████

11  ██████.

12  BY MS. COLLINS:

13  Q      Okay.  I heard ██████████.  Who was the

14  other one?

15  A      ██████████████.

16  Q      Okay.  When was this?

17  A      Oh, I don't -- it was several years back.

18  Maybe four or five years ago.  I don't remember

19  exactly when.

20  Q      Okay.  What other specific situations?  You

21  said there were a couple.

22  A      There was another situation --

23             THE WITNESS:  Can I answer this?

24             MS. SANDERS:  You can.  This is under

25  seal.  It's going to be attorneys' eyes only, so
```

```
 1   it's fine.
 2              THE WITNESS:  Okay.  There was another
 3   situation with ████████████ where he had had a
 4   non-intercourse affair that we became aware of.
 5   BY MS. COLLINS:
 6   Q      Okay.  How did you know that it was a
 7   non-intercourse affair?
 8   A      Because that's what he and his wife at the
 9   time told us.
10   Q      When you hire employees and you make it known
11   that they can't engage in premarital sex if they're
12   not married, do you also tell them that they can
13   have oral sex but they can't have intercourse?
14   A      No.
15   Q      Do you get into that level of detail?
16   A      No.
17   Q      Why not?
18   A      I don't know why not.  Never occurred to me
19   to talk about that level of detail in an interview.
20   Q      Do you communicate to the -- do you know if
21   it's communicated to the employees that the
22   violation of righteous living that encompasses
23   premarital sex only includes intercourse and not
24   oral sex?  Is that generally known or communicated
25   to the employees?
```

1    A       No.

2    Q       Why not?

3    A       I don't believe there's a reason to talk

4    about that level of detail.  The only time we've

5    ever talked about it is when we've had to react to

6    specific situations.

7    Q       But it sounds like you call the people in and

8    ask them if they've had sex, right?

9    A       If we become aware of a relationship and

10   we're trying to make a determination on whether or

11   not they can stay employed, then yes.  But do we

12   regularly call employees in and talk about it, no.

13   Q       And you don't communicate to them that oral

14   sex is okay but intercourse is not?

15   A       No.  We just try to figure out whether or not

16   they get to stay.

17   Q       And whether or not they get to stay -- if a

18   woman gets pregnant as a result of engaging in

19   premarital intercourse, then she'll get terminated

20   no matter what; is that correct?

21   A       It's not a matter of whether or not she gets

22   pregnant.  It's a matter of whether or not she

23   engaged in premarital sex.

24   Q       Right.  But if the prohibition is on

25   premarital intercourse and a woman gets pregnant,

Elite Discovery Reporting Services  (515) 525-9073
www.elitereportingservices.com

1   she would have had to have had premarital -- she

2   would have had to have had intercourse, right?

3   A       That's typically how that happens.  I suppose

4   it's not the only way, but it's the way it has

5   happened, to the best of my knowledge, here.

6   Q       Okay.  And other women have been terminated

7   for getting pregnant outside of marriage, right?

8   A       For having -- not getting pregnant outside of

9   marriage.  For having had sex outside of marriage.

10  They're not terminated because they're pregnant.

11  They're terminated because they had sex outside of

12  marriage.

13  Q       But in the instances where the women were

14  pregnant, the company found out about it because

15  they notified y'all they were pregnant, correct?

16  A       Yes.

17  Q       Does Ramsey Solutions only hire Christians?

18  A       Not that I'm aware of, no.

19  Q       Do you know if any Jewish people work there,

20  people that are of the Jewish faith?

21  A       I don't know of any.  That doesn't mean that

22  there's not any.

23  Q       Do you know if the company -- do you know of

24  any Jehovah's Witnesses that work there?

25  A       I don't know of any, but again, I'm not

1   asking people that, so I don't know.

2   Q      Do you know of any Muslims that work there?

3   A      Again, I'm not asking them that, so I don't

4   know.  We make it very clear that we are a

5   biblically based company as part of the hiring

6   process.

7   Q      What about Mormons?  Do you know of any

8   Mormons that work out there?

9   A      I don't know of any.

10  Q      When you say that you make it clear that

11  you're a biblically based company, is that to

12  discourage someone from another faith from working

13  there?

14  A      It's to make it clear that our mission

15  statement and our core values are biblically based.

16  Q      Okay.  And the company has weekly devotional

17  periods, right?

18  A      Yes.

19  Q      Are those mandatory?

20  A      Yes.

21  Q      And for those weekly devotionals, does that

22  include biblical content?

23  A      Sometimes it does.

24  Q      Have you ever known an employee to refuse to

25  attend the weekly devotionals?

```
 1    A      No.

 2    Q      Can they, to your knowledge?

 3    A      It's not -- honestly, it's never come up.

 4    Q      Is that because you only hire Christians?

 5    A      No.

 6    Q      Is there any flexibility in the application

 7   of the righteous living policy?

