# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**Attorneys Eyes Only**

# JACKSON GALLOWAY

# August 06, 2021

---



Jerri L. Porter, RPR, CRR, CLR, LCR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

IN THE UNITED STATES DISTRICT COURT
FOR the MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
_____

CAITLIN O'CONNOR,

Plaintiff,

vs.                          Case No. 3:20-cv-00628

THE LAMPO GROUP, LLC,
a/k/a RAMSEY SOLUTIONS,

Defendant.
_____


***CONFIDENTIAL***
***ATTORNEYS' EYES ONLY***
(UNTIL FURTHER DETERMINATION)


Videoconference Deposition of:

JACKSON GALLOWAY, JR.

Taken on behalf of the Plaintiff
August 6, 2021

Commencing at 9:28 a.m. CST


_____

Elite-Brentwood Reporting Services
www.elitereportingservices.com
Jerri L. Porter, RPR, CRR, LCR
P.O. Box 292382
Nashville, Tennessee 37229
(615)595-0073

Case 3:20-cv-00628 Document 86-11 Filed 09/01/22 Page 2 of 61 PageID #: 4757
Elite-Brentwood Reporting Services (615)595-0073
www.elitereportingservices.com

1

2                    A P P E A R A N C E S

3

4    For the Plaintiff:

5              MS. HEATHER MOORE COLLINS
               Attorney at Law
6              Collins & Hunter
               7000 Executive Center Drive
7              Building 2, Suite 320
               Brentwood, Tennessee 37027
8              (615)724-1996
               heather@collinshunter.com
9

10
     For the Defendant:
11
               MS. LESLIE SANDERS
12             Attorney at Law
               Webb Sanders
13             611 Commerce Street
               Suite 3102
14             Nashville, Tennessee  37203
               (615)4915-3300
15             lsanders@webbsanderslaw.com

16

17
     Also present:
18

19   DANIEL CORTEZ, Ramsey Solutions General Counsel
     ARMANDO LOPEZ, Ramsey Solutions Corporate Rep
20

21

22

23

24

25

2

1

2              S  T  I  P  U  L  A  T  I  O  N  S

3

4              The video deposition of JACKSON GALLOWAY,

5    JR. was taken by counsel for the Plaintiff, by

6    Notice, with all participants appearing at their

7    respective locations, on August 6, 2021, for all

8    purposes under the Federal Rules of Civil

9    Procedure.

10        All formalities as to caption, notice,

11   statement of appearance, et cetera, are waived.

12   All objections, except as to the form of the

13   question, are reserved to the hearing, and that

14   said deposition may be read and used in evidence in

15   said cause of action in any trial thereon or any

16   proceeding herein.

17              It is agreed that Jerri L. Porter, RPR,

18   CRR, Notary Public and Licensed Court Reporter for

19   the State of Tennessee, may swear the witness, and

20   that the reading and signing of the completed

21   deposition by the witness is not waived.

22

23

24   / /

25   / /

Case 3:20-cv-00863-Brentwood Reporting Services Page 5 of 61 PageID #: 4760 4
Elite Reporting Services
www.elitereportingservices.com

1

2                        *    *    *

3

4              THE REPORTER:  Good morning.  My name is

5    Jerri Porter.  I am a Tennessee Licensed Reporter,

6    LCR Number 335.  Today's date is August 6, 2021, and

7    the time is approximately 9:28 a.m. Central Standard

8    Time.

9              This is the deposition of Jack Galloway

10   in the matter of O'Connor versus The Lampo Group,

11   LLC, also known as Ramsey Solutions, Case Number

12   3:20-cv-00628 in the United States District Court

13   for the Middle District of Tennessee, Nashville

14   Division.

15             At this time, I will ask counsel to

16   identify yourselves, state whom you represent, and

17   agree on the record that there is no objection to

18   Jerri Porter administering a binding oath to the

19   witness via Zoom.

20             MS. COLLINS:  Heather Collins for the

21   plaintiff, no objection to the administration of the

22   oath via Zoom.

23             MS. SANDERS:  This is Leslie Sanders for

24   defendants.  With me is Jack Galloway, also Daniel

25   Cortez and Armando Lopez.  We are all in the same

Case 3:20-cv-00628   Document 61-1   Filed 08/01/22   Page 6 of 61 PageID #: 4761
Elite Reporting Services      (615) 595-0073
www.elitereportingservices.com
5

```
 1    room.  And there is no objection to you
 2    administering the oath via Zoom.  Thank you.
 3                        *    *    *
 4
 5                  JACKSON GALLOWAY, JR,
 6    was called as a witness, and after having been duly
 7    sworn, testified as follows:
 8
 9                       EXAMINATION
10    QUESTIONS BY MS. COLLINS:
11    Q       Good morning.  Could you state your full name
12    for the record, please.
13    A       Jackson Galloway, Jr.
14    Q       And what is your address?
15    A       ████████████████████████████████████
16    ██████████████████████
17    Q       And where are you currently employed?
18    A       Ramsey Solutions.
19    Q       How long have you been there?
20    A       Twenty-one years.
21    Q       What is your current job title?
22    A       Chief people officer.
23    Q       How long have you held that role?
24    A       Approximately four and a half months.
25    Q       All right.  What does the chief people
```

```
1   officer do?
2   A      I am the board member responsible for human
3   resources.
4   Q      Is that a new role?
5   A      Yes, it is.
6   Q      Okay.  Why was that role created or what's
7   your understanding as to why that role was created?
8   A      This role was created because our company is
9   intending to scale from approximately a thousand
10  people to approximately 3,000 people over the next
11  few years, and we wanted to be more prepared in our
12  human resources area to meet our company as we
13  scale.
14  Q      Okay.  Do you have a human resources
15  background?
16  A      No, I do not.
17  Q      Okay.  What position did you hold before
18  chief people officer?
19  A      I was the senior executive vice president of
20  business to business.
21  Q      How long did you hold that role?
22  A      I was in that role -- I was in -- I was in
23  the same role that changed titles, if you will, over
24  a long period of time.  That role was created
25  approximately four to five years ago.  Prior to that
```

Case 3:20-cv-00623 Document... Filed 06/01/22 Page 8 of 61 PageID #: 47637
Elite Reporting Services
www.elitereportingservices.com

1  my title was executive vice president of business to

2  business.  Prior to 2012, my title was vice

3  president of endorsed local providers.

4  Q      Okay.  Are you on the board of directors?

5  A      I am on our operating board.

6  Q      Okay.  How long have you been on the

7  operating board?

