# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

# SUZANNE SIMMS

# September 10, 2021

---



Deborah H. Honeycutt, LCR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

CAITLIN O'CONNOR,

           Plaintiff,          No.: 3:20-cv-00628

vs.                    JUDGE RICHARDSON

THE LAMPO GROUP, LLC a/k/a   MAGISTRATE JUDGE
RAMSEY SOLUTIONS,         FRENSLEY

          Defendant.        JURY DEMAND

---

Videoconference Deposition of:

SUZANNE SIMMS

Taken on behalf of the Plaintiff
September 10, 2021

Commencing at 10:01 a.m.

---

Elite-Brentwood Reporting Services
www.elitereportingservices.com
Deborah H. Honeycutt, LCR, Associate Reporter
P.O. Box 292382
Nashville, TN 37229
(615)595-0073

```
 1

 2              A P P E A R A N C E S

 3

 4   For the Plaintiff:

 5              MS. HEATHER MOORE COLLINS
               Attorney at Law
 6              Collins & Hunter, PLLC
               7000 Executive Center Drive, Suite 320
 7              Brentwood, TN  37027
               (615)724-1996
 8              heather@collinshunter.com

 9

10

11   For the Defendant:

12              MS. LESLIE SANDERS
               Attorney at Law
13              Webb Sanders PLLC
               611 Commerce Street, Suite 3102
14              Nashville, TN  37203
               (615)915-3300
15              lsanders@webbsanderslaw.com

16

17

18   Also present:

19              MR. DANIEL CORTEZ, Attorney at Law

20              MR. ARMANDO LOPEZ

21

22

23

24

25
```



Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 4 of 76 PageID #: 4820

```
 1

 2                S T I P U L A T I O N S

 3

 4          The videoconference deposition of

 5  SUZANNE SIMMS was taken by counsel for the

 6  plaintiff, by agreement, with all participants

 7  appearing at their respective locations, on

 8  September 10, 2021, for all purposes under the

 9  Tennessee Rules of Civil Procedure.

10          All objections, except as to the form of

11  the question, are reserved to the hearing, and said

12  deposition may be read and used in evidence in said

13  cause of action in any trial thereon or any

14  proceeding herein.

15          It is agreed that Deborah H. Honeycutt,

16  Notary Public and Licensed Court Reporter for the

17  State of Tennessee, may swear the witness remotely,

18  and that the reading and signing of the completed

19  deposition by the witness is not waived.

20

21

22

23

24

25
```

*    *    *

          THE REPORTER:  Good morning.  My name is
Deborah Honeycutt.  I am a stenographic reporter
with Elite-Brentwood Reporting Services.  My license
number is 472.  Today's date is September 10, 2021,
and the time is approximately 10:01 a.m. Central
time.

          This is the deposition of Suzanne Simms
in the matter of Caitlin O'Connor vs. The Lampo
Group, LLC, filed in the United States District
Court for the Middle District of Tennessee at
Nashville.  The Case Number is 3:20-cv-00628.

          This deposition is being taken by
videoconference, and the oath will be administered
remotely by me.  Any digital exhibits marked during
this deposition will be deemed as "original" for
purposes of said deposition, with the actual
original document retained by counsel introducing
the exhibit for purposes possibly needed for
in-court hearing.

          At this time, I'll ask counsel to
identify yourselves and state whom you represent.
If you have any objections with the procedures I've
outlined, please state so when you introduce

1   yourself.  We will start with the noticing attorney.

2                  MS. COLLINS:  Heather Collins for the

3   plaintiff.

4                  MS. SANDERS:  Leslie Sanders for

5   Defendants.  And with me is Daniel Cortez, general

6   counsel and attorney for Defendant, and Armando

7   Lopez the company representative and, obviously, the

8   witness, Suzanne Simms.  And no objection.

9

10                          *    *    *

11                      SUZANNE SIMMS

12  was called as a witness, and after having been duly

13  sworn, testified as follows:

14

15                        EXAMINATION

16  QUESTIONS BY MS. COLLINS:

17  Q.     Good morning.  Could you state your full name

18  for the record, please.

19  A.     Susan Talbert Simms.

20  Q.     And what is your address?

21  A.     ███████████████████████████████████████.

22  Q.     And what is your phone number?

23  A.     ███████████████████.

24  Q.     Okay.  And where are you currently employed?

25  A.     I'm currently employed at The Lampo Group.

```
 1   Q.      How long have you been there?

 2   A.      Approximately 20 years.

 3   Q.      What is your current job title?

 4   A.      I am the senior executive vice president of

 5   our Business to Consumer Channel.

 6   Q.      Okay.  How long have you held that role?

 7   A.      Approximately nine years.

 8   Q.      All right.  And what are your job duties as

 9   the senior executive vice president of Business to

10   Consumer Channel?

11   A.      I oversee the business units and the

12   departments that are in that channel.  I am a member

13   of our Operating Board that actively leads our

14   organization.

15   Q.      Okay.  Are you on the Human Resources

16   Committee?

17   A.      No.

18   Q.      Okay.  Have you ever been on the Human

19   Resources Committee?

20   A.      Yes.

21   Q.      Okay.  When were you last on the Human

22   Resources Committee?

23   A.      I don't remember the exact date, but it would

24   have been approximately six months ago.

25   Q.      Why are you no longer on that Human Resources
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 8 of 76 PageID #: 4824

```
 1   Committee?
 2   A.      I have been actively working on some other
 3   committees, and just due to time constraints I
 4   rolled off that committee and others rolled on.
 5   Q.      Okay.  Prior to six months ago when you
 6   rolled off of the HRC -- and that's just what I'm
 7   going to refer to as the Human Resources -- I'm
 8   going to use HRC to refer to the Human Resources
 9   Committee.
10          Prior to six months ago, how long had you
11   been on it?
12   A.      Approximately eight years.
13   Q.      Okay.  What was your role on the Human
14   Resources Committee?
15   A.      I was one of the board members who was just
16   actively involved in that committee with some of my
17   peers.
18   Q.      What did you do?  Did you make employment
19   decisions?  Did you set policy?  What was the extent
20   of your involvement?
21   A.      As a group we listened to cases, situations
22   of various team members who were having significant
23   personal problems or significant performance
24   problems and as a group we would make decisions on
25   how to best handle each situation individually.
```

```
 1   Q.     Is there some sort of voting process when
 2   y'all make a decision as to how to handle one of
 3   these problems?
 4   A.     No.  We collaborate, discuss, argue, and
 5   build consensus.  And once we reach consensus, then
 6   the decision is made.
 7   Q.     And when you say significant personal
 8   problems that the HRC address, what do you mean by
 9   that?
10   A.     If someone who is employed here has a
11   significant illness in their family that requires
12   them to be out of work for a while would be one
13   example.
14   Q.     Does the HRC typically get involved when an
15   employee notifies it that they are pregnant?
16   A.     No.
17   Q.     Are there any circumstances in which the HCR
18   Committee would be involved in a situation where an
19   employee would notify them that they were pregnant?
20   A.     Yes.
21   Q.     Okay.  Tell me what you mean by that.
22   A.     One example might be if there are significant
23   health issues involved with the pregnancy.
24   Q.     Okay.  Anything else?
25   A.     Another would be if they were not married.
```

