# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**Attorneys Eyes Only**

## MICHAEL FINNEY

## September 28, 2021



Jerri L. Porter, RPR, CRR, CLR, LCR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

IN THE UNITED STATES DISTRICT COURT
FOR the MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
_____

CAITLIN O'CONNOR,

          Plaintiff,

vs.                    Case No. 3:20-cv-00628

THE LAMPO GROUP, LLC,
a/k/a RAMSEY SOLUTIONS,

          Defendant.
_____

***CONFIDENTIAL***
***ATTORNEYS' EYES ONLY***
(UNTIL FURTHER DETERMINATION)


Videoconference Deposition of:

MICHAEL FINNEY

Taken on behalf of the Plaintiff
September 28, 2021

Commencing at 1:35 p.m. CST


_____

Elite-Brentwood Reporting Services
www.elitereportingservices.com
Jerri L. Porter, RPR, CRR, LCR
P.O. Box 292382
Nashville, Tennessee 37229
(615)595-0073

Case 3:20-cv-00628 Document 86-6 Filed 03/11/22 Page 2 of 134 PageID #: 4894
Elite-Brentwood Reporting Services (615)595-0073
www.elitereportingservices.com

A P P E A R A N C E S


For the Plaintiff:

          MS. ASHLEY WALTER
          Attorney at Law
          Collins & Hunter
          7000 Executive Center Drive
          Building 2, Suite 320
          Brentwood, Tennessee 37027
          (615)724-1996
          ashley@collinshunter.com



For the Defendant:

          MS. LESLIE SANDERS
          Attorney at Law
          Webb Sanders
          611 Commerce Street
          Suite 3102
          Nashville, Tennessee  37203
          (615)4915-3300
          lsandesr@websanderslaw.com



Also present:


DANIEL CORTEZ, Ramsey Solutions General Counsel
██████████████, Ramsey Solutions Corporate Rep

```
 1

 2              S  T  I  P  U  L  A  T  I  O  N  S

 3

 4          The videoconference deposition of MICHAEL

 5     FINNEY was taken by counsel for the Plaintiff, by

 6     Notice, with all participants appearing at their

 7     respective locations, on September 28, 2021, for

 8     all purposes under the Federal Rules of Civil

 9     Procedure.

10         All formalities as to caption, notice,

11     statement of appearance, et cetera, are waived.

12     All objections, except as to the form of the

13     question, are reserved to the hearing, and that

14     said deposition may be read and used in evidence in

15     said cause of action in any trial thereon or any

16     proceeding herein.

17          It is agreed that Jerri L. Porter, RPR,

18     CRR, Notary Public and Licensed Court Reporter for

19     the State of Tennessee, may swear the witness, and

20     that the reading and signing of the completed

21     deposition by the witness is not waived.

22

23

24     / /

25     / /
```

*   *   *

THE REPORTER:  Good afternoon.  My name is Jerri Porter.  I am a Tennessee Licensed Reporter, LCR Number 335.  Today's date is September 28, 2021, and the time is approximately 1:35 p.m. Central time.

This is the deposition of MICHAEL FINNEY in the matter of O'Connor versus The Lampo Group, in the United States District Court for the Middle District of Tennessee, Nashville Division, Case Number 3:20-cv-00628.

At this time, I will ask counsel to identify yourselves, state whom you represent, and agree on the record that there is no objection to Jerri Porter administering a binding oath to the witness via Zoom.

MS. WALTER:  Ashley Walter for the plaintiff, and no objection.

MS. SANDERS:  Leslie Sanders for defendant, along with Daniel Cortez, attorney for defendant.  And with us is █████████, the company representative, and the witness, Michael Finney.  No objection.

/ /

```
1                    *    *    *

2                 MICHAEL FINNEY,

3

4    was called as a witness, and after having been duly

5    sworn, testified as follows:

6

7                    EXAMINATION

8    QUESTIONS BY MS. WALTER.

9    Q      All right.  Mr. Finney, like I mentioned

10   before, my name is Ashley Walter and I represent

11   Ms. O'Connor.

12          Have you ever had your deposition taken

13   before?

14   A      No.

15   Q      Okay.  So, with any deposition, there's

16   always kind of some ground rules, just so that you

17   and I aren't stepping on each other's toes, and

18   that's especially true of Zoom depositions to make

19   sure the court reporter can easily get everything

20   down.  One of the biggest things I'm going to try to

21   do and I'm going to ask you to try to do us not talk

22   over each other.  So I'm going to try to let you

23   finish your response before jumping into another

24   question.  If you'll let me finish my question

25   before responding.
```

Case 3:20-cv-00627-BJD Document 45-7 Filed 08/11/22 Page 7 of 134 PageID #: 48996
Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

1        Does that sound okay?

2   A     Yes.

3   Q     All right.  And sometimes I'll probably have

4   to remind -- do a little reminder.  That's not to

5   kind of scold you.  It's more to kind of keep both

6   of us on -- make sure we're both being aware of it

7   because sometimes when you know where a question is

8   going, it's tempting to jump in and answer before I

9   get it out.  But for the court reporter, we always

10  try to make sure we're not talking over each other.

11        Another thing is, during the deposition, it

12  is especially hard via Zoom, if someone responds

13  with an uh-huh or huh-uh or shakes their head yes or

14  no.  So I do just ask that you always do verbal

15  responses, a yes or a no.  That way the court

16  reporter can get it down, because uh-huh and huh-uh

17  look exactly the same on a transcript.  So, for

18  accuracy sake, if you could stick to verbal

19  responses, that would be great.

20        And the last thing is, I'm going to be asking

21  you a number of questions.  There may be something

22  that I ask you that is unclear or you don't quite

23  understand what I'm asking.  You are welcome to ask

24  me to rephrase it or to clarify it.  That way we can

25  assume that if you do answer my question, that you

understand the question that you were asked.

Does that seem fair?

A    Yes.

Q    Okay.  And also, if you need a break -- I don't anticipate this taking particularly long, but those are every attorney's famous last words.  So if you need a break during any of this, just let me know.  We can take a five-minute break.  I only ask that you finish what -- answer whatever question I've most recently asked and then we can take a break.  All right?

A    Cool.

Q    Okay.  Mr. Finney, could you state your full name for the record, please.

A    Michael Finney.

Q    All right.  And what is your address, Mr. Finney?

A    Home address?

Q    Yes, sir.

A    ████████████████████████████████████████
████████

Q    Okay.  And then what is your phone number?

A    ████████████████████

Q    All right.  Is that a personal phone?

A    Yes.

1  Q      Okay.  So it's not a company phone?

2  A      Correct.

3  Q      All right.  And what is your current job

4  title?  Where do you work?

5  A      Chief operating officer.

6  Q      Okay.  And where are you the chief operating

7  officer?

8  A      Can you say that again?

9  Q      Yes.  Where are you the chief operating

10 officer?

11 A      Ramsey Solutions.

12 Q      Okay.  And when did you take that position?

13 A      Sixty days ago, roughly.

14 Q      All right.  And what was your position before

15 that?

16 A      Chief digital officer.

17 Q      Okay.  And how long were you in that

18 position?

19 A      Roughly four years.

20 Q      All right.  So, you were the chief digital

21 officer during the summer of 2020?

22 A      Yes.

23 Q      Okay.  And what were your duties as the chief

24 digital officer?

25 A      To lead several disciplines for the company

Case 3:20-cv-00613  Document 337  Filed 05/21/22  Page 10 of 134 PageID #: 4902
Elite Document Reporting Service 615-595-0073
www.elitereportingservices.com

```
 1   and to serve on the operating board.
 2   Q      Okay.  When you say serve -- I believe you
 3   said multiple disciplines.  What do you mean by
 4   that?
 5   A      So, our company has people that work in
 6   different disciplines and my job was to lead several
 7   of the more technical disciplines.
 8   Q      Okay.  And what do those disciplines include?
 9   A      IT, digital development, data and analytics.
10   Q      Okay.
11   A      Customer success.  And I might be forgetting
12   one.
13   Q      Okay.  And is customer success like a
14   customer service?
15   A      Yes.
16   Q      Okay.  In your position -- and you said you
17   were on the operating board?
18   A      Yes.
19   Q      So, in your position as the chief digital
20   officer, is it -- is there anything in your role to
21   set policy?  Is that part of your duties?
22   A      Can you clarify?
23   Q      Sure.  Do you set policy as to how operations
24   are run or set policy as to what actions are
25   fireable or disciplinary actions?
```

Elite-Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

```
 1   A        I do not set policy as to what actions are
 2   fireable or disciplinary actions.
 3   Q        Okay.  But you do set policy as to how the --
 4   how certain departments are run?
 5   A        For example, standards on how we do data and
 6   analytics or standards on how we do IT.
 7   Q        Okay.  What about as a member of the
 8   operating board?
 9   A        It depends what -- can you be more specific
10   about what you're asking?
11   Q        Sure.  So what do you do as a member of the
12   operating board?
13   A        Sure.  On the operating board we meet
14   regularly to discuss holistic company matters,
15   usually business matters.  Yeah, so, it's a regular
16   meeting of the top leaders in the company.
17   Q        Okay.  And how long have you been a member of
18   the operating board?
19   A        I believe since the beginning of 2017.
20   Q        Okay.  So, does the operating board set
21   policies as to fireable offenses?
22   A        No.
23   Q        Who does set those standards?
24   A        The HR committee.
25   Q        Okay.  And then I have -- are you ever
```

Elite Courtroom Reporting Services
www.elitereportingservices.com

1   involved with HR committee decisions?

2   A      No.

3   Q      So, the HR committee never talks to you even

4   if it's their own employee that they're making a

5   determination about?

6   A      I may provide information to the HR

7   committee, but I am not part of the decision-making

8   for HR committee.

9   Q      Okay.  Are you ever called upon to do the

10  firing?  Like are you ever in meetings where you're

11  telling somebody that they've been fired?

12  A      Yes.

13  Q      Okay.  And why is that if you're not the

14  decision -- if you're not involved in making the

15  decision?

16  A      I've always gone to the HRC for those

17  decisions.

18  Q      Okay, sure.  But my question was, do you know

19  why you are the one telling an employee that they're

20  fired if you're not involved in the decision to fire

21  them?

22  A      The reason that I might be involved in being

23  the person to fire someone would be if they are on

24  my team, but that doesn't mean that I made the

25  decision to fire them.

Elite Document Reporting Services  (615) 595-0073
www.elitereportingservices.com

1    Q      Okay.  Who from the -- so, if you -- correct

2    me if I'm wrong, but the HR committee makes the

3    decision on who's getting fired, correct?

4    A      The HR committee makes the decision, yes.

5    Q      Okay.  And who from the HR committee notifies

6    you that you're going to be the one to fire someone?

7    A      It depends.  It's different.  At least one

8    member of the HRC, but it's never a consistent one

9    person.

10   Q      Okay.  Do you ever make recommendations to

11   the HRC committee about recommending someone to be

12   fired?

13   A      I don't recall if I've ever said I think we

14   should fire this person.

15   Q      Okay.  Have you ever brought to the HRC

16   committee a concern about somebody, one of your

17   employees?

18   A      Yes.

19   Q      Okay.  And how does that process work?

20   A      Sometimes it's in person, sometimes it's by

21   e-mail.

22   Q      Okay.  So, you just notice a behavior of

23   an employee and then report them to the HRC

24   committee -- or the HRC?

25   A      Correct.

Elite Document Reporting Service (415) 1595-0073
www.elitereportingservices.com

1    Q       Okay.  So, in order to do that, though, you'd

2    have to -- are you aware of Ramsey Solutions'

3    policies and what types of behaviors are considered

4    fireable offenses?

5    A       I, of course, know what HRC has decided in

6    past circumstances, yes.

7    Q       So, as a chief digital officer, part of your

8    duties is to have a working knowledge of Ramsey

9    Solutions' policies?

10   A       Yes.

11   Q       Okay.  Do you get trainings on those?

12   A       What do you mean by training?

13   Q       Sure.  Do you get training on -- have you

14   ever received a training on the Ramsey Solutions --

15   throughout this I'll probably say Ramsey.  In that

16   case I'm referring to Ramsey Solutions, the company.

17   If I'm ever referring to Dave Ramsey specific, I'll

18   specifically say his name, or Mr. Ramsey, making it

19   clear that I'm talking about a person.

20           So, do you ever receive training on the

21   Ramsey handbook?

22   A       No.

23   Q       What about within that -- and we'll talk

24   about it more in detail later, but just generally

25   are you familiar with the Ramsey core values?

Case 3:20-cv-00828  Elite Reporting Services  Page 15 of 134  PageID #: 4907
Document 88-1  Filed 05/21/22  Page 15 of 134
www.elitereportingservices.com

1    A       Yes.

2    Q       Do you receive training on those?

3    A       I don't know if I would call it training.

4    Q       Okay.  What would you call it?

5    A       From time to time we might talk about a core

6    value from stage during staff meeting, as an

7    example.

8    Q       Okay.  So, it's more of a collective meeting

9    with everybody in the company?

10   A       Correct.

11   Q       Okay.  Have you ever received training on how

12   company policies are supposed to be enforced?

13   A       I'm struggling -- I'm struggling a lot with

14   the word training.  Can you be more specific?

15   Q       Sure.  Instruction.  You know, this behavior

16   needs to be reported to the HR committee, this

17   behavior you need to handle yourself and discipline.

18   Have you ever received any instruction as to when to

19   do a verbal warning, when to do a written warning,

20   when to escalate it to the HRC?

21   A       No.

22   Q       Okay.  So, how do you know that?

23   A       I do receive -- I do know what previous items

24   that I have brought to the HRC and sometimes what

25   others have brought to the HRC so I have a gauge for

Case 3:20-cv-00023 Document 94 Filed 05/27/22 Page 16 of 134 PageID #: 4905
Elite Reporting Services · (615) 595-0073
www.elitereportingservices.com

1    what things need to go there.  But no training as to

2    what specifically should go there.

