# CAITLIN O'CONNOR

## vs.

## LAMPO GROUP

---

**30(b)(6), Attorneys Eyes Only**

## ARMANDO LOPEZ

## September 30, 2021

---



**R. Michelle Smith, RMR, LCR, CCR, FPR, CLR**

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
_____

CAITLIN O'CONNOR,

                    Plaintiff,

vs.                                    Case No. 3:20-cv-00628

THE LAMPO GROUP, LLC a/k/a
RAMSEY SOLUTIONS,

                    Defendant.
_____


                    ***CONFIDENTIAL***
                ***ATTORNEYS' EYES ONLY***
                (UNTIL FURTHER DETERMINATION)

            30(b)(6) Video Recorded and Videoconference
            Deposition of:

             THE LAMPO GROUP, LLC a/k/a
            RAMSEY SOLUTIONS by ARMANDO LOPEZ

            Taken on behalf of the Plaintiff
            September 30, 2021

            Commencing at 11:15 a.m.


_____
            Elite-Brentwood Reporting Services
    MICHELLE SMITH, RDR, LCR, CCR, FPR, CLR, CLVS, CDVS
                Nashville, Tennessee
                    (615)595-0073

Case 3:20-cv-00628  Document 111-2  Filed 09/11/22  Page 2 of 101 PageID #: 5028
Elite-Brentwood Reporting Services  (901)522-4477
www.EliteReportingServices.com

```
 1

 2              A P P E A R A N C E S

 3

 4

 5    For the Plaintiff, via videoconference:

 6            MS. HEATHER MOORE COLLINS
              MS. ASHLEY WALTER
 7            Collins & Hunter PLLC
              7000 Executive Center Drive, Suite 320
 8            Brentwood, TN 37027
              (615)724-1996
 9            Heather@collinshunter.com
              Ashley@collinshunter.com
10

11    Attorney For Defendant, via videoconference:

12            MS. LESLIE SANDERS Attorney at Law
              Webb Sanders
13            611 Commerce Street, Suite 3102
              Nashville, TN 37203
14            (615)4915-3300
              Lsandesr@websanderslaw.com
15

16    ALSO PRESENT:

17            MS. MARY CIEZADLO, Legal Videographer
              MR. DANIEL CORTEZ
18            MS. CAITLIN O'CONNOR

19

20

21

22

23

24

25
```

Case 3:20-cv-01062 Document 53-3 Filed 09/21/22 Page 3 of 17 PageID #: 50292
Elite-Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com





Case 3:20-cv-01062-Brentwood Reporting Services Page 5 of 101 PageID #: 50314
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1

2          S  T  I  P  U  L  A  T  I  O  N  S

3

4          The 30(b)(6) Video Recorded and

Videoconference of  THE LAMPO GROUP, LLC a/k/a

5

RAMSEY SOLUTIONS by ARMANDO LOPEZ was taken by

6

Counsel for the Plaintiff, by Agreement, with all

7

participants appearing at their respective

8

locations, on September 30, 2021, for all purposes

9

under the Federal Rules of Civil Procedure.

10

          All formalities as to caption, notice,

11

statement of appearance, et cetera, are waived.  All

12

objections, except as to the form of the question,

13

are reserved to the hearing, and that said deposition

14

may be read and used in evidence in said cause of

15

action in any trial thereon or any proceedings

16

herein.

17

          It is agreed that R. MICHELLE SMITH, RDR, and

18

Licensed Court Reporter for the State of Tennessee,

19

may swear the witness, and that the reading and

20

signing of the completed deposition by the witness

21

was not discussed.

22

23

24

25

1                          *    *    *

2

3              THE VIDEOGRAPHER:  We are now on the

4     record, today is Thursday the 30th of September 2021

5     and the time indicated on the video screen is 11:15

6     a.m.  This is the video conference deposition of

7     30(b)(6) corporate designee witness Armando Lopez,

8     taken in the matter of O'Connor versus The Lampo

9     Group, LLC, a/k/a, Ramsey Solutions; Case No.

10    3:20-cv-00628 filed in the United States District

11    Court for the Middle District of Tennessee, Nashville

12    Division.  My name is Mary Ciezadlo, the

13    videographer.  The court reporter is Michelle Smith,

14    both in association with Elite-Brentwood Reporting

15    Services.

16            Since this deposition is being taken by video

17    conference, the oath will be administered remotely by

18    the court reporter.  Any digital exhibits marked

19    during this deposition will be deemed as original for

20    purposes of said deposition.  At this time I'll ask

21    Counsel to identify yourselves and state whom you

22    represent.  And if you have any objections with the

23    procedures outlined, please state so when you

24    introduce yourselves.  We will start with the

25    noticing attorney.

Case 3:20-cv-00628 Document 150-7 Filed 09/12/22 Page 7 of 17 PageID #: 50336
Elite-Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

 1          MS. COLLINS:  Heather Collins for the

 2    Plaintiff, no objections.

 3          MS. WALTER:  Ashley Walter for the

 4    Plaintiff, no objections.

 5          MS. SANDERS:  Leslie Sanders for

 6    Defendant, and Daniel Cortez, counsel for Defendant,

 7    no objections.

 8          THE VIDEOGRAPHER:  Will the court

 9    reporter please swear in the witness.

10          MS. SANDERS:  Heather, before you begin

11    the deposition, Mr. Lopez has in front of him the

12    documents that you've identified in the 30(b)(6)

13    notice, and they're in a binder and I'm placing those

14    before the witness.  There are no notes on these, the

15    only thing there are, are Post-It notes that divide

16    the documents by employee.

17          And also as a reminder, given the topic of

18    this deposition, all of this information, this entire

19    deposition will be deemed confidential and should not

20    be disclosed beyond this lawsuit.

21    //

22    //

23    //

24    //

25    //

1               THE LAMPO GROUP, LLC a/k/a

2        RAMSEY SOLUTIONS by ARMANDO LOPEZ,

3   was called as a witness, and after having been duly

4   sworn, testified as follows:

5

6                  EXAMINATION

7   QUESTIONS BY MS. COLLINS:

8   Q.     Okay.  Could you state your name for the

9   record, please.

10  A.     Sure.  Armando Lopez.

11  Q.     And Mr. Lopez, what is your current job title

12  with Ramsey Solutions?

13  A.     Senior executive director of human resources.

14  Q.     And you've been designated as a corporate

15  representative with respect to specific topics here

16  today; correct?

17  A.     Yes, ma'am.

18  Q.     Okay.  And the first topic that I have you

19  being a designated representative to or for, is topic

20  number three, ██████████ personnel file, including

21  Defendant production 2208 to 2293?

22  A.     Yes, ma'am.

23        MS. SANDERS:  For the record I'm showing

24  Mr. Lopez the designation on my computer.  And also

25  to clarify, he does not have these documents in front

1    of him.

2              MS. COLLINS:  He doesn't have 2208

3    through 2293?

4              MS. SANDERS:  No, he does not.

5              MS. COLLINS:  Okay.  Well --

6              MS. SANDERS:  Those documents, Heather,

7    would be attorney's eyes only.

8              MS. COLLINS:  All right.  So are you

9    instructing him not to discuss topic number three

10   until Ms. O'Connor leaves the deposition?

11             MS. SANDERS:  Yes, that's correct.

12             MS. COLLINS:  All right.  We will tab

13   topic number three and leave the deposition open as

14   to that until we can get instruction from the Court.

15   BY MS. COLLINS:

16   Q.     And I will move on to topic number five, this

17   is about Plaintiff's termination and violation of the

18   Defendant's core values, including all communications

19   and discussions.

20        Mr. Lopez, do you have in front of you the

21   previously marked Exhibits in this case?

22             MS. SANDERS:  I have them.

23             THE WITNESS:  Yes, ma'am, I don't have

24   them in front of me but my attorney does.

25   //

1   BY MS. COLLINS:

2   Q.      Okay.  Now, if you could turn to Exhibit

3   Number 5.

4            MS. SANDERS:  Let the record reflect I'm

5   handing Mr. Lopez a document identified as Exhibit 5,

6   Lopez.

7   BY MS. COLLINS:

8   Q.      And well, I'm just going to ask you if you

9   could review Exhibit Number 5, 6, 7 and 8, these were

10  the e-mails that were produced to us that had to do

11  with Ms. O'Connor's termination.  As corporate

12  representative, are these the only e-mails that are

13  in the company's possession that discuss her

14  termination?

15           MS. SANDERS:  For the record I'm handing

16  the corporate representative three documents,

17  Exhibit 6, I've handed him that now; Exhibit 7, both

18  marked Lopez; and Exhibit 8 marked Lopez.

19           THE WITNESS:  Yes, ma'am.  I can attest

20  to my knowledge these are the only documents that

21  exist regarding Ms. O'Connor's termination.

22  BY MS. COLLINS:

23  Q.      Okay.  Were there any -- well, was the

24  decision to terminate her discussed at a human

25  resources committee meeting?

**Elite Brentwood Reporting Services (901) 522-4477**
**www.EliteReportingServices.com**

1  A.      I do not recall that, but in reading through

2  Exhibit Number 5, it does not appear that it was in a

3  meeting.  It appears that it was HR committee via

4  e-mail.

5  Q.      Okay.  And when you say HR committee via

6  e-mail, is that just all of the people that chimed in

7  on Exhibit Number 5?

8  A.      There were some added people that are not

9  part of HR committee that chimed in.  But HR

10 committee, again, reviewing the e-mails and

11 remembering from having read them, the decision to do

12 something consistent with what we've done in the past

13 was made by HR committee unless there were any new

14 information or new facts that surfaced.  Those facts

15 did not surface different than what we had faced

16 within the past, so that decision was made by the HR

17 committee.

18 Q.      Okay.  Other than the e-mails that we've

19 discussed, 5 through eight, is there any specific

20 e-mail that says the HR committee recommends

21 termination, or is it just in these e-mails?

22 A.      Only in the e-mails produced, there's no

23 additional e-mails.

24 Q.      Okay.  Are there any other memos or anything

25 else that exists that discussed the reasons for

Case 3:20-cv-00628-Brentwood at Reporting Services Page 12 of 101 Page #: 5031
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    Ms. O'Connor's termination?

2    A.      Not to my knowledge that have not been turned

3    in to you.

4    Q.      Okay.  And decision to terminate her was

5    based on a violation or a perceived violation of the

6    righteous living value that's encompassed in the

7    Defendant's core values?

8    A.      That is correct.

9    Q.      Okay.  All right.  Let's move on to topic

10   Number 10.

11          MS. SANDERS:  And for the record I have

12   pulled up on my computer topic Number 10, and it

13   also shows topic number 11, Mr. Lopez is reviewing

14   that.

15          MS. COLLINS:  All right.  Let's go off

16   the record for just one second.

17          MS. SANDERS:  Sure.

18          THE VIDEOGRAPHER:  Going off the record

19   at 11:24 a.m.

20          (Brief break.)

21          THE VIDEOGRAPHER:  We are back on the

22   record at 11:38 a.m.

23   //

24   //

25   //

1    BY MS. COLLINS:

2    Q.     Okay.  Mr. Lopez, back again.  All right.

3    We're moving on to topic Number 10.  And topic Number

4    10 in particular we're going to be discussing the

5    circumstances and events surrounding and including

6    the termination of Ms. O'Connor's comparators that

7    were included in your -- in the Defendant's

8    production Bates stamped 78 and 2169.

