# CAITLIN O'CONNOR

## vs.

# LAMPO GROUP

---

**30(b)(6), Attorneys Eyes Only**

## SUZANNE SIMMS

## September 30, 2021

---



**R. Michelle Smith, RMR, LCR, CCR, FPR, CLR**

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

CAITLIN O'CONNOR,

          Plaintiff,

vs.                   Case No. 3:20-cv-00628

THE LAMPO GROUP, LLC a/k/a
RAMSEY SOLUTIONS,

          Defendant.

_____


           ***CONFIDENTIAL***
        ***ATTORNEYS' EYES ONLY***
      (UNTIL FURTHER DETERMINATION)

      30(b)(6) Video Recorded and Videoconference
      Deposition of:

       THE LAMPO GROUP, LLC a/k/a
      RAMSEY SOLUTIONS by SUZANNE SIMMS

      Taken on behalf of the Plaintiff
      September 30, 2021

      Commencing at 2:20 p.m.


_____

      Elite-Brentwood Reporting Services
MICHELLE SMITH, RDR, LCR, CCR, FPR, CLR, CLVS, CDVS
        Nashville, Tennessee
        (615)595-0073

1

2                    A   P   P   E   A   R   A   N   C   E   S

3

4

5    For the Plaintiff, via videoconference:

6              MS. HEATHER MOORE COLLINS
               MS. ASHLEY WALTER
7              Collins & Hunter PLLC
               7000 Executive Center Drive, Suite 320
8              Brentwood, TN 37027
               (615)724-1996
9              Heather@collinshunter.com
               Ashley@collinshunter.com
10

11   Attorney For Defendant, via videoconference:

12             MS. LESLIE SANDERS Attorney at Law
               Webb Sanders
13             611 Commerce Street, Suite 3102
               Nashville, TN 37203
14             (615)4915-3300
               Lsandesr@websanderslaw.com
15

16   ALSO PRESENT:

17             MS. MARY CIEZADLO, Legal Videographer
               MR. DANIEL CORTEZ
18             MR. ARMANDO LOPEZ

19

20

21

22

23

24

25

Elite Brentwood Reporting Services (901) 522-4477
www.EliteReportingServices.com                                    2

1

2           S   T   I   P   U   L   A   T   I   O   N   S

3

4           The 30(b)(6) Video Recorded and

    Videoconference of  THE LAMPO GROUP, LLC a/k/a

5   RAMSEY SOLUTIONS by SUZANNE SIMMS was taken by

6   Counsel for the Plaintiff, by Agreement, with all

7   participants appearing at their respective

8   locations, on September 30, 2021, for all purposes

9   under the Federal Rules of Civil Procedure.

10           All formalities as to caption, notice,

11   statement of appearance, et cetera, are waived.  All

12   objections, except as to the form of the question,

13   are reserved to the hearing, and that said deposition

14   may be read and used in evidence in said cause of

15   action in any trial thereon or any proceedings

16   herein.

17           It is agreed that R. MICHELLE SMITH, RDR, and

18   Licensed Court Reporter for the State of Tennessee,

19   may swear the witness, and that the reading and

20   signing of the completed deposition by the witness

21   was not discussed.

22

23

24

25

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1                    *    *    *

2

3          THE VIDEOGRAPHER:  We are now on the

4    record.  Today is Thursday, the 30th of September,

5    2021 and the time indicated on the video screen is

6    2:20 p.m.  This is the video conference deposition of

7    30(b)(6) corporate designee witness Suzanne Simms,

8    taken in the matter of O'Connor versus The Lampo

9    Group, LLC, a/k/a Ramsey Solutions; Case No.

10   3:20-cv-00628 filed in the United States District

11   Court for the Middle District of Tennessee Nashville

12   Division.

13          My name is Mary Ciezadlo, the videographer.

14   The court reporter is Michelle Smith, both in

15   association with Elite-Brentwood Reporting Services.

