# CAITLIN O'CONNOR

## vs.

## LAMPO GROUP

---

# DAVID L. RAMSEY, III

## November 12, 2021

---



**Jeannie Chaffin, LCR**

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

1    IN THE UNITED STATES DISTRICT COURT FOR THE
       MIDDLE DISTRICT OF TENNESSEE
2        NASHVILLE DIVISION
  _____

3

  CAITLIN O'CONNOR,
4
      Plaintiff,
5

6  vs.        Case No. 3:20-CV-00628

7

  THE LAMPO GROUP, LLC a/k/a
8  RAMSEY SOLUTIONS,

9      Defendant.
  _____
10  _____

11

12

13

14       Video Deposition of:

15       DAVID L. RAMSEY III

16       Taken on behalf of the Plaintiff
        November 12, 2021
17
        Commencing at 1:30 p.m.
18

19

20

21

  _____
22
     Elite-Brentwood Reporting Services
23     www.elitereportingservices.com
    Jeannie Chaffin, LCR, Associate Reporter
24      Post Office Box 292382
      Nashville, Tennessee 37229
25       (615)595-0073

Case 3:20-cv-00628 Document 84-13 Filed 06/01/22 Page 2 of 100 PageID #: 5211
Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com

```
 1                    A P P E A R A N C E S

 2

 3

    For the Plaintiff:
 4
                    MS. HEATHER M. COLLINS
 5                  MS. ASHLEY WALTER
                    Attorneys at Law
 6                  Collins & Hunter, PLLC
                    7000 Executive Center Drive
 7                  Suite 320
                    Brentwood, TN  37027
 8                  (615)724-1996
                    heather@collinshunter.com
 9                  ashley@collinshunter.com

10

11

    For the Defendant:
12
                    MS. LESLIE SANDERS
13                  Attorney at Law
                    Webb Sanders, PLLC
14                  611 Commerce Street
                    Suite 3102
15                  Nashville, TN  37203
                    (615)915-3300
16                  lsanders@webbsanderslaw.com

17

                    MR. DANIEL CORTEZ
18                  General Counsel
                    Ramsey Solutions
19                  1011 Reams Fleming Boulevard
                    Franklin, TN  37064
20                  (615)371-8881
                    daniel.cortez@daveramsey.com

21

22

23  Also Present:

24                  MS. CAITLIN O'CONNOR
                    MS. JENNIFER JOHNSON, Videographer
25
```

Case 3:20-cv-00628 Document Elite Reporting Services Page 6 of 100 PageID #: 5212
Elite Brentwood Reporting Filed 03/21/22 (615) 595-0073
www.EliteReportingServices.com



```
 1              S T I P U L A T I O N S

 2

 3         The video deposition of DAVID L. RAMSEY III was taken by

 4    counsel for the Plaintiff, at the offices of Webb Sanders, PLLC,

 5    611 Commerce Street, Suite 3102, Nashville, Tennessee, on

 6    November 12, 2021, for all purposes under the Federal Rules of

 7    Civil Procedure.

 8         All formalities as to caption, notice, statement of

 9    appearance, et cetera, are waived.  All objections, except as to

10    the form of the questions, are reserved to the hearing, and that

11    said deposition may be read and used in evidence in said cause of

12    action in any trial thereon or any proceeding herein.

13         It is agreed that JEANNIE CHAFFIN, LCR, Notary Public and

14    Court Reporter for the State of Tennessee, may swear the witness,

15    and that the reading and signing of the completed deposition by

16    the witness was not discussed.

17

18

19

20

21

22

23

24

25
```

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1              *   *   *

 2

 3          THE VIDEOGRAPHER:  We are now on the

 4  record.  Today is Friday, the 12th of November,

 5  2021, and the time indicated on the video

 6  screen is 1:30 p.m.  This is a video deposition

 7  of Dave Ramsey.  Case number 3:20-CV-00628.

 8  The deposition is being held today at

 9  611 Commerce Street, Nashville, Tennessee.

10          My name is Jennifer Johnson, the

11  videographer.  The court reporter is

12  Jeannie Chaffin.

13          Will counsel please introduce

14  yourselves and state whom you represent.

15          MS. COLLINS:  Heather Collins and

16  Ashley Walter for the Plaintiff.

17          MS. SANDERS:  Leslie Sanders and

18  Daniel Cortez for Defendant.

19          THE VIDEOGRAPHER:  Will the court

20  reporter please swear in the witness.

21

22              *   *   *

23          DAVID L. RAMSEY III,

24  was called as a witness and having first been

25  duly sworn, testified as follows:
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
                    EXAMINATION
 1

 2   QUESTIONS BY MS. COLLINS:

 3   Q.    Good afternoon.  Could you state your

 4   name for the record, please?

 5   A.    David L. Ramsey III.

 6   Q.    And what is your address?

 7   A.    My personal address?

 8   Q.    Yes.

 9   A.    ███████████████████████.

10   Q.    What city?

11   A.    ████████████████, Tennessee.

12   Q.    Zip code?

13   A.    ███████.

14   Q.    Okay.  And what is your job title at

15   Ramsey Solutions?

16   A.    I'm the CEO.

17   Q.    Are you also the founder?

18   A.    Yes.

19   Q.    Okay.  Is it a privately held company?

20   A.    Yes.

21   Q.    What majority share do you own?  I assume

22   it's majority share.

23   A.    Yes.  Yes.  I am the only voting stock.

24   Q.    Okay.  In your current role do you set

25   policy?
```

```
 1  A.    In consensus with my operating board.
 2  Q.    Do you also enforce policy in your
 3  current role as CEO?
 4  A.    Rarely.
 5  Q.    What type of business entity is Ramsey
 6  Solutions?
 7  A.    An LLC.
 8  Q.    Okay.  Are you the only member of that
 9  LLC?
10  A.    No.
11  Q.    Who are the other members?
12  A.    My wife, Sharon, and my children.
13  Q.    How many children?
14  A.    Three.
15  Q.    And what are their names?
16  A.    Daniel Ramsey, Denise Whittemore,
17  Rachel Cruz.
18  Q.    What -- what -- I might have gotten the
19  second and third mixed up.
20  A.    Oh, I'm sorry.  I'm sorry.  I'll go
21  slower.
22        Daniel Ramsey, Rachel Cruz,
23  Denise Whittemore.
24  Q.    Okay.
25  A.    W-H-I-T-T-E-M-O-R-E.
```

Elite Document Reporting Services
www.EliteReportingServices.com

```
1   Q.     Does Ramsey Solutions have articles of
2   incorporation?
3   A.     Yes.
4   Q.     Do they state a religious purpose, to
5   your knowledge?
6   A.     I don't know.
7   Q.     What products does your company offer?
8   A.     How much time do we have?  Hundreds and
9   hundreds of products.
10  Q.     Just generally.
11  A.     We have broadcast entities.  We produce
12  books.  We train counselors, coaches.  We
13  produce live events.  We produce other digital
14  products.  Subscription services.  And that is
15  not -- that probably doesn't -- high school
16  curriculum or educational curriculum for
17  schools in general.
18         And that's probably not everything.
19  That's a general overview.
20  Q.     Okay.  Are any of those products that
21  your company offers secular in nature?
22  A.     They all serve the mainstream and are
23  available in churches and anything else for
24  that matter.  We don't -- we don't distinguish.
25  Q.     The educational products that are for
```

Case 3:20-cv-02078-Brentwood Reporting Services Page 9 of 100 PageID #: 5218
Elite Document Support Services (615) 595-0073
www.EliteReportingServices.com

1  high schools, what about those?  Do they have

2  any reference to religion or anything like

3  that?

4  A.    If they are in public schools, they have

5  to abide by the law.  And so there is

6  reference, but it is the reference that is

7  allowed under the law.

8  Q.    Okay.  Does the company have any other

9  governmental contracts?  I believe I recall

10  seeing something for National Guard?

11  A.    National Guard has been and might be a

12  sponsor for one of the radio shows.  I'm not

13  aware of any government contracts.

14  Q.    So is it fair to say the extent of the

15  business that Ramsey Solutions has with public

16  entities like boards of education, where it

17  serves the educational part, complies with the

18  law which requires you to take out a religious

19  component?

20        MS. SANDERS:  Object to the form.

21  BY MS. COLLINS:

22  Q.    You can answer.

23        MS. SANDERS:  You can answer if you

24  know.

25        THE WITNESS:  Okay.  Well, that's not

1  correct.  The law does not require all
2  religious components to be taken out.  The law
3  requires in public schools, per Supreme Court
4  rulings that I understand, that the religious
5  references cannot be proselytizing.  They can
6  only be instructive.  The instructive ones are
7  left in.  And we don't have anything that
8  violates the law.
9  BY MS. COLLINS:
10 Q.    Okay.  Are there Bible verses?
11 A.    Yes.  There are Bible verses in almost
12 everything we do.
13 Q.    Is there anything in any of the
14 government contracts that your company has that
15 says your employees must not engage in
16 premarital sex?
17 A.    I have never read any of the government
18 contracts.
19 Q.    If an unwed female employee gets
20 pregnant, does that burden your ability to
21 conduct business in accordance with your
22 beliefs?
23 A.    Well, our employment agreement that every
24 employee signs states that they are going to
25 live their life in accordance with that value

1    system.  Pregnancy does not enter into it.  But

2    if a -- if we hold -- when we hold ourselves

3    out as Christians to the community, if an

4    employee is doing something that is contrary to

5    standard Christian beliefs, normative Christian

6    beliefs, then the people that we deal with in

7    the Christian community would feel that we are

8    hypocrites, and it would damage our brand.

9    That's why we've done that.

10   Q.    Done what?

11   A.    Listed that in the employment agreement I

12   was referring to.

13   Q.    Listed what?

14   A.    What I just referred to.

15   Q.    Engaging in premarital sex?

16   A.    No.  Living your life in accordance with

17   evangelical beliefs.  Normative Christian

18   beliefs.

19   Q.    Okay.  And is engaging in premarital sex

20   part of that normative belief, as you referred

21   to it?  Or not engaging in premarital sex.

22   A.    I'm confused what you're saying.

23   Q.    Sure.

24          You just mentioned that your policies

25   conform with what you believe to be normative

Case 3:20-cv-00406-Brentwood Reporting Services Filed 03/11/22 Page 12 of 100 PageID #: 5221
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  evangelical belief systems --

2  A.    Uh-huh.

3  Q.    -- right?

4  A.    Uh-huh.

5  Q.    So do the policies of Ramsey Solutions

6  prohibit employees from engaging in premarital

7  sex?

8  A.    In literal form it is not written, no.

9  But under the righteous living values, one of

10 our core values, it is accepted within the

11 whole organization that that would be a

12 violation of that.

13 Q.    How is it accepted within the

14 organization that it's a value of the righteous

15 living values?

16 A.    I'm sorry.  I still don't understand.

17 Q.    Well, how is it part of the righteous

18 living core values that premarital sex is

19 encompassed in that value, not engaging in

20 premarital sex?

21 A.    How -- I'm still a little bit confused of

22 exactly what you're asking.  I -- how are we

23 communicating it?

24 Q.    Well, how -- you said that it was part of

25 the belief system, right, of the company --

1   A.      Uh-huh.

2   Q.      -- that premarital sex was prohibited --

3   A.      Uh-huh.

4   Q.      -- under the righteous living core value.

5           How did it become part of the belief

6   system that it's part of the company's culture?

7   A.      How did it become part of the belief

8   system that it is part of the company culture.

9           I'm still a little fuzzy, but I'll

10  take a stab at it.  Question's not very clear.

11          But the -- again, righteous living

12  would be living your life in a righteous way.

13  Obviously, stated that.  And normative

14  Christian belief is that having sex outside of

15  marriage is not a righteous act.  And so pretty

16  much anyone that is familiar with the concepts

17  would assume that or know that, if that's what

18  you're asking.  I don't know if that helps or

19  not.

20  Q.      Where does it come from that sex outside

21  of marriage is not a righteous act?

22  A.      Comes from normative standard beliefs

23  within the Christian community.

24  Q.      Is there a Bible verse that you know of

25  that prohibits it?

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   A.    I suspect there are several, none of

 2   which at this moment I can call off the top of

 3   my head.

 4   Q.    But this policy that prohibits premarital

 5   sex at Ramsey Solutions is not written down

 6   anywhere; is that correct?

 7   A.    Not that I'm aware of.

 8   Q.    Why not?

 9   A.    I'm sorry?

10   Q.    Why not?

11         MS. SANDERS:  Object to the form.

12         You can answer.

13         THE WITNESS:  There's not a reason.

14   BY MS. COLLINS:

15   Q.    Does it always lead to termination if the

16   company finds out an employee engaged in

17   premarital or extramarital sex?

18   A.    When we define sex as intercourse, yes.

19   Q.    Have there ever been any exceptions?

20   A.    Not to my recollection.

21   Q.    When did it come about -- or how did it

22   come about that there is a distinction between

23   a definition of sex being defined as

24   intercourse versus something else?

25   A.    When I answered that question, I wanted
```

```
1    to be clear.
2    Q.    What do you mean by that?
3    A.    I wanted to be clear what I meant by sex
4    outside of marriage.
5    Q.    Okay.  If someone engages in oral sex
6    outside of marriage, will they be terminated?
7    A.    Don't recall that coming up except once,
8    and there were other circumstances around that.
9    Q.    Okay.  Tell me about that.
10           MS. SANDERS:  The -- I believe we're
11   going into the course of the deposition that's
12   attorneys' eyes only.  So I believe that's
13   where this answer is going to lead.  So at this
14   time Ms. O'Connor will need to leave.
15           MS. COLLINS:  Okay.  Caitlin, can you
16   step out for just one sec?
17           (Off-the-record discussions.)
18           (WHEREUPON, the pending question was
19   read back by the reporter.)
20           MS. SANDERS:  This portion of the
21   deposition is marked as attorneys' eyes only.
22           THE WITNESS:  Okay.  In the case of
23   ██████████, there was some vague form of some
24   kind of oral sex referenced that he admitted
25   to.  We never could really get to the bottom of
```

