**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CAITLIN O'CONNOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 3:20-cv-00628** |
| | ) | |
| **v.** | ) | **Judge Eli J. Richardson** |
| | ) | |
| | ) | |
| **THE LAMPO GROUP, LLC d/b/a** | ) | **Magistrate Judge Frensley** |
| **RAMSEY SOLUTIONS,** | ) | **Jury Demand** |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Ramsey Solutions attempts to justify the discriminatory termination of Caitlin O'Connor due to its requirement that employees adhere to "Judeo-Christian" or "normative" Christian beliefs couched as policy when after she requested FMLA and ADA accommodation paperwork for her pregnancy she was unlawfully terminated. Indeed, only by ignoring legal precedent, the deposition transcripts, and shaping its own narrative by way of a singular, self-serving affidavit of its Human Resources Director does Ramsey Solutions bring the instant sanitized, factually and legally deficient motion. The facts demonstrate without exception that Ramsey Solutions, under the guise of its "Righteous Living" core value, has terminated every pregnant female employee who notified them of her pregnancy if the pregnancy was out of wedlock, just as it did Ms. O'Connor. The direct evidence in this case demonstrates Ms. O'Connor's termination was motivated by her pregnancy, and FMLA and ADA request. Ramsey Solutions' policies and attitudes couched as "values" demonstrate a pattern of hostility toward women while giving men second chances and the benefit of the doubt. A reasonable jury could find that Ms. O'Connor's termination was a violation of Title VII, the THRA, FMLA, TMLA,

1

ADA and TDA. As such, the motion for summary judgment must be Denied.[1] Ms. O'Connor is, however, voluntarily dismissing her ADA accommodation claim.

## I. FACTUAL BACKGROUND

**O'Connor's Employment History with Ramsey Solutions and her Job Duties.**

Caitlin O'Connor began working for The Lampo Group d/b/a Ramsey Solutions ("Ramsey Solutions") on February 2016 as a full-time administrative assistant in the Digital Development Group ("DDG"), reporting to Michael Finney, Chief Digital Officer. (O'Connor Dep. 41, 43 47, 267; Finney Dep. 9). Ramsey Solutions is a for-profit company, not a 501c3 organization, that provides financial leadership, career, and small-business education. (Lopez Dep. 21-22; Galloway 30(b)(6) Dep. 12; Floyd Dep. 21; Ramsey Dep. 8). O'Connor's duties included managing leader calendars, team care management, coordinating DDG travel, and keeping lists of DDG employees addresses, numbers, favorite coffees etc. (O'Connor Dep. 56, 250; Finney Dep. 18). O'Connor was a good, honest, and hard worker who did not receive any write-ups, disciplinary action, and received good yearly reviews. (O'Connor Dep. 269; Finney Dep. 48).

**Ramsey Solutions' Human Resources Structure and Policies**

Human Resources Committee ("HRC"): The HRC enforces and sets Ramsey Solutions Policy, deals with personnel issues, employees in crisis, disciplinary actions, performance improvement plans, nearly all terminations, and determines the scope of its Righteous Living Core Value ("Righteous Living"). (Lopez Dep. 17-18; Floyd Dep. 80; Simms Dep. 8; Finney Dep. 13). Although it relies on precedent, the HRC determines the subjective gradient of "Righteous Living," including its application, judging the extreme nature of the behavior, patterns, and individual

---

[1] Defendant also made a perplexing and indeed untimely discovery argument that Plaintiff's interrogatory response warrants dismissal and makes a backhanded allegation of professional negligence. (ECF 67 p. 11-12). This quite simply ignores Fed. R. Civ. P. 37, the other allegation does not warrant a response. Plaintiff will address substantive factual and legal issues not smears or gotcha tactics.

circumstances and depending on those facts and circumstances, an employee's behavior is subject to "review, probation, or termination." (Lopez Dep. 66, 85-86, Ex. 1 p. 0007; Galloway Dep. 30; Finney Dep. 37; Ramsey Dep. 28-29). This enforcement can change as new members bring a different perspective and the collective decision might be different.[2] (Lopez Dep. 174).

The 2020 HRC consisted of Armando Lopez, Executive Director of Human Resources, Jennifer Sievertsen, Director of Marketing, Suzanne Simms, Senior Executive Vice President of the Business to Consumer Channel, Floyd, Jack Galloway, Senior Executive Vice President of Business to Business, and Sarah Sloyan. (O'Connor Dep. 240; Lopez Dep. 8; Floyd Dep. 7; Galloway Dep. 7-8; Simms Dep. 8).[3] Galloway acted as Chair, although he has no background in HR. (Galloway Dep. 7; Sievertsen Dep. 8). Founder and CEO Dave Ramsey is involved in the decisions to terminate employees. (Lopez Dep. 18; Sievertsen Dep. 7). The HRC members and Ramsey have had very little, if any, training on Title VII or FMLA. (Lopez 30(b)(6) Dep. 73; Floyd Dep. 8; Simms Dep. 13-14; Ramsey Dep. 20).

<u>Operating Board:</u> In 2020, Ramsey Solutions' Operating Board consisted of Ramsey, Rachel Cruze, ███████, Daniel Ramsey, Simms, Sievertsen, Finney, Galloway, Williams, and Floyd. (Lopez Dep. 161; Sievertsen Dep. 8, 31; Simms Dep. 7; Galloway Dep. 8). It sets the strategic direction for Ramsey Solutions and runs the day-to-day operations; the HRC is a subset of the operating board. (Sievertsen Dep. 8). Although the Board and Ramsey can choose to

---

[2] Daniel Tardy, a member of the Operating Board, stated on social media that Ramsey Solutions does not have policies but instead "principles" which "are guideposts and allow room for our hearts and wisdom to influence the decision. (O'Connor Dep. Ex. 26).

[3] Lopez' duties include recruiting, onboarding, retention, development and "culture" and he was promoted to Senior Executive Director around January 2021. (Lopez Dep. 8). As Senior Executive Director, Lopez now reports to Galloway, who was promoted to Chief People Officer. (Lopez Dep. 20). In 2020, Lopez reported to Mark Floyd, CFO. (Lopez Dep. 20). Neither have training or experience in Title VII or human resources. (Galloway Dep. 7 Lopez 30(b)(6) Dep. 73; Floyd Dep. 8).

terminate employees, this typically goes through the HRC, as the Board does not set policy as to "fireable offenses." (Lopez Dep. 168; Finney Dep. 11, 109).

