CAITLIN O'CONNOR,                    )
                                     ) Case No. 3:20-cv-00628
    Plaintiff,           )
                                     ) District Judge Richardson
v.                                   )
                                     ) Magistrate Judge Frensley
THE LAMPO GROUP, LLC,                )
                                     ) Jury Demand
    Defendant.           )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS AND ADDITIONAL STAMEMENT OF FACTS

Plaintiff responds to Defendant's Statement of Facts and submits an Additional Statement of Facts in support of her Opposition to Defendant's Motion for Summary Judgment

1.    Defendant is a private, closely held company that specializes in creating and delivering education programs for individuals and organizations. (Declaration of Armando Lopez ("Lopez") at ¶2).[1]

**Response: Admit.**

2.    Defendant is best known for providing biblically based financial counseling programs that help individuals get out of debt, manage their money well and achieve financial success. (Id. at ¶3).

**Response: Denied. Ramsey Solutions is a for-profit company, not a 501c3 organization, that provides financial leadership, career, and small-business education. (Lopez Dep. 21-22; Galloway 30(b)(6) Dep. 12; Floyd Dep. 21; Ramsey Dep. 8).**

3.    Defendant's mission is stated as follows: "[w]e provide biblically based, commonsense education and empowerment that give hope to everyone in every walk of life." (Id. at ¶4).

---

[1] All documents referenced in Defendant's Statement of Undisputed Material Facts have been filed with the Court or attached to the Memorandum of Law filed in support of Defendant's Motion for Summary Judgment (Doc. #67).

**Response: Admit.**

4.      Defendant has a set of 14 principles known as "Core Values" that embody the philosophy

of the company. (Id. at ¶5).

**Response: Admit.**

5.      Defendant uses the Core Values as the guiding principles for all decisions made at the

company. (Id.).

**Response:      Denied. The HRC determines the subjective gradient of "Righteous Living,"
including the application, the extreme nature of the behavior, patterns, and individual
circumstances and depending on the facts and circumstances an employee's behavior is
subject to "review, probation, or termination." (Lopez Dep. 66, 85-86, Ex. 1 p. 0007;
Galloway Dep. 30; Finney Dep. 37; Ramsey Dep. 28-29). This enforcement can change as
new members bring a different perspective and the collective decision might be different.[2]
(Lopez Dep. 174).**

6.      One of Defendant's Core Values is "Righteous Living", expressed as "[w]e believe

character matters. All the time." (Id. at ¶6; Third Amended Complaint at ¶23).

**Response: Admit.**

7.       Defendant also has a "Company Conduct" section in its Employment Policies and

Procedures that states the following:

> The image of Ramsey Solutions is held out to be Christian. Should a team
> member engage in behavior not consistent with traditional Judeo-Christian values
> or teaching, it would damage the image and the value of our good will and our
> brand. If this should occur, the team member would be subject to review,
> probation, or termination.

(Third Amended Complaint at ¶21).

**Response: Admit.**

8.      Defendant considers premarital sex to be inconsistent with the Righteous Living Core
Value. (Defendant 0002315; Lopez at ¶6).

---

[2] Daniel Tardy, a member of the Operating Board, stated on social media that Ramsey Solutions does not have
policies but instead "principles" which "are guideposts and allow room for our hearts and wisdom to influence the
decision. (O'Connor Dep. Ex. 26).

**Response: Admit.** "Righteous Living" is a construct the HRC makes as they decide on personnel issues. (Finney Dep. 38; Galloway 30(b)(6) Dep. 11-12; Galloway Dep. 20; Simms Dep. 10). Out of concern for their brand, Ramsey Solutions requires employees to engage in behavior that they view is Christian; such behaviors that are contrary to this purpose include drunkenness, cursing someone out in public, engaging in premarital or extramarital sex, gossiping, watching pornography, and alcohol and drug addiction. (Lopez Dep. 55-56, 60, 64; Sievertsen Dep. 14-15, 21, 38; Galloway Dep. 15). Galloway did, however, acknowledge there is no correlation between getting out of debt and having sex outside of marriage. (Galloway Dep. 20).

9. Defendant prohibits its employees from engaging in premarital sex while employed there.

(Lopez at ¶7).

**Response:** **Admit.** In ██████████ re- and extra-marital sex violations were limited to "intercourse" after a male employee had admitted he engaged in an extramarital affair involving oral sex. (Lopez Dep. 60, 87; Sievertsen Dep. 23, 25, 30; Floyd Dep. 75; Simms Dep. 28; Galloway Dep. 31).

10. Defendant manages its organization through committees who interpret and implement the

Core Values as situations arise. (Id. at ¶8).

