IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CAITLIN O'CONNOR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:20-cv-00628 |
| | ) | |
| v. | ) | Judge Eli J. Richardson |
| | ) | |
| THE LAMPO GROUP, LLC d/b/a | ) | Magistrate Judge Frensley |
| RAMSEY SOLUTIONS, | ) | Jury Demand |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Lampo Group, ("Ramsey" or "Ramsey Solutions"), requires its employees to follow its punitive view of "Judeo-Christian" or "normative" Christian beliefs or be fired. Caitlin O'Connor did not conform to Ramsey's religion-based mandate when she got pregnant and was not married, and as a result, she was terminated. Ms. O'Connor was not terminated for a legitimate reason like job performance or because she was downsized; no, she was terminated in blatant disregard of federal and state law that prohibit discrimination because of religion. Ms. O'Connor was terminated because she did not conform to Defendant Ramsey Solutions' narrow-minded view of Christianity, and Ramsey refused to accommodate her view of Christianity. Ramsey Solutions terminated Ms. O'Connor because of the company's view that pregnancy outside of marriage or pre-marital sex is inconsistent with Christianity and a violation of its "Righteous Living" core value, which it contends encompasses a prohibition against pre-marital sex. Many of the facts are largely undisputed because Ramsey's religious policy is what motivated O'Connor's termination. What is in dispute is whether its actions violated Ms. O'Connor's civil rights. Because a reasonable jury could find that Ms. O'Connor's termination was a violation of Title VII and the THRA,

1

Ramsey's motion for summary judgment must be denied.

## I. FACTUAL BACKGROUND

Caitlin O'Connor's employment and background, as well as the Company structure and policies are covered in her prior briefing. (Opp. MSJ, Doc. 94-1, pp. 2-9). Ramsey Solutions adheres to a policy that states, "[s]hould a team member engage in behavior not consistent with traditional Judeo-Christian[1] values or teaching, it would damage the image and the value of our goodwill and our brand," meaning an employee cannot engage in behavior contrary to evangelical "normative Christian beliefs" regardless of their religious beliefs. (Lopez Dep. 55, Ex. 1 p. 0007; Ramsey Dep. 11, 27). Thus, it is Ramsey's interpretation of what is and is not "traditional Judeo-Christian values" or "normative Christian beliefs" and how it forces its views on its employees that is at issue. In 2013, the Operating Board created "Core Values." (Lopez Dep. Ex. 2 p. 0003; Galloway 30(b)(6) Dep. 10; Galloway Dep. 14, Finney Dep. 11). The Core Values, including a "Righteous Living"[2] core value, described as "Judeo-Christian," are allegedly based on the Christian Bible, and are used by Ramsey as "guidelines" for operating the company and employee conduct. (Lopez Dep. 76-77, 118, Ex. 2 p. 0007; Lopez 30(b)(6) Dep. 18; Sievertsen Dep. 21-23, 28; Floyd Dep 32, 35-36). Ramsey Solutions has adopted contemporary evangelical, complementarity beliefs that sex is only allowed within marriage, between one man and one woman, and that the marital relationship is to "embody gender complementarity; the idea that men and women have different but complementary and co-equal roles in marriage and the household" and that men serve as "benevolent head[s]" and women as "caretakers."[3] (Walker Dep. 29-31, Ex.

---

[1] Lopez testified that he understood this term to have a religious foundation and derived from the Bible. (Lopez Dep. 56, 58).

[2] According to Ramsey Solutions' view, in the Christian Bible, "Righteous Living" is the principle that people should keep themselves "pure and holy;" although there are many things the Bible prohibits that Ramsey Solutions does not. (Floyd Dep 32, 35-36; Sievertsen Dep. 21-23).

[3] Dr. Walker, Ramsey's expert, also testified that Complementarianism was the cultural norm until the second wave of feminism. (Walker Dep. 32).