 8    A      I'm not sure what you mean.

 9    Q      Sure.  So, if a situation comes up and

10   there's a concern that an employee violated the

11   righteous living core value, is there a rigid

12   application of that policy, like, well, if they've

13   done this, then they're going to be terminated, or

14   do y'all look at the specific facts and

15   circumstances and then decide whether or not they

16   need to be terminated?

17    A      I'm not sure how to -- I feel like you're

18   asking me something that I'm not sure how to answer.

19           I think we always look at the specific

20   situation.  And yet, if it's a situation that we've

21   dealt with before, then we're going to handle it the

22   same way when it comes up again.  So I'm not sure

23   exactly how to answer that question.

24    Q      Okay.  When was the first time that it came

25   up that oral sex was okay but intercourse was not?
```

Elite Discovery Reporting Services (615) 595-0073
www.elitereportingservices.com

```
1   Was it with the ████████ situation or was it with
2   the ████████ situation?
3   A    I think -- I can't recall it coming up prior
4   to the ████████ situation.  I can't swear it
5   didn't come up prior to that, but I can't recall it
6   coming up prior to that.  We had had a discussion
7   prior to that about intercourse specifically, but
8   talking about oral sex, I can't recall it coming up
9   prior to that.
10  Q    Who was involved in that discussion where
11  there was kind of a carve-out for oral sex?
12  A    I don't recall.  I don't recall it as a
13  carve-out for oral sex.  I recall it as we draw the
14  line at intercourse.
15  Q    Okay.  Well, who was involved in the
16  discussions?
17  A    Around ████████ specifically, that was the
18  operating board.
19  Q    Okay.  Well, who suggested that oral sex was
20  not a violation of that core value but intercourse
21  was?
22            MS. SANDERS:  Object to the form.
23            You can answer.
24            THE WITNESS:  I don't recall who brought
25  that up.  I recall a discussion of the operating
```