8  A      Since 2012.

9  Q      Are you a member of the human resources

10 committee, the HRC?

11 A      Yes, I am.

12 Q      Were you a member of the HRC in -- well, how

13 long have you been on the HRC?

14 A      Since 2012.

15 Q      Okay.  Are you familiar with Ramsey's

16 policies?

17 A      Yes, I am.

18 Q      Okay.  Now, when you were the vice president

19 of business to business, who did you report to?

20 A      I was the executive vice president of

21 business to business and I reported to our operating

22 board.

23 Q      Okay.  When you were senior or executive vice

24 president of business to business, did anyone report

25 to you directly?

1    A       Yes.

2    Q       Who?

3    A       I had -- would you like names and positions?

4    Q       Well, let's just break it down a little bit.

5    How many people reported to you, approximately?  It

6    doesn't have to be exact.

7    A       Okay.  I probably had, though it varied at

8    different times, five direct reports who were

9    responsible for a total of a few hundred people.

10   Q       Okay.  Who were your primary direct reports?

11   Who were those five people?

12   A       Walt Yates.  We shared -- I was not his

13   primary leader, but he did also report to me.  Jim

14   Ebert, same situation, more than one leader, but he

15   did report to me.  Brian Hamilton reported directly

16   to me.  Jim King reported directly to me.  Daniel

17   Tardy reported directly to me.  And the last area

18   changed over time, but who are still employed here,

19   Jason Blake reported to me and Darrell Moore

20   reported to me.

21   Q       Okay.  All right.  And a moment ago you

22   mentioned that you're familiar with Ramsey policies.

23   And are you familiar with how they're to be

24   enforced?

25   A       Yes.

Case 3:20-cv-00628-Document Report Filed 03/11/22es Page(815)f595-9073 # 47659
Elite Brentwood Reporting Services (615) 595-0073 #: 47659
www.elitereportingservices.com

1    Q        Okay.  And have you played a role in the
2    enforcement of Ramsey's policies?
3    A        Yes.
4    Q        Do you have any authority to hire or fire
5    employees?
6    A        I share authority to hire or fire.  I do make
7    some final hiring decisions.  We rarely make single
8    termination decisions without consulting other board
9    members or our human resources committee.  But I do
10   have that authority.
11   Q        Okay.  Have you had any specific training in
12   Title VII or anything like that?  Title VII of the
13   Tennessee Human Rights Act.
14   A        Not formal training.
15   Q        Okay.  What sort of informal training have
16   you had in it?
17   A        Armando Lopez reports to me and he has had
18   formal training in that, and I lean on him, as well
19   as Daniel Cortez for anything that might involve
20   Title VII or other legalities.
21   Q        Okay.  Was that the case in 2020?
22   A        In -- yes.  Can you be more specific as to
23   what part of 2020?  My role changed -- I guess my
24   role actually changed in March of this year.  So in
25   2020 I was still the senior executive vice president

Case 3:20-cv-00028-Document Reporting Services Page 11 of 73 PageID #: 4760
Elite Reporting Services  (615) 595-0073
www.elitereportingservices.com

1  and not in human resources.

2  Q      Okay.  So before this year when you got --

3  when you changed to the chief people officer role,

4  you had not had that informal interaction with

5  Armando or Daniel Cortez about Title VII or THRA,

6  right?

7  A      I would say I have had some informal

8  conversation with them about that as it related to

9  business contracts or human resources committee.

10 Q      Okay.  So, is it fair to say in 2020 you

11 didn't really have any specific knowledge as to

12 whether a particular employment action would have

13 potentially violated Title VII or the Tennessee

14 Human Rights Act?

15 A      I was on the human resources committee, HRC,

16 at that time, so I would not agree with that

17 statement.

18 Q      Okay.  What about that statement do you not

19 agree with?

20 A      The HRC does -- would you mind repeating the

21 original question?

22            MS. COLLINS:  Sure.

23            Jerri, can you repeat the original

24 question.  I never can remember what it is.

25 / /

1           (The requested testimony was read back

2    by the court reporter as follows:

3           "Question:  So, is it fair to say in

4    2020 you didn't really have any specific knowledge

5    as to whether a particular employment action would

6    have potentially violated Title VII or the Tennessee

7    Human Rights Act?

8           "Answer:  I was on the human resources

9    committee, HRC, at that time, so I would not agree

10   with that statement.

11          "Question:  Okay.  What about that

12   statement do you not agree with?")

13          THE WITNESS:  I was familiar with

14   employment decisions at that time.

15   BY MS. COLLINS:

16   Q     Okay.  You were familiar with employment

17   decisions, but were you familiar with the various

18   ins and outs of Title VII or the Tennessee Human

19   Rights Act?

20   A     I was familiar with it in a layman's

21   position, familiar with its purpose and what it's

22   for, but for anything more technical, I would have

23   consulted Armando Lopez or Daniel Cortez.

24   Q     Now, what is your understanding as to the

25   basis of the righteous living core value?

1    A      The basis of it was that it was a cultural

2    value when our company began that we would have a

3    workplace free from -- free from people having sex

4    with people that they're not married, free from

5    gossip, free from dishonesty.  The value itself was

6    there in the beginning, and we gave language to it

7    later.

8    Q      Okay.  Where did that value come from?

9    A      It was a part of our culture from the

10   beginning of our company's existence, that we all as

11   employees adopted and fostered.  That was before

12   there was a board.  And later our board took those

13   values that we were already fostering in our company

14   and tried to give language to them so that we could

15   better communicate them.

16   Q      Okay.  And when you say that you gave

17   language to them to better communicate them, are you

18   just referring to the written out statement of core

19   values?

20   A      Yes.

21   Q      Okay.  And a moment ago you referred to we,

22   when we first started we had these cultural values.

23   Who is the "we" that you're referring to?

24   A      In the early days, it would have been our

25   small group of employees.  Once our board was

Case 3:20-cv-00628 Document Report Filed 08/11/22 Page 14 of 61 PageID #: 4763
Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1  formed, it would have been our operating board.

2  Q      So did the operating board come up with the

3  core values like when it was written out?

4  A      The operating board took core values that we

5  were already practicing and gave some language to

6  them.  When I say gave language, I mean wordsmithed

7  them down so that they were things that we could

8  communicate and would be remembered.

9  Q      Okay.  And when you say giving language to

10  them and wordsmithing them, was the purpose of that

11  so the employees would know what they were?

12  A      Yes.  It was to make them very clear for

13  particularly new employees that we could communicate

14  these values and why they were important and what

15  they meant.