```
 1    Q.      Why is that considered a significant personal
 2    issue that the HRC would be involved in?
 3    A.      It is against our core values.  It would be
 4    out of alignment with our core valves.
 5    Q.      And those core values are based on an
 6    interpretation of the Christian Bible; is that
 7    correct?
 8    A.      They are biblically based, yes.
 9    Q.      Do you know where in the Bible it says that a
10    person should not be pregnant and unmarried?
11    A.      I cannot quote scripture verse reference to
12    you.
13    Q.      Do you have any familiarity with any story in
14    the Bible that stands for this premise?
15    A.      I don't have familiarity with a story.  I
16    grew up being taught that that is what the Bible
17    says and for pretty much all of my life.  I don't
18    have scripture references memorized.
19    Q.      When you say you grew up being taught that's
20    what the Bible says, how were you taught that?  Did
21    it come from public education?  Home schooling?
22    Church?  What do you mean by that?
23    A.      Church and my parents.
24    Q.      What church?
25    A.      Various churches.
```

```
1   Q.      What denomination?

2   A.      Nondenominational.

3   Q.      Did you grow up here in Tennessee?

4   A.      Yes.

5   Q.      Which church?

6   A.      A couple that I can remember off the top of

7   my head would be Belmont Church and Christ Church.

8   Q.      When did Ramsey start having this policy

9   against premarital sex?

10  A.      It is not a policy.  It is part of the core

11  value that we established -- I don't know exactly

12  when it was established.  It was prior to my

13  employment here.  My understanding is it's been part

14  of the core valves of this company since the

15  beginning, but it has definitely been one of our

16  core values as long as I have been employed here.

17  Q.      So is it your understanding that employees

18  have to adhere to that biblically-based core value

19  if they want to remain employed by Ramsey Solutions?

20  A.      We do request that they do that.

21  Q.      Will an employee be terminated if they don't

22  do that, if they don't comply with the core value

23  that they not engage in premarital sex?

24  A.      Sometimes.

25  Q.      What do you mean by sometimes?
```

A.    We do not have time to spy on 1,000 team
members.  We are not aware of how all of them live
their lives.  But from time to time, very few times,
but when a situation has been brought to our
attention that someone is living against one of our
core valves, there is a possibility they would be
terminated.

Q.    To your knowledge, and this is based on your
experience on the Human Resources Committee, has
every woman that has worked for Ramsey Solutions
that has come to them and notified them that they
were pregnant and unwed, have they all been
terminated?

A.    To my knowledge, yes.

Q.    And that was specifically because they were
unwed and pregnant and that violated Ramsey
Solutions' core values?

A.    No.  They were terminated because they had
sex outside of marriage, which violates our core
value.

Q.    Okay.  Who were the women off the top of your
head that happened with?  Can you recall?

A.    The only two names that I remember are
███████ -- I don't remember her last name -- and
Caitlin O'Connor.

```
1    Q.    So both of those women came to Ramsey
2    Solutions and informed them that they were pregnant
3    and not married and they were terminated because of
4    that, right?
5    A.    No.  They informed us that they were pregnant
6    and not married, and they were terminated for having
7    sex outside of marriage which is against our core
8    values.
9    Q.    But pregnancy was part of the equation
10   because that's why they came to you and informed
11   you, right?
12   A.    Yes.  They did inform us they were pregnant.
13   Q.    Okay.  A moment ago you said part of your job
14   duties were to oversee business units and
15   departments.  Which business units and departments
16   do you oversee?
17   A.    I oversee our Ramsey Personalities, our
18   Consumer Products, our Ramsey Press, which is our
19   Publishing Department, our Live Events, and what we
20   call our Ramsey Network, the production of all of
21   our shows, megaphones.
22   Q.    When you said you oversaw the Personalities,
23   was one of those ██████████ when he was there?
24   A.    Yes.
25   Q.    Do you have any background in human
```

```
 1   resources?
 2   A.      No.
 3   Q.      Have you had any sort of specific training in
 4   human resources?
 5   A.      Yes.  We do -- we do some training here
 6   around human resources for all of our leaders.
 7   Q.      How often?
 8   A.      It's not on a -- on a schedule.  It's just
 9   various times throughout the year as it's necessary.
10   Q.      Was that sort of training conducted in 2020?
11   A.      I don't remember specific dates.
12   Q.      What about 2019?  Do you recall if any
13   training was held in 2019?
14   A.      Not specifically.  I do believe there was
15   some, but I can't remember specific dates.
16   Q.      When you say there's some training held for
17   leaders, is it documented in any way, any sort of HR
18   training that's held?
19   A.      I cannot speak to how it's documented.  That
20   would be up to our Human Resources Department.
21   Q.      Well, did you do any sort of sign-in sheet?
22   A.      Not that I remember.
23   Q.      Were you given any materials or documentation
24   at any of these trainings?
25   A.      I don't recall any specifically.
```

```
 1   Q.     Have you had any specific training or
 2   background, education, in Title VII or the
 3   discrimination laws?
 4   A.     Some, yes.
 5   Q.     Tell me about it.
 6   A.     We have trained our entire leadership team on
 7   Title VII.
 8   Q.     How often?
 9   A.     I don't remember and can't speak to exactly
10   how often, but we have done training on that.
11   Q.     Did you do it before June of 2020?
12   A.     Yes, I do believe so.  I cannot remember a
13   specific date.
14   Q.     Were you provided any training materials?
15   A.     I cannot remember any specific materials.
16   Q.     Did you do a sign-in sheet of any kind when
17   that occurred?
18   A.     I don't remember.
19   Q.     Who did the training?  Who conducted the
20   training?
21   A.     I do not remember all of the people involved,
22   but we did utilize Armando Lopez and some other
23   leaders.
24   Q.     What do you mean by other leaders?
25   A.     I do remember we had a group of leaders that
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 16 of 76 PageID #: 4832

```
 1   did some training for us.  I just don't remember who
 2   all was involved in that.  I do remember Armando
 3   Lopez.
 4   Q.     Okay.  The other leaders that you're
 5   referring to, you don't remember specifically who
 6   any of those people were?
 7   A.     No.
 8   Q.     Were they Ramsey Solutions employees?
 9   A.     For sure, yes.
10   Q.     Were there any outside people that came in
11   and trained the management team, third party?
12   A.     Not that I remember.
13   Q.     Okay.  So other than these training sessions
14   that you can't remember when they took place or who
15   conducted them other than Armando Lopez, is there
16   any other documentation or evidence that you would
17   have that these trainings took place with respect to
18   Title VII?
19   A.     You would have to talk to Human Resources.  I
20   personally don't -- cannot speak to that.
21   Q.     What was your understanding of Title VII
22   based on these trainings?
23   A.     I don't remember all the details.
24   Q.     Are you aware that Title VII prohibits
25   discrimination on the basis of pregnancy?
```

```
 1   A.     Yes.
 2   Q.     Okay.  Are you aware that Title VII prohibits
 3   discrimination on the basis of religion?
 4   A.     Yes.
 5   Q.     And that includes an employer imposing its
 6   religious beliefs on its employees?
 7              MS. SANDERS:  Object to the form.  She
 8   can answer it.
 9              THE WITNESS:  Can you restate the
10   question?
11   BY MS. COLLINS:
12   Q.     Well, is it part of your understanding that
13   Title VII prohibits an employer from imposing its
14   religious beliefs on its employees?
15   A.     That's not my exact understanding.  My
16   understanding is they cannot be terminated as a
17   result of religious beliefs.
18   Q.     As a result of the employer's religious
19   beliefs?
20   A.     Any religious beliefs.
21   Q.     So wouldn't terminating an employee based on
22   a biblically-based core value be terminating them
23   because of the employer's religious beliefs?
24              MS. SANDERS:  Objection.  She can
25   answer.  Object to the form.
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 18 of 76 PageID #: 4834