3    Q      Okay.  So, there's maybe communications with

4    you and some of the other supervisors about

5    situations that they've run into and what the HRC

6    has told them to do about it?

7    A      Yes.

8    Q      Okay.  Who would some of those other people

9    be?

10   A      All members of the HRC.

11   Q      Okay.  So -- and maybe this will just help me

12   kind of clarify.  So, who would be your colleagues?

13   And more specifically I'm talking about during 2020.

14   So, when you were the chief digital officer.  So,

15   who would the colleagues be?  Who are the other

16   chiefs that were in line with you?

17   A      Other operating board members.

18   Q      Which are?

19   A      There are, I want to say 14 or 15.  So,

20   specifically excluding Dave, Dave -- I'm not on

21   level with Dave.  But the other operating board

22   members.

23   Q      Okay.  And are all board members -- are all

24   members of the HRC also operating board members?  I

25   understand that it doesn't necessarily go in the

Elite Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1    reverse, that not all operating board members are

2    members of the HRC, but is everybody who is on the

3    HRC also a member of the operating board?

4    A      No.

5    Q      Who is the exception?

6    A      On our current -- I would need to see a

7    current roster of our HRC to be able to tell you

8    that.

9    Q      Okay.  So, as the chief digital officer, who

10   do you report to?  Do you report to anyone?

11   A      Dave Ramsey.

12   Q      Okay.  And then who reports -- who reported

13   to you?  Obviously, that's probably changed since.

14   A      Directly reported?

15   Q      Yes.

16   A      I'm trying to think.  Are you looking for

17   specific names?

18   Q      No.  Just anybody who directly reported to

19   you while you were the chief digital officer.

20   A      Are you looking for names, for titles, for --

21          (Overlapping speech.)

22   Q      Names and titles if you can give them.

23   A      I mean, there were over 200 -- I think at one

24   point 250 people inside that organization, so...

25   Q      I'm looking for people who reported directly

Case 3:20-cv-00628    Document 36-1    Filed 05/31/22    Page 18 of 134    PageID #: 4917
Elite Court Reporting Service (615) 595-0073
www.elitereportingservices.com

to you, not kind of the people who reported to
people who reported to people who reported to you.
Just the direct line who was right beneath you in
terms of the chain of command, if you will.

A        Sure.  I may miss somebody, but the people
that reported to me and that I had regular
one-on-ones with were my assistant, Katie Myers;
████████████, who was our senior technical
officer, or he was at that time; Matt Michaud, who
leads our analytics team; Lee Yoder, who leads
customer success; ████████████, who leads some of our
software operations; and Chelsea Bremer, who leads
our IT.

Q        Okay.  Did at one point Caitlin O'Connor
report to you?

A        On the org chart, yes.  In practice, no.

Q        Okay.  What do you mean by that?

A        Caitlin was, at one point when I joined this
team, a team assistant in that she supported just
kind of whoever on the team needed help.  Again,
there's a couple hundred people.  And during that
season, it was decided, well, because she's not
really directly assisting anyone, we'll just have
her report to me on the org chart.

         I want to say around 2018 -- I might have my

1    date kind of wrong, but somewhere in there -- we
2    made the decision for her to no longer be a team
3    assistant, but instead to more directly start
4    assisting certain leaders in the technology
5    organization.  And so, 99.9 percent of her
6    communication and -- was with those people that she
7    was assisting.
8    Q      Okay.  Who -- in the course of regular
9    business, do you do annual evaluations?
10   A      Yes.
11   Q      Okay.  Who would have performed Caitlin
12   O'Connor's annual evaluation in 2018, 2019, and
13   2020?
14   A      I did those evaluations, but I wouldn't
15   necessarily call it an evaluation.  I would call it
16   more of a check-in.  Usually, because of the
17   relationship of Caitlin helping out multiple other
18   leaders, our conversation would more be focused on
19   the future and what she had in mind for her
20   aspirations.
21   Q      Okay.  If one of your employees, whether it
22   be your direct reports or one of their direct
23   reports, became pregnant, who were they supposed to
24   report that to?  Who were they supposed to let know?
25   A      I don't know.

Elite Document & Reporting Service, LLC 615-595-0073
www.elitereportingservices.com

1    Q    Would they let you -- have you had an

2    employee let you know that they were pregnant?

3    A    I have, yes.

4    Q    Okay.  And what do you typically do with that

5    information?

6    A    Nothing.

7    Q    Okay.  You don't tell them to go to HR?

8    A    No.

9    Q    Do you tell them at all that they need to

10   request FMLA?

11   A    I have never been asked that.

12   Q    You've never been asked about FMLA?

13   A    Correct.

14   Q    Okay.  But you have been told that one of

15   your employees is pregnant.

16   A    Yes.

17   Q    Okay.  So, you've never told an employee,

18   congratulations, go to HR and request FMLA

19   paperwork?

20   A    No.

21   Q    Okay.  Do you receive any trainings as a

22   supervisor on FMLA or Title VII?  Let me break that

23   up.

24        Have you ever received training on FMLA as a

25   supervisor?

Elite Document Reporting Services
www.elitereportingservices.com

```
1    A       No.

2    Q       What about Title VII?

3    A       No.

4    Q       Are you familiar at all with what Title VII

5    is?

6    A       I've heard the term, but no.

7    Q       Okay.  What's your background?  Where did you

8    work prior to working at Ramsey Solutions?

9    A       Watson Wyatt Worldwide.

10   Q       And what did they do there?

11   A       They are a benefits consulting firm.  Or they

12   were.

13   Q       And what did you do there?

14   A       I was an actuarial analyst.

15   Q       That was going to be my next question.  What

16   is an actuarial analyst?  I have no idea what that

17   is.

18   A       An actuarial analyst measures and values

19   risk.

20   Q       Okay.  What types of risk do they measure?

21   A       An analyst can measure lots of risk.

22   Specifically what I did was measure the risk of

23   liabilities to defined benefit pension plans.

24   Q       All right.  I would have no idea where to

25   start with that.
```

Elite-Brentwood Reporting Services
www.elitereportingservices.com

1        What education allows you to be able to be an
2   actuarial analyst, if I even said that right?
3   A      I don't know.  Good with numbers.
4   Q      Okay.  Do you have to get like a bachelor's
5   in math?
6   A      No.  My bachelor's was not in math or -- I
7   had a business degree.
8   Q      Okay.  Where did you get your business degree
9   from?
10  A      University of Memphis.
11  Q      And was that a bachelor's in business?
12  A      Yes.
13  Q      Do you have any master's or anything like
14  that?
15  A      No.
16  Q      Okay.  You would be hard pressed to find an
17  attorney who has a bachelor's in math or anything
18  regarding numbers.  I'm going to be learning a lot
19  about what you do.
20       And you had said earlier that as a supervisor
21  you did not have the ability to fire; is that right?
22  A      I did not make the decisions to fire.
23  Q      Okay.  What about to hire?
24  A      Yes.
25  Q      All right.  And what does that process look

Elite Document Reporting Service 615 1595-0073
www.elitereportingservices.com

1   like?  Can you walk me through the hiring process,

2   what you would do?

3   A      These days my involvement in the hiring

4   process usually looks like one or two interviews

5   towards the tail end of the interview process.  I do

6   relatively few these days.  I usually do only upper

7   level leaders.

8   Q      Okay.  What about as the chief digital

9   officer?

10  A      Same.

11  Q      Same?  Okay.  So, kind of walk me through how

12  you get notified of when you're doing interviews and

13  what those interviews look like.

14  A      Can you be more specific?

15  Q      Yeah.  And again, I'm more referencing the

16  time period when you were the chief digital officer.

17  How would you be notified that you have an interview

18  to do?

19  A      I would receive an e-mail.

20  Q      From?

21  A      Usually someone in HR.

22  Q      Okay.  And was it always someone within your

23  department?

24  A      That I received the notification from?

25  Q      Or the people that -- good question.  The

Case 3:20-cv-00283  Document 349  Filed 05/21/24  Page 24 of 134 PageID #: 4923
EliteLitigationReportingServices Page 24 - Page 24
www.elitereportingservices.com

1  people that you would be doing the interviews of,

2  were they for your department?

3  A      Usually, but not exclusively.

4  Q      Okay.  When would you do interviews of other

5  people not within your department?

6  A      If another board member asked me to interview

7  someone.

8  Q      Okay.  And by the time it gets to you, are

9  you doing individual interviews or are you more a

10  part of the spousal interview process?

11  A      Individual.

12  Q      Okay.  Did you ever participate in the

13  spousal interviews?

14  A      Not -- as chief digital officer, I don't

15  believe so.  It's been a long time.

16  Q      Okay.  Were you involved in the hiring

17  process of Caitlin O'Connor?

18  A      No.

19  Q      No?  And why is that?

20  A      I was -- I don't recall, but I was not her

21  leader or the person that she was going to be

22  assisting.  I'm not even sure I was on that team at

23  the time she was hired.  I would have to look at her

24  hire date to know for sure.

25  Q      Okay.  As a supervisor and as the chief

1    digital officer, in your experience how important is

2    it for employees to know what actions are fireable

3    offenses?

4    A      During the interview process?

5    Q      Or just how important is it for them to know

6    for their career?

7    A      So, to be clear, during the interview process

8    and while they are here?

9    Q      Yes.

10   A      It is important for them to know that.

11   Q      Okay.  And why is that?

12   A      I don't have a good answer to that.  Common

13   courtesy?

14   Q      Sure.  Just as a -- you know, in your

15   experience as a supervisor, why do you think it is

16   important that employees know what actions will

17   cause them to be fired?

18   A      I mean, people need to know what the values

19   are of the organization and -- yeah, people need to

20   know the values of the organization.

21   Q      Sure.  Would you consider it important that

22   employees know what will get them fired since it

23   affects their ability to pay their bills?

24   A      Yes.

25   Q      And then, have you -- in the times that you

1    have been involved in interview processes, have you

2    ever hired -- have you ever interviewed someone who

3    was visibly pregnant?

4    A       I don't recall.

5    Q       Okay.  Have you ever hired anybody who told

6    you they were pregnant?

7    A       I don't recall.

8    Q       All right.  If someone was visibly pregnant,

9    would you ask them if they were married?

10   A       No.

11   Q       Would you double-check to confirm if they

12   were?

13   A       No.

14   Q       Would they be able to be hired if they were

15   pregnant and unmarried?

16   A       We only hire the best person for the job.

17   Q       So, if the best person for the job was

18   pregnant and unmarried, they would get hired?

19   A       I've never been in that situation before.

20   Q       Do you know of any reason they wouldn't get

21   hired if they were the best person for the job?

22   A       No.

23   Q       Okay.  All right.  And this is just to

24   clarify.  You have not been a part of any spousal

25   interviews; is that right?

Elite Document Reporting Services
www.elitereportingservices.com

1    A       I have.  It has been a very long time.

2    Q       Okay.  What is the purpose of the spousal

3    interview?

4    A       The purpose of it is twofold.  One, for my

5    spouse to meet whoever we are considering hiring,

6    and then also to meet the spouse of the person that

7    is coming onboard.

8    Q       Okay.  And why is that important?

9    A       It's important because we -- we value -- we

10   value spouses' opinions, both the opinion of my

11   spouse and the opinion of the spouse who's -- of the

12   person we are interviewing.

13   Q       And is there a particular opinion that you

14   like to know about?

15   A       There's no particular opinion that we ask

16   about.  It's more of a get-to-know-you type thing.

17   Q       Okay.  Is there any sort of background check

18   that you're involved in?

19   A       No.

20   Q       In the spousal interviews that you've

21   participated in, were there any inquiries as to

22   where the new employee might go to church?

23   A       No.

24   Q       Okay.  Do you receive any training to be a

25   part of the hiring team for the -- or any -- we'll

Case 3:20-cv-00023 Document 36-2 Filed 05/01/22 Page 28 of 134 PageID #: 4927
Elite Brentwood Reporting Services  615 595-0073
www.elitereportingservices.com

1    just start there.

2    A       Training for interviewing?

3    Q       Yes.

4    A       Similar to how I answered earlier, that

5    would -- not like direct one-on-one training or any

6    manual.  More -- if there is any discussion about

7    it, it would be at a kind of company-wide level.

8    Q       Okay.  Do you receive -- in those

9    company-wide level trainings, do you receive any

10   information as to questions you're allowed to ask or

11   you're not allowed to ask?

12   A       I don't know where I heard this or who gave

13   it to me or what training, but I have heard that

14   there are specific questions you are not allowed to

15   ask.

16   Q       Okay.  And which ones were you told you're

17   not allowed to ask?

18   A       Questions related to children, marriage, age.

19   That is not meant to be an exhaustive list.

20   Q       Okay.  All right.  Are you able to ask about

21   religious background?

22   A       No.

23   Q       Were you told you couldn't ask about

24   religious background?

25   A       I know I am not supposed to ask about

1   religious background and I do not ask about it.

2   Q       All right.  Do you ever have conversations

3   about where people attend religious ceremonies, like

4   if they go to church, if they don't go to church,

5   what church they go to, things like that?

6   A       I do not ask questions about that.

7   Q       Okay.  Do you have discussions about things

8   like that?

9   A       A candidate may choose to volunteer

10  information, but I do not ask.

11  Q       Okay.  Are you generally familiar -- do most

12  of the employees you work with -- or do all of the

13  employees that you work with attend church that you

14  know of?

15  A       I don't know.

16  Q       You don't know if anyone goes to church?

17  A       Can you define anyone?

18  Q       People you work with.

19  A       Of course I know some people go to church.  I

20  don't know if everyone or specifically who does or

21  who does not go to church.