9          So we are going to mark that as Exhibit --

10   are we up to 21?

11              THE REPORTER:  Yes, ma'am, 21.

12              (WHEREUPON, a document was marked as

13   Exhibit Number 21.)

14              MS. SANDERS:  Hold on one second,

15   Heather, I'm making sure I gave him the right one.

16   Yeah, he has 78 and 2169, yeah.  Okay.  Sorry about

17   that.  He has that in front of him.

18              MS. COLLINS:  Okay.  What we'll do, is 78

19   will be 21, and 2169 will be 22.

20              (WHEREUPON, a document was marked as

21   Exhibit Number 22.)

22              MS. SANDERS:  Okay.  And Heather, just so

23   you don't have to keep referring to the Bates number,

24   I'm going to write 21 and 22 on those, so that he

25   knows which ones you're referring to.

Case 3:20-cv-00028-Brentwood Reporting Services Page 14 of 101 Page #: 504
Elite Reporting Services (901) 522-4477
www.EliteReportingServices.com

```
1              MS. COLLINS:  Okay.  78 is 21, and
2   2169 is 22.  Okay.  For the record I wrote 21 and 22
3   so the witness knows which exhibit Ms. Collins is
4   referring to.  Okay.
5   BY MS. COLLINS:
6   Q.      Mr. Lopez, with respect to Exhibit Number 21,
7   do you know who created this document?
8   A.      Yes, ma'am.
9   Q.      Who?
10  A.      It was a combination of people, the HR
11  committee, myself and ultimately our attorney as well
12  to put this document together.
13  Q.      Okay.  And what was done to arrive at the
14  list of names here of employees believed to have
15  engaged in premarital sex between ███████████████
16  and ████████████?
17  A.      We went back and looked at every person that
18  left during that time period and the reasons for
19  which they had left, which helped us to compile
20  which ones were righteous living core value
21  violations.
22  Q.      Were these just people that had had that
23  issue brought before the HRC?
24  A.      It was the list of all exited team members,
25  not just those that went through HRC, but all of them
```

1   went through HRC.

2   Q.      Okay.  And did it just start from

3   January 1st, 2018 or was any -- did you guys look at

4   anything before ██████████████? 

5   A.      We looked at the entire list, I think the

6   dates that are on here was ████████████ through

7   ███████████.

8   Q.      Okay.  So this list is a comprehensive list?

9   A.      Yes, ma'am.

10  Q.      Have there been any since then, the people

11  that have been terminated for engaging in premarital

12  sex?

13  A.      Not to my knowledge.

14  Q.      All right.  Now, if you can turn to

15  Exhibit Number 22, please.  Can you tell me what this

16  is?

17  A.      It's a continuation or a more exhaustive list

18  of Exhibit Number 21.  This list has the same people

19  and then some that were pornography problems that

20  had -- that had come into HR committee, not

21  necessarily people that had left the company, just

22  issues that HR committee had dealt with.

23  Q.      And the people that -- well, all of the

24  people that are listed on both Exhibit 21 and 22,

25  again there's overlap between the two, but all of

Case 3:20-cv-01023-Brentwood Reporting Services Page 100 of 221 Page (901) 522-4477 #: 5042
Elite Brentwood Reporting Services Filing 08/12 cel age 16
www.EliteReportingServices.com

1    these people, the righteous living core value was

2    implicated; right?

3    A.      It's not the way we consider them.  It's more

4    behaviors, but yes, you could say those behaviors

5    were tied into the righteous living core values.

6    Q.      And with respect to Exhibit 22, there were

7    three people listed as engaging in conduct, and it

8    lists pornography was their problematic behavior;

9    correct?

10    A.      Yes, ma'am.  There are three names where the

11    conduct says pornography.

12    Q.      Okay.  And all three of those people were

13    men; right?

14    A.      Yes, ma'am.  All three of those are men.

15    Q.      And when it comes to light that an employee

16    has been looking at pornography, it's not an

17    automatically terminable offense; is that correct?

18    A.      It is not.  It could be, but it is not

19    typically.  We seek to find the facts.

20    Q.      What do you mean "it could be"?

21    A.      The -- these three individuals did not result

22    in an automatic termination, but it could have been

23    if none of them had chosen to seek some kind of help

24    to stop doing that behavior, to stop conducting that

25    behavior.

Case 3:20-cv-00628-Brentwood Reporting Services cece 1901-1522-44e77 # : 50416
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    Q.      Okay.  And with respect to ▮▮▮▮▮, it was

2    listed that he was terminated, but that was -- was

3    that after he had already been given an opportunity

4    to correct the behavior?

5    A.      Yes, ma'am.

6    Q.      Okay.  If someone is -- so for all of the

7    other ones, it involves sex, it looks like there is

8    two that involve extramarital sex; right?

9    A.      Yes, ma'am.

10   Q.      Okay.  And those two employees, they were

11   having an extramarital affair, right, with each

12   other?

13   A.      Yes, ma'am.  Those two were having an

14   extramarital affair with each other.

15   Q.      And the others where it's listed that they

16   had premarital sex, all of the people that were

17   accused of having premarital sex were terminated;

18   right?

19   A.      That is correct.

20   Q.      Okay.  And there's no second chances or

21   chance for rehabilitation for engaging in premarital

22   sex; right?

23   A.      Premarital sex is an automatic termination,

24   that is correct.

25   Q.      And that's based on that righteous living

1    core value; correct?

2    A.      Yes, ma'am.

3    Q.      Right.  And the -- I think we've already

4    established time and time again the righteous living

5    core value is Biblically based; right?

6    A.      Correct.

7    Q.      Okay.  Of the employees that were terminated

8    for premarital sex, there were three females;

9    correct?

10           MS. SANDERS:  I'm sorry, Heather, did you

11   say premarital?

12           MS. COLLINS:  Yes.

13           MS. SANDERS:  Okay.  I'm sorry, I had a

14   hard time understanding you.

15   BY MS. COLLINS:

16   Q.      And just to help you out, Mr. Lopez, because

17   yours probably is not handily highlighted the way

18   mine is.

19   A.      It's not.

20   Q.      Ms. ████, she's the top, ████████, and

21   then ████████, and Caitlin Eastwood, who we

22   know as Caitlin O'Connor; correct?

23   A.      Yes, ma'am.

24   Q.      And all three of those women who were

25   terminated for violating the righteous living core

Case 3:20-cv-00069-Brentwood Reporting Services-Page 19 of 101 PageID #: 5043
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1   value of having premarital sex, all three of those

2   women had came to Ramsey Solutions and notified it

3   that they were pregnant; correct?

4   A.      That is not correct.

5   Q.      Okay.  What is not correct about that?

6   A.      ███████████ was not pregnant.

7   Q.      Okay.  How did you find out she was having

8   premarital sex then?

9   A.      I'm going to refer to a document just to

10  refresh my memory.

11  Q.      Yeah.  Sure.

12          MS. SANDERS:  You have to tell her which

13  document.

14          THE WITNESS:  Yes.  I am looking at

15  Defendant Document 0910.

16  BY MS. COLLINS:

17  Q.      Okay.

18  A.      Bottom portion of that has an e-mail exchange

19  from Rebecca Ward to Jack Galloway and Heath Hartzog,

20  dated ████████████████████ where they

21  are speaking with █████████, ██████████, her

22  middle name is █████████, and they're asking her

23  about the person that spent the night.  And then I'm

24  going a little further back in that chain of e-mails

25  to Defendant Document Number 0911, bottom portion

1    e-mail exchange Jack Galloway, Heath Hartzog, Rebecca

2    Ward, dated ███████████ at ████████ where

3    it says that we learn from ████████ with a situation

4    that he ran across over the weekend, he and

5    ████████ live in the same apartment.

6         Yesterday morning around 7:00 a.m.

7    ████████ boyfriend came out of her apartment in

8    boxer shorts and a blanket to walk the dog.  Please

9    connect with █████ and get any context needed.  So we

10   learned about this from ████████, and then asked

11   ████████ about it.

12   Q.    Okay.  And by ████████ telling management

13   that, that he ran across ████████ boyfriend in

14   his boxer shorts on a Saturday morning walking

15   ████ dog, that doesn't violate the core value

16   against gossip?

17   A.    He went to leadership, he didn't go to

18   subordinates or peers.

19   Q.    Okay.  So it's not gossip if you go to

20   leadership?

21   A.    That is correct.

22   Q.    Okay.  All right.  Well, let me just go ahead

23   and mark because that set of documents is included in

24   one of the 30(b)(6) requests, so just for sake of the

25   record.

Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1      MS. SANDERS:  I think it's Number 12,

2    Heather.

3    BY MS. COLLINS:

4    Q.     Yes, I'm sending over a set of documents

5    we're going to mark as Exhibit 23 to the deposition,

6    and these are ███████████ records.

7           (WHEREUPON, a document was marked as

8    Exhibit Number 23.)

9           MS. SANDERS:  Okay.  And for the record,

10   he's got that set of documents, and which exhibit did

11   you make it, Heather?

12          MS. COLLINS:  23.

13          MS. SANDERS:  Okay.  I'm going to write

14   23 on this Post-It note so that you don't have to

15   refer to the Bates Numbers.

16   BY MS. COLLINS:

17   Q.     Okay.  So going back to Exhibit Number 22,

18   Mr. Lopez, ███████████ and Caitlin Eastwood were

19   both terminated when they came to the company and

20   told that they were pregnant, and neither of them

21   were married; correct?

22   A.     I'm going to refer to ███████████

23   paperwork real quick.

24   Q.     And I'll go ahead and send that over and

25   we'll mark that as Exhibit Number 24.  And this is

1  the set that starts with Page 435.

2         (WHEREUPON, a document was marked as

3  Exhibit Number 24.)

4         MS. SANDERS:  So the set that's in

5  response to topic number 15?

6         MS. COLLINS:  Yes.

7         MS. SANDERS:  Okay.  Once he's reviewed

8  that I'll write 15 on that Post-It note -- I mean not

9  15, I'm sorry, 24.

10        THE WITNESS:  Okay.  I've refreshed my

11  mind on ████.  And so your question was, can you

12  repeat the question real quick?

13  BY MS. COLLINS:

14  Q.     I believe the question was, was that both

15  ████████ and Catlin O'Connor, who is listed on

16  this document as Eastwood, were terminated for

17  righteous living core value violations when they came

18  and told the company that they were pregnant.

19  A.     They were terminated for violation of the

20  core value in having sex out of wedlock or premarital

21  sex.  In the context of sharing it, they shared that

22  they were pregnant, yes.