16   Since this deposition is being taken by video

17   conference, the oath will be administered remotely by

18   the court reporter.  Any digital exhibits marked

19   during this deposition will be deemed as original for

20   purposes of said deposition.

21          At this time I'll ask Counsel to identify

22   yourselves and state whom you represent.  And if you

23   have any objections with the procedures outlined,

24   please state so when you introduce yourselves.  We

25   will start with the noticing attorney.

1      MS. COLLINS:  Heather Collins and Ashley

2  Walter for the Plaintiff.  No objections.

3      MS. SANDERS:  Leslie Sanders for the

4  Defendant, and with me is Daniel Cortez, counsel for

5  Defendant and company representative Armando Lopez,

6  and we have no objections.

7      THE VIDEOGRAPHER:  Will the court

8  reporter please swear in the witness.

9                  *   *   *

10        THE LAMPO GROUP, LLC a/k/a

11      RAMSEY SOLUTIONS by SUZANNE SIMMS,

12  was called as a witness, and after having been duly

13  sworn, testified as follows:

14

15                EXAMINATION

16  QUESTIONS BY MS. COLLINS:

17  Q.      Good afternoon.  Could you state your full

18  name for the record, please.

19  A.      Suzanne Simms.

20  Q.      And Ms. Simms, I have that you've been

21  designated as a corporate representative to speak

22  on behalf of the company in this case; is that

23  correct?

24  A.      Yes.  Yes.

25  Q.      And what I have is that you are going to

Elite Reporting Services
www.EliteReportingServices.com

1    speak to us about topic Number 1, topic number 2 and
2    topic number 4 as set forth on the notice of
3    corporate designee deposition that's been marked as
4    Exhibit 19, is that your understanding?
5    A.       I was actually told Number 2 and Number 4.
6              MS. SANDERS:  No, you have Number 1.
7              THE WITNESS:  Number one, okay.  Sorry.
8              MS. SANDERS:  She's looking at the
9    documents on my computer.
10             THE WITNESS:  Yes, yes, number one, yes.
11   BY MS. COLLINS:
12   Q.       Okay.  All right.  So starting -- and you're
13   still employed obviously by Ramsey Solutions;
14   right?
15   A.       Right, yes.
16   Q.       All right.  Starting with topic Number 1,
17   the circumstances and events surrounding the
18   termination or departure of ████████████ tell me
19   about that.
20   A.       He was terminated on ████████████████████.
21   Q.       Okay.  What was the -- what were the
22   circumstances or events surrounding the termination?
23   A.       Do you -- can you specify like where you want
24   me to start?
25   Q.       As early as possible, I mean, how it came

```
1   about.
2   A.       There was a decision made in ███████████████
3   by our operating board that there was information we
4   were privy to about him, and we made it clear to him
5   and to each other that if any new information came to
6   light whatsoever that was not in line with our core
7   values, he would be terminated immediately, and that
8   is what happened in ████████████████.
9   Q.       Okay.  All right.  Let's break that down a
10  little bit.
11           Tell me about what happened in ███████████████
12  ███████ to give him that warning that if anymore
13  information came to light that he would be terminated
14  immediately?
15  A.       Yes.  In ████████████████ we were made aware
16  that he had had two previous extramarital affairs
17  that had happened in the past, not in realtime at the
18  time we were learning of them, that it had been
19  somewhat quite a bit in the past, and we made a
20  decision to not terminate him at that point, but we
21  made it clear it him, we gave him a final warning and
22  let him know that if he did anything against our core
23  values ever again, or if we became aware that he had
24  at any point in time, we would terminate him
25  immediately.
```

```
 1   Q.      Okay.  What -- you mentioned that he had been
 2   accused of having two previous extramarital affairs,
 3   did -- why wasn't he terminated when that was found
 4   out?
 5   A.      The reason we made that decision in ██████████
 6   ████████  was because that information was brought to
 7   us in ███████████████  and both instances had
 8   happened pretty far in the past, one had happened
 9   over ████████████████  the other one was over ██████████████
10   prior.  We had never been made privy to any
11   information on one of our team members like that ever
12   before.  It was unprecedented for us.
13           And after a lot of deliberation we decided we
14   would not terminate him, and in large part that was
15   because he and his wife wanted us to partner with
16   them in a, what we hoped would be a redemption story
17   for their marriage.
18   Q.      Okay.  The prior affairs that he was accused
19   of in ████, did they involve an employee of Ramsey
20   Solutions?
21   A.      One did.
22   Q.      Okay.  Who was that, the employee he was
23   accused of having an affair with?
24   A.      Her name was ████████████  and I don't remember
25   her last name.
```

```
1    Q.      Okay.  At that time had it been brought to

2    Ramsey's attention that there were allegations he had

3    had an inappropriate relationship with ████████

4    ████

5    A.      We -- we had been notified by ██████ in the

6    ██████████  that something inappropriate had

7    happened between the two of them, according to

8    her.

9    Q.      Okay.  What was your understanding as to

10   what had happened between the two of them in the

11   fall?

12   A.      My understanding, or what did she claim had

13   happened?

14   Q.      Well, is there a difference?

15   A.      Yes, at that time, yes.

16   Q.      Okay.  Let's start with what Ms. █████ had

17   claimed.

18   A.      She claimed that █████ and ████████ were

19   having an affair.

20   Q.      Okay.  And did the company not believe her

21   when she said that?

22   A.      I'm sorry, can your repeat that?

23   Q.      Sure.  Did the company not believe her

24   when she brought those allegations to it, that she

25   felt -- that she thought that █████ was having an
```