exactly what it was.  And it was a part of an
overall process, so it was not -- it was not
intercourse at that time.  A fairly recent --
or a fairly recent thing at the time it became
to us.

    And so we did not terminate him based
on that because it was not intercourse.  He was
accused of intercourse and admitted to that
from ███████ before.  And two new pieces of
information there that we had never faced
before.  We had never faced the question of
oral sex, and we had never faced the question
of something being ████████████.

    We decided that something that was
████████████ we were not going to hold against
everyone.  Because if everything gets hold
against everybody for ████████, we probably
wouldn't have anything.

    And the oral sex was accused by his
wife in a high-stress situation.  He admitted
it, but said it was not what it sounded like.
And frankly, I didn't want all the details.

    So the conclusion was that they were
going to try to work on it to save their
marriage.  So we didn't push it.

```
1  BY MS. COLLINS:

2  Q.    The ███████ allegation, was he an

3  employee at the time?

4  A.    Yes.

5  Q.    And you mentioned a moment ago that some

6  kind of oral is referred to.  What did you mean

7  by that?  And how was it referred to?  How did

8  you find out about it?

9  A.    His wife at the time came accusing him of

10 many things.  And we were trying get to the

11 bottom of what the truth was in her erratic

12 behavior and his stonewalling.  Their church

13 elders were in the room, several of our

14 operating board members.  And a shouting match

15 between her began.  Her shouting and accusing

16 him of this, trying to get him to own up to it.

17       And he said he had taken comfort in

18 this lady that was his ███████ because

19 they were both married to crazy people,

20 according to him.  And an emotional affair had

21 developed.  And that -- an oral sex act had

22 begun but was not completed, according to him.

23 She contends otherwise, but she was not there.

24 His wife, now ex-wife.

25       The truth is, the whole thing is such
```

```
1    a mess, it's hard to tell what was really going
2    on.  The people involved were so dramatic and
3    out of control, there was no way to make a real
4    judgment on what was happening.  That's one of
5    the reasons we didn't act on it, because we
6    couldn't figure out what the real truth was.
7    Q.    But he admitted to some form of physical
8    affair?
9    A.    Yes.  Physical, oral sex starting but not
10   completed.  I have no idea what -- whether to
11   believe that or what really happened.  But
12   that's what he admitted.
13   Q.    And it was determined that did not
14   violate the righteous living core value?
15   A.    Correct.
16   Q.    Who made that determination?
17   A.    I'm sorry?
18   Q.    Who made that determination that it did
19   not -- that --
20   A.    The operating board and myself.  And
21   sitting there trying to -- because we'd never
22   faced this before.  And we'd never had to make
23   that decision before.
24   Q.    And was it at this same time that he made
25   the admission he had an affair █████████ ago?
```

```
 1   A.    Yes.  ████████  before that.  Now ██
 2   ██.
 3   Q.    And so even though he was an employee at
 4   the time he admitted to having an affair, that
 5   was still not held against him?
 6   A.    Because it was ████████  before.
 7   Q.    And it was a physical affair?
 8   A.    That's what we were told.
 9   Q.    Did he admit it involved intercourse?
10   A.    Yes.
11   Q.    So he hid it from the company for ██
12   ██?
13   A.    He, his wife, and his church elders
14   actively deceived everyone in the company, as a
15   group, for ████████, knowing that we would
16   terminate him.  Because it was common knowledge
17   that if you had a physical intercourse affair,
18   we would fire you.
19   Q.    And you would agree with me that it's
20   easier for a man to hide a physical affair
21   involving intercourse than a woman who can get
22   pregnant or who does get pregnant?
23   A.    Anyone who doesn't get pregnant can hide
24   a physical affair easier.
25              MS. COLLINS:  Can we go off the
```

```
 1  record one second?

 2          THE VIDEOGRAPHER:  We are off the

 3  record at 1:54 p.m.

 4          (Short break.)

 5          THE VIDEOGRAPHER:  We are back on the

 6  record at 1:54 p.m.

 7  BY MS. COLLINS:

 8  Q.    Okay.  I'm going to switch gears a little

 9  bit.  Got a little off track.  But I'll

10  probably come back to some of that, much to

11  your delight.

12          What sort of training have you had in

13  Title VII?

14          MS. COLLINS:  Oh, should we bring --

15          MS. WALTER:  I'll go get her.

16          MS. COLLINS:  -- Caitlin back in?

17          (Off-the-record discussions.)

18  BY MS. COLLINS:

19  Q.    All right.  So, Mr. Ramsey, what sort of

20  title -- training have you had in Title VII?

21  A.    None.

22  Q.    None?

23  A.    None.

24  Q.    Okay.  Have you ever considered whether

25  any of your policies violate the law or Title
```

1  VII?

2  A.    We are very careful to follow the law.

3  Q.    How do you ensure that you are very

4  careful to follow the law?  In particular Title

5  VII is what I'm zeroing in on.

6  A.    I'm sorry?

7  Q.    How do you ensure that you are very

8  careful to follow the law, in particular Title

9  VII?

10 A.    I have a professional HR team that

11 manages any situation that might come close, so

12 that we don't.

13 Q.    Before now has there ever been a

14 consideration, to your knowledge, as to whether

15 or not the righteous living core value could

16 run afoul of Title VII?

17 A.    Our understanding from everything that

18 the HR professionals and the legal team has

19 looked at is that it does not.

20 Q.    To your knowledge, has every unwed mother

21 who's gotten pregnant during the course of

22 their employment and not been married been

23 terminated?

24 A.    To my knowledge, yes.

25 Q.    And why is that?

Case 3:20-cv-00069-TCB-RGV Document 96-1 Filed 04/11/22 Page 21 of 95 PageID #: 5231
Florida Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  A.    We have never terminated anyone for

2  pregnancy.  60 people plus in the year that

3  Caitlin was terminated had babies.  We love

4  babies.  We terminate people for having sex

5  outside of marriage because that's a violation

6  of the righteous living core value.

7  Q.    Do you think that's a good way to take

8  care of the woman's baby, by terminating her

9  job?

10         MS. SANDERS:  Object to the form.  He

11  can answer.

12         THE WITNESS:  We've only had to deal

13  with this a couple of times.  And been very,

14  very heartbreaking.  Every case.  Because

15  there's a baby involved, so it's very, very

16  sad.  And so we're always extremely generous,

17  kind, helpful, financially generous, to make

18  sure that everybody involved is taken care of

19  if they want to be.  But we have to be

20  consistent with our application.

21  BY MS. COLLINS:

22  Q.    Part of that generosity involves signing

23  a nondisclosure agreement, correct?  If -- if a

24  --

25  A.    Every severance package that leaves our

Case 3:20-cv-00069-TCB-RGV  Document 92-11  Filed 04/11/22  Page 23 of 100  Page ID #: 5232
Elite-Brentwood Reporting Services  (515) 595-0073
www.EliteReportingServices.com

1  company has a nondisclosure agreement.