Equal Employment Opportunity: Ramsey Solutions' handbook includes a brief provision regarding classes protected against discrimination. (Lopez Dep. 43, 46, 174, Ex. 1 p. 0004; Galloway Dep. 21). Ramsey Solutions does not have a written ADA or accommodation policy or forms, "[they] just comply with the ADA;" a process where employees go to HR and discuss the accommodation request. (Lopez Dep. 47-48).[4]

Company Conduct Policy: Ramsey Solutions is "held out to be Christian," meaning Ramsey Solutions holds itself out as a Christian company "from time to time," but has no practical application other than its "image" is Christian and its market[5] "views" it as a biblically based company. (Finney Dep. 33-34; Lopez Dep. 48, Ex. 1 p. 0007; Floyd Dep. 38). Additionally, the policy states "[s]hould a team member engage in behavior not consistent with traditional Judeo-Christian[6] values or teaching, it would damage the image and the value of our goodwill and our brand;" meaning an employee cannot engage in behavior contrary to evangelical "normative Christian beliefs" regardless of their religious beliefs. (Lopez Dep. 55, Ex. 1 p. 0007; Ramsey Dep. 11, 27).

Mission Statement and Core Values: In 2013, the Operating Board created "Core Values." (Lopez Dep. Ex. 2 p. 0003; Galloway 30(b)(6) Dep. 10; Galloway Dep. 14, Finney Dep. 11). The Core Values are also "Judeo-Christian," allegedly based on the Christian Bible are "guidelines"

---

[4] Despite Title VII's admonitions against discrimination, even as policies espousing religious beliefs couched as a Core Value, Floyd testified that if Ramsey Solutions interviewed an unwed pregnant employee he would ask if they violated the Core Values, *i.e.* engaged in pre-marital sex, and they would not be hired because they are not the most qualified because they do not align with the Core Values. (Sievertsen Dep. 10, 47; Floyd Dep. 58, 72).
[5] This "market" is the market that gives Ramsey Solutions money for its product, which includes public educational institutions. (Floyd Dep. 39-40).
[6] Lopez testified that he understood this term to have a religious foundation and derived from the Bible. (Lopez Dep. 56, 58).

4

Case 3:20-cv-00628   Document 94-1   Filed 09/01/22   Page 4 of 27 PageID #: 5315

terminate employees, this typically goes through the HRC, as the Board does not set policy as to "fireable offenses." (Lopez Dep. 168; Finney Dep. 11, 109).

Equal Employment Opportunity: Ramsey Solutions' handbook includes a brief provision regarding classes protected against discrimination. (Lopez Dep. 43, 46, 174, Ex. 1 p. 0004; Galloway Dep. 21). Ramsey Solutions does not have a written ADA or accommodation policy or forms, "[they] just comply with the ADA;" a process where employees go to HR and discuss the accommodation request. (Lopez Dep. 47-48).[4]

Company Conduct Policy: Ramsey Solutions is "held out to be Christian," meaning Ramsey Solutions holds itself out as a Christian company "from time to time," but has no practical application other than its "image" is Christian and its market[5] "views" it as a biblically based company. (Finney Dep. 33-34; Lopez Dep. 48, Ex. 1 p. 0007; Floyd Dep. 38). Additionally, the policy states "[s]hould a team member engage in behavior not consistent with traditional Judeo-Christian[6] values or teaching, it would damage the image and the value of our goodwill and our brand;" meaning an employee cannot engage in behavior contrary to evangelical "normative Christian beliefs" regardless of their religious beliefs. (Lopez Dep. 55, Ex. 1 p. 0007; Ramsey Dep. 11, 27).

Mission Statement and Core Values: In 2013, the Operating Board created "Core Values." (Lopez Dep. Ex. 2 p. 0003; Galloway 30(b)(6) Dep. 10; Galloway Dep. 14, Finney Dep. 11). The Core Values are also "Judeo-Christian," allegedly based on the Christian Bible are "guidelines"

---

[4] Despite Title VII's admonitions against discrimination, even as policies espousing religious beliefs couched as a Core Value, Floyd testified that if Ramsey Solutions interviewed an unwed pregnant employee he would ask if they violated the Core Values, *i.e.* engaged in pre-marital sex, and they would not be hired because they are not the most qualified because they do not align with the Core Values. (Sievertsen Dep. 10, 47; Floyd Dep. 58, 72).
[5] This "market" is the market that gives Ramsey Solutions money for its product, which includes public educational institutions. (Floyd Dep. 39-40).
[6] Lopez testified that he understood this term to have a religious foundation and derived from the Bible. (Lopez Dep. 56, 58).

4

for operating the company and employee conduct, this includes a "Righteous Living"[7] core value. (Lopez Dep. 76-77, 118, Ex. 2 p. 0007; Lopez 30(b)(6) Dep. 18; Sievertsen Dep. 21-23, 28; Floyd Dep 32, 35-36). Ramsey Solutions has adopted contemporary evangelical, complementarity beliefs that sex is only allowed within marriage, between one man and one woman, and that the marital relationship is to "embody gender complementarity; the idea that men and women have different but complementary and co-equal roles in marriage and the household" and that men serve as "benevolent head[s]" and women as "caretakers."[8] (Walker Dep. 29-31, Ex. 17 p. 1. *See* Armour Report, MSJ Opp. Ex. 1 p. 6). This view of sexual abstinence regulates all of sexuality, the performance of gender, and reinforces patriarchal authority, requiring proper dress and submissive demeanor for women.[9] (Ingersoll Report, MSJ Opp. Ex. 2 p. 2). Complementarity affects women disproportionately to men enforcing rigid boundaries between men and women, including women's secondary status to men. (Walker Dep. 53-54; Ingersoll Report, MSJ Opp. Ex. 2 p. 2-3, 4). Complementarianism in the workplace, including the policing of sexual morality through moral codes of conduct "disproportionately impacts women." (Ingersoll Report, MSJ Opp. Ex. 2 p. 6). Ramsey Solutions adamantly contends that the Bible prohibits Sex outside of marriage, despite acknowledging Christian denominations interpret the Bible and the issue of sex outside of marriage differently.[10] (Lopez Dep. 56, 77-79, Ex. 2 p. 07, Ex. 12 p. 3; Floyd Dep. 35, 47-48; Galloway Dep. 15, 21; Seivertsen Dep. 21; Simms Dep. 25; Ramsey Dep. 14; Walker Dep. 14-15, Ex. 17 p. 9; Armour Report, MSJ Opp. Ex. 1 pp. 2, 4, 9; Ingersoll Report, MSJ Opp. Ex. 2 p. 1).

---

[7] According to the Christian Bible, "Righteous Living" is the principle that people should keep themselves "pure and holy;" although there are many things the Bible prohibits that Ramsey Solutions does not. (Floyd Dep 32, 35-36; Sievertsen Dep. 21-23).

[8] Dr. Walker, Ramsey's expert, also testified that Complementarianism was the cultural norm until the second wave of feminism. (Walker Dep. 32).

[9] Which is consistent with the workplace at Ramsey Solutions, who would have "fashion shows" for women, but not men, in the summertime, directing them in a modest form of dress. (Seivertsen Dep. 48).