**Response: Admit.** The HRC determines the subjective gradient of "Righteous Living," including the application, the extreme nature of the behavior, patterns, and individual circumstances and depending on the facts and circumstances an employee's behavior is subject to "review, probation, or termination." (Lopez Dep. 66, 85-86, Ex. 1 p. 0007; Galloway Dep. 30; Finney Dep. 37; Ramsey Dep. 28-29). This enforcement can change as new members bring a different perspective and the collective decision might be different.[3] (Lopez Dep. 174).

11. Employment-related matters, including employee discipline and employment policies, are

typically decided and implemented by the Human Resources Committee ("HRC"). (Id. at ¶9).

**Response: Denied.**

12. The HRC consists of the Human Resources leader and 4-5 other upper-level managers

who rotate on and off the committee at regular intervals. (Id.).

**Response: Admit.**

---

[3] Daniel Tardy, a member of the Operating Board, stated on social media that Ramsey Solutions does not have policies but instead "principles" which "are guideposts and allow room for our hearts and wisdom to influence the decision. (O'Connor Dep. Ex. 26).

3

13.     The company's day-to-day operations are managed by the Operating Board. (Id. at ¶10).

**Response: Admit.**

14.     Although the Operating Board does not typically make employment-related decisions, if

there is a new issue the company has not dealt with or the employee in question is an executive or

a public-facing personality, the Operating Board may be involved in the decision-making process.

(Id.).

**Response: Admit. In 2020, Ramsey Solutions' Operating Board consisted of Ramsey, Rachel Cruze, ▮▮▮▮▮▮▮▮, Daniel Ramsey, Simms, Sievertsen, Finney, Galloway, Williams, and Floyd. (Lopez Dep. 161; Sievertsen Dep. 8, 31; Simms Dep. 7; Galloway Dep. 8). It sets the strategic direction for Ramsey Solutions and runs the day-to-day operations; the HRC is a subset of the operating board. (Sievertsen Dep. 8). Although the Board and Ramsey can choose to terminate employees, this typically goes through the HRC, as the Board does not set policy as to "fireable offenses." (Lopez Dep. 168; Finney Dep. 11, 109).**

15.     The Operating Board is a larger group (typically 15-17 employees) comprised of the

executive leaders and owners of the company. (Id.).

**Response: Admit.**

16.     The company employed Plaintiff as an administrative assistant from February 22, 2016 to

June 25, 2020. (Third Amended Complaint at ¶¶ 12, 20).

**Response: Admit.**

17.     On June 18, 2020, Plaintiff emailed the following to Armando Lopez, the company's

Director of Human Resources and an HRC member:

> I needed to let you know that I'm 12 weeks pregnant. I understand that being
> unmarried and expecting is frowned on here, but the reality of the situation is this
> is what I'm walking through right now. This is obviously uncharted territory for
> me so I'm not sure what my next steps are regarding sharing the news with my
> leader, getting FMLA & ADA paperwork in case it's needed in the future, etc.

(Id. at ¶16).

**Response: Admit.**

18.     Mr. Lopez forwarded Plaintiff's e-mail to his fellow HRC members: Jack Galloway,

Suzanne Simms, Jen Sievertsen, Mark Floyd and Sarah Sloyan. (Id. at ¶12).

**Response: Admit.**

19.     Mr. Lopez also forwarded Plaintiff's e-mail to her supervisor, Michael Finney, and the

company's CEO, Dave Ramsey. (Lopez at ¶12).

**Response: Admit.**

20.     Mses. Simms and Sievertsen met with Plaintiff on June 24, 2020 and confirmed that she

had engaged in premarital sex. (Id.).

**Response: Denied. O'Connor was not asked if she engaged in premarital sex and never
informed Ramsey Solutions how her pregnancy came about. (Lopez Dep. 87; O'Connor
Dep. 123).**

21.     Since 2016, Defendant has made the decision to terminate every employee known to be

engaging in premarital sex during their employment. (Lopez at ¶14; Plaintiff's Motion to

Reconsider (Doc.#56) at FN1).

**Response: Denied. In ▮▮▮▮▮▮▮▮ another male employee admitted to Ramsey Solutions
and Ramsey that he had engaged in an extramarital affair ▮▮▮▮s prior, while employed
by Ramsey Solutions, and also to a recent affair involving oral sex after his wife approached
Ramsey Solutions with concerns he was having an ongoing affair with another employee
and disclosed his previous affairs. (Ramsey Dep. 15-19, 65-66; Simms 30(b)(6) Dep. 10, 17,
Ex. 36 p. 2337). Though the male employee and co-worker initially denied it, he did admit to
telling the employee she looked good and he missed her in the morning. (Ramsey Dep. 68,
Ex. 41 p. 2610). In response, Ramsey chose to "walk[] with a broken guy who was trying to
heal" including having the employee and his co-worker chaperoned on his book tour and
proposed a "restoration plan" for his marriage and made the decision not to terminate him,
despite his repeated extramarital affairs and violation of "Righteous Living." (Ramsey Dep.
70, 72, Ex. 41 p. 2611; MSJ Opp. Ex. 4 p. 2661-63; Sievertsen Dep. 53; Simms 30(b)(6) Dep.
8). None of this man's affairs resulted in a pregnancy. (Simms 30(b)(6) 32).**