17 p. 1. *See* Armour Report, MSJ Opp. Ex. 1 p. 6; Ingersoll Report, MSJ Opp. Ex. 2 p. 2). Ramsey Solutions adamantly contends that the Bible prohibits sex outside of marriage, despite acknowledging Christian denominations interpret the Bible and the issue of sex outside of marriage differently.[4] (Lopez Dep. 56, 77-79, Ex. 2 p. 07, Ex. 12 p. 3; Floyd Dep. 35, 47-48; Galloway Dep. 15, 21; Seivertsen Dep. 21; Simms Dep. 25; Ramsey Dep. 14; Walker Dep. 14-15, Ex. 17 p. 9; Armour Report, MSJ Opp. Ex. 1 pp. 2, 4, 9; Ingersoll Report, MSJ Opp. Ex. 2 p. 1). According to Ramsey, the whole organization accepts that premarital sex would be a violation of its Righteous Living core value, as this is a "normative" belief within the Christian community, and if an employee does not know what traditional Judeo-Christian values are, it is the employee's responsibility to ask before they sign the handbook. (Ramsey Dep. 12-13, 42). Ramsey Solutions assumes that these values are "both self-evident and shared by all Christians in all times and all places." (Armour Report, MSJ Opp. Ex. 1 p. 1). However, despite Ramsey's myopic line of thought, Christian values on matters of sex, marriage, and pregnancy have been shaped in response to "shifting historical and cultural context," and there is no "singular teaching regarding sex and sexuality in the Christian tradition or in the biblical text."[5] (Walker Dep. 14-15, Ex. 17 p. 9; Armour Report, MSJ Opp. Ex. 1 pp. 2, 4, 9; Ingersoll Report, MSJ Ex. 2 p. 1). Nevertheless, neither Dave Ramsey, nor one single Ramsey employee, could identify where the Bible explicitly prohibits sex outside of marriage. (Lopez Dep. 59; Ramsey Dep. 14; Galloway Dep. 20; Seivertsen Dep. 21; Floyd Dep. 35; Simms Dep. 26). "Righteous Living" is a construct the Human Resources Committee ("HRC") makes as they decide on personnel issues. (Finney Dep. 38; Galloway 30(b)(6) Dep. 11-12; Galloway Dep. 20; Simms Dep. 10). Out of concern for its brand, Ramsey

---

[5] Dr. Walker claims "no serious scholar of repute would argue . . . that the Bible licenses fornication of any variety" and that denominations in disagreement are not faithful to biblical traditions. (Walker Dep. 14-15, 41, Ex. 17 p. 9).

3

Solutions requires employees to engage in behavior that it views is Christian; such behaviors that are contrary to this purpose include drunkenness, cursing someone out in public, engaging in premarital or extramarital sex, gossiping, watching pornography, and alcohol and drug addiction. (Lopez Dep. 55-56, 60, 64; Sievertsen Dep. 14-15, 21, 38; Galloway Dep. 15). However, there is no correlation between Ramsey's education about getting out of debt and having sex outside of marriage. (Galloway Dep. 20). Quite simply, Ramsey expects employees to disclose intimate details of their personal life if it is going to violate a Core Value. (Ramsey Dep. 40).

**O'Connor's Beliefs**

O'Connor believes sex outside of marriage is not a sin and is compatible with her Christian faith.[6] (O'Connor Dep. 259, 261-262; Armour Report, MSJ Opp. Ex. 1 p. 7).

**Ramsey Solutions Terminates O'Connor After She Notifies It of Her Pregnancy and Requests ADA and FMLA Information**

On June 18, 2020, O'Connor emailed Lopez:

> I needed to let you know that I'm 12 weeks pregnant. I understand that being unmarried and expecting is frowned on here, but the reality of the situation is this is what I'm walking through right now. This is obviously uncharted territory for me so I'm not sure what my next steps are regarding sharing the news with my leader, getting FMLA & ADA paperwork in case it's need in the future, etc.