```
 1   board where we reaffirmed something that I feel like
 2   has been in place for quite a while where we drew
 3   the line at intercourse.
 4            But if you're asking me who in that
 5   discussion brought up that point, I don't know.  I
 6   don't remember.
 7   BY MS. COLLINS:
 8   Q     Okay.  And the operating board meeting
 9   involving ███████████, who are you referring to
10   specifically?
11   A     I'm saying that that was the entire operating
12   board that was at the time, that whoever was part of
13   the operating board would have been part of that
14   meeting.
15   Q     Who do you recall was involved in that, on
16   the operating board at that time?
17   A     It would have been myself, Suzanne Simms,
18   Jack Galloway, Mark Floyd, Denise Whittemore, Rachel
19   Cruze, Winston Cruze, Daniel Ramsey, Dave Ramsey,
20   Jeremy Brelund, Brian Williams, Michael Finney,
21   Daniel Tardy, Brian Mayfield, Herb Jenkins.  I think
22   that's it, but I might be forgetting somebody.
23   Q     Okay.  Do you recall when this was?
24   A     It was late in ██████, ███████████ ███████
25   ██████████.  I don't remember the date.
```

1   Q       Okay.  Was anybody taking notes during this

2   operating board meeting?

3   A       I think I was, actually.

4   Q       Okay.  Were you taking them electronically or

5   handwritten?

6   A       Probably electronically.

7   Q       Do you still have those notes?

8   A       I'd have to look.  I can't tell you off the

9   top of my head.

10  Q       Have you looked for them in connection with

11  this litigation?

12  A       No.

13  Q       Did you circulate them after the meeting to

14  the operating board?

15  A       If I took notes, I probably circulated them

16  to the operating board.

17  Q       And by circulate them, would you have

18  e-mailed them to the operating board?

19  A       Yes.  Again, I can't swear I took notes

20  during that meeting, but I took notes during some of

21  those meetings around there.  And if I did, I would

22  have circulated them.

23  Q       Okay.  But sitting here today, you think you

24  did take electronic notes during that operating

25  board meeting?

1    A     I can't swear that I took my notes during

2    that operating board meeting.  I remember I took

3    notes during some of the meetings surrounding that

4    situation.  I can't tell you, sitting here right

5    now, if I took notes for that operating board

6    meeting or not.

7    Q     Okay.  Can you recall if in any of the notes

8    that you took surrounding that situation that you

9    just referred to, that you recorded that there was

10   this difference between oral sex and intercourse as

11   a prohibition under the premarital sex prohibition

12   under the righteous living core value?

13   A     Honestly, I don't recall.

14   Q     You mentioned a moment ago that the righteous

15   living core value was based on Judeo-Christian

16   values; is that right?

17   A     Yes.

18   Q     Okay.  So all employees are supposed to

19   adhere to that righteous living Judeo-Christian

20   based value, right?

21   A     Yes.

22   Q     Do you think that it's fair to punish a woman

23   for getting pregnant and not being married?

24   A     I don't feel like anybody was punished.

25   Punishment wasn't the intent.  That's implying an

Case 3:20-cv-00023-Brandwood Reporting Services (615) 595-0073 # 471 Page 34 of 72
Elite Document Filed 08/11/22 Page (6) of 72 PageID #: 473
www.elitereportingservices.com

1    intent that wasn't there.

2    Q      What do you mean by that?

3    A      Exactly what I said.  There was no intent to

4    punish.

5    Q      Do you think losing your job is not

6    punishment?  I mean, that seems like it would be

7    pretty brutal to lose your job when you're pregnant.

8    A      I think violating a value that you're aware

9    of is the reason that somebody is -- loses their

10   job.

11   Q      Okay.  My question was, do you think that

12   it's fair to terminate a -- which I said punish.

13   But do you think it's fair to terminate a woman who

14   notifies you that she's pregnant, no matter how the

15   pregnancy came about?

16   A      We don't terminate people for pregnancy when

17   they notify us of pregnancy.

18   Q      Well, you terminated Caitlin O'Connor when

19   she notified you.

20   A      Yes, because she violated a core value, but

21   not because she was pregnant.

22   Q      Okay.  But it was in the context of her

23   notifying you that she was pregnant, right?

24   A      That's true, yes.

25   Q      Okay.  And at that same time, were you aware

Case 3:20-cv-00628-Brenwood Reporting Services Filed 03/11/22e Page 35 of 73 PageID #: 47134
Elite Reporting Services (615) 595-0073
www.elitereportingservices.com

1  that she was requesting information about FMLA?

2  A      I believe in her e-mail that she said

3  something about FMLA information.

4  Q      Okay.  And do you have any knowledge as to

5  whether or not when someone requests FMLA there are

6  any obligations on the part of the employer to

7  provide them information about their rights under

8  the FMLA?

9  A      I know that we regularly grant FMLA leave,

10 and so I'm not sure how to answer that.

11 Q      In Caitlin O'Connor's case, do you know if

12 she was provided a notice of her rights under the

13 FMLA after she gave the notice to the company that

14 she was pregnant and was requesting information

15 about FMLA?

16 A      I don't know that she was -- I don't know if

17 anything was provided to her related to FMLA at that

18 time.  I don't know.  I'm not -- I'm not the HR

19 person that was asked about FMLA.

20 Q      If an employee is asked, are they required to

21 provide intimate details about their personal lives

22 to remain employed at Ramsey Solutions?

23 A      I think I need a more specific question.  I'm

24 not sure how to answer.

25 Q      Sure.  If an employee is asked if they're

Case 3:20-cv-00628 Document 88-1 Filed 08/11/22 Page 36 of 73 PageID #: 4715
Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1    engaging in premarital sex, and they just say that's

2    none of your business as my employer for you to have

3    this information --

4    A      To my knowledge --

5    Q      -- would they be terminated?

6    A      To my knowledge, that's never happened.  What

7    you just put out is not a situation that I've dealt