16  Q      And no gossiping is a separate core value; is

17  that correct?

18  A      That's correct.

19  Q      But you mentioned no premarital sex.  That is

20  not a separate core value, is it?

21  A      That is correct.

22  Q      Why did you -- why did y'all decide when

23  y'all were wordsmithing these core values to

24  communicate them to the employees not to include a

25  prohibition against premarital sex in writing?

1    A      Because righteous living means more than
2    having premarital sex.
3    Q      Okay.  What other components does righteous
4    living encompass?
5    A      Righteous living would encompass
6    relationships between two people that weren't
7    married to each other, that were married to other
8    people in the office that did not include sex.  It
9    would encompass how we choose to make decisions as
10   individuals that represent our company.
11          Broader than that, it is a principle and not
12   having premarital sex is a specific example of
13   living out that principle.  And I really should say
14   sex outside of marriage more than premarital.
15   Q      Where is the notion that sex outside of
16   marriage is prohibited, is not living righteously?
17   A      It is found in the Bible.  It's a biblical
18   principle and we seek to run our company in a
19   biblical way, the best that we can interpret that.
20   Q      Okay.  So, in seeking to run the company in a
21   biblical way, is the company imposing biblical or
22   Christian beliefs on its employees?
23   A      Our brand is one that we openly talk about
24   being a Judeo-Christian value system.  We discuss
25   that in our policies and procedures handbook.

Case 3:20-cv-00628-Brentwood Reporting Services - (615) 595-0073  Filed 03/11/22 Page 16 of 61 PageID #: 4715
Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

```
1    Q      Okay.  So, you impose that Judeo-Christian

2    value system on your employees and expect the

3    employees to adhere to that Judeo-Christian value

4    system; is that correct?

5              MS. SANDERS:  Object to the form.

6              You can answer it.

7              THE WITNESS:  Would you mind to repeat

8    the question?

9              MS. COLLINS:  Sure.

10             Jerri, can you repeat that back for me.

11             (The requested question was read back by

12   the court reporter as follows:

13             "Question:  Okay.  So, you impose that

14   Judeo-Christian value system on your employees and

15   expect the employees to adhere to that

16   Judeo-Christian value system; is that correct?")

17             THE WITNESS:  As best we are able to

18   interpret what the Bible says, that is what we seek

19   to do.

20   BY MS. COLLINS:

21   Q      Okay.  You seek to impose your

22   interpretation, Ramsey Solutions' interpretation of

23   the Bible on its employees.  Is that what you're

24   saying?

25   A      We seek biblical principles, and out of that
```

1    we might have an example of not having sex outside

2    of marriage that comes from that principle.  We are

3    not using the Bible as our policies and procedures

4    handbook.

5    Q      Okay.  But you're imposing a biblical

6    principle on the employees, a biblically based

7    principle on the employees?

8              MS. SANDERS:  Object to the form.

9              You can answer.

10             THE WITNESS:  We feel that not having

11   sex outside of marriage is biblical and it is part

12   of our righteous living core value.

13   BY MS. COLLINS:

14   Q      And the employees are expected to adhere to

15   that if they want to keep their job; is that

16   correct?

17   A      That's correct.

18   Q      Have you ever had a situation where an

19   employee came to you, or that you're aware of, and

20   they said that, you know, one of these biblical

21   principles did not align with their religious

22   beliefs?

23   A      Not that I recall.

24   Q      Okay.  Would you hire someone if during the

25   hiring phase that came out that their religious

1  beliefs did not align with biblical principles?

2  A     That has never happened before and I can't

3  say.

4  Q     Okay.  To your knowledge, has the company

5  ever hired someone that was not Christian?

6  A     That's not a question we ask during our

7  interview process, so I do not have knowledge of

8  that.

9  Q     Okay.  Potential candidates are usually --

10 they usually go to a dinner is my understanding.  Is

11 that correct?

12 A     That is correct.

13 Q     Okay.  And what is the purpose of the dinner?

14 A     The purpose of the dinner is if they are

15 married, that their spouse joins us for dinner to

16 agree that the candidate that we're interviewing is

17 a good fit for the position, that culturally the

18 candidate is aligned with our mission and where

19 we're going, and to give them a chance to meet the

20 candidate's potential leaders or ask questions.

21 Q     Okay.  When you say culturally aligned with

22 your mission, what does that mean?

23 A     That we exist to help people, we exist to

24 educate and teach people.  We have some specific

25 beliefs about debts and smart ways to use your

1   money.  So we want to hire people that are aligned

2   with that mission of helping people, educating

3   people, and teaching people better ways to use their

4   money before they join our team.

5   Q      Is it typical to also ascertain whether or

6   not they will adhere to your core values?

7   A      Yes.

8   Q      Okay.  So y'all make the core values known to

9   potential candidates when you're hiring them

10  before --

11              (Overlapping speech.)

12  A      Yes, we do.

13  Q      Okay.  Do you -- do you know if Ramsey

14  Solutions has a particular practice of discussing

15  the righteous living core value?

16  A      Yes, we do.

17  Q      Okay.  What about the prohibition against sex

18  outside of marriage?

19  A      Yes, we do.

20  Q      Okay.  Is there any sort of training or

21  script that leaders or other people go through that

22  are meeting with potential candidates for these

23  dinners?

24  A      Not formal training.

25  Q      Okay.  And the concept of sex outside of

1   marriage, you said that you believe that is

2   biblically based; is that right?

3   A       That's correct.

4   Q       Okay.  And that -- just to be clear, that's

5   the Christian Bible, right?

6   A       That is correct.

7   Q       But sitting here today, do you know where in

8   the Bible or what story that's associated with?

9   A       I'm unable to give you chapter and verse, but

10  there are multiple instances in the Bible where

11  sexual immorality or sexual impurity are prohibited.

12  Q       And what does that have to do with debt or

13  smart ways to use your money?

14  A       I'm not able to give you a clear correlation

15  between getting out of debt and not having sex

16  outside of marriage.

17  Q       Okay.  A moment ago I was asking you a little

18  bit about your familiarity with Title VII and the

19  Tennessee Human Rights Act.  You understand that

20  generally it prohibits -- both of those laws

21  prohibit discrimination, right?

22  A       I do, yes.

23  Q       Okay.  And discrimination means to treat

24  differently.  Do you have that understanding?