```
 1              THE WITNESS:  That is not my
 2   understanding of Title VII.
 3   BY MS. COLLINS:
 4   Q.    Okay.  What is your understanding based on?
 5   A.    My understanding is based on the training
 6   that I have had.
 7   Q.    So you think it's okay to terminate an
 8   employee premised on a biblically-based core value?
 9   A.    My understanding is we are within our rights
10   to have core values for our organization.
11   Q.    Even if it's opposing --
12   A.    That we -- I'm sorry.
13   Q.    Go ahead.
14   A.    That we ask our employees to abide by.
15   Q.    And that's even if it's imposing an
16   employer's view of their own religious beliefs on
17   its employees?
18              MS. SANDERS:  Object to the form.  She
19   can answer.
20              THE WITNESS:  My understanding is yes.
21   BY MS. COLLINS:
22   Q.    And other than the trainings that you've
23   received from Armando Lopez and other leaders, is
24   your understanding based on anything else, that that
25   premise we just discussed was okay?
```

```
 1    A.      Not that I know of.
 2    Q.      Is it possible that that understanding is
 3    incorrect, an incorrect interpretation of Title VII?
 4    A.      Anything is possible.
 5    Q.      As a member of the HRC, do you think it's
 6    important to understand the ins and outs of
 7    Title VII?
 8    A.      Yes.
 9    Q.      As a member of the HRC, decisions you make
10    can result in the loss of an employee's career; you
11    understand that?
12    A.      No.
13    Q.      No?  Well, you terminate employees, so they
14    can lose their job, right?
15    A.      You said career.  Yes, they can lose their
16    job.
17    Q.      Okay.  And many of your employees that work
18    there consider their jobs their career, right?
19                MS. SANDERS:  Object to the form.
20                THE WITNESS:  I don't agree with that
21    statement.
22    BY MS. COLLINS:
23    Q.      Do you consider your job at Ramsey Solutions
24    your career?
25    A.      It is part of my career.
```

```
 1   Q.     Okay.  What is the distinction in your mind
 2   between a job and a career?
 3   A.     My career would be over my lifetime.  This is
 4   one job.
 5   Q.     Have you ever hired anyone who is visibly
 6   pregnant?
 7   A.     I don't recall.
 8   Q.     Would you agree that it's probably harder for
 9   a pregnant person to get a job when they're visibly
10   pregnant?
11   A.     I do not.  I do not agree with that.
12   Q.     But you've never personally hired someone who
13   is visibly pregnant, right?
14   A.     Not that I remember.
15   Q.     What is your understanding as to what
16   discrimination is under Title VII?
17   A.     My understanding is refusing to hire someone
18   or terminating someone.
19   Q.     On the basis of what?
20   A.     The various elements of that title which I do
21   not remember all of them.
22   Q.     I think we already discussed that includes
23   religion and sex or pregnancy, right?
24   A.     Not sex.  Pregnancy, yes.  Religion, yes.
25   I'm sorry, sex as in their gender?  I don't
```

understand what you're asking.

1    Q.      Do you have any understanding as to whether

2    or not Title VII covers discrimination on the basis

3    of sex?

4    A.      As far as gender, yes.

5    Q.      Do you understand discrimination to mean to

6    treat differently, basically?

7    A.      I don't remember specifically.

8    Q.      Have you ever hired someone who was not

9    Christian?

10   A.      Possibly.  I don't know for sure.

11   Q.      Have you been a part of employee interviews

12   before they get hired?

13   A.      Yes.

14   Q.      What about spousal interviews?

15   A.      Yes.

16   Q.      As part of either the employee interview or

17   the spousal interview, are they typically asked

18   where they go to church?

19   A.      Not typically.

20   Q.      What do you mean by not typically?  Are they

21   asked that sometimes?

22   A.      That is not -- that is not part of our

23   questions that we ask prior to hiring someone.

24   Q.      Is there any discussion as to what their

1   faith practices are?
     2   A.      No.
     3   Q.      So you've never been a part of a spousal
     4   interview that included discussions of an employee,
     5   where they go to church, or their faith practices?
     6   A.      Only if they bring it up and desire to
     7   discuss it.
     8   Q.      When you have participated in one of those
     9   spousal interviews, do you create any sort of
    10   documentation after the interview?
    11   A.      Are you asking if I personally do?
    12   Q.      Yeah.
    13   A.      Personally after an interview, I will usually
    14   send an email with my thoughts on the -- on the
    15   interview.
    16   Q.      Who would you typically send that to?
    17   A.      It depends on the situation.
    18   Q.      What do you mean by that?
    19   A.      Depends on who the hiring manager is.
    20   Q.      Would you send it to someone else besides the
    21   hiring manager?
    22   A.      Possibly the recruiter.
    23          MS. SANDERS:  I'm sorry, Heather.  Did
    24   you just say someone else?  There was a little bit
    25   of an interruption.  Is that what you said?

```
 1                 MS. COLLINS:  (Nods head.)
 2                 MS. SANDERS:  Okay.  Just making sure.
 3   BY MS. COLLINS:
 4   Q.    Are the recruiters for Ramsey Solutions
 5   in-house?
 6   A.    Yes.
 7   Q.    Has it been your experience that other people
 8   send out interview summaries like that after they've
 9   interviewed a candidate or had a spousal interview?
10   A.    I can't speak to how other people do it.
11   Q.    Have you received a summary like that from
12   any other hiring managers?
13   A.    Yes.
14   Q.    Who?
15   A.    I cannot remember any off the top of my head.
16   Q.    Now, with respect to Title VII, would you
17   agree with me that it's a violation of Title VII to
18   treat an employee differently because they tell you
19   they are pregnant?
20                 MS. SANDERS:  Object to the form.  She
21   can answer.
22                 THE WITNESS:  Can you rephrase the
23   question?
24   BY MS. COLLINS:
25   Q.    Well, do you agree that it would be a
```