22  Q       Okay.  All right.  I'm going to share a

23  document with you.  This is previously marked

24  Exhibit 1.  I'm going to share it in the chat, but

25  I'll also pull it up on the share screen.

Elite-Brentwood Reporting Services
www.elitereportingservices.com

MS. SANDERS:  He's got it, Ashley, in front of him.  You don't have to pull it up if you don't -- we've got Exhibit 1, ██████.

MS. WALTER:  Yes, that is the one.

(WHEREUPON, a document was presented, previously marked as Exhibit Number 1.)

MS. WALTER:  What I might do is do share screen just to make sure he and I are on the same page.

MS. SANDERS:  Sure.

BY MS. WALTER:

Q     All right.  Mr. Finney, can you see the screen I'm sharing with you?

A     Yes.

Q     Okay.  Do you recognize this document?

A     It looks vaguely familiar.

Q     Okay.  So, are you familiar with this document at all?

A     No.

Q     Okay.  So, you've never received training on -- you've never received information on Ramsey Solutions' policies and procedures?

A     I don't recall.

Q     Okay.  Do you know what the second paragraph means by that "Ramsey Solutions is committed to

1    providing equal employment and advancement

2    opportunities to all individuals"?

3    A      No.

4    Q      All right.  Are you familiar -- do you know

5    what it means -- do you understand what it means by

6    "We do not unlawfully discriminate in employment

7    opportunities or practices based on race, color,

8    religion, sex, national origin, age, disabilities,

9    or any other characteristic protected by law"?

10   A      Yes, I understand what that says.

11   Q      Okay.  And what do you understand that to

12   mean?

13   A      What it says, "We do not unlawfully

14   discriminate in employment opportunities or

15   practices based on race, color, religion, sex,

16   national origin, age, disabilities, or any other

17   characteristic protected by law."

18   Q      Okay.  And would you understand

19   discrimination means to treat somebody different for

20   any of those listed reasons?

21   A      Yes.

22   Q      Okay.  And is it your understanding that

23   included in discrimination on sex, that includes

24   pregnancy?

25   A      I would not assume that based on this

1    sentence.

2    Q      Okay.  And what is your understanding of --

3    that Ramsey does not unlawfully discriminate in

4    employment opportunities or practices based on

5    specifically religion?  What does that mean in

6    practice at Ramsey Solutions?

7    A      Speaking for myself, I believe that that

8    means that we cannot take religion into account when

9    making decisions about the opportunities of an

10   employee.

11   Q      Okay.  So, kind of like you testified before,

12   you can't treat somebody differently based on their

13   religion?

14   A      Correct.

15   Q      All right.  And that was your understanding

16   when you were the chief digital officer?

17   A      Correct.

18   Q      And your current understanding as the chief

19   operating officer?

20   A      Yes.

21   Q      Okay.  All right.  I'm going to scroll down a

22   little bit.  All right.  Underneath "Company

23   Conduct," it states that -- and correct me if I'm

24   wrong, but it states that "The image of Ramsey

25   Solutions is held out to be Christian."

1        What is your understanding of what that

2   means?

3   A       My opinion on what that means is that when we

4   represent ourselves in the marketplace, from time to

5   time we do so as Christians.

6   Q       Okay.  And you said from time to time.  At

7   what times does Ramsey Solutions represent itself to

8   be Christian?

9   A       One time that we do every day is to wrap up

10  The Ramsey Show, Dave will say that there's only one

11  way to have financial peace, and that's to walk

12  daily with the prince of peace, Christ Jesus.

13  Q       Okay.  And what are times that Ramsey

14  Solutions does not hold itself out to be Christian?

15  A       Can you maybe state that another way?

16  Q       Sure.  You had mentioned that from time to

17  time Ramsey Solutions holds itself out to be

18  Christian and you gave an example of a time when it

19  does.  Based off what you testified, are there times

20  that it doesn't?

21  A       What I meant was that we don't just

22  constantly say it in every publication, in every

23  document, or everything that we produce.

24  Q       Okay.  So, it's -- Ramsey Solutions doesn't

25  put everywhere that it's a -- it holds itself out to

1  be a Christian organization.

2  A      Correct.

3  Q      Okay.  Do you know if, in your experience as

4  a -- on the hiring teams, if Ramsey Solutions only

5  hires Christians?

6  A      I don't know.

7  Q      In your experience, has -- have all employees

8  that you've hired been Christians?

9  A      I don't know.

10  Q      Okay.  The next sentence says, "Should a team

11  member engage in behavior not consistent with

12  traditional Judeo-Christian values or teaching...the

13  team member would be subject to review, probation,

14  or termination."

15        What is your understanding of what it means

16  by "if a team member engages in behavior not

17  consistent with traditional Judeo-Christian

18  values..."?

19  A      My opinion is that it means that because we

20  hold ourselves out to be Christians in the

21  marketplace, that acting inconsistently with that

22  could be damaging to the image of the company.

23  Q      What behaviors are not consistent with

24  traditional Judeo-Christian values or teaching?

25  A      There is not a specific list.

**www.elitereportingservices.com**

1    Q      As a chief digital officer, so as an

2    operating board member, in your experience, in your

3    understanding, what behaviors are not consistent

4    with traditional Judeo-Christian values or teaching?

5    A      Again, I would say that I don't have a

6    specific list in mind when I think of that.

7    Q      Do any examples come to mind?

8    A      Yes.

9    Q      Such as?

10   A      So, we have a core value called righteous

11   living, and one of the things we frequently talk

12   about as it relates to righteous living is having

13   extramarital or premarital sex.

14   Q      And when do those come up?

15   A      When does what come up?

16   Q      You mentioned that they get talked about.

17   A      Oh.  Staff meeting, company-wide staff

18   meeting, company-wide leadership meetings, during

19   the interview process, during the onboarding

20   process.  There might be more.

21   Q      Okay.  Do they come up in the devotionals or

22   the devos?

23   A      I don't recall.

24   Q      Okay.  Are there anything -- can you think of

25   any other examples besides extramarital sex or

Elite-Brentwood Reporting Services 615 595-0073
www.elitereportingservices.com

1 premarital sex?

2 A     When -- no, I cannot.

3 Q     Okay.  So, it mentions -- it states at the

4 bottom, "If this should occur, the team member would

5 be subject to review, probation, or termination."

6       So, is it correct to say that if a team --

7 depending on the behavior that a team member engages

8 in that would be considered inconsistent with

9 traditional Judeo-Christian values, some behaviors

10 might be subject to review, some different ones

11 might be subject to probation, and other ones might

12 be subject to termination?

13 A     I would say that we are clear that if you

14 violate our righteous living core value, that you

15 might be terminated for that.

16 Q     But you also might not be terminated.

17 A     In my experience, we terminate team members

18 that violate that core value.

19 Q     Is -- would viewing pornography violate the

20 righteous living core value?

21 A     Yes.

22 Q     Okay.

23 A     In my opinion, yes.

24 Q     Okay.  Would you automatically be terminated

25 for that?

Case 3:20-cv-00023 Document 38 Filed 05/21/21 Page 37 of 134 PageID #: 4926
Elite Document Reporting Services 615 1595-0073
www.elitereportingservices.com

```
 1   A       In my opinion, no.

 2   Q       Okay.  So, there are some violations of the

 3   righteous living core value that would lead to

 4   termination and some that don't.

 5   A       Correct.

 6   Q       Okay.  And how, as a supervisor, are you

 7   aware of which ones do and don't?

 8   A       I am aware based on prior decisions made by

 9   the HRC.

10   Q       Okay.  And who's the ultimate decision-maker

11   for the HRC?

12   A       I don't know.

13   Q       Okay.  And how does Ramsey Solutions ensure

14   that their employees are Christians and adhere to

15   the biblical teachings of the Judeo-Christian

16   values?

17           MS. SANDERS:  Object to the form.  He

18   may answer that.

19           THE WITNESS:  Can you ask that again,

20   please?

21   BY MS. WALTER:

22   Q       Yeah.  How does Ramsey Solutions make sure

23   that all of its employees are Christians and adhere

24   to the traditional Judeo-Christian values or

25   teachings as set out in the "Company Conduct"
```

```
 1   portion of the handbook?
 2              MS. SANDERS:  Object to the form.
 3              You can answer.
 4              THE WITNESS:  The wording of your
 5   question is weird.  I'm having trouble understanding
 6   exactly what you want me to answer.
 7   BY MS. WALTER:
 8   Q      Sure.  I'm wondering how Ramsey Solutions
 9   enforces the company conduct policy, like how they
10   ensure that employees are adhering to these biblical
11   teachings or alleged -- or the traditional
12   Judeo-Christian values or teachings.
13   A      I don't know.
14   Q      Is it anybody's job to find out if people
15   aren't?
16   A      To my knowledge, no.
17   Q      Okay.  How do you typically find out if
18   someone is not?
19          I guess first let me ask, have you ever had
20   an employee be terminated or put on probation or
21   reprimanded for not following -- or engaging in
22   behavior not consistent with traditional
23   Judeo-Christian values?
24   A      I have had team members that have violated
25   the righteous living core value.
```

Elite Document Reporting Services
www.elitereportingservices.com

1    Q      Which would be behavior not consistent with

2    traditional Judeo-Christian values, right?

3    A      The way I would put it is that the team

4    members that I have dealt with have violated the

5    righteous living core value.

6    Q      Okay.  In your experience, what does the

7    righteous living core value come from?  What

8    determines righteous living?

9    A      It is a construct that has been adapted

10   over -- adapted is not the right word.  It is a

11   construct that HRC, as they decide on issues, that I

12   understand what our -- and new things come up.  My

13   understanding of what righteous living comes from

14   that.

15   Q      Okay.  Do you know who originally wrote the

16   righteous living policy, like who wrote the

17   handbook?

18   A      No.

19   Q      Do you know who came up with the idea of the

20   righteous living core value?

21   A      No.

22   Q      All right.  And is there a written policy

23   that outlines what behaviors violate the righteous

24   living core value?

25   A      To my knowledge, there is not.

Elite Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1  Q      So, employees don't -- do employees know

2  which violations of the righteous living core value

3  will get them terminated?

4  A      I don't know.

5  Q      Do you know what violations of the righteous

6  living --

7              (Technical difficulties.)

8              THE REPORTER:  Excuse me.  Would you

9  repeat the question?

10             MS. WALTER:  Yes.

11 BY MS. WALTER:

12 Q      Mr. Finney, do you know which violations of

13 the righteous living core value will lead to the

14 termination of your employees?

15 A      I know based on prior HRC decisions which

16 things could lead to termination.

17 Q      Okay.  So, you don't necessarily know what

18 will -- what violation would get an employee put on

19 probation versus one that will get them terminated?

20 A      I know based on what HRC has previously

21 decided.

22 Q      Okay.  So, then there is a set list of which

23 ones will always get you terminated?

24 A      I am not aware of such a list.

25 Q      Okay.  So, then, how are employees supposed

1    to know what behaviors will get them terminated and

2    which ones won't?

3    A       When we talk about the righteous living core

4    value from stage or interviewing or onboarding, the

5    employee would know what was covered during that

6    time.

7    Q       Okay.  So, which ones are covered during that

8    time?

9    A       To my knowledge, I know that we cover the

10   having extramarital and premarital sex.  I do not

11   know whether violations or whatever conduct might

12   also be included.

13   Q       Okay.  And when you say premarital sex, what

14   do you mean by that?

15   A       I mean, having sex before marriage.

16   Q       Okay.  Does sex before marriage include oral

17   sex?

18   A       Yes.

19   Q       Okay.

20   A       In my opinion, yes.

21   Q       Okay.  So, do you let employees know that

22   when you're in the interview?

23   A       I don't know.  I do not let them know that.

24   Q       Okay.  All right.  Do you know if employees

25   are required to sign any sort of contract about the

Case 3:20-cv-00628   Document 38   Filed 05/21/21   Page 42 of 134 PageID #: 4934
Elite Document Reporting Service   (615) 595-0073
www.elitereportingservices.com

1   righteous living core value?

2   A      I don't know.

3   Q      Okay.  As a member of the hiring team, would

4   you hire somebody who is not a Christian?

5          MS. SANDERS:  Object to the form, but he

6   can answer.

7          THE WITNESS:  I hire the best person for

8   the job.

9   BY MS. WALTER:

10  Q      Okay.  If the best person for the job was not

11  a Christian, would they get hired?

12  A      I would hire the best person for the job.

13  Q      Okay.  I'll be more specific.  If you were

14  interviewing someone of the Jewish faith and they

15  were the best -- qualifications-wise, the best

16  person for the job, would they get hired?

17  A      I do not ask about someone's religion, so I

18  would not know if they were Jewish or not.

19  Q      Sure.  As you testified earlier, sometimes in

20  the spousal interviews it comes up where people go

21  to church and if they volunteer the information.

22  So, if it came up in an interview and they were the

23  best person for the job, at that point would they

24  still be hired if they were of the Jewish faith?

25  A      Yes, I would hire them.

Case 3:20-cv-00023-Document 36-Filed 05/21/21 Page 46 of 134 PageID #: 4932
Elite Document Reporting Service (615) 595-0073
www.elitereportingservices.com

1    Q      Okay.  Would they still be required to engage
2    in behavior that is consistent with traditional
3    Judeo-Christian values or teachings?
4    A      To my knowledge, we don't -- we don't
5    selectively apply core values to particular team
6    members.
7    Q      Okay.  So, regardless of religious
8    affiliation, they would have to follow traditional
9    Judeo-Christian values?
10   A      I would say what I said, that we don't
11   selectively apply it to selective team members.
12   Q      Okay.  So, yes, they would have to follow it,
13   follow -- engage in behavior that is consistent with
14   Judeo-Christian values, correct?
15   A      I would say that we expect all team members
16   to follow our core values.
17   Q      Okay.  You'd mentioned staff meetings.  Are
18   there things called devos that employees partake in?
19   A      Yes.
20   Q      And what does devo stand for?
21   A      It's short for devotional.
22   Q      Okay.  And where does that name come from?
23   Like what happens at these devos?
24   A      I don't know where the name comes from.
25   Q      Okay.  Do you know why it's called

Case 3:20-cv-00023-Document-Report-Filing 05/11/22 ce Page 44 of 134 Page ID #: 4936
Elite Reporting Services
www.elitereportingservices.com

1  devotional?