23  Q.     But they didn't come and say hey, I violated

24  the righteous living core value, they came to the

25  company and said, hey, I'm pregnant; right?

```
1    A.        They did.

2    Q.        Okay.  And ███████████, the first several

3    pages of her file contain a general release and an

4    employment resignation, so this is basically a

5    severance agreement; correct?

6    A.        Correct.

7    Q.        Okay.  And the company paid her ████████ plus

8    some benefits for health benefits; correct?

9    A.        That is correct.

10   Q.        And that was in exchange for her agreeing not

11   to sue the company and to sign a nondisclosure

12   agreement; correct?

13   A.        Not entirely, but yes, it was to -- to care

14   for her and to make sure she had health insurance

15   coverage and income during her pregnancy and while

16   she delivered her baby.

17   Q.        Okay.  So even though on this, on document

18   Number 22 where it says she was terminated, was --

19   was she asked -- was she offered this document to say

20   that she resigned in lieu of termination because no

21   matter what, she was going to be terminated, or how

22   did that play out?

23   A.        I am looking for document 22, can you tell me

24   what's on there?

25   Q.        That was the list that has the 2169 at the
```

Case 3:20-cv-00628-Brentwood Reporting Services-1 Page 790 of 22 PageID #: 5023
Elite Brentwood Reporting Services 901.522.4477
www.EliteReportingServices.com

```
 1   bottom.
 2   A.      I'm sorry, yeah.  Exhibit 22, yeah, it says
 3   resigned.  We weren't really doing a great job of
 4   keeping up with who was terminated, who resigned, and
 5   the reality is, ███████████ would have been
 6   terminated.  I don't recall that she resigned in lieu
 7   of being called terminated.
 8   Q.      Okay.  Do you recall if she filed for
 9   unemployment benefits?
10   A.      I do not recall that.
11   Q.      Okay.  And do all of the documents that were
12   marked as Exhibit 24, ███████████ documents,
13   does that pretty much accurately reflect all of the
14   circumstances surrounding her termination?
15   A.      It does.
16   Q.      All right.  I'm going to go back to our
17   topics here.  We're on topic Number 11, and this has
18   to do with ███████████, and this was previously
19   marked as Exhibit Number 14 in the depositions in
20   this case, all of his information, so if you have
21   that in front of you.
22           MS. SANDERS:  Heather, can I just make
23   sure, we don't have Exhibit 14, can I just make sure
24   that we have all of the documents that are in
25   Exhibit 14 with you?
```

```
1              MS. COLLINS:  Sure.
2    BY MS. COLLINS:
3    Q.      Mr. Lopez, this is probably in your binder,
4    it starts with 519.
5              MS. SANDERS:  Yes, we have 519 through
6    528; 858 through 873; and 1324 through 1348, is that
7    Exhibit 14?
8              MS. COLLINS:  Yes.
9              MS. SANDERS:  Okay.  He's got that.  I'm
10   going to mark that as 14.
11             MS. COLLINS:  Okay.
12   BY MS. COLLINS:
13   Q.      Now, Mr. Lopez, does this set forth the
14   reasons for ███████████ -- am I pronouncing that
15   right, ██████?
16   A.      I believe that's how he pronounced it, yeah.
17   Q.      Okay.  Does this set of documents accurately
18   reflect the reasons why he was terminated?
19   A.      Yes, ma'am.
20   Q.      Okay.  And on Page 521 he was also offered a
21   severance agreement in exchange for not suing the
22   company and signing and agreeing to a nondisclosure
23   agreement; is that correct?
24   A.      He was offered a severance.
25   Q.      Okay.  And that includes a provision that he
```

1    not sue the company and that he not disclose certain

2    information about the company; right?

3    A.      Yes, ma'am, similar to all severance

4    agreements, yes.

5    Q.      Okay.  And on Page 861 of Exhibit Number

6    14.

7    A.      Yes, ma'am, I'm there now.

8    Q.      The reason he was terminated is because he

9    was living with his fiancée, or he was asked if he

10   was living with his fiancée; correct?

11   A.      Yes.

12   Q.      And he was not transparent in living with his

13   fiancée?

14   A.      As I'm reading through this and from my

15   recollection, what happened was, not just the living

16   with his fiancée, but he refused to answer any

17   questions related around the relationship and whether

18   it was a romantic situation or not.

19   Q.      And it is Ramsey Solutions' position that

20   they are entitled to know that information?

21   A.      Only as it pertains to the violation of

22   righteous living.

23   Q.      Okay.  And he refused to answer questions

24   about his personal life; right?

25   A.      He did during that initial conversation,

1   yes.

2   Q.      Okay.  All right.  And going to page --

3   Page 61, Mr. Perry mentions that his attitude and

4   willingness to be transparent will be key to what

5   action we take.  What was your understanding as to

6   what that meant, or the company -- or the company's

7   position as to what that meant?

8   A.      The position would be was he in fact in a

9   romantic relationship having premarital sex or

10  not.

11  Q.      Okay.  If you can turn to Page 1324.  On --

12  at the top of the e-mail thread on Page 1324

13  Jack Galloway sent an e-mail to the operating board

14  about ███████████, and he says ██████ is very

15  liberal in his beliefs, and shared with us that his

16  fiancée's pastor recommended that they live together

17  prior to marriage.

18          We had some short discussion about the

19  difference in varying interpretation right and wrong

20  versus agreeing to work here and respect our core

21  values.

22          What was -- what did that mean that ██████ is

23  very liberal in his beliefs?

24  A.      I'm not sure why Mr. Galloway wrote that.  My

25  thought is that he would have said it's fine with him

Case 3:20-cv-00023 Document 38 Filed 09/22/21 Page 28 of 101 PageID #: 5027
Elite Brentwood Reporting Services  (901) 522-4477
www.EliteReportingServices.com

1   to live with his girlfriend to engage in premarital

2   sex.

3   Q.      Okay.  At this point in time had he admitted

4   to engaging in premarital sex?

5   A.      At this point in time he had confirmed that

6   they were in a romantic relationship.

7   Q.      But did that include premarital sex?

8   A.      I don't know that it was worded that way, but

9   yes, it was understood that he was in a romantic

10  relationship.

11  Q.      Okay.  Did anyone ask him if that included

12  intercourse, or did it get that specific?

13  A.      I don't think it got that specific, I

14  think at this point ████ was ready to go, he was

15  not wanting to stay, and we did not want him to

16  stay.

17  Q.      Okay.  And in the context of this discussion,

18  Mr. Galloway wrote that he was liberal in his beliefs

19  and that he had spoken with the fiancée's pastor.  So

20  at this point in time did the company know that

21  his -- that ██████████ religious beliefs

22  differed as to living together with his fiancée?

23  A.      I'm sorry, can you rephrase that question?

24  Q.      Sure.  At this point in time, was Ramsey

25  Solutions aware that ██████████ believed that it

1   was okay for him to live with his fiancée, whether it
2   was romantic or involved intercourse or what, because
3   his fiancée's pastor suggested it?
4   A.      No, he did not.  Until this moment in time,
5   we were not aware of that.
6   Q.      Okay.  But the company did become aware the
7   difference in his beliefs based on what his pastor
8   had given, based on what their pastor had guided them
9   to as of the writing of this e-mail on ███████████,
10  ██████; correct?
11  A.      That is correct.
12  Q.      Okay.  If you could turn to Page 1326, and it
13  looks like Mr. Dave Ramsey chimed in about the
14  ██████████████████; right?
15  A.      Yes, ma'am.
16  Q.      Okay.  And he wrote, "It is starting to feel
17  like we are running Bob Jones University."  Do you
18  know what that means?
19  A.      Yeah, I think we had had some separations at
20  that point in time related to conduct and morals, and
21  I think that he probably felt frustrated that it felt
22  like a college campus.
23  Q.      Okay.  What is -- is Bob Jones University, is
24  that a religious school?
25  A.      I believe it is, I cannot say that a hundred

Case 3:20-cv-00036 Document 86-7 Filed 08/21/22 Page 30 of 101 PageID #: 5059

1    percent.

2    Q.      Okay.  And it looks like Mr. Ramsey also

3    directed that ██████████████ should be fired on the

4    spot if he wouldn't answer a question about his

5    personal life; is that correct?

6    A.      That's what he said in the e-mail.

7    Q.      Okay.  Is that your understanding of the

8    application of the righteous living policy?

9    A.      It is not.  It's a consensus in HR committee,

10   I think it was Mr. Ramsey venting.

11   Q.      Okay.  Okay.  So employees shouldn't be fired

12   on the spot, is that what you're saying?

13   A.      Employees should not be fired on the spot?  I

14   didn't understand the question.

15   Q.      Yeah, that was my question, is that what

16   you're saying, that the HRC committee should make

17   these decisions, and employees shouldn't just be

18   fired on the spot as a knee-jerk reaction?

19   A.      Yes, I would agree with that.

20   Q.      Okay.  Now, on Page 1331 of Exhibit 14, if

21   you could turn to that for me, please.  Well, it

22   really starts on 1332, I think.  Yeah, where there's

23   an e-mail from Michael Finney that said it was his

24   fiancée's pastor at a ████████████████████████.

25   So there was discussion about what sort of pastor

1    was giving ████████ and his fiancée guidance;
2    right?
3    A.      I'm not sure in what context it was, but
4    yes, that is what Michael Finney says, he said it was
5    the fiancée's pastor at the ████████████
6    ██████.
7    Q.      And Mr. Ramsey; if you go to Page 1331, he
8    responds back that -- well, he's inserting a sarcasm
9    font, which frankly I wish was a thing, but and he
10   says, "Well, that makes it okay."
11   A.      Yes, ma'am.  I see that.
12   Q.      Okay.  But that's intended to be sarcastic?
13   A.      Yeah, I see it, it's intended to be
14   sarcastic.  We're not changing our core value based
15   on a pastor in a ██████████████████.
16   Q.      Okay.  And ██████████ was not any sort of
17   executive with the company; right?
18   A.      No, ma'am.
19   Q.      Is it typical for Mr. Ramsey to be
20   involved in terminations like this of employees like
21   ████████████?
22   A.      It's typical to let the CEO know when a
23   person is being terminated for a violation of a core
24   value.  But if I -- if I refer back to that line of
25   it feels like we're running a Bob Jones University,

1    1326, I think that it was just that we were having a

2    few happening at the same time.

3    Q.      Okay.  Did you-all attribute that to

4    anything?

5    A.      Nope, we did not.

6    Q.      Did you-all look into why it was going on, or

7    ever get to the bottom of it, or just having a bad

8    day?

9    A.      We didn't do an investigation to figure out

10   what was going on or what was happening.

11   Q.      Okay.  All right.  In the next set of

12   documents is ███████████, and we've already marked

13   that as Exhibit Number 23.  I think she was also

14   offered a release in exchange, and she was offered a

15   severance payment, it looks like her severance

16   payment was ████████ in exchange for agreeing not to

17   sue and not to disparage the company; correct?

18   A.      She was offered a severance and she signed a

19   severance agreement that included those things in it,

20   yes.

21   Q.      And on the first page of her -- of

22   Exhibit Number 23 is the separation notice that was

23   sent to the Department of Labor, and it says that she

24   resigned, but she was in fact, terminated, wasn't

25   she, or asked to leave?

1    A.       That's correct.  That's correct.  As I stated

2    earlier, we were not very diligent in how this

3    paperwork was being completed at that time.

4    Q.       Okay.  And when you say not diligent in how

5    this paperwork, are you referring to the separation

6    notices that were sent to the Department of Labor or

7    something else?

8    A.       I am only speaking to the separation notice,

9    and they're not actually sent to the State of

10   Tennessee, they are just handed to the team member.

11   Q.       Okay.  But they're a State of Tennessee

12   document; right?