affair with ████████████

A.      She offered no proofs and we confronted both

████████ and ████, they denied it implicitly, and

so no, we did not at that time.

Q.      Was it communicated to ████ and ██████ that

if they admitted to having an affair they would have

been terminated at the time?

A.      To ████ and ████████

Q.      Yes.

A.      Say that question one more time, I want to

make sure I understand.

Q.      Sure.  Was it communicated to ████ and

████████ that if they would have admitted to having

an affair in ████, they would have been terminated at

that time?

A.      I don't believe it was stated that way to

them in that moment.  But we state that implicitly to

our team on a regular basis, if you have sex outside

of marriage, you will be terminated.

Q.      Okay.  Were these conversations that happened

in ████ about ██████████ and the extramarital

affairs he'd had, how did it come about that he had

had oral sex?

A.      I believe ██████ made that claim and he did

admit it.

```
 1   Q.      Did he admit that with one of the affairs
 2   that it had occurred further away in time or with
 3   Ms. ████
 4   ██████████████████████████████████████████████████
 5   ██████████████████████████████████████████████████
 6   Q.      Okay.  All right.  And did anyone else accuse
 7   █████████████ of having an extramarital affair at that
 8   time in ██████ other than ███████████████
 9   A.      Her father did.
10   Q.      Okay.  Did anyone speak with her father to
11   see what the basis was of his information?
12   A.      Armando Lopez spoke to him, and I believe
13   Jeremy Breland spoke to him at one point, and
14   Jen Sievertsen.
15   Q.      Okay.  Was the father deemed not credible?
16   A.      Yes.
17   Q.      Why?
18   A.      He offered no proof whatsoever.
19   Q.      Now, did Ms. ███████ or ███████ at that time,
20   did she admit that she had had personal conversations
21   with ████████████
22   A.      Yeah.  They always had personal
23   conversations, they were friends and worked very
24   closely together.  Do you want to restate that, like
25   what do you mean by "personal"?
```