2  Q.    Okay.  And it also includes an agreement

3  not to sue the company for a violation of the

4  employee's civil rights, correct?

5  A.    I don't know the details of the document.

6  Q.    Generally are you aware if the severance

7  agreements include an agreement not to sue the

8  company?

9  A.    Generally they should.  Why would you

10 give someone money and turn around and get

11 sued?  That would be kind of ludicrous.

12 Q.    Does the company hire people who have had

13 children out of wedlock?

14 A.    We would.  I don't know if we have.

15 Q.    Why would you?

16 A.    If their lifestyle going forward does not

17 include sex outside of marriage, their past is

18 not held against them.

19 Q.    Does the company require unmarried

20 employees to sign any kind of purity pledge or

21 anything like that?

22 A.    No.

23 Q.    So there's no formal means to notify an

24 unmarried employee that sex outside of marriage

25 is prohibited?

```
 1   A.    There is a formal means.  It's their
 2   employment agreement that they signed that
 3   included a righteous living and holding your --
 4   and living your life in such a way that is
 5   consistent with Christian values.  That is
 6   notice.
 7   Q.    But it doesn't explicitly say that
 8   premarital sex is prohibited, does it?
 9   A.    No, it does not.
10   Q.    Isn't forgiveness a Christian value?
11   A.    Of course.
12   Q.    Would you consider being non-judgemental
13   a Christian value?
14   A.    No.
15   Q.    Didn't somewhere in the Bible it say
16   something to that effect, judge not lest you be
17   judged?
18   A.    And in the Bible it says for us to judge
19   the spirits and to judge.  And several times
20   we're told to judge.  We're supposed to use
21   common sense as Christians.
22   Q.    It also says not to eat shrimp.  Do you
23   eat shrimp?
24         MS. SANDERS:  Object to the form.
25         I don't care if you answer it.
```

www.EliteReportingServices.com

```
 1              THE WITNESS:  That's ridiculous.  I'm
 2   not going to answer.
 3   BY MS. COLLINS:
 4   Q.    So you're refusing to answer whether or
 5   not you eat shrimp?
 6   A.    Yes, I'm refusing to answer.
 7   Q.    Okay.
 8   A.    That's a ridiculous question.
 9   Q.    Okay.  So is it fair to say you pick and
10   choose which parts of the Bible you follow?
11              MS. SANDERS:  Object to the form.  He
12   can answer.
13              THE WITNESS:  No, it is not fair to
14   say.
15   BY MS. COLLINS:
16   Q.    Okay.  Explain.
17   A.    I don't pick and choose which parts to
18   follow.
19   Q.    Do you follow every single part of it?
20   A.    There are several instructional things in
21   scripture, books of wisdom and so forth, that
22   we follow.  And there are Old Testament dietary
23   laws that do not apply today.  It's a doctrinal
24   discussion.  Probably would have to take a
25   little time in seminary to grasp.
```

1    Q.    Have you been to seminary?

2    A.    No.  But I've studied scripture for 30

3    years.

4    Q.    Are you ordained?

5    A.    No.

6    Q.    Are potential hirees of Ramsey Solutions

7    subject to any kind of background

8    investigation?

9    A.    Yes.

10   Q.    What?

11   A.    Standard criminal check.  And possibly

12   others but I'm not positive.  Standard hiring

13   procedures for most companies, I'd say.

14   Q.    Now, I understand from the employee

15   handbook in the company conduct section that

16   the company is held out to be Christian.  What

17   does that mean?

18   A.    It means the company is held out to be

19   Christian.

20   Q.    Okay.  Where did it come from?

21   A.    Where did what come from?

22   Q.    That the company is held out to be

23   Christian.  Where did that come from?  You?  A

24   board?  What?

25   A.    Oh, I see.

```
 1              Because I am a believer.  And a lot
 2  of the things we teach are biblical principles.
 3  A lot of our customers have been Christians
 4  over the years.  A lot of our customer base is.
 5  And they know in that sense that we are a
 6  Christian company.  We are a company with
 7  Christian values.
 8  Q.    Is it a requirement that employees of
 9  Ramsey Solutions be Christian?
10  A.    No.
11  Q.    Is it a requirement of Ramsey Solutions
12  that its employees have the same Christian
13  values that you or the company holds itself out
14  as having?
15  A.    That's what the employee signs in the
16  employee handbook -- or in the employee
17  agreement, when they sign, when they join.
18  Q.    So it is a requirement?
19  A.    Yes.
20  Q.    Are you aware of anyone working for
21  Ramsey Solutions who is not Christian?
22  A.    We are not allowed to ask under the law.
23  Q.    The employee handbook also states that
24  you will discipline or terminate employees who
25  do not engage in behavior that is consistent --
```

1   that is not consistent with traditional

2   Judeo-Christian values or teaching.

3          What does that mean?

4   A.     Exactly what it says.

5   Q.     Okay.  Let's break it down.

6          How is an employee to know what is

7   behavior that is not consistent with

8   traditional Judeo-Christian values?  If they

9   are not Christian, to go even further.

10  A.     If they are going to sign that employment

11  agreement, we assume that they are smart enough

12  to ask if they don't know.

13  Q.     Okay.  What is your understanding as to

14  what traditional Judeo-Christian values means?

15  What do you mean by that?

16  A.     Basic morality as taught in scriptures.

17  Q.     When it comes to the company's attention

18  that an employee might not have engaged in --

19  or might have engaged in conduct that was not

20  consistent with traditional Judeo-Christian

21  values, what happens?

22  A.     We would look at what the behavior was,

23  how extreme it was, what patterns were

24  involved, and make a decision based on that.

25  Q.     So is it fair to say that y'all look at

```
 1  the individual circumstances of the behavior?
 2  A.    On things we have never run into before,
 3  we have to because we don't have a baseline.
 4  For instance, the case we referenced earlier.
 5  But on things where we have run into it before,
 6  we've already made our decisions based on that.
 7  And unless there's a -- some kind of different
 8  information, it would not be -- I mean, we're
 9  going to look at each case separately.  But
10  the -- but we want to treat everyone equally.
11  Q.    Who is typically involved in looking at
12  each case?
13  A.    HR committee.
14  Q.    Are you on the HR committee?
15  A.    No.
16  Q.    Are you kept in the loop on HR committee
17  business or activities when they have to look
18  at employee issues?
19  A.    I'm kept in the loop on all committees.
20  I'm the CEO.
21  Q.    Are you on the HRC group e-mails?
22  A.    No.
23        Oh, group -- HRC does a report, does
24  an e-mail to the operating board once a week to
25  update and keep all the operating board
```

Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

```
1   included, as do all the other committees.

2   Q.    And that -- who sends that HRC e-mail to

3   the operating board?

4   A.    Jack Galloway chairs HRC right now, so he

5   would send it.

6   Q.    How long has that practice taken place?

7   A.    Several years.  I'm not positive.

8   Q.    What's --

9   A.    Long time.

10  Q.    -- typically in the e-mail?

11  A.    I'm sorry?

12  Q.    What's typically in the e-mail?

13  A.    Families and people who are hurting that

14  we're assisting.  There's usually a long list

15  of those.  Employees who are struggling with

16  performance and we're trying to help them turn

17  the corner.  People who we've tried to help

18  turn the corner but didn't and are going to be

19  moved on, be terminated.

20        What else is there?  That's it.

21  That's most of it.

22  Q.    Did you get an e-mail like this that had

23  to do with Caitlin O'Connor's situation?

24  A.    Yes.

25  Q.    And it came from Jack Galloway?
```

Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

1  A.     Well, it came from HRC, yes.  I would
2  suspect I did.  It would be normal.
3  Q.     Is there a particular day of the week
4  that you typically -- that the operating board
5  would typically get these e-mails?
6  A.     I don't know.  I just read them when I
7  get them.
8  Q.     Do you recall what the one said about
9  Caitlin O'Connor?
10  A.     No.
11  Q.     Now, with respect to the core values, are
12  those -- those are applied across the board to
13  all employees, right?
14  A.     Yes.
15  Q.     Why did the -- the company lay out this
16  list of core values?  Why did y'all do that?
17  A.     Many years ago we hired a HR director
18  named Rick Perry, who helped us recognize the
19  way we were making decisions.  And he began to
20  memorialize those processes, the values that we
21  were using to make decisions.  And we
22  wordsmithed those later, and they became our
23  core values.  They were not aspirational of
24  what we wanted to become; it was more an
25  observation of who we are.

Case 3:20-cv-00616-Document 36-1 Filed 03/11/22 Page 32 of 100 PageID #: 524  32
Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

1 Q.    Is that still the case, that it's still

2 an observation of who you are?

3 A.    Yes.

4 Q.    Is it your opinion that different

5 religious beliefs demonstrate a lack of

6 character in some of those belief systems?  And

7 let me -- let me rephrase that.

8          Is it your opinion that different

9 Christian beliefs demonstrate a lack of

10 character?  For example, Lutheran, Methodist,

11 Episcopalian?

12          MS. SANDERS:  Object to the form.

13          But you can answer.

14          THE WITNESS:  I'm sorry.  Is it -- I

15 don't know what you mean.  I'm sorry.

16 BY MS. COLLINS:

17 Q.    Uh-huh.  Well, you would agree with me

18 that different denominations -- let's just

19 characterize it that way -- some are more

20 progressive than others, right?

21 A.    I'm not sure what your definition of

22 progressive is.

23 Q.    Well, not all denominations or Christian

24 beliefs require -- or have a prohibition

25 against premarital sex, correct?

1    A.    I -- I'm not aware of one that doesn't

2    have that prohibition.  Certainly not an

3    evangelical.

4    Q.    Okay.  And not all Christians are

5    evangelical, right?

6    A.    Correct.

7    Q.    What would you define as evangelical?

8    A.    A stricter adherence to -- a strict

9    adherence to scripture.

10   Q.    And that includes not engaging in

11   premarital or extramarital sex, right?

12   A.    Yes.

13   Q.    And, in particular, intercourse?

14   A.    Yes.

15   Q.    Does it or does it not include oral sex?

16   A.    The scripture is not clear.  We -- we

17   don't know -- I mean, I -- we've had to make --

18   we've had to use wisdom to ascertain what we

19   believe that meant.

20   Q.    And the conclusion was, was that it did

21   not include oral sex?