[10] However, not one single Ramsey employee could identify where the Bible prohibits sex outside of marriage. (Lopez Dep. 59; Ramsey Dep. 14; Galloway Dep. 20; Seivertsen Dep. 21; Floyd Dep. 35; Simms Dep. 26)

There is no written policy detailing behaviors that violate "Righteous Living,"[11] including its prohibition on sex outside of marriage, even though Ramsey Solutions acknowledges the importance of knowing what are "fireable offenses."[12] (Lopez Dep. 66, 91, Ex. 3 p. 0028; Sievertsen Dep. 14, 38; Floyd Dep. 42; Finney Dep. 25, 35, 39; Ramsey Dep. 12, 24). Importantly, the company does not "go looking for" core value violations or regularly call employees in to ascertain whether they have had sex outside of marriage. (Sievertsen Dep. 17, 25; Simms Dep. 26-27). Employees are not required to sign a purity pledge, but they are expected to know what Righteous Living means. (Lopez Dep. 78-79, 91; Ramsey Dep. 23). According to Ramsey, the whole organization accepts that premarital sex would be a violation, as this is a "normative" belief within the Christian community and if an employee does not know what traditional Judeo-Christian values are, it is the employee's responsibility to ask before they sign the handbook. (Ramsey Dep. 12-13, 42). Ramsey Solutions assumes that these values are "both self-evident and shared by all Christians in all times and all places." (Armour Report, MSJ Opp. Ex. 1 p. 1). However, despite Ramsey's myopic line of thought, Christian values on matters of sex, marriage, and pregnancy have been shaped in response to "shifting historical and cultural context," and there is no "singular teaching regarding sex and sexuality in the Christian tradition or in the biblical text."[13] (Walker Dep. 14-15, Ex. 17 p. 9; Armour Report, MSJ Opp. Ex. 1 pp. 2, 4, 9; Ingersoll Report, MSJ Ex. 2 p. 1).

"Righteous Living" is a construct the HRC makes as they decide on personnel issues. (Finney Dep. 38; Galloway 30(b)(6) Dep. 11-12; Galloway Dep. 20; Simms Dep. 10). Out of

---

[11] The only explanation of Righteous Living is stating Righteous Living means, "No cheating, stealing or lying. Goal No. 1 is to be men and women of integrity." (Lopez Dep. 66, 91, Ex. 3 p. 0028)

[12] For example, according to Ramsey, lying is not automatically terminable, but a habitual liar should be fired as, "[it] violates common sense to keep people you can't trust." (Ramsey Dep. 35).

[13] Dr. Walker claims "no serious scholar of repute would argue . . . that the Bible licenses fornication of any variety" and that denominations in disagreement are not faithful to biblical traditions. (Walker Dep. 14-15, 41, Ex. 17 p. 9).

6

concern for their brand, Ramsey Solutions requires employees to engage in behavior that it views is Christian; such behaviors that are contrary to this purpose include drunkenness, cursing someone out in public, engaging in premarital or extramarital sex, gossiping, watching pornography, and alcohol and drug addiction. (Lopez Dep. 55-56, 60, 64; Sievertsen Dep. 14-15, 21, 38; Galloway Dep. 15). Galloway did, however, acknowledge there is no correlation between getting out of debt and having sex outside of marriage. (Galloway Dep. 20).

However, there are exceptions to Righteous Living if you are a man. For example, employees, all men, who violated the Righteous Living regarding pornography were offered restoration plans, regardless of whether they had an addiction or not, and porn blockers were put on their work computers. (O'Connor Dep. 134; Lopez Dep. 172, 182; Lopez 30(b)(6) Dep. 16, 62, 65-66, 71-73, Ex. 30 p. 001507, Ex. 31, Ex. 34; Sievertsen Dep. 53-54, Galloway Dep. 35). Ramsey Solutions acknowledges porn offenses as "generally a male offense" and "the same story of every male born in the last half century. You see a magazine or a website and [its] evil claws get into you." (Lopez 30(b)(6) Dep. Ex. 34 p. 001810; Ramsey Dep. 78).

In contrast, women who engaged in premarital sex have not been given second chances, and would not be, even if they were to state they would not engage in the behavior again. (Lopez Dep. 171; Lopez 30(b)(6) Dep. 64). However, pregnancy via IVF do not violate this policy, and Ramsey testified he "doubts" Ramsey Solutions would terminate a woman who was raped and became pregnant. (Lopez Dep. 87; Ramsey Dep. 45). It was universally acknowledged that pregnancy out of wedlock is easier for men to hide because pregnancy is obviously a visible condition that only affects women. (Lopez Dep. 83, 173; Sievertsen Dep. 37; Galloway Dep. 35; Ramsey Dep. 42). However, Ramsey expects employees to disclose intimate details of their personal life if it is going to violate a Core Value. (Ramsey Dep. 40).

In late ███, pre- and extra-marital sex violations were limited to "intercourse" after a male employee had admitted he engaged in an extramarital affair involving oral sex. (Lopez Dep. 60, 87; Sievertsen Dep. 23, 25, 30; Floyd Dep. 75; Simms Dep. 28; Galloway Dep. 31). The Operating Board, including Ramsey, among others, decided to use "wisdom to ascertain" what the Bible meant, as it is not clear on "oral sex" and decided to "draw the line at intercourse" determining oral sex does not violate "Righteous Living" and is more forgivable.[14]  (Sievertsen Dep. 23, 30; Floyd Dep. 65, 75, 77-78; O'Connor Dep. 147-48; Simms Dep. 29-30; Galloway Dep. 27-28; Ramsey Dep. 14, 33). Finney and Galloway contradicted this assessment, but claimed the multiple affairs alleged against the male employee were not recent because the most recent (at the time the issue was brought to their attention) was around ████████████████████. (Finney Dep. 41, 73-78, 112; Galloway 30(b)(6) Dep. 23, 26). It was agreed that employees cannot become pregnant from oral sex. (Simms Dep. 30; Galloway 30(b)(6) Dep. 27).

**O'Connor's Understanding of the "Righteous Living Core Value."**

Simms and Lopez, among others, interviewed O'Connor for her administrative position. (O'Connor Dep. 45-46).  Although Lopez testified that employees are notified of the prohibition against premarital and extramarital sex during interviews and onboarding, the exception for oral sex is not addressed, O'Connor was only notified of "Righteous Living" generally and never told it included a prohibition of premarital and extramarital sex. (O'Connor Dep. 61, 65; Lopez Dep. 60, 61, 80; Sievertsen Dep. 26; Galloway 30(b)(6) Dep. 23, 26)[15]. At the time of her employment, Ramsey Solutions was aware that O'Connor's prior two children were born outside of marriage. (O'Connor Dep. 344). While O'Connor later heard that premarital sex might be frowned upon by

---

[14] Ramsey Solutions' expert testified that the Judeo-Christian values "reserves all sexual activity, regardless of kind to the confines of marriage," including oral sex. (Walker Dep. 36, 47, Ex. 11 p. 4).
[15] Ramsey Solutions now uses "culture ambassadors" to complete this process. (Lopez Dep. 61).