**Additionally, another male employee was not immediately fired as a result of his
disclosure he engaged in premarital sex with a female employee, but instead was kept on as
contract employee for a short period after giving a chance to tell his side of the story.
(O'Connor Dep. 131; Lopez 30(b)(6) Dep. 52-53, Ex. 27; Ramsey Dep. 76-77). This employee
was given an opportunity by Ramsey to "repent" and refrain from engaging in premarital
sex, which he refused. (O'Connor Dep. 133; Lopez 30(b)(6) Dep. 52-53).**

5

22.     The HRC decided to terminate Plaintiff's employment effective June 25, 2020. (Lopez at

¶13).

**Response: Denied. Within two minutes of receiving O'Connor's email, Lopez forwarded it to the HRC, Finney, and Ramsey. (Lopez Dep. 95, 97, Ex. 5 p. 0084). Sievertsen immediately replied, "We've dealt with this before [unwed pregnancy/motherhood] and I think we should handle it exactly the same way . . . our core values and what they stand for are clear" and Floyd noted it was "totally classless" and he agreed with "precedent, (a/k/a principles and values)," meaning they intended on terminating O'Connor for violating Righteous Living immediately upon notification of her pregnancy. (Lopez Dep. 97-98, 100 Ex. 5 p. 0083; Sievertsen Dep. 43; Floyd Dep. 46). Ramsey chimed in, at 5:10am the next morning, before anyone in the HRC spoke to O'Connor, stating that O'Connor's pregnancy news was "so sad" and speculated she only sent the email because she "is scared and embarrassed." (Ramsey Dep. 50, Ex. 6 p. 2170). In this same email, Ramsey stated, "we will work this out with her" meaning work out her separation. (Ramsey Dep. 51; Lopez Dep Ex. 6 p. 2170).**

23.     After terminating Plaintiff's employment on June 25, 2020, Plaintiff's duties have been

absorbed by existing employees and Defendant has not hired anyone to replace her. (Id. at ¶18).

**Response: Admit.**

24.     Since 2016, the HRC has become aware of eight employees (including Plaintiff) who have

engaged in premarital sex during their employment with the company, five men and three women.

(Id. at ¶14).

**Response: Admit.**

25.     The HRC decided to terminate the employment of all eight employees, although some

opted to resign in lieu of termination. (Id. at ￿14).

**Response: Denied. A male employee was not immediately fired as a result of his disclosure he engaged in premarital sex with a female employee, but instead was kept on as contract employee for a short period after giving a chance to tell his side of the story. (O'Connor Dep. 131; Lopez 30(b)(6) Dep. 52-53, Ex. 27; Ramsey Dep. 76-77). This employee was given an opportunity by Ramsey to "repent" and refrain from engaging in premarital sex, which he refused. (O'Connor Dep. 133; Lopez 30(b)(6) Dep. 52-53).**
       **However, Ramsey Solutions has terminated all pregnant, unwed female employees after they notified Ramsey Solutions of their pregnancy. (Lopez Dep. 124; Sievertsen Dep. 27; Simms Dep. 12, 13). One employee was terminated, her pregnancy part of the equation,**

after she notified her leader, ████████████ [4] of her pregnancy and the father was her boyfriend. (O'Connor Dep. 113-114; Lopez Dep. 178-179; Lopez 30(b)(6) Dep. 34-35, Ex. 25). The other employee was terminated when she informed Ramsey Solutions of her pregnancy the weekend after she got married. (Lopez 30(b)(6) Dep. 22-23, 42, Ex. 24 p. 000902).

26.     In addition to those eight employees, one other employee (a woman) was also terminated for engaging in premarital sex, but that decision was made by the Operating Board, not the HRC. (Id. at ¶16).

**Response: Admit.**

27.     Defendant provides up to 16 weeks of job-protected maternity leave, regardless of whether employees are FMLA eligible. (Id. at ¶19).

**Response: Admit.**

28.     If employees are FMLA eligible (meaning they have worked at the company for at least a year and they have worked at least 1,250 hours in the year preceding maternity leave), Defendant pays their full salary and continues to contribute to their benefits for the first 12 weeks of their maternity leave. (Id.).