(O'Connor Dep. 111, 254-256, Ex. 9 p. 9). Through this email, O'Connor requested an exception to "Righteous Living" with respect to pregnancy outside of marriage. (O'Connor Dep. 344). It is only through this email that Ramsey Solutions became aware O'Connor *may have* engaged in premarital sex, and it would not have known until her pregnancy began to show, at which point, Ramsey Solutions would have called her in to discuss. (Lopez Dep. 93, 98-99, 116; Sievertsen

---

[6] This philosophy is embraced and espoused by mainline Protestant denominations, including the United Methodist Church." (Armour Report, MSJ Opp. Ex. 1 p. 7). Dr. Walker testified that denominations that hold this belief are in error. (Walker Dep. 39). Dr. Walker also testified that any peer review on his writings or opinions on sex outside of marriage are "so unnecessary" because there would be "no sincere exegetical argument" by any scholar of repute based on a believed consensus for which Dr. Walker has no quantitative analysis. (Walker Dep. 40-41, 46).

Dep. 17; Galloway Dep. 25-26; Finney Dep. 54). Ramsey Solutions HR was never contacted despite Ms. O'Connor's explicit request, nor did Lopez discuss the policies with her. (Lopez Dep. 71, 75, 94, 127). Within two minutes of receiving O'Connor's email, Lopez forwarded it to the HRC, Finney, and Ramsey. (Lopez Dep. 95, 97, Ex. 5 p. 0084). Sievertsen immediately replied, "We've dealt with this before [unwed pregnancy/motherhood] and I think we should handle it exactly the same way . . . our core values and what they stand for are clear," and Floyd noted [O'Connor] was "totally classless" and agreed with "precedent, (a/k/a principles and values)," meaning they intended on terminating O'Connor for violating Righteous Living immediately upon notification of her unwed pregnancy. (Lopez Dep. 97-98, 100, Ex. 5 p. 0083; Sievertsen Dep. 43; Floyd Dep. 46). Ramsey stated that O'Connor's pregnancy news was "so sad" and speculated she only sent the email because she "is scared and embarrassed." (Ramsey Dep. 50, Ex. 6 p. 2170).

Although the emails continued that HRC would talk to O'Connor about the circumstances of her pregnancy, the HRC assumed she engaged in premarital sex and would be terminated due to perceived violation of "Righteous Living." (Lopez Dep. 102, 105; Sievertsen Dep. 45, 52; Lopez 30(b)(6) Dep. 12; Floyd Dep. 57; Simms Dep. 32, 43; Ramsey Dep. 47-48).

On June 23, 2020, O'Connor met with Simms and Sievertsen in Simms' office, after which O'Connor became nervous that she was going to be illegally terminated. (O'Connor Dep. 103; Sievertsen Dep. 19; Lopez Dep. 94; Simms Dep. 36, 38). After this meeting, Simms emailed Ramsey, Finney, and the HRC that O'Connor was not going to resign or "self-select out," but was not asked why she would not "self-select out." (Lopez Dep. 110-11, Ex. 7 p. 1930-1931). Two days later, only a week after notifying Ramsey Solutions of her pregnancy, Simms and Lopez terminated O'Connor, informing her their morals did not align. (O'Connor Dep. 91-92, 94, 104, 257, 267; Lopez Dep. 171; Ramsey Dep. 38). The HRC relied on O'Connor's email notifying

Lopez of her pregnancy in its decision to terminate O'Connor for engaging in premarital sex, which violated its version of Judeo-Christian, biblically-based "Righteous Living." (Lopez Dep. 92, 112-13, 171, 175).

**Ramsey Solutions Terminates Employees Based on Its Religious Policy**

Ramsey Solutions has terminated all pregnant, unwed female employees **after** they notified Ramsey Solutions of their pregnancy. (Lopez Dep. 124; Sievertsen Dep. 27; Simms Dep. 12, 13). One employee was terminated after she notified her leader, Winston Cruze,[7] of her pregnancy and that the father was her boyfriend. (O'Connor Dep. 113-114; Lopez Dep. 178-179; Lopez 30(b)(6) Dep. 34-35, Ex. 25). The other employee was terminated when she informed Ramsey Solutions of her pregnancy the weekend after she got married. (Lopez 30(b)(6) Dep. 22-23, 42, Ex. 24 p. 902). A male employee was terminated after he notified his leader that his wife was pregnant and his leader calculated the date of conception, determining it was conceived prior to his marriage and his hire date. (O'Connor Dep. 212; Lopez 30(b)(6) Dep. 46-49; Finney Dep. 81-84, Ex. 18 pp. 671, 0677). A Ramsey Solutions employee reported seeing a female employee's boyfriend walking her dog in his boxers in the morning at her apartment building. (Lopez 30(b)(6) Dep. 20, Ex. 23). Ramsey Solutions assumed that she engaged in premarital sex and terminated her. (Lopez 30(b)(6) Dep. Ex. 23 p. 916). A male was terminated when it came to light that he was living with his fiancée at the direction of her pastor.[8] (Floyd Dep. Ex. 14 p. 861, 865, 1340-1341; Lopez 30(b)(6) Dep. 26-27, 29). Ramsey made it clear they would not change their Core Values based on the recommendation of a pastor in another state and that the employee should be fired on the spot if he would not answer questions about his personal life, stating, "If he slept with her [or] lives with