8    with.

9    Q      Okay.  So to your knowledge, if an employee

10   declined to provide you information about their sex

11   life if they were not married, they would remain

12   employed?

13   A      What you just described is not a situation

14   I've been a part of.

15   Q      So is it fair to say that every time it's

16   come up where an employee has potentially violated

17   the righteous living core value for engaging in

18   premarital sex, in situations that you've been

19   involved in where y'all have gone back and asked the

20   employee about it, they've just fessed up the

21   specific nature of their sex life?

22   A      They've just answered the questions.

23   Q      So y'all just assume that the employee is

24   being honest?

25   A      Yes.

1    Q      And you would agree with me that an employee

2    who is engaging in premarital sex that becomes

3    pregnant, that's much harder to lie about, right?

4    A      Yes.

5    Q      Okay.  And that's because pregnancy is a

6    visible condition, correct?

7    A      Yes.

8    Q      Do you know who established the righteous

9    living core value?

10   A      I'm sorry.  Can you repeat that?  You cut out

11   at the beginning.

12   Q      Sure.  Do you know how -- do you know who

13   established the righteous living core value, how

14   that came about?

15   A      I don't specifically know.  It was here prior

16   to -- it was in place prior to my starting with the

17   organization.

18   Q      Okay.  Do you think the prohibition against

19   premarital sex encourages gossiping in the company?

20   A      No.

21   Q      Well, how else would you find out if someone

22   was living with someone and they weren't married?

23   A      I can't recall specifically how the different

24   situations have come up.

25   Q      And gossiping is prohibited as a core value,

Case 3:20-cv-00628-Document Reporting Services Page 38 of 73 PageID #: 4721
Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1  right?

2  A      Uh-huh.  That's right.

3  Q      That's a yes?

4  A      That's right, it is prohibited.

5  Q      Is gossiping mentioned in the Bible?

6  A      Yes.

7  Q      Do you know where that's mentioned?

8  A      No.  I couldn't tell you the book and verse,

9  no.

10  Q      Getting into unmarried people's sex lives,

11  does that discourage honesty and authenticity with

12  your employees?

13  A      Not that I'm aware of, no.

14  Q      And I think we discussed a moment ago that

15  this, I guess, rule against premarital sex is not in

16  writing anywhere specifically, right?

17  A      No.

18  Q      Okay.  And would you agree that most

19  important things are reduced to writing if they're

20  really important?

21  A      Our core values are still in writing and we

22  talk about our core values regularly, so...

23  Q      But specifically premarital sex is not in

24  writing, right?

25  A      Not anyplace that I'm aware of, no.

1    Q      Okay.  Do you think that it should be in

2    writing?

3    A      I've never really given it much thought.  The

4    core values, again, are in writing, and they're

5    discussed and talked about regularly.

6    Q      Are they discussed in the weekly devotional

7    meetings?

8    A      Sometimes they're covered maybe in a

9    devotional meeting, sometimes maybe they're covered

10   in a staff meeting.

11   Q      The mandatory devotional meetings, are they

12   opened with prayer?

13   A      Sometimes.

14   Q      Are they typically closed with prayer?

15   A      Typically they're closed with prayer, but not

16   always.  But probably more often than not.

17   Q      Okay.  Are the devotional meetings recorded?

18   A      I believe they are sometimes, maybe not

19   always.  I'm not sure.

20   Q      Okay.  Are employees encouraged to record

21   them if they want to?

22   A      We -- I've -- we've never talked about it.  I

23   don't know.  No, I would say they're not encouraged,

24   but it's not talked about.  I don't know.

25   Q      Okay.  Are they discouraged from recording

1    the meetings?

2    A      I can't recall ever having a conversation or

3    anything said about employees recording or not

4    recording devotionals.

5    Q      Okay.  So was the first time that you talked

6    with Caitlin O'Connor about her pregnancy when you

7    met with her with Suzanne Simms?

8    A      Yes.

9    Q      Okay.  Did you have any other meetings with

10   her besides that one?

11   A      Not that I can recall.

12   Q      Okay.  Did you have any meetings with anyone

13   else about Caitlin O'Connor's pregnancy?

14   A      I'm sure we talked about it in HR committee,

15   but I don't recall the meeting specifically.

16   Q      And are notes taken during HRC meetings?

17   A      Typically, yes.

18   Q      Who takes the notes?

19   A      Jack Galloway.

20   Q      Okay.  Are the notes disseminated to the HRC

21   after the meeting?

22   A      Usually, yes.

23   Q      Are they disseminated by e-mail?

24   A      Yes.

25   Q      Did that happen with respect to Caitlin

Case 3:20-cv-06469 Document 66-1 Filed 08/31/22 Page 41 of 73
Elite-Brentwood Reporting Services (415) 525-9073 #: 47240
www.elitereportingservices.com

1    O'Connor?  Were there notes made about the decision

2    to terminate Caitlin O'Connor?

3    A       Probably.  I don't recall specifically.

4    Q       Did you agree with the decision to terminate

5    Caitlin O'Connor?

6    A       I did.

7    Q       And were you a part of that decision?  Were

8    you a decision-maker?

9    A       Yes, as part of the HRC, I was.

10   Q       When the decision was made to terminate

11   Caitlin O'Connor, did you know that she had other

12   children out of wedlock?

13   A       No.  I knew she had other children.  I didn't

14   know if they were out of wedlock or not.

15           MS. COLLINS:  Now, if you could pull up

16   the document that's been previously marked as, I

17   believe it's Exhibit Number 5 in the deposition.

18           (WHEREUPON, a document was presented,

19   previously marked as Exhibit Number 5.)

20           MS. SANDERS:  For the record, I just

21   handed the witness Exhibit 5.

22   BY MS. COLLINS:

23   Q       And on the -- I guess it's the -- on

24   Page 103, it's the e-mail -- starts the e-mail from

25   Caitlin O'Connor, or Eastwood it has in her