25              MS. SANDERS:  Object to the form.

Case 3:20-cv-00062-Brenwood Reporting 08/11/22 Page 21 of 73 (615) 595-0073 PageID #: 4772
Elite Reporting Services
www.elitereportingservices.com

```
1            You may answer.
2            THE WITNESS:  I don't know that I would
3    agree with those exact words being the definition of
4    that word, but I agree with your general definition
5    of the word.
6    BY MS. COLLINS:
7    Q     Okay.  What about that do you not agree with?
8    A     I would describe discrimination as treating
9    not only differently but also usually unfairly based
10   on the protected classes in Title VII.
11   Q     Okay.  And do you understand that sex and
12   pregnancy are protected classes under Title VII and
13   the Tennessee Human Rights Act, correct?
14   A     Yes, I do.
15   Q     Okay.  And religion is as well.
16   A     Yes.
17   Q     And that even within the Christian religion,
18   there are many different interpretations of the
19   Bible.
20   A     Yes.
21   Q     Okay.  And so if an employee has a different
22   interpretation of the Bible than Ramsey's
23   interpretation, in particular with respect to sex
24   outside of marriage, then would you agree that that
25   would be a form of discrimination if they're treated
```

1    differently or terminated because of that?

2              MS. SANDERS:  Object to the form.

3              You can answer.

4              THE WITNESS:  We do not seek to use the

5    Bible as our policy handbook and enforce our

6    interpretation of everything in the Bible into the

7    workplace.  We have taken the principle of having a

8    workplace free of gossip, free of dishonesty, free

9    of having sex outside of marriage, and we have

10   created a core value that is in our policies and

11   procedures handbook that is called righteous living,

12   and we specifically discuss with our team in the

13   hiring process and once they're here that having sex

14   with someone you're not married to would violate

15   that core value.

16   BY MS. COLLINS:

17   Q     Okay.  If an employee does not share that

18   belief, if they -- you know, if their interpretation

19   of the Bible is that sex outside of marriage is not

20   prohibited, then when Ramsey composes that belief on

21   its employees, that's treating the employee

22   differently because they have a different belief

23   than Ramsey Solutions.  Is that not correct?

24             MS. SANDERS:  Object to the form.

25             THE WITNESS:  I have not had an

1    experience where someone shared that they disagreed
2    with that based on their religious interpretation.
3    BY MS. COLLINS:
4    Q      Okay.  But if they have sex outside of
5    marriage, would that indicate that they disagree
6    with Ramsey's interpretation of the Bible that it's
7    prohibited?
8                   MS. SANDERS:  Object to the form.
9                   You can answer it.
10                   THE WITNESS:  I'm not able to speak to
11    what they agree with or disagree with when they
12    choose to do that.
13    BY MS. COLLINS:
14    Q      But you would agree with me that
15    discrimination on the basis of religion is also
16    illegal under Title VII and the Tennessee Human
17    Rights Act, correct?
18    A      I would agree.
19    Q      Okay.  And that also includes different
20    beliefs in the Bible?
21    A      Are you asking me a question?
22    Q      Yes.  That you would agree with me that also
23    discrimination on the basis of religion also
24    includes different beliefs in what the Bible says
25    and requires.

1           MS. SANDERS:  Object to that form.

2           You can answer.

3           THE WITNESS:  I'm not able to clearly

4   answer whether or not discrimination in Title VII

5   encompasses different beliefs of the Bible.

6   BY MS. COLLINS:

7   Q     Okay.  And Ramsey has terminated employees

8   for having sex outside of marriage, right?

9   A     When you say Ramsey, would you be more

10  specific?

11  Q     Ramsey Solutions, the company.

12  A     That is correct.

13  Q     Okay.  And the reason they terminated those

14  employees when they found out they had sex outside

15  of marriage was based on that biblical belief that

16  that's prohibited; is that correct?

17  A     That is correct.

18  Q     Now, were you involved at all in the

19  termination of Caitlin O'Connor?

20  A     I was not.  I was actually out of town that

21  particular week on vacation.

22  Q     Okay.  Do you have any understanding as to

23  the reasons for her termination?

24  A     Yes, I do.

25  Q     Okay.  What is your understanding?

1    A       My understanding is that she had sex outside

2    of marriage and came to Armando Lopez with that

3    information and was terminated for having sex

4    outside of marriage, violating the righteous living

5    core value.

6    Q       Okay.  So, she was terminated for not

7    adhering to Ramsey Solutions' interpretation of the

8    biblical principle?

9    A       She was terminated for violating our core

10   value of righteous living which includes having sex

11   outside of marriage.

12   Q       And that is based on a biblical principle; is

13   that correct?

14   A       That's correct.

15   Q       Okay.  And when you say she came to Armando

16   Lopez with information, was that information that

17   she was pregnant?

18   A       It was.

19   Q       Okay.  So, the basis of Ramsey Solutions'

20   knowledge that she engaged in sex outside of

21   marriage was when she came to notify the company

22   that she was pregnant?

23            MS. SANDERS:  Object to the form.

24            You may answer.

25            THE WITNESS:  That was when the

1    knowledge that she had had sex outside of marriage

2    came to light.

3    BY MS. COLLINS:

4    Q      Okay.  And at that same time, she also

5    requested information about the Family Medical Leave

6    Act, correct?

7    A      Correct.

8    Q      Okay.  And so when Caitlin O'Connor came to

9    the company and informed them that she was pregnant

10   and requested information about the Family Medical

11   Leave Act, she was ultimately terminated after

12   making that notification; is that correct?

13   A      Ultimately.

14   Q      Okay.  And that was based on the biblically

15   based righteous living core value.

16   A      Yes.

17   Q      Okay.  Now, a moment ago when we were talking

18   about the righteous living core value, you also

19   mentioned one of the components that is relationship

20   with two people not married to each other that's not

21   sex.  What did you mean by that?

22   A      Sex outside of marriage is not the only thing

23   a person might do that violates that principle.

24   There are other things that we would ask questions

25   about or give warnings about short of sex outside of

Elite Discovery Reporting Services (615) 595-0073
www.elitereportingservices.com

1   marriage.  And our default is not termination.  Our

2   default is to try to correct the behavior.  Sex

3   outside of marriage is where we have drawn the line

4   to say a person must leave our company when that

5   happens.

6   Q       Okay.  Well, how is sex defined by the

7   company, that it would give rise to an automatic

8   termination?

9   A       Sexual intercourse outside of marriage.

10  Q       Okay.  And does that include oral sex?

11  A       It does not.

12  Q       Who made that decision?

13  A       Our operating board chose sexual intercourse

14  outside of marriage as the line at which a person

15  must leave and the assumption is termination at that

16  point.  Things short of that are more case by case

17  and more at least open for discussion.