```
 1    violation of Title VII to treat an employee
 2    differently because they inform you they are
 3    pregnant?
 4    A.      If by informing us they are pregnant, yes,
 5    that would be a violation to treat them differently.
 6    Q.      It would also be a violation of Title VII to
 7    treat an employee differently because their
 8    religious beliefs are different than those of
 9    Ramsey Solutions?
10            MS. SANDERS:  I object to the form.  She
11    can answer.
12            THE WITNESS:  My understanding of
13    Title VII is we cannot discriminate or treat someone
14    differently based on their religious views.
15    BY MS. COLLINS:
16    Q.      And would you agree with me that not all
17    employees have the same religious view that
18    premarital sex is prohibited by the Bible?
19    A.      That is possible.
20    Q.      Would those employees still be terminated, if
21    they disagreed with the religious view held by
22    Ramsey Solutions?
23    A.      I have never terminated someone for having
24    that view.
25    Q.      But you have terminated employees who engaged
```

1  in premarital sex, right?
2  A.    Yes.
3  Q.    Wouldn't that imply that they disagree with
4  any sort of religious premise that premarital sex is
5  prohibited by the Bible?
6  A.    Having a view and engaging in are two
7  different things.
8  Q.    Okay.  Well, if an employee makes a decision
9  to engage in premarital sex, wouldn't that indicate
10  that they disagree that it's prohibited by the
11  Bible?
12  A.    Not necessarily.
13  Q.    What do you mean by that?
14  A.    I don't believe that everyone who has
15  premarital sex believes that it's okay to do that
16  based on what the Bible says.
17  Q.    Isn't it true that the Bible is actually
18  silent as to that premise?
19  A.    As to which premise?
20  Q.    That premarital sex is prohibited?
21  A.    I believe the Bible says that it is wrong to
22  have sex outside of marriage.  That's what I
23  personally believe.
24  Q.    But you just don't know any sort of Bible
25  verse that supports that belief, right?

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 26 of 76 PageID #: 4842

```
 1   A.      I don't have any scripture references
 2   memorized.
 3   Q.      Were you aware that Title VII prohibits
 4   retaliation in the workplace?
 5   A.      I am not familiar.  I don't remember
 6   specifically on that.
 7   Q.      Okay.  Why is it a private corporation's
 8   business under what circumstances an employee can
 9   get pregnant?
10   A.      We are private.  That pretty much answers the
11   question.  We have decided we want a certain culture
12   here, one in which people are not sleeping around.
13   Q.      Okay.
14   A.      And that is within our rights as a private
15   organization.
16   Q.      Okay.  And it's your belief that as a private
17   corporation they can ask employees when they have
18   sex or if they're married or not, if they're
19   engaging in sex outside of marriage?
20   A.      I believe it is our right.  We do not conduct
21   that.  We have never asked our employees those
22   questions.
23   Q.      Would an employee be terminated if they
24   refuse to answer those questions as to whether or
25   not they are having sex outside of marriage?
```

```
1    A.    I don't know how to answer that.  That's not
2    part of our -- that's not part of the way we conduct
3    ourselves in leading this organization.
4    Q.    Well, Caitlin O'Connor was terminated because
5    she notified the company she was pregnant outside of
6    marriage, right?
7    A.    No.  That is not why she was terminated.
8    Q.    Okay.  What is your belief as to why she was
9    terminated?
10   A.    Because she had sex outside of marriage,
11   which is in violation of our core values.
12   Q.    And the company only knew about that because
13   she notified it that she was pregnant, correct?
14   A.    That is how we became aware, yes.
15   Q.    And Caitlin O'Connor was not a personality
16   with the company, was she?
17   A.    No.
18   Q.    She wasn't the face of the company?
19   A.    She was not a public face of the company, no.
20   Q.    She was an administrative assistant, correct?
21   A.    Yes.
22   Q.    Was she an administrative assistant in one of
23   the departments that you oversee?
24   A.    No.
25   Q.    Sitting here today, can you think of any
```

1  non-Christians that work at Ramsey Solutions?

2  A.    We have a thousand team members, and I do not

3  know the large majority of them so no, I cannot list

4  any names.

5  Q.    Well, do you know of any employees there are

6  Muslim and do Noonday Prayers?

7  A.    I personally do not.

8  Q.    Have you seen any or do you know if there are

9  any Jewish employees?

10 A.    I personally do not.

11 Q.    Now, did there come a point in time when with

12 respect to the righteous living core value that it

13 was determined that premarital intercourse was

14 prohibited but not premarital oral sex?

15 A.    As far as the core value itself, I don't

16 remember a specific conversation where we made that

17 blanket statement.

18 Q.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22 XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23 XX    XXXXXXXXXXXXXXXXXXXXXXXXX

24 XX    XXXXXXXXXXXXXXXXXXXX

25        XXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXX

4                  XXXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXX

13  XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXX

17  XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXX

21  XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XX      XXXXXXXXXXXXXXXXXXXXXXXX

23  XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXX

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 30 of 76 PageID #: 4846

```
 1   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 2   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5   XXXXXXXXXXXXX

 6   XX        XXXXXXXXXXXXXXXX

 7   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9   XXXXXX

10   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXX

16   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XX        XXXXXXXXXXXXXXXXXXXXXXXXX

25   XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 31 of 76 PageID #: 4847

```
1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
3   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
4   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
5   XXXXXXXXXXX
6   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

7   Q.    And as far as you know, you're not aware of

8   any situation where a female employee like

9   Caitlin O'Connor would have notified the company of

10  a pregnancy outside of wedlock where any sort of

11  restoration plan would have been offered?

12  A.    Can you say the question one more time?

13          MS. COLLINS:  Sure.  Deb, can you just

14  repeat what I said?  I'll see it if makes sense.

15          (Question was read.)

16          THE WITNESS:  I am not aware of any

17  situation where that has happened.

18  BY MS. COLLINS:

19  Q.    Okay.  When did you first find out about

20  Caitlin O'Connor notifying the company that she was

21  pregnant?

22  A.    I don't remember the exact date.  I believe I

23  was notified by an email from Armando Lopez.

24  Q.    Okay.  When you received the email, did you

25  discuss it with anyone?

1    A.    Not that particular -- not in that particular
 2    moment.
 3    Q.    Okay.  When you received the email, were you
 4    aware that she was not married?
 5    A.    Yes.  I believe she stated that in her email.
 6    But I was aware she was not married.
 7    Q.    So was it a foregone conclusion that she
 8    would be terminated because she was not married?
 9    A.    In being consistent with our core values, the
10    fact that she had sex outside of marriage meant that
11    we would terminate her.
12    Q.    If she would have gotten married, would she
13    have been given a restoration plan or a second
14    chance?
15    A.    That's a hypothetical.  I cannot answer that
16    question.
17    Q.    Was that discussed or considered?
18    A.    We never had a discussion because she never
19    brought up the idea that she would get married.
20    Q.    Did you have any discussion with her or ask
21    her if she had plans to get married?
22    A.    No.  And the core value had already been
23    violated because she had sex outside of marriage.
24    Q.    So there was no way, there was no path that
25    she could have taken to redeem herself at that point

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 33 of 76 PageID #: 4849