2  A      No.

3  Q      And do you attend church?

4          MS. SANDERS:  Object to the form.  He

5  can answer it.

6          THE WITNESS:  Do I personally attend

7  church?

8  BY MS. WALTER:

9  Q      Yes, sir.

10  A      Yes.

11  Q      Okay.  Does your church do devos or

12  devotionals?

13  A      No.

14  Q      Okay.  And what happens at the Ramsey

15  Solutions devotionals?

16  A      A speaker will come in and talk for roughly

17  30 minutes, and then -- yeah, that's it.  We all

18  attend, and someone will come, usually from outside

19  the organization, and speak to the company for about

20  30 minutes.

21  Q      Okay.  What type of speakers come?

22  A      All kinds, from -- all kinds of people.  Like

23  usually people that are here locally, people that

24  come from afar, people that -- business people,

25  different pastors in the area.  It's a wide range.

Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

1  Q      All right.  Have you had a particular

2  favorite that's come?

3  A      No.

4  Q      I think I've heard that some are more like

5  musically based, others are more like just a

6  speaker.  Is that true?

7  A      Yes.

8  Q      Okay.  Do you tend to prefer the speakers or

9  the more musical devotionals?

10 A      The speakers.

11 Q      The speakers?  Are these devotionals required

12 for -- by employees to participate, to attend?

13 A      I don't know.

14 Q      Have you ever had an employee ask not to be

15 able to attend?

16 A      Yes.

17 Q      Have you had an employee ask to never have to

18 attend the devotionals?  So, not sort of a one-off

19 situation of I'm sick and can I not go, but more of

20 a request not to ever attend the devotionals.

21 A      No.

22 Q      Okay.  Would an employee be allowed to not go

23 to any devotionals?

24 A      I don't know.

25 Q      If an employee asked you that, as their

Case 3:20-cv-00023 Document 98-15 Filed 05/21/21 Page 46 of 134 PageID #: 4935
Elite Document Reporting Services (615) 595-0073
www.elitereportingservices.com

1   supervisor, what would you tell them?

2   A       I would tell them I don't know and I would go

3   to the HRC.

4   Q       Okay.  All right.  And then, you worked with

5   Caitlin O'Connor, right?

6   A       Can you define worked with?

7   Q       You worked around her.

8   A       Caitlin was an assistant, but she was never

9   my assistant.

10  Q       Okay.  But you would see her during the day?

11  A       Yes.

12  Q       Would you have conversations with her during

13  the day?

14  A       Yes.

15  Q       Okay.  How often would you see her during the

16  day?

17  A       Pretty infrequently.

18  Q       Okay.  Would she ever come and ask you

19  questions or what was the nature of y'all's

20  relationship?

21  A       Umm...

22  Q       I realize that phrasing sounds awkward.  Were

23  you guys friendly.  Did you rarely see her?  Was it

24  sort of a you would just say hi and keep walking?

25  What was kind of the nature of your relationship

Case 3:20-cv-00028-Brentwood Reporting Services Page 47 of 134 Page 0013 #: 4936
Elite Document Reporting Filed 05/31/22 Page 47 1345-0013
www.elitereportingservices.com

1   with her?

2   A       I would characterize it as friendly.  I don't

3   know if she would ever like specially come and seek

4   me out for a question.  She may have, but I don't

5   recall.

6   Q       Did you guys chat about your families?

7   A       I don't recall specific conversations, but --

8   I don't recall specific conversations.

9   Q       Okay.  Are you married?

10  A       Yes.

11  Q       Okay.  Do you have any kids or dogs or

12  anything like that?

13  A       Yes.

14  Q       Okay.  Would Caitlin have known about that?

15  A       She may have known.  I don't know if she did

16  know that.

17  Q       Okay.  Would she share about her family with

18  you?

19  A       From time to time, yes.

20  Q       Okay.  Were you aware that she had two

21  kids --

22  A       Yes.

23  Q       -- at the time of her employment?

24  A       Yes.

25  Q       Okay.  Were you aware that she had those two

Elite Document Reporting Services - 615 1595 0071
www.elitereportingservices.com

1    kids out of wedlock?

2    A      I don't recall.

3    Q      Would it surprise you that that was the fact?

4    A      I recall her saying she was young when it

5    happened, but I don't know if she was married when

6    it happened.

7    Q      Okay.  In your experience with her, what type

8    of employee was she?  Was she a good employee?

9    A      Overall, yes, she was a good employee.

10   Q      Did she seem like a hard worker?

11   A      Yes.

12   Q      Did she seem like an honest employee?

13   A      Yes.

14   Q      Did you have any issues with her as an

15   employee?

16   A      I mean, all team members usually have at

17   least something, so I would hesitate to say never

18   had an issue.

19   Q      Okay.  But no major issues?

20   A      Correct.

21   Q      All right.  And do you recall what the reason

22   for Caitlin's termination was?

23   A      I was not involved in the decision to fire

24   Caitlin.

25   Q      Sure.  But do you know why she was fired?

Elite Document Reporting Service (615) 595-0073
www.elitereportingservices.com

A     Yes.

Q     And why was that?

A     She was terminated for having extramarital
sex.

Q     And how did you find out about that?

A     I became aware from an e-mail that ████████
forwarded me that Caitlin had sent to ████████.

Q     Okay.  And the -- Caitlin was terminated for
engaging in premarital sex, which violated the
righteous living core value; is that right?

A     She was fired for having premarital sex --

Q     And was that --

A     -- which violated --

          (Overlapping speech.)

Q     Sorry.  Go ahead.

A     Sorry.  She was terminated for having
premarital sex, which violated the righteous living
core value.  My opinion is that that's why she was
terminated.

Q     Okay.  Is that what you were told or how did
you come to that opinion?

A     I don't recall who told me or how I learned
of that.

Q     Okay.  And does having premarital sex violate
the righteous living core value because it's a

1   Judeo-Christian value that premarital sex is wrong?

2   How does that become a violation of the righteous

3   living value -- or righteous living core value?

4   A      We -- as I have said, we talk frequently from

5   stage, staff meeting, about what righteous living

6   core value means, such as premarital sex.  And so,

7   that's -- I'm sorry.  I forgot the exact nature of

8   your question.

9   Q      Sure.  I'll kind of rephrase it.

10         So, engaging in premarital sex is a violation

11  of the righteous living core value because it's

12  consistent with Judeo-Christian values that

13  premarital sex is wrong; is that right?

14  A      My opinion is she was terminated because she

15  violated the righteous living core value by having

16  premarital sex, period.

17  Q      Do you know why having premarital sex

18  violates the righteous living policy or core value?

19  A      No.

20  Q      Okay.  So, as a member of the operating

21  board, you don't know why premarital sex violates

22  the righteous living core value?

23  A      Correct.

24  Q      Okay.  And you were -- I think you mentioned

25  this before.  You were not a decision-maker into

Caitlin's termination, right?

A    Correct.

Q    Did you recommend that she be terminated?

A    I don't recall.

Q    Do you agree with the decision to terminate Ms. O'Connor?

A    Yes, I agree with the decision.

MS. WALTER:  I am going to show you another -- this is previously marked Exhibit 5.

(WHEREUPON, a document was presented, previously marked as Exhibit Number 5.)

MS. SANDERS:  For the record, I've just given the witness a paper document marked Exhibit 5, ▇▇▇.

BY MS. WALTER:

Q    All right.  I'm going to scroll down.  This is one of those situations where the earliest message is actually at the bottom.  So, just bear with me.  So, if you'll actually go to the last page.  You're welcome to follow along on the computer, whatever is easiest for you.  I just want to make sure that we are on the same page.

All right.  Do you recognize this e-mail?

A    Could you zoom that in?

Q    Yes, absolutely.

A      Yes, I recognize that e-mail.

Q      Okay.  And then, I'm going to scroll up.  It looks like within two minutes -- so Caitlin sent that e-mail June 18th at 4:44 p.m., and then at 4:46 p.m. that same day, ███████████ forwarded this e-mail to yourself, Dave Ramsey, and the HR committee; is that right?

A      Yes.

Q      Okay.  All right.  And then I'm going to scroll up a little bit.  And in here, in an e-mail that you are included in, ███████████ says, "She sent me the e-mail only.  I agree with handling the same way we have in the past."

       Do you know what he meant by that?

              MS. SANDERS:  Ashley, I'm going to let Mr. Finney read the whole document if he wants to.  It's kind of hard to see --

              (Overlapping speech.)

              MS. WALTER:  That's fine if he wants to read the e-mail that's between them.

              THE WITNESS:  Can you scroll back to ███████████ response?

BY MS. WALTER:

Q      Sure.

A      Can you ask your question again?

Q      Yes.  What is your understanding of what
████████  meant by "I agree with handling the same way
we have in the past"?

A      My opinion is  ████████  was relying on previous
HR committee experience when he made that statement.

Q      Okay.  And what was that HR committee
experience that he was relying on?

A      I don't know.

Q      And I'll scroll back down.  Ms. Sievertsen
says in the last sentence, "Lots of grace, lots of
generosity, but our core values and what they stand
for are clear."

       Do you know what she meant by that?

A      My opinion is that she meant that the
specific core value of righteous living and what we
mean by it is clear.

Q      Okay.  And is that alluding to the premarital
sex requirement of the core value?  Or the
abstaining from premarital sex requirement of the
core value?

A      My opinion is that she was talking about
premarital sex.

Q      Okay.  And so, the first notification that
Ms. O'Connor violated the righteous living policy
was after she sent this e-mail below, notifying

████████████ that she was pregnant?

A      I'm sorry.  Could you say that one more time?

Q      Sure.  So, the first time Ramsey Solutions became aware that Ms. O'Connor violated its core value of righteous living by engaging in premarital sex is when she sent ██████████ an e-mail saying that she was pregnant?

A      To my knowledge, that is true.

Q      Okay.  So, you have no reason to believe that Ms. O'Connor told somebody else in a different way that she was -- that she had violated the premarital sex righteous living core value?

A      I wouldn't know.

Q      Okay.  All right.  And do you agree with the decision that after Ms. O'Connor notified ████████ ██████ that she was pregnant and unmarried that she should be terminated?

          MS. SANDERS:  Object to the form.  He can answer it.

          THE WITNESS:  Can you ask that again, please?

BY MS. WALTER:

Q      Sure.  So, do you agree with the decision to terminate Ms. O'Connor after she notified ████████ ██████ that she was pregnant and unmarried --

MS. SANDERS: Object to the form.

BY MS. WALTER:

Q       -- and requested FMLA paperwork?

A       I do not believe she was terminated because she requested FMLA or was pregnant.

Q       Sure.  But that wasn't quite my question. So, would you agree that in her e-mail she is notifying ██████ that she is pregnant, that she's unmarried, and that she requested FMLA and ADA paperwork?

A       I see that she requested ADA paperwork and FMLA something.

Q       Okay.  So, after she sent an e-mail that says she was pregnant, unmarried, requesting FMLA paperwork, and requesting ADA paperwork, there was a decision to terminate her, right?

A       To my knowledge, I do not believe the decision had anything to do with the FMLA or ADA paperwork.

Q       Sure.  That's just not quite my question. I'm more asking if you agreed with the decision to terminate her after she sent this e-mail.

A       I stated previously, I agree with the decision to terminate Caitlin because she engaged in premarital sex, which is a violation of the

righteous living core value.

Q    Sure.  After she was notified Ramsey
Solutions she was pregnant, unmarried, and requested
FMLA paperwork and ADA paperwork.

        MS. SANDERS:  Object to the form.  He's
answered this.

        MS. WALTER:  He's answered a variation
of it, but not actually that question.

        MS. SANDERS:  Is your question timing?
Does he agree that they fired Caitlin after
June 18th?  Is that what you're asking?  Because
I'm confused, too, frankly.

BY MS. WALTER:

Q    I'll scroll up and then we can maybe work our
way backwards.

        So, Ms. O'Connor notifies ████████████ on
June 18th at 4:44 p.m. that she's pregnant,
unmarried, and requested FMLA paperwork and ADA
paperwork; is that right?

A    Yes.

Q    Okay.  And then, two minutes later, ████████
forwarded that -- Ms. O'Connor's e-mail to yourself,
Dave Ramsey, and the HR committee, right?

A    Right.

Q    Okay.  And two minutes after that,

1  Ms. Sievertsen sends an e-mail that ends with "Lots
2  of grace, lots of generosity, but our core values
3  and what they stand for are clear."
4  A      Yes.
5  Q      And she stated, "We've dealt with this before
6  and I think we should handle it exactly the same
7  way."
8  A      Yes, Jen said that in that e-mail.
9  Q      Okay.  Do you know what she means by "...we
10 should handle it exactly the same way"?
11 A      Again, my opinion is that she is referencing
12 prior HR committee decisions.
13 Q      And what is that prior HRC committee
14 decision?
15 A      That we terminate someone for a violation of
16 the righteous living core value for having
17 premarital sex.
18 Q      Okay.  So, based -- is it correct that based
19 off of Ms. O'Connor's e-mail, a decision was made to
20 fire her within four minutes of her sending it?
21 A      I do not know when the decision was made, how
22 long after this e-mail the decision was made.
23 Q      Okay.  We can scroll up and see.  And feel
24 free to look through -- it looks like Mark Floyd
25 said he agrees with the precedent.  Sarah Sloyan

1    said, "I agree with Jen's thoughts."  Is that right?