13   A.       It is a State of Tennessee required document.

14   Q.       Okay.  And is that your signature on that

15   document?

16   A.       Yes, ma'am.

17   Q.       Okay.  And you're certifying to this State of

18   Tennessee -- or on this State required document, that

19   the reasons listed are true and correct; right?

20   A.       That is correct.

21   Q.       Okay.  Do you think that's accurate to say

22   that she resigned when she was in fact, terminated or

23   told to leave?

24   A.       I don't think it's accurate to say that;

25   however, I do think it is permissible in that she

1    signed the general release and voluntary employment

2    resignation separation.

3    Q.      Okay.  So I'm going to move on to topic 13,

4    which is ██████████, and these are Defendant

5    documents, they start with 406, and these will be

6    marked as Exhibit 25 I think is what we're up

7    to.

8              (WHEREUPON, a document was marked as

9    Exhibit Number 25.)

10             MS. SANDERS:  I've marked on the Post-It

11   note 25, so he has those.

12   BY MS. COLLINS:

13   Q.      All right.  Mr. Lopez, as corporate

14   representative, are you familiar with these

15   documents?

16   A.      Yes, ma'am, I am.

17   Q.      And with respect to ████████, we got a

18   copy of her resignation -- or well, we got a copy of

19   her separation notice and the general release and

20   resignation form.

21             Now, can you tell me the reason why her

22   employment was separated?  I didn't really get the

23   specifics of that.

24   A.      She violated the righteous living core value

25   of premarital sex.

Case 3:20-cv-00628  Document 36  Filed 05/11/22  Page 35 of 101  PageID #: 5064
Elite Brentwood Reporting Services  (901) 522-4477
www.EliteReportingServices.com

1    Q.      Okay.  And unless I'm missing it back on

2    Exhibit 22, I don't think that she's listed, is

3    she?

4    A.      She is not on Exhibit 22, she is listed on

5    Exhibit 21.

6    Q.      Okay.  Can you tell me circumstances that led

7    to her termination, or resignation?

8    A.      She violated the righteous living core value,

9    made her leader aware of it, who made his leader

10   aware of it.  And ████████████, this was the first

11   time this had happened where -- where someone came in

12   to say that to her leader, and was pregnant.

13   Q.      Okay.  Who was her leader?

14   A.      Her leader was Winston Cruze.

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   A.      Yes, ma'am.

18   Q.      Okay.  Were there any e-mails or HRC

19   documents generated as a result of ████████████

20   termination or talking about it like there have been

21   some others that we've already discussed?

22   A.      No, ma'am.

23   Q.      Okay.  Were you involved in the meetings

24   where she, where ████████████ went to ████████ and

25   told him that she was pregnant?

Case 3:20-cv-00623 Document 89 Filed 08/12/22 Page 36 of 101 PageID #: 5065
*Elite Brentwood Reporting Service (901) 522-4477*
*www.EliteReportingServices.com*

1    A.      I was not involved in the meetings with her

2    discussing her with the -- her leader.  I was

3    involved in meeting with ███████████ after the

4    decision had been made.

5    Q.      Okay.  And was she not married as well?

6    A.      That's correct, she was unmarried.

7    Q.      Okay.  So she came to ███████, told him

8    that she was pregnant, and then that was the first

9    time the company made the decision to terminate an

10   employee for -- that had come to them that was

11   pregnant, for engaging in conduct that they felt

12   violated the righteous living core value; is that

13   correct?

14   A.      To my understanding, yes.

15   Q.      Okay.  And her severance offer was █████████;

16   correct?

17   A.      Yes, ma'am.

18   Q.      Okay.  And she agreed to that?

19   A.      Yes, ma'am.

20   Q.      Okay.  Did you agree with the decision to

21   terminate ███████████?

22   A.      On a personal basis or as a company?  I --

23   Q.      Both.

24   A.      From a company basis I agreed that we needed

25   to be consistent in the application of our core

1   value.  On a personal basis, I did not agree.

2   Q.      Why did you not agree?

3   A.      I did not agree just on personal belief.

4   Q.      What -- what was your personal belief?

5   A.      My personal belief would have extended some

6   grace.

7   Q.      Okay.  So if it would have been up to you,

8   ███████████ would not have been terminated?

9   A.      That's a different question.  If it had been

10  up to me as the head of HR making a consistent

11  decision, I would have agreed with that decision.  If

12  it had been up to me, Armando Lopez, that an elder in

13  a church or a neighbor of someone that told me about

14  it, I would not have agreed.

15  Q.      Okay.  Well, ███████████ was the first

16  pregnant employee to be terminated on this basis;

17  correct?

18  A.      Correct.

19  Q.      Did any other leaders, either on the HRC or

20  the operating board share your concern or your belief

21  that she should be extended some grace?

22  A.      I did not speak to anyone about that.

23  Q.      Okay.  How was the consensus built that she

24  should be terminated?

25  A.      I was not involved in those meetings.

Case 3:20-cv-00628 Document 88-7 Filed 08/22 Page 390 of 522 PageID #: 5067
**Elite Reporting Services** (901) 522-4477
**www.EliteReportingServices.com**

1   Q.      Okay.  Who told you that she should be
2   terminated?
3   A.      That she should, or the decision was made
4   that she would?
5   Q.      Yes.  That she -- that the decision had been
6   made that she would be terminated.
7   A.      ████████████.
8   Q.      Okay.  And you -- just a moment ago, you drew
9   a distinction that she should be terminated, is that
10  a different person than ████████?
11  A.      No.  Same person.  I wanted a distinction
12  from you, you said "should she" versus "would she".
13  I didn't find out should she, I found out that she
14  would.
15  Q.      Okay.  Got it.  How was ████████████ when you
16  informed her that she would be terminated, how did
17  she take it?
18  A.      Her demeanor was good.  She knew that what
19  she did violated a company policy, company core
20  value, she was grateful for the money and the
21  insurance for her child.  Was sad for leaving the
22  company but she -- she knew that this was -- that
23  when she said this to ████████, that that equated
24  to her termination for having violated that core
25  value.

1    Q.      Would she be eligible for rehire today?

2    A.      We have a policy for rehires of almost never.

3    But every single one of those that comes back would

4    go through HR committee.

5    Q.      So if she, if ████████████ came back and

6    wanted her job back, it would have to be subject to

7    HR committee review before the decision would be

8    made?

9    A.      Yes, that's with all rehires.

10   Q.      Okay.  And this was the same thing on the

11   separation notice where it says she resigned, in

12   actual -- in actuality she was terminated; right?

13   A.      She was terminated and signed the separation

14   agreement and employment resignation.

15   Q.      All right.  All right.  We're going to move

16   on to topic Number 14.  Does anybody need to take a

17   break?

18   A.      I'm okay.

19           MS. SANDERS:  I'm okay.  Thank you.

20   BY MS. COLLINS:

21   Q.      We're going to move on to topic 14,

22   and this is ██████████, and this is, it starts

23   Bates Number 469, and this will be marked as

24   Exhibit  Number 26.

25   //

1          MS. SANDERS:  The witness has that set of

2    documents identified as topic number 14, and I'm

3    writing 26 on the Post-It note.

4          (WHEREUPON, a document was marked as

5    Exhibit Number 26.)

6    BY MS. COLLINS:

7    Q.      All right.  Mr. Lopez, do you have

8    ███████████ set of documents in front of you?

9    A.      Yes, ma'am.

10   Q.      He was terminated on ████████████; correct?

11   A.      That is correct.

12   Q.      His offer, according to the next page of the

13   document, he was offered a ███████ severance;

14   correct?  That's on --

15   A.      Right.  That is correct.

16   Q.      Okay.  And that was also in exchange for him

17   not suing the company and a non disparagement or

18   nondisclosure agreement; correct?

19   A.      Those are provisions in the separation

20   agreement.

21   Q.      And according to Page 599 of the documents,

22   it came up that his girlfriend had moved in with him;

23   right?

24   A.      Yes, that appears to be the e-mail from

25   Sarah Sloyan, on ████████████, the bottom of

Page 599.

Q.     Okay.  And because that occurred, he was
going to be terminated; right?

A.     Yes.  We were speaking with him to find out
how -- if it was a romantic situation, but yes.

Q.     Okay.  And are you referring to the ████████
████████ e-mail from Jack Galloway where he says
"It's 99 percent, a hundred percent really, I just
like to leave room for the unexpected, a firing
situation"?

A.     That's correct, that's what I'm referring
to.

Q.     Okay.  Well, what if Mr. -- what if
████████ would have said no, she's just living with
me and we have separate bedrooms and there's nothing
romantic going on?

A.     It's not what he said.  And I don't know that
we have faced that in the past where someone has said
that.

Q.     Okay.  All right.  Now, if you could turn to
Page 902 of this set of documents -- I'm sorry, I
skipped ahead.  I was looking at the wrong section.
All right.  I think that's all I have to ask about
████████, he was terminated, his girlfriend
lived with him and he violated the righteous living

Case 3:20-cv-00028-Brentwood Reporting Services Page 42 of 101 Page 477 #: 5061
**Elite Brentwood Reporting Services (901) 522-4477**
**www.EliteReportingServices.com**

```
 1    value, that's pretty much the end of the story;
 2    right?
 3    A.      Pretty much.
 4    Q.      All right.  I am just trying to speed through
 5    some of these things.
 6            MS. SANDERS:  We appreciate that, it's
 7    lunchtime.
 8    BY MS. COLLINS:
 9    Q.      All right.  So let's move on to topic number
10    15, and this is ███████████, she's already -- her
11    stuff has already been marked, and that was
12    Exhibit Number 24.  And I feel like we've covered
13    most of the stuff about ████████████, the only
14    question I had -- well, let's go to page 902 of that
15    set of documents.
16    A.      Yes, ma'am.
17    Q.      Okay.  And on page 902, it looks like
18    ██████████ had come in and said she had gotten
19    married over the weekend or over a break and that she
20    was four months pregnant.  So even though she got
21    married, because she was pregnant before she got
22    married, that was -- the timing was off and that's
23    why she was terminated; right?
24    A.      There was a little bit more.  So she --
25    Kassidy and ██████ suspected that she might be living
```

1    with her fiancé already, and then she came in and

2    said that she had gotten married over the break

3    and then told Kassidy that she was four months

4    pregnant.

5    Q.     Okay.  And that was before that she had

6    gotten married; right?

7    A.     Correct.

8    Q.     And it says based on the conversations and

9    decisions we made in ▮▮▮▮▮▮ situation who is

10   ▮▮▮▮▮, or is that a typo?

11   A.     It's supposed to be ▮▮▮▮.

12   Q.     All right.  That's sort of what I figured

13   that was.

14          And it also looks like Mr. Ramsey was also

15   involved in the e-mail thread on this one where it

16   says surely this is not a shock to her.  And again,

17   is that typical that he is directly involved in these

18   termination decisions of employees who are accused of

19   violating the righteous living core value?

20   A.     It's not typical.  Again, this is only the

21   second time the company had ever had a situation

22   where a woman had been pregnant and that's how we

23   found out and learned.  We suspected that she had

24   violated company policy but we didn't know it until

25   that moment.

1    Q.      Okay.  Were there any meetings set before

2    finding out she was pregnant just based on the

3    suspicion she was living with her boyfriend or having

4    a romantic relationship with her boyfriend?