1    Q.      Well, talking about his marriage, troubles
2    with his marriage.
3    A.      Yes, she did admit that they had some
4    conversation about that.
5    Q.      Okay.  All right.  So in ████████████ it
6    was just generally deemed that the allegations that
7    both ████████████ and her father made against
8    ████████████ were unsubstantiated?
9    A.      What was the first part of that question,
10   what was the date that you gave?
11   Q.      ████████████.
12   A.      No.  In ████████████ admitted to what
13   she -- to what ████████ had accused him of.
14   Q.      Except anything with ████████ -- I mean,
15   anything with ████████████ right?
16   A.      That is right, yes.
17   Q.      Okay.  Okay.  All right.  So fast-forward to
18   the reason why he was terminated, how did that come
19   about?
20   A.      ████████████ came to Jen Sievertsen and myself
21   and advised us that she had been engaged in a sexual
22   relationship with ████████████ and we terminated him
23   that same day.
24   Q.      Did she get terminated?
25   A.      She resigned when she brought that

```
 1   information to us.
 2   Q.      Okay.  Did she get offered a severance
 3   package?
 4   A.      She resigned.
 5   Q.      Okay.  But did she --
 6   A.      She resigned of her own volition, like she
 7   came in and said, hey, I'm leaving and this is what I
 8   need to do, and while I'm leaving, I need to let you
 9   know about this information.
10   Q.      Did she sign any sort of NDA or
11   confidentiality agreements after disclosing that?
12   A.      I don't believe so.
13   Q.      So to your knowledge she was not offered a
14   severance package or a separation package?
15   A.      No.
16   Q.      Were you surprised by her statement?
17   A.      Absolutely.
18   Q.      So the allegations that ████████████ brought
19   up that he -- that something was going on with
20   ████████████ in ██████ was actually true?
21   A.      Yes.
22   Q.      So in ██████ the company took ████████████
23   word over ████████████████ word; is that fair to
24   say?
25   A.      Yeah, ████████████ was our employee, he was
```

```
1   our team member and had been for quite sometime.  We
2   had absolutely no indication for any behavior from
3   him at all during that time that any of that would be
4   substantiated, and there was no proof.  We are
5   very loyal to our team until we are given proof
6   otherwise.
7   Q.      Okay.  And when Ms. ███ came to you, and
8   Ms. Sievertsen in ███ about ██████ did you-all
9   take any notes?
10  A.      No.
11  Q.      Did you send a summary of the conversation to
12  anyone?
13  A.      No.
14  Q.      And you said that ██████ was terminated
15  that same day; correct?
16  A.      Yes.
17  Q.      Who was involved in that termination?
18  A.      Myself, Jen Sievertsen, Brian Williams and
19  Jeremy Breland.
20  Q.      Did you have any conversations with
21  Dave Ramsey about terminating ██████
22  A.      We called to let him know what we were about
23  to do as an FYI.
24  Q.      Did he agree with the decision?
25  A.      Yes, because that decision had been made by
```

```
1   our operating board in ██.
2   Q.      When that decision was made in ██ by the
3   operating board, was that memorialized or written
4   down anywhere?
5   A.      I don't believe so.  It was communicated very
6   clearly verbally with everyone involved.
7   Q.      Was Ms. ██ given the same warning in
8   ██?
9   A.      I was not in the conversation with her.
10  Jen Sievertsen spoke to her, but made it very clear
11  to her that she was to not engage in any
12  inappropriate conversations with ██ ever again.
13  And the way we communicate about our core values is
14  very consistent along with that.
15  Q.      Okay.  Does Ms. ██ still live in the area?
16  A.      I'm not sure.
17  Q.      So have you had any contact with her since
18  the day she came in and resigned?
19  A.      Have I had any, no.
20  Q.      Okay.  I'm going to provide you some
21  documents.  All right.  These are documents that I
22  was provided this morning.  They're labeled 2321 to
23  2354.
24  //
25  //
```

```
 1            MS. SANDERS:  I have those pulled up on
 2    my computer and I'm showing those to Ms. Simms, and
 3    those are the only documents on my computer, or
 4    the only documents showing on my computer I should
 5    say.
 6            MS. COLLINS:  I'm going to mark these as
 7    Exhibit Number -- is it 35?
 8            THE REPORTER:  I have it as 36.
 9            MS. COLLINS:  Yeah, you're right.  Of
10    course you're right, Exhibit 36, thank you, Michelle.
11            (WHEREUPON, a document was marked as
12    Exhibit Number 36.)
13    BY MS. COLLINS:
14    Q.     Okay.  Ms. Simms, have you seen these
15    documents before, these e-mails from █████ about █████████
16    ██████
17    A.     Yes.  I'm copied on what -- the one I'm
18    looking at right now, yes.
19    Q.     All right.  And this deals with the situation
20    where ██████████████ father had called in and left
21    messages with a couple of people with the company
22    about ████████████ affairs; correct?
23    A.     Yes, about his alleged, yes, at that point.
24    Q.     And ████████████ was also wanting to set
25    meetings with people at the company at this time;
```

```
 1    correct?

 2    A.      I believe she requested a meeting with Dave

 3    in particular, but yes, she wanted a meeting.

 4    Q.      And the company also received a letter from

 5    Mr. ███████ ████████████'s father; correct?

 6    A.      I believe so, yes.

 7    Q.      Did you see the letter?

 8    A.      I don't remember.

 9    Q.      All right.  And if you could turn to Page

10    2331 of Exhibit 36.

11              MS. SANDERS:  Which one is it, Heather?

12    Sorry.

13              MS. COLLINS:  2331.

14              MS. SANDERS:  Okay.  I'm scrolling to

15    find that document for the witness.  Okay.  She has

16    it.  This is it.

17              THE WITNESS:  Okay.

18    BY MS. COLLINS:

19    Q.      All right.  And this is an e-mail that you

20    sent to a team of people on ██████████ about an

21    update for about ████████ and ████████

22              MS. SANDERS:  Give us one second, I'm

23    going to shrink this document so she can see the

24    whole thing and let her have the computer.

25              MS. COLLINS:  Okay.
```

```
 1              THE WITNESS:  Yes.

 2              MS. SANDERS:  Okay.  She's got it.

 3  BY MS. COLLINS:

 4  Q.      All right.  And so was this in the context of

 5  setting up the meetings with ████████████

 6  A.      Yes.

 7  Q.      And you wrote at the end of the first

 8  paragraph, "She may be looking for vindication after

 9  what she knows he said about her and to people at

10  work."  Do you know what that is about?

11  A.      Yes.

12  Q.      What?

13  A.      He had been telling us that their marriage

14  was not doing well at all.

15  Q.      Okay.  And then if you go down to the fourth

16  paragraph, you wrote "The meeting today left us

17  feeling like maybe there is something below the

18  surface here, it's feeling really weird.  ████

19  seemed really afraid in our meeting."

20          What did you mean by that?

21  A.      When we met with him about this subject he

22  just, I mean, it was exactly that.  He seemed afraid

23  and he wasn't himself.  That's the first time I began

24  to wonder if there was more going on than what we had

25  believed previously.
```