22   A.    No, that was not the conclusion.

23   Q.    So what would happen if you found out

24   today that an employee had had oral sex outside

25   of marriage?  Would they be terminated for

```
 1   violating the righteous living core value?

 2          MS. SANDERS:  Object to the form.

 3          You can answer.

 4          THE WITNESS:  We would look at all of

 5   the circumstances around it.  The intent around

 6   it.  The credibility of the information.  The

 7   one time we faced it, the information was not

 8   credible.  And that entered into the decision

 9   because the players were not credible.  The

10   people involved were not credible.  And so we

11   couldn't tell.

12          If we had an absolute situation where

13   someone has walked away from their marriage in

14   that way, it would likely end in termination.

15   But it would have to be -- it would be based on

16   the credibility of the people involved.  They

17   would have to be stable.

18   BY MS. COLLINS:

19   Q.    Is there any kind of mandatory reporting

20   if an employee engages in premarital or

21   extramarital sex?

22   A.    No.  And there's no investigation.  The

23   only time we've ever dealt with it is when

24   someone brought it to us.

25   Q.    So if they are extra sneaky and extra
```

```
 1   careful, they can get away with it?
 2           MS. SANDERS:  Object to the form.
 3           THE WITNESS:  I guess if you're extra
 4   sneaky and extra careful you can get away with
 5   almost anything, like stealing, which I would
 6   also fire you for.
 7   BY MS. COLLINS:
 8   Q.    Do you fire employees for lying?
 9   A.    I have.
10   Q.    Is that not an automatic termination, the
11   same way engaging in premarital sex is?
12   A.    No.  It depends on what the lie involves.
13   Q.    What if you determine someone is a
14   habitual liar?
15   A.    I would let them go.
16   Q.    Why?
17   A.    Because they are a habitual liar.
18   Q.    Does it violate a policy or a value?
19   A.    It violates common sense to keep people
20   that you can't trust.
21   Q.    Does it also violate one of the company's
22   core values?
23   A.    Probably.  But not sure which one.
24   Q.    Why is it the company's business if an
25   employee engages in premarital sex?
```

1  A.    A larger portion of our Christian -- our
2  customer base -- a large portion of our
3  customer base -- in the early days the largest
4  portion of our customer base -- are
5  Bible-believing Christians.  And they expect --
6  they -- they hold us up to that standard.  And
7  if someone inside of our organization is
8  damaging that brand, it's a business decision
9  to not retain them.
10 Q.    And so an administrative assistant who
11 gets pregnant outside of marriage could damage
12 your brand?
13 A.    Our condoning people having sex outside
14 of marriage can damage our brand.
15 Q.    And the only way that you find out if an
16 employee is having sex outside of marriage is
17 if either they report it or someone else
18 reports that they think something's going on;
19 is that correct?
20 A.    Correct.
21 Q.    Is it the company's expectation that any
22 female employee that becomes pregnant lets the
23 company know so that they can take advantage of
24 FMLA or company benefits that are offered?
25 A.    We don't have an expectation.

```
 1   Q.    Okay.  Well, if they want to take -- if a
 2   female employee who's pregnant wants to take
 3   FMLA for her maternity leave --
 4   A.    That's the law.
 5   Q.    -- she has to notify the company?
 6   A.    That's the law.
 7   Q.    Okay.  And you agree that she should not
 8   face reprisal or retaliation for reporting to
 9   the company that she is pregnant, correct?
10   A.    We have never had any reprisal against
11   someone for being pregnant.
12   Q.    Well, you terminated Caitlin O'Connor
13   when she came to you and asked the company if
14   she could take FMLA for her pregnancy.  Is that
15   not reprisal or retaliation?
16         MS. SANDERS:  Object to the form.
17         You can answer.
18         THE WITNESS:  We did not terminate
19   Caitlin O'Connor for being pregnant or for
20   asking for FMLA.  We terminated her for having
21   sex outside of marriage.
22   BY MS. COLLINS:
23   Q.    But she came to the company and let it
24   know she was pregnant, correct?
25   A.    That's my understanding.
```

1  Q.    And she also came to the company and let
2  it know that she needed FMLA, right?
3          MS. SANDERS:  Object to the form.
4          THE WITNESS:  I don't know.  I didn't
5  -- I wasn't personally involved in that.
6  BY MS. COLLINS:
7  Q.    Okay.  After she notified the company she
8  was pregnant, she was terminated?
9  A.    That's my understanding.
10 Q.    Okay.  And you were involved in that
11 termination?
12 A.    No.
13 Q.    You didn't send any e-mails?
14 A.    No.  I mean, I -- no, I e-mailed in
15 response.  I was kept in the loop.  And I
16 e-mailed back to that, but I didn't cause the
17 termination.  I did not participate in the
18 termination personally.
19 Q.    What do you mean personally?  You didn't
20 participate in the termination personally?
21 A.    Operating board members and the HRC
22 handled it.
23 Q.    Did you give them direction?
24 A.    No.  Other than to be compassionate and
25 kind like we always are.  And generous.  Sad

Case 3:20-cv-01062-Brentwood Reporting Services Page 39 of 100 PageID #: 5248
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   situation.
 2   Q.    Do you think it's being compassionate and
 3   kind to terminate a pregnant employee?
 4   A.    I think we offered her an amazing amount
 5   of money.  Amazing -- an amazing compensation
 6   package.  And we were -- no one was unkind in
 7   any way.  So, yes, I think she knew what she
 8   was into and exactly what -- what was coming.
 9   Q.    Do you think a separation package is a
10   substitute for knowing you have a job?
11   A.    A separation package is what you get when
12   you're separated.
13   Q.    But is it a substitution for the comfort
14   of knowing you have a job?
15         MS. SANDERS:  Object to the form.  He
16   can answer.
17         THE WITNESS:  You know, losing your
18   job is always a hard thing.  It's very sad.
19   There is no thing that makes the pain of that
20   great.  But I've lost jobs for things when I
21   misbehaved, and I have experienced that
22   discomfort.
23   BY MS. COLLINS:
24   Q.    Have you ever lost a job when your wife
25   was pregnant with one of your kids?
```

```
1   A.     No.  But I went bankrupt that year.
2   Q.     That's probably very stressful, wasn't
3   it?
4   A.     Uh-huh.
5   Q.     If asked by a member of management, are
6   employees required to provide intimate details
7   about their personal lives to remain employed?
8   A.     I didn't hear the last part.
9   Q.     Sure.
10         If asked, are employees required to
11  provide intimate details about their personal
12  lives to remain employed by Ramsey Solutions?
13  A.     Only in a situation where we felt like
14  something like this righteous living core value
15  was violated.  And so if, for instance, someone
16  came in and said I'm thinking about -- or
17  someone says -- moving in with his girlfriend.
18  We'd say, hey, so and so, are you moving in
19  with your girlfriend?  I guess that's asking
20  intimate details.  And we would say, you don't
21  want to do that if you want to work here.
22  Q.     What if they refuse to say one way or the
23  other if their girlfriend was moving in with
24  them, would they be fired?
25  A.     We would have to work through that
```

1  situation and determine.  But if we think that

2  it's simply that that's what's going on, then

3  we would have to -- we would have to be

4  consistent.

5  Q.    So the presumption would be if someone is

6  living with someone else of the opposite sex,

7  that they are boyfriend or girlfriend, it would

8  be that they are engaging in premarital sex and

9  they should be terminated?

10  A.    That's a fairly reasonable assumption.

11  Q.    Is there any sort of correlation between

12  an employee who engages in premarital sex and

13  is unmarried, to their job performance?

14  A.    Well, part of their job performance at

15  Ramsey is, they sign an employment agreement

16  that says they wouldn't do that.  So in that

17  sense, yes, they are not performing their job.

18  Q.    And when you say they sign an employment

19  agreement that they would not do that, what is

20  the "that," specifically?

21  A.    Once again, seems like we've covered this

22  ground.

23        They sign an employment agreement

24  that says that they are not going to violate

25  righteous living, which is standard Christian

Case 3:20-cv-00066-Document 92-2 Filed 08/11/22 Page 42 of 100 PageID #: 5241
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  beliefs.  And so if they are violating that
2  intentionally, they are violating their
3  employment agreement.  That is not performing.
4  Q.    And even though it's not written, it's
5  considered that engaging in premarital or
6  extramarital sex is a violation of the
7  righteous living core value?
8          MS. SANDERS:  Objection to form.
9          You may answer.
10         THE WITNESS:  It's widely accepted
11  that a normative in Christianity is sex outside
12  of marriage is not righteous living.
13  BY MS. COLLINS:
14  Q.    And you would agree with me that a woman
15  who has premarital sex and gets pregnant can't
16  hide it typically, right?
17  A.    I would suspect.
18  Q.    Would you also agree with me that a man
19  who engages in premarital sex and gets his
20  partner pregnant can hide it?
21  A.    Yes.  A lot of people can hide a lot of
22  things, as we established earlier.
23  Q.    To your knowledge, was Caitlin O'Connor
24  ever asked if she engaged in premarital sex, or
25  was that just an assumption because she was

```
 1  pregnant?

 2  A.    I have no knowledge if she was asked

 3  personally.

 4  Q.    What if she would have gotten pregnant

 5  through IVF, would she have been terminated?

 6            MS. SANDERS:  Object to the form.

 7            You may answer.

 8            THE WITNESS:  No.

 9  BY MS. COLLINS:

10  Q.    Do you know if anyone asked her?

11  A.    I'm sorry?

12  Q.    Do you know if anyone asked her?

13  A.    No.

14  Q.    So was it assumed that she engaged in

15  intercourse to get pregnant?

16  A.    My understanding is that we had reason to

17  believe that.  More than just an assumption.

18  Q.    What was the basis of that assumption?

19            MS. SANDERS:  Object --

20            THE WITNESS:  Conversations she had

21  with the executive team.

22  BY MS. COLLINS:

23  Q.    But sitting here today, you have no

24  knowledge as to whether or not anyone

25  specifically asked her if she engaged in
```

Case 3:20-cv-06570-TSH   Document 98-2   Filed 04/11/23   Page 45 of 100
Elite-Brentwood Reporting Services   (415) 595-9933   Page ID #: 5253
www.EliteReportingServices.com
44

```
 1  intercourse, correct?

 2  A.    I was not involved personally in the

 3  conversations with Caitlin.

 4  Q.    So you don't have that knowledge,

 5  correct?

 6  A.    I was not involved personally in the

 7  conversations with Caitlin.

 8  Q.    Okay.  Would you just answer my question?

 9  A.    That is the answer.

10  Q.    Okay.  You don't know?

11  A.    I couldn't know.  I wasn't personally

12  involved.