Ramsey Solutions, by a leader in DDG, she never heard Ramsey or a top-level executive state that premarital sex or living with your boyfriend/girlfriend was terminable, in regular discussions about "Righteous Living" in staff meetings or mandatory devotionals. (O'Connor Dep. 66, 70, 90-91, 244). O'Connor's view of "Righteous Living" was about adultery or not being a bad person. (O'Connor Dep. 81). O'Connor believes sex outside of marriage is not a sin and is compatible with her Christian faith.[16] (O'Connor Dep. 259, 261; Armour Report, MSJ Opp. Ex. 1 p. 7).

**Ramsey Solutions Terminates O'Connor After She Notifies It of Her Pregnancy and Requests ADA and FMLA Information**

On June 18, 2020, O'Connor emailed Lopez:

> I needed to let you know that I'm 12 weeks pregnant. I understand that being unmarried and expecting is frowned on here, but the reality of the situation is this is what I'm walking through right now. This is obviously uncharted territory for me so I'm not sure what my next steps are regarding sharing the news with my leader, getting FMLA & ADA paperwork in case it's need in the future, etc.

(O'Connor Dep. 111, 254-256, Ex. 9 p. 9). O'Connor through this email requested an exception to "Righteous Living" with respect to pregnancy outside of marriage. (O'Connor Dep. 344). It is only through this email that Ramsey Solutions became aware O'Connor *may have* engaged in premarital sex, and it would not have known until her pregnancy began to show, at which point, Ramsey Solutions would have called her in to discuss. (Lopez Dep. 93, 98-99, 116; Sievertsen Dep. 17; Galloway Dep. 25-26; Finney Dep. 54). O'Connor was terminated because of her email informing Ramsey Solutions she was pregnant and requesting information regarding FMLA and ADA paperwork. (Galloway Dep. 26). Ramsey Solutions HR who manages FMLA, maternity leave, and ADA requests were never contacted despite the explicit request, nor did Lopez discuss these

---

[16] This philosophy is embraced and espoused by mainline Protestant denominations, including the United Methodist Church." (Armour Report, MSJ Opp. Ex. 1 p. 7). Dr. Walker testified that denominations that hold this belief are in error. (Walker Dep. 39). Dr. Walker also testified that any peer review on his writings or opinions on sex outside of marriage are "so unnecessary" because there would be "no sincere exegetical argument" by any scholar of repute based on a believed consensus for which Dr. Walker has no quantitative analysis. (Walker Dep. 40-41, 46).

policies with her. (Lopez Dep. 71, 75, 94, 127). Lopez's only response was, "First let me say that every child is from God! What a blessing he/she will be! Thank you for sending me this email. I'll follow up soon." (Lopez Dep. Ex. 8 p. 2167).

What O'Connor did not know, was that within two minutes of receiving O'Connor's email, Lopez forwarded it to the HRC, Finney, and Ramsey. (Lopez Dep. 95, 97, Ex. 5 p. 0084). Sievertsen immediately replied, "We've dealt with this before [unwed pregnancy/motherhood] and I think we should handle it exactly the same way . . . our core values and what they stand for are clear" and Floyd noted it was "totally classless" and he agreed with "precedent, (a/k/a principles and values)," meaning they intended on terminating O'Connor for violating Righteous Living immediately upon notification of her pregnancy. (Lopez Dep. 97-98, 100 Ex. 5 p. 0083; Sievertsen Dep. 43; Floyd Dep. 46). Ramsey chimed in, at 5:10am the next morning, before anyone in the HRC spoke to O'Connor, stating that O'Connor's pregnancy news was "so sad" and speculated she only sent the email because she "is scared and embarrassed." (Ramsey Dep. 50, Ex. 6 p. 2170). In this same email, Ramsey stated, "we will work this out with her" meaning work out her separation. (Ramsey Dep. 51; Lopez Dep Ex. 6 p. 2170).

Although the emails continued that HRC would talk to O'Connor about the circumstances of her pregnancy, the HRC assumed she engaged in premarital sex and would be terminated due to perceived violation of "Righteous Living." (Lopez Dep. 102, 105; Sievertsen Dep. 45, 52; Lopez 30(b)(6) Dep. 12; Floyd Dep. 57). At this point it was a foregone conclusion that O'Connor would be terminated for engaging in premarital sex, as Ramsey testified, he understood O'Connor's email to mean she was resigning or knew that she would be terminated and that he focused on the fact that she was expecting. (Simms Dep. 32, 43; Ramsey Dep. 47-48).

10

After Ramsey's email, Simms texted O'Connor to set up a time to call her later that day, stating, "Ramsey Solutions will walk through this situation with you with love." (O'Connor Dep. 98, 102; Lopez Dep. Ex. 9 p. 381). Love did not include keeping her job. Simms called O'Connor and although they discussed her pregnancy, Simms did not discuss termination and instead told O'Connor there would be another meeting; as a result, O'Connor was not concerned about her employment and returned to work. (O'Connor Dep. 99-100, 268; Simms Dep. 34-35).

On June 23, 2020, O'Connor met with Simms and Sievertsen in Simms' office, after which O'Connor became nervous that she was going to be illegally terminated. (O'Connor Dep. 103; Sievertsen Dep. 19; Lopez Dep. 94; Simms Dep. 36, 38). Simms wanted to make sure that O'Connor was "okay" in this meeting because they had no reason to assume that "she was feeling great about her situation [her pregnancy] or not," despite O'Connor stating that she and her boyfriend were very happy about the pregnancy. (Simms Dep. 36-37). O'Connor was not asked if she engaged in premarital sex and never informed Ramsey Solutions how her pregnancy came about. (Lopez Dep. 87; O'Connor Dep. 123). Simms and Sievertsen were both aware that O'Connor was considered to have a geriatric pregnancy due to her age. (O'Connor Dep. 281).

After this meeting, Simms emailed Ramsey, Finney, and the HRC that O'Connor was not going to "self-select out,"[17] but was not asked why she would not "self-select out." (Lopez Dep. 110-11, Ex. 7 p. 1930-1931). Two days later, only a week after notifying Ramsey Solutions of her pregnancy and requesting information on FMLA and the ADA, Simms and Lopez terminated O'Connor, informing her their morals did not align; O'Connor spoke very little during this meeting. (O'Connor Dep. 91-92, 94, 104, 257, 267; Lopez Dep. 171; Ramsey Dep. 38). The HRC relied on O'Connor's email notifying Lopez of her pregnancy in its decision to terminate

_____

[17] Other employees who engaged in premarital sex stated they knew it meant they would be terminated. (Lopez Dep. 110-11).