**Response: Admit.**

29.     If an employee remains on maternity leave past 12 weeks, the company continues to provide them with profit-sharing (if eligible) for the final four weeks. (Id.).

**Response: Admit.**

30.     In addition to maternity leave, the company's pregnant employees are provided with other benefits like reserved parking spaces close to the company's entrance, work schedule flexibility to accommodate doctor's visits, work-from-home arrangements, participation in the Healthy Maternity Program which provides counseling and guidance for expectant mothers, and reimbursement for pregnancy-related wellness programs such as exercise and yoga. (Id. at ¶21).

---

[4] ████████████████████████████████████████████

**Response: Admit.**

31.     Since January 1, 2018, Defendant has granted approximately 86 maternity leaves. (Id. at

¶20).

**Response: Admit.**

32.     Plaintiff claims that she requested FMLA leave and a disability accommodation in her

June 18 e-mail to Mr. Lopez when she wrote "I'm not sure what my next steps are regarding …

getting FMLA & ADA paperwork in case it's needed in the future, etc." (Third Amended

Complaint at ¶16).

**Response: Admit.**

33.     Plaintiff did not expressly notify Defendant that she had a geriatric pregnancy or provide

Defendant with any information about how that geriatric pregnancy limited her or otherwise

constituted a disability. (O'Connor Declaration at ¶29, Attachment 6; Third Amended Complaint

at ¶16).

**Response: Denied. Simms and Sievertsen were both aware that O'Connor was considered to
have a geriatric pregnancy. (O'Connor Dep. 281).**

34.     Following her June 18 e-mail, Plaintiff did not have any further communications with

anyone at Defendant regarding her alleged disability, need for a disability accommodation, or

need for FMLA leave. (O'Connor Deposition at 255:19-257:9).

**Response: Denied. Simms and Sievertsen were both aware that O'Connor was considered to
have a geriatric pregnancy. (O'Connor Dep. 281). Further, Ramsey Solutions HR who
manages FMLA, maternity leave, and ADA requests were never contacted despite the
explicit request, nor did Lopez discuss these policies with her. (Lopez Dep. 71, 75, 94, 127).
Only a week after notifying Ramsey Solutions of her pregnancy and requesting information
on FMLA and the ADA, Simms and Lopez terminated O'Connor, informing her their
morals did not align; O'Connor spoke very little during this meeting. (O'Connor Dep. 91-
92, 94, 104, 257, 267; Lopez Dep. 171; Ramsey Dep. 38).**

35.     When Plaintiff inquired about FMLA and ADA paperwork in her June 18 e-mail, she did

not know whether she would request leave but wanted the paperwork to take to her doctor in case she needed it. (Id.).

**Response: Denied. Defendant mischaracterizes Plaintiff's testimony. Plaintiff also testified that she requested FMLA leave to produce to her OBGYN. (O'Connor Dep. 254).**

36.  Defendant propounded interrogatories to Plaintiff asking her to explain the factual basis for her claim that Defendant terminated her employment based on sex, pregnancy, disability and in retaliation for requesting FMLA and TMLA leave. (Plaintiff's Responses to Defendant's First Set of Interrogatories at ¶¶12, 13, 14, and 16).

**Response: Admit.**

37.  Plaintiff provided the following response to Interrogatories No. 12, 13, 14, and 16 of Defendant's First Set of Interrogatories, which she thereafter filed with the Court and reaffirmed in a sworn declaration:

> Plaintiff's sincerely held Christian belief is that Christianity is not meant to be punitive, hateful, vengeful, or judgmental. Accordingly, her Christian belief is that God gave a woman the ability to procreate, and that ability to procreate was not restricted by a contract, i.e. marriage or employment. Moreover, Plaintiff does not believe that her identification as a Christian gives her the right to judge and condemn other Christians or humans for how they choose to carry out their one dictate from Jesus, that is, to love one another. Her view of Christianity does not require her to invade or inquire or know the specifics of what other people do or do not do in their bedroom or when they do it, much less pass morality judgment on other people. Moreover, Plaintiff sincerely believes that she should be able to seek the support of her Christian community during her pregnancy without fear of termination from her employment.

(Id.; Doc. #26-2; O'Connor Declaration at ¶30, Attachment 7 at ¶¶11, 12, 13, 14, and 16).

**Response: Admit. In amended responses, Plaintiff also included the following information in response to Interrogatory no. 14:**

> **Plaintiff informed Defendant she was pregnant, and she was immediately terminated after this disclosure. Soon her disclosure, Plaintiff was contacted by management to discuss various aspects of her pregnancy. During this time, Defendant's Human Resources Committee and Dave Ramsey exchanged a series of emails regarding Plaintiff's pregnancy. Mr. Floyd stated that Plaintiff**

9

was "classless," and Mr. Ramsey stated Plaintiff was "scared and embarrassed" about her pregnancy. Plaintiff was allegedly terminated due to a violation of Defendant's policy against engaging in premarital sex, a violation which Defendant was only aware of due to Plaintiff's disclosure of her pregnancy.