---

[7] Winston Cruze is Mr. Ramsey's son-in-law. (Lopez 30(b)(6) Dep. 35),
[8] Sievertsen testified that Ramsey Solutions had never had an employee refuse to disclose whether they engaged in pre-marital sex, which is not the case. (Sievertsen Dep. 35).

her or won't answer the question, fire him on the spot. We have let people go that were much more repentant and offended the policy less." (Lopez 30(b)(6) Dep. 30-31; Floyd Dep. 63, Ex. 14 p. 1326).

## II. SUMMARY JUDGMENT STANDARD

The court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party on a Rule 56 motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether the moving party has met its burden, the court must not make credibility determinations, the evidence of the nonmovant is to be believed, and court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III. ARGUMENT

### A. Ramsey Solutions Violated Title VII and the THRA

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "[F]ailing to accommodate the religious needs of an employee is [] a kind of religious discrimination." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 943 n.4 (6th Cir. 2024). "The heart of [a] failure-to-accommodate claim is that an employer discharges (or otherwise discriminates against) an employee for failing a job-related requirement

7

instead of abiding by its 'statutory obligation to make reasonable accommodation for the religious observances' of its employees." *Id.* at 944. Further, Title VII "preclude[s] employers from discriminating against an employee because . . . the employee fails to comply with the *employer's* religion." *Pedreira v. Kentucky Baptist Homes for Child., Inc.*, 579 F.3d 722, 727 (6th Cir. 2009); *see also Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (explaining, in the context of Title VII exemptions, that the scope of Title VII includes the decision to fire an employee whose conduct is inconsistent with the religious views of his employer); *Amos v. Lampo Grp.*, LLC, 2024 U.S. App. LEXIS 19821 at * 7-8 (6th Cir. Aug. 6, 2024).

### 1. Ramsey Solutions Discriminated Against O'Connor in Violation of Title VII and the THRA

There is ample evidence for a reasonable jury to conclude O'Connor was discriminated against in violation of Title VII's prohibition against religious discrimination. Ramsey argues that O'Connor did not have a sincerely held religious belief and urges the Court to adopt standard that only the Third Circuit adheres to, the "Africa test," but then "doubts…but concedes" that O'Connor had a sincerely held religious belief, (Doc. 109 p. 8-10). Ramsey then contends that O'Connor cannot establish element 4 of the easily met prima facie case under the *McDonnell Douglas* paradigm – that "the action occurred under circumstances that support an inference of discrimination" (*Id*. p. 10) or that she can demonstrate pretext (*Id*.). But in doing so, it encourages a rigid approach to what basis she can prove discrimination (*Id*. 18-21) and limits application of the so-called requirement to demonstrate pretext (*Id*. pp 10-11). Further, Ramsey separates its discrimination analysis from that of "religious non-conformity" when in fact, discrimination is discrimination, irrespective of the genesis and artificial hurdles that undermine Title VII. *See Ames*

*v. Ohio Dep't of Youth Serv*s., 145 S. Ct. 1540 \*; 221 L. Ed. 2d 929 \*\*; 2025 U.S. LEXIS 2198 \*\*\* (June 5, 2025).