```
 1    signature line.

 2              THE WITNESS:  I don't have a 103.  I

 3    have a 104, 105, 106, and I have an 83,84, 85, 86.

 4              MS. SANDERS:  Heather, it looks like --

 5    can you pull the Exhibit 5 up in the chat?  We seem

 6    to be missing some pages.

 7    BY MS. COLLINS:

 8    Q     Okay.  Well, let's just go to Page -- it's on

 9    Page 106.  I'm just referring to the first e-mail

10    that Caitlin O'Connor sent.

11              THE WITNESS:  Okay.  I have 106.

12              MS. SANDERS:  She has that, yes.  Okay.

13              THE WITNESS:  Okay.  I've got it.

14    BY MS. COLLINS:

15    Q     It's dated ██████████.  And you received a

16    copy of this e-mail that day, on ████████, right?

17    A     Yes, I did.

18    Q     Okay.  And up above that on Page 105, it

19    looks like Armando Lopez ordered it to the HRC

20    committee and he cc'd Dave Ramsey, among others,

21    correct?

22    A     Yes, that's right.

23    Q     Okay.  And you received it as part of the

24    HRC, right?

25    A     That's correct.
```

1    Q      And it looks like you wrote back at 4:48

2    that, you said, "Did she talk to you or just e-mail

3    this on her way out the door today?  We've dealt

4    with this before and I think we should handle it

5    exactly the same way, lots of grace, lots of

6    generosity, but our core values and what they stand

7    for are clear."

8    A      Yes.

9    Q      Okay.  All right.  Now, as to the first

10   sentence, "Did she talk to you or just e-mail this

11   on her way out the door," why did you ask that?

12   A      It just felt like something that was -- that

13   was worthy of an in-person conversation and maybe a

14   follow-up with e-mail, so I was surprised it was

15   just sent via e-mail.

16   Q      Are there any rules that certain

17   conversations need to take place in person versus an

18   e-mail?

19   A      No.

20   Q      Okay.  And when you say, "We've dealt with

21   this before...," what do you mean?

22   A      I mean, we've dealt with someone having

23   premarital sex before.

24   Q      Okay.  And you say, "...I think we should

25   handle it exactly the same way."  As who?  What are

1  you specifically referring to?

2  A     Specifically as referring to somebody who's

3  had premarital sex before and ended up pregnant, we

4  want to take care of the unwed mother and the baby

5  that's on the way.  And so lots of grace, lots of

6  love, lots of generosity, but you can't continue to

7  work for us and violate our core values.

8  Q     Doesn't grace encompass forgiveness?

9  A     Sure.

10  Q     Does Ramsey Solutions consider offering grace

11  to its employees a part of its core values?

12  A     Sure.

13  Q     Was it ever discussed that it would set a

14  better example for Ramsey Solutions to extend grace

15  to a pregnant woman rather than offering her money,

16  letting her keep her job?

17  A     Yeah, I think offering a generous severance

18  with health insurance benefits is a lot of grace.

19  Q     What about letting her keep her job, wouldn't

20  that be extending grace as well?

21  A     If somebody violates our core values, they

22  don't get to continue to work here in that

23  situation.

24  Q     So y'all draw a line on what the grace is,

25  right, what grace is extended?

1          MS. SANDERS:  Object to the form.

2          You can answer.

3          THE WITNESS:  We just draw a line around

4    some conduct that violates core values.

5    BY MS. COLLINS:

6    Q     Now, in this e-mail thread, it looks like --

7    let's see.

8          Well, when you wrote the response that "We've

9    dealt with this before and I think we should handle

10   it exactly the same way," is it fair to say that the

11   decision to terminate Caitlin O'Connor had been made

12   at that time?

13   A     If it was what it seemed on its face via her

14   e-mail, then yes.  But we met with her when she

15   returned to the office and she confirmed it was what

16   it seemed on its face, which was she had engaged in

17   premarital sex.

18   Q     And on the first page, Mark Floyd wrote back

19   that it was classless on her part.  How did you

20   interpret that?

21   A     What I said earlier about not having a

22   conversation and just sending an e-mail.  It just

23   felt like it warranted a conversation.  That's how I

24   interpreted it.

25   Q     Did you think it was classless of her --

Case 3:20-cv-06328-Redwood Report Filed 08/11/22 e-Page 46 of 72 Page ID #: 47245
Elite-Brentwood Reporting Services (415) 525-9073
www.elitereportingservices.com

```
1                    (Overlapping speech.)

2    A      Do I think it was classless --

3    Q      Did you think it was classless of Caitlin

4    O'Connor?

5    A      Did I think it was classless of her?  I'm not

6    sure I thought about it one way or the other as

7    classless or not classless.  I just thought it

8    warranted a conversation.

9    Q      Okay.  Have we covered everything that went

10   on that you can recall about the meeting that you

11   had with Caitlin O'Connor and Suzanne Simms?

12   A      Yes.  That's all I can recall, what I told

13   you already.

14   Q      Okay.  Did you and Suzanne Simms have any

15   conversations after the meeting?

16   A      I'm sure we probably did, but I couldn't tell

17   you what they were sitting here right now.

18   Q      Did you take any notes?

19   A      I don't believe so.

20           MS. SANDERS:  Heather, can we take a

21   break soon?

22           MS. COLLINS:  Yeah, yeah, yeah.  We can

23   go ahead and take a break right now.  That's fine.