18  Q       Okay.  Does the Bible -- is that biblically

19  based, that oral sex might be okay but intercourse

20  is not?

21              MS. SANDERS:  Object to the form.

22              You can answer that.

23              THE WITNESS:  I am unaware where the

24  Bible makes a distinction between those two things.

25  / /

Elite-Brentwood Reporting Services (815) 595-0073
www.elitereportingservices.com

1  BY MS. COLLINS:

2  Q      Okay.  Do you know if the Bible makes a

3  distinction between different types of relationships

4  outside of marriage?

5  A      Would you mind to be more specific?

6  Q      Well, I'm just going back to your statement

7  earlier about the relationships of two people not

8  married or married but -- you know, that engage in

9  behavior that's not sex and we've broken that down

10 to intercourse.  So I'm just curious and just

11 wondering whether there's something in the Bible

12 that deals with that variation.

13 A      The Bible would tell you to only have love or

14 romantic feelings for the person whom you've

15 promised to be their spouse for the rest of your

16 life.  We do not go to chapter and verse for every

17 instance of how to live out the principle of

18 righteous living.

19        But to answer your question, if two unmarried

20 people that were not working on a project together

21 were spending a great deal of time together, we

22 would feel it appropriate to ask some questions of

23 why they're spending so much time together in the

24 workplace when they're not working together in an

25 effort to help them not make mistakes further by

1  ignoring that behavior.

2  Q     Okay.  And when you just gave that scenario

3  of spending a lot of time together, two people who

4  are not married spending a lot of time together, is

5  that in the workplace working on a specific project

6  or is that outside of the workplace?

7  A     It would be in the workplace if they're

8  spending a disproportionate amount of time together

9  or showing flirtatious behavior or some other

10  behavior that might not be acceptable to their

11  spouse if they were here.

12  Q     Okay.  So, are men and women assigned on big

13  projects together or is that avoided?

14  A     It is not a consideration in getting the work

15  done.  Yes, men and women are assigned to work

16  together on large projects.

17  Q     Okay.  Y'all just keep a closer eye on them?

18  A     No.  We really are not policing or walking

19  around seeking this behavior.  We really only deal

20  with these things as they come up or become obvious

21  or present themselves to us.

22  Q     Okay.  And the distinction between

23  intercourse and oral sex where y'all decided to draw

24  the line, what was the situation where that came

25  about?

```
 1    A      I do not recall the exact situation that that

 2    came about.  It has been the line at which we've

 3    made that decision for a very long time.

 4    Q      Okay.  Was the discussion had when some

 5    issues came up about ███████████

 6    A      Was the discussion about sexual intercourse

 7    had?

 8    Q      Yes.  Sexual intercourse is not okay versus

 9    oral sex which is okay.

10              MS. SANDERS:  Object to the form.

11              You can answer that.

12    BY MS. COLLINS:

13    Q    Did it come about -- and I'm using that term

14    loosely when I say is okay.  I guess when I'm saying

15    is okay, the company sees that as being redeemable

16    if they've just had oral sex.  Is that fair to say?

17    A      I would not phrase it that way.  I would

18    phrase it as saying that we have decided the point

19    at which a couple has gone so far as to have sexual

20    intercourse, that that is not redeemable for their

21    employment.

22          We have not made blanket decisions on other

23    scenarios.  They really are addressed depending on

24    the facts and circumstances of the situation.

25    Q      Okay.  Now, specifically with respect to oral
```

```
1   sex and having that come up in a specific situation,

2   that came up with respect to ████████ right?

3   A      It did.

4   Q      Okay.  And that came about because his wife,

5   ████████, came to the company and made them

6   aware that he had engaged in extramarital affairs.

7   A      That's correct.

8   Q      Okay.  And so the company got involved in

9   that situation and determined because he did not

10  have intercourse, but he did admit to having oral

11  sex, that he could continue his employment.

12  A      There was a lot more involved in that

13  situation, as would be the case with each unique

14  situation.

15          ████ and his wife were seeking

16  reconciliation.  Their counselors and pastors were

17  involved in the conversation.  It was not a

18  knee-jerk response that since he had not had sexual

19  intercourse that his employment would continue.

20              MS. SANDERS:  As a reminder, this

21  portion of the deposition is for attorneys' eyes

22  only.

23  BY MS. COLLINS:

24  Q      And the determination that he had not had

25  sexual intercourse, what was that based on?
```

```
1    A       That was based on his comments.
2    Q       Okay.  But didn't their pastors confirm that
3    there had been multiple allegations of infidelity
4    with ████████████  and his wife possibly involving
5    sex?
6    A       I was not present at any meeting with the
7    pastors.
8    Q       Okay.  Do you have an understanding as to
9    what the pastors informed the company?
10   A       Very broadly.  Not specifically at all.
11   Q       Okay.
12   A       I never had --
13                   (Overlapping speech.)
14   Q       Broadly, what was your understanding?
15   A       Broadly, my understanding is that █████  and
16   ████████  had been walking with them, and by that I
17   mean counseling over a period of time to improve
18   their marriage.  But I am unaware of any specific
19   comments that they made about his actions.
20   Q       Okay.  But did you know that the problems in
21   their marriage were due to multiple acts of
22   infidelity?
23                   MS. SANDERS:  Object to the form, but he
24   can answer that.
25                   THE WITNESS:  I was not sure what all of
```

```
1   the elements of the problems in their marriage were.
2   BY MS. COLLINS:
3   Q       Okay.  Well, did you review any e-mails from
4   ███████████████?
5   A       Not to my knowledge.
6   Q       Did you review any -- the letter that her
7   father sent in to the company about ████████████
8   infidelity?
9   A       Not that I remember.  I was not very involved
10  in the decisions or discussions or meetings with
11  ████████ and ████████████ outside of any full board
12  conversation.
13  Q       Okay.  But you were made aware that ████████
14  ████████ had an affair with a former employee.
15  A       I was.
16  Q       Has the company fired employees for having
17  what's known as an emotional affair before?
18  A       Would you mind to define emotional affair?
19  Q       One that does not involve intercourse or oral
20  sex.
21  A       I do not recall specific examples where
22  employees were terminated for those things.
23  Q       Okay.  Is pornography covered under the
24  righteous living clause -- or core value?
25  A       By covered, if you mean does it violate the
```

1  righteous living core value, yes, it does.

2  Q      Okay.  But if an employee is caught looking

3  at pornography, if the company finds out about it,

4  is there some effort to rehabilitate that employee?