```
 1   to keep her job?
 2   A.    In being consistent with core values, we did
 3   not have a choice but to terminate her.
 4   Q.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7   XXXXXXXXXXXXXXXXXXXXXXXXX
 8                 XXXXXXXXXXXXXXXXXXXXXX
 9           XXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXX
10           XXXXXXXXXXXX  XXXXX
11           XXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXX
12   XXXXXXXXXXX
13   XXXXXXXXXXXXXXX
14   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18   Q.    If Ms. O'Connor would have notified the
19   company closer to her due date that she had engaged
20   in, you know -- that she was pregnant and unmarried,
21   would she have still been terminated?
22   A.    She would have been terminated for having sex
23   outside of marriage.
24   Q.    Did you know that she had had other children
25   outside of wedlock?
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 34 of 76 PageID #: 4850

```
1   A.     I knew she had other children.  I don't
2   remember the circumstances.
3   Q.     Now, when you received the email, did you
4   have any -- or after you received the email from
5   Armando Lopez that Caitlin O'Connor had sent to him,
6   did you have any conversation with Ms. O'Connor?
7   A.     I did.
8   Q.     Okay.  Tell me what you recall.
9   A.     I recall having a phone conversation with
10  her, and I recall having a meeting in person with
11  her.
12  Q.     Which came first, the phone conversation or
13  the meeting?
14  A.     The phone conversation.
15  Q.     Right.  Did you have that on your cell phone
16  or your company phone or just your landline?
17  A.     Cell phone.
18  Q.     Okay.  Did you record the phone conversation?
19  A.     No.
20  Q.     Is your cell phone a company-provided cell
21  phone?
22  A.     Yes.
23  Q.     Okay.  When did you speak with her?
24  A.     I don't remember.
25  Q.     Okay.  What do you recall about the phone
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 35 of 76 PageID #: 4851

conversation?

A.    I really don't recall anything from the
conversation specifically.

Q.    What do you recall generally about the phone
conversation?

A.    The only thing generally I remember is
feeling very much the intention of wanting to make
sure Caitlin was okay.

Q.    Do you recall her telling you anything in
specific?

A.    I don't.

Q.    Do you recall any specific questions that you
asked her?

A.    No, I don't.

Q.    Did you take any notes?

A.    No.

Q.    Was anyone else present when you had that
phone conversation with her?

A.    No.

Q.    Then you mentioned -- well, about how long
did the phone conversation last, if you recall?

A.    I don't remember.  I do feel like it was
fairly brief.

Q.    Okay.  So tell me about the meeting that you
had with her in person.

```
 1   A.     Jen Sievertsen and I met with her not long
 2   after us receiving the email.
 3   Q.     Okay.  What do you recall about that meeting?
 4   A.     I do not recall details.  I simply recall
 5   that we simply wanted to see how Caitlin was doing
 6   and if she was going to be doing okay.
 7   Q.     What do you mean if she was going to be doing
 8   okay?
 9   A.     Just if she was okay.  We didn't know.  We
10   had no reason to assume that she was feeling great
11   about her situation or not.  So we simply wanted to
12   sit down with her and see how she was doing.
13   Q.     What do you mean feeling great about her
14   situation?  About the fact that she was pregnant or
15   the fact that she was going to lose her job?
16   A.     Based on her email to Armando, we wanted to
17   make sure she was okay.
18   Q.     What do you mean by okay?
19   A.     We wanted to make sure that she was doing
20   okay, as one person to another would ask if they
21   were doing okay.
22   Q.     Well, I need you to explain that.  Do you
23   mean emotionally?  What do you mean?
24   A.     That was part of it.  She referenced in her
25   email she knew that there was a conflict of our core
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 37 of 76 PageID #: 4853

```
 1   values.  We knew she might be nervous.  We knew --
 2   we didn't want to assume anything.  So we simply
 3   wanted to see how she was doing.
 4   Q.     Okay.  Did you take any notes?
 5   A.     I don't recall.
 6   Q.     Did you send a summary of the meeting to
 7   anyone?
 8   A.     I don't recall.
 9   Q.     Have you checked to see if you had any notes
10   or an email summary of the meeting?
11   A.     I personally have not unless -- not -- not
12   that I recall.
13   Q.     Sitting here today, you don't know if you
14   created any notes from that meeting that you had
15   with Caitlin O'Connor?
16   A.     I do not know for sure if I personally did.
17   Q.     Okay.  And you haven't checked?
18   A.     No.
19   Q.     All right.  So you had the meeting with
20   Caitlin O'Connor and Jen Sievertsen to see if she
21   was okay.  Do you recall anything else about the
22   meeting?
23   A.     No.  It was very brief.
24   Q.     How did Ms. O'Connor seem during the meeting?
25   A.     I don't remember specifics.  I do feel like
```

```
1   she expressed to us that she was happy, and her
2   boyfriend was very happy about the situation.  And I
3   don't remember much else about that conversation.
4   Q.     Where did the meeting take place?
5   A.     In my office.
6   Q.     Was the door open or shut?
7   A.     Closed.
8   Q.     Do you recall if anyone else took notes, if
9   you observed anyone else taking notes during the
10  meeting?
11  A.     I don't recall.
12  Q.     Okay.  If you could pull up Exhibit Number 6
13  for me, please.
14         MS. SANDERS:  I just handed the witness
15  an exhibit marked Number 6 from Mr. Lopez's
16  deposition.
17         WHEREUPON, a document was presented,
18  previously marked as Exhibit Number 6.
19  BY MS. COLLINS:
20  Q.     Okay.  All right.  Ms. Simms, have you seen
21  this email thread before?
22  A.     Yes.
23  Q.     Now, it looks like you were provided
24  Ms. O'Connor's phone number on Friday, June 19th.
25  Do you think that was the day that you called her?
```

```
 1   A.      I don't remember exactly.  It is possible.
 2   Q.      Before you met with Ms. O'Connor did you have
 3   any conversations with Jen Sievertsen as far as what
 4   you expected to get from the meeting with
 5   Ms. O'Connor?
 6   A.      Actually, I don't remember if we had any
 7   conversations prior to the meeting.
 8   Q.      Okay.  And on Exhibit Number 6, it looks like
 9   Dave Ramsey sent the HR Committee, which you're a
10   part of, an email at 5:10 a.m. on June 19th.
11           Did you have any conversations with him about
12   Ms. O'Connor after he sent this email?
13   A.      No.  No.
14   Q.      So at any point in time did you have any
15   conversations with Mr. Ramsey about this email that
16   he sent on June 19th?
17   A.      No.
18   Q.      Did you have any conversations with him about
19   Caitlin O'Connor?
20   A.      Like during this time frame?  During which
21   time frame?
22   Q.      During the time frame around her termination?
23   A.      No.
24   Q.      In Mr. Ramsey's email, he states:  Then next
25   week we will follow the steps we did before.  What
```

```
 1   was your understanding as to what that meant?
 2   A.    My understanding was that we would have to
 3   terminate her as we had had to do previously due to
 4   the conflict with our core values.  It also included
 5   making sure that we would financially take very good
 6   care of her.
 7   Q.    And that was in the form of severance
 8   agreement?
 9   A.    In this case it was not just severance.  We
10   offered a full year of health insurance for she and
11   the baby as well.
12   Q.    And she would have also been required to sign
13   a nondisclosure agreement as part of that severance
14   agreement, correct?
15   A.    Yes.  As part of any severance agreement,
16   yes.
17   Q.    Which meant she couldn't talk about the
18   reasons why she was terminated, correct?
19   A.    That's correct.
20   Q.    And it also prohibited her from pursuing her
21   legal rights with respect to any discrimination she
22   felt she experienced as a result of her termination,
23   correct?
24          MS. SANDERS:  Object to the form.  You
25   can answer.
```

```
 1              THE WITNESS:  She was -- she would have
 2    been given time to speak to a lawyer before signing
 3    an NDA.  We encourage everyone to do that.  But once
 4    it is signed, part of it is there would be no legal
 5    action taken against our organization.
 6    BY MS. COLLINS:
 7    Q.    So for her to get the severance and the
 8    health insurance that she needed to care for her
 9    newborn, she would have had to waive all of her
10    legal rights and agree not to talk anything about
11    Ramsey Solutions?
12              MS. SANDERS:  Object to the form.  You
13    can answer it.
14              THE WITNESS:  Once she signs an NDA,
15    part of that is she cannot file a lawsuit against us
16    and take legal action against our organization.
17    BY MS. COLLINS:
18    Q.    Okay.  If you could pull up Exhibit Number 7
19    for me, please.
20              WHEREUPON, a document was presented,
21    previously marked as Exhibit Number 7.
22              MS. SANDERS:  I'm handing the witness a
23    document marked Exhibit 7 from Mr. Armando Lopez's
24    deposition.
25    / /
```

```
 1              MS. COLLINS:  If you could turn to the
 2   second page of Exhibit Number 7.
 3              MS. SANDERS:  What's the Bates Number,
 4   Heather, that you want her to look at?
 5              MS. COLLINS:  1830.
 6              MS. SANDERS:  Okay.  There you go.
 7   BY MS. COLLINS:
 8   Q.    Have you -- well, did you send this email on
 9   June 23rd, 2020 at 2:29 p.m.?
10   A.    If I could, I would like a moment just to
11   finish reading it.
12   Q.    Sure.
13   A.    Okay.  I have read it.
14   Q.    Okay.  Do you recall sending this email?
15   A.    Yes.
16   Q.    Okay.  When was the last time you reviewed it
17   besides this morning?
18   A.    I don't remember.
19   Q.    Okay.  Now, it says that -- well, first, does
20   this refresh your recollection as to when you had
21   the meeting with Jen Sievertsen and
22   Caitlin O'Connor?
23   A.    I still don't remember exactly.  I can assume
24   it was on Tuesday the 23rd but I cannot speak to
25   that exactly.
```