2    A      Yes.

3    Q      And then you replied, "[I] agree with Jen as

4    well.  Sad."  Is that right?

5    A      Yes.

6    Q      What were you agreeing with?

7    A      I agreed with what Jen said.

8    Q      And what about what Jen said -- and I'll go

9    back -- did you agree with?

10   A      Specifically, the last sentence.  "Lots of

11   grace, lots of generosity, but our core values and

12   what they stand for are clear."

13   Q      Okay.  And what did you agree with about that

14   statement?  What is clear?

15   A      Our core values and what they stand for.

16   Q      And what are those core values and what do

17   they stand for?

18   A      Specifically, righteous living and that

19   premarital sex is a violation of the righteous

20   living core value.

21   Q      Okay.  And why did you say, "Sad"?  I would

22   think that having a baby is a happy occasion.

23   A      I was sad to know we might be losing Caitlin

24   as a team member.

25   Q      Okay.  And why wouldn't you lose Caitlin as a

Elite Reporting Services ● (615) 595-0073
www.elitereportingservices.com

1  team member?

2  A     I'm sorry, say that again.

3  Q     Yeah.  You said we might be losing her as a

4  team member.  Would there have been something that

5  prevented her from being terminated?

6  A     As of this e-mail, when I replied, "Agree

7  with Jen as well.  Sad," to my knowledge, we had not

8  made a final decision at that point.  I don't know

9  if there were further HR committee discussions or

10  not.

11  Q     Sure.  And based off of Ms. O'Connor's

12  e-mail, are there a set of circumstances that would

13  have prevented -- that would have ensured she kept

14  her job, that wouldn't have led to her termination?

15         MS. SANDERS:  Object to the form.  He

16  can answer.

17         THE REPORTER:  I'm sorry I need a

18  moment, please.

19         MS. WALTER:  Sure.

20         (Discussion off the record.)

21         (The requested question was read back by

22  the court reporter as follows:

23         "Question:  And based off of

24  Ms. O'Connor's e-mail, are there a set of

25  circumstances that would have prevented -- that

Case 3:20-cv-00028  Document 82-11  Filed 05/31/22  Page 60 of 134 PageID #: 4952
Elite Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

 1 | would have ensured she kept her job, that wouldn't
 2 | have led to her termination?")
 3 |        THE REPORTER:  And then an objection to
 4 | form by Ms. Sanders.
 5 |        MS. SANDERS:  You can answer.
 6 |        THE WITNESS:  I don't know.
 7 | BY MS. WALTER:
 8 | Q      Okay.  You've referenced -- you've testified
 9 | before about, you know, a previous HRC committee
10 | decision.  Has there ever been -- with the knowledge
11 | that Ms. O'Connor stated that she was unmarried and
12 | pregnant, would there have been a situation that
13 | would have allowed her to keep her job?
14 |        MS. SANDERS:  Same objection.
15 |        You can answer.
16 |        THE WITNESS:  To my knowledge, I don't
17 | know.  I don't think so, but that would be up to the
18 | HR committee.
19 | BY MS. WALTER:
20 | Q      Okay.  But in your experience, no?
21 | A      Correct.
22 | Q      Okay.  All right.  And then I'm going to keep
23 | scrolling.  Some of these are repeats.
24 |       Mark Floyd wrote in his e-mail, "Totally
25 | classless on her part."

Do you know what -- what did you take that to mean when you read it?

A       I don't recall.

Q       Looking over it now, what do you take that to mean?  And you can take a minute to read through them if you'd like.

A       I don't know why Mark said that.  I would guess that perhaps he meant that it was sent in an e-mail.

Q       Okay.

A       But I don't know.

        MS. WALTER:  All right.  I'm going to share with you another document which is previously marked Exhibit 6.

        (WHEREUPON, a document was presented, previously marked as Exhibit Number 6.)

        MS. SANDERS:  For the record, I've just handed the witness the copy of Exhibit 6, █████.

BY MS. WALTER:

Q       All right.  It looks like -- so, this again starts with Ms. O'Connor's initial e-mail notifying that she's pregnant, followed by ██████████ sending the e-mail to Dave Ramsey, yourself, and the HRC committee.  I keep saying that.  The HR committee. HRC committee is redundant.

Then it looks like Dave Ramsey responded to you, Daniel Ramsey, the HR committee, and ███████ saying, "So sad.  The reason she sent an e-mail is she is scared and embarrassed.  Jen or Suzanne, please pick up the phone and call her today.  Love her.  Tell her we will work this out with her next week but she will be loved and cared for.  Then next week we will follow the steps we did before.  Lots of grace, care for the child, money, counseling, pastor support.  We were thorough because that is the right thing to do."  And he sent that at 5:10 a.m. the next morning.

What did you understand him to mean when he said, "Tell her we will work this out with her next week but she will be loved and cared for.  Then next week we will follow the steps that we did before"?

A      My opinion is he's referring to some past experience with HR committee.

Q      Do you know what that experience is?

A      No.

Q      Do you know if the next steps would be termination?

A      I don't know.

Q      Okay.  All right.  Have you ever had --
actually, strike that.

MS. WALTER:  I'm going to share what is
previously marked Exhibit 7.

(WHEREUPON, a document was presented,
previously marked as Exhibit Number 7.)

BY MS. WALTER:

Q     All right.  So, in this it looks like
there -- and you can take a minute to read through.

A     Thank you.  (Reviewing document.)

Q     Let me know when you're ready.

A     I'm ready.

Q     Okay.  So I'm just going to scroll up.  It
looks like the decision was made at some point to
terminate Ms. O'Connor.  And then it looks like Dave
Ramsey responds agreeing with Suzanne Simms' e-mail
and that "Finney and █████ should not talk.  As a
matter of fact, would be good if one of them is not
there."

Do you know why you shouldn't talk --

A     I don't know.

Q     -- to Ms. O'Connor?

A     I don't know.

Q     Okay.  And it looks like you responded later
that "I don't want her to feel ganged up on either.
If I felt a lot of shame, I think I'd appreciate
fewer people rather than more.  I'm good to let you

and ████ take it."

      Were you concerned that Ms. O'Connor would feel ganged up on?

A    I was trying to communicate that in a meeting where you may terminate someone, generally having fewer rather than more people in the room is preferable.

Q    Okay.  And then next you said, "If I felt a lot of shame..."

      Why did you feel like Ms. O'Connor felt shameful?

A    I don't know.  I believe what I was trying to communicate was it's just hard to get fired.  It's not a good day.

Q    Okay.  I'm going to reference back to Exhibit 6, where Mr. Ramsey states, "So sad.  The reason she sent an e-mail is she's scared and embarrassed."

      Did that influence why you thought she might feel shameful?

A    I don't recall.

Q    Okay.  Is an employee required to announce their pregnancy in person?

A    I don't believe so.

Q    Okay.  Is there a reason to believe that an

1    e-mail is not the appropriate medium to announce --

2    to tell HR you're pregnant and request paperwork?

3    A      I'm sorry.  Can you -- I missed the first

4    part of what you said.

5    Q      Sure.  Is there a reason to believe that

6    someone e-mailing HR to announce that they're

7    pregnant and request paperwork is a problem?  Is

8    that not how they should request paperwork?

9    A      My opinion is it is not a problem to request

10   paperwork by e-mail.

11   Q      And if a married person e-mailed HR saying

12   they were pregnant and requested FMLA paperwork,

13   would you assume that they were ashamed?

14   A      I would say what I said.  I don't -- I don't

15   think it is inappropriate to request paperwork by

16   e-mail.

17   Q      Okay.  Is there a standard policy or

18   procedure that this -- that this information should

19   be requested in person?

20   A      I don't know.

21   Q      Okay.  In your experience with Ms. O'Connor's

22   employment, had there been any other inquiries into

23   Ms. O'Connor's personal behavior with significant

24   others?

25   A      Can you say what you mean by inquiry?

Case 3:20-cv-00028-document Reporting Services Page 66 of 134 PageID #: 4955
Elite Document Reporting Services
www.elitereportingservices.com

1  Q      I guess curiosity or discussion, asking about

2  personal details of Ms. O'Connor's significant

3  other's relationship.

4  A      I can't remember a time when I ever asked

5  about a significant other's relationship with

6  Ms. O'Connor.

7  Q      Okay.  So, you never asked Ms. O'Connor if

8  she shared a hotel room or any sort of room with a

9  significant other?

10  A      I did not ask that.

11  Q      Okay.  Did you ask anything of Ms. O'Connor

12  about her significant others ever?

13  A      I don't recall.

14  Q      Okay.  Have you ever had to look into

15  Ms. O'Connor's relationships with her significant

16  others?  And by --

17              (Overlapping speech.)

18  A      When you say --

19  Q      Yeah.  And by look into, I mean uncover

20  details about Ms. O'Connor's personal relationship

21  with her significant others.

22  A      I have never investigated details about her

23  relationship with significant others.

24  Q      Okay.  With any other employees have you been

25  asked to do that?

Elite Document Reporting Services 615-595-0073
www.elitereportingservices.com

1    A       I don't think so.

2    Q       Okay.  And I guess with any other employees,

3    have you looked into details of their personal lives

4    with their significant others, even if you weren't

5    asked to do so?

6    A       I have not investigated personal details.

7    Q       Okay.  Does sharing a room with a member of

8    the opposite sex automatically violate the righteous

9    living policy?

10   A       Does sharing a room automatically violate it?

11   Q       Sure.  So, for example, if you found out an

12   employee was -- stayed the weekend at their

13   significant other's home or apartment, would that

14   violate the righteous living policy?

15   A       No.

16   Q       Okay.  There wouldn't be an assumption that

17   if a female employee was staying at her boyfriend's

18   house that premarital sex occurred?

19   A       I don't think that I could automatically make

20   that assumption.

21   Q       If -- is an employee required to answer

22   questions if that information was uncovered about

23   it?

24   A       I don't know.

25           MS. WALTER:  Okay.  All right.  I'm

Elite Reporting Services
www.elitereportingservices.com

1   going to pull up one document.  And this is

2   previously marked Exhibit 2.

3            (WHEREUPON, a document was presented,

4   previously marked as Exhibit Number 2.)

5            MS. SANDERS:  For the record, I've

6   handed the witness the paper document marked

7   Exhibit 2.

8   BY MS. WALTER:

9   Q     Okay.  Mr. Finney, do you recognize this

10  document?

11  A     Yes.

12  Q     Okay.  Are these the Ramsey Solutions core

13  values?

14  A     Yes.

15  Q     Okay.  And it looks like under "Righteous

16  Living," it says, "We believe that character

17  matters.  All the time."

18        Is that right?

19  A     Yes.

20  Q     Can you just kind of explain to me how having

21  premarital sex means that someone doesn't have

22  character and that character matters all the time?

23  A     When we have talked about this core value, I

24  can't remember us talking about premarital sex and

25  connecting it to the subtitle of "we believe that

Case 3:20-cv-00628 Document 36-1 Filed 05/31/22 Page 69 of 134 PageID #: 4968
Elite Document Reporting Services  615-595-0073
www.elitereportingservices.com

1    character matters all the time."  We have just

2    referred to that as a violation of the righteous

3    living core value.

4    Q      Okay.  So, someone can engage in premarital

5    sex and still have character?

6    A      Again, we've never connected someone's

7    character to premarital sex anytime I can remember

8    us discussing this core value.

9    Q      Okay.  But righteous living is a component of

10   having character that an employee should have all

11   the time?

12   A      I believe that this says that we believe that

13   character matters all of the time.

14   Q      Okay.  And so, if you -- actions that violate

15   righteous living would then, by extension, violate

16   someone having good character?

17   A      I can't recall when we've ever said that.

18   Q      Okay.  But what's your understanding of it?

19   A      My understanding is that premarital sex is

20   something that is inconsistent with how we talk

21   about righteous living.

22   Q      Okay.  Now, if -- I guess if someone by

23   extension -- if it was a gay couple who were

24   engaging in marital sex, would that violate the

25   righteous living policy, to your understanding?

Case 3:20-cv-00023 Document 38 Filed 05/21/21 Page 70 of 134 PageID #: 4962
Elite Document Reporting Service (615) 595-0073
www.elitereportingservices.com

1      MS. SANDERS:  Object to the form.  He
2  can answer to his understanding.
3      THE WITNESS:  I'm sorry.  Can you state
4  that again?
5  BY MS. WALTER:
6  Q    Sure.  So, you mentioned that it's come up a
7  few times before that premarital sex and
8  extramarital sex violate the righteous living
9  policy; is that right?
10 A    Yes.
11 Q    Okay.  What about marital sex, so sex within
12 a marriage, but it happens to be a homosexual
13 couple, does that violate the righteous living
14 policy?
15 A    That has never come up.
16 Q    Okay.  But your understanding as the -- at
17 the time and currently as the -- at the time as a
18 chief digital officer and currently as the chief
19 operating officer and a member of the operating
20 board, what is your understanding?
21 A    My understanding is that the HR committee is
22 the one -- ones who make determinations as to what
23 does or does not constitute righteous living, and I
24 am not aware of any decision that they have made
25 related to the scenario you proposed.

1   Q      Okay.  Do you know who makes the final call

2   within the HRC committee of whether something

3   violates the righteous living policy, like if the

4   committee -- there's no majority vote, so to speak,

5   who makes the final decision?

6   A      I don't know.

7   Q      Okay.  And do you know where the righteous

8   living policy comes from -- or the righteous living

9   core value comes from?