5    A.      Yes, I believe so.

6    Q.      Okay.  And what do you base that on?

7    A.      A conversation with ███████ at the time

8    that this happened.

9    Q.      Okay.  Is there any documentation that she

10   was being brought before the HRC or any other group

11   before she notified the company that she was

12   terminated?

13   A.      Is there -- can you repeat your question?

14   Q.      Sure.  Is there any documentation to support

15   what we just discussed, that there was a suspicion

16   that she was engaging in conduct that violated --

17   that would have violated the righteous living

18   policy and she would need to be brought before the

19   HRC?

20   A.      Got it.  Thank you.  No, not to my knowledge.

21   Q.      Okay.  All right.  Moving along to topic 16,

22   and this is ███████, and it's my understanding

23   this set of documents has been previously marked as

24   Exhibit Number 18, this one starts at 488.

25   //

Case 3:20-cv-00201-RNC Document 367-1 Filed 08/22/23 Page 49 of 101 Page ID #: 5044
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    MS. SANDERS:  Can I just make sure
2    because I don't have that exhibit in front of me.
3    But here is what I have, I have 488 through -- sorry,
4    through 492.  And then I have 494 through 496, and
5    then 671, this goes on for a minute, excuse me, 671
6    through 773.  And then 1085 through 1098, is that the
7    right exhibit?
8              MS. COLLINS:  Yeah, it should be, I think
9    that it's actually 671 through 719, then just 773,
10   and then 1085 through 1098.
11             MS. SANDERS:  Yes, sorry about that.
12   That's what I've got, yeah.  And I'm sorry, which
13   exhibit is it?
14             MS. COLLINS:  This one was previously
15   marked in the deposition that Ashley took the other
16   day, Exhibit 18.
17             MS. SANDERS:  Okay.  I'm just writing 18
18   on here so, on his Post-It notes, okay, he has that
19   in front of him.
20   BY MS. COLLINS:
21   Q.     All right.  Mr. Lopez, do you have
22   Exhibit Number 18 or the one that starts at 488 in
23   front of you?
24   A.     Yes, ma'am.
25   Q.     Great.  And ▮▮▮▮▮▮▮▮▮ was offered a

Case 3:20-cv-00028-Brentwood Reporting Set-21-cBage 4901 1522-4470 #: 5075
**Elite Reporting Services**
**www.EliteReportingServices.com**

1    severance of ███████ in exchange for a

2    non-disparagement or nondisclosure and to not sue the

3    company; correct?

4    A.      He was offered it as a severance, and those

5    are provisions in the severance agreement.

6    Q.      Okay.  And in █████████ case, he had come

7    to the company and notified it that his wife was

8    pregnant and he was inquiring about paternity leave;

9    right?

10   A.      I do not remember him inquiring about

11   paternity leave.

12   Q.      Okay.  All right.  Let's -- let me just --

13   we'll back up then and look at some of these

14   e-mails.

15   A.      Okay.

16   Q.      I think that if we start on Page 671?

17   A.      Yeah, I'm there.

18   Q.      Okay.  All right.  So Ms. -- it looks like

19   this was the first e-mail about ██████████

20   situation, I think, where █████████ sent an e-mail

21   saying that she had a one-on-one with ██████████████

22   and he informed her that he and his wife are

23   expecting their first child in █████████████?

24   A.      That is correct.

25   Q.      Okay.  Yeah, and it doesn't say anything

Case 3:20-cv-00624-Brentwood Reporting Settice-eBage 4901 1522 Page 47 # 50 76
**Elite Brentwood Reporting Services - (901) 522-4477**
**www.EliteReportingServices.com**

1    about paternity leave.  So but somebody, and I guess

2    it was ███████ went back and calculated that he got

3    married in December, and that with the due date, they

4    would have not been married when their baby was

5    conceived basically?

6    A.      That is correct.  And for the record,

7    ██████████ is a male.

8    Q.      Okay.  Thanks.  So but it --████████████

9    situation came up in the context of him notifying his

10   supervisor that his wife was expecting her first

11   child and was pregnant?

12   A.      That is correct, yes.

13   Q.      Is that typical for a company representative

14   to go back and calculate a due date with when

15   somebody got married, to see if they'd had sex before

16   they got married?

17   A.      Typical no, I would not say it's typical.  In

18   this case ████████ had been with the company a very

19   short period of time, and so it just didn't -- it was

20   an obvious it didn't line up.

21   Q.      What do you mean it didn't line up?

22   A.      According to the e-mail, he informed me that

23   he and his wife are expecting their first child

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

1    how is that possible.

2    Q.      Okay.

3    A.      It's not that it's impossible, but it

4    just would have raised a question of how did that

5    happen.

6    Q.      Okay.  Got it.  All right.  If you could turn

7    to Page 676, you sent an e-mail on ███████, and

8    you said "Righteous living was discussed with ██████

9    at the interview and brought up at the spousal lunch

10   with █████ and his wife █████.  ██████ showed up

11   alone since he was not married at the time, and

12   conversations were had to ensure he understood our

13   core values."

14           So is the company's position on premarital

15   sex discussed at the interview stage before an offer

16   is made?

17   A.      It is discussed, that's correct, it's

18   discussed in several time periods, but the interview

19   is one of those.

20   Q.      Okay.  Is it just discussed with single

21   people or is it discussed with everyone that, you

22   know, the company prohibits premarital or

23   extramarital sex and we're not going to hire you

24   if you do these things or if you've done these

25   things?

1    A.      It's discussed with everyone, married or

2    single.

3    Q.      Okay.  Were you there during ███████████, I

4    guess pre-hire interview?

5    A.      Yes, ma'am, I did his culture interview.

6    Q.      His culture interview, where did that take

7    place?

8    A.      It took place -- it would have taken place in

9    my office.

10   Q.      Okay.  All right.  And Mr. Finney wrote at

11   the top of that page on 676, that the only wrinkle in

12   this whole thing is that he got her pregnant before

13   he started here.  And he says sure, we hire people

14   all of the time who have kids out of wedlock, and he

15   wonders if that changes anything.  So are you aware

16   of hiring other employees who had kids out of

17   wedlock?

18   A.      Yes, ma'am.  I am aware we've hired other

19   people out of wedlock, the timing was what was in

20   question.

21   Q.      What, because he had had his interview before

22   he got married, or what was the timing issue?

23   A.      The timing was -- he would have perhaps

24   been engaged in premarital sex not just prior to

25   joining the company, but even after joining the

1    company.

2    Q.      Okay.  So does the -- okay.  Got it.  So in

3    those initial interviews like the culture interview

4    as you referred to it, does someone point blank ask

5    someone if they're engaging in premarital sex or if

6    they have a boyfriend or fiancé or girlfriend or

7    whatever?

8    A.      No, we don't ask.  We would state the

9    company's position on the core value of righteous

10   living and that that would prevent and prohibit

11   premarital sex.  We don't say are you engaged in it

12   at this time.  We want them to be aware that should

13   they engage in that behavior, it would result in

14   separation.

15   Q.      Okay.  All right.  And on 677 there's an

16   e-mail from Mr. Galloway discussing the severance,

17   but he didn't feel like that the company needed to be

18   as generous to a guy that had already gotten a girl

19   pregnant as the company was with ▮▮▮▮.  Did you

20   have any understanding as to what that meant, or do

21   you have any understanding?

22   A.      Other than what he wrote, no.  I can read the

23   same sentence that you just read, and basically he's

24   just saying, hey, this feels odd.  It goes back to

25   the same thing that Mr. Finney pointed out, are they

Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

51

1    still and have they continued to engage in that

2    activity even after he worked here.

3    Q.      Okay.  All right.  Now, we're going to move

4    on to topic 17, and this is with -- ▮▮▮▮▮▮

5    ▮▮▮▮▮▮, I hope I'm pronouncing that right?

6    A.      That's close enough.

7    Q.      Okay.  How would you pronounce it?

8    A.      ▮▮▮▮▮▮.

9    Q.      ▮▮▮▮▮▮, okay.  That's actually easier.  All

10   right.  And ▮▮▮▮▮▮▮▮ was also one of those that

11   was terminated for violation of the righteous living

12   core value and engaging in extramarital or premarital

13   sex; right?

14   A.      Yeah, he -- he resigned, so that's the only

15   thing I would correct.  But yes, it was still a

16   violation of righteous living.

17   Q.      Okay.  If he would not have resigned, would

18   he have been terminated?

19   A.      Yes, ma'am, he would have.

20   Q.      Okay.

21           MS. SANDERS:  I'm sorry, Heather, which

22   exhibit is this one?

23           MS. COLLINS:  Oh, I didn't mark it.  This

24   starts with 282 and this will be Exhibit 27 I believe

25   is what we're up to.

1        MS. SANDERS:  27, okay, he has that in

2   front of him.

3            MS. COLLINS:  And I'm sending over

4   Exhibit 27 right now.

5            (WHEREUPON, a document was marked as

6   Exhibit Number 27.)

7   BY MS. COLLINS:

8   Q.      Okay.  So with respect to ███████, he

Case 3:20-cv-00232-Brentwood Reporting Services-Page 53 of 101-Page ID #: 5072
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1

2

3

4

5

6

7

8

9

10

11

12

13    Q.      Okay.  And he continued to be paid; correct?

14    A.      Yes, under contract, but yes.

15    Q.      Okay.

16    A.      So what I mean by that is there were no

17    additional benefits or 401-K or HSA or any other

18    contributions by the company.

19    Q.      All right.  And he had come to Dave Ramsey,

20    and I'm on Page 961, he had come -- and I'm just

21    summarizing, so you tell me if I get any of this

22    wrong.  He'd come to Mr. Ramsey and told Mr. Ramsey

23    that he had had a three months sexual affair with

24    another employee of the company and that she quit

25    after that, and that she threatened to expose him,

1    and so he told -- ▮▮▮▮▮ told Mr. Ramsey about

2    it?

3

4

5

6

7    Q.    Okay.  And so Mr. Ramsey wrote in this --

8    now, this was -- the e-mail that was sent on 961, he,

9    Mr. Ramsey sent that to the operating board and also

10    Sharon Ramsey, which is his wife, Michael Reddish,

11    and also Mr. ▮▮▮▮▮, are you on the operating

12    board's e-mail?

13    A.    I am not.

14    Q.    Okay.  And Mr. Ramsey wrote on this e-mail,

15    sex with other teammates that you're not married to

16    is our only concern.  But he wanted ▮▮▮▮▮ to have

17    a chance to tell his own story to the HR committee.

18    Are you on the HR committee?

19    A.    I am.

20    Q.    Were you in a meeting of the HR committee at

21    9:30 in his office the next day?

22    A.    I was not.

23    Q.    Do you know why you were not?

24    A.    It is was a short notice and I had something

25    already booked on my calendar.