1    Q.      Okay.  But at any rate, at this point nobody
2    believed ████████████ when she said he was having an
3    affair?
4    A.      Up until this point until we had the meeting
5    on ████████████, no, we did not.  We believed our
6    team member that we had ████████████████████████████
7    and experience with, and again, had seen zero sign of
8    behavior that would indicate otherwise.
9    Q.      Okay.  And back to the first page of this
10   document, on Page 2321 it looks like Dave Ramsey
11   wrote on ██████████, and this is down at the bottom
12   of the page, "So ████████ and ██████████ in the same
13   dinner for the Christmas party?"
14                   MS. SANDERS:  Okay.  She's got it.
15   BY MS. COLLINS:
16   Q.      So as of at least ██████████████, was the
17   company made aware that there were these allegations
18   made that ████████████ was having an affair with
19   ████████████████?
20   A.      The allegations had been made, yes.
21   Q.      All right.  So how long did the meeting with
22   Ms. ██████ last in ██████?
23   A.      I don't know exactly how long it lasted.
24   Q.      Okay.
25   A.      Wait, I'm sorry, did you say ██████?

```
1   Q.      Uh-huh, where she disclosed that she had had
2   an affair.
3   A.      I believe about 30 minutes.
4   Q.      Okay.  And other than you and Ms. Sievertsen,
5   was anyone else present?
6   A.      Yes.  She brought her therapist that she been
7   seeing for some time.
8   Q.      Okay.  Who was that?
9   A.      I don't remember her name.
```