13  Q.    Would it have been better for her to have

14  an abortion and keep it quiet --

15          MS. SANDERS:  Object to the form.

16  BY MS. COLLINS:

17  Q.    -- if she had had premarital sex, so she

18  could keep her job?

19          MS. SANDERS:  Object to the form.

20          THE WITNESS:  No.

21  BY MS. COLLINS:

22  Q.    Don't you think this policy places unwed

23  mothers in that position?

24  A.    No.

25  Q.    Is it fair to say that in the eyes of
```

```
 1  Ramsey Solutions, that a woman who gets

 2  pregnant out of wedlock can't be rehired?

 3          MS. SANDERS:  Object to the form.  He

 4  can answer.

 5          THE WITNESS:  We have a stated policy

 6  that would almost never rehire anyone who

 7  leaves for any reason, whether they are fired

 8  or quit.

 9  BY MS. COLLINS:

10  Q.    Have there been exceptions to that

11  policy?

12  A.    It's an almost never.  So there are

13  exceptions.

14  Q.    Okay.  What if Ms. O'Connor had been

15  raped, would she have still been terminated?

16          MS. SANDERS:  Object to the form.

17          THE WITNESS:  We have never faced

18  that.  I doubt it.  It is not consistent with

19  who we are.  It's different than an active

20  decision to have premarital sex.  Considerably

21  different.

22  BY MS. COLLINS:

23  Q.    But as a general rule, if an unwed mother

24  comes to the company and lets it know that

25  she's pregnant, she'll be terminated?
```

```
 1              MS. SANDERS:  Object to the form.
 2              THE WITNESS:  It's only happened two
 3    times in our history.  And in both cases, yes.
 4    BY MS. COLLINS:
 5    Q.    Who was the other person?
 6    A.    Young lady named ███████.
 7    Q.    Okay.  Did you know there was another
 8    person, a third person?
 9    A.    No.
10    Q.    Have you ever heard of ███████████████?
11    A.    No.
12    Q.    Okay.  If you could turn to Exhibit
13    Number 6 in that binder right there.
14    A.    Can we take a five-minute break?
15    Q.    Oh, yeah.  Sure.  Absolutely.
16              MS. COLLINS:  Let's go off the
17    record.
18              THE VIDEOGRAPHER:  We are off the
19    record at 2:43 p.m.
20              (Short break.)
21              THE VIDEOGRAPHER:  We are back on the
22    record at 2:49 p.m.
23    BY MS. COLLINS:
24    Q.    Okay.  If you could turn to Exhibit
25    Number 6 in that binder for me, please.
```

```
 1  A.     Number 6?

 2  Q.     Uh-huh.

 3          (Off-the-record discussions.)

 4  BY MS. COLLINS:

 5  Q.     Okay.  About halfway down on the page is

 6  an e-mail.  It says from Ramsey Dave.  Is that

 7  your e-mail address?

 8  A.     Yes, ma'am.

 9  Q.     Okay.  Did you write this e-mail?

10  A.     (Reviews documents.)

11          Yes.

12  Q.     Okay.  And this is in response to

13  Caitlin O'Connor's e-mail that she sent to

14  Armando Lopez the evening before, letting him

15  know that she was 12 weeks pregnant, correct?

16  A.     I didn't get the e-mail, but I understood

17  she had resigned or was knowing that this was

18  going to result in a termination.

19  Q.     Okay.  If you could just turn to the --

20  page 2 of 6, maybe that will help refresh your

21  recollection.  And just start with her e-mail

22  and work your way --

23  A.     Yeah.

24  Q.     -- up.

25  A.     Frowned upon.
```

1  Q.    Okay.  So did you read that when it was

2  forwarded to you from Mr. Lopez?

3  A.    Yes.

4  Q.    Okay.  So you knew that Ms. O'Connor was

5  12 weeks pregnant at that time, right?

6  A.    Uh-huh.

7  Q.    And you also knew only that she was

8  unmarried, right?

9  A.    Yes.

10 Q.    And that she was checking to see about

11 getting FMLA and ADA paperwork, right?

12 A.    Well, what I mainly saw was that she's

13 expecting.  And I understand being unmarried

14 and expecting is frowned upon here, which is

15 Caitlin saying that she knows that this is not

16 going to be something we go forward with; that

17 she was aware.

18 Q.    So you ascertained all that from that one

19 sentence?

20 A.    Yes.

21 Q.    Okay.  And she doesn't say that she's

22 resigning or she knows that it will lead to her

23 termination, does she?

24 A.    No.

25 Q.    Okay.  And from this e-mail there's no

```
1   way to tell if she engaged in premarital sex or
2   if she had IVF, right?
3   A.    She would not have stated that being
4   unmarried and expecting is frowned upon here if
5   it was IVF.  Because she would have come to us
6   and said -- I mean, it's easy to assume that
7   she would have come to us and said that that's
8   what was going on.  Instead she knew that she
9   had engaged in something that was in violation
10  of her employment.
11  Q.    How do you know what she would have done?
12  A.    Well, you don't say I'm unmarried and
13  expecting is frowned upon here, if you have
14  IVF.  You come and sit down.  And normal people
15  would come and have a conversation.  A
16  conversation -- our doors are open for people
17  to have conversations.
18  Q.    Okay.
19  A.    And this was done by e-mail, which is why
20  I responded the way I did.  I was thinking of
21  her.  I figured she was embarrassed and scared.
22  And I was kind of taking up for her, if you
23  read the e-mail actually carefully.
24  Q.    Okay.  So in your e-mail response, you
25  say, so sad?
```

```
 1   A.      Uh-huh.

 2   Q.      What is so sad about her providing

 3   sensitive information about her being pregnant

 4   to the HR director?  What is sad about that?

 5           MS. SANDERS:  Object to the form.

 6           You can answer.

 7           THE WITNESS:  It's sad that

 8   apparently she's going to lose her job for

 9   having premarital sex.  And there's a baby

10   involved.  And it's a horrible, horrible

11   situation.  And we're going to have to be

12   unbelievably compassionate and kind.

13   BY MS. COLLINS:

14   Q.      Okay.  And from her e-mail you assume

15   that she was scared and embarrassed; is that

16   right?

17   A.      The fact that she did this by e-mail

18   instead of in person made me -- gave me that

19   impression.

20   Q.      Is there a requirement that an employee

21   notify HR --

22   A.      No.

23   Q.      -- that they are pregnant, in person?

24   A.      No, there's not a requirement.  This was

25   a human reaction.  Not a policy.
```

```
1   Q.     In your e-mail you write -- and this is

2   at 5:10 a.m., on June 19th, after she sent the

3   initial e-mail on June 18th at 4:44 p.m.  You

4   write, tell her we will work this out with her

5   next week, but she will be loved and cared for.

6              What did you mean by that?

7   A.     We'll work out her separation.

8   Q.     Okay.  And then the next sentence says,

9   then next week we'll follow the steps we did

10  before.

11             What do you mean by that, the steps

12  we did before?

13  A.     Every time we separate someone, we're

14  kind and generous.

15  Q.     Are you talking about every time you

16  separate an unwed mother?

17  A.     Every time we separate anyone.

18  Q.     Are you more generous with unwed mothers?

19  A.     This only happened twice.  And I only had

20  the opportunity to be generous once.

21  Q.     When you say twice, does that include

22  Caitlin O'Connor or -- does that include

23  Caitlin O'Connor?

24  A.     Yes.  Yes.

25  Q.     And ██████?
```

```
 1   A.    Yes.
 2   Q.    And then your last sentence says, we were
 3   thorough because that is the right thing to do.
 4             What does that mean?
 5   A.    It means we are going to thoroughly take
 6   care of her, be kind to her, and generous to
 7   her.  There's a baby involved, and this is a
 8   sad situation.
 9   Q.    But the right thing does not involve
10   letting her keep her job, correct?
11   A.    Correct.
12   Q.    If you could turn to tab number --
13   Exhibit 7.  It's been previously marked in a
14   deposition in this case.
15   A.    Uh-huh.  Just the first page or the
16   second or what?
17   Q.    On the second page.
18             MS. SANDERS:  I'm sorry.
19             THE REPORTER:  You're fine.
20             MS. COLLINS:  These are the ones
21   marked by the court reporter.
22             MS. SANDERS:  Okay.
23             MS. COLLINS:  So I have not --
24             MS. SANDERS:  Maybe I could take a
25   moment to just look through the book and make
```

Case 3:20-cv-01023   Document 92   Filed 08/11/22   Page 53 of 100 PageID #: 52 52
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1 sure there's no writing or anything on this.

2 I've just not seen the book.  So I can look

3 through it, and then I won't have to keep

4 getting up and being disruptive.  That would be

5 fine.

6          MS. COLLINS:  It's -- it's the

7 official court reporter copy.

8          MS. SANDERS:  Oh, it's her copy?

9          MS. COLLINS:  Yes.

10          MS. SANDERS:  I didn't realize that.

11          THE REPORTER:  Our firm brought it.

12          MS. SANDERS:  Oh, thank you.  I

13 thought it was a copy you had made for her.

14 Thank you.  Sorry about that.

15          THE REPORTER:  No problem.

16          THE WITNESS:  (Reviews documents.)

17          Caitlin is 12 weeks pregnant.  Not

18 married.  She's 37 and has a 19-year-old and

19 20-year-old.  Boyfriend and father of her child

20 is 52.  They plan to get married, but she is

21 not officially engaged.

22          So apparently she told Suzanne and

23 Jim that it was not IVF.  Huh.  Okay.

24 Interesting.

25          And your question about this is what?

BY MS. COLLINS:

Q.    Have you read the document?

A.    I have now, yes.

Q.    Okay.  Now, do you recall receiving this
e-mail from Suzanne Simms?

A.    Vaguely.

Q.    Okay.  And is -- the e-mail just above
that, did you write that e-mail?

A.    I'm sorry?  Agreed -- which one are you
talking about?  There's three -- no, there's
two from Suzanne.

Q.    The one that you responded to that starts
with "agreed."

A.    Oh, okay.

Q.    Did you write that e-mail?

A.    Yes.

Q.    Okay.  What were you agreeing to in
Suzanne Simms' e-mail?

A.    Her e-mail.

Q.    Okay.  What part -- what about her e-mail
were you agreeing to?

A.    I guess the entire e-mail.  If I would
have not agreed to the whole thing, I would
have said so.

Q.    Okay.  When you state in your e-mail

Case 3:20-cv-00620-Brentwood Reporting Services Page 55 of 100 PageID #: 5254
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  Finney and Armando should not talk, why did you

2  state that?

3  A.    On the previous page Finney --

4  Michael Finney had said he didn't want her to

5  feel ganged up on.  I was agreeing with that.

6  I didn't -- I was trying to not -- this is a

7  painful, sad situation.  I'm trying to not have

8  this young lady with a whole bunch of people in

9  the room feeling ganged up on.  I was trying to

10  be kind.

11  Q.    Okay.  And that e-mail from

12  Michael Finney came after your e-mail, correct?

13  A.    Okay.  He's agreeing with me.  I don't

14  want her to feel ganged up on either.  Because

15  I said, don't want her to feel ganged up on.

16          Yeah, that's it.  Yeah, we're

17  agreeing.  We're not -- we're not trying to be

18  unkind.  We're trying to be -- I'm just trying

19  to envision a young lady sitting there with a

20  whole bunch of executives around her; that this

21  is some kind of, you know, super high-pressure

22  thing for her.  And I was trying to just help

23  her.

24  Q.    When you say this is obviously contrary

25  to our values, what did you mean by that?  What