O'Connor for engaging in premarital sex, violating its version of Judeo-Christian, biblically based "Righteous Living." (Lopez Dep. 92, 112-13, 171, 175). Ramsey Solutions took into account O'Connor's pregnancy when it determined the amount of her severance offer, including health insurance. (Lopez Dep. 121).[18] Ramsey Solutions never considered a "restoration plan" for O'Connor to keep her position and no other female, pregnant, unwed employees have ever been offered a "restoration plan" under the premise that there is no way for these employees to "redeem" themselves; instead, every unwed, pregnant woman employed by Ramsey Solutions has been terminated for "consistent[cy]." (Sievertsen Dep. 53; Simms Dep. 31, 33; Ramsey Dep. 21-22).

**Ramsey Solutions Treats Women More Harshly Than Men**

Ramsey Solutions identified employees terminated for violating "Righteous Living," as well as a list of employees brought before the HRC for violating "Righteous Living," regardless of whether they were terminated. (Lopez 30(b)(6) Dep. 15, Ex. 21 p. 0078, Ex. 22 p. 2169). In addition to the second chances males who viewed pornography were given, *supra*, the following information was extrapolated:

- Ramsey Solutions has terminated all pregnant, unwed female employees **after** they notified Ramsey Solutions of their pregnancy. (Lopez Dep. 124; Sievertsen Dep. 27; Simms Dep. 12, 13). One employee was terminated, her pregnancy part of the equation, after she notified her leader, ██████████ of her pregnancy and the father was her boyfriend. (O'Connor Dep. 113-114; Lopez Dep. 178-179; Lopez 30(b)(6) Dep. 34-35, Ex. 25). The other employee was

---

[18] Pregnant women are offered more severance than male employees terminated for engaging in premarital sex. (Lopez Dep. 106). According to Sieversten, Ramsey Solutions provides "grace" by offering a severance when it terminates pregnant, unwed employees. (Sievertsen Dep. 44). However, to receive the severance, the employees must agree to a non-disclosure provision.

[19] ████████████████████████████████████

terminated when she informed Ramsey Solutions of her pregnancy the weekend after she got married. (Lopez 30(b)(6) Dep. 22-23, 42, Ex. 24 p. 902).

- A male employee was terminated after he notified his leader that his wife was pregnant and his leader calculated the date of conception, determining it was conceived prior to his marriage and his hire date. (O'Connor Dep. 212; Lopez 30(b)(6) Dep. 46-49, Ex. 18 pp. 671, 676-677; Finney Dep. 81-84, Ex. 18 pp. 671, 0677).

- A Ramsey Solutions employee reported seeing a female employee's boyfriend walking her dog in his boxers in the morning at her apartment building. (Lopez 30(b)(6) Dep. 20, Ex. 23). Ramsey Solutions assumed that she engaged in premarital sex and terminated her. (Lopez 30(b)(6) Dep. Ex. 23 p. 916).

- A male was terminated when it came to light that he was living with his fiancée at the direction of her pastor.[20] (Floyd Dep. Ex. 14 p. 865; Lopez 30(b)(6) Dep. 26-27, 29, Ex. 14 pp. 861, 132). Ramsey made it clear they would not change their Core Values based on a pastor in another state and the employee should be fired on the spot if he would not answer questions about his personal life; "If he slept with her [or] lives with her or won't answer the question, fire him on the spot. We have let people go that were much repentant and offended the policy less." (Lopez 30(b)(6) Dep. 30-31; Floyd Dep. 63, Ex. 14 p. 1326). A religious accommodation was never discussed. (Finney Dep. 102, 108).

- Another male employee was not immediately fired as a result of his disclosure he engaged in premarital sex with a female employee, but instead was kept on as contract employee for a short period after giving a chance to tell his side of the story. (O'Connor Dep. 131; Lopez 30(b)(6) Dep. 52-53, Ex. 27; Ramsey Dep. 76-77). This employee was given an opportunity

---

[20] Sievertsen testified that Ramsey Solutions had never had an employee refuse to disclose whether they engaged in pre-marital sex, which is not the case. (Sievertsen Dep. 35).

by Ramsey to "repent" and refrain from engaging in premarital sex, which he refused. (O'Connor Dep. 133; Lopez 30(b)(6) Dep. 52-53).

- In ███████████, another male employee admitted to Ramsey Solutions and Ramsey that he had engaged in an extramarital affair ███████ prior, while employed by Ramsey Solutions, and also to a recent affair involving oral sex after his wife approached Ramsey Solutions with concerns he was having an ongoing affair with another employee and disclosed his previous affairs. (Ramsey Dep. 15-19, 65-66; Simms 30(b)(6) Dep. 10, 17, Ex. 36 p. 2337). Though the male employee and co-worker initially denied it, he did admit to telling the employee she looked good and he missed her in the morning. (Ramsey Dep. 68, Ex. 41 p. 2610). In response, Ramsey chose to "walk[] with a broken guy who was trying to heal" including having the employee and his co-worker chaperoned and proposed a "restoration plan" for his marriage and made the decision not to terminate him, despite his repeated extramarital affairs and violation of "Righteous Living." (Ramsey Dep. 70, 72, Ex. 41 p. 2611; MSJ Opp. Ex. 4 p. 2661-63; Sievertsen Dep. 53; Simms 30(b)(6) Dep. 8). None of this man's affairs resulted in a pregnancy. (Simms 30(b)(6) Dep. 32). During the time, Ramsey acknowldeged this man had "actively deceived everyone in the company . . . for ███████" and had lived a "double-life." (Ramsey Dep. 19, 58, 72, 75, Ex. 43 p. 2511). Ramsey did not consider the male employee's wife "credible" because he viewed her as "erratic, out of control," and referred to her as a "world-class bitch." (Ramsey Dep. 62, 74, Ex. 43 p. 2483-84). Simms stated that the employee's wife was "crazy" and thought his wife "drove [him] to do the things he did." (MSJ Opp. Ex. 3 p. 2636). It was later proven the male employee's wife was not lying. (Ramsey Dep. 63). In ████, Ramsey Solutions finally terminated the male employee because the female co-worker who initially denied the affair in ████ admitted that they had engaged in a sexual

14

affair and parts of this relationship were not consensual. (Simms 30(b)(6) Dep. 16, 21; Lopez 30(b)(6) Dep. 79). Nonetheless, the male employee was questioned for one hour and forty-five minutes, pushing him to admit to the affair, despite his original claims he had not had an affair with this employee. (Simms 30(b)(6) Dep. 24).