## ADDITIONAL STATEMENT OF MATERIAL FACTS

1.    Human Resources Committee ("HRC"): The HRC enforces and sets Ramsey Solutions Policy, deals with personnel issues, employees in crisis, disciplinary actions, performance improvement plans, nearly all terminations, and determines the scope of its Righteous Living Core Value ("Righteous Living"). (Lopez Dep. 17-18; Floyd Dep. 80; Simms Dep. 8; Finney Dep. 13).

**RESPONSE:**

2.    Galloway acted as Chair, of the HRC during the relevant time, although he has no background in HR. (Galloway Dep. 7; Sievertsen Dep. 8).

**RESPONSE:**

3.    Founder and CEO Dave Ramsey is involved in the decisions to terminate employees. (Lopez Dep. 18; Sievertsen Dep. 7).

**RESPONSE:**

4.    The HRC members and Ramsey have had very little, if any, training on Title VII or FMLA. (Lopez 30(b)(6) Dep. 73; Floyd Dep. 8; Simms Dep. 13-14; Ramsey Dep. 20).

**RESPONSE:**

5.    Ramsey Solutions is "held out to be Christian," meaning Ramsey Solutions holds itself out as a Christian company "from time to time," but has no practical application other than its "image" is Christian and its market "views" it as a biblically based company. (Finney Dep. 33-34; Lopez Dep. 48, Ex. 1 p. 0007; Floyd Dep. 38).

**RESPONSE:**

6.    Ramsey Solutions policy states "[s]hould a team member engage in behavior not consistent with traditional Judeo-Christian values or teaching, it would damage the image and the value of

11

our goodwill and our brand;" meaning an employee cannot engage in behavior contrary to evangelical "normative Christian beliefs" regardless of their religious beliefs. (Lopez Dep. 55, Ex. 1 p. 0007; Ramsey Dep. 11, 27).

**RESPONSE:**

7.     Ramsey Solutions also has adopted a set of "Core Values" that are also "Judeo-Christian" allegedly based on the Christian Bible as "guidelines" for operating the company and employee conduct and including a "Righteous Living" core value. (Lopez Dep. 76-77, 118, Ex. 2 p. 0007; Lopez 30(b)(6) Dep. 18; Sievertsen Dep. 21-23, 28; Floyd Dep 32, 35-36).

**RESPONSE:**

8.     Ramsey Solutions has adopted contemporary evangelical, complementarity beliefs that sex is only allowed within marriage, between one man and one woman and that the marital relationship is to "embody gender complementarity; the idea that men and women have different but complementary and co-equal roles in marriage and the household" and that men serve as "benevolent head[s]" and women as "caretakers." (Walker Dep. 29-31, Ex. 17 p. 1. *See* Armour Report, MSJ Opp. Ex. 1 p. 6).

**RESPONSE:**

9.     This view of sexual abstinence regulates all of sexuality, the performance of gender, and reinforces patriarchal authority, requiring proper dress and submissive demeanor for women. (Ingersoll Report, MSJ Opp. Ex. 2 p. 002).

**RESPONSE:**

10.     Complementarity affects women disproportionately to men enforcing rigid boundaries between men and women, including women's secondary status to men. (Walker Dep. 53-54; Ingersoll Report, MSJ Ex. p. 000002-3, 4).

**RESPONSE:**

11. Complementarianism in the workplace, including the policing of sexual morality through moral codes of conduct "disproportionately impacts women." (Ingersoll Report, MSJ Ex. 2 p. 06). Ramsey Solutions adamantly contends that the Bible prohibits Sex outside of marriage, despite acknowledging Christian denominations interpret the Bible and the issue of sex outside of marriage differently. (Lopez Dep. 56, 77-79, Ex. 2 p. 07, Ex. 12 p. 3; Floyd Dep. 35, 47-48; Galloway Dep. 15, 21; Seivertsen Dep. 21; Simms Dep. 25; Ramsey Dep. 14; Walker Dep. 14-15, Ex. 17 p. 9; Armour Report, MSJ Opp. Ex. 1 pp. 2, 4, 9; Ingersoll Report, MSJ Opp. Ex. 2 p. 01).

**RESPONSE:**

12. There is no written policy detailing behaviors that violate "Righteous Living," including its prohibition on sex outside of marriage, even though Ramsey Solutions acknowledges the importance of knowing what are "fireable offenses."[5] (Lopez Dep. 66, 91, Ex. 3 p. 0028; Sievertsen Dep. 14, 38; Floyd Dep. 42; Finney Dep. 25, 35, 39; Ramsey Dep. 12, 24).