Characterizing the claim as "religious non-conformity" merely recognizes that "lack of adherence to the religious beliefs promoted by the [employer] was the genesis of the discrimination" as opposed to the plaintiff's beliefs. *Amos v. Lampo Grp*., LLC, 2024 U.S. App. LEXIS 19821 at \* 7-8 (6th Cir. Aug. 6, 2024) (citing *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007)). To be sure, the bulk of Ramsey's argument is with the Sixth Circuit's opinion against it in *Amos*, going so far as to improperly urge the court to "disregard it." (Doc. 109 p. 21).

Apparently in an attempt to undermine the discrimination claim, Ramsey incorrectly characterizes a "non-conformity" claim in the same vein as a "reverse discrimination" claim and attempts to draw a parallel to *Ames*. (Doc. 109 p. 18). However, in doing so, it demonstrates a misunderstanding of the Supreme Court's analysis in *Ames*. In *Ames*, the Supreme Court cautioned against judicially created hurdles in proving discrimination when the Sixth Circuit had improperly imposed a "background requirement rule" in so-called majority or "reverse" discrimination cases. *Id*. at 1547. *Ames* does not argue against non-conformity or so-called reverse claims; it merely recognizes that such claims be treated the same as any other discrimination claim without extra barriers. *Id.* 1548.

Going a step further, consistent with the rule against creating hurdles in discrimination cases, the concurrence in *Ames* reminded that "litigants and lower courts are free to proceed without the *McDonnell Douglas* framework. This Court has never required anyone to use it." *Ames v. Ohio Dep't of Youth Serv*s., 145 S. Ct. at 1555. *See also*, *Hittle v. City of Stockton*, 604 U. S. --, 145 S. Ct. 759, 762, 221 L. Ed. 2d 425, 428 (2025)(dissent Thomas, J.) (slip op., at 3)("satisfying *McDonnell Douglas* is not the only way or even the best way to prove a claim"); *Provenzano* v.

*LCI Holdings, Inc.*, 663 F. 3d 806, 813 (6th Cir. 2011) (arguing that *McDonnell Douglas* "often fails to fulfill its purpose" and that this failure "is particularly pronounced in the context of summary judgment"). Where discriminatory motivations in the employment context are at issue, summary judgment should be denied. *See Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004) (noting "that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain . . . thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage . . . ."). Thus, the central holding in *Ames* is to make all discrimination claims on par. To this point, this case is one where rigid application of the *McDonnell/Douglas* burden shifting is unnecessary because there is direct evidence of discrimination. For the most part, the facts are not in dispute; Ramsey admits it terminated Ms. O'Connor because she informed them that she was pregnant and was not married. (Doc. 109, p. 11). Moreover, there are facts that a reasonable jury could find demonstrate that Ramsey's motivation was discriminatory and thus, there is no need to set a higher burden for "non-conformity" based claims because at its root, the decision was still born from a discriminatory motive.

Finally, Ramsey wrongly contends the Free Exercise clause protects it from a non-conformity claim. (Doc. 109 p. 21). This assertion has also been rejected by the Sixth Circuit. "Constitutional guarantees conventionally apply only to entities that exercise sovereign power, such as federal, state, or local governments, and, in some other instances, tribal governments. Smucker's may be a big company. But it is not a sovereign." *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 279 (6th Cir. 2023). Moreover, even though Smucker's sold products to the federal government, sovereignty still was not established for purposes of a free exercise claim. *Id.* Similarly, irrespective of what Ramsey thinks of itself, it is not an entity that exercises sovereign power.

The following demonstrates that a reasonable jury could find that Ms. O'Connor's pregnancy and her refusal to adhere to Ramsey's narrow view of Christianity as covered by its "righteous living" core value, but rather her own view of Christianity, was the motivating factor in Ms. O'Connor's termination:

- The CEO and founder, Dave Ramsey, has never had Title VII training. (Ramsey Dep. 6, 20).

- Ramsey requires its employees to sign employment agreements that say they are going to live their life "in accordance with that value system," in other words, Ramsey Solutions' evangelical, normative Christian beliefs. (Ramsey Dep. 11, 24). Its Handbook states that the company is held out to be a Christian company adhering to "traditional Judeo-Christian values." (Ramsey Dep. 26, 28; Galloway 30(b)(6) Dep. Ex. 20(Doc. 67-6)). Employees are required to have the same Christian values as Dave Ramsey and Ramsey Solutions. (Ramsey Dep. 27). Ramsey Solutions requires its employees to agree to "Core Values" that include a "righteous living" core value based on Biblical principles. (Galloway Dep. 8, 11-12, 14; Ex. 20).