24           MS. SANDERS:  I don't want to interrupt

25   you.  There is a little bit of a delay and I thought
```

Case 3:20-cv-06023 Document Reporting Services Filed 08/11/22 Page 47 of 73 (415) 525-9073 # 47346
Elite Brentwood Reporting Services (415) 525-9073
www.elitereportingservices.com

1   you were pausing.  Sorry if I interrupted.

2          MS. COLLINS:  That's okay.  Let's take a

3   break.

4          MS. SANDERS:  Okay.  Thank you.

5          (Recess observed.)

6          MS. COLLINS:  Back on the record.

7   BY MS. COLLINS:

8   Q    Ms. Sievertsen, is it fair to say that you

9   don't have any formal training in human resources?

10  A    That's fair to say, yes.

11  Q    Okay.  Do you know whether or not it's

12  illegal to terminate someone when they request FMLA?

13  A    I don't believe a request for FMLA is a

14  terminable offense, generally.

15  Q    Okay.  Well, do you know whether or not it's

16  illegal to terminate someone if they notify you they

17  need FMLA?

18  A    I thought I just answered that.  To the best

19  of my knowledge, FMLA -- requesting FMLA is not

20  something you terminate somebody for.

21  Q    Okay.  And is that because it's illegal to do

22  so?

23         MS. SANDERS:  Object to the form.

24         THE WITNESS:  I don't know technically

25  if it's illegal or not.

1  BY MS. COLLINS:

2  Q     Have you ever been involved in a fashion show

3  at Ramsey where women are shown what type of summer

4  clothing or what type of clothing is appropriate in

5  the summertime?

6  A     We, as a funny way to show it, years ago, had

7  a situation where we just -- again, in kind of a

8  humorous fashion, had a pretend fashion show.

9  Q     Was it just for the women of the company?

10 A     Yes.

11 Q     Was it just to show women what type of

12 clothing was appropriate to wear in the summertime?

13 A     Yes.

14 Q     Was a similar fashion show done for the men

15 of the company?

16 A     I don't recall one being done for the men.

17         MS. COLLINS:  Okay.  If you could pull

18 up Exhibit Number 6 for me, please.

19         (WHEREUPON, a document was presented,

20 previously marked as Exhibit Number 6.)

21         MS. SANDERS:  For the record, I've

22 handed her a paper exhibit, Number 6.

23 BY MS. COLLINS:

24 Q     Now, Ms. Sievertsen, have you seen the e-mail

25 at the bottom of Page 2170, the one from Dave

1   Ramsey?

2   A      I was on that e-mail.  I'm sure I -- so I'm

3   sure I saw it.  Let me read it.

4          (Reviewing document.)  Yes.

5   Q      Okay.  And is this typical that Mr. Ramsey

6   would be involved in an administrative assistant's,

7   I guess, notification that they're pregnant at the

8   company?

9   A      No, not typically.

10  Q      Okay.  Is he on the HRC e-mails; do you know?

11  A      No, he's not.  Not on the HRC distribution.

12  Q      And Mr. Ramsey writes back in response to

13  Mr. Lopez forwarding the initial e-mail from Caitlin

14  O'Connor that she was pregnant, he writes back, "So

15  sad.  The reason she sent an e-mail is she is scared

16  and embarrassed."

17         Was there any further discussion about

18  Caitlin O'Connor being sad or embarrassed or did she

19  specifically say that she was sad or embarrassed

20  about being pregnant?

21              MS. SANDERS:  Object to the form.

22              THE WITNESS:  Can I respond?

23              MS. SANDERS:  Yes.

24              THE WITNESS:  I don't recall her saying

25  she was sad or embarrassed.

1    BY MS. COLLINS:

2    Q      Do you recall her saying she was scared or

3    embarrassed?

4    A      I don't recall her saying she was scared or

5    embarrassed.

6    Q      Okay.  And Mr. Ramsey goes on to say, "Jen or

7    Suzanne, please pick up the phone and call her

8    today."

9           Did you do that or did just Ms. Simms do

10   that?

11   A      I did not call Caitlin.

12   Q      Okay.  To your knowledge, did Suzanne Simms

13   do that?

14   A      I believe she did.

15   Q      Okay.  Do you know if she spoke to her or if

16   she just texted with her?

17   A      I don't recall.

18   Q      Okay.  And Mr. Ramsey also writes, "Tell her

19   we will work this out with her next week, but she

20   will be loved and cared for.  Then next week we will

21   follow the steps we did before."

22          What did you interpret that to mean, "Then

23   next week we will follow the steps we did before"?

24   A      What I believed was he was saying the same

25   thing I had said, we'll show her lots of grace and

1   generosity for her and the baby on the way, but that

2   she can't continue working here because she's

3   violated our core values.

4   Q      And the last sentence says, "We were thorough

5   because that is the right thing to do."

6          What did you interpret that to mean?

7   A      The "lots of grace, care for the child,

8   money, counseling, pastor support," the previous

9   sentence.

10  Q      So, is it fair to say that as of 5:10 a.m. on

11  ███████, that the decision had pretty much been

12  made that Caitlin O'Connor was going to be

13  terminated?

14  A      I think the decision was made, again, as I

15  said earlier, when she sent the e-mail, assuming

16  that it was as it appeared on its face, which she

17  confirmed when she met with us when she returned to

18  the office.

19  Q      Did you review any documents to prepare for

20  your deposition today?

21  A      I did review some documents.

22  Q      What did you review?

23          MS. SANDERS:  I object to the extent it

24  calls for any attorney/client privileged

25  information.

```
 1              You can answer that.

 2              THE WITNESS:  I don't recall everything,

 3   but it was some of the documents that were produced

 4   as part of discovery.

 5   BY MS. COLLINS:

 6   Q      And you were involved in the discussions when

 7   it came out that ████████ had had several

 8   affairs, right?