5  A      Yes.  As with most things that we feel

6  violate the righteous living core value, if the

7  person is willing to seek help with drug addiction

8  or pornography addiction and involves usually some

9  professional help, they are typically not terminated

10 for that behavior the first time.

11 Q      And for those types of addiction that you've

12 just described, are you -- those primarily involve

13 male employees, correct?

14 A      No.

15 Q      Can you think of a female employee that had a

16 pornography addiction?

17 A      I cannot recall a name, but I recall

18 instances of employees struggling with pornography,

19 female employees.

20 Q      Can you recall a name?

21 A      No.  And it's -- I am unable to pull together

22 names and dates on these situations.  And that is a

23 vague memory and may not be entirely accurate.  It's

24 the best of my memory.

25        I seem to recall at least one female who was

1    struggling with pornography, though the majority of

2    people dealing with pornography I would agree would

3    be men.

4    Q      Okay.  And with respect to a woman that gets

5    pregnant as a result of having sex outside of

6    marriage, they don't get a second chance; is that

7    correct?

8    A      We would not make any decision around

9    employment based on pregnancy.  If they had sex

10   outside of marriage, just as if the male had sex

11   outside of marriage, then the assumed decision --

12   unless made otherwise, the assumed decision would be

13   termination based on having sex outside of marriage.

14   Q      And you would agree with me that a woman, as

15   a general rule, cannot hide a pregnancy.

16   A      As a general rule.

17   Q      Okay.  And that she does have a right to come

18   to the company and inform them if she is going to be

19   needing FMLA for pregnancy -- irrespective of how

20   that pregnancy comes about, she still has that right

21   to come to the company and inform them that she

22   needs FMLA, just like anybody else, to take time off

23   for her pregnancy.

24   A      I do agree she does have that right to

25   inform.

```
 1    Q      Okay.  But if a woman comes to the company

 2    and requests FMLA for a pregnancy and they're not

 3    married, the company is going to terminate them.

 4              MS. SANDERS:  Object to the form.

 5              You can answer it.

 6              THE WITNESS:  Having sex outside of

 7    marriage, the presumed decision is that that person

 8    can no longer work here.  It would still be a

 9    decision made at that time, but that is the assumed

10    decision.

11    BY MS. COLLINS:

12    Q      And with respect to ████████ the company

13    at some point found out that he had been dishonest

14    about the extent of the sexual relationships he had

15    engaged in outside of marriage; is that correct?

16    A      I was not in any meeting where ████ -- I was

17    not in any meeting with ████████ period, that I

18    recall on this topic.

19    Q      Okay.  I'm not asking about a specific

20    meeting you were in with ████████ but you were

21    on the operating board, correct?

22    A      Correct.

23    Q      And the operating board was involved in the

24    ████████ situation when it came to light that he

25    eventually was asked to resign, correct?
```

1    A       Correct.

2    Q       Okay.  And as part of that, you have

3    knowledge that it came to light that he had been

4    dishonest about the extent of the sexual

5    relationships he had had outside of his marriage.

6    A       That is correct.

7    Q       Okay.  And the person that brought that to

8    light was a former employee who he had an

9    extramarital affair involving sexual intercourse

10   with, correct?

11   A       Correct.

12   Q       Okay.  You just let me know if you need a

13   break at any point in time for any reason.

14   A       Okay.

15   Q       I'm just going to move a little bit slow here

16   for a little bit.  I'm going to try to wipe out a

17   few things from my outline.

18           Does the company also prohibit employees who

19   are -- does it prohibit employees from living with

20   someone that they're not married to that's not just

21   like a roommate?

22   A       Yes.

23   Q       Okay.  Tell me a little bit about that.

24   A       There would be an assumption that a couple

25   living together is having sex outside of marriage if

Case 3:20-cv-00628-Document 53-1 Filed 08/31/22 Page 38 of 61 PageID #: 4793
Elite Reporting Services * (615) 595-0073
www.elitereportingservices.com

1  they are living together and not married.

2  Q    Okay.  Is that automatic termination?

3  A    Sex outside of marriage, the assumed response

4  or decision would be that they could no longer work

5  here.  But as with any case, it would be fact

6  dependent upon that situation.  But the presumed

7  decision is that they could no longer work here.

8  Q    Okay.  If they're living with a boyfriend or

9  girlfriend and they're not married, the presumed

10 decision would be that they would be terminated?

11 A    Yes.

12          MS. SANDERS:  Heather, would you mind if

13 we took a short break?

14          MS. COLLINS:  Yes, that's fine.

15          MS. SANDERS:  He might not need one, but

16 I would appreciate one.

17          MS. COLLINS:  Yes.  About ten minutes?

18          MS. SANDERS:  Sure.  Back at 10:45?

19          (Recess observed.)

20 BY MS. COLLINS:

21 Q    Okay.  Mr. Galloway, what was the extent of

22 your involvement in the decision to terminate

23 Caitlin O'Connor?

24          MS. SANDERS:  Objection.  Asked and

25 answered, but he can answer that.

1        THE WITNESS:  I was not involved in that

2   decision.  I was out of the office that week.

3   BY MS. COLLINS:

4   Q      Okay.  And which week are you referring to

5   specifically?

6   A      I don't have the specific dates of that week,

7   but it was the week that these events transpired.

8   Q      Okay.  So you were not involved in the

9   decision to terminate Caitlin O'Connor.

10  A      That is correct.

11  Q      Did you have any conversations with anyone

12  about the decision to terminate Caitlin O'Connor?

13  A      No, I did not.

14  Q      When you came back from vacation, had the

15  decision already been made to terminate Caitlin

16  O'Connor?

17  A      Yes.

18  Q      Okay.  Who informed you of that decision?

19  A      I read it in an e-mail.

20  Q      Okay.  In an e-mail from who?

21  A      I believe it was from Suzanne Simms, though

22  I'm not positive of that fact.

23  Q      Okay.  What do you recall generally the

24  e-mail saying?

25  A      I have very vague memory of the content of

1    that e-mail other than the events that had occurred

2    and the decision that had been reached.

3    Q     And sitting here today, do you know if you've

4    provided that e-mail to Ramsey's attorneys in

5    connection with this litigation?

6    A     I have provided all e-mails that have been

7    requested.

8    Q     Okay.  Did you provide that e-mail?

9    A     Yes.

10   Q     Did you respond to the e-mail in any way?

11   A     Not that I recall.

12   Q     And other than the e-mail that you think was

13   from Suzanne Simms, did you talk with anyone about

14   Caitlin O'Connor's termination?

15            MS. SANDERS:  Object to the extent that

16   asks for attorney/client information, but he can

17   testify otherwise.