1   Q.    Okay.  Now, in the second paragraph, the
2   second-to-last sentence, you wrote:  She seemed
3   nervous.  That made it clear she needs us to make
4   this decision.  She isn't going to self-select out.
5   What did you mean by that?
6   A.    She did not resign.
7   Q.    Did you ask her to resign?
8   A.    No, we did not.
9   Q.    And then in the third paragraph, it says:  We
10  met with HRC today.  Who did you meet with on the
11  HRC?
12  A.    I don't remember who was in that meeting.
13  Q.    Was it in person?
14  A.    I would assume so because I sent him that
15  with HRC.
16  Q.    Okay.  Had the decision already been made to
17  terminate her when the email was received on
18  June 19th?
19  A.    The decision was made shortly thereafter.
20  Q.    Okay.  Who was the final decision-maker, or
21  was this another situation where the entire HRC had
22  to agree?
23  A.    This decision was made by the HRC.
24  Q.    If you could turn to Exhibit Number 9 for me,
25  please.

```
 1          MS. SANDERS:  I'm handing the witness a
 2   document that was marked Exhibit Number 9 in Armando
 3   Lopez's deposition.
 4              THE WITNESS:  Yes, I have it.
 5              WHEREUPON, a document was presented,
 6   previously marked as Exhibit Number 9.
 7   BY MS. COLLINS:
 8   Q.     Okay.  Do you recall sending this text
 9   message to Caitlin O'Connor?
10   A.     Yes.
11   Q.     Did you send her any other text messages
12   around the time frame in June of 2020?
13   A.     I don't recall.
14   Q.     Have you looked to see if you received any or
15   sent any?
16   A.     I have turned over all that was asked of my
17   attorneys.  I do not recall if I had any other text
18   conversations with her.
19   Q.     Okay.  Did you talk with Caitlin O'Connor on
20   this day, June 19th?
21   A.     I don't remember exactly when we spoke.
22   Q.     Did you text with anyone else about Caitlin
23   O'Connor's situation?
24   A.     I don't remember.
25   Q.     Have you gone to check your text messages to
```

```
 1   see if you did?
 2   A.     I have turned over all text messages,
 3   anything that was asked of me, to my attorneys.  I
 4   don't recall any specifics.
 5   Q.     Okay.  How many text messages did you turn
 6   over?
 7   A.     I don't remember.
 8   Q.     But you did turn over text messages that had
 9   to do with Caitlin O'Connor?
10   A.     This one for sure I did.  I don't recall if
11   there were any others.
12   Q.     Did you know that it was illegal to terminate
13   a qualifying employee when they notify you that they
14   need FMLA?
15               MS. SANDERS:  Object to the form.  You
16   can answer it.
17               THE WITNESS:  Yes.  And that is not why
18   we terminated Caitlin O'Connor.
19   BY MS. COLLINS:
20   Q.     Okay.  But part of the reason why she
21   notified Ramsey Solutions of her pregnancy was in
22   the context of requesting FMLA, correct?
23   A.     She did request to speak about FMLA in her
24   initial email to Human Resources.
25   Q.     Do you know if she was provided a notice of
```

```
 1   her rights under the FMLA?
 2   A.     I do not know for sure.
 3   Q.     As a member of the HRC Committee, did you ask
 4   as to whether or not she was provided a notice of
 5   her rights?
 6   A.     No.  That would be our Human Resources
 7   Department obligation.
 8   Q.     Do you know what I mean by notice of rights?
 9   A.     Not exactly.
10          MS. COLLINS:  Okay.  Let's take a quick
11   break.  Off the record.
12          (Short break.)
13   BY MS. COLLINS:
14   Q.     Ms. Simms, would you agree with me that the
15   prohibition against premarital and extramarital sex
16   is not written down anywhere at Ramsey Solutions?
17   A.     To my knowledge -- I can't speak for certain,
18   but to my knowledge it's not formally written down.
19   Q.     And what is your understanding as to how it's
20   communicated?
21   A.     We communicate in multiple ways with our team
22   that we do not want them engaging in sex outside of
23   marriage, from the interview process, to the
24   on-boarding, to regular communication from our staff
25   meeting with our entire team.
```

```
 1   Q.     Is all of that verbal?

 2   A.     Yes.

 3   Q.     Okay.  Would you agree with me that most

 4   important things should be reduced to writing?

 5   A.     I do not agree with that.

 6   Q.     Okay.  Why not?  What do you disagree about

 7   that?

 8   A.     I feel we are very clear and very effective

 9   in our communication of all our core values.

10   Q.     But y'all just don't put some of them down in

11   writing, correct?

12   A.     We did not put in formal writing the

13   specifics around the sex outside of marriage.

14   Q.     Has that ever been considered?

15   A.     I don't know for sure.

16   Q.     Have you been a part of any conversations

17   where that's been considered?

18   A.     Not that I recall.

19   Q.     Do you know of an employee named

20   ██████████████?

21   A.     I am aware of ██████████████.

22   Q.     Why was ██████ terminated?

23   A.     ██████ was not terminated.

24   Q.     Did ██████ quit?

25   A.     If I am remembering the correct person, ████████
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 48 of 76 PageID #: 4864

```
 1    resigned from our organization.