10  A      I do not know its origins.

11  Q      Okay.  Do you remember which employees you've

12  reported to the HRC committee -- or the HR

13  committee?

14  A      I don't have a list in front of me, no.

15  Q      Okay.  Do you recall any?

16  A      Yes, there have been times I have sent

17  information about a team member to HR committee.

18  Q      Okay.  And do you remember any of those

19  people's names?

20  A      Offhand?

21  Q      Yes.

22  A      Offhand, it's been a while.  None just

23  immediately come to mind.

24  Q      Okay.  Do you remember -- even if you don't

25  remember their name, do you know what you reported

them for?

A       I don't have any specific knowledge.

Q       You don't recall what --

         (Overlapping speech.)

A       None specifically come to mind right now.

Q       Okay.  Well, for example, I guess we talked
about some earlier.  What about pornography?

A       I have sent information to the HRC related to
pornography.

Q       Okay.  Do you remember who that was
regarding?  Did the pornography jog your memory?

A       ████████████  is one that comes to mind.

Q       Okay.  Tell me a little bit about what
happened with ████████████  when you reported him to
the HR committee.

A       Because I lead IT, I was notified that our
firewall that protects our incoming traffic from
pornography and viruses, et cetera, that our
firewall was -- a lot of pornography was attempting
to get through our firewall.  And when we traced it,
we traced it to a device that ████████████ was using.

Q       Okay.  And what happened when you traced it
to ████████████ device?

A       I don't remember specifically what I did, but
I know that I notified -- ██████ was not on my team,

so I provided information to, I believe initially,

███████ leader of what happened.

Q     Okay.  Do you remember -- who was his leader?

A           ████████████.

Q     Okay.  Do you know what happened to ██████

██████?

A     I know that he was eventually terminated.

Q     Was he terminated right away?

A     I don't recall the timing.

Q     Okay.  Do you know if he was given a warning?

A     Goodness.  I don't recall specifically that situation and whether or not a warning was given.

Q     Okay.  I'm going to show you a document real quick.

      Actually, are you familiar with an ████████

██████?

A     No.

Q     No?  He's never worked for you or within your department?

A     No.

Q     What about a ████████████████?

A     No.

Q     Have you had any other -- or any employee other than ████████████ caught looking at porn at work or through any of the devices at work?

```
1    A      I don't recall.
2    Q      Okay.  Have you had any employees who were
3    treated for a porn addiction in your experience?
4    A      No one on my team that I'm aware of.
5    Q      Okay.  What about -- now, when you say your
6    team, do you just mean your direct reports or the
7    people who report to your direct reports?
8    A      Both.
9    Q      Both, okay.  Are you aware of any Ramsey
10   Solutions employees who have had extramarital
11   affairs?
12   A      Do you mean current employees?
13   Q      Current and former.
14   A      I'm sorry.  So state that again now that I
15   understand.
16   Q      Are you aware of any current or former Ramsey
17   Solutions employees who have had extramarital
18   affairs?
19   A      Yes.
20   Q      Okay.  And who were those people?
21   A      Again, I don't have a list in front of me and
22   would struggle to recall individual names.
23   Q      Do you remember any individual names?  It
24   doesn't have to be an exhaustive list if you don't
25   remember all of them, but do you remember any names?
```

Elite Court Reporting Services (615) 595-0073
www.elitereportingservices.com

MS. SANDERS:  For the record, we'll designate this deposition as confidential so you can testify and the transcript will be confidential.

THE WITNESS:  Okay.

MS. SANDERS:  So if you do recall names, it's okay to say it.

THE WITNESS:  Okay.  ███████████ is one that I -- the one that comes to mind.

BY MS. WALTER:

Q     Okay.  And what's your understanding of the situation -- the extramarital affair involving ███████ ████?

A     My understanding, that the affair was something that happened quite a long time ago, if I recall correctly, perhaps ████████████████, and that -- yes, that there was an extramarital affair ███████████████████.

Q     Okay.  So with extramarital affairs, there's a little bit of a flexible policy if it's happened a few years prior?

MS. SANDERS:  Object to the form.  He can answer.

THE WITNESS:  To my knowledge, ██████ ████████ extramarital affair was the first time we had been presented with an extramarital affair that

had happened in the past.

BY MS. WALTER:

Q       But while he was still a Ramsey employee?

A       I believe he was a Ramsey employee when that extramarital affair took place.

Q       Okay.  So that -- and was that a decision made by the operating board?

A       Yes.

Q       And when did you first become aware of it, of the extramarital affair?

A       It was ███████████████████.  I could have that year wrong, but it was a ████████.

Q       Okay.  So, your understanding of the extramarital affair that Ramsey Solutions became aware of in ████ was one that happened a number of years prior; is that right?

A       Yes.

Q       Okay.  And so, the operating board made a decision that because it happened a number of years prior, that was not a terminable offense?

A       Correct.

Q       Okay.  So would you then say there's some flexibility with the prohibition of extramarital affairs depending on when they happen?

A       I would say that the -- in my experience, the

1   only time that we have ever made an exception to

2   that core value was in that one case where the

3   affair had been such a long time ago.

4   Q      Okay.  So, if a male employee had a child

5   outside of wedlock but never disclosed it to Ramsey

6   Solutions and Ramsey Solutions found out about it

7   years later, would an exception be made?

8   A      I don't know.

9   Q      Because theoretically, a man could hide a

10  pregnancy or a child out of wedlock where a female

11  couldn't, right?

12  A      I don't know.

13  Q      You don't know if a woman could hide a

14  pregnancy?

15  A      I'm saying, in your hypothetical scenario, I

16  don't know what our decision would be.

17  Q      Okay.  But you agree that a man could more

18  easily hide a child out of wedlock than a female, a

19  pregnant female could, right?

20  A      I've honestly never thought about it.

21  Q      What are your thoughts now?

22  A      I don't know.  I've never thought of a male

23  hiding a child or a pregnancy.  I've never -- I've

24  just never even thought about it.

25  Q      I follow all those scenarios where there's

people with secret second families and they
typically end up being men because women can't
really hide all of their secret families around.

So, as a member of the operating board in
███, was there any discussion about █████████
engaging in recent oral sex with someone?

A    There was a discussion about oral sex that
was, I believe, ██████████████████████ prior
to that conversation.

Q    Okay.  And what was that conversation?

A    The conversation was around the timing of
that as well.

Q    Okay.  So your understanding is, in ████, any
discussions about ██████████ extramarital affairs
included both intercourse and oral sex but both were
years prior; is that right?

A    Yes.

Q    Okay.  I just -- I'm not trying to put words
in your mouth.  I'm just trying to make sure I
understand what you're saying.

So, in █████, there was no discussion of a
recent affair involving ██████████?

A    Correct.

Q    And that the reason the oral sex was not a
terminable offense is because it happened years

prior; is that right?

A     Correct.  It was due to the timing.

Q     Okay.  So, there is a prohibition -- so if a current -- if you find out a current employee tomorrow has recently engaged in oral sex, that would violate the righteous living policy?

A     My personal opinion is that it does, but I would take that to the HRC.

Q     Okay.  But your understanding as the COO and a member of the operating board and a supervisor, that that would violate the righteous living policy?

A     My understanding is that oral sex outside of wedlock would violate righteous living.

Q     Okay.  Have you ever had another employee under your supervision terminated after informing Ramsey Solutions they were having a baby, whether it be themselves or their spouse?

A     Yes.

Q     Okay.  And who was that?

A     I believe his name was ██████.

Q     Is that ████████████?

A     ██████████████, yes.

Q     I'm going to show you a document.  I'm going to share this one because this is not a previously marked exhibit, so I'm going to go ahead and share

it and then also share it on the screen.

MS. SANDERS:  While she's doing that,
Jerri, just as a reminder, I know you've heard this,
but any testimony related to ███████████ is
attorneys' eyes only.

THE REPORTER:  Yes.

MS. WALTER:  All right.  This may take a
minute to come through.

MS. SANDERS:  It's open, Ashley.  We
can't see you, but we can see the document.

MS. WALTER:  You can't see me?

MS. SANDERS:  No.  We can only see the
document.

MS. WALTER:  That is so strange.  Okay.
Well, I guess the most important thing is to see the
document.  I don't know that it's necessary to see
my face.

MS. SANDERS:  He just minimized it.  So
I think he can --

(Overlapping speech.)

THE WITNESS:  I can see the document
now.  We can see your screen share of the document.

MS. WALTER:  Okay.  Got it.  All right.
We're going to go ahead and mark this as the next
exhibit, which I believe is Exhibit 18.

(WHEREUPON, a document was marked as Exhibit Number 18.)

BY MS. WALTER:

Q      I'm going to scroll through.  I have a few questions about some of these documents to see what you were aware of.

Could you walk me through a bit the situation you mentioned earlier with ████████████?

A      With ███████, I learned -- I don't recall how I learned, but I learned that there was concern that he had violated the righteous living core value. That discussion was taken to the HR committee and the HR committee made the decision to terminate him.

Q      Okay.  Did you agree with the decision to terminate him at the time?

A      I provided information to the HR committee, but this was -- this was one I struggled with.

Q      Okay.  And why did you struggle with this one?

A      I struggled because I wasn't -- I wasn't sure of the timing related to when he was hired and when the premarital sex may have occurred.

Q      Okay.  I'll walk through some documents and maybe you can kind of explain that more.  So let me scroll down.  All right.

It looks like -- and correct me if I'm wrong, but it looks like on ███████████████, an e-mail was sent by ████████.  Who is ██████████?

A      Could you zoom in?

Q      Absolutely.

            MS. SANDERS:  We can't see that at all, Ashley.  Sorry.  Okay.  That's much better, thank you.

            THE WITNESS:  ███████████ was █████████ leader.

BY MS. WALTER:

Q      Did ████████ report to you?

A      ████████ reported to ████████████, ██████ ██████ reported to ███████████████, ███████████████ reported to me.

Q      Okay.  So it's seven degrees of Mike Finney is what I'm hearing, from one to the other to the other to the other and then eventually up to you.

            And is this how you found out about it, about ██████████████ situation, this e-mail on ████████████?

A      I don't recall if that was the first time I had heard about it or not.

Q      And in this ██████████ [sic] note, it says, "Gentlemen, I wanted to let you all know something

that I just learned about in my one-on-one with
██████████ this morning.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████

████████████████████████████████

██████████████

██████████████████████████████████

████████████████████████████████

████████████████████

████████████████████████████

██████████████████████

     "Rick and ████████, I will be looking to get
some time with you today or tomorrow to figure out
the next steps."

     What is this e-mail trying to communicate to
you?  Why do you believe that ████████ sent this
e-mail to ██████████, Rick Perry, ████████████,
yourself, and ████████████████?

A      I believe ████████ sent that e-mail because
he was concerned about a potential violation of the
core value as it relates to marital sex --
premarital sex.

Q      And I probably should clarify.  Is ██████ a

man or a woman?

A      Man.

Q      Okay.  So, ██████ found out that

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████

A      I would say that ██████ was concerned about a

violation of the righteous living core value.

Q      █████████████████████████████████████

████████████████████████████████████

that's what triggered ████████ concern?

A      I don't know what conversations happened

prior to this or if there was anything else that

caused him concern.

Q      But that's what he communicated to you; is

that right?

A      He communicated this timeline of events in

this e-mail.

Q      So then ████████ went from the date that

██████████████████████████████████

████████████████████████████████████

███████████████████████████████████

A      My opinion is that is what he was doing.

Q      Okay.  Do employees at Ramsey Solutions often

try to create a timeline to determine when an

employee conceived their child?

A       No.

Q       Okay.  So what happened after you got this
e-mail, after ████████ decided to create a timeline
of conception to present date at the time of this
e-mail?

A       I don't recall the exact next action.

Q       All right.  Do you remember if you had any
conversations with ████████████████?

A       I don't recall having conversations with
██████████████ related to what ██████ -- I don't
recall having conversations with ██████ about this.

Q       Okay.  So this was on ████████████.  I'm
going to try to scroll through.  It looks like -- so
then it looks like there was an e-mail between you,
Mr.-- how do you pronounce that? ██████████
(phonetic)?

A       ██████████  (phonetic).

Q       ██████, ████████████, yourself, and ██████████
setting up a meeting.  I'm trying to make sure I
have these in the right order.  I have to scroll
down to actually go further back.  Okay.  Here we
go.

        So, ████████ responds to ████████ e-mail
with, "FYI, I will meet with ██████ today.  Crap."

Do you know why he would have said that?

A      I don't know why he said that.

Q      Okay.  I'm sorry.  I'm skipping ahead.

And you were not part of the HRC committee at this time, were you?

A      I have never been on the HR committee.

Q      That helps, because I'll then skip through some of the e-mails that aren't addressed to you.

All right.  It does look like you received an e-mail from ███████ that says -- I'm sorry.  I'm just trying to figure out where this starts.  One second.  It is hard when they kind of go backwards.

Okay.  So it looks like then the next day in January, you received an e-mail from ███████ stating, "Dave is good to move forward.  Can you let me know what time you plan to meet for me to be ready?"

And you responded with, "We probably only need a half hour but we should schedule the full hour.  I have either the 1:00 p.m. hour, the 3:00 p.m. hour where I can shift things.

"First 15 minutes, ███████████/Finney talk, agree on plan.

"The next 15 to 45 minutes, bring ██████ in.  Talk.  Give him the bad news.  Take him to ████████

office."

        And that's from you, right?

A       I sent that e-mail.

Q       Okay.  So, is it your understanding that when
████████ said "Dave is good to move forward," that
the moving forward was with the termination of
█████████████?

A       It's tough to see the whole document and all
the context here, so I don't know.