Case 3:20-cv-01023-Brentwood Reporting Services Page 55 of 101 522-4477 Page ID #: 5084
Elite Reporting Services • (901) 522-4477
www.EliteReportingServices.com

1   Q.      Okay.  All right.  I mean, is that typical to
2   give someone a chance to tell their own story, would
3   that had changed anything?
4   A.      I don't think it would have.  There was more
5   to the story as we learned from ███████████.  So
6   as -- so that's why I think Dave summarized part of
7   what was said to him that night before, but there was
8   more, and so he wanted that to come out, and felt
9   since this all came from ██████████, felt that this
10  should come from him as well.
11  Q.      Okay.  And when you say "more to the story",
12  what are you referring to?
13  A.      There had been additional -- there were
14  pictures, there were some additional things that were
15  more recent than that ██████, and an admission of
16  having this was not the only person that he had
17  premarital sex or extramarital sex with.
18  Q.      Okay.  Did you review the e-mails that are
19  referenced in this e-mail, it says he has not seen
20  her since ██████ but lots of e-mails of crazy, did
21  you-all review any e-mails in the context of this
22  decision?
23  A.      I was not at that meeting, but yes,
24  afterwards, ████████████ did produce some e-mails.
25  Q.      Okay.  Sitting here today as the corporate

1   representative, have you seen any of those e-mails?

2   A.      I have.

3   Q.      Okay.  Did you bring any of those e-mails to

4   the deposition with you today?

5   A.      I did not.

6   Q.      Okay.  Do you know if the e-mails were

7   produced in this litigation?

8   A.      I don't know that.

9   Q.      Okay.  What was the purpose of the e-mails,

10  was that to show that he didn't commit the violation

11  or what?

12  A.      So these were on ████████████ personal

13  computer and personal e-mail address and they were,

14  what they showed, what appeared to be shown from what

15  I saw was the consensual relationship that then

16  turned sour.

17  Q.      Does the company, what was done with those

18  e-mails, do you-all still, does the company still

19  have the e-mails?  I think you said you --

20  A.      I don't think -- I don't think we ever got

21  those e-mails.  He showed us the e-mails.  He had

22  retained counsel and was defending himself.

23  Q.      Who did he retain?

24  A.      I'm not sure.

25  Q.      Okay.  And Mr. Ramsey wrote in his e-mail

```
1    that ███████████, the person that ███████████ had
2    an affair with quit Ramsey after the affair, that
3    Michael, which was her boss, her supervisor confirmed
4    she had a screw loose.  Did that play a part in the
5    ████████████████████████████████████████████████████
6    ████████████████████████████████████████████████████
7    that ███████████ had a screw loose or --
8    A.       Not to my knowledge.
9    Q.       -- really turned sour?
10   ████████████████████████████████████████████████████
11   ████████████████████████████████████████████████████
12   ████████████████████████████████████████████████████
13   ████████████████████████████████████████████████████
14   Q.       All right.  Moving on to topic Number 18,
15   this says ██████████████████████████, isn't that
16   ████████?
17              MS. SANDERS:  I just noticed that.
18              THE WITNESS:  Yeah.
19              MS. COLLINS:  I think it was, wasn't it
20   ████████?
21              MS. SANDERS:  I think so.
22   BY MS. COLLINS:
23   Q.       Anyway we're going to assume that maybe
24   that's why he goes by ████████.
25   A.       He goes by ████████.
```

Case 3:20-cv-00274 Document 327 Filed 09/22/25 Page 58 of 101 PageID #: 5084
**Elite Brentwood Reporting Services (901) 522-4477**
**www.EliteReportingServices.com**

1  Q.      Doesn't want to be confused with ███████.

2  This is the one that starts with 338.

3         MS. SANDERS:  Yes, he's got those

4  documents in front of him that are in your

5  designation -- or in our designation, but your

6  notice, and I just wrote 28.

7         MS. COLLINS:  Okay.  We're going to

8  mark these, this will be Number 28 to the deposition.

9         (WHEREUPON, a document was marked as

10  Exhibit Number 28.)

11  BY MS. COLLINS:

12  Q.      All right.  Do you have these in front of

13  you?

14  A.      Yes, ma'am, I do.

15  Q.      All right.  And ██████████, he was also

16  someone that was terminated for violating the

17  righteous living policy but he was offered the chance

18  to resign, or given the same sort of separation

19  agreement in exchange for a release of his claims and

20  non-disparagement; correct?

21  A.      He was given a separation agreement, that's

22  correct.

23  Q.      Okay.  And for him, if you turn to Page 874,

24  he mentioned to someone that his girlfriend was

25  coming to stay with him, and when he was asked about

1    it he said he would get her a hotel room.  Is that

2    kind of what kicked everything off?

3    A.      Are you referring to the e-mail from

4    Mr. Blake?

5    Q.      Yes, on Page 874.

6    A.      Yes, I see that line, I see that reference

7    you're making.

8    Q.      Okay.  And as a result of him making that

9    comment it looks like John Markie followed up

10   with him about his girlfriend staying with him;

11   right?

12   A.      Yes.  He also in that same e-mail from

13   Mr. Blake confirms that she had stayed the night at

14   Mitch's place when she had came into town in the past

15   while he was employed with us.

16           And he says in the following -- skip one

17   bullet, so three bullet one over:

18           "█████ understands and aligns to what

19   righteous living means and has heard Dave talk about

20   it from stage multiple times.  He was adamant that he

21   has had the conversation with his girlfriend several

22   times and they are both on the same page."

23   Q.      Okay.  So was he terminated for allowing his

24   girlfriend to stay with him because the presumption

25   was that they had had intercourse?

Case 3:20-cv-00023-Brentwood Reporting Services Page 60 of 101 522-4477 #: 5059
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    A.        ███████ did in fact, confirm that they were.

2    Q.        Okay.  So was he asked if they had had

3    intercourse?

4    A.        He volunteered it.

5    Q.        Okay.  And because of that, he was

6    terminated; right?

7    A.        Yes.

8    Q.        Okay.  All right.  Moving on to topic

9    Number 19, and this starts with Page 648.

10              MS. SANDERS:  We have that in -- he has

11   that in front of him, Heather, and I just wrote 29.

12   I guess I got ahead of you.  Sorry.  I'm assuming

13   you're marking that as Exhibit 29.

14              MS. COLLINS:  Yes, that will be marked as

15   Exhibit 29.

16              (WHEREUPON, a document was marked as

17   Exhibit Number 29.)

18   BY MS. COLLINS:

19   Q.        And this e-mail talks about ███████████, who

20   we just talked about -- no, we haven't talked about.

21   Well, it talks about ███████████ and ███████████.

22   What -- was ███████████ terminated for a righteous

23   living violation?

24   A.        ███████████ was not terminated.

25   Q.        Okay.

1    A.       He retired.

2    Q.       Okay.  But did it have anything to do with

3    righteous living?

4    A.       Had nothing to do with righteous living.

5    Q.       Okay.  So this was just pertinent as to the

6    extent it related to ███████████ , and he was one of

7    the ones that was terminated for righteous living

8    violation?

9    A.       That is correct.

10   Q.       Okay.  All right.  We can move on quickly.

11   We're going to go to topic Number 20 now.  And

12   this is ███████████ , this starts at 1506, we're

13   going to mark this as Exhibit Number 30 to the

14   deposition.

15           MS. SANDERS:  Okay.  I've just written

16   30 on the Post-It note and he has those in front of

17   him.

18           (WHEREUPON, a document was marked as

19   Exhibit Number 30.)

20   BY MS. COLLINS:

21   Q.       Now, ███████████ , he did not have an

22   extramarital affair that you-all know of; right?

23   A.       He did not.

24   Q.       Okay.  Is he still --

25   A.       To my knowledge.

**Elite-Brentwood Reporting Services (901) 522-4477**
**www.EliteReportingServices.com**

1  Q.      Is he still with the company?

2  A.      He is not.

3  Q.      Okay.  Now, his issue was pornography; right?

4  A.      Correct.

5  Q.      Okay.  And -- well, how did that come to your

6  attention, the company's attention?

7  A.      I believe it came out with his leader,

8  ██████████████, he said something to ██████████████

9  about it.

10  Q.      About watching pornography?

11  A.      Yes.

12  Q.      Why is he no longer with the company?

13  A.      Performance, part of that -- the conversation

14  where he said something to ██████████ began as a

15  one-on-one conversation deeper into performance.  And

16  one of the reasons he said he had been unable to

17  conduct his job duties was because of this

18  pornography.

19  Q.      Okay.  And when it initially came to the

20  company's attention that he had been watching

21  pornography, he was given a second chance and sent to

22  Celebrate Recovery; correct?

23  A.      Yes, there were other conditions, but yes,

24  that was one.

25  Q.      Okay.  What were the other conditions?

1    A.      Being able to have a support group and being

2    able to share it with his wife, let her know what was

3    going on.

4    Q.      Okay.  So the company told him he had to tell

5    his wife that he had been looking at pornography?

6    A.      To get her in the conversation, we

7    didn't follow up to see if he would do it, we

8    just said that's part of the Celebrate Recovery

9    program.

10   Q.      Okay.  And if you could turn to Page 1555 of

11   Exhibit Number 30.  And Mr. Galloway wrote that the

12   only thing we haven't talked about is the balance

13   between us not shooting our wounded, and him

14   continuing to use porn.  This has to be a one-way

15   trip from using porn to healing, but he can't stay

16   and use porn the way he has been, he needs to

17   understand and agree to do this.

18          So with respect to that sort of conversation

19   in that it's a one-way trip to healing, that sort of

20   opportunity is -- has not been offered to any of the

21   pregnant women who came to the company and told them

22   that they had gotten pregnant as a result of an

23   extramarital affair or premarital sex; is that

24   correct?

25   A.      They're different circumstances.

```
 1   Q.      Okay.  What do you mean by that?
 2   A.      I don't understand how that would apply to
 3   having sex outside of marriage.
 4   Q.      Okay.
 5   A.      So you said pregnant, and again, the
 6   pregnancy was not the issue, the issue was having sex
 7   outside of marriage.
 8   Q.      Okay.  Well, what if they said I'm not -- I'm
 9   never going to do this again, but I just want to
10   keep my job and have my baby and I'm not going
11   to do this again until I'm married, that wouldn't
12   stop --
13   A.      As a company -- as a company we have decided
14   that that is terminable, it is not a tolerance.
15   Q.      It's not what?
16   A.      There is not a second chance to that.
17   Q.      All right.  Moving on to topic number 21,
18   this is ████████.  This is the one that
19   starts with 1717, and this will be marked as
20   Exhibit Number 31.
21           MS. SANDERS:  The witness has that
22   document and I've marked with a Post-It note
23   31.
24           (WHEREUPON, a document was marked as
25   Exhibit Number 31.)
```

1  BY MS. COLLINS:

2  Q.      Okay.  And ██████████ was another one of the

3  male employees that had been looking at porn;

4  right?

5  A.      Correct.

6  Q.      Okay.  And with respect to ██████████ he had

7  already been given a first chance; is that fair to

8  say?

9  A.      ██████████ had been -- can you define that?

10 Q.      Sure.  Well, he was terminated; right?

11 A.      Correct.

12 Q.      Okay.  But he -- the company knew that he had

13 looked at porn and that he was already on his second

14 chance, is what I'm getting at.

15 A.      Yeah, so similar to ██████████, there was

16 a recovery counseling effort for him to not watch

17 pornography.  And yes, he did then violate that and

18 watch pornography again.

19 Q.      Okay.  And according to -- well, according to

20 1718, the document Number 1718, the reason for

21 leaving was addiction problems; right?