A.      Mr. ███ was terminated because new
information was brought to light that he had violated
our righteous living core value, and when confronted,
he admitted it.

```
 1   Q.      Okay.  Where did the meeting with ███████
 2   ████ and her therapist take place in ████?
 3   A.      In Jen Sievertsen's office.
 4   Q.      Were you surprised by what she told you?
 5   A.      Absolutely.
 6   Q.      Okay.  Do you remember any other specifics
 7   about that meeting that we haven't already discussed?
 8   A.      No.  Not that we haven't discussed, no.
 9   Q.      Okay.  So was she just resigning because she
10   was admitting to having an extramarital affair?
11   A.      That's what she told us.
12   Q.      Did you believe her?
13   A.      I had no reason not to, and then he admitted
14   it when confronted.
15   Q.      Okay.  Tell me about the confrontation.
16   A.      We called him into a meeting and told him
17   that a team member had just come forward alleging
18   that they had had a sexual extramarital affair, and
19   did not tell him who it was, and he eventually
20   admitted to it and gave us her name.
21   Q.      Ms. ███████ name?
22   A.      Yes.
23   Q.      Okay.  Who -- who was in that meeting?
24   A.      Myself, Jen Sievertsen, Brian Williams and
25   Jeremy Breland and ███████████████
```

```
1    Q.      Where did that meeting take place?

2    A.      In one of our executive conference rooms on

3    our 6th floor.

4    Q.      Did anyone take notes during the meeting that

5    you observed?

6    A.      No.

7    Q.      Was the meeting recorded?

8    A.      No.

9    Q.      Was the meeting with Ms. ███ earlier in the

10   day recorded?

11   A.      No.

12   Q.      How long did the meeting last?

13   A.      The one with ███?

14   Q.      Yes.

15   A.      About an hour and 45 minutes.

16   Q.      What all was discussed?

17   A.      It was actually fairly repetitive, he didn't

18   want to admit it and we just kept pushing until he

19   finally did.

20   Q.      Did -- was he informed anything -- did

21   you-all believe Ms. ███ when she -- when she told

22   you and Ms. Sievertsen that she had had this

23   affair?

24   A.      We did not have reason not to believe her,

25   but we needed him to admit to it as well.  If he had
```

```
1   completely denied it we would have had to figure out
2   what the next step was, because at that point it's
3   her word against his.
4
5
6
7
8
9
10
11  Q.      Okay.  Is there any parts of the conversation
12  with ██████████ that occurred in █████ that we
13  haven't discussed?  You said that it was --
14  A.      No.
15  Q.      -- pretty repetitive and you told me that
16  Ms. -- you told him that a team member had made these
17  allegations, and that -- sounds like it went round
18  and round a couple of times where he denied it until
19  he finally admitted to it?
20  A.      That's right, yes.
21  Q.      Okay.  All right.  Now, I'm going to move on
22  to topic number two.  This covered the ████ affair
23  and --
24  A.      When you say ████, which affair are you
25  referring to?
```

```
 1    Q.      I guess when it came to your attention, all

 2    of the different things that came to the company's

 3    attention.

 4    A.      Yeah, ███ is when we were first made aware

 5    of those allegations, yeah.

 6    Q.      And what sort of -- part of topic number two

 7    requests to know what sort of investigation you

 8    undertook, what happened there?

 9    A.      Can you rephrase?  I'm not -- I'm not clear

10    on what you're asking.

11    Q.      Did the company conduct an investigation into

12    the allegations that ██████ had had an affair,

13    not just with people outside of work, but a

14    co-worker?

15    A.      In ██████ our investigation

16    involved us questioning him.

17    Q.      Okay.  So you questioned him and you also

18    questioned Ms. ███ correct?

19    A.      We did question her prior to, I believe it

20    was in ██████ but yeah, it was in ███, yes.

21    Q.      Okay.  And they both denied it?

22    A.      Implicitly, yes.

23    Q.      And at that time Mr. ███ that's when he

24    was put on the warning that if anything else happens

25    he was going to be terminated; correct?
```

```
 1   A.     No, that's not when we did that.  That
 2   warning was given to him on █████████, I believe ████████
 3   ████████████████████████████████████.
 4   Q.     And that was after all of the investigation
 5   talking with him and with Ms. ██████ and meeting with
 6   the team; right?
 7   A.     That was after ████████ came forward around
 8   and he admitted to the two extramarital affairs that
 9   had happened in the past.  There was still no
10   admittance at all to any impropriety with ██████████
11   ██████.
12   Q.     Okay.  Okay.  All right.  Topic number two
13   just covered the circumstances and events surrounding
14   ████████████████ ███████ affair.  Is there anything else
15   with respect to that that covers the Defendant's
16   investigation, actions, communications or response to
17   the allegations of the affair that we haven't already
18   discussed?
19   A.     No, not -- not in that time frame, no.  In
20   █████ he admitted to two extramarital affairs,
21   completely denied any impropriety with ████████████
22   ██████.
23   Q.     Okay.  Did anything happen in █████?
24   A.     What do you mean exactly?
25   Q.     Did -- were any accusations made against him
```