```
1   is --
2   A.    It's obviously contrary to the righteous
3   living values when you get pregnant with the
4   father of your child who is 52; and they plan
5   to get married, but she is not officially
6   engaged.
7   Q.    What does this refer to?  Is that --
8   would -- the fact that he was 52 --
9   A.    That she has --
10  Q.    -- or what?
11  A.    No.  No.  That she has been having sex
12  out of marriage.
13  Q.    Okay.  Does it say anywhere in
14  Suzanne Simms' e-mail that she was having sex
15  outside of marriage?
16  A.    No, but it's inferred.
17  Q.    Why did you single out that the men
18  should not talk, as opposed to the women?
19  A.    Again, I didn't want someone -- I didn't
20  want a young lady feeling like she was being
21  mansplained to, something that was going on.  I
22  wanted some ladies to be compassionate with a
23  young lady who was in a horrible, difficult
24  situation, losing her job.
25          MS. COLLINS:  Okay.  I'm about to get
```

```
 1  into some documents that have been marked
 2  attorneys' eyes only.  So I think we need to
 3  have Caitlin leave the room.
 4          (Off-the-record discussions.)
 5          MS. COLLINS:  And just for the
 6  record, we just received production of these
 7  documents.  Most of them last night after
 8  midnight.  So we are not sure if this is all of
 9  the documents we might need to depose
10  Mr. Ramsey on.  And for that reason we may need
11  to leave the deposition open.
12          MS. SANDERS:  We object to that.  But
13  we can take that up at another time.
14          (Off-the-record discussions.)
15  BY MS. COLLINS:
16  Q.   I'm going to hand you a document.  We are
17  going to mark --
18          MS. COLLINS:  Where are we on
19  exhibits?
20          (Off-the-record discussions.)
21          (WHEREUPON, the above-mentioned
22  document was marked as Exhibit 37.)
23  BY MS. COLLINS:
24  Q.   All right.  Now, this document that's
25  been marked as Exhibit Number 37, if you go
```

Elite-Brentwood Reporting Services    (615) 595-0073
www.EliteReportingServices.com

```
 1  down to the bottom of the page -- and this is
 2  one from ███████████ -- you're referring to
 3  ███████████; is that correct?
 4          MS. SANDERS:  While he's reviewing
 5  that, for the record, this portion of the
 6  deposition is attorneys' eyes only.  She may
 7  have said that.  I'm not sure.
 8          THE WITNESS:  (Reviews documents.)
 9          Yes.
10  BY MS. COLLINS:
11  Q.    Okay.  And you state in this e-mail about
12  ███████████, that he simply lied out of shame
13  and fear of being fired, which is actually what
14  a normal human does.
15          So is it okay for some employees to
16  lie and not others?
17  A.      ████████ and ████████ had lied out of shame
18  and fear for ████████.  Together they had
19  contrived and deceived us intentionally.  I
20  stated that earlier.  And that's what I'm
21  referring to.
22  Q.    What do you mean they lied to you for █
23  ████?
24  A.    They knew, along with the church elders
25  of the church they were attending at the time,
```

```
 1  that ████ had an affair.  An intercourse-based

 2  affair with an employee at that time ███

 3  ████ -- a ███████████████████ prior to them

 4  coming to us.  It's approaching ███████, now,

 5  ago.

 6          But they held it -- or they deceived

 7  us for ████████.  The two of them together,

 8  along with their church elders.  They all knew

 9  what would happen if we found out in

10  contemporary times.

11  Q.    Did you ever find out why they lied?

12  A.    Because they knew he would have been

13  fired if we had found out any time near the

14  time it actually occurred.  Because it's

15  generally accepted in our firm.

16  Q.    Okay.  All right.  I'm going to hand you

17  another document we're going to mark as Exhibit

18  Number 38.  I'm going to hand it to the court

19  reporter so she can mark it first.

20          (WHEREUPON, the above-mentioned

21  document was marked as Exhibit 38.)

22          THE WITNESS:  (Reviews documents.)

23  BY MS. COLLINS:

24  Q.    If you could turn to the second page of

25  Exhibit Number 38.  It's got 2521 down at the
```

```
 1  bottom.  You state in the second to last
 2  paragraph, it says, remember our principle is
 3  to slightly overshare but never to the point of
 4  shaming or harming internal brand to the point
 5  of hurting effectiveness.
 6            What does that mean?
 7  A.    Any time we have uncomfortable
 8  information on a team member, we believe good
 9  organizational mental health is for folks to
10  know what's going on.  And so we tend to go up
11  to the edge of oversharing, while never
12  throwing that person under the bus.
13  Q.    I'll mark the next document as Exhibit
14  Number --
15            THE REPORTER:  39.
16            (WHEREUPON, the above-mentioned
17  document was marked as Exhibit 39.)
18            (Off-the-record discussions.)
19            THE WITNESS:  (Reviews documents.)
20  BY MS. COLLINS:
21  Q.    And this is an e-mail that you sent to
22  ████████████, correct?
23  A.    Yes.
24  Q.    Okay.  And at this point in time, as of
25  ██████████████████, was it your understanding
```

```
 1  that he was getting a divorce?

 2  A.    Yes.

 3  Q.    Okay.  At this point in time, did you

 4  know that he had engaged in an extramarital

 5  affair?

 6  A.    I knew he had engaged in an extramarital

 7  affair ███████ previous, as we've already

 8  discussed.  We found out several months later

 9  that he had had an extramarital affair

10  during -- shortly -- probably around this time

11  this was written or shortly before.  And we

12  fired him instantaneously.

13  Q.    As of ████████████ had ██████████████,

14  his wife, come to you and let you know that he

15  had engaged in extramarital affairs and he had

16  just denied it?

17  A.    ████████ had told us a lot of things.  But

18  ███████ lost her credibility because of her

19  behaviors.  And so we couldn't tell any -- if

20  anything ███████ was saying was true.  So she

21  said a lot of things about a lot of people,

22  including me, that weren't true.  And so it's

23  not -- she -- I have no idea what all ████████

24  has accused somebody of.  Lots of things.

25  Q.    Okay.  So because of her behaviors, y'all
```

```
 1  didn't believe ███████?

 2  A.    Yeah.  Erratic.  Completely out of

 3  control.  Inconsistent.  Changing her story.

 4  It was not a credible source to make a decision

 5  on someone's life with.

 6  Q.    Okay.  And in this e-mail you state that,

 7  this is the year your Ramsey family continues

 8  to walk the rest of this path with you.  Got

 9  your six.  Always have.

10            So at this point in time, as of

11  ████████████, you knew that ██████████

12  had violated the righteous living core value

13  during his employment, but you were still

14  letting him know that you had his six, correct?

15  A.    He had violated it ████████ previous.

16  And ██████ before this e-mail was written, we

17  had made the decision to keep him and work

18  forward, because the information -- or the

19  affair was ancient history.

20  Q.    But you knew that ████████████ had

21  made allegations that there was not affairs

22  that were ancient history, but you chose not to

23  believe her because she was erratic?

24            MS. SANDERS:  Object to the form.

25            THE WITNESS:    ████████████ was not a
```

```
 1   credible source.  She had -- her -- her

 2   behavior kept us from believing anything she

 3   said.

 4           Oddly enough, I'll add, it turns out

 5   that she was right.  I wish she had been a

 6   credible source.  It would have saved us all a

 7   lot of pain.  It was a huge mistake.  But we

 8   had to make the decision with the information

 9   and the sources that we had that we could trust

10   at the time.  And we made the best decision we

11   could at the time.  Obviously, we found out

12   later we were wrong.

13   BY MS. COLLINS:

14   Q.    Do you have a page number 2746 in that

15   exhibit?

16   A.    In this exhibit?

17   Q.    The one I just gave you.  Or is that just

18   one page?

19   A.    That's a one page.

20   Q.    Okay.  Let's mark the next document as

21   Exhibit Number 40.

22           (WHEREUPON, the above-mentioned

23   document was marked as Exhibit 40.)

24   BY MS. COLLINS:

25   Q.    If you could turn to page 2746.
```

```
 1   A.    (Reviews documents.)
 2   Q.    If you could turn to page 2.  And I'm
 3   talking about the ██████████████ , e-mail
 4   that you sent at 10 o'clock a.m.
 5         You wrote -- is this about
 6   ████████ , first?
 7   A.    Yes.
 8   Q.    Okay.  And so the company sent him to
 9   ████████████████████
10   A.    ██████████████████████████
11   ████████
12   Q.    ██████████████████████████████
13   ████████████████████████
14   ████████
15   A.    When ████████ came in in ██████████████
16   at the start of this whole process and went
17   through a three-day unpacking of the whole
18   situation, and as a group, including ██████ and
19   ████████ , decided that there were many, many
20   steps that needed to be taken of healing to
21   cover this ██████████ of deception, the affairs,
22   the manipulation, even ██████████ erratic
23   behavior.
24         And we had, as a group -- including
25   ████████ and ██████ -- decided there were several
```

1  things -- several steps that needed to be taken
2  to bring healing to these folks as best we
3  could, if -- to the extent -- to the extent we
4  had input on it.  ██████████████████████
5  ██████████████████████████████████
6  ███████████████████████████████████
7  ████████████████████████████████████
8  ██████████████████       Including multi, multi, multi
9  steps of things we did to take him off the
10 road, to try to give him space, to put this
11 entire mess behind him and heal and for their
12 marriage to heal.  Apparently, neither one of
13 those things worked.
14 Q.    Okay.  At this point in time had he been
15 accused of a righteous living violation, or had
16 the righteous living core value been
17 implicated?
18 A.    He was accused of a righteous violation.
19 It was accused of many things.  But the only
20 thing that we got admission from him on and/or
21 felt like we could tell what the truth was --
22 we were wrong, but we felt like we could tell
23 -- as best we could tell what the truth was --
24 the only thing we were sure of was the
25 ███████████████  affair and the emotional affair

1   and -- beginning, not ending, of oral sex with

2   the ███████████.  Those were the only things.

3            And again, as stated earlier, we

4   made -- that's where we made the distinction of

5   intercourse is a nonstarter for remaining.  But

6   this is ancient history, so we're going to try

7   to work it out.

8            Plus the two of them together had

9   deceived us.  And -- and were work -- were

10  willing to work on their marriage at that time.

11  And we're thinking hopefully we could save a

12  marriage and be involved in them saving their

13  marriage anyway and be a blessing to them, be a

14  help to them.

15           And so long way around of saying,

16  again, it was a nuanced type of violation and

17  we made a decision to go forward and try to

18  keep working with him.

19  Q.    Okay.  At this point in time, as of

20  ███████████████, you write in your e-mail

21  that he still has serious issues on the need to

22  appear perfect, lack of authenticity, which led

23  to deception before.  That has to be cleaned

24  up.

25  A.    Uh-huh.