## II.    SUMMARY JUDGMENT STANDARD

The court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party on a Rule 56 motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether the moving party has met its burden, the [t]he evidence of the nonmovant is to be believed and court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III.   ARGUMENT

### A. Ramsey Solutions Violated Title VII and the THRA

The Pregnancy Discrimination Act, provides that:

> The terms "because of sex" or "on the basis of sex" [under Title VII] include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k). "[T]he Pregnancy Discrimination Act does not require preferential treatment for pregnant employees. Rather, it mandates that employers treat pregnant employees the same as nonpregnant employees who are similarly situated with respect to their ability to work." *Tysinger v. Police Dep't of the City of Zanesville*, 463 F.3d 569, 575 (6th Cir. 2006).

15

O'Connor's THRA and Title VII claims are analyzed under the same standard. *Lynch v. City of Jellico,* 205 S.W.3d 384, 399 (Tenn. 2006). "Courts agree that an employer commits a violation of the Pregnancy Discrimination Act when it premises an employment decision, in whole or in part, on the fact that one of its female employees or applicants is pregnant out of wedlock." *Strickland v. Prime Care of Dothan*, 108 F.Supp. 2d 1329, 1337 (M.D. Ala. 2000) (internal citations omitted). The only cases where this premise is even questionable are those where the ministerial exception under Title VII applies; however, Ramsey Solutions does not qualify for this exception, nor is Ms. O'Connor a minister. *See Dias v. Archdiocese of Cincinnati*, 2013 U.S. Dist. LEXIS *5 (Jan. 13, 2013) (a teacher's "Title VII rights trump any illegal anti-pregnancy provision in a contract"). As such, because Defendant blatantly admits O'Connor was terminated because she was not married, Title VII has been violated. Nonetheless, the following facts further bolster the conclusion that a reasonable jury could find the same.

### 1. Ramsey Solutions Discriminated Against O'Connor in Violation of Title VII

A plaintiff may demonstrate pregnancy discrimination under the Title VII (1) by presenting direct evidence of discrimination; (2) by establishing an indirect case of discrimination under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), or; (3) by demonstrating defendant's decision was based on a mixed motive.[21] O'Connor can demonstrate all three.

***Direct Evidence:*** Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v.*

---

[21] In a mixed motive claim, both legitimate and illegitimate reasons motivate the decision, thus the *McDonnell Douglas* paradigm does not apply. *See White v. Baxter Healthcare Corp.,* 533 F.3d 381, 396 (6th Cir. 2008). In such cases, a plaintiff must show that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [the plaintiff's pregnancy] was a motivating factor for the defendant's adverse employment action." *Spees v. James Marine, Inc.,* 617 F.3d 380, 390 (6th Cir. 2010).

*Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999); *see also Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."). Direct evidence of pregnancy discrimination includes remarks made by decisionmakers. *EEOC v. Corp. Sec. Solutions*, 2007 U.S. Dist. LEXIS *11-12 (S.D. Ohio 2007) (statement about pregnancy in context of conversation notifying employee of termination was direct evidence).

With respect to O'Connor, Ramsey Solutions justifies the "how" of her pregnancy (unwed motherhood) as the reason for her termination premised on its core value. Defendant admitted she was terminated because of the June 18, 2020, email notifying them she was pregnant; Ms. Connor was deemed in violation of their values, "classless" and the decision was made within hours of this email to terminate before any further communication with O'Connor. (Galloway Dep. 26, Ex. 5; Lopez Dep. 97-98, 100 Ex. 5 p. 83; Sievertsen Dep. 43; Floyd Dep. 46). Nonetheless, this is still direct evidence that her pregnancy was a motivating factor in its decision.

**Indirect Evidence:** Under the *McDonnell Douglas* framework, to establish her *prima facie* case of pregnancy discrimination the plaintiff must show: (1) that she was pregnant; (2) that she was subject to an adverse employment decision; (3) that she was qualified for her job and (4) that there is a "nexus" between her pregnancy and the adverse employment decision. *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 658 (6th Cir. 2000); *Asmo v. Keane, Inc.,* 471 F.3d 588, 592 (6th Cir. 2006)); *Tysinger*, 463 F.3d at 573; *Lassiter v. Neurological Surgeons, P.C.*, 2008 U.S. Dist. LEXIS 100261 *11-12 (M.D. Tenn. Dec. 11, 2008) (Trauger, J.). "The burden of establishing a prima facie case is not onerous, but one easily met." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, (1981); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). One way

for the plaintiff to establish "nexus" is to show that there was a temporal proximity between her employer's learning of her pregnancy and the adverse employment decision. *Asmo,* 471 F.3d at 593-594 (two months between the employer's learning of the pregnancy and the employee's termination, established nexus between plaintiff's pregnancy and her termination). Once the plaintiff establishes her *prima facie* case, the defendant may articulate a legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut with evidence that the explanation is pretextual. *Cline,* 206 F.3d at 658.

Defendant uses the wrong analysis when it erroneously contends O'Connor is unable to establish her prima facie case of sex discrimination, which is premised entirely on her pregnancy. (ECF 67 p. 13). The temporal proximity between her pregnancy announcement to HR and the immediate conclusion that she would be terminated like other unmarried pregnant women was made within hours. (Lopez Dep. 97-98, 100, 102-105, Ex. 5 p. 83; Sievertsen Dep. 43, 45, 52; Floyd Dep. 46, 57; Lopez 30(b)(6) Dep. 12; Simms Dep. 32, 43). *Asmo,* 471 F.3d at 593-594 (two-month delay was enough to establish nexus). Thus, nexus is established.

Defendant contends O'Connor cannot establish pretext, yet it fails to clearly articulate what its legitimate, non-discriminatory justification was, presumably it was premised on their prohibition against premarital sex under the Righteous Living core value. This "value" however is exactly the type of "built-in headwind" unrelated to measuring job capability that is proscribed by Title VII. *Griggs v. Duke Power Co*., 401 U.S. 424, 432 (1971). In *Griggs*, the Court recognized that "Congress directed the thrust of [Title VII] to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." *Id*. at 432. The core value that prohibits sex outside of marriage has no bearing on whether O'Connor

can or cannot perform her job as an administrative assistant. Instead, it operates as an artificial barrier to employment free from discrimination, in this case pregnancy. *See Jacobs v. Martin Sweets Co*., 550 F.2d 364, 371 (6th Cir. 1977) (upholding judgment finding violation of Title VII, in particular that an unwed pregnancy bore no rational relationship to defendant's business where no such barrier existed with respect to a wed pregnancy). Moreover, O'Connor, not being the face of the company (unlike at least one male employee who was much more visible and who got away with much more), was not going to jeopardize the company's image in any way. Thus, Defendant's reason is neither legitimate, nor non-discriminatory as a matter of law.