**RESPONSE:**

13. The company does not "go looking for" core value violations or regularly call employees in to ascertain whether they have had sex outside of marriage. (Sievertsen Dep. 17, 25; Simms Dep. 26-27).

**RESPONSE:**

14. Employees are not required to sign a purity pledge, but they are expected to know what Righteous Living means. (Lopez Dep. 78-79, 91; Ramsey Dep. 23).

**RESPONSE:**

15. According to Dave Ramsey, the whole organization accepts that premarital sex would be

---

[5] For example, according to Ramsey, lying is not automatically terminable, but a habitual liar should be fired as, "[it] violates common sense to keep people you can't trust." (Ramsey Dep. 35).

a violation, as this is a "normative" belief within the Christian community and if an employee does not know what traditional Judeo-Christian values are, it is the employee's responsibility to ask before they sign the handbook. (Ramsey Dep. 12-13, 42).

**RESPONSE:**

16.     There are exceptions to Righteous Living if you are a man. For example, employees, all men, who violated the Righteous Living regarding pornography were offered restoration plans, regardless of whether they had an addiction or not, and porn blockers were put on their work computers. (O'Connor Dep. 134; Lopez Dep. 172, 182; Lopez 30(b)(6) Dep. 16, 62, 65-66, 71-73, Ex. 30 p. 001507, Ex. 31, Ex. 34; Sievertsen Dep. 53-54, Galloway Dep. 35). Ramsey Solutions acknowledges porn offenses as "generally a male offense" and "the same story of every male born in the last half century. You see a magazine or a website and [its] evil claws get into you." (Lopez 30(b)(6) Dep. Ex. 34 p. 001810; Ramsey Dep. 78).

**RESPONSE:**

17.     Female employees of Ramsey Solutions who engaged in premarital sex have not been given second chances, and would not be, even if they were to state they would not engage in the behavior again. (Lopez Dep. 171; Lopez 30(b)(6) Dep. 64).

**RESPONSE:**

18.     Pregnancy via IVF does not violate this policy, and Ramsey testified he "doubts" Ramsey Solutions would terminate a woman who was raped and became pregnant. (Lopez Dep. 87; Ramsey Dep. 45).

**RESPONSE:**

19.     It was universally acknowledged by Ramsey Solutions managers that pregnancy out of wedlock is easier for men to hide because pregnancy is obviously a visible condition that only

14

affects women. (Lopez Dep. 83, 173; Sievertsen Dep. 37; Galloway Dep. 35; Ramsey Dep. 42).

20.      In ████, pre- and extra-marital sex violations were limited to "intercourse" after a male employee had admitted he engaged in an extramarital affair involving oral sex. (Lopez Dep. 60, 87; Sievertsen Dep. 23, 25, 30; Floyd Dep. 75; Simms Dep. 28; Galloway Dep. 31).

**RESPONSE:**

21.      The Operating Board, including Ramsey, among others, decided to use "wisdom to ascertain" what the Bible meant, as it is not clear on "oral sex" and decided to "draw the line at intercourse" determining oral sex does not violate "Righteous Living" and is more forgivable. (Sievertsen Dep. 23, 30; Floyd Dep. 65, 75, 77-78; O'Connor Dep. 147-48; Simms Dep. 29-30; Galloway Dep. 27-28; Ramsey Dep. 14, 33). It was agreed that employees cannot become pregnant from oral sex. (Simms Dep. 30; Galloway 30(b)(6) Dep. 27).

**RESPONSE:**

22.      O'Connor through her June 18, 2020 email, O'Connor requested an exception to "Righteous Living" with respect to pregnancy outside of marriage. (O'Connor Dep. 344).

**RESPONSE:**

23.      It is only through this email that Ramsey Solutions became aware O'Connor *may have* engaged in premarital sex, and it would not have known until her pregnancy began to show, at which point, Ramsey Solutions would have called her in to discuss. (Lopez Dep. 93, 98-99, 116; Sievertsen Dep. 17; Galloway Dep. 25-26; Finney Dep. 54).

**RESPONSE:**

24.      O'Connor was terminated because of her email informing Ramsey Solutions she was pregnant and requesting information regarding FMLA and ADA paperwork. (Galloway Dep. 26).

**RESPONSE:**

25.    Ramsey Solutions HR who manages FMLA, maternity leave, and ADA requests were never contacted despite the explicit request, nor did Lopez discuss these policies with her. (Lopez Dep. 71, 75, 94, 127).