- The normative Christian beliefs that Ramsey adheres to includes the belief that "having sex outside of marriage is not a righteous act." (Ramsey Dep. 13, 42; Galloway 14-16).

- Ramsey's policies do not explicitly prohibit premarital sex, but it is part of the Righteous Living core value and the "whole organization" accepts that premarital sex would be a violation and an employee will be terminated for a violation. (Ramsey Dep. 12, 24, 41; Galloway Dep. 14-15; Lopez 30(b)(6) Dep. 17, 63-64).

- The decision to terminate O'Connor was made within hours of her notification to Ramsey Solutions that she was pregnant and before any member of the Operating Board spoke to her. (Lopez Dep. 97-98, 100, Ex. 5 p. 0083; Sievertsen Dep. 43; Floyd Dep. 46).

- A week after notifying Ramsey Solutions of her pregnancy, Simms and Lopez terminated O'Connor, informing her their morals did not align. (O'Connor Dep. 91-92, 94, 104, 257, 267; Lopez Dep. 171; Ramsey Dep. 38).

- After Caitlin O'Connor notified Ramsey Solutions of her pregnancy, Dave Ramsey responded that it was "so sad" because she was going to lose her job and she had a baby coming, but he contends "she knew" she was in violation of her employment agreement. (Ramsey Dep. 49-50; Lopez Dep. Ex. 6 p. 2170). Ramsey believed letting her keep her job would not be the right thing to do. (Ramsey Dep. 52).

- Dave Ramsey communicated to upper management that Caitlin O'Connor's pregnancy was "obviously contrary to our values." (Ramsey Dep. 55-56; Lopez Dep. Ex. 7).

- When Ramsey finds out an employee had engaged in premarital sex, it always leads to termination. (Ramsey Dep. 14; Galloway Dep. 26).

- Defendant made an exception for an extra-marital affair of a male employee because it was removed in time, even though he was an employee when it occurred. (Finney Dep. 41, 73-78, 112; Galloway 30(b)(6) Dep. 23, 26).

- Unwed mothers were not afforded second chances or "restoration plans;" every single unwed mother has been terminated. (Lopez Dep. 124, 171; Lopez 30(b)(6) Dep. 64; Sievertsen Dep. 27, 53; Simms Dep. 12-13, 31, 33; Ramsey Dep. 21-22).

- Defendant acknowledged that a male employee could hide a pregnancy out of wedlock easier than a female employee, due to pregnancy being a visible condition. (Lopez Dep. 83, 173; Sievertsen Dep. 37; Galloway Dep. 35; Ramsey Dep. 42).

- Not one single upper management employee of Defendant could cite to a Biblical basis for the core value that they based O'Connor's termination on, which undermines any legitimacy of the proscription against pre-marital sex. (Lopez Dep. 59; Ramsey Dep. 14; Galloway Dep. 19; Seivertsen Dep. 21; Floyd Dep. 35; Simms Dep. 26).

- There is no written policy detailing behaviors that violate "Righteous Living," including its prohibition on sex outside of marriage. (Lopez Dep. 66, 91, Ex. 3 p. 0028; Sievertsen Dep. 14, 38; Floyd Dep. 42; Finney Dep. 25, 35, 39; Ramsey Dep. 12, 24).

- The policing of sexual morality through moral codes of conduct "disproportionately impacts women" and reinforces patriarchal authority. (Ingersoll Report, MSJ Opp. Ex. 2 p. 2, 6).

As encouraged in *Ames* and *Hittle*, this case is not appropriate for the strict burden shifting and narrow pretext inquiry from the bench trial standard articulated in *McDonnell Douglas*. *Ames v. Ohio Dep't of Youth Serv*s., 145 S. Ct. at 1546. Ramsey imposes a narrow-minded view of Christianity on its employees through its righteous living core value. (Ramsey Dep. 26-28; Galloway 30(b)(6) Dep. 8, 11-12, 14, Ex. 20 (Doc. 67-6)). This imposition has nothing to do with Ms. O'Connor's job performance. She was terminated solely for not having the same religious belief system as the decisionmakers at Ramsey. (Lopez Dep. 92, 97-98, 100, 112-113, 171, 175, Ex. 5 p. 0083, Ex. 7; Sievertsen Dep. 43; Floyd Dep. 46; Ramsey Dep. 38, 55-56; O'Connor Dep.