 9   A      Right.  As part of the operating board, I was

10   part of that.

11   Q      ████████████████████████

12   ████████████████████████████

13   ████████████████████████████

14   ████████████████

15   A      ████████████████████████

16   ████████

17   Q      Okay.  Well, you were involved in setting up

18   counseling sessions for ████████ and his wife,

19   ████████████, right?

20   A      I didn't personally set up any counseling

21   arrangements.  If you're asking if I was part of a

22   discussion around that, I was.  But did I personally

23   set up any of that, no, I did not personally set up

24   any of that.

25   Q      Okay.  Well, you made sure he was registered
```

████████████████████████████████████████

```
 1
 2    A       That was part of what we had decided, but I
 3    didn't personally -- again, I didn't personally set
 4    up any of those arrangements.
 5    Q       Okay.  And he was offered a restoration plan,
 6    right?
 7    A       He and his wife had agreed to -- that they
 8    were trying to walk a restoration plan for their
 9    marriage.
10    Q       Okay.  Do you know if there was any
11    discussion with Caitlin O'Connor as far as a
12    restoration plan or some way to forgive her for
13    engaging in premarital sex?
14    A       No.
15    Q       Okay.  And the -- you had mentioned earlier
16    that an addiction such as pornography are a
17    violation of righteous living, correct?
18    A       Yes.
19    Q       And you've been involved in some of those
20    situations, where it's come out that an employee has
21    been looking at pornography, right?
22    A       Yes.
23    Q       And had they been offered the opportunity to
24    get counseling or go to Celebrate Recovery to help
25    them with that pornography addiction before they're
```

1    terminated?

2    A      Yes.

3    Q      And most of the employees who -- well, all of

4    the employees who it's come to your attention have

5    pornography issues, they're all male employees,

6    right?

7    A      Yes.

8    Q      Okay.

9    A      The ones I'm aware of, yes.

10   Q      Okay.  So, the employees that you found out

11   had an issue with pornography, they were given a

12   second chance, right?

13   A      For pornography, as well as other addictions

14   we've become aware of, if somebody wants to walk a

15   recovery path and are actually able to walk that

16   recovery path, they're given that option.

17   Q      Okay.  But there's no recovery path if you

18   become pregnant, right?

19   A      Righteous living violation we've deemed as

20   different than an addiction.  A righteous living

21   premarital sex we've deemed as different than an

22   addiction recovery.

23   Q      Okay.  But the pornography, whether it's an

24   addiction or not, looking at pornography is a

25   righteous living violation, right?

1    A      Yes.

2    Q      Okay.  And that's only been -- that's only

3    come up in the context with male employees, looking

4    at pornography, correct?

5    A      To the best of my knowledge.  I can only

6    think of male employees, yes.

7    Q      Okay.  And there are second chances given to

8    those male employees if they go through recovery

9    steps, right?

10   A      For pornography, yes.

11   Q      Okay.  But there's no -- there's no recovery

12   program for a woman who notifies you that she's

13   pregnant as a result of premarital sex?

14   A      It's not an addiction issue.  We've

15   determined that premarital sex is premarital sex.

16   Q      Okay.  And as you sit here today, you can't

17   say where in the Bible addiction is covered?

18   A      No.

19   Q      And you can't say where in the Bible it

20   prohibits premarital sex, can you?

21   A      No, but I know it's in there.

22   Q      In the Old Testament or New Testament?

23   A      Probably both, but I can think more -- I can

24   think more about New Testament situations.

25   Q      Doesn't the New Testament also state that

```
1   you're not supposed to throw stones at people?

2   A      I believe there's a story about that.

3   Q      Do you recall who was the -- who the stones

4   were being thrown at?

5   A      I don't recall stones being thrown.  I

6   remember there being a reference to stones being

7   thrown.

8   Q      Do you remember the context?

9   A      Loosely, yes.

10  Q      What was it?  What do you remember?

11  A      A woman that was engaged in sexual immorality

12  being brought before the Pharisees.

13  Q      Okay.  And didn't Jesus -- wasn't Jesus

14  involved in that story?

15  A      Yes.

16  Q      Didn't he encourage the Pharisees not to

17  throw stones at the woman who was engaging in

18  premarital sex?