18            THE WITNESS:  No.

19   BY MS. COLLINS:

20   Q     In preparing for your deposition today, did

21   you review that e-mail from Suzanne Simms?

22   A     I believe I have seen the e-mail conversation

23   in preparation, though it has been a little while.

24   It was for our earlier previous deposition date, so

25   yes.

1    Q     All right.  I'm going to provide you a

2    document, and this has been previously marked as

3    Exhibit Number 5 to the depositions in this case.

4               MS. COLLINS:  Leslie, if you have that

5    handy, you can just provide him a hard copy.  If

6    not, I've sent it across on the Zoom again.

7               MS. SANDERS:  I think I have a hard

8    copy.  Yes, I do.  Is the top of it from Mark Floyd

9    to --

10              MS. COLLINS:  Yes.

11              MS. SANDERS:  Okay.  I've got that.  For

12   the record, I'm handing him a copy of the document

13   previously marked Exhibit 5 on June 29th.

14              (WHEREUPON, a document was presented,

15   previously marked as Exhibit Number 5.)

16   BY MS. COLLINS:

17   Q     Just let me know when you've had a moment to

18   scan through that, Mr. Galloway.

19   A     (Reviewing document.)  Okay.

20   Q     Was this the e-mail that you were referring

21   to that we were discussing a moment ago?

22   A     Yes.

23   Q     Okay.  So, was it Jen Sievertsen that had

24   actually sent the e-mail or do you still think it

25   was Suzanne Simms?

1    A      I must have been mistaken thinking it was

2    Suzanne Simms.  I apologize for that.  But this is

3    the e-mail thread that I'm referring to.

4    Q      Okay.  And are you on the HRC committee

5    e-mail group?

6    A      Yes, I am.

7    Q      Okay.  And was that the same in 2020?

8    A      I was on that in 2020.

9          MS. COLLINS:  Okay.  If you could pull

10   up what's been previously marked Exhibit Number 13.

11   I'm going to send it over as well, just in case you

12   don't have it.

13         MS. SANDERS:  For the record, I've got a

14   copy of Exhibit 13 that was marked on June 29th,

15   and I've just handed it to the witness.

16         (WHEREUPON, a document was presented,

17   previously marked as Exhibit Number 13.)

18   BY MS. COLLINS:

19   Q      And just let me know when you've had a moment

20   to scan through this.

21   A      (Reviewing document.)  Okay.

22   Q      And this is an e-mail thread from around --

23   well, it's all from May 19th, 2020.  It looks like

24   it's where the HRC committee agenda is being

25   circulated around that date.

Case 3:20-cv-06754  Elite Reporting Services  (415) 595-0073
Case 3:20-cv-06754  Document 884-1  Filed 08/11/23  Page 45 of 73  #: 4794
www.elitereportingservices.com

1          Do you see that or do you agree with that?

2     A     Yes, I do.

3     Q     Okay.  Do you recall -- on the second page of

4     Exhibit Number 13, do you recall what the team

5     member discussion was that Finney was talking about

6     on that day?

7     A     I do not recall.

8     Q     Okay.  And up at the top of this e-mail

9     or the agenda for Tuesday May 19, it lists the

10    HR committee, and it has your name listed.

11         Were you present on this day as well?

12    A     According to this document, I was present.

13    Q     Okay.  So, if you were present on Tuesday --

14    and I'm back on the first page.  It says Tuesday --

15    well, it says May 19th is a Tuesday.  Were you

16    there that whole week and the next week is the week

17    that you were gone?

18    A     I do not recall the specific dates.  From

19    this document, it appears I was present on this day.

20    Q     Okay.

21    A     I don't remember -- I don't recall the dates

22    that I was not in the office following this.

23    Q     Okay.  Do you recall where you went on

24    vacation?

25    A     Yes.

```
 1   Q      Just trying to jog your memory.
 2   A      We went to the beach.  We went to Panama City
 3   Beach.
 4   Q      Okay.  Did y'all stay in a rental, like a
 5   condo or a house?
 6   A      Yes, we did.
 7   Q      Okay.  Do you think it was a Saturday-to-
 8   Saturday rental?  That's how most of them are down
 9   there.
10   A      I do not recall the specific dates, but
11   typically we would be gone an entire week and
12   Saturday to Saturday would be close.
13   Q      Okay.  Unless you're lucky enough to have a
14   friend who actually has a condo and they don't
15   require the Saturday-to-Saturday thing because the
16   traffic on those two days is terrible, Saturday or
17   Sunday.  But, anyway, I'm going to get back to
18   asking you real questions.
19          So, at the top of this e-mail thread on
20   Exhibit Number 13, you also mention that you're
21   changing the agenda to give -- to give us, I guess
22   referring to the HR committee, more time to talk
23   about the ███████ thing and move it up on the agenda.
24          Do you recall what that was, the ██████ thing
25   around May of 2020?
```

1    A       I don't recall.  I looked at the agenda items

2    to see if it might be on there, but it's not, and I

3    don't recall what that specific conversation would

4    have been about.

5    Q       Okay.  Did y'all keep minutes from those HRC

6    meetings?

7    A       We do not keep minutes, per se.  We do send

8    out decisions that are made by HRC to the operating

9    board each week.

10   Q       Okay.  And who typically sends out that

11   update to the operating board?

12   A       Currently, my assistant, Sarah Webb, would

13   write a rough draft and send to me for corrections,

14   and then I send that to our operating board.

15   Q       Okay.  So it comes from your e-mail?

16   A       That's correct.

17   Q       Okay.  Was that the same in 2020?

18   A       That is correct.

19   Q       Okay.  And the rough draft that Sarah -- you

20   said Sarah creates a rough draft.  What does she

21   create that from or does she sit in on the meetings

22   and make notes?

23   A       Currently, she sits in on the meetings and

24   makes notes.

25   Q       Okay.  Was that the same in 2020, where she

1    sat in on meetings?

2    A      I don't recall when she started sitting in.

3    It was in 2020 that she started sitting in, but

4    there was a time where she was not and would still

5    have created the agenda.

6    Q      Okay.  When she did not sit in on the

7    meetings, how did she get the information to create

8    the rough draft for you to ultimately send out?

9    A      Prior to her sitting in the meetings, I would

10   have taken the notes and sent them out myself.

11   Q      Okay.  When you took notes, did you take

12   notes contemporaneously during the HRC meetings?