 2    Q.      Do you know why?

 3    A.      My memory is that she resigned because she

 4    very respectfully told us she disagreed with some of

 5    our core values.

 6    Q.      Which core values?

 7    A.      I don't remember specifically which ones.

 8    Q.      Was Caitlin O'Connor's situation brought up?

 9    A.      I'm sorry, can you repeat the question?  It

10    faded out.

11    Q.      Sure.  Was Caitlin O'Connor's situation

12    brought up?

13    A.      I don't recall if it was in that

14    conversation.

15    Q.      Did she sign an NDA or severance agreement?

16    A.      I don't recall.

17    Q.      Was she asked to resign?

18    A.      No.

19    Q.      Did she work in your department?

20    A.      At the time she resigned, I do believe she

21    worked in a department that reported up to me.

22    Q.      Do you recall who her immediate supervisor

23    was?

24    A.      No, I don't recall exactly who it was.

25    Q.      What did you do to prepare for your
```

```
 1  deposition this morning?

 2  A.    What do you mean by prepare?

 3  Q.    Did you talk to anyone?  Did you review any

 4  documents?

 5         MS. SANDERS:  Objection to the extent it

 6  calls for attorney-client privileged communication.

 7  But you can answer other than that.

 8         THE WITNESS:  I mean, as far as

 9  formal -- there was no formal preparation for this

10  deposition.

11  BY MS. COLLINS:

12  Q.    Okay.  Did you review any documents during

13  the course of your deposition?

14  A.    The documents that you asked for us to review

15  only, yes.

16  Q.    Okay.  Did you send or receive any text

17  messages or emails during the course of the

18  deposition?

19  A.    No.

20  Q.    Did you communicate with anyone during the

21  course of the deposition?

22  A.    No.

23  Q.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XX    XXXXXXXXXXXXXXXXX
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 50 of 76 PageID #: 4866

```
 1   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2   XXXXXXXXXXXXXXXXX
 3            XXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXX
 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5            XXXXXXXXXXXX  XXXXX
 6            XXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXX
 7   XXXXXXXXXXXXXXXXXXXXXXXXX
 8   XXXXXXXXXXXXXXX
 9   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXX
11   XX      XXXX
12   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXX
13   XX      XXXXXXXXXXXXXXXXXXXXXXX
14   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16   XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17            MS. COLLINS:  Okay.  Okay.  Let me just
18   have one second.  I think I'm done.
19            MS. SANDERS:  Sure.
20            (Short break.)
21   BY MS. COLLINS:
22   Q.    Okay.  Let's go back on the record.  Does the
23   company hold weekly devotionals?
24   A.    Yes.
25   Q.    Okay.  Are those required attendance?
```

```
 1    A.    We ask our employees to all attend, but
 2    there's no way to take roll.
 3    Q.    Are most of those devotionals faith based?
 4    A.    Yes, most of them are.
 5    Q.    Do they open and close with prayer?
 6    A.    Sometimes.
 7    Q.    And by faith based, are they Christian?  Are
 8    they based on the Christian faith?
 9    A.    Most of them are.
10              MS. COLLINS:  Okay.  That's all I have.
11              MS. SANDERS:  Thank you.  Nothing from
12    us.
13              THE REPORTER:  Ms. Collins, would you
14    like to order this transcribed?
15              MS. COLLINS:  Yes, please.
16              THE REPORTER:  And would you like to
17    order a copy, Ms. Sanders?
18              MS. SANDERS:  Yes.
19              THE REPORTER:  Reading and signing?
20              MS. SANDERS:  Yes.  Sorry.  I couldn't
21    understand you.  We will be reviewing and signing.
22                   FURTHER DEPONENT SAITH NOT
23              (Proceedings concluded at 11:36 a.m.)
24
25
```

```
 1                 E R R A T A   P A G E

 2                 I, SUZANNE SIMMS, having read the
 3     foregoing videoconference deposition, pages 1 -28,
       31 - 33, 34 - 49, 50 - 51, do hereby certify said
 4     testimony is a true and accurate transcript, with
       the following changes (if any):

 5

 6     PAGE  LINE          SHOULD HAVE BEEN

 7     _____ _____     _____

 8     _____ _____     _____

 9     _____ _____     _____

10     _____ _____     _____

11     _____ _____     _____

12     _____ _____     _____

13     _____ _____     _____

14     _____ _____     _____

15     _____ _____     _____

16     _____ _____     _____

17     _____ _____     _____

18     _____ _____     _____

19     _____ _____     _____

20

21                     _____
                                 SUZANNE SIMMS

22

23     _____
       Notary Public

24     My Commission Expires: _____

25     Reported by: Deborah H. Honeycutt, LCR
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 53 of 76 PageID #: 4869

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF DAVIDSON

      I, Deborah H. Honeycutt, Licensed Court Reporter, with offices in Hermitage, Tennessee, hereby certify that I reported the foregoing videoconference deposition of SUZANNE SIMMS by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me. I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

      I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature, and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

_____
Deborah H. Honeycutt, LCR
Elite-Brentwood Reporting Services
Associate Reporter
Notary Public State of Tennessee

My Notary Public Commission Expires: 07/09/24
LCR # 472 - Expires: 06/30/22



Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 55 of 76 PageID #: 4871



Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 56 of 76 PageID #: 4872







Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 59 of 76 PageID #: 4875



Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 60 of 76 PageID #: 4876



Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 61 of 76 PageID #: 4877



Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 62 of 76 PageID #: 4878

# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**Attorneys Eyes Only**

# SUZANNE SIMMS

# September 10, 2021

---



Deborah H. Honeycutt, LCR

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

1   IN THE UNITED STATES DISTRICT COURT FOR THE
    MIDDLE DISTRICT OF TENNESSEE
2             NASHVILLE DIVISION
    _____
3

CAITLIN O'CONNOR,
4
            Plaintiff,          No.: 3:20-cv-00628
5
vs.                            JUDGE RICHARDSON
6
THE LAMPO GROUP, LLC a/k/a     MAGISTRATE JUDGE
7   RAMSEY SOLUTIONS,           FRENSLEY

8           Defendant.         JURY DEMAND
    _____
9

10

11           *CONFIDENTIAL PORTIONS*
    *ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER*
12

13          Videoconference Deposition of:

14          SUZANNE SIMMS

15          Taken on behalf of the Plaintiff
            September 10, 2021
16
            Commencing at 10:01 a.m.
17

18

19

20

21      _____
22
            Elite-Brentwood Reporting Services
23              www.elitereportingservices.com
            Deborah H. Honeycutt, LCR, Associate Reporter
24              P.O. Box 292382
                Nashville, TN 37229
25                 (615)595-0073

```
 1

 2                  A P P E A R A N C E S

 3

     For the Plaintiff:
 4
                 MS. HEATHER MOORE COLLINS
 5               Attorney at Law
                 Collins & Hunter, PLLC
 6               7000 Executive Center Drive, Suite 320
                 Brentwood, TN  37027
 7               (615)724-1996
                 heather@collinshunter.com
 8

 9

10   For the Defendant:

11               MS. LESLIE SANDERS
                 Attorney at Law
12               Webb Sanders PLLC
                 611 Commerce Street, Suite 3102
13               Nashville, TN  37203
                 (615)915-3300
14               lsanders@webbsanderslaw.com

15

16

17   Also present:

18               MR. DANIEL CORTEZ, Attorney at Law

19               MR. ARMANDO LOPEZ

20

21

22

23

24

25
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 65 of 76 PageID #: 4881

```
 1   //

 2   //

 3   //

 4   //

 5   //

 6   //

 7   //

 8   //

 9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17              (Confidential portion begins:)

18   Q.     Do you have any recollection as to a

19   situation where that came up, that an employee would

20   not be terminated if they engaged in premarital or

21   extramarital oral sex but not intercourse?

22   A.     There was one instance of that, yes.

23   Q.     Okay.  Tell me about that.

24   A.     That was █████████.

25              MS. SANDERS:  Just a reminder, this
```

entire deposition is marked confidential until

further notice, and anything about ████████ is

attorney's eyes only.