Q       Did you bring ████████████ -- when you said
bring ███████ in, talk, give him the bad news, would
there be any other bad news besides his termination?

A       I believe that's when we terminated him, but
I don't -- I don't recall if it was that particular
meeting.

Q       Did you have any other bad news that you
recall having to tell ███████████ that would then
require him to go to ████████████ office?

A       I don't recall.

Q       And is the Dave referenced in ████████████
e-mail, is that Dave Ramsey or is there another
Dave?

A       I don't know.  It's tough, because again, I
can't see what that is in response to.

Q       It looks like that that's the first e-mail.

But I can scroll down.

A     I am unaware of what conversations happened with ████████ and HR committee or anyone else.

Q     Okay.  Let me scroll down to the beginning of this one, then.  All right.

All right.  It looks like that ██████████████, on ██████████, the same day as receiving the e-mail from ████████, said, "Nothing new to report after meeting ██████.  Righteous living was discussed with ██████ at interview and brought up at spousal lunch with ██████ and his wife, ██████.  ██████ showed up alone since he was not married and conversations were had to insure he understood our core value and stance."

Then it lists out when ██████ started, how much he makes, and ████████ says, "I'm leaning towards 5K, which is what we offer people who opt out in 90 days.  Thoughts?"

And your response seems to be, "The only wrinkle in this whole thing is he got her pregnant before he started here.  Sure, we hire people all the time to who kids out of wedlock.

"My question would be would that change anything?  I'm 99 percent sure that doesn't change things, but I had to call it out before we made the

final decision."

        Did you write that?

A       Yes.

Q       Okay.  What did you mean by that?

A       What I meant was, I wanted to be sure that if
the righteous living core value was violated, that
it was violated post ██████ being hired.

Q       And how would you have been able to determine
that?

A       I never determined that.

Q       Sorry.  I didn't say -- I didn't ask if you
did.  I just said how would you have been able to
determine that?  Like what method would you have
tried to use to determine whether he violated it
before or after he was hired?

A       I never had a conversation with ██████ about
that.

Q       Okay.  Would that mean that if he had, you
know, premarital sex with her on the ████ before
being -- before his start date, then he would be --
he wouldn't be fired, but if he did after his start
date, then he would?

A       I was communicating a concern to ██████ and,
I believe, the rest of the HR committee that I
wanted them to consider when making a decision.

1  Q      Okay.  You do write, "But I had to call it
2  out before we make the final decision."
3        Who is the we?
4  A      Yeah.  That was more meant to say you guys,
5  because I'm sending it to them for the decision.  I
6  was not involved, nor did I expect to be involved in
7  the decision.
8  Q      Okay.  Got it.  I'm going to scroll down.  It
9  looks like you then, after sending that e-mail, sent
10 another one that said, "Wow.  That didn't come out
11 right.  I'm sure we hire people who had sex before
12 marriage all the time.  We don't hold that against
13 them.
14       "Maybe these two renewed their pledge to stay
15 off each other after getting pregnant (but I highly
16 doubt it).
17       "Again, I don't think it changes it.  Does
18 it?  If he says he knows he screwed up and they
19 talked about it and he told her dad and they talked
20 with their pastor and and and...would that change
21 anything?"
22       What did you mean by that e-mail?
23 A      I felt like my previous e-mail didn't
24 communicate very well what I was trying to say, so I
25 sent this just a couple of minutes later trying to

Elite Reporting Services
www.elitereportingservices.com

be more clear.

Q       Okay.  And what did you mean by this e-mail?
Did you think that there were circumstances that
would have made it so that ███████ didn't have to
be fired for engaging in premarital sex?

A       I was trying to communicate a concern, that I
wanted to be sure that we didn't hold something
against someone that happened prior to them getting
hired here.

Q       What about the portion where it says, "If he
says he knows he screwed up and they talked about
it..."?  If ███████ would have admitted that the
premarital sex was a mistake and, you know, he
married the mother of his child, in your opinion
would that change whether he should be terminated?

A       I'm sorry.  Can you zoom in?  It's really
hard to see.

Q       Absolutely.  I'm happy to do that.  Sorry.
There's a balance between being zoomed out enough to
see and being zoomed in enough to see.

A       (Reviewing document.)
        I am offering hypothetical questions to the
HRC for them to consider when they make the
decision.

Q       Okay.  So, in your opinion, things like

1    whether someone apologized or talked with their

2    pastor or things like that should be considered in

3    whether someone is terminated for engaging in

4    premarital sex?

5              MS. SANDERS:  Object to the form.  He

6    can answer.

7              THE WITNESS:  My main and I believe only

8    concern was more around the timing.

9    BY MS. WALTER:

10   Q     So it didn't matter if he said he knows he

11   screwed up and they talked about it and he told her

12   dad and they talked about it with their pastor, that

13   wouldn't matter, in your opinion?

14   A     I'm talking about that within the context of

15   the timing.

16   Q     Okay.  I'm zooming far out just so I can

17   scroll quickly.  I will zoom back in.  I'm going to

18   scroll a little bit down because it looks like this

19   conversation began a little bit earlier.

20         Okay.  So it looks like Ms. Simms, in

21   response to your e-mail that we just talked about

22   that said "Wow, that didn't come out right," she

23   states, "Feels like he would've said all that by

24   now," question mark, exclamation point.

25         And then Jack Galloway responded, "Didn't

Case 3:20-cv-00028  Document 36  Filed 05/21/21  Page 93 of 134 PageID #: 4992
Elite Document Reporting Service  615 1595-0073
www.elitereportingservices.com

hear back from Dave yesterday, but I don't expect any pushback.  So anytime after Dave replies:

"I will confirm with you guys by e-mail.

"Finney and ████ sound like the right pair to meet with him.

"████████ will meet with him afterwards."

Who is your understanding of who Dave is in that context?

A     My understanding is that's Dave Ramsey.

Q     Okay.  So, if -- am I reading this correctly that once Dave replies, as he had not yet, then you could go ahead with a meeting to terminate ████████ ████?

A     I do not know how HRC operates in regards to that.

Q     Sure.  I'm asking your understanding of how that e-mail is written.

A     My understanding is Jack says he didn't hear back from Dave and that he is expecting Dave to reply.

Q     And so anytime after Dave replies, Jack will confirm with you by e-mail, you and ████ are the right pair to meet with ████, and then ████████ will meet with him afterwards.  Is that right?

A     I mean, it says that -- it's laying out those

three bullet points.

Q      Okay.  So, after Dave replies, then Jack will confirm, you and ██████ are the right pair to meet with ████████, and then ██████████ will meet with him afterwards.  Is that right?  I'm just trying to make sure I'm understanding.

A      That's what the e-mail says.  I do not know what actually happened.

Q      Okay.  And then it looks like you responded, "I think it should be ██████████ and ████████.  I can be there, too, but I've never spoken to him outside of a quick meet and greet and my Fraps with Finney meeting."

       Who is ████████?

A      ██████████ is my direct report in the organization where ██████████████ resided.

Q      Okay.  So, in that e-mail, are you saying it should be ██████████ and ████████ who do the talking but you could also be there?

A      I'm reading.

Q      Take your time.

A      (Reviewing document.)

       It looks like I'm communicating that because I don't have -- I've barely ever spoken to ██████████, that I would prefer that others be there in the

meeting.

Q      Okay.  And then it looks like Suzanne said, "Finney, a board member has to be there."

And you responded, "I said I'll be there, too," exclamation point.

Is that right?

A      Yes.

Q      Were you frustrated with having to be there? Is that why there's an exclamation point?

A      I think -- no, I was not frustrated with having to be there.

Q      Okay.  What was the emotion behind the exclamation point?

A      I don't recall.

Q      Okay.  Would it help to read through the e-mails a little bit more?

A      My guess is that I was -- I thought I had been clear that I intend to be there and so I'm reiterating that point.

Q      In kind of the context of the e-mails that we just went over, you had testified earlier that you struggled with this one.  After kind of going through the e-mails, do you have clarity on what you struggled with with this one, with ███████████ termination?

MS. SANDERS:  Objection.  Asked and answered.  He can answer it.

THE WITNESS:  I'm sorry.  That question was confusing.

BY MS. WALTER:

Q      Sure.  You had testified earlier that you had struggled with the termination of ███████████, but I believe you also testified earlier that you couldn't really remember all the details.  So, I was asking if after reviewing some of these documents if that gave understanding as to why you struggled with ███████████ termination.

MS. SANDERS:  Object to the form.  He can answer.

THE WITNESS:  I struggled with the timing related, as we discussed.  And yes, I'm now clear on that I was struggling with the timing.

BY MS. WALTER:

Q      Is it your belief that Ramsey Solutions should be able to get into an investigation into the exact date and time of conception in order to determine whether they fire an employee?

A      I don't know.

Q      You don't have an opinion, as a supervisor, as a member of the operating board?

A     As to whether we should conduct investigations?

Q     Into the dates of conception of employees to determine whether or not they should be terminated when they tell you that they're pregnant or their wife is pregnant?

A     I believe that we should be concerned if information comes to us that causes us to be reasonably concerned that a violation of the righteous living core value happened.

Q     ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

        MS. SANDERS:  Object to the form.

        You can answer.

        THE WITNESS:  I don't seek out to investigate people's personal lives.

BY MS. WALTER:

Q     Would it be fair to say that ██████ could have lied and hidden the date of conception of his soon-to-be-born baby?

A     I assume ██████ could do whatever he wanted.

Q     Would it be fair that a female employee couldn't do the same thing, as she's the pregnant

1  employee?

2  A     Again, I've never really put thought into

3  people trying to disclose or not disclose certain

4  information.

5  Q     But in an effort to keep their position,

6  would that be fair to say, that a male employee

7  could do that?

8  A     I believe that people could choose to

9  disclose or not disclose whatever they want.  I

10  don't have any control over that.

11  Q     But since a female employee is the pregnant

12  employee, could she really lie about that or hide

13  it?

14  A     I don't know.  I don't know.

15  Q     Okay.  And then -- I am actually almost done.

16        Have any employees during your employment

17  been terminated after Ramsey Solutions became aware

18  that they were living with their significant other?

19  A     I am aware that we have terminated people who

20  were violating the righteous living core value and

21  they may have been living together.

22  Q     Do you know if those employees were asked if

23  they having intercourse or oral sex with their

24  significant others?

25  A     I don't know.

Elite Document Reporting Service
www.elitereportingservices.com

Q       Okay.  Are you familiar with a ████
████████?

A       Yes.

        MS. WALTER:  Okay.  I am going to pull
up what is previously marked Exhibit 14.

        (WHEREUPON, a document was presented,
previously marked as Exhibit Number 14.)

        MS. SANDERS:  I'm handing the witness a
document marked Exhibit 14, Floyd.

BY MS. WALTER:

Q       What is your understanding about the
situation involving the termination of ████
████████?

A       I recall that it was a violation of the
righteous living core value.

Q       Do you remember what that violation was?

A       I believe it was premarital sex.

Q       Did ████████ say that he and his
significant other were having premarital sex?

A       I don't recall.

Q       I'm going to scroll down.

        And this was in ████████.  Were you
on the operating board at that time?

A       Yes.

Q       Okay.  Do you recognize the e-mail that is on

the screen?  It's page -- if you look at the bottom, there are numbers.  It's DEFENDANT 1324, but I'll also zoom in on it on the screen.

A      I have a paper copy here.

Q      Okay.  Take a minute to look through that and let me know when you're ready.

A      (Reviewing document.)  Okay.

Q      Do you recall, is this how you found out about the situation involving ████████████?

A      I don't recall.

Q      Okay.  But it looks like Jack Galloway sent an e-mail saying, "Yesterday Jim Ebert and ██████ ██████ came to me concerned that ███████" -- I assume that means ████████?

A      Yes.

Q      Okay.  "...████████████ and his fiancée are living together.  I met with ██████ today, along with Finney and Ebert, in my office.  The short version is that ██████ was very nice but also very guarded and was hesitant to tell me anything other than he and his fiancée live at the same address.  But it was clear that they are living together and don't plan to change the situation.

       "We had some discussion about our core values, how clear we've been about them and why

they're important.  He understood all of that.

████ is very liberal in his beliefs and shared with us that his fiancée's pastor recommended that they live together prior to marriage.  We had some short discussion about the difference in varying interpretations of right and wrong versus agreeing work here and respect our core values."

    Do you remember the conversation you had with ████?

A    I don't recall specifics of that discussion.

Q    Okay.  But based off of Jack Galloway's e-mail, the discussion was that ████ was living with his fiancée and was guarded and was hesitant to tell Jack anything other than he and his fiancée live at the same address.

    Do you have any reason to believe that that's not accurate?

A    That is what the e-mail says, but again, I don't recall the details of the meeting that we had.

Q    Okay.  Do you have a reason to believe that the e-mail is not accurate?

A    I believe that this e-mail is a short summary of a longer conversation that happened.

Q    Okay.  I'm going to scroll down to Page 1327. It appears -- that first e-mail was ████████,

and this e-mail is -- appears earlier that day.  It
says -- again, it's from Jack to Dave Ramsey,
yourself, and ████████.  And it says, "████████
████████ is an ████████" -- which again means
████████.  "His leaders strongly suspected he lives
with his girlfriend.  ████████ is showing some attitude
about it and says he won't talk anymore about this.
I will meet with him today and give him a second
shot at discussing this, leveling with me, and
moving her out (or him) immediately.

        "If that doesn't go well, I assume we will
let him go today."

        Is there a righteous -- does it violate the
righteous living policy to live with your
significant other?

A       In my opinion, it does not violate the
righteous living core value.

Q       It appears then Dave Ramsey responds saying,
"And the beat goes on.  Starting to feel like we are
running Bob Jones University.

        "Attitude if almost funny it is so pitiful.
The arrogance of that.