22 A.      That is what it says there, yes.

23 Q.      Okay.  And it was an involuntary termination;

24 correct?

25 A.      That is correct.

Case 3:20-cv-00028-Brentwood Reporting Services Page 66 of 101 Page ID #: 5095
Elite Reporting Services ● (901) 522-4477
www.EliteReportingServices.com

1    Q.       And he was offered a ▮▮▮▮▮ severance; is
2    that right?
3    A.       That is correct.
4    Q.       Okay.  And on Page 1722, he had gone to
5    ▮▮▮ -- is it ▮▮▮▮▮?
6    A.       ▮▮▮▮▮.
7    Q.       ▮▮▮▮▮, he had gone to ▮▮▮▮▮▮
8    and -- because Mr. Finney had come to him and found
9    out that ▮▮▮▮▮ had taken a work device home and
10   looked at porn on it; is that correct?
11   A.       That is correct.
12   Q.       Okay.  And on 1722 Mr. Ramsey was involved in
13   or commented on this one as well?
14   A.       Yes.
15   Q.       Okay.  And he said "Satan is having a field
16   day with us."  Was there other stuff that he was
17   referring to that you know of in that statement that
18   Satan was having a field day with you?
19   A.       Not that I know of.  We would have to go
20   back to that time period, but nothing that comes to
21   mind.
22   Q.       Okay.  Moving along.  Does anybody need to
23   take a break now?
24   //
25   //

Case 3:20-cv-00406-Brentwood Reporting Services Page 67 of 101 522 Page 47 #: 5096
Elite Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    MS. SANDERS:  How much longer do you

2    think, Heather?  I won't hold you to it, but it looks

3    like you're almost finished, I think.

4    MS. COLLINS:  I am.

5    MS. SANDERS:  He's fine, he said he's

6    fine.

7    MS. COLLINS:  Okay.  I know it's real

8    stimulating conversation here, but.

9    BY MS. COLLINS:

10   Q.     Okay.  Topic Number 22, this is ███████,

11   and his starts with Bates Number 1762.

12   MS. SANDERS:  Yes, he has that set of

13   documents in front of him that's in your notice.

14   MS. COLLINS:  And this will be

15   Exhibit Number 32.

16   MS. SANDERS:  And I wrote 32 on the

17   Post-It note.

18   (WHEREUPON, a document was marked as

19   Exhibit Number 32.)

20   BY MS. COLLINS:

21   Q.     And now why was -- why was ██████

22   terminated?

23   A.     For having extramarital sex.

24   Q.     Oh, okay.  He was the one that had an affair

25   with a co-worker; right?

1    A.      That is correct.

2    Q.      Okay.  And the co-worker that he had an

3    affair with was ███████████?

4    A.      Yes, ma'am.

5    Q.      Okay.  And she was also terminated; right?

6    A.      That is correct.

7    Q.      Okay.  Now, on Page 1763 it looks like

8    initially ████████ problems came to the attention

9    of the company because he notified Mr. Finney and

10   Ms. Simms that he was divorcing his wife and that he

11   had been accused of or had -- had some sort of

12   emotional affair with an old girlfriend; is that

13   right?

14   A.      Which page are you reading that?

15   Q.      Sure, sure, sure.  That's 1763, down at the

16   bottom of the page.

17   A.      Okay.  So in that e-mail from Jack Galloway,

18   "I'm about to include him in an HR Comm update and

19   want to make sure you are in the loop.  Yesterday,

20   Sarah Sloyan", who is the leader of that area, "told

21   me that ████████, and ██████████ stands for ████████

22   ████████, "is close friends with ████████████."  That

23   would have been ██████████.  And ████████████

24   called ████████████ to let her know not only are

25   they divorcing, but that there was an affair, at

Case 3:20-cv-00893 Document 98-7 Filed 08/22/23 Page 69 of 101 PageID #: 5098
**Elite Brentwood Reporting Service (901) 522-4477**
**www.EliteReportingServices.com**

1    least an emotional affair, perhaps more, and that's

2    how we learned about ██████████ affair, through

3    ████████████, through Sarah Sloyan to Jack Galloway

4    to HR committee.

5    Q.      Okay.  So at some point in time somebody

6    talked with ████████████ and found out there was a

7    lot of stuff going on, and then it came up that there

8    was this affair with ████████████; is that pretty

9    accurate?

10    A.      Yes.

11    Q.      And what I'm referring to is if you go to

12    Page 1777, and this was about a week later on

13    ████████████ where she admitted that she had sex with

14    ████████████ when they got drunk; is that right?

15    A.      That's correct.

16    Q.      Okay.  And because they had sex, they both

17    had to be terminated?

18    A.      Yes.

19    Q.      Okay.  Okay.  But initially the things with

20    ████████████ came up because he was just having problems

21    with his wife and he had wrecked a car and was taking

22    pills and then you-all found out that it was actually

23    more than that; right?

24    A.      Yes.  And we found out through his wife.

25    Q.      Okay.  That's a lot going on with him.

1    A.      I'm sorry?

2    Q.      That's a lot going on with him.

3    A.      There was a lot going on with him.

4    Q.      Well, hopefully he's okay now.

5            All right.  Well, let's move on to topic 23,

6    if that's the right one.  All right.  And this is

7    ▇▇▇▇▇▇▇  and hers starts at 1848.

8            MS. SANDERS:  Yes, and the witness has

9    that in front of him and I marked it as 33.

10           MS. COLLINS:  Sorry, I think I said 23,

11   Exhibit 33, yes.

12           (WHEREUPON, a document was marked as

13   Exhibit Number 33.)

14   BY MS. COLLINS:

15   Q.      Does this set of documents, and I assume you

16   reviewed all of these before the deposition, does

17   this pretty much set forth the reasons why ▇▇▇▇▇▇▇

18   was let go?

19   A.      Yes.  In conjunction with the admission of

20   having gotten drunk and had sex with on -- that we

21   read on the previous.

22   Q.      Okay.  All right.  Moving on to topic

23   Number 24, and this is ▇▇▇▇▇▇▇.  His starts at

24   1810, and this will be Exhibit Number 34?

25   //

Case 3:20-cv-01023-Brentwood Reporting Service Page 71 of 101 PageID #: 5097
Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    MS. SANDERS:  Yes, the witness has those

2 documents in front of him and I just marked 34 on the

3 Post-It note.

4    (WHEREUPON, a document was marked as

5 Exhibit Number 34.)

6 BY MS. COLLINS:

7 Q.    Okay.  And was ███████, he was caught

8 looking at porn, or he'd had some pornography

9 websites blocked at work, does that sound about

10 right?

11 A.    Yes.

12 Q.    Okay.  And so is it fair to say that the

13 company raised that issue with him, and he was given

14 a second chance?

15 A.    Yes, he was treated similar to ███████

16 and the other, ███████.

17 Q.    Okay.  Is he still there?

18 A.    He is.

19 Q.    Okay.  Well, good for him.  Is he still going

20 through all of the motions that the company told him

21 to go through?

22 A.    He's completed his program, yes, and has gone

23 through.

24 Q.    Okay.  And ███████ -- he's a man, right?

25 A.    Yes.

1    Q.      All right.  And with respect to ▮▮▮▮▮▮,

2    it looks like it came to Mr. Finney's attention that

3    that there were 1300 blocks from his iPhone, and that

4    in total that he had found 2700 blocks from his phone

5    dating back to ▮▮▮ from explicit.bing.net, so is

6    that how it came about that he was looking at

7    pornography --

8    A.      Yes.

9    Q.      -- at work or around work?

10   A.      Yeah, that's correct.

11   Q.      Okay.  Does the company have a pornography

12   blocking system?

13   A.      It blocks a lot of things, not just

14   pornography, but yes, there is a filter, I guess.

15   Q.      Okay.  But the filter sends reports as to

16   Websites that have been blocked?

17   A.      I'm sorry, what was the question?

18   Q.      Sure.  Does the filter that the company has,

19   does it send a report to someone like Mr. Finney

20   about all of the websites that have been blocked in a

21   given period of time?

22   A.      Yes, ma'am.  I'm not sure if that report goes

23   directly to Mr. Finney, but yes, there is a report

24   generated.

25   Q.      Okay.  All right.  All right.  Let's go off

Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    the record real quick.

2            THE VIDEOGRAPHER:  Going off the record

3    at 1:20 p.m.

4            (Brief break.)

5            (WHEREUPON, Caitlin O'Connor exited the

6    proceeding and is not present from here until the

7    conclusion of the deposition.)

8            THE VIDEOGRAPHER:  We are back on the

9    record at 1:31 p.m.

10   BY MS. COLLINS:

11   Q.      All right.  Mr. Lopez, the last -- well,

12   second-to-last topic for you, that is topic

13   Number 25.  And this requests information about

14   training that Ramsey Solutions has provided to your

15   managers, including to your human resources

16   committee, so let's start there, what sort of

17   training have you provided to your human resources

18   committee about the FMLA and Title VII compliance or

19   discrimination from 2019 to present?

20   A.      To the human resource committee, none that

21   I'm aware of.

22   Q.      Okay.  What about HR managers?

23   A.      We have done different trainings for HR

24   leaders.

25   Q.      What does that consist of?

1  A.      Mostly how to interview and conduct

2  interviews, how to find the best quality candidate.

3  Q.      Okay.  Is there any specific training for HR

4  managers or leaders about the FMLA, Title VII

5  compliance, or discrimination?

6  A.      To Ramsey Solutions' leaders, what we would

7  call ourselves, we have conducted training on --

8  Title VII was a part of it, but it was really

9  on the -- how do we interview to find the best person

10  for us, for Ramsey, for the position.

11  Q.      Okay.  What about after they've been hired?

12  A.      There is not -- there's not been training

13  after we've been hired.  The training has all been on

14  the finding the best person for us.

15  Q.      Okay.  And topic Number 25 also requests for

16  dates of anything, is that documented anywhere when

17  this training was held?

18  A.      It is, I did not actually bring that, and

19  it's not in that folder.  But yes, we do have a date

20  that we conducted that training.

21  Q.      Okay.  What year was it, or is it every year,

22  or what's your general recollection of that?

23  A.      General recollection would be that it was

24  around 2020.

25  Q.      Okay.  Did the company keep any kind of

Case 3:20-cv-00628 Brentwood Reporting Services Page 75 of 101 Page # : 51074
Elite Reporting Services (901) 522-4477
www.EliteReportingServices.com

1    roster as to who attended that training?

2    A.      Yes, the company kept a roster of who

3    attended the training.

4    Q.      Do you recall who attended, any of the people

5    that attended that training?

6    A.      That would have been anybody that is in

7    Ramsey Solutions' leadership.  So it does include the

8    people in HR committee.

9    Q.      Okay.  Okay.  But as you stated, that has

10   more to do with training on hiring and finding the

11   best person for a job, but not necessarily on the

12   FMLA requirements or Title VII requirements; is that

13   right?

14   A.      That's correct.  That is correct.

15   Q.      About how long did that training last?

16   A.      I would say probably an hour, most of our

17   sessions last about an hour.

18   Q.      Okay.  Was any material -- were any materials

19   provided or generated as a result of the training?

20   A.      We don't typically generate materials for

21   training or handouts.