1  in ███?

2  A.      Not that I recall.

3  Q.      Okay.  In ███, were any allegations made

4  against Mr. ███ in ███?

5  A.      Not that I recall.

6  Q.      Okay.  So the next thing that came up with

7  Mr. ███ was in ███ when Ms. ███ came forward?

8  A.      Yes.

9  Q.      Okay.  And in the meantime Mr. ███ had

10  gotten divorced; right?

11  A.      Yes.

12

13

14

15

16

17

18

19

20

21  Q.      Okay.  All right.  And did you attend any of

22  his divorce proceedings or court hearings?

23  A.      There was one that I sat outside of, I

24  never attended any of the actual hearings themselves,

25  no.

```
 1   Q.      Why did you do that?

 2   A.      Why did I sit outside the one?

 3   Q.      Uh-huh.

 4   A.      His attorney asked me to just in case I

 5   needed to testify to any aspects of what was being

 6   done in the hearing.  It was not needed and it did

 7   not occur.

 8   Q.      Did Mr. ████ provide you with any regular

 9   updates as to the status of his divorce proceedings

10   in ████?

11   A.      From time to time.

12   Q.      Okay.  Did you all have access to any of

13   the documents that were filed in his divorce

14   proceedings?

15   A.      In ████?

16   Q.      At any point in time since the divorce

17   proceedings were initiated.

18   A.      I mean, they're public knowledge, so yeah,

19   I've had access to them.

20   Q.      Did you go look at them, or did anyone under

21   your supervision go look at them?

22   A.      I have, I have viewed the divorce decree

23   itself, yes.

24   Q.      Okay.  Have you viewed any other documents?

25   A.      I don't believe so.
```

```
1   Q.      Why did you go view the divorce decree?

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   Q.      Okay.  At any point in time during the

10  divorce proceedings did an officer or manager at

11  Ramsey Solutions find out that he had had an

12  extramarital affair other than the two that it

13  had been previously -- that he previously admitted?

14              MS. SANDERS:  Object.  It's outside the

15  scope of the topics, but she can answer if she

16  knows.

17              THE WITNESS:  The only three we've ever

18  been made privy to at all were the two ████a

19  brought that he admitted to in ████████, and

20  █████████ on ████████████.

21  BY MS. COLLINS:

22  Q.      But before Ms. ████ coming forward in ████,

23  was there any information in his divorce proceedings

24  that indicated he had in fact, had an affair with

25  Ms. ████
```

1         MS. SANDERS:  Same objection, but you can

2    answer.