```
 1  Q.    At this point in time did you feel like
 2  ███████████  had been deceitful to the company?
 3  A.    He is a -- the further we got into this,
 4  the more we discovered how wounded and harmed
 5  he was.  And -- and is, I guess.  And we were
 6  trying to walk through a healing process with
 7  him.
 8            So in the midst of that, we would
 9  discover little things that he would say that
10  weren't true.  But there were no major
11  deceptions.
12            (Brief conference between attorneys.)
13            MS. COLLINS:  All right.  I'm going
14  to mark the next document as Exhibit Number 41.
15            (WHEREUPON, the above-mentioned
16  document was marked as Exhibit 41.)
17  BY MS. COLLINS:
18  Q.    And this is Bates labeled 2610 through
19  2611.  Just let me know when you've had a
20  moment to review it.
21  A.    (Reviews documents.)
22  Q.    Okay.  Have you seen the e-mail from
23  Jen Sievertsen before, from ██████████?
24  A.    It's copied to the operating board, so I
25  would have gotten it.
```

```
 1   Q.    Okay.  Are these the circumstances that
 2   you were referring to where ████████████
 3   accused ██████████ of having an affair, both a
 4   current affair and an older affair?
 5   A.    Yes.
 6   Q.    Okay.  And with respect to the current
 7   affair with the person named ███████, that
 8   was an employee of Ramsey Solutions, correct?
 9   A.    Yes.
10   Q.    Okay.  And at this time ███████████
11   made the allegation that he had told ███████
12   she looked good in her shirt and he missed
13   seeing her and thought about her, and he missed
14   her within a few hours of waking up, right?
15   A.    Yes.
16   Q.    Okay.  Did he deny that that conversation
17   took place?
18   A.    No.
19   Q.    Okay.  So at this point in time, as of
20   ████████████████, Ramsey Solutions had
21   information that ██████████ had made these
22   comments to ██████████ about how she looked in a
23   shirt and that you thought -- that he missed
24   her within a few hours of waking up, correct?
25             MS. SANDERS:  Object to the form.
```

```
1              But you can answer.
2              THE WITNESS:  Apparently that's what
3   he told, based on this e-mail.
4   BY MS. COLLINS:
5   Q.    All right.  And even though he admitted
6   to saying that, the company did not fire him
7   for a righteous living violation, correct?
8   A.    We don't -- we have never fired someone
9   only for flirting or only for telling someone
10  they looked good in their shirt.
11  Q.    Is that a violation of the righteous
12  living core values, to be engaging in that sort
13  of conduct as a married employee, to be
14  flirting with a female co-worker?
15  A.    A minor violation.  And he was confronted
16  on it.  And so was ███████, according to this
17  e-mail.  And that's what I remember happening.
18  Q.    Why was he not terminated?
19  A.    Well, there a way difference in a degree
20  of telling someone they look good in their
21  shirt and having sex outside of marriage.
22  Q.    Okay.
23  A.    The same as...
24  Q.    The same as what?
25  A.    Nothing.  Sorry.
```

1  Q.    Okay.  And as a result of this,
2  ████████████████████████████████████████?
3           MS. SANDERS:  Object to the form.
4           You can answer.
5           THE WITNESS:  I've already covered
6  that.  Yes.
7  BY MS. COLLINS:
8  Q.    And he had to have a male chaperon with
9  him?
10  A.    That was part of our agreement with he,
11  his wife, his church elders, our operating
12  board, to have people with ████, people with
13  ████████.  ████████████████████████████████
14  ████████████.  There were several steps we
15  took to try to bring healing and trust and
16  stability to this situation.
17  Q.    I'm going to hand you another set of
18  documents -- here we go -- marked as Exhibit
19  42.
20           (WHEREUPON, the above-mentioned
21  document was marked as Exhibit 42.)
22           THE WITNESS:  (Reviews documents.)
23           How much are you -- are you asking me
24  to read this?
25  ///

```
 1  BY MS. COLLINS:

 2  Q.    I just want to ask you a few questions

 3  about the e-mail from ██████████ on ████████

 4  ████.

 5  A.    Second page?

 6  Q.    Yes.

 7  A.    Okay.

 8  Q.    Did you read it?

 9  A.    Yes, ma'am.

10  Q.    Okay.  What happened in ████████████

11  to bring back up the ██████ situation?

12  A.    I don't remember.

13  Q.    Okay.  ██████████ writes, I started

14  simply by saying the entire board has all the

15  details of the divorce decree and

16  communications sent and have been discussing.

17  And it's really not good.

18        Do you know what that's about?

19  A.    There was -- his divorce -- her divorce

20  attorney has garnished ██████ wages.  He was

21  behind on payments of child support.  There

22  were a lot of little nitzy details of things we

23  felt like he should have told us that were in

24  the divorce decree.  But there was nothing

25  major in there.  But it was an accumulation of
```

1  little things that were building up.

2  Q.    Is it fair to say at this point in time

3  he was still being dishonest with the company?

4  A.    We now know that for sure he was.  We did

5  not know that then.

6  Q.    Okay.  And was continued dishonesty with

7  the company considered a violation of the

8  righteous living core value or any of the core

9  values?

10 A.    We were walking with a broken guy who was

11 trying to heal, as I mentioned earlier.  We

12 were hoping for his spiritual and emotional

13 healing.  He had been living a lie for ████████

14 with me and ████████.  And he was trying to get

15 his life together.  We were trying to walk with

16 him and give him some mercy through that

17 process.

18         In all of these situations, they are

19 always -- everything we've discussed today --

20 sad and hurt and a lot of hurt people.  And

21 we're always trying to be kind and gracious and

22 give grace and still stand on principle.

23         And so, yeah, we were -- we were

24 walking with a guy that was hurting.  And

25 sometimes he wasn't being forthcoming, and we

```
 1  weren't happy with that.  Apparently that's

 2  what's reflected in ███████ e-mail.

 3  Q.    Okay.

 4  A.    He was hanging on by a thread.  That's

 5  what this is.

 6           I'm going to have to go to the

 7  restroom again.

 8           MS. SANDERS:  Sure.  Can we take a

 9  break?

10           MS. COLLINS:  Yep.

11           THE VIDEOGRAPHER:  We are off the

12  record at 3:39 p.m.

13           (Short break.)

14           THE VIDEOGRAPHER:  We are back on the

15  record at 3:50 p.m.

16  BY MS. COLLINS:

17  Q.    Okay.  I think I already asked you about

18  that one, right?

19  A.    Yes, ma'am.

20           MS. SANDERS:  42, yeah.

21           THE WITNESS:  I think so.

22  BY MS. COLLINS:

23  Q.    Okay.  Okay.  I don't need to ask you

24  anything about that, so you can put that to the

25  side.
```

1          And I'm going to hand the court

2   reporter another set of documents we're going

3   to mark as 43.

4              THE REPORTER:  Yes.

5              (WHEREUPON, the above-mentioned

6   document was marked as Exhibit 43.)

7   BY MS. COLLINS:

8   Q.    Now, if you could turn to page 2484 of --

9   well, first let's start on page 2483.  This

10  starts with an e-mail from you on ██████████

11  ██████████, at 3:47 a.m.  Couldn't sleep; is

12  that right?

13  A.    2:30 a.m.?  Begins with that?

14  Q.    Yeah.  Or 3:47 a.m.

15  A.    Oh, it comes out at 3:47 a.m.  Yeah.  But

16  I -- my first line is, it's 2:30 a.m.  I was in

17  Cabo.  Yeah.

18  Q.    Okay.  And on the next page, 2484, you

19  write that, I'm afraid we were being played

20  after we were warned he's a world-class liar

21  and manipulator.  Maybe he isn't playing as in

22  ████████ is a world-class bitch, using her own

23  kids as pawns.

24             Is -- is that a term, referring to a

25  woman as a bitch, that you frequently use?

```
 1   A.     No.
 2   Q.     Why did you use that term to refer to
 3   ██████████████ as a bitch?
 4   A.     It's pretty accurate.
 5   Q.     Okay.  Have you used that terminology to
 6   refer to other women?
 7   A.     Rarely.
 8   Q.     Okay.  Have you ever used that
 9   terminology to refer to men as bitches?
10   A.     Probably.  Or any other myriad of names.
11   I'm an equal opportunity offender.
12   Q.     And if you could turn to page 2511, you
13   wrote, the reason he is so private -- and
14   you're referring to ████████████ again -- is he
15   has been lying to us for ████████.  Of course
16   he doesn't communicate well and authentically.
17   He's been living a double life.
18          So at this point in time, as of
19   ██████████████████, you knew that ████████████████
20   had been lying to the company for ████████████ and
21   living a double life, correct?
22   A.     We already established that ████████ and
23   ████████ and their church elders had misled us
24   for ████████████.
25   Q.     Okay.  And yet he still wasn't terminated
```

```
1   for that?

2   A.    We already established that.

3   Q.    So the answer to my question is, correct,

4   he was not terminated?

5   A.    Again, that's the same answer.  Yes.

6   Q.    If an employee's pastor told them it was

7   permissible to have premarital sex or to live

8   with their partner, would you consider that a

9   request for religious accommodation?