Nonetheless, assuming *arguendo* Defendant met their burden of production, O'Connor can still meet her burden of persuasion under a pretext analysis, and only by ignoring the record does Defendant contend otherwise. (ECF 67 p. 14). Importantly, when an employer justifies a termination of a pregnant employee on the basis of a prohibition against pre-marital sex, this is an ultimate question of discrimination. *Cline,* 206 F.3d at 660. As such, the following demonstrates that a reasonable jury could find that her pregnancy, not just the core value, was the motivating factor in O'Connor's termination:

- The decision to terminate O'Connor was made within hours of her notification to Ramsey Solutions that she was pregnant and before any member of the Operating Board spoke to her. (Lopez Dep. 97-98, 100 Ex. 5 p. 0083; Sievertsen Dep. 43; Floyd Dep. 46).

- Male employees who violated the core value for looking at pornography deemed "generally a male offense" were given second chances. (Lopez 30(b)(6) Dep. Ex. 34 p. 1810; Ramsey Dep. 78).

- Unwed mothers were not afforded second chances or "restoration plans;" every

19

single unwed mother has been terminated. (Lopez Dep. 124, 171; Lopez 30(b)(6) Dep. 64; Sievertsen Dep. 27, 53; Simms Dep. 12-13, 31, 33; Ramsey Dep. 21-22).

- Defendant made an exception for an extra-marital affair of a male employee because it was removed in time, even though he was an employee when it occurred. (Finney Dep. 41, 73-78, 112; Galloway 30(b)(6) Dep. 23, 26).

- Defendant made an exception for an extra-marital affair for a male employee because the sex act involved oral sex, not intercourse. (Lopez Dep. 60, 87; Sievertsen Dep. 23, 25, 30; Floyd Dep. 75; Simms Dep. 28; Galloway Dep. 31).[22]

- A male employee who admitted to having sex outside of marriage [not resulting in pregnancy] was offered a 6-month contract to complete terms of employment and the opportunity to repent. (O'Connor Dep. 131, 133; Lopez 30(b)(6) Dep. 52-53, Ex. 27; Ramsey Dep. 76-77).

- Defendant acknowledged that a male employee could hide a pregnancy out of wedlock easier than a female employee, due to pregnancy being a visible condition. (Lopez Dep. 83, 173; Sievertsen Dep. 37; Galloway Dep. 35; Ramsey Dep. 42).

- Defendant acknowledged that they did not go looking for core value violations, nor do they require a "purity pledge" among employees, but they only looked into alleged violations when presented to them. (Lopez Dep. 78-79, 91; Ramsey Dep. 23).

- A woman must request FMLA in the event she wants to request maternity leave, this will expose pregnancy. (Lopez Dep. 74, 174).

---

[22] It was agreed that employees cannot become pregnant from oral sex. (Simms Dep. 30; Galloway 30(b)(6) Dep. 27).

20

- O'Connor was never asked if in fact she engaged in pre-marital sex, it was assumed. (Lopez Dep. 87; O'Connor Dep. 123). Though never faced with it [that they know of], Defendant may have made an exception if an employee had conceived by way of IVF or rape. (Lopez Dep. 87; Ramsey Dep. 45).

- Not one single employee of Defendant could cite to a Biblical basis for the core value that they based O'Connor's termination on, which undermines any legitimacy of the proscription against pre-marital sex. (Lopez Dep. 59; Ramsey Dep. 14; Galloway Dep. 20; Seivertsen Dep. 21; Floyd Dep. 35; Simms Dep. 26)

- There is no written policy detailing behaviors that violate "Righteous Living," including its prohibition on sex outside of marriage. (Lopez Dep. 66, 91, Ex. 3 p. 0028; Sievertsen Dep. 14, 38; Floyd Dep. 42; Finney Dep. 25, 35, 39; Ramsey Dep. 12, 24).

- The policing of sexual morality through moral codes of conduct "disproportionately impacts women" and reinforces patriarchal authority. (Ingersoll Report, MSJ Opp. Ex. 2 p. 2, 6).

- Ramsey chose to "walk[] with a broken guy who was trying to heal" from extra-martial affairs and allegations which included having the employee and his co-worker with whom he was accused of having an affair with chaperoned and proposed a "restoration plan" for his marriage and made the decision not to terminate him, despite his repeated extramarital affairs and violation of "Righteous Living;". (Ramsey Dep. 70, 72, Ex. 41 p. 2611, MSJ Ex. 4 p. 2661-63; Sievertsen Dep. 53; Simms 30(b)(6) Dep. 8). None of this man's affairs resulted in a pregnancy. (Simms 30(b)(6) 32).

21

In *Cline*, in denying summary judgment, the Sixth Circuit found that "[the employer] acknowledged … that Cline's pregnancy alone had signaled them that she engaged in premarital sex, and that the school does not otherwise inquire as to whether male teachers engage in premarital sex. … These admissions raise an issue of material fact as to whether [the school] enforces its policy solely by observing the pregnancy of its female teachers, which would constitute a form of pregnancy discrimination." *Cline,* 206 F.3d at 667. Likewise, only O'Connor's June 18, 2020, email alerted Ramsey Solutions to her pregnancy, given that pregnancy is not a condition that can be hidden, and because Ramsey Solutions does not seek out information of male employees, her presumed engagement in pre-marital sex would not have been an issue had she not notified them she was pregnant and seeking information about FMLA and the ADA. (Galloway Dep. 26, 35, Ex. 5; Lopez Dep. 83, 173, 97-98, 100 Ex. 5 p. 0083; Sievertsen Dep. 37, 43; Floyd Dep. 46; Ramsey Dep. 42). Thus, a reasonable jury could conclude O'Connor was terminated based on her pregnancy rendering summary judgment inappropriate.

B. **Ramsey Solutions Interfered with O'Connor's FMLA Rights and Retaliated Against O'Connor in Violation of Her FMLA and TMLA Rights**

An employer violates the FMLA when it "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. § 2615(a)(1). FMLA interference claims follow the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1972); *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).[23] Terminating an employee prior to the employee taking FMLA leave may constitute a denial of FMLA benefits. *Arban,* 345 F.3d at 401 (explaining that "the timing of

---

[23] To establish a *prima facie* case of FMLA interference, the plaintiff must show: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Id.* at 761. Plaintiff does not dispute Defendant's TMLA analysis.

22

this decision could lead a fact finder to infer that the employee would not have been fired absent her" seeking leave); *see also*, *Cavin v. Honda of Am. Mfg.,* 346 F.3d 713, 726-27 (6th Cir. 2003).

An employer cannot use an employee's use of FMLA as a "negative factor" in employment actions "such as hiring, promotions or disciplinary actions. 29 C.F.R. § 825.220(c). *Hunter v. Valley View Local Schools*, 579 F.3d 688, 691-92 (6th Cir. 2009). "The phrase 'a negative factor' envisions that the challenged employment decision might also rest on other, permissible factors." *Id.* at 692.[24]; *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 508 (6th Cir. 2006).