**RESPONSE:**

26.    Within two minutes of receiving O'Connor's email, Lopez forwarded it to the HRC, Finney, and Ramsey. (Lopez Dep. 95, 97, Ex. 5 p. 0084). Sievertsen immediately replied, "We've dealt with this before [unwed pregnancy/motherhood] and I think we should handle it exactly the same way . . . our core values and what they stand for are clear" and Floyd noted it was "totally classless" and he agreed with "precedent, (a/k/a principles and values)," meaning they intended on terminating O'Connor for violating Righteous Living immediately upon notification of her pregnancy. (Lopez Dep. 97-98, 100 Ex. 5 p. 0083; Sievertsen Dep. 43; Floyd Dep. 46). Ramsey chimed in, at 5:10am the next morning, before anyone in the HRC spoke to O'Connor, stating that O'Connor's pregnancy news was "so sad" and speculated she only sent the email because she "is scared and embarrassed." (Ramsey Dep. 50, Ex. 6 p. 2170). In this same email, Ramsey stated, "we will work this out with her" meaning work out her separation. (Ramsey Dep. 51; Lopez Dep Ex. 6 p. 2170).

**RESPONSE:**

27.    The HRC assumed she engaged in premarital sex and would be terminated due to perceived violation of "Righteous Living." (Lopez Dep. 102, 105; Sievertsen Dep. 45, 52; Lopez 30(b)(6) Dep. 12; Floyd Dep. 57). At this point it was a foregone conclusion that O'Connor would be terminated for engaging in premarital sex, as Ramsey testified, he understood O'Connor's email to mean she was resigning or knew that she would be terminated and that he focused on the fact that she was expecting and not that she was asking for FMLA and ADA paperwork. (Simms Dep.

16

32, 43; Ramsey Dep. 47-48).

**RESPONSE:**

28.     Simms called O'Connor and although they discussed her pregnancy, Simms did not discuss termination and instead told O'Connor there would be another meeting; as a result, O'Connor was not concerned about her employment and returned to work. (O'Connor Dep. 99-100, 268; Simms Dep. 34-35, Ex. 9).

**RESPONSE:**

29.     On June 23, 2020, O'Connor met with Simms and Sievertsen in Simms' office, after which O'Connor became nervous that she was going to be illegally terminated. (O'Connor Dep. 103; Sievertsen Dep. 19; Lopez Dep. 94; Simms Dep. 36, 38). Simms wanted to make sure that O'Connor was "okay" in this meeting because they had no reason to assume that "she was feeling great about her situation or not," despite O'Connor stating that she and her boyfriend were very happy about the pregnancy. (Simms Dep. 36-37).

**RESPONSE:**

30.     O'Connor was not asked if she engaged in premarital sex and never informed Ramsey Solutions how her pregnancy came about. (Lopez Dep. 87; O'Connor Dep. 123). Simms and Sievertsen were both aware that O'Connor was considered to have a geriatric pregnancy. (O'Connor Dep. 281).

**RESPONSE:**

31.     After this meeting, Simms emailed Ramsey, Finney, and the HRC that O'Connor was not going to "self-select out," and was never asked why she would not "self-select out." (Lopez Dep. 110-11, Ex. 7 p. 1930-1931).

**RESPONSE:**

17

32.     The HRC relied on O'Connor's email notifying Lopez of her pregnancy in its decision to terminate O'Connor for engaging in premarital sex, violating its version of Judeo-Christian, biblically based "Righteous Living." (Lopez Dep. 92, 112-13, 171, 175).

**RESPONSE:**

33.     Ramsey Solutions never considered a "restoration plan" for O'Connor to keep her position and no other female, pregnant, unwed employees have ever been offered a "restoration plan" under the premise that there is no way for these employees to "redeem" themselves; instead, every unwed, pregnant woman employed by Ramsey Solutions has been terminated for "consistent[cy]." (Sievertsen Dep. 53; Simms Dep. 31, 33; Ramsey Dep. 21-22).

**RESPONSE:**

34.     Ramsey Solutions identified employees terminated for violating "Righteous Living," as well as a list of employees brought before the HRC for violating "Righteous Living," regardless of whether they were terminated. (Lopez 30(b)(6) Dep. 15, Ex. 21 p. 0078, Ex. 22 p. 2169).

**RESPONSE:**

35.     Ramsey Solutions has terminated all pregnant, unwed female employees **after** they notified Ramsey Solutions of their pregnancy. (Lopez Dep. 124; Sievertsen Dep. 27; Simms Dep. 12, 13). One employee was terminated, her pregnancy part of the equation, after she notified her leader, ██████████ of her pregnancy and the father was her boyfriend. (O'Connor Dep. 113-114; Lopez Dep. 178-179; Lopez 30(b)(6) Dep. 34-35, Ex. 25). The other employee was terminated when she informed Ramsey Solutions of her pregnancy the weekend after she got married. (Lopez 30(b)(6) Dep. 22-23, 42, Ex. 24 p. 000902).