13

91-92, 94, 104, 257, 267). See Armour Report, MSJ Opp. Ex. 1 p. 7. Ms. O'Connor was terminated because her religious beliefs run contrary to the religious beliefs dictated by Ramsey. *See Amos v. Lampo Grp*., LLC, 2024 U.S. App. LEXIS 19821 at *6.

**B. Ramsey Solutions Refused to Accommodate O'Connor's request for Religious Accommodation in Violation of Title VII and the THRA**

Contrary to Ramsey's assertion that knowledge of Ms. O'Connor's sincere beliefs is required, §2000e-2(a)(1) does not impose a knowledge requirement… some antidiscrimination statutes do. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2032. 33 ("A request for accommodation, or the employer's certainty that the practice exists, may make it easier to infer motive, but is not a necessary condition of liability"). *C.f.* Doc. 109 p. 12. To demonstrate failure to accommodate, Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . [the] religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). "The heart of the failure-to-accommodate claim is that an employer discharges (or otherwise discriminates against) an employee for failing a job-related requirement instead of abiding by its 'statutory obligation to make reasonable accommodation for the religious observances' of its employees." *Savel v. MetroHealth Sys*., 96 F.4th 932, 944-45 (6th Cir. 2024) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977)). Claims that allege a failure to accommodate "necessarily involve direct evidence." *Kleiber*, 485 F.3d at 868. *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013) (direct evidence "does not require the fact finder to draw any inferences 'that the disability was at least a motivating factor'"). Here, Ms. O'Connor was requesting accommodation from imposition of Ramsey's religious beliefs that she was not permitted to have a baby unless she was wed. (Lopez Dep. Ex. 8). She was requesting to keep her job and have her baby. Ms. O'Connor

believed she could get pregnant and have her baby regardless of marital contract. (Doc. 67-8 p. 5, Plaintiff's Responses to Interrogatories).

Ramsey also contends that "even if [it] had been aware…[her beliefs] do not conflict with its prohibition against premarital sex." (Doc. 109 p. 12). Then, it goes on to claim that Ms. O'Connor pre-marital sex was merely a personal preference." *Id.* p. 13. Again, as previously explained, Ms. O'Connor's "preference," whether religious or not, would not be at issue but for Ramsey's imposition of its view of religion on her. Ms. O'Connor does not believe her faith requires her to be married to have a baby. (O'Connor Dep. 262). Ramsey does have such a religious belief and punishes employees who believe differently. A reasonable jury will likely find this is a violation of Title VII.

### 1. Ramsey is Unable to Establish Undue Hardship

It is Ramsey's burden to demonstrate that the accommodation would impose a substantial" burden "in the context of [the] employer's business." *Groff v. DeJoy*, 600 U.S. 447, 471, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023); *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 845 (6th Cir. 2024).

The Sixth Circuit has stated it is not enough for the employer to show that an "accommodation would be bothersome to administer or disruptive of the operating routine;" an employer must present evidence to establish otherwise "speculative" or "hypothetical hardships" that could result from accommodations never attempted. *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), *cert. denied,* 485 U.S. 989, 108 S. Ct. 1293, 99 L. Ed. 2d 503 (1988). Moreover, where an employer fails to attempt accommodation, any argument as to undue hardship fails as a matter of law. *Arlington Transit Mix, Inc.,* 957. Here, Ramsey did not even attempt to

15

Case 3:20-cv-00628   Document 113   Filed 07/29/25   Page 15 of 19 PageID #: 6062

accommodate Ms. O'Connor's religious belief and instead immediately made the decision to terminate her, so any argument as to undue hardship cannot be considered.

### 2. The Establishment Clause Does Not Apply

Despite acknowledging the Establishment Clause "furor" died with the 1977 Supreme Court case of *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 97 S. Ct. 2264, 53 L. Ed. 2d 113, Ramsey complains that the Supreme Court's more recent opinion in *Groff v. DeJoy*, 600 U.S. 447, 471 (2023) did not address the Establishment Clause again (likely for good reason). (Doc. 109 p. 15). Taking a step further, Ramsey then grumbles that Plaintiff is prohibited from "invoking the machinery of federal statutory law to privilege her or anyone else's sincerely held beliefs over those of Defendant" and then goes on to speculate she "understands this is wrong." (Doc. 109 p. 16 n.7). This screed is nonsensical and untethered to any relevant facts or legal argument, thus no real response can be made since Ramsey's gripe is with Congress who made laws prohibiting companies like Ramsey from imposing a religion on its employees.

### 3. RFRA is Inapplicable

Likewise, Ramsey acknowledges that the Sixth Circuit does not apply RFRA in this sort of circumstance but then rants about the EEOC and "awesome machinery" of the federal government to "preserve" the issue. Nonetheless, there was no factual application and thus, this is a legal non-issue and no substantive response is required. (Doc. 109 p. 16). *See EEOC v. R.G.*, 884 F.3d 560, 584 (6th Cir. 2018) (Congress intended RFRA to apply only to suits in which the government is a party).

### C. Ramsey Solutions Retaliated Against O'Connor in Violation of Title VII and THRA

"To come within the protection of Title VII, [a plaintiff] must establish that [s]he challenged an employment practice that [s]he reasonably believed was unlawful." *Yazdian v.*

16

*ConMed Endoscopic Techs., Inc*, 795 F.3d 634, 645 (6th Cir. 2015). Defendant contends Plaintiff did not engage in protected conduct and that she cannot establish "a prima facie case" or pretext. (Doc. 109 p. 23). In doing so, Ramsey appears to focus on Ms. O'Connor's protected activity, yet it ignores the evidence. In doing so, it fails to meet its burden pursuant to Rule 56.

O'Connor first opposed Ramsey's discriminatory practice toward people who engage in premarital sex in her email, when she disputed the policy that "frowned upon" her pregnancy. (Lopez Dep. Ex. 5, p. 0106). Thereafter, she engaged in multiple discussions with HRC members regarding her pregnancy and desire to work, including that she was not going to "self-select out."[9] (Lopez Dep. Ex. 7 p. 1930-31, Ex. 9). This was protected conduct, and it satisfies her easily met *prima facie* burden. For the same reasons articulated *supra*, pretext is likewise established. Moreover, a reasonable jury could find that the comment that O'Connor refused to "self-select out" but she "knows what's gonna happen" indicates retaliatory intent. (Lopez Dep. Ex. 7 p. 1930). Thus, Defendant's motion should be denied with respect to O'Connor's retaliation claims.

## IV. CONCLUSION

O'Connor has demonstrated that a reasonable jury could find that she was discriminated and retaliated against in violation of her rights under Title VII and the THRA. As such, O'Connor requests the Court deny Defendant's motion.

Respectfully submitted,

*/s/ Heather Moore Collins*
Heather Moore Collins BPR # 026099
Ashley Shoemaker Walter BPR #037651

---

[9] A prima facie case of retaliation: (1) she engaged in protected conduct; (2) the exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Harrison v. Metropolitan Gov't,* 80 F.3d 1107, 1118 (6th Cir. 1996). *Accord Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ("the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic'"). At the *prima facie* stage, O'Connor is not required to prove her underlying case of discrimination or allege specific facts pertaining to discriminatory statements. *See White v. Burlington Northern & Santa Fe Ry.,* 364 F.3d at 64, 67.

HMC Civil Rights Law, PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@hmccivilrights.com
ashley@hmccivilrights.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been e-mailed on July 29, 2025 to counsel of record through the court's CM/ECF system:

Leslie Goff Sanders
Daniel Crowell
Barton LLP
611 Commerce Street
Suite 2911
Nashville, TN 37203
lsanders@bartonesq.com
dcrowell@bartonesq.com

*/s/ Heather Moore Collins*
Heather Moore Collins