19  A      I believe so.

20  Q      So, is Ramsey Solutions more like the

21  Pharisees or the woman?

22  A      I never recall having had a discussion about

23  Ramsey Solutions as it relates to that story in the

24  Bible.

25              MS. COLLINS:  Okay.  All right.  Let me
```

1    take a quick break and I just need to review my

2    notes.  Off the record.

3                (Recess observed.)

4                MS. COLLINS:  Back on the record.

5    BY MS. COLLINS:

6    Q     Ms. Sievertsen, have you looked at or

7    referred to anything other than the exhibits that

8    I've discussed throughout this deposition?

9    A     Have I looked at?  Could you repeat the

10   question?  You cut out for a minute.

11   Q     Sure.  Other than the exhibits that I've

12   provided, have you looked at or referred to any

13   documentation or notes or anything throughout the

14   course of this deposition?

15               MS. SANDERS:  She means today during the

16   deposition.

17               THE WITNESS:  Oh, during the deposition.

18               I wrote down some things as you were

19   asking me questions, the board member names, the

20   direct reports, and I have some other documents that

21   were notes of mine from discussions with my

22   attorney.

23   BY MS. COLLINS:

24   Q     Okay.  So, the notes -- are the notes that

25   you have, are they in front of you?

1    A       They're beside me.

2    Q       Okay.  And have you looked at those during

3    the deposition?

4    A       I haven't -- I haven't looked at them as part

5    of my responses for the deposition, no.

6               MS. COLLINS:  Okay.  Well, I'm going to

7    mark those notes as an exhibit to the deposition.  I

8    think they would be Exhibit Number 15.

9               MS. SANDERS:  Objection to that,

10   Heather.  She didn't have them in front of her.

11   They were off to the side.  They were things she

12   looked at before her deposition began.

13              MS. COLLINS:  Well, if they're on the

14   table, then they're going to be part of the record

15   in this deposition.

16              MS. SANDERS:  We'll object to that.

17              MS. COLLINS:  So we're going to mark

18   those -- okay, that's fine, you can object.

19              We're going to mark those as Exhibit

20   Number 15, and the list that you made of the

21   operating board as well as the people that you

22   supervise, we're going to mark those as Exhibit

23   Number 16.

24   / /

25   / /

Case 3:20-cv-00629-Brendwood Reporting Services Page 59 of 72 PageID #: 47458
Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

1              (WHEREUPON, a document was marked as

2    Exhibit Number 15.)

3              (WHEREUPON, a document was marked as

4    Exhibit Number 16.)

5              MS. SANDERS:  No objection to that.

6              MS. COLLINS:  If you'll scan a copy of

7    both of those and send them to the court reporter at

8    the -- well, let's go off the record for one second.

9              (Discussion off the record.)

10   BY MS. COLLINS:

11   Q     Ms. Sievertsen, for the document that's being

12   marked as Exhibit Number 15, just make sure that the

13   entire document that are the notes that you had on

14   the table with you are scanned and produced to the

15   court reporter, okay?

16   A     I'll give them to my attorney.

17             MS. COLLINS:  Okay.  That's all I have.

18             MS. SANDERS:  Nothing further.

19             THE REPORTER:  Regular turnaround okay?

20             MS. COLLINS:  Yes, fine.

21             THE REPORTER:  Did you want the witness

22   to read and sign?

23             MS. SANDERS:  Yes, she will read and

24   sign.  And we'd like a copy.

25             FURTHER DEPONENT SAITH NOT

1               (Proceedings concluded at 11:20 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Elite-Brentwood Reporting Services    (615) 595-0073
www.elitereportingservices.com

1               E R R A T A   P A G E

2  I, JENNIFER LYNN SIEVERTSEN, having read the
   foregoing deposition, Pages 1 through 59, do hereby
3  certify said testimony is a true and accurate
   transcript, with the following changes (if any):

4

5  **PAGE**  **LINE**       **SHOULD HAVE BEEN**

6  9    20      Chris Dean and Amy Warren should be added

7  10    18      "profession" should be "professional"

8  23    17      Should be "We've just drawn the line for

9               termination at intercourse."

10  31    20     "Jeremy Brelund" should be "Jeremy Breland"

11  31    21     Luke Lefevre should be added

20        JENNIFER LYNN SIEVERTSEN

23  Notary Public: _____

24  My Commission Expires: February 24, 2024

25  Reported by: Jerri L. Porter, RPR, CRR, LCR

Case 3:20-cv-00628 Document 99-3 Filed 08/31/22 Page 62 of 72 PageID #: 4745

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF Davidson

         I, Jerri L. Porter, RPR, CRR, Licensed

Court Reporter, with offices in Nashville,

Tennessee, hereby certify that I reported the

foregoing deposition of JENNIFER LYNN SIEVERTSEN by

machine shorthand to the best of my skills and

abilities, and thereafter the same was reduced to

typewritten form by me.  I am not related to any of

the parties named herein, nor their counsel, and

have no interest, financial or otherwise, in the

outcome of the proceedings.

         I further certify that in order for this
document to be considered a true and correct copy,
it must bear my original signature, and that any
unauthorized reproduction in whole or in part
and/or transfer of this document is not authorized,
will not be considered authentic, and will be in
violation of Tennessee Code Annotated 39-14-104,
Theft of Services.

_____
Jerri L. Porter, RPR, CRR, LCR
Elite-Brentwood Reporting Services
Notary Public State of Tennessee

My Notary Public Commission Expires: 2/6/2022
LCR 335 - Expires: 6/30/2022

Case 3:20-cv-00451-CEA-DCP Document 181-3 Filed 08/11/22 Page 64 of 73 PageID #: 47462
Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com