13   A      I would write down decisions or details that

14   I thought our operating board needed to know.  I do

15   not write down every conversation that we have.

16   Typically, if they're not important, I will not

17   update those.  And then I go back and create notes

18   from those and send those to our operating board.

19   Q      Okay.  So, you just wrote down notes like on

20   a piece of paper or a notepad and then took those

21   notes and created a rough draft?

22              MS. SANDERS:  Object to the form.

23              You can answer.

24   BY MS. COLLINS:

25   Q      The typed-up notes.

Case 3:20-cv-00628-Document Reporting 08/31/22 Page 47 of 61 PageID #: 4804
Elite Reporting Services (615) 595-0073
www.elitereportingservices.com

```
 1   A       Prior to Sarah Webb, I would have, as you
 2   suggested, written down on a piece of paper, the
 3   things, and then gone back and created a document
 4   with a more understandable version of what we
 5   discussed that I would send out.
 6   Q       Okay.  And you just don't remember exactly
 7   when in 2020 you switched from you taking the notes
 8   during the meeting to Sarah taking the notes during
 9   the meeting?
10   A       No.  I was -- I do see that I was in my
11   previous position and was not yet in my chief people
12   officer position.  I was in my SEVP position, and I
13   do not recall when she began attending those
14   meetings.
15   Q       Okay.
16   A       And I'm not able to tell by this document
17   because she did create the agendas, including this
18   one, before she sat in on the meetings.
19   Q       Okay.  So, do you think your notes from the
20   meeting on May 19th, 2020, would have reflected
21   what the ████ thing was that's referred to?
22   A       I'm not sure.  Possibly.
23              MS. COLLINS:  Okay.  Let's go off the
24   record.  I just need a moment to review my notes.
25   It shouldn't take but a couple of minutes, but I
```

1    think I can wrap up.

2              MS. SANDERS:  Okay.

3              (Recess observed.)

4    BY MS. COLLINS:

5    Q      Mr. Galloway, have you ever heard Dave Ramsey

6    state publicly that if one of his employees was

7    caught cheating on their spouse, they would be

8    terminated?

9    A      I'm sorry, there was a little bit of an echo.

10   Would you mind to repeat?

11   Q      Sure.  Have you ever -- can you hear me okay

12   now?

13   A      Yes.

14   Q      Have you ever heard Dave Ramsey state

15   publicly that if he found out one of his employees

16   was cheating on their spouse, he would terminate

17   them?

18   A      I have heard him say that if they were having

19   sex outside of marriage that he would.

20   Q      Okay.  Does the company have a pornography

21   blocker?

22   A      I'm sorry?  A what?

23   Q      A pornography blocker on the computers.

24   A      I am not -- I don't know -- I'm not able to

25   answer that.  I don't know.

Case 3:20-cv-00628 Document 85-1 Filed 08/31/22 Page 49 of 73 PageID #: 4048
Elite Document Reporting Services (415) 595-9073
www.elitereportingservices.com

1    MS. COLLINS:  Okay.  All right.  That's
2  all I have.
3            MS. SANDERS:  Thank you.  Just as a
4  reminder, this deposition transcript is confidential
5  until otherwise indicated.
6            Jerri, that one provision was attorneys'
7  eyes only, but we can mark it after you send the
8  transcript.
9            THE REPORTER:  Do y'all want the same
10 order as last time?
11           MS. COLLINS:  Yes.
12           MS. SANDERS:  Yes.
13           FURTHER DEPONENT SAITH NOT
14           (Proceedings concluded 11:15 a.m. CST.)
15
16
17
18
19
20
21
22
23
24
25

Case 3:20-cv-00663-Brenwood Reporting Services Page 50 of 61 PageID #: 4809
Elite Reporting Services      (615) 595-0073
www.elitereportingservices.com

Attorneys Eyes Only

1                 **E R R A T A   P A G E**

2  I, JACKSON GALLOWAY, JR., having read the foregoing
    deposition, Pages 1 through 49, do hereby certify
3  said testimony is a true and accurate transcript,
    with the following changes (if any):

4

5  **PAGE    LINE**           **SHOULD HAVE BEEN**

6  Cover Sheet          "Jackson Galloway" should be "Jack Galloway, Jr."

7  1      17             "Jackson" should be "Jack"

8  4      4              "Jackson" should be "Jack"

9  6      5              "Jackson" should be "Jack"

10 6      13             "Jackson" should be "Jack"

11 50     2              "Jackson" should be "Jack"

12 50     20            "Jackson" should be "Jack"

13 51     9              "Jackson" should be "Jack"

14 Page 4 of Index     "Jackson" should be removed and references

15 _____ _____       moved to "Jack"

16 _____ _____    _____

17 _____ _____    _____

18 _____ _____    _____

19

20                          **JACKSON GALLOWAY, JR.**

21

22

23 Notary Public: _Crystal Klauss_

24 My Commission Expires: __1/26/2025__

25 Reported by: Jerri L. Porter, RPR, CRR, LCR

Case 3:20-cv-00823 Document 93-4 Filed 06/31/22 Page 51 of 61 PageID #: 4806    50

1                    REPORTER'S CERTIFICATE

2

3   STATE OF TENNESSEE

4   COUNTY OF Davidson

5

6           I, Jerri L. Porter, RPR, CRR, Licensed

7   Court Reporter, with offices in Nashville,

8   Tennessee, hereby certify that I reported the

9   foregoing deposition of JACKSON GALLOWAY, JR. by

10  machine shorthand to the best of my skills and

11  abilities, and thereafter the same was reduced to

12  typewritten form by me.  I am not related to any of

13  the parties named herein, nor their counsel, and

14  have no interest, financial or otherwise, in the

15  outcome of the proceedings.

16          I further certify that in order for this
    document to be considered a true and correct copy,
17  it must bear my original signature, and that any
    unauthorized reproduction in whole or in part
18  and/or transfer of this document is not authorized,
    will not be considered authentic, and will be in
19  violation of Tennessee Code Annotated 39-14-104,
    Theft of Services.

20

21

22

23  _____
    Jerri L. Porter, RPR, CRR, LCR
    Elite-Brentwood Reporting Services
24  Notary Public State of Tennessee

25  My Notary Public Commission Expires: 2/6/2022
    LCR 335 - Expires: 6/30/2022

Case 3:20-cv-00663 Document 63-3 Filed 08/31/22 Page 52 of 61 PageID #: 4805
Elite-Brentwood Reporting Services    (615) 595-0073
www.elitereportingservices.com

