            MS. COLLINS:  I disagree with the

blanket statement that the entire deposition is

confidential because I don't think that it is.  If

you want to state for the record that discussions

with respect to ████████ particular employment

circumstances are attorney's eyes only, that's fine.

We'll certainly deal with that later with the court

and with respect to filing deadlines.

BY MS. COLLINS:

Q.      So you said that that came up with ██████

████.  What were the circumstances where it was

deemed that oral sex was not a terminable offense

but intercourse was?

A.      The circumstances in that case was it was

something that had happened so far in the past and

we had never encountered that type of situation

before.

Q.      Who was involved in that decision?

A.      Our Operating Board.

Q.      Who was on the Operating Board at the time?

A.      We have had some turnover.  I don't remember

exactly all of the names.

```
 1    Q.      Was Dave Ramsey involved in that decision?

 2    A.      Yes.  He is on the Operating Board.

 3    Q.      So is there a biblical basis that oral sex is

 4    a form of premarital sex that is okay but not

 5    intercourse?

 6    A.      I don't know.

 7    Q.      And you would agree with me that a person

 8    typically can't get pregnant through oral sex,

 9    right?

10    A.      As far as I know, that is correct.

11    Q.      But when this situation came up with ████,

12    with respect to ████████, you mentioned that it

13    was something that occurred so far in the past and

14    y'all had never encountered it before, what do you

15    mean by that?

16    A.      We had never been made aware of a situation

17    that was not happening in realtime.  And he and his

18    wife agreed they wanted to restore their marriage.

19    And because it had happened so far in the past, we

20    decided to partner with them in that.

21    Q.      So was there discussion if y'all would have

22    known about it in realtime he would have been

23    terminated for engaging in oral sex?

24    A.      That is a possibility.

25    Q.      So your recollection was that there was no
```

```
 1   recent form of sex being engaged in, whether it was

 2   oral or intercourse; is that correct?

 3   A.      That was our understanding at that time.

 4   Q.      And for that reason ████████ remained in his

 5   job, right?

 6   A.      Yes.  Because of that decision, yes.

 7              (Confidential portion ends.)

 8   //

 9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 69 of 76 PageID #: 4885

```
 1   //

 2   //

 3              (Confidential portion begins:)

 4   Q.      With respect to the ██████████ situation,

 5   how far removed in time was your understanding as to

 6   when he last engaged in a sex act with someone

 7   outside of his marriage?

 8                  (Simultaneous talking.)

 9              MS. SANDERS:  Object to the form.

10              MS. COLLINS:  Okay.

11              THE WITNESS:  I don't remember the exact

12   time frame.

13   BY MS. COLLINS:

14   Q.      Okay.  Do you remember generally?  Like, was

15   it a few weeks?  A few months?  A few years?

16   A.      It was at least over two years.  I don't

17   remember the exact time frame.

18                  (Confidential portion ends.)

19   //

20   //

21   //

22   //

23   //

24   //

25   //
```

```
1    //
2    //
3    //
4    //
5    //
6    //
7    //
8    //
9    //
10   //
11   //
12   //
13   //
14   //
15   //
16   //
17   //
18   //
19   //
20   //
21   //
22              (Confidential portion begins:)
23   Q.    Have you reviewed a declaration that was
24   provided by ████████████ in this case?
25   A.    I don't recall.
```

```
 1    Q.      Do you recall referring ███████ to a

 2    divorce attorney?

 3                MS. SANDERS:  Could you repeat that,

 4    Heather?  You're cutting out just a little bit.

 5                THE WITNESS:  Yeah.

 6                MS. SANDERS:  It almost sounds like the

 7    microphone is covered up.

 8    BY MS. COLLINS:

 9    Q.      Do you recall referring ███████ to a

10    divorce attorney?

11    A.      Yes.

12    Q.      Okay.  Why did you do that?

13    A.      He requested that I do.

14    Q.      Is this the company's practice to get

15    involved in its employees' marital problems?

16    A.      We don't have a company practice around that.

17                (Confidential portion ends.)

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //
```

```
 1              E R R A T A   P A G E

 2                  I, SUZANNE SIMMS, having read the
 3     redactions of the foregoing videoconference
       deposition, pages 28 - 31, 33, 49 - 50, do hereby
 4     certify said testimony is a true and accurate
       transcript, with the following changes (if any):

 5
 6     PAGE   LINE          SHOULD HAVE BEEN

 7     _____  _____         _____

 8     _____  _____         _____

 9     _____  _____         _____

10     _____  _____         _____

11     _____  _____         _____

12     _____  _____         _____

13     _____  _____         _____

14     _____  _____         _____

15     _____  _____         _____

16     _____  _____         _____

17     _____  _____         _____

18     _____  _____         _____

19     _____  _____         _____

20
                            _____
21                                 SUZANNE SIMMS

22
       _____
23     Notary Public

24     My Commission Expires: _____

25     Reported by: Deborah H. Honeycutt, LCR
```

```
 1

 2                    REPORTER'S CERTIFICATE

 3
     STATE OF TENNESSEE
 4
     COUNTY OF DAVIDSON
 5

 6              I, Deborah H. Honeycutt, Licensed Court

 7     Reporter, with offices in Hermitage, Tennessee,

 8     hereby certify that I reported the redactions in

 9     the foregoing videoconference deposition of

10     SUZANNE SIMMS by machine shorthand to the best of

11     my skills and abilities, and thereafter the same

12     was reduced to typewritten form by me.  I am not

13     related to any of the parties named herein, nor

14     their counsel, and have no interest, financial or

15     otherwise, in the outcome of the proceedings.

16              I further certify that in order for this
       document to be considered a true and correct copy,
17     it must bear my original signature, and that any
       unauthorized reproduction in whole or in part
18     and/or transfer of this document is not authorized,
       will not be considered authentic, and will be in
19     violation of Tennessee Code Annotated 39-14-104
       Theft of Services.
20

21     _____

22     Deborah H. Honeycutt, LCR
       Elite-Brentwood Reporting Services
23     Associate Reporter
       Notary Public State of Tennessee
24
       My Notary Public Commission Expires: 07/09/24
25     LCR # 472 - Expires: 06/30/22
```

Case 3:20-cv-00628   Document 93-5   Filed 08/31/22   Page 74 of 76 PageID #: 4890