        "If he slept with her" -- it says "of lives,"
but I believe that probably means or lives, so, "If
he slept with her [or] lives with her or won't

answer the question, fire him on the spot.  We have let people go that were much more repentant and offended the policy less.

"Thing is, Jack...that should be obvious."

To which Jack replies, "Sorry.  I'll take care of it today."

So, is it your understanding, based off of that e-mail, that regardless of whether ███ was sleeping with his girlfriend, living with her was enough, or if he wouldn't answer a question about details of their personal life, then it was a fireable offense?

A     I would not make that conclusion based on this e-mail.

Q     Okay.  What conclusion would you make?

A     The conclusion that I would make is an assumption is being made that they are having premarital sex, and that if that is the case, that we shall fire him because that is what we have typically done.

Q     The part where it says, "...or won't answer the question, fire him on the spot," what's your understanding of what that was meant to say?

A     My understanding is that Dave was frustrated that someone may not answer a question.

Q       And is that question whether or not he was
having premarital sex with his girlfriend or
fiancée?

A       I would assume so.

Q       So you could be fired for actually having
premarital sex or refusing to answer a question
about premarital sex?

A       In my experience, no one that I'm aware of
has ever been fired for refusing to answer a
question about that.

Q       But is this e-mail Mr. Ramsey directing Jack
Galloway to fire ██████████████ if he slept with
his fiancée or lives with her or won't answer the
question?

A       My opinion is that we act very consistently
as a company, and I would consider it inconsistent
of us to fire someone who won't answer a question
about something like that on the spot.

Q       Sure.  But is that what Mr. Ramsey's e-mail
says?

        MS. SANDERS:  Objection to the form.  He
can answer it.

        THE WITNESS:  My experience with Dave's
e-mails is that sometimes Dave can sound a lot more
forceful than what he really means.

BY MS. WALTER:

Q     So, is Dave lying that Jack should not do what he just -- what he says he should do?

A     My assumption -- again, my opinion is that Dave is just frustrated about the situation in general and that is why he responded the way that he did.

Q     And that's because ███████████ wouldn't answer whether -- Mr. Galloway's question whether he was sleeping with his fiancée?

A     I don't pretend to know what Dave meant in this e-mail.  My opinion is that by "and the beat goes on," that this, perhaps, could have been maybe a similar situation to something that had happened -- I don't know.

Q     Okay.  But is this Mr. Ramsey directing Jack Galloway's next action with regards to whether ██████ ████████ is terminated or not?

A     I would not conclude that he is directing Mr. Galloway's exact next action.  I would suspect that by saying "that should be obvious," that Dave is saying follow our normal procedure for how we handle these things through the HR committee.

Q     Okay.  So Jack is responding, saying, "Sorry, I'll take care of it today" to Mr. Ramsey's "if he

slept with her or lives with her or won't answer the question, fire him on the spot" is not a directive?

A    If I had received that e-mail, I would not have taken that directive quite that literally.

Q    Is there a Dave Ramsey interpreter that determines whether or not he's serious about his directive or not serious about it?

A    No.

Q    All right. And was ███████████ ultimately terminated?

A    Yes.

Q    Okay. And in the previous -- well, what is previously talked about but what is actually, I believe, a later e-mail that afternoon after Mr. Ramsey's e-mail, where it states, "I met with ████ today, along with Finney and Ebert, in my office. The short version is that ██████ was very nice but also very guarded and was hesitant to tell me anything other than he and his fiancée live at the same address."

It mentions in that e-mail that his fiancée's pastor recommended they live together prior to marriage. Is that right? Based on the e-mail.

A    The e-mail does say that.

Q    Okay. Do you have any reason to believe that

that e-mail is wrong about that fact?

A      No, I do not believe that to be wrong.

Q      Okay.  Was there any discussion about a
religious accommodation for ████████, due to
the recommendation from a pastor that he and his
fiancée should live together?

A      Not to my knowledge.

Q      Would that be something that's taken into
consideration when someone's religious leader tells
them that they should live together before marriage?

A      We have never had anybody ask for that
accommodation, to my knowledge.

Q      Does an employee have to specifically say I'm
requesting a religious accommodation when they tell
you that a pastor recommended they do something?

A      To my knowledge, again, this is the only time
this has ever happened and ██████████ did not
request an accommodation, to my knowledge.

Q      I guess that goes back to my question, does
an employee have to say I'm requesting a religious
accommodation for it to be considered?

A      I don't know.

Q      Okay.  Did that come up in the operating
board discussion about ██████████?

                MS. SANDERS:  Object to the form.

1             You can answer.

2             THE WITNESS:  I don't recall ever

3    discussing a religious accommodation.

4    BY MS. WALTER:

5    Q    Okay.  Out of just curiosity, why was this an

6    operating board decision instead of an HR committee

7    decision?

8             MS. SANDERS:  Object to form.  He can

9    answer it.

10            THE WITNESS:  I don't know.

11   BY MS. WALTER:

12   Q    And when these decisions come to the

13   operating board, which you were a part of, who makes

14   the decision to terminate?

15   A    I don't know.

16   Q    You mentioned that as a member of the

17   operating board you don't make fireable -- decisions

18   on who to fire, so who on the operating board does?

19   A    My understanding is that it would have been

20   somebody on the operating board and that is on HRC.

21   Q    Just anybody who does both?

22   A    Correct.

23   Q    So, it could be Jack, it could be Suzanne, or

24   it could be Mark Floyd?

25   A    Yes.

Q       Could it be Dave Ramsey?

A       In my experience, the HRC is the one that makes all of those decisions.

Q       Sure.  But none of these e-mails regarding ███████████ include any other members of the HR committee.  They're only to the operating board.

A       I don't know why.

Q       Would Dave Ramsey be able to make a determination of whether someone is fired?

A       He is CEO.  He could make whatever decision he wants.

        MS. WALTER:  Okay.  I'm going to look at my notes real quick, but I think I'm almost ready to wrap up.  Let's take a five-minute break.

        MS. SANDERS:  Okay.

        (Recess observed.)

BY MS. WALTER:

Q       Mr. Finney, I won't take up too much more of your afternoon.  I just have a few questions.

        You had testified earlier that there is not an exception for oral sex with regards to the righteous living core value.  So you can't engage in oral sex, extramaritally or premaritally, and that be considered fine under the righteous living core value; is that right?

A     That is my opinion, yes.

Q     Okay.  And we had discussed earlier the situation with ████████ and extramarital affairs. That situation was handled by the operating board, right?

A     Yes.

Q     Okay.  Would it surprise you that other members of the operating board have testified that there is an exception to the premarital -- to any violation of the premarital sex righteous living core value so long as it's exclusively oral sex?

          MS. SANDERS:  Object to form.  He can answer.

          THE WITNESS:  It would not surprise me if others had differing opinions on that.

BY MS. WALTER:

Q     So different members of the operating board believe the decision regarding ████████ is for different reasons?

          MS. SANDERS:  Object to the form.  He can answer.

          THE WITNESS:  My understanding is that the decision related to the oral sex event was made more out of the timing than out of the characterization of it being oral sex.

BY MS. WALTER:

Q     Okay.  Would it be a problem for employees if some members of the operating board believed that oral sex -- premarital oral sex violated the righteous living core value but other ones believed it didn't?

A     I believe that if that got presented to the HRC that they would come to agreement on that.

Q     The ███████████ situation didn't get presented to the HRC with regard to his oral sex extramaritally?

A     My personal opinion, that if the timing of that event had been much more recent, then there would have been a lot more vigorous debate as to the oral sex part of it.

Q     Okay.  But if other members of the operating board have said that premarital or extramarital oral sex does not violate the righteous living core value, would that be a problem for employees to know whether or not they'd be fired or not?

A     Again, to my knowledge, we have never been presented with that before, other than in the ██████ ██████ case, and only then it was more around timing than around oral sex.

Q     Okay.  So it's still your understanding that

1  an employee cannot engage in extramarital or

2  premarital oral sex with their significant other and

3  remain an employee at Ramsey Solutions?

4  A      That is my personal opinion.

5  Q      As a member of the operating board?

6  A      Yes.  I am a member of the operating board

7  and that is my opinion.

8  Q      Sure.  Just clarifying this isn't just you

9  have personal opinions about it, but in your

10  position as a member of the operating board, that is

11  your understanding.

12  A      No.

13              MS. SANDERS:  No.

14              THE WITNESS:  No.

15              MS. SANDERS:  Objection.

16              THE WITNESS:  That is not what I said.

17  What I said is it is my personal opinion of that.

18  BY MS. WALTER:

19  Q      So, then, as a -- you mentioned that you

20  could take things to the HRC.

21  A      Yes.

22  Q      Okay.  So, then, one member of the operating

23  board could not report an employee for engaging in

24  extramarital oral sex but you might, and one

25  employee might be terminated for it and another

employee might not be because it's just everybody's personal opinion about how they feel about the righteous living policy?

A     No.  No.  I believe that if that was presented to the HRC, that they would come to an agreement on it and that when they made the decision there would be agreement on it.

Q     Okay.  And the operating board made a decision that ████████████ extramarital oral sex did not violate the righteous living policy?

A     No.  We made the determination that it was more about the timing, not about the oral sex.

Q     So, because you just didn't find out about it soon enough, he wouldn't lose his job?

A     That was the first time we had been presented with a case of oral sex or intercourse that had been in the past.

Q     Okay.  And then, Mr. Finney, other than speaking to your attorney, what did you do to prepare for your deposition today?

A     I spoke with the attorneys and they shared with me some of the exhibits that we've gone over today.

Q     Which documents did you review?

            MS. SANDERS:  Objection to that.  That's

1    attorney/client privilege.

2            MS. WALTER:  If they're exhibits or

3    documents that have been produced, it's not

4    attorney/client privilege.

5            MS. SANDERS:  He doesn't know if they've

6    been produced.  I do and I'm --

7            (Overlapping speech.)

8            MS. WALTER:  Well, they have --

9            MS. SANDERS:  -- objecting.

10           MS. WALTER:  -- nice little Bates stamps

11   on them.

12           MS. SANDERS:  He doesn't know that.  He

13   doesn't --

14           (Overlapping speech.)

15           MS. WALTER:  He doesn't know --

16           (Overlapping speech.)

17           THE REPORTER:  One at a time, please.

18   BY MS. WALTER:

19   Q      And then, Mr. Finney, do you have any

20   other -- the documents that have been handed to you

21   during your deposition, did any of them have

22   handwritten notes on them?

23   A      No.

24   Q      All right.

25           MS. SANDERS:  As an officer of the

Case 3:20-cv-00008-Brentwood Reporting Services Page 115 of 134 PageID #: 5004
Elite Brentwood Reporting Services (615) 595-0073
www.elitereportingservices.com

1   Court, Ashley, I represented to you that I handed

2   him the exhibits that have been produced in these

3   depositions and that's what I handed to him.  That's

4   what I represented.

5          And I want to go on record, Jerri, I

6   said that every single time that I handed him the

7   actual exhibit from the deposition transcript.

8          MS. WALTER:  Okay.

9   BY MS. WALTER:

10  Q      Do you have any other documents in front of

11  you other than the documents that have been handed

12  to you during the course of your deposition?

13  A      No.

14         MS. WALTER:  Okay.  All right.  Those

15  are all the questions that I have.

16         MS. SANDERS:  None from us.  Thank you.

17  He'll read and sign.

18         THE REPORTER:  Regular turnaround?

19         MS. WALTER:  Yes.

20         THE REPORTER:  And same transcript

21  orders as previous?

22         MS. WALTER:  Yes.

23         MS. SANDERS:  Yes.

24         FURTHER DEPONENT SAITH NOT

25         (Proceedings concluded at 4:30 p.m. CST)

1          E R R A T A   P A G E

2    I, MICHAEL FINNEY, having read the foregoing
     deposition, Pages 1 through 115, do hereby certify
3    said testimony is a true and accurate transcript,
     with the following changes (if any):

4

5    PAGE  LINE              SHOULD HAVE BEEN

6    _____ _____    _____

7    _____ _____    _____

8    _____ _____    _____

9    _____ _____    _____

10   _____ _____    _____

11   _____ _____    _____

12   _____ _____    _____

13   _____ _____    _____

14   _____ _____    _____

15   _____ _____    _____

16   _____ _____    _____

17   _____ _____    _____

18   _____ _____    _____

19

20                      _____
                              MICHAEL FINNEY
21

22
     _____
23   Notary Public: _____

24   My Commission Expires: _____

25   Reported by: Jerri L. Porter, RPR, CRR, LCR

1  REPORTER'S CERTIFICATE

2

3  STATE OF TENNESSEE

4  COUNTY OF Davidson

5

6          I, Jerri L. Porter, RPR, CRR, Licensed

7  Court Reporter, with offices in Nashville,

8  Tennessee, hereby certify that I reported the

9  foregoing deposition of MICHAEL FINNEY by machine

10  shorthand to the best of my skills and abilities,

11  and thereafter the same was reduced to typewritten

12  form by me.  I am not related to any of the parties

13  named herein, nor their counsel, and have no

14  interest, financial or otherwise, in the outcome of

15  the proceedings.

16          I further certify that in order for this
    document to be considered a true and correct copy,
17  it must bear my original signature, and that any
    unauthorized reproduction in whole or in part
18  and/or transfer of this document is not authorized,
    will not be considered authentic, and will be in
19  violation of Tennessee Code Annotated 39-14-104,
    Theft of Services.

20

21

22

23  _____
    Jerri L. Porter, RPR, CRR, LCR
    Elite-Brentwood Reporting Services
24  Notary Public State of Tennessee

25  My Notary Public Commission Expires: 2/6/2022
    LCR 335 - Expires: 6/30/2022