22   Q.      Okay.  How does the company go about finding

23   the best person for a job?

24   A.      How do we go about finding them?

25   Q.      Yes.

Case 3:20-cv-00628-Brentwood Reporting Services Page 76 of 101 Page #: 5107
Elite Reporting Services    (901) 522-4477
www.EliteReportingServices.com

1    A.      We source from all areas.  So obviously all

2    of our personalities, radio shows, et cetera, we

3    generate applications from anywhere and everywhere

4    that we can.

5    Q.      How do you-all determine the best fit for a

6    job?

7    A.      We break it down into kind of five

8    categories.  So three of which, the words themselves

9    come from a Patrick Lencioni book, which is Humble,

10   Hungry and Smart.  And then skill and fit, team fit,

11   company fit.

12   Q.      Okay.  And based on your testimony just now,

13   it doesn't sound like there's any specific training

14   given to managers or the HR committee, on the FMLA or

15   Title VII compliance or discrimination laws; is that

16   accurate?

17   A.      No, ma'am.  Title VII is a part of the hiring

18   training process.

19   Q.      Okay.  And what does that consist of?

20   A.      It would consist of the things that would not

21   matter to us and are against the law for hiring

22   somebody.  So it would include Title VII areas that

23   should not be asked about, nor should they matter in

24   hiring someone.

25   Q.      Okay.  Okay.  But outside of the hiring

Elite Brentwood Reporting Settlence Page 77 of 101 Page ID #: 51076
www.EliteReportingServices.com

1  context, no other training is given for managers or

2  employees about discrimination or FMLA; is that

3  accurate?

4  A.       That is correct, we have not done so.

5  Q.       Okay.  All right.  Now, we're going to

6  backtrack back to topic number three, and this was

7  going back to the ███████ personnel file, let me

8  just pull it up here.

9          My desk has gotten messy.  All right.

10         And this is the one that starts with 2208.

11  A.      I don't have anything in front of me yet.

12  Ms. Sanders is pulling it up.

13          MS. SANDERS:  Sorry, I closed out of my

14  file, sorry about that, I didn't do it on purpose.

15  What does it start with, Heather, 2208?

16          MS. COLLINS:  Yes.  And this will be

17  marked as Exhibit Number 35, I believe is what we're

18  up to, yeah.

19          (WHEREUPON, a document was marked as

20  Exhibit Number 35.)

21  //

22  //

23  //

24  //

25  //

Case 3:20-cv-01023-Brentwood Reporting Services Page 78 of 101 1522-447 #: 5107
Elite Brentwood Reporting Services (901) 522-447
www.EliteReportingServices.com

```
 1              MS. SANDERS:  Okay.  For the record I
 2    have it pulled up on my computer and the
 3    defendant -- or the deponent is reviewing it on
 4    computer, it's the only document open on my
 5    computer.
 6              THE WITNESS:  Yes, ma'am.
 7    MS. COLLINS:
 8    Q.      All right.  Now, this was produced to us as a
 9    copy of ████████ personnel file as the company
10    representative, is that your understanding as to what
11    this set of documents is?
12    A.      That -- that is correct, that is my
13    understanding.
14    Q.      All right.  And on page -- if you could flip
15    back to Page 2287, and this was a separation
16    agreement that ███████ signed; correct?
17    A.      I am actually just getting there, 2287.
18              MS. SANDERS:  There you go.  Yeah, he's
19    found it.
20              THE WITNESS:  Yes, ma'am, that is the
21    separation agreement.
22    BY MS. COLLINS:
23    Q.      Okay.  What is your understanding as to the
24    reason why ██████ was terminated?
25    A.      Violation of righteous living core value.
```

1    Q.      Okay.  Specifically what did he do to violate
2    the righteous living core value?
3    A.      Sex outside of marriage.
4    Q.      Okay.  And how did that come about that
5    you-all found out that he had had sex outside of
6    marriage?
7    A.      There was a team member or a person that came
8    forward, I don't remember if the person came to a
9    team member and a team member came to us, but we
10   learned that he had had an affair with someone.
11   Q.      And did that affair include intercourse, not
12   just oral sex?
13   A.      That is correct.
14   Q.      Okay.  Who were the team members that
15   came -- who was the team member that came to you,
16   came to the company?
17   A.      The team member that came to the company was
18   ███████████████.
19   Q.      Okay.  Who was the one that he had an affair
20   with?
21   A.      ████████████.
22   Q.      Okay.  Had there been prior allegations that
23   he had had an affair with ████████?
24   A.      There had been.
25   Q.      Okay.  When were the prior allegations that

1  he had had an affair with ████████?

2  A.      My understanding was a couple of years prior

3  to that.

4  Q.      But you weren't involved in that, those

5  discussions?

6  A.      I was not.

7  Q.      Okay.  Does that surprise you that you

8  weren't involved in those discussions?

9  A.      No.

10  Q.      Okay.  Why?

11  A.      All other members of HR committee were, and

12  there are times when someone has to miss for a

13  vacation or whatever.

14  Q.      Okay.  All right.  So ████████ came to the

15  company in ██████ and informed it that she had in

16  fact, had a sexual affair with ████████; is that

17  right?

18  A.      That is correct.

19          MS. SANDERS:  Objection Heather, only

20  because this is getting outside of number three, but

21  he can answer.  He's not the one designated to

22  answer these questions, but if he knows them, he can

23  answer.

24          MS. COLLINS:  Okay.

25  BY MS. COLLINS:

Case 3:20-cv-00052-Brentwood Reporting Services Page 81 of 101 (901) 522-4477 # 5100
Elite Reporting Services Document 321-2 cel Page 901 1522 4477 #: 5100
www.EliteReportingServices.com

1    Q.       Now, with respect to the separation agreement

2    that -- that ██████████ was offered, he was given

3    an amount that was equal to ████████; is that

4    correct?

5    A.       Yes, that's what it says there.

6    Q.       Did he receive any additional amounts other

7    than getting that amount forgiven?

8    A.       He received his normal wages up to the date

9    of separation, and any unused accrued PTO that he

10   might have had.

11   Q.       Is he affiliated at all with Lampo or Ramsey

12   Solutions at this point in time?

13   A.       Not to my knowledge.

14

15

16

17

18

19

20

21

22

23

24

25   A.       That's how I would read it, the same way you

1    did.  

16   Q.      Okay.  And is that your signature on Page 3

17   of the separation agreement?

18   A.      Yes, ma'am, that is my signature.

19   Q.      Okay.  So did you handle

20   separation or the dotting of the I's and crossing of

21   the T's with respect to the separation agreement with

22   him?

23   A.      Yes, ma'am, I did.

1   

2   

3   

4   

5    That is on the

6    Tennessee separation notice, document 2257.  I

7    was -- what I'm aware of is that he did some

8    contract work beforehand, but not as a full-time team

9    member.

10    Q.      Okay.  Got it.  So where there's that

11    document 2214 where he signed for receiving the

12    employment policies and procedures, that's dated

13    , was it the company's practice

14    to make it people who are doing contract work also

15    sign for acknowledgment of the policies and

16    procedures?

17    A.      I am going back to 2214.  Yes, it does appear

18    he signed it on                .  And I wasn't

19    here, I can't to speak to where if we made

20    contractors sign it at that time.  I know what is in

21    the system is what it shows on the Tennessee

22    separation agreement.

23    Q.      Okay.  Okay.  And you also, the separation

24    agreement you referenced, whether it's 2257 or 2258,

25    I think those are both the same form, that's your

Case 3:20-cv-00028 Document 187-5 Filed 08/02/22 Page 84 of 101 PageID #: 5133
Elite Brentwood Reporting Service (901) 522-4477
www.EliteReportingServices.com

1    signature on that document; right?

2    A.      Yes.

3    Q.      Okay.  Why was no reason given for his

4    separation?

5    A.      Is that 2257, is that the one you're

6    referring to?

7    Q.      Yes.

8    A.      Oh.

9            MS. SANDERS:  Sorry, that's eight.

10           MS. COLLINS:  Either one, they're both

11   the same, I think.

12           MS. SANDERS:  Okay.  Sorry.

13           THE WITNESS:  Okay.  I don't recall.

14   BY MS. COLLINS:

15   Q.      Okay.  All right.  I think that's all of the

16   questions I have about his personnel file, so you are

17   free to go, Mr. Lopez, I appreciate it.

18           MS. SANDERS:  When do you want to come

19   back, Heather, do you want to take like a 10 or

20   15-minute break?

21           THE REPORTER:  One moment, let's go off

22   record, please.

23           MS. SANDERS:  Sure.

24           THE VIDEOGRAPHER:  The time is 1:50 p.m.,

25   we are going off the record.  This will conclude the

Case 3:20-cv-00028-Brentwood Reporting Services cPage 801152244870 # 51 34
Elite Reporting Services      (901) 522-4477
www.EliteReportingServices.com

1    deposition of 30(b)(6) witness Armando Lopez.

2              FURTHER DEPONENT SAITH NOT.

3              (Proceedings concluded at 1:50 p.m.)

```
1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE

3    COUNTY OF DAVIDSON

4

5            I, R. MICHELLE SMITH, Licensed Court

6    Reporter, with offices in Nashville, Tennessee,

7    hereby certify that I reported the foregoing

8    deposition of ARMANDO LOPEZ by machine shorthand to

9    the best of my skills and abilities, and thereafter

10   the same was reduced to typewritten form by me.

11           I am not related to any of the parties named

12   herein, nor their counsel, and have no interest,

13   financial or otherwise, in the outcome of the

14   proceedings.

15           Further certify that in order for this
     document to be considered a true and correct copy it
16   must bear my original signature, and that any
     unauthorized reproduction in whole or in part and/or
17   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
18   Tennessee Code Annotated 39-14-04, Theft of Services.

19

20

21

22

23
     _____
24   MICHELLE SMITH, RDR, LCR, CCR, FPR, CLR, CLVS, CDVS
     Elite Reporting Services
25   LCR# 544 - Expires:  6/30/2022
```

Elite Brentwood Reporting Service (901)522-4477
www.EliteReportingServices.com



Elite Reporting Services * (901) 522-4477
www.EliteReportingServices.com



Elite Reporting Services * www.EliteReportingServices.com * (901) 522-4477



Elite-Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com



Elite Brentwood Reporting Services · (901) 522-4477
www.EliteReportingServices.com



Elite Reporting Services  *  (901) 522-4477
www.EliteReportingServices.com





Elite Reporting Services · (901) 522-4477
www.EliteReportingServices.com





Case 3:20-cv-00028-Brentwood Reporting Set-22c-age 9001)1522-4477t #: 5129
Elite Reporting Services * (901) 522-4477
www.EliteReportingServices.com



Case 3:20-cv-01023 Document 86-7 Filed 08/11/21 Page 99 of 101 PageID #: 5123
Elite-Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com





Elite Reporting Services * (901) 522-4477
www.EliteReportingServices.com



Case 3:20-cv-01628-Brentwood Reporting Services Page 100 of 101 PageID #: 5123
Elite Brentwood Reporting Services · (901) 522-4477
www.EliteReportingServices.com



Case 3:20-cv-00628 Brentwood Reporting Services Page 1 of 1 PageID #: 124
Filed 08/21/... (901) 522-4477
www.EliteReportingServices.com