3         THE WITNESS:  I don't remember anything

4    being in there about █████████.

5    BY MS. COLLINS:

6    Q.    Okay.  All right.  And with respect to topic

7    Number 4, it seeks information about ███████████

8    employment history, including any and all allegations

9    of extramarital affairs in or around ███████████, I

10   think those were those two others that he admitted

11   to; correct?

12   A.    Okay.  So the one that he admitted to having

13   an affair was around, I think ██████████, somewhere

14   in there.  The other one was so if we became privy in

15   ████, it was at least ██████████████, which would

16   have been ████████████, somewhere in there.  Those

17   were the two.

18   Q.    Okay.  All right.  Okay.  Let's take a quick

19   break so I can just review my notes and I think I'm

20   done.

21        THE VIDEOGRAPHER:  Going off the record

22   at 3:04 p.m.

23        (Brief recess.)

24        THE VIDEOGRAPHER:  We are back on the

25   record at 3:13 p.m.

BY MS. COLLINS:

Q.      Ms. Simms, did any of the allegations made
against Mr. ████ involve pregnancy?

A.      Not that I'm aware of.

Q.      Okay.  And when Ms. ████ came to your office
or had that meeting with you and Ms. Sievertsen, she
didn't -- she wasn't pregnant or anything like that,
was she?

A.      Not to my knowledge.

Q.      Okay.  Is she married?

A.      As of right now, I don't know.  I don't know
that she is, but it's been a long time since I spoke
to her.

Q.      In ████ when she was -- before she resigned
was she still -- was she unmarried?

A.      Right, she was divorced.

Q.      Okay.  Okay.  That's all I have.

        MS. SANDERS:  Nothing from us.  Just a
reminder that this portion of the deposition is
marked attorney's eyes only.  That's it from us.

        MS. COLLINS:  Okay.  Thank you-all, have
a good afternoon.

        MS. SANDERS:  You too, thank you.

//

//

1          THE VIDEOGRAPHER:  The time is 3:14 p.m.,

2     we are going off the record.  This will conclude the

3     deposition of 30(b)(6) witness Suzanne Simms.

4          THE REPORTER:  Do both counsel want to

5     order all transcripts?

6          MS. COLLINS:  Yes.

7          MS. SANDERS:  Yes.

8          FURTHER DEPONENT SAITH NOT

9          (Proceedings concluded at 3:14 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2     STATE OF TENNESSEE

3     COUNTY OF DAVIDSON

4

5             I, R. MICHELLE SMITH, Licensed Court

6     Reporter, with offices in Nashville, Tennessee,

7     hereby certify that I reported the foregoing

8     deposition of SUZANNE SIMMS by machine shorthand to

9     the best of my skills and abilities, and thereafter

10    the same was reduced to typewritten form by me.

11            I am not related to any of the parties named

12    herein, nor their counsel, and have no interest,

13    financial or otherwise, in the outcome of the

14    proceedings.

15            Further certify that in order for this
      document to be considered a true and correct copy it
16    must bear my original signature, and that any
      unauthorized reproduction in whole or in part and/or
17    transfer of this document is not authorized, will not
      be considered authentic, and will be in violation of
18    Tennessee Code Annotated 39-14-04, Theft of Services.

19

20

21

22

23

_____
24    MICHELLE SMITH, RDR, LCR, CCR, FPR, CLR, CLVS, CDVS
      Elite Reporting Services
25    LCR# 544 - Expires:  6/30/2022