10  A.    It's never happened.

11  Q.    Now, at some point in time your former

12  ████, ██████████████████, came to you and let

13  you know that he had had an extramarital -- or

14  extramarital sex, right?

15  A.    Sex outside of marriage, yes.  He wasn't

16  married.

17  Q.    Sex outside of marriage?

18  A.    Yeah.  He wasn't married.

19  Q.    And he was not -- well, he was allowed to

20  continue to work for the company for a while,

21  right?

22  A.    ████████████████████████████████████████

23  █████████████████████████████████████

24  ████████████████████████████████████████████

25  ██████████████████████████████████████████,
```

1 ████████████████████████████████████

2 ████████████████████████████████

3 ██████████████████.

4 Q.    Okay.

5 A.    He was no longer an employee at the

6 company.

7 Q.    Okay.  So -- but that was after you knew

8 that he had had premarital sex, correct?

9 A.    Yes.  Contract labor is a different thing

10 than employee status.  And I -- it was not a

11 long-term solution.  It was a short-term thing.

12 Very, very temporary.  I would not have

13 contracted with him long term.

14 Q.    Does the company have a porn blocker, a

15 pornography blocker?

16 A.    I don't know.  It would be a good idea.

17 Q.    Are -- is looking at pornography or

18 having a pornography addiction a violation of

19 the righteous living core value?

20 A.    Yes.

21 Q.    Have you been involved in any employee

22 decisions or discipline involving employees who

23 have had a problem with pornography?

24 A.    Yes.  We've -- I've been involved with

25 employees who have had all kinds of different

```
1   addictions.  And we always treat addictions the

2   same.  We always try to work with them to turn

3   their life.  If they continue in the addiction,

4   we let them go.  And that's true with the

5   pornography as well.

6   Q.    Okay.  Have all of the employees you've

7   dealt with, with respect to pornography, been

8   male employees?

9   A.    To my knowledge, yes.  That I've dealt

10  with personally, yes.  I don't know of any

11  inside the company that were female ever.  It's

12  generally a male offense.

13  Q.    Why was ████████████ eventually

14  terminated?

15  A.    A young lady came to us -- came to two of

16  our operating board members and told a credible

17  story, that she had been involved in a recent,

18  current affair with him.

19            And I was out of town.  They called

20  and let me know they were terminating him.  And

21  I agreed.

22  Q.    ██████████████████████████████████████

23  ██████████████████████████████████

24  A.    I didn't meet with her.

25  Q.    I'm asking you what your knowledge is.
```

1  Were you told --

2  A.    I was told that she did.

3  Q.    What was that about?

4  A.    ███████████████████████████

5  ████████████████████████████████

6  ██████████████████████████████████

7  ██████████████████

8  Q.    ██████████████████████████

9  █████████████

10  A.    ██████████████████████████

11  ████████████████████████████████

12  █████████████████████████████████

13  ██████████████████████████████████

14  █████████████

15  Q.    ████

16  A.    ███████████████

17          MS. COLLINS:  All right.  Let's take

18  a brief break --

19          MS. SANDERS:  Sure.

20          MS. COLLINS:  -- so I can just review

21  my notes with Ashley.

22          MS. SANDERS:  Sure.  We'll go down

23  the hall.

24          THE VIDEOGRAPHER:  We are off the

25  record at 4:00 p.m.

```
 1              (Short break.)

 2              THE VIDEOGRAPHER:  We are back on the

 3    record at 4:13 p.m.

 4    BY MS. COLLINS:

 5    Q.     Okay.  I understand that the company has

 6    weekly devotional meetings; is that correct?

 7    A.     Yes, ma'am.

 8    Q.     Are those required that employees attend

 9    that?

10    A.     Never stated it.  But most people -- I

11    mean, virtually required.  It's not a stated

12    policy.  But staff meeting is required on

13    Monday morning, and we want folks in devo on

14    Wednesday.

15    Q.     Before this lawsuit had -- do you recall

16    meeting Caitlin O'Connor?

17    A.     Sure.

18    Q.     Okay.  What was your impression of her?

19    A.     What was my impression of her?

20    Q.     Uh-huh.  When you just ran into her, met

21    her in the workplace.

22    A.     You know, we have a thousand team

23    members.  And I don't -- we weren't working

24    together on anything, so I didn't really have

25    an impression initially.
```

Case 3:20-cv-01023  Document 52-2  Filed 03/31/22  Page 81 of 100 PageID #: 5290
Elite-Brentwood Reporting Services        (615) 595-0073
www.EliteReportingServices.com

1  Q.    Okay.

2  A.    It wasn't negative or positive.

3  Q.    Okay.  And prior to her termination, to

4  your knowledge had there been any complaints

5  about -- made about her?

6  A.    There was some stuff in an HR report a

7  time or two about performance.  And some

8  question about some kind of a honeymoon thing

9  or something with a different fiancé at some

10 point.  But -- like, going on the honeymoon

11 before marriage or something.  I don't

12 remember.  Something along those lines.  But I

13 don't recall the exact details.

14          But I remember coming -- her name

15 coming up a couple of times in negative reports

16 in HR.

17 Q.    And those are those HR --

18 A.    E-mails that go out once a week.

19 Q.    Okay.  After Caitlin O'Connor sent the

20 e-mail to Mr. Lopez letting him know that she

21 was pregnant, do you think that was a classless

22 way of her to handle it, by e-mailing him and

23 letting him know that?

24 A.    No, not to tell somebody you're pregnant.

25 But to tell somebody that you've violated a

1  core value and that you're, in effect,

2  resigning or know you're about to get fired,

3  that would normally be something that we think

4  someone would do in person.  But that would be

5  an issue.

6  Q.    There's no --

7  A.    You would sit down -- it's not a

8  requirement.  But it would just be -- you said

9  class.  You didn't say policy.  So it would be

10 classy to sit down in person, where you've got

11 an extreme situation and have a discussion.

12 But she fired an e-mail.

13 Q.    You use e-mail a lot, though, don't you?

14 A.    I use it all the time.

15 Q.    But it wasn't classless in and of itself

16 for her to send the e-mail, was it?

17 A.    It's not relative to me one way or the

18 other.

19 Q.    Do you think that's a very kind way to

20 handle it, if you -- if you were to refer to

21 that, her sending an e-mail about that as

22 classless?

23 A.    I don't think I did that, that I know of.

24 I don't think I said it was classless.  Maybe I

25 did.  I don't think I did.

Case 3:20-cv-01023-ter Filed 08/11/22 Page 83 of 100 PageID #: 5292
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  Q.   Well, I'm asking you if you think that

2  it's kind.  I'm not saying you did it.

3  A.   Oh.  It's a very small part of this

4  entire equation.  So I don't care.

5  Q.   Do you encourage members of management or

6  your management team to hold themselves to a

7  higher standard?

8  A.   Of course.

9  Q.   Okay.  That's all I have.

10        MS. SANDERS:  Okay.  No questions,

11 other than just to -- there were a number of

12 things in today's deposition that would be

13 confidential.  We can deal with that when we

14 get the transcript.  We'll mark it as

15 confidential until the transcript comes in and

16 we've had an opportunity to review it.

17        No questions.

18        THE VIDEOGRAPHER:  Hearing no

19 objections, this concludes the deposition for

20 today.  We are off the record at 4:17 p.m.

21        THE REPORTER:  Ms. Collins, do you

22 want to order the transcript?

23        MS. COLLINS:  Yes.  And I think I

24 need a quick turnaround on it.

25        THE REPORTER:  Okay.

Case 3:20-cv-01023   Document 56-20   Filed 08/11/22   Page 84 of 100 PageID #: 5293
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1          MS. COLLINS:  I mean, you don't have
2   to stay up all weekend.  Next week sometime.
3          THE REPORTER:  Okay.  I'll get it to
4   you.
5          And do you want a copy?
6          MS. SANDERS:  Yes, please.
7          THE REPORTER:  Next week?
8          MS. SANDERS:  Whenever you do that.
9   Same time.  Thank you.
10          FURTHER DEPONENT SAITH NOT
11          (Proceedings concluded at 4:18 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              C E R T I F I C A T E

 2

 3   STATE OF TENNESSEE

 4   COUNTY OF SUMNER

 5              I, JEANNIE CHAFFIN, Licensed Court

 6   Reporter, with offices in Portland, Tennessee, hereby

 7   certify that I reported the foregoing video

 8   deposition of DAVID L. RAMSEY III by machine

 9   shorthand to the best of my skills and abilities, and

10   thereafter the same was reduced to typewritten form

11   by me.

12              I further certify that I am not related

13   to any of the parties named herein, nor their

14   counsel, and have no interest, financial or

15   otherwise, in the outcome of the proceedings.

16        I further certify that in order for this
     document to be considered a true and correct copy, it
17   must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
18   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
19   Tennessee Code Annotated 39-14-104, Theft of
     Services.
20

21

22        _____
          JEANNIE CHAFFIN, LCR
23        Elite Reporting Services
          Associate Court Reporter and
24        Notary Public State of Tennessee

25        My Notary Commission Expires:  6/7/2025
          LCR #169 - Expires:  6/30/2022
```

NOTARY SEAL:
JEANNIE M CHAFFIN
STATE OF TENNESSEE NOTARY PUBLIC
SUMNER COUNTY


```
1                    E R R A T A   P A G E

2
                I, DAVID L. RAMSEY, III, having read
3        the foregoing videoconference deposition, pages
         6 - 84, do hereby certify said testimony is a
4        true and accurate transcript, with the following

5         changes (if any):

6        PAGE   LINE           SHOULD HAVE BEEN

7         16      4            "Became" should be replaced
                               with "came"
8        _____  _____

9         18     15            "Correct" should be deleted
                               and replaced with "No, it
10       _____  _____          did violate righteous

11       _____  _____          living, but it didn't

12       _____  _____          warrant automatic

13       _____  _____          termination."

14        53     23           "Jim" should be replaced
                               with "Jen"
15       _____  _____

16       _____  _____          _____

17       _____  _____          _____

18       _____  _____          _____

19       _____  _____          _____

20       _____                 _____

21                            _____
                              DAVID L. RAMSEY, III
22

23       _____
         Notary Public
24       My Commission Expires: February 24, 2024

25       Reported by: Deborah H. Honeycutt, LCR
```

PATTI HARRIS
STATE
OF
TENNESSEE
NOTARY
PUBLIC
COUNTY OF WILLIAMSON

My Comm. Expires
Feb 24, 2024

Case 3:20-cv-00628   Document 93-10   Filed 08/31/22   Page 87 of 100 PageID #: 5296