Defendant's only argument that it did not interfere with or retaliate against O'Connor's assertion of FMLA rights is that her need to take FMLA was only "potential" and temporal proximity was not enough.[25] (ECF 67 p. 15). In doing so, Defendant relies on a case that is inapposite, *Walton v. Ford Motor Co.*, 424 F. 3d 481 (6th Cir. 2006). In *Walton*, the employee only stated he "twisted his knee." Id. at 487. O'Connor was specific about her condition and that she was seeking information about FMLA. (Lopez Dep. Ex. 5 p. 106). Moreover, an employee need not "expressly assert rights under the FMLA or even mention the FMLA" all that is required is that she give the employer enough information to conclude an FMLA qualifying event has occurred. *Verhoff v. Time Warner Cable, Inc*., 299 Fed. Appx. 488, 496 (6th Cir. 2008). Pregnancy or childbirth are specifically identified as qualifying conditions under the FMLA and TMLA. 29 C.F.R. § 825.120(a); T.C.A. §4-21-408(a). Thus, her need was not "potential." Defendant "bypassed" any argument O'Connor could not establish a prima facie case. (ECF 67 n.13).

---

[24] A prima facie case of FMLA retaliation, a plaintiff must show: (1) she was engaged in an activity the FMLA protects; (2) defendant knew she was exercising her FMLA rights; (3) defendant took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Jaszczyszyn v. Advantage Health Physician Network*, 504 Fed. App'x 440, 447 (6th Cir. 2012). Temporal proximity to protected conduct and an adverse employment action can establish causation. *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007). "The burden of establishing a *prima facie* case of retaliation *is not onerous, but one easily met*.'" *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997).
[25] Defendant made a singular argument with respect to both interference and retaliation, even though these are distinct legal claims. As such, Plaintiff is likewise responding in a singular manner.

Accordingly, the same reasons articulated above likewise apply here, *e.g.*, their unwritten practice with respect to the righteous living core value was not black and white, but under no circumstances did this practice give Ramsey Solutions the right to interfere with and retaliate against O'Connor in violation of the FMLA or the TMLA.

**C. Ramsey Solutions Discriminated Against O'Connor in Violation of the ADA & TDA**

Title I of the Americans with Disabilities Act ("ADA") prohibits an employer from "discharging" an employee because the employee is disabled, because the employee has a record of being disabled, *or* because the employer "regards" the employee as disabled. 42 U.S.C. §§ 12102(1), 12112(a). "Under the Americans with Disabilities Act, your employer can't fire you because they *think* you are disabled, even if, in fact, you are *not* disabled." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 310 (6th Cir. 2019).[26]

Defendant asserts O'Connor is unable to demonstrate the first, fourth and fifth elements of an ADA prima facie test. (ECF 67 p. 17). With respect to the first element, although as a general rule, pregnancy is generally not a disability, impairments from pregnancy are, which is why O'Connor requested ADA paperwork. *Spees v. James Marine, Inc*., 617 F.3d 380, 396-397 (6th Cir. 2010); 20 C.F.R. 1630.2. When Defendant made the decision to terminate her based on her raising the issue about ADA paperwork, it regarded her as disabled. (Lopez Dep. 93, 98-99, 116, Ex. 5; Sievertsen Dep. 17; Galloway Dep. 25-26; Finney Dep. 54). For this same reason, element four is satisfied. With respect to element 5, that similarly situated employees were treated more favorably, Defendant acknowledges in its brief other women were treated more favorably. (ECF 67 p. 14). The difference here is that O'Connor's request was disregarded and used as a reason for termination. (Galloway Dep. 25-26). The reason used, *i.e*., the discriminatory premarital sex core

---

[26] The TDA is analyzed the same.

value, was pretext for discrimination for the same reasons articulated above. Accordingly, Defendant's motion with respect to O'Connor's ADA discrimination claim must be denied.

### D. Ramsey Solutions Retaliated Against O'Connor in Violation of Title VII, THRA, TDA and ADA

"To come within the protection of Title VII, [a plaintiff] must establish that [s]he challenged an employment practice that [s]he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc*, 795 F.3d 634, 645 (6th Cir. 2015). Defendant contends Plaintiff did not engage in protected conduct and that she cannot establish pretext. (ECF 67 pp. 20-23)

O'Connor first opposed Ramsey Solutions's discriminatory practice toward pregnancy women in her email, when she disputed the policy "frowned upon" her pregnancy. (Lopez Dep. Ex. 5). Thereafter, she engaged in multiple discussions with HRC committee members regarding her pregnancy and desire to work, including that she was not going to "self-select out".[27] (Lopez Dep. Ex. 7 p. 1930-31, Ex. 9). This was protected conduct and it satisfies her easily met *prima facie* burden. For the same reasons articulated *supra*, pretext is likewise established. Moreover, a reasonable jury the comment that O'Connor refused to "self-select out" but she "knows what's gonna happen" indicates retaliatory intent. (Lopez Dep. Ex. 7 p. 1930). Thus, Defendant's motion should be denied with respect to O'Connor's retaliation claims.

### IV. CONCLUSION

---

[27] A plaintiff must establish a prima facie case of retaliation: (1) she engaged in protected conduct; (2) the exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Harrison v. Metropolitan Gov't,* 80 F.3d 1107, 1118 (6th Cir. 1996). *Accord Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ("the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic'"). At the *prima facie* stage, O'Connor is not required to prove her underlying case of discrimination or allege specific facts pertaining to discriminatory statements. *See White v. Burlington Northern & Santa Fe Ry*., 364 F.3d at 64, 67. Defendant analyzed all retaliation claims together; Plaintiff is responding in the same manner. (ECF 67 pp. 20-23).

O'Connor has demonstrated that a reasonable jury could find that she was discriminated and retaliated against in violation of her rights under Title VII, THRA, ADA and TDA; and that her rights under the FMLA and TMLA were violated when Defendant interfered with her rights and retaliated against her. As such, with the exception of her ADA accommodation claim, which she is voluntarily dismissing, O'Connor requests the Court Deny Defendant's motion.

Respectfully submitted,

*s/ Heather Moore Collins*
Heather Moore Collins BPR # 026099
Ashley Shoemaker Walter BPR #037651
Collins & Hunter PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
ashley@collinshunter.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that a copy of the foregoing has been e-mailed on December 17, 2021 to counsel of record through the court's CM/ECF system:

Leslie Goff Sanders
Daniel Crowell
WEBB SANDERS PLLC
611 Commerce Street
Suite 3102
Nashville, TN 37203
lsanders@webbsanderslaw.com
dcrowell@webbsanderslaw.com

/s/ Heather Moore Collins
*Attorney for Plaintiff*