**RESPONSE:**

36.     A male employee was terminated after he notified his leader that his wife was pregnant and

his leader calculated the date of conception, determining it was conceived prior to his marriage and his hire date. (O'Connor Dep. 212; Lopez 30(b)(6) Dep. 46-49, Ex. 18 p. 000671, 0676-677; Finney Dep. 81-84, Ex. 18 p. 00671, 0677).

**RESPONSE:**

37.    A Ramsey Solutions employee reported seeing a female employee's boyfriend walking her dog in his boxers in the morning at her apartment building. (Lopez 30(b)(6) Dep. 20, Ex. 23). Ramsey Solutions assumed that she engaged in premarital sex and terminated her. (Lopez 30(b)(6) Dep. Ex. 23 p. 0916).

**RESPONSE:**

38.    A male was terminated when it came to light that he was living with his fiancée at the direction of her pastor. (Floyd Dep. Ex. 14 p 0865; Lopez 30(b)(6) Dep. 26-27, 29, Ex. 14 0861, 0132). Ramsey made it clear they would not change their Core Values based on a pastor in another state and the employee should be fired on the spot if he would not answer questions about his personal life; "If he slept with her [or] lives with her or won't answer the question, fire him on the spot. We have let people go that were much repentant and offended the policy less." (Lopez 30(b)(6) Dep. 30-31; Floyd Dep. 63, Ex. 14 p. 1326). A religious accommodation was never discussed. (Finney Dep. 102, 108).

**RESPONSE:**

39.    Another male employee was not immediately fired as a result of his disclosure he engaged in premarital sex with a female employee, but instead was kept on as contract employee for a short period after giving a chance to tell his side of the story. (O'Connor Dep. 131; Lopez 30(b)(6) Dep. 52-53, Ex. 27; Ramsey Dep. 76-77). This employee was given an opportunity by Ramsey to "repent" and refrain from engaging in premarital sex, which he refused. (O'Connor Dep. 133;

19

Lopez 30(b)(6) Dep. 52-53).

**RESPONSE:**

40.     I ███████████ another male employee admitted to Ramsey Solutions and Ramsey that

he had engaged in an extramarital affair ███████s prior, while employed by Ramsey Solutions, and

also to a recent affair involving oral sex after his wife approached Ramsey Solutions with concerns

he was having an ongoing affair with another employee and disclosed his previous affairs.

(Ramsey Dep. 15-19, 65-66; Simms 30(b)(6) Dep. 10, 17, Ex. 36 p. 2337). In response, Ramsey

chose to "walk[] with a broken guy who was trying to heal" including having the employee and

his co-worker chaperoned on his book tour and proposed a "restoration plan" for his marriage and

made the decision not to terminate him, despite his repeated extramarital affairs and violation of

"Righteous Living;".(Ramsey Dep. 70, 72, Ex. 41 p. 2611; MSJ Opp. Ex. 4 p. 2661-63; Sievertsen

Dep. 53; Simms 30(b)(6) Dep. 8). None of this man's affairs resulted in a pregnancy. (Simms

30(b)(6) 32).

**RESPONSE:**

41.     During the time, Ramsey was aware that this man had "actively deceived everyone in the

company . . . for ████████" and had lived a "double-life." (Ramsey Dep. 19, 58, 72, 75, Ex. 43 p.

2511).

**RESPONSE:**

42.     Ramsey did not find the male employee's wife "credible" because she was "erratic, out of

control," and he referred to her as a "world-class bitch." (Ramsey Dep. 62, 74, Ex. 43 p. 2483-84).

Simms stated in an email that the employee's wife was "crazy" and thought his wife "drove [him]

to do the things he did. (MSJ Opp. Ex. 3 p. 2636).  It was later proved the male employee's wife

was not lying. (Ramsey Dep. 63).

20

**RESPONSE:**

Respectfully submitted,

                            /s/ Heather Moore Collins
                            Heather Moore Collins (BPR 26099)
                            Ashley Walter (BPR 037651)
                            7000 Executive Center Drive
                            Building Two Suite 320
                            Brentwood, TN 37027
                            (615) 724-1996
                            heather@collinshunter.com
                            ashley@collinshunter.com

                            *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on December 17, 2021, I caused a copy of the foregoing document to be sent

by e-mail to:

Leslie Sanders
Daniel Crowell
WEBB SANDERS PLLC
611 Commerce Street
Suite 3102
Nashville, TN 37203
Telephone: (615) 915-3300
Fax: (866) 277-5494
lsanders@webbsanderslaw.com
dcrowell@webbsanderslaw.com

*Attorneys for Defendant*

                            /s/ Heather Moore Collins
                            Heather Moore